1  NOAH ZINNER (SBN 247581)
   nzinner@heraca.org
2  HOUSING & ECONOMIC RIGHTS
   ADVOCATES
3  1814 Franklin Street, Suite 1040
   Oakland, CA 94612
4  Tel.: (510) 271-8443
   Fax: (510) 868-4521
5
6  EILEEN M. CONNOR (SBN 248856)
   econnor@law.harvard.edu
7  LEGAL SERVICES CENTER OF
   HARVARD LAW SCHOOL
8  122 Boylston Street
   Jamaica Plain, MA 02130
9  Tel.: (617) 390-3003
   Fax: (617) 522-0715
10
11 Attorneys for Plaintiffs

12                    **UNITED STATES DISTRICT COURT**
                   **NORTHERN DISTRICT OF CALIFORNIA**
13

14

15  MARTIN CALVILLO MANRIQUEZ, JAMAL      Case No.: 17-7210
    CORNELIUS, and RTHWAN DOBASHI, on
16  behalf of themselves and all others similarly   **CLASS ACTION COMPLAINT FOR**
    situated,                             **DECLARATORY AND INJUNCTIVE**
17                                         **RELIEF**
               *Plaintiffs*,
18                                         (Class Action)
19         v.                              (Administrative Procedure Act Case)

20  ELISABETH DEVOS, in her official
    capacity as Secretary of the United States
21  Department of Education,

22  And
23
    THE UNITED STATES DEPARTMENT OF
24  EDUCATION,

25             *Defendants*.

26

27

28
                                1
   _____
                          CLASS ACTION COMPLAINT
              FOR DECLARATORY AND INJUNCTIVE RELIEF

## **PRELMINARY STATEMENT**

1.     Named Plaintiffs Martin Calvillo Manriquez, Jamal Cornelius, and Rthwan Dobashi borrowed federal student loans in order to attend career training programs at schools operated by Corinthian Colleges, Inc. ("Corinthian" or "CCI"). They were misled and mistreated by Corinthian, which held itself out as offering quality vocational training programs that consistently placed graduates in desired jobs. In reality, Corinthian's schools were a sham, propped up by a series of lies. Its marketing campaigns targeted people who were in urgent need of employment. Like so many of their classmates, Named Plaintiffs incurred substantial debt to attend a Corinthian program that wasted their time and provided no value.

2.     Each of the Named Plaintiffs has submitted an application for loan discharge to the Defendants, Elisabeth DeVos, Secretary of the United States Department of Education, and the Department of Education. In recognition of substantial evidence of Corinthian's illegal conduct and falsification of job placement rate data it widely published, the Department determined that Named Plaintiffs and others who attended specified Corinthian programs during specified time periods are entitled to have their federal student loans discharged. The Department created a short, simple attestation form for students to use to apply for and receive a discharge.

3.     Prior to January 20, 2017, the Department granted full discharges to nearly 25,000 former Corinthian students who submitted this attestation form. Since January 20, 2017, the Department has not granted a single discharge. It has halted the processing of the applications of Named Plaintiffs and other students who are eligible for loan relief. In so doing, it has abandoned an established rule, and left over 80,000 former Corinthian students who have applied for loan discharge in limbo. The Department does not have the discretion to take these actions in light of its well-publicized prior determination that Named Plaintiffs, and tens of thousands of other individuals victimized by the predatory Corinthian Colleges, are entitled to loan discharge upon submission of a simple attestation form.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

4.      Named Plaintiffs bring this lawsuit under the Administrative Procedure Act on behalf of themselves and all other individuals who attended Corinthian Colleges programs that the Department determined Corinthian cheated and lied to students by, among other things, falsifying job placement rates, who have applied or will apply for loan discharge on that basis. They ask the Court to declare that the Department's delay in processing their claims is unreasonable and that the Department has unlawfully withheld the benefits of its rule. They further ask the Court to mandate that the Department continue to implement its prior rule with respect to the class, and declare that the Department may not retroactively apply a different rule to Named Plaintiffs and other members of the proposed class.  In short, they ask this Court to require the Department to make good on its word.

## JURISDICTION AND VENUE

5.      This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the Higher Education Act and its amendments, 20 U.S.C. § 1001, *et seq.* This Court has jurisdiction over this case as it arises under federal law. 28 U.S.C. § 1331.

6.      This Court is authorized to grant the relief requested in this case pursuant to the APA, 5 U.S.C. § 706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the Mandamus Act, 28 U.S.C. § 1361; the Higher Education Act, 20 U.S.C. § 1082; and Federal Rule of Civil Procedure 23.

7.      Venue is proper in this judicial district because Named Plaintiffs reside in this district, and because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. §§ 1391(b)(2), 1391(e)(1).

## INTRADISTRICT ASSIGNMENT

8.      Assignment to the San Francisco/Oakland Division is appropriate because a substantial part of the events or omissions which give rise to Plaintiffs' claims occurred in this district.  *See* Local Rule 3-2(c). The Corinthian campuses that Named Plaintiffs attended and incurred the federal student loan debt at issue in this case were located in this district and two of

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

the Named Plaintiffs currently reside in the district and have done so throughout the time period at issue in this action.

## PARTIES

9.      Plaintiff Martin Calvillo Manriquez is a resident of Oakland, located in Alameda County California.

10.     Plaintiff Jamal Cornelius is a resident of Hercules, located in Contra Costa County, California.

11.     Plaintiff Rthwan Dobashi is a resident of San Jose, located in Santa Clara County, California.

12.     Defendant Elisabeth DeVos is the Secretary of Education and charged with the supervision and management of all decisions and actions of the United States Department of Education.  Plaintiffs sue Secretary DeVos in her official capacity.[1]

13.     Defendant United States Department of Education is an agency of the United States within the meaning of the APA, 5 U.S.C. § 701(b)(1).  It is responsible for overseeing and implementing rules for federal student aid program.

## ALLEGATIONS COMMON TO THE CLASS

*Statutory and Regulatory Framerwork of "Borrower Defense"*

14.     The Higher Education Act of 1965 and its amendments ("HEA") authorize the federal student financial aid program, often referred to as "Title IV." 20 U.S.C. § 1070, *et seq.*

15.     The Department is responsible for overseeing and implementing rules for Title IV of the Higher Education Act, as amended, including the William D. Ford Direct Loan Program, 20 U.S.C. § 1087a, *et seq.*

16.     The Department administers various Title IV programs, including the William D. Ford Federal Direct Loan Program, 20 U.S.C. §§ 1087a-1087j.

---

[1] Plaintiffs allege that Secretary DeVos is responsible by statute for all official actions and activities of the Department.  As such, all allegations in this Complaint against Defendant U.S. Department of Education are made equally against Defendant DeVos.

4

17.     Under the Direct Loan Program, the Department directly lends money to eligible student borrowers for use at "participating institutions of higher education" as approved by the Department.

18.     All institutions approved by the Department to participate in Title IV programs enter into a Program Participation Agreement with the Department.

19.     The purpose of the Direct Loan Program is "to assist in making available the benefits of postsecondary education to eligible students[.]" 20 U.S.C. § 1070(a).

20.     The Direct Loan Program, like other Title IV programs, is an important source of financing for individuals who otherwise would not be able to afford higher education and could not meet underwriting standards of private lenders.

21.     In 1993, Congress altered the terms and conditions of Direct Loans to allow for student loan borrowers to seek cancellation of their loans on the basis of school misconduct.  103 P.L. 66, 107 Stat. 312 (amending Section 455(h) of the HEA). The statute directs that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part[.]" 20 U.S.C. § 1087e(h). Pursuant to this directive, the Secretary promulgated a regulation that permits a Direct Loan borrower to assert, as a defense to repayment, "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1). This regulation became effective July 1, 1995.

22.     Since that time, all Direct Loans have been issued pursuant to a Master Promissory Note that informs borrowers that he or she "may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done," provided that "the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law."

23.     A borrower defense relieves the borrower "of the obligation to repay all or part of the loan and associated costs and fees." 34 C.F.R. § 685.206(c)(2).  The Secretary is empowered

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

to provide "further relief," which may include, without limitation, "[r]eimbursing the borrower for amounts paid toward the loan voluntarily or through enforced collection," "[d]etermining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act," and "[u]pdating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan." *Id.*

24.     The 1995 borrower defense regulation governs the loans at issue in this action, consistent with the terms of those notes.

***Corinthian's Serious and Repeated Misconduct as Basis for Loan Discharge***

25.     Corinthian Colleges, Inc. was a large for-profit college chain headquartered in California.  It stands as a powerful and notorious example of a predatory for-profit college that cheated students and wasted taxpayer money.

26.     A 2012 report of the United States Senate's Health, Education, Labor and Pensions ("HELP") Committtee, entitled "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success," as well as other studies regarding for-profit colleges, have documented abusive practices by for-profit schools that include, but are not limited to:

     a.   Improperly attracting students by touting inflated graduation or employment statistics, which convey an inaccurate and misleading impression of the value of the program;

     b.   Employing high-pressure sales tactics to pressure students into enrolling;

     c.   Providing incomplete, inaccurate, or false information about program cost and financial aid;

     d.   Falsely representing that credits earned at their institution will be transferrable to other education institutions;

     e.   Misrepresenting that programs will enable completers to sit for professional licensure exams or other exams that are legal or *de facto* requirements for employment in the student's field of study; and

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

f.   Saddling students with debt without providing advertised career training.

27.     Corinthian committed the misconduct identified by the HELP Committee Report, and more.

28.     Corinthian operated schools across the country and online under the brands Everest, Heald, and WyoTech. It offered primarily certificate and associate degree programs that purported to provide training in a variety of vocations, including health care, business, criminal justice, transportation technology and maintenance, construction trades, and information technology.

29.     During its peak year of 2009-10, Corinthian operated over 100 campuses in 25 states, enrolled over 110,000 students, and collected $1.7 billion in federal student aid. Over $500 million of this was in Pell Grants, a form of federal student aid for economically disadvantaged students.

30.     The 2012 Senate HELP Report found that Corinthian's programs were among the highest-cost of the for-profit programs examined, and that withdrawal and default rates of Corinthian students were among the highest in the for-profit sector.

31.     In two examples cited by the HELP Report, a Medical Assistant diploma at Corinthian's Heald College in Fresno, California cost $22,275. A comparable program at Fresno City College cost $1,650.  An associate degree in paralegal studies at Everest College in Ontario, California cost $41,149, compared to $2,392 for the same degree offered at Santa Ana College.

32.     As of 2014, the population of students enrolled in Corinthian schools nationwide was 42 percent white, 35 percent African American, and 18 percent Latino.  Over 70 percent of all students at Corinthian schools were female.

33.     In the decade prior to its collapse, the attorneys general of twenty-three states launched investigations of and/or issued subpoenas to Corinthian concerning its predatory and deceptive recruiting and financial aid practices and their potential violation of state consumer protection laws.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

34.     These investigations demonstrated that Corinthian relentlessly pursued potential students—including veterans, immigrants, people of color, single parents, and first-generation college students—promising jobs and high earnings that its degrees simply did not come close to providing.  In one two-week period in 2014, Corinthian spent over $600,000 to purchase advertisements for its schools on Black Entertainment Television ("BET").

35.     Internal Corinthian documents describe a marketing strategy geared toward prospective students who were "isolated," "impatient," had "low self-esteem," "few people in their lives who care about them," were "stuck," and "unable to see and plan well for the future."

36.     In 2007, the Attorney General of California sued Corinthian for a "persistent pattern of unlawful conduct" in the operation of its schools in California, including the promotion of falsely inflated job placement statistics and the use of other untrue and misleading statements to induce students to enroll in Corinthian schools.  The case was concluded by stipulated judgment that same year. The judgment prevented Corinthian from enrolling new students in specific programs, cancelled student debt owed directly to the school, and ordered further injunctive relief related to calculation of job placement rates.

37.     The Attorney General of California again sued Corinthian in 2013 for violating California law by misrepresenting job placement rates to students, using misleading advertising, and making misrepresentations to students in order to enroll them in Corinthian programs. Following submission of proof by the California Attorney General, the court entered a default judgment against Corinthian in 2016, making multiple well-documented findings of fact that Corinthian committed systemic fraud and misrepresentation. These findings of fact included, but were not limited to:

a.   That Corinthian systematically and fraudulently induced students to enroll through "untrue and/or misleading" respresentations about their likely employment outcomes; and

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

b.   That Corinthian issued misleading "standardized disclosures for each campus related to job placement," which were published online and given to each student in the enrollment process.

38.   Also in 2013, the Massachusetts Attorney General filed suit against Corinthian for violations of Massachusetts consumer protection law, alleging that the company misrepresented the need to enroll immediately in Corinthian schools, the school's influence and historical success in placing students in jobs, the earnings of graduates, the placement assistance provided by the school, the nature and quality of the programs offered, the transferability of credits earned at the school, the training opportunities available in school-arranged externships, and the nature and availability of financial aid.

39.   The Massachusetts Attorney General's extensive investigation of Corinthian "uncovered a program built on predation and lies," amounting to "an unrelenting scheme to secure unaffordable federal loans from vulnerable students, without providing the education, services, or opportunities promised" and "a pervasive violation of Massachusetts law."

40.   In granting summary judgment against Corinthian and for Massachusetts, the court found Corinthian liable for violating the Massachusetts Consumer Protection Act, and ordered Corinthian to pay restitution representing refunds of all costs paid by all graduates of all programs offered between July 1, 2007 and June 30, 2014.

41.   The Attorney General of Wisconsin sued Corinthian in October 2014, on the grounds that the company used deceptive marketing to lure students into its Everest Institute campus located in that state.  The Attorney General of Wisconsin's investigation showed that whereas Corinthian advertised a job placement rate of 90% and higher for its programs, some of its programs had job placement rates as low as 5%, and none as high as advertised.

42.   In 2014, the Consumer Financial Protection Bureau sued Corinthian, alleging that for years, the school had induced prospective students to enroll through false and misleading representations about its graduates' career opportunities and likelihood of obtaining jobs upon graduation, using falsely inflated job placement statistics, among other things.  In 2015, the court

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

entered a default judgment against Corinthian, which included numerous findings that Corinthian engaged in unfair and deceptive acts on a widespread basis.

43.     The Department began its investigation of Corinthian's reported placement rates in January 2013.

44.     In January 2014, the Department requested data from Corinthian to verify its reported placement rates for every Corinthian location, for the calendar years 2010, 2011, 2012, and (when available) 2013, including a list of all students either placed or omitted from the placement calculation.

45.     Receiving no response, in June 2014 the Department of Education placed Corinthian schools on "Heightened Cash Monitoring," requiring Corinthian to wait 21 days after submitting requests to draw down federal student aid funds.

46.     In March 2015, the Department ordered Corinthian to post a letter of credit as a condition of continued participation in federal student aid programs.

47.     In April 2015, the Department fined Corinthian approximately $30 million for violating the Department's prohibition on "substantial misrepresentation," 34 C.F.R. Part 668, subpart F, by publishing falsely inflated job placement rates in 947 separate programs at its Heald College locations. The Department explained that it:

> determined that Heald College's inaccurate or incomplete disclosures were misleading to students; that they overstated the employment prospects of graduates of Heald's programs; and that current and prospective students of Heald could have relied upon that information as they were choosing whether to attend the school. Heald College provided the Department and its accreditors this inaccurate information as well.

48.     In addition, the Department found that Heald paid temporary agencies to hire its graduates to work temp jobs on its own campuses for positions as short as two days, performing tasks such as moving computers and organizing cables, and counted those graduates as placed in their field of study.  One Heald location classified a 2011 graduate of an accounting program as employed in the field on the basis of a food service job she started at Taco Bell years prior to

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

enrolling. Another campus counted a graduate of its business administration program as "placed in the field" based upon a seasonal clerk position she held prior to her graduation.

49.     Later that month, on April 27, 2015, Corinthian announced the closure of all of its remaining school locations.

50.     In May 2015, Corinthian filed for bankruptcy under Chapter 11.

***The Department's "Corinthian Job Placement Rate Rule"***

51.     When Corinthian closed abruptly after years of documented illegal conduct, those who borrowed federal student loans to attend a Corinthian program began to assert, in unprecedented numbers, their right to loan cancellation under the Department's borrower defense regulations and the terms of their loan notes.

52.     The Department created a special process for former Corinthian students to submit a borrower defense claim, and formulated a rule to govern the adjudication of these claims.

53.     Because Corinthian schools consistently misrepresented job placement rates of its programs in a manner that would give rise to a cause of action under state law—a borrower defense—the Department's rule focuses on this type of misconduct.

54.     The rule (referred to herein as "Corinthian Job Placement Rate Rule") consists of several interrelated determinations made by the Department:

      a.  First, the law that is "applicable" to the borrower defense claims submitted by Corinthian borrowers, wherever they attended, is California law;

      b.  Second, evidence establishes that Corinthian misrepresented job placement rates at specified campuses, respecting specified programs, during specified periods of time ("findings cohorts");

      c.  Third, any Corinthian borrower who submits a simple attestation form provided by the Department, or otherwise submits information sufficient to establish membership in a findings cohort has established a borrower defense; and

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

     d.    Fourth, the relief available to Corinthian borrowers who establish that they are members of a findings cohort is full cancellation of outstanding amounts on related loans and return of any money collected by the Department on those loans, as a matter of California law.

55.    On information and belief, the legal basis for the Corinthian Job Placement Rate Rule is codified in legal memoranda written, approved, and relied upon by the Department, including, without limitation, a May 2015 memorandum prepared by the Department's Office of General Counsel ("OGC"), a fine action letter prepared by Federal Student Aid's Administrative Actions & Appeals Service Group, and an April 2015 document prepared by Federal Student Aid ("FSA")'s Administrative Actions & Appeals Service Group.

56.    The existence and specifics of the Corinthian Job Placement Rate Rule are clear from multiple public statements of the Department.

57.    For example, a report released on September 3, 2015, by Joseph A. Smith, Jr., the Department-appointed Special Master for Borrower Defense ("Special Master"), explains that

> [b]ecause Heald was headquartered in and managed from California, the Department looked to California law and determined that Heald's misrepresentation of placement rates constituted prohibited unfair competition under California's Unfair Competition Law (UCL). Accordingly, students that relied on such misleading placement rates when they enrolled at Heald would have a cause of action under state law.

58.    The Department publicly announced the cohorts of borrowers covered by the Corinthian Job Placement Rate Rule in three stages.

59.    In June 2015, the Department announced that it had "determined that evidence of misrepresentation exists for students enrolled in a large majority of programs offered at Heald College campuses between 2010 and 2015."

60.    In November 2015, the Department announced findings of job placement rate misrepresentation at specific programs, during specific periods, offered at 20 Everest and WyoTech campuses and online programs.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

61.     In March 2016, the Department announced findings of job placement rate misrepresentation at specific programs, during specific periods, offered at an additional 71 Everest and WyoTech campuses.

62.     These findings are publicly available on the Department's website and attached hereto as Exhibit A (Heald findings) and Exhibit B (Everest and WyoTech findings).

63.     The Department also makes available to the public on its website two simple forms for the purpose of establishing the applicability of the Corinthian Job Placement Rate Rule to individual borrowers, attached hereto as Exhibit C (Heald Attestation Form) and Exhibit D (Everest and WyoTech Attestation Form).

64.     As explained by the Department to the Office of Management and Budget ("OMB"):

> Student borrowers who attended the Heald College programs that the Department has found made false representations will have their loans discharged if they complete the attached attestation. These borrowers need not prove that Heald College's actions violated State law as the Department's findings show a State law violation.

65.     The Department reiterated that submission of the attestation was sufficient for a borrower to "confirm elibigilty for the borrower defense against repayment" under its Corinthian Job Placement Rate Rule when it later sought authorization from OMB to continue its emergency data collection from Corinthian borrowers, in order to allow

> [s]tudent borrowers who attended the Heald College programs that the Department has found made misrepresentations to have their loans discharged if they complete the attached attestation.  These borrowers need not prove that Heald College's actions violated State law as the Department's findings show a State law violation.

66.     The Corinthian Job Placement Rate Rule was further affirmed with respect to Heald borrowers in a December 2015 report by the Special Master, describing:

> the Department's determination, after consultation with the Office of the California Attorney General, that students who relied upon false or misleading placement rate disclosures in enrolling in Heald College programs would have established a BD claim *as to which relief would be granted under California law*.  The Heald Attestation Form provided by ED to student borrowers incorporated each of these elements of a claim as to which relief could be granted.

13

(emphasis added).

67.     Thus, the attestation form allowed the Department to determine "whether [the borrower] met the elements for relief," under the Corinthian Job Placement Rate Rule, "namely whether they were enrolled in the covered programs for the time periods for which the Department found that Heald College had misrepresented job placement rates."

68.     The Heald attestation form is four pages long.  The first page contains the following statement:

> The Department of Education has found that at various times between 2010 and 2014, Heald College published misleading job placement rates for many of its programs of study. This form is designed to expedite the process of obtaining loan forgiveness based on borrower defense to repayment for loans taken out by Heald College students to enroll in these programs.  This form covers federal Direct Loans received on or after July 1, 2010.  A list of covered programs and dates of enrollment is available at https://studentaid.gov/sa/sites/default/files/heald-findings.pdf. Please fill out this attestation ONLY IF your programs and dates of enrollment are included on this list.

69.     The form contains five sections: Section I, Borrower Information; Section II, Program Information; Section III, Other Information; Section IV, Direct Loan Forbearance; and Section V, Certification.

70.     Section II prompts the borrower to select, from a predetermined list, the Heald campus and program that she attended, and the credential associated with that program.  The form asks the borrower to supply her enrollment start and end date.

71.     Section II also asks the borrower to indicate, by checking a box, that they received information about job placement rates related to their program of study prior to enrolling. It further contains the statement:

> I believed that the job placement rates related to my program of study indicated the level of quality a Heald education offered to stduents. I chose to enroll at Heald based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

72. The form allows but does not require the borrower to include "document(s) with additional information to confirm that I was enrolled in the program of study at Heald College that I identified above, and was enrolled for the dates I provided above."

73. Section III allows the borrower to "provide or attach any other information about your experience at Heald College that you believe is relevant: (2,000 characters max)."

74. Section IV asks the borrower to indicate whether they wish their federal loans to be placed into forbearance and for collection on any federal loans in default to stop while the borrower defense claim is reviewed by the Department.

75. Section V asks the borrower to sign and date an attestation of truthfulness, subject to the penalties set forth in 18 U.S.C. § 1001.

76. The attestation form for Everest and WyoTech borrowers is identical in all material respects to the Heald attestation form.

***The Department's Application of the Corinthian Job Placement Rate Rule***

77. From its inception until January 20, 2017, the Department consistently applied the Corinthian Job Placement Rate Rule to grant borrower defense relief to individuals who attended the specified programs during the periods of time identified by the Department.

78. The Corinthian Job Placement Rate Rule took effect as early as June 2015, when the Department sought and received emergency clearance from OMB to take certain actions with respect to Corinthian borrowers.

79. Whereas the Department had received only 5 claims for borrower defense in the previous 20 years, "[o]ver the last several months, the Department has received over 1,000 such claims due to a building debt activism movement as well as the notoriety of Corinthian's collapse, creating a need for a clearer process for potential claimants."

80. The Department recognized that "borrowers have a right to assert a defense to repayment claim," and in light of the fact "that the Department has made findings against a number of CCI's former programs," the Department "has a legal responsibility to timely

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

provide" relief by "set[ting] up a process to review and adjudicate" the claims of former Corinthian students.

81.     The Corinthian Job Placement Rate Rule was the first and primary means that the Department used to ensure that student borrowers injured by Corinthian would, in the words of Arne Duncan, former Secretary of Education, "get every penny of the debt relief [they] are entitled to[.]"

82.     The Department recognized that, out of the tens of thousands of borrower defense claims it had received, the clearest, simplest claims to resolve were those submitted under the Corinthian Job Placement Rate Rule:

> Wherever possible, the Department will rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief.  This will simplify and expedite the relief process, reducing the burden on borrowers.

83.     The Department intended the Corinthian Job Placement Rate Rule to be an "expedited" and "streamlined" process. The Rule was a means to "fast track relief based on legal findings for large groups of students," so that there would be "no need for these students to make any individual showing that they were affected by the school's fraud," according to Ted Mitchell, former Under Secretary of Education.

84.     Between June 2015 and June 30, 2016, the Department's borrower defense process was administered by the Special Master in conjunction with FSA, the Office of the Under Secretary, and the Office of General Counsel of the Department.

85.     In his first report, issued in September 2015, the Special Master affirmed that the Corinthian Job Placement Rate Rule cases were the low hanging fruit of the pending applications for loan discharge under borrower defense because "both facts and law are clear."  Thus, "[t]he clearest claims at present are claims from Heald College students using the Attestation Form created by the Department that meet the criteria set forth in that form."

86.     Each time that the Special Master submitted claims to the Under Secretary for approval pursuant to the Corinthian Job Placement Rate Rule, he recommended, and the Under

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

Secretary approved, relief according to the rule—complete cancellation and a return of any money paid to the Department on the loans.

87.     During the Special Master's tenure, the Department approved approximately 3,787 claims pursuant to the Corinthian Job Placement Rate Rule.

88.     As of July 1, 2016—the termination of the Special Master's appointment—there were approximately 22,800 claims for borrower defense pending at the Department.

89.     Beginning July 1, 2016, the Department's borrower defense process was administered by the Borrower Defense Unit, a division of the Enforcement Unit created within FSA, in conjunction with the Office of the Under Secretary, Office of General Counsel, and the Business Operations Unit of FSA.

90.     The Borrower Defense Unit continued to process claims according to Corinthian Job Placement Rate Rule, and integrated the Rule into its operating procedures.

91.     The Borower Defense Unit evaluated every claim it reviewed first under the Corinthian Job Placement Rate Rule. Only if the borrower was not covered by the Rule—that is, did not attend a specific Corinthian program within an identified findings window—did the Department consider whether the borrower otherwise established a claim for discharge under borrower defense.

92.     Between July 1, 2016 and January 20, 2017, the Department approved approximatley 24,500 claims under the Corinthian Job Placement Rate Rule.

93.     In October 2016, FSA issued a public report on the Department's borrower defense process, indicating that the Borrower Defense Unit's "focus has been to accelerate adjudication of the rapidly increasing number of claims based on the Department's findings concerning Corinthian's misleading job placement rates ('findings claims')."

94.     As of October 2016, the Department had received approximately 82,000 borrower defense claims.  Approximately 60 percent of these claims were covered by the Corinthian Job Placement Rate Rule.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

95.     In its October 2016 report, the Department stated that between June and October 2016, the Department had approved 11,822 "findings claims" pursuant to the Corinthian Job Placement Rate Rule, and that "[a]t the current pace, the Department expects to resolve all pending eligible findings claims by spring 2017."

96.     On information and belief, each and every time the Department approved a claim pursuant to the Job Placement Rate Rule, it provided the borrower with a full cancellation of all outstanding student loan debt and a return of all money previously collected by the Department on that loan.

97.     Prior to January 20, 2017, the Department did not deny any claims for borrower defense.

98.     In total, prior to January 20, 2017, the Department granted borrower defense discharges to approximately 25,000 individuals who attended Corinthian.  The vast majority of these claims (all but approximately 600) were granted pursuant to the Corinthian Job Placement Rate Rule.

99.     The Department also approved a number of claims asserted by Corinthian borrowers who were not members of a findings cohort, on the grounds that those borrowers had established a cause of action under state law (and therefore a borrower defense) because Corinthian made an express guarantee of employment, or misrepresented that credits awarded by the school would transfer to another institution.

100.     On information and belief, the legal and factual bases of the Department's decision to grant relief with respect to these two categories of non-findings claims are set forth in memoranda that specifically reference and build off of the Corinthian Job Placement Rate Rule.

***The Department's Abandonment of the Corinthian Job Placement Rate Rule***

101.     Since January 20, 2017, the Department has not approved any claims under the Corinthian Job Placement Rate Rule.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

102.     This is true despite the Department's receipt of tens of thousands of attestation forms from borrowers covered by the Rule on which it has failed to act.  Many of these applications were received by the Department well over a year ago.

103.     Public statements by senior Department officials, the Secretary of Education, the Acting Under Secretary of Education James Manning, and a report conducted by the Department's Office of Inspector General ("OIG") (Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process, Dec. 8, 2017, ED-OIG/I04R0003) confirm that the Department made an affirmative decision to abandon the Corinthian Job Placement Rate Rule.

104.     In March 2017, the Acting Under Secretary formed a Borrower Defense Review Panel.

105.     Shortly thereafter, the Review Panel placed the processing of borrower defense claims, including those under the Corinthian Job Placement Rate Rule, on indefinite pause.

106.     This pause meant that approximately 16,000 claims that the prior administration had approved pursuant to the Corinthian Job Placement Rate Rule, which had not yet gone through the mechanical discharge process, were not discharged.

107.     On May 4, 2017, the Acting Under Secretary issued a directive to the Borrower Defense Unit to cease submitting any borrower defense claims to the Acting Under Secretary for approval until "interim procedures" could be developed.

108.     On June 14, 2017, the Secretary announced that, pursuant to a "regulatory reset," she was undergoing further rulemaking on borrower defense, and delaying the borrower defense regulation that had become final during the prior administration and was set to go into effect on July 1.[2]

---

[2] This rulemaking does not impact the loans at issue in this Complaint.  Further, the lawfulness of the Defendants' delay of the regulation has been challenged as unlawful by students, *Bauer v. DeVos*, No. 17-1330 (D.D.C., filed July 6, 2017) and a multi-state group of attorneys general, *Mass. v. U.S. Dept. of Educ.*, No. 17-1331 (D.D.C., filed July 6, 2017).

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

109.    On July 7, 2017, in reponse to questions from several members of the U.S. Senate, the Acting Under Secretary stated that, as of that date, 96,944 borrower defense claims had been received by the Department since June 2015, and 65,169 of these claims were "currently pending review, decision, or adjudication."  Of these, 45,092 "pending claims" were "associated with students who attended Corinthian."

110.    Data provided by Acting Under Secretary Manning to Senators showed that residents of California had submitted the most claims for borrower defense (25,653) and had the most claims pending (15,465) of any state.  This volume is attributable to the large number of students in California affected by Corinthian's illegal conduct.

111.    Acting Under Secretary Manning reported that between January 20, 2017 and July 7 of that year, the Department received 14,949 borrower defense claims.

112.    He further stated, "No borrower defense applications have been approved between January 20, 2017, and today."

113.    On information and belief, the Department has not "approved" any borrower defense applications between July 7, 2017 and the date of the filing of this Complaint.

114.    Two claims out of 96,944 had been denied. On information and belief, these claims were submitted by borrowers who were not members of findings cohorts subject to the Corinthian Job Placement Rate Rule.

115.    Acting Under Secretary Manning advised that "there are currently no regularly produced reports provided to senior officials" concerning borrower defense, "pending the review of the borrower defense process by the new Administration."

116.    The Department's position that it is not bound by its Corinthian Job Placement Rate Rule, and decision to abandon the Rule, is further evidenced by a procurement notice it issued in August 2017.  The Department sought to "acquire added resources" in the form of outside contractors because "policy changes may necessitate certain claims already processed be revisited to assess other attributes."

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

117.   This procurement also acknowledged an "existing large backlog of claims from borrowers requesting relief from student loan debts," which is "largely due to a combination of [Department] outreach efforts and growing public awareness about the loan relief program, which is causing a continuous flow of new claims."

118.   Despite these outreach efforts and the "continuous flow" of new claims, since January 20, 2017, the Department has dramatically reduced the amount of internal resources devoted to processing borrower defense claims, including under the Corinthian Job Placement Rate Rule.

119.   In November 2016, the Borrower Defense Unit was staffed with 10 attorneys, a director, and 19 contracted staff.  As of September 2017, the same unit had no director, and only six contracted staff. The Department acknowledged in its procurement notice that "the FSA borrower defense unit currently lacks sufficient staff[.]"

120.   According to news reports, Secretary DeVos stated, during a September 2017 speech to the Mackinac Republican Leadership Conference, "Under the previous [borrower defense] rules, all one had to do was raise his or her hands to be entitled to so-called free money."

121.   According to a news article published in the *Washington Post* on October 24, 2017, there were at that time over 87,000 applications for debt relief pending at the Department. "[P]eople within the agency who were not authorized to speak publicly" reported that "[a]t least 10,000 of those claims have been recommended for approval," but "department officials are refusing to pull the trigger."  Per this news article,

> [Departmental sources] say leadership in the Office of Federal Student Aid and the Office of the General Counsel would prefer to grant partial relief based on the debt-to-earnings data collected from vocational programs.  For example, if a former nursing student from Corinthian Colleges applied for relief, her claim could be judged based on the average salary of students in similar programs at other schools. But those familiar with the issue say there is no consensus on a path forward at the department.

122.   The Department continues to receive attestation forms and other claims for borrower defense discharge from borrowers covered by the Corinthian Job Placement Rate Rule.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

123.    In its December 8, 2017 report, the Office of Inspector General recommended that the Department resume the discharge process and noted that, in order to do so, the Borrower Defense Unit would have to seek permission from the Office of the Under Secretary.

***Class Members' Reliance on Corinthian Job Placement Rate Rule and Harm from the Department's Changed Course***

124.    To date, the Department has provided relief to approximately 24,504 individuals pursuant to the Corinthian Job Placement Rate Rule.

125.    As of July 7, 2017, the Department had received but not processed over 45,000 claims for relief from former Corinthian students.  By November 14, 2017, the Department had received but not processed over 95,000 claims.

126.    Assuming a continuation of prior trends, and in light of the outreach efforts described below, a substantial number of these pending claims are covered by the Corinthian Job Placement Rate Rule.

127.    More individuals who are eligible for relief under the Corinthian Job Placement Rule have applied for, and have not yet received, a borrower defense discharge than have gotten the discharge.

128.    The Department estimates that approximately 50,000 former Heald College students may be eligible for loan discharge under the Corinthian Job Placement Rate Rule. When the Department announced, in November 2015, the first round of findings regarding job placement rate misrepresentation at Everest and WyoTech, it estimated that 85,000 additional students may be eligible for relief under those findings.

129.    The precise number of individuals eligible for discharge under the Corinthian Job Placement Rate Rule is known to the Department.

130.    On information and belief, the Department has in its possession program-level data that allows it to determine which individual borrowers are covered by the Corinthian Job Placement Rate Rule.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

131.    Tens of thousands of individuals who are eligible for loan relief under the Corinthian Job Placement Rate Rule have not, but may, submit a claim to the Department.

132.    It is likely that additional individuals will submit claims for relief because the Department, state attorneys general, and legal aid advocates have engaged in extensive efforts to make eligible individuals aware of the Corinthian Job Placement Rate Rule and the process for submitting an attestation form.

133.    The Department has conducted extensive outreach to borrowers it determined potentially eligible for loan discharge under the rule.

134.    These outreach efforts began as soon as the Department made findings regarding Heald College.

135.    In July 2015, the Department conducted an email outreach campaign to over 50,000 borrowers who attended Heald College since 2010 to notify them that they may be eligible for debt relief.  The email provided information about eligiblity and linked to both the list of programs covered by the Department's findings and the webpage where one could fill out and submit the attestation form.

136.    Over the Special Master's one year appointment, the Department had sent over 330,000 letters via email and postal mail to former Corinthian students who were members of cohorts covered Department findings of job placement misrepresentation:

> The Department is making numerous efforts to reach borrowers who may be eligible for loan discharges under the CCI job placement rate findings, and continues to work to improve its outreach efforts.  This outreach consists of multiple rounds of emails and postal mail to CCI borrowers who had their first loan disbursement as early as January 1, 2010.  This includes email and postal mail to over 280,000 Everest and WyoTech borrowers and over 55,000 Heald borrowers.

137.    The Federal Student Aid Enforcement Unit, after taking over the borrower defense process over from the Special Master, conducted "ongoing outreach efforts to former students of Corinthian Colleges, Inc."

138.    In October 2016, the Department explained that the methods it employed to "inform borrowers that they may be eligible for borrower defense relief" included "expanded

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

postal mail outreach, a Facebook advertisement pilot, a servicer pilot that relies on emails, postal mail, phone calls, and texts, and an outreach partnership with state attorneys general[.]"

139.    The Department reported that it was "working closely" with state attorneys general from 42 states and the District of Columbia to reach more borrowers covered by the Corinthian Job Placement Rate Rule. The Department noted that it

> would like to especially thank the Illinois and Maryland Attorney General's Office for their leadership and coordination of these efforts, as well as the Massachusetts Attorney General's Office, which has already gathered and submitted a large number of claims from borrowers who attended campuses in Massachusetts. The BD Unit thanks all of these state partners for their commitment to helping the eligible borrowers in their state.

140.    In spring 2017, a bipartisan group of 47 state attorneys general, using information provided by the Department, conducted outreach to inform more than 100,000 former Corinthian students who are eligible for discharge pursuant to the Corinthian Job Placement Rate Rule.

141.    On information and belief, the Department provided these attorneys general with spreadsheets identifying specific individuals it had determined were members of findings cohorts and thus subject to the Corinthian Job Placement Rate Rule, for the purpose of conducting outreach. This outreach is ongoing.

142.    Legal aid organizations, including those representing Named Plaintiffs in this action, have conducted outreach and held clinics to make former students of Corinthian Colleges aware of their potential eligibility for loan discharge pursuant to the Corinthian Job Placement Rate Rule and borrower defense generally.

143.    These outreach efforts are justified in light of the harm that those subjected to illegal conduct and thus eligible for relief under the Corinthian Job Placement Rate Rule have suffered and continue to suffer.

144.    Members of the proposed class spent their time, money, and eligiblity for federal student aid on sham programs. They did so because Corinthian lied to them, a fact which the Department's findings confirm.

145.    The Department recognizes that they are entitled to a borrower defense discharge.

146.   Borrower defense discharge removes the obligation to repay the loan, restores a borrower's eligiblity for federal financial aid, removes negative credit reporting associated with the discharged loan or loans, and refunds any amount paid on the loan.

147.   Until members of the proposed class receive discharge of their loans, the harm from Corinthian's misconduct compounds. Members of the proposed class must forgo or defer further education; they are unable to qualify for loans, or qualify only for the most predatory loans, that many require to secure basic housing and transportation needs. Members of the proposed class have impaired credit that negatively impacts their ability to obtain certain jobs and precludes them from renting certain apartments.

148.   Interest continues to accumulate on the loans of class members while claims are pending, even if a borrower requests and the Department grants an administrative forbearance during this period.

149.   The Department's abandonment of the Corinthian Job Placement Rate Rule denies members of the proposed class relief that they are entitled to.  It treats them differently than other borrowers who were granted discharges prior to the Department's abandonment of the Rule.

150.   The Department's actions compound the psychological distress that members of the proposed class carry, due to the fact that they are saddled with loans that Defendants have already determined to be the product of illegal behavior by Corinthian.  Now they have been lied to by both Corinthian and the federal government.

151.   The Department has taken action to collect loans from members of the proposed class, including by seizing their tax refunds and wages.

152.   Because the Department has abandoned the Corinthian Job Placement Rate Rule, Named Plaintiffs and members of the proposed class may not receive full discharges of their loans.

153.   Those who have applied or will apply for discharge based on the Department's Corinthian Job Placement Rate Rule, and who ultimately do not receive full discharges will be

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

required to repay more money than had they never applied, because interest continues to accumulate while Defendants sit on the claims.

154.    Members of the proposed class who apply for, but ultimately do not receive full discharges will further be injured by the Department's abandonment of the Corinthian Job Placement Rate Rule. In reliance on the Department's promise of "expedited" and "fast-track" relief, members of the proposed class have placed their loans in forbearance rather than in a repayment status, thus extending not only the amount but also the life of the loan.

## FACTS CONCERNING NAMED PLAINTIFFS

*Martin Calvillo Manriquez*

155.    Martin Calvillo Manriquez resides in Oakland, California.

156.    Mr. Calvillo Manriquez first learned about WyoTech from a Corinthian recruiter who attended a career fair at Mr. Calvillo Manriquez's high school.  This recruiter, and later other Corinthian representatives, discouraged Mr. Calvillo Manriquez from attending the automotive program at a local community college that he had been considering and to instead enroll in WyoTech. They repeatedly represented to him that WyoTech provided a top-notch education that would lead to a sucessful and well-paid career in automotive technology.

157.    He enrolled in the Applied Automotive Technology Diploma program at Corinthian's WyoTech-Fremont campus on September 28, 2011.  The financing that WyoTech representatives arranged for his enrollment included two federal Direct Loans totalling $6,418.

158.    After enrolling at WyoTech, Mr. Calvillo Manriquez discovered that the quality of education was not as promised and that he would not learn the skills there that he would need to be employable. He did not have any real opportunity for the promised hands-on learning while he was enrolled. Both the equipment and the instructors were insufficient and sub-par.

159.    While he was in school, he worked at an oil change shop earning $8 an hour. His job involved changing oil and fluids, but the shop did not do any automotive repairs.  Mr. Calvillo Manriquez noticed former WyoTech students, who had completed the very same program he was currently enrolled in, coming to the oil change shop to apply for the same low-

1   paying, non-technical job he already had—a job that did not require a certificate or any special

2   training.

3   160.   Furthermore, after enrolling, Mr. Calvillo Manriquez spoke with several

4   WyoTech automotive program graduates who told him that their WyoTech education and

5   diploma had not helped them to get jobs in the field and instead had left them with

6   unmanageable student loan debt.

7   161.   Based on this information, Mr. Calvillo Manriquez decided to withdraw from

8   WyoTech in early 2012.  His last date of attendance was April 11, 2012.

9   162.   Mr. Calvillo Manriquez is a member of the findings cohort identified by the

10  Department for the Applied Automotive Technology Diploma program at WyoTech-Fremont.

11  As listed in Exhibit B, this findings cohort includes those who attended between July 1, 2010 and

12  September 20, 2013.

13  163.   Even though the Department determined that Mr. Calvillo Manriquez was misled

14  and cheated, the Department has collected aggressively on the federal loans he obtained to enroll

15  in WyoTech. Mr. Calvillo Manriquez is unable to afford the demanded payments.

16  164.   On February 2, 2016, the Department offset of Mr. Calvillo Manriquez's full

17  2015 tax refund, in excess of $2,000.  In July 2016, the Department began garnishing 15% of his

18  wages.

19  165.   Mr. Calvillo Manriquez did not learn of the Department of Education's findings

20  of wrongdoing by WyoTech or of his eligibilty for discharge of his federal loans until well after

21  the Department initiated forced collection proceedings against him.

22  166.   Mr. Calvillo Manriquez applied for borrower defense discharge by completing

23  and submitting the attestation form included as Exhibit D on January 3, 2017.  The Department

24  has confirmed receiving his application on this date.

25  167.   On January 12, 2017, Mr. Calvillo Manriquez sent separate requests for hearing to

26  the Department to contest the Department's garnishment of his wages and offset of his tax

27  refund.  The Department never responded to Mr. Calvillo Manriquez's requests for hearing.

28

168.   Shortly after Mr. Calvillo Manriquez submitted requests for hearings, the Department stopped garnishing his wages without explanation.  However, the Department again offset Mr. Calvillo Manriquez's tax refund, this time for the 2016 tax year.

169.   In total, the Department took approximately $7,500 from Mr. Calvillo Manriquez through forced collection.

170.   The Department has yet to notify Mr. Calvillo Manriquez of any decision on his application for discharge of his federal student loans.  Though he has requested forbearance on his loans while his hearing requests and application are under review, the Department continues to report these loans as defaulted to credit reporting agencies.

171.   Mr. Calvillo Manriquez's credit is impaired by the non-discharge of his Corinthian loans.  They are the only tradelines reported on his credit report, and the reporting is negative.

172.   Mr. Calvillo Manriquez has deferred applying for any credit transactions until these loans and the negative reports associated with them have been removed, something he anticipated would have already happened.

***Jamal Cornelius***

173.   Jamal Cornelius resides in Hercules, California.

174.   Mr. Cornelius became interested in Heald College shortly after completing high school, based on advertisements and recruitment promises that Heald programs would lead to a rewarding and well-paid career in information technology.  He enrolled in the Information Technology-Emphasis in Network Security AAS program at Heald College's Concord, California campus on July 22, 2013.

175.   To finance his enrollment in Heald College, the school arranged for Mr. Cornelius to take out a total of $25,555 in federal student loans, $6,375 in Federal Pell Grants, and $2,000.26 in private student loans originated through a proprietary Corinthian loan program.

176.   In early 2015, Heald-Concord notified its students that it would be closing in short order.  On or around April 9, 2015, the school told Mr. Cornelius that he had completed his

program and issued him a diploma.  Mr. Cornelius' Heald College transcript, which he subsequently obtained from the California Bureau of Private Postsecondary Education, states that Mr. Cornelius completed his program on April 9, 2015.

177.     Mr. Cornelius tried and was unable to obtain a job in information technology and currently works in a fast food restaurant.

178.     During the summer of 2016, Mr. Cornelius received a letter from the Department of Education, notifying him of its findings with respect to Heald's wrongful conduct and his eligibility for borrower defense discharge of his federal student loans.

179.     Mr. Cornelius is a member of the findings cohort identified by the Department for the Information Technology-Emphasis in Network Security AAS program offered at Heald-Concord.  As listed in Exhibit A, this findings cohort includes those who attended this program after July 1, 2010.

180.     Shortly after receiving the Department's notice, Mr. Cornelius applied for a borrower defense discharge, using the form that the Department included with the notification letter, a copy of which is attached as Exhibit C.

181.     Several months after his first application, Mr. Cornelius resubmitted his application to the Department because he had not heard anything regarding his first submission. The Department subsequently confirmed that it had received an application from Mr. Cornelius' on August 24, 2016.

182.     After Mr. Cornelius' federal loans went into repayment in late 2015, he began making the demanded monthly payments of $273.64 to the Department.  Mr. Cornelius did not request forbearance on his federal student loans when he first submitted his application for discharge because he was concerned about the unpaid interest that would accumulate on his loans while his application was under review.

183.     However, the monthly payments represented a substantial hardship to Mr. Cornelius, and in November 2017, after waiting more than 14 months for the Department to review his application, he contacted the Department and his federal student loan servicer to

request administrative forbearance on his loans.  The Department told Mr. Cornelius that it would take six to eight weeks for it to notify his servicer that he was eligible for administrative forbearance. The servicer told Mr. Cornelius that it could not place Mr. Cornelius in administrative forbearance unless it first received approval from the Department, but that in the interim it could offer him a less favorable forbearance program that would result in the capitalization of unpaid interest.

184.    The Department has yet to provide Mr. Cornelius with any notice of a decision on his application for discharge of his federal student loans.

*Rthwan Dobashi*

185.    Rthwan Dobashi resides in San Jose, California. He is married, has two children, and is expecting a third.

186.    Mr. Dobashi became interested in attending an automotive program at WyoTech's Fremont campus based on advertisements and recruitment promises of a rewarding and well-paid career in the field.  Before enrolling, Mr. Dobashi made it clear to WyoTech representatives that he wanted a program focused on high-performance automobiles.  WyoTech representatives told him that he should enroll in two separate, consecutive programs in order to reach this goal.

187.    Mr. Dobashi began an Applied Automotive Technology Diploma program at WyoTech's Fremont, California campus on November 10, 2011 and completed the program on February 27, 2013.  Based on WyoTech's representations to him that he needed to attend a second program to learn to work on high-performance engines, Mr. Dobashi began a second diploma program at WyoTech-Fremont for Applied Automotive Technology-Advanced Diagnostics on February 28, 2013 and completed it on July 22, 2013.

188.    To finance Mr. Dobashi's enrollment in these two WyoTech programs, the school arranged for him to take out a total of $22,184 in federal student loans, $11,100 in Federal Pell Grants, and $3,183.73 in private student loans originated through a proprietary Corinthian loan program.

189.    Mr. Dobashi tried and failed to find employment in the field of auto repair.

190.    In late March or early April of 2016, Mr. Dobashi received a letter from the California Attorney General's Office notifying him that the Department of Education had made specific findings of misconduct by Corinthian at its WyoTech-Fremont campus that covered students who attended the Applied Automotive Technology Diploma program and the Applied Automotive Technology-Advanced Diagnostics program between July 1, 2010 and September 30, 2013.

191.    On April 5, 2016, Mr. Dobashi applied for a borrower defense discharge of his federal student loans using the designated "Attestation For Certain Everest and WyoTech Students Application For Borrower Defense To Repayment Loan Discharge" form provided by the Department, a copy of which is attached as Exhibit D, and provided supporting documentation.

192.    Prior to applying for borrower defense discharge of his federal student loans, Mr. Dobashi had made monthly payments on his federal student loans and private student loans related to his enrollment at WyoTech.  When he applied for borrower defense discharge of his federal student loans, he requested forbearance while his application was being reviewed.  On May 20, 2017, over a year after he first applied for discharge, the Department informed Mr. Dobashi that his federal loans had been put into forbearance but that they would accrue interest at an estimated amount of $76.27 per month while the forbearance was in effect.

193.    After Mr. Dobashi learned about the Department's findings and his eligibility for a borrower defense discharge, he shared the information with a friend who was a former classmate. His friend submitted an attestation form, and Defendants discharged his loans nearly one year ago.

194.    The Department has yet to provide Mr. Dobashi with any notice of decision on his application for discharge of his federal student loans.

195.    The continued existence of Mr. Dobashi's Corithian loans is a source of stress for him and his family.

## CLASS ACTION ALLEGATIONS

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

196.    Named Plaintiffs Manriquez, Cornelius, and Dobashi file this action on behalf of themselves and all other individuals similarly situated. They seek to represent a class consisting of

all individuals who borrowed a Direct Loan to finance the cost of enrollment in a program who are covered by the Department's Corinthian Job Placement Rate Rule, who have applied or will apply for a borrower defense, and who have not been granted a discharge pursuant to the Rule.

197.    For the purposes of this class definition, a borrower is "covered by the Department's Corinthian Job Placement Rate Rule" to the extent he or she attended a program within the timeframe specified by the Department on the Heald findings list attached as Exhibit A or the Everest/WyoTech findings list attached as Exhibit B.

198.    The proposed class satsifies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure.

    a.  The class is so numerous that joinder of all members is impracticable.  As previously alleged, the Department has received but not processed over 45,000 claims for borrower defense discharge from former Corinthian students.  A substantial proportion of these applications—the precise figure is known only to the Department—are from members of the proposed class, *i.e.*, individuals covered by the Corinthian Job Placement Rate Rule. Tens of thousands of individuals who are eligible for loan relief under the Corinthian Job Placement Rate Rule have not, but may, submit a claim to the Department;

    b.  There are questions of law and fact common to the class, including without limitation:

        i.  Whether the Department's prior statements and actions concerning the eligiblity for borrower defense relief of certain Corinthian students constitutes a rule within the meaning of the APA, or otherwise binds the Department;

ii. Whether the Department may retroactively apply a different rule to Corinthian borrower defense applications on which it has not granted relief; and

iii. Whether the Department has unlawfully withheld or unreasonably delayed processing claims of the Named Plaintiffs and members of the proposed class under the Job Placement Rate Rule within the meaning of the APA;

c. The claims of Named Plaintiffs are typical of the claims of the proposed class. They each borrowed Direct Loan(s) to finance enrollment in a career-training program at a Corinthian-operated school. Named Plaintiffs, like members of the proposed class, are intended beneficiaries of the Department's Corinthian Job Placement Rate Rule. They have been identified for outreach by the Department as members of a findings cohort. They, along with members of the proposed class, are injured by the Department's unlawful, unreasonable, and arbitrary abandonment of the Corinthian Job Placement Rate Rule;

d. The Named Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the Class they seek to represent; they have retained counsel who are competent and experienced in APA and class action litigation; and because they intend to prosecute this action vigorously. Named Plaintiffs are represented by attorneys from Housing and Economic Rights Advocates ("HERA") and the Project on Predatory Student Lending of the Legal Services Center of Harvard Law School ("Project"). Together, attorneys from HERA and the Project have represented and/or advised hundreds of former Corinthian students regarding the borrower defense process. They have knowledge of and familiarity with the relevant law and regulations concerning federal student loans and borrower defense.

199. A class action is superior to other available means for the fair and efficient adjudication of the claims of Named Plaintiffs and the class. Each class member has been

damaged and is entitled to recovery by reason of Defendants' impermissible actions under the APA.

200.   A class action is appropriate under Federal Rule of Civil Procedure 23(b)(1).  If all members of the proposed class were to challenge the Defendant's actions under the APA, it would risk establishing incompatible standards of conduct for the Defendants, vis-à-vis the handling of borrower defense claims.

201.   This case is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because the Defendants' action in abandoning the Corinthian Job Placement Rate Rule applies generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

## CAUSES OF ACTION

## COUNT 1

### Arbitrary, Capricious, and Unlawful Abandonment of the Corinthian Job Placement Rate Rule—APA §706(2)

202.   Plaintiffs repeat and reallage the foregoing paragraphs as if fully set forth herein.

203.   The Administrative Procedure Act provides that those "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" are entitled to seek judicial review. 5 U.S.C. § 702.

204.   Under section 706(2) of the APA, a reviwing court "shall…hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).  A court shall also set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" *Id.* § 706(2)(C).

205.   Without adequate explanation or justification, and without notice, the Department abruptly halted its processing of claims under the Corinthian Job Placement Rate Rule.  It has decided that it can change course and not honor the Rule, notwithstanding its previous determinations and actions, which include:

a.  deciding that the borrower defense claims of former Corinthian students are governed by California law;

b.  deciding that evidence supports a cause of action under California law for cohorts of borrowers;

c.  identifying with specifity the cohorts of borrowers covered by its findings;

d.  deciding that those borowers covered by findings can supply all necessary information to receive a borrower defense discharge on a simple 4-page form;

e.  determining that the appropriate amount of relief for such borrowers under California law is a full discharge and return of any money previously collected by the Department;

f.  notifying former Corinthian students of the availability and terms of the discharge; providing spreadsheets identifying specific individuals who are members of findings cohorts to attorneys general for the purposes of contacting those individuals and faciliating their applications for borrower defense discharge; and

g.  granting approximately 25,000 such applications for discharge.

206.    Since January 20, 2017, Defendants have not granted any borrower defense discharges, even for individuals who followed the Department's invitation to submit a simple attestation form establishing membership in a findings cohort. This fact, and other public statements and actions, confirm that the Department has made the determination that it is not bound by the Corinthian Job Placement Rate Rule.

207.    This determination constitutes "final agency action" reviewable by this Court. 5 U.S.C. § 704.

208.    This final agency action must be set aside under the APA, 5 U.S.C. § 706(2), because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law, and/or without observance of procedure required by law.

## COUNT 2

### Unlawful Retroactive Application of a Rule—APA §706(2)

209.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

210.    The Corinthian Job Placement Rate Rule is a "rule" within the meaning of the APA, 5 U.S.C. § 551(4).

211.    By its terms, the Rule applies to Named Plaintiffs and members of the proposed class.

212.    This Rule holds that Named Plaintiffs and members of the proposed class are eligible for a discharge pursuant to borrower defense upon providing the Department with a signed attestation form establishing that they are covered by the Department's findings, and borrowed Direct Loans.

213.    The Corinthian Job Placement Rate Rule further holds that the relief warranted is full discharge of related outsanding loans and a return of money collected by the Department on those loans.

214.    The Department has provided or attempted to provide notice of the Rule, and procedures for securing a borrower defense discharge, to Named Plaintiffs and members of the proposed class, because the Department has determined that they are members of a cohort of borrowers covered by the Department's findings.

215.    Named Plaintiffs and members of the proposed class have applied, or will apply, for loan discharge under the process established by the Department for implementation of the Rule, which the Department notified or attempted to notify them of.

216.    The Department has abandoned this Rule, and will not apply it to Named Plaintiffs and members of the proposed class.  Instead, the Department will apply a different rule or rules to Named Plaintiffs and members of the proposed class.

217.    The Department's decision to abandon the Corinthian Job Placement Rate Rule upsets the reliance interest that the Department has created in Named Plaintiffs and members of

the proposed class that they will receive full cancellation of their loans upon submitting a signed attestation form to the Department.

218.    As such, the Department's departure from this rule must be set aside as violating the APA, 5 U.S.C. §§706(2)(A) and (C). The Department cannot permissibly apply a different rule to Named Plaintiffs and members of the proposed class.  Application of a rule other than the Corinthian Job Placement Rate Rule would constitute arbitrary and unlawful retroactive rulemaking not authorized by statute.

## COUNT 3

### Unlawfully Withheld Agency Action—APA §706(1)

219.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

220.    Defendants have unlawfully withheld the application of the Corinthian Job Placement Rate Rule to Named Plantiffs and members of the proposed class in violation of the APA, 5 U.S.C. § 706(1).

221.    Application of the Corinthian Job Placement Rate Rule is straightforward and mechanistic.

222.    The Department does not have discretion to withhold the Rule's application from Named Plaintiffs and members of the proposed class who have submitted, or will submit, applications according to the process that the Department established.

223.    The Department has already exercised its discretion in making findings about Corinthian job placement rate misrepresentations, establishing findings cohorts, and determining that the signed borrower defense applications of Named Plaintiffs and members of the proposed class are:

  a.  Governed by California law;

  b.  Sufficient to state a claim under California law;

  c.  Sufficient to establish a defense to repayment;

  d.  Sufficient to warrant full loan cancellation and a return of any money collected by the Department in payment of those loans.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

224.    In light of these findings, the Department is unlawfully withholding the Rule, and therefore relief, from Named Plaintiffs and members of the proposed class, in pursuit of an unlawfully undertaken "regulatory reset."

225.    The Court should compel the Department to process the applications of Named Plaintiffs and members of the proposed class according to the Corinthian Job Placement Rate Rule.

### COUNT 4

### Unreasonably Delayed Agency Action—APA §706(1)

226.    Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

227.    Defendants have violated the APA, 5 U.S.C. § 706(1) because they have unreasonably delayed processing the claims of Named Plaintiffs and members of the proposed class.

228.    Pursuant to the APA, a court "shall [ ] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

229.    The Department's delay in processing the applications of Named Plaintiffs, and members of the proposed class, is unreasonable in light of the Department's demonstrated ability to process claims under the Corinthian Job Placment Rate Rule.

230.    Between June 30, 2016 and October 12, 2016, the Department approved 11,822 claims pursuant to the Corinthian Job Placement Rate Rule. The Department approved more than 10,000 additional claims pursuant to the Rule by January 20, 2017.

231.    The Department estimated in October 2016 that it could clear the existing backlog of cases by Spring 2017.

232.    Since January 20, 2017, the Department has approved zero claims pursuant to the Corinthian Job Placement Rate Rule.

233.    Despite a growing backlog of claims that, as of November 2017, approached 100,000, the Department has drastically decreased the amount of staff and resources devoted to the processing of borrower defense claims since January 20, 2017.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

234.    The Department has not brought to conclusion the applications presented to it within a reasonable time, as required by the APA, 5 U.S.C. § 555(b).

235.    Defendants' inaction and delay has harmed Named Plaintiffs and members of the proposed class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in their favor and grant the following relief:

A.  Certify the class as defined in paragraph 196 pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.  Declare that the Department's delay in processing the borrower defense claims submitted by members of the class is unreasonable;

C.  Declare that the Department has unlawfully withheld the application of the Corinthian Job Placement Rate Rule to the borrower defense applications submitted by members of the class;

D.  Declare that the Department may not retroactively apply a rule other than the Corinthian Job Placement Rate Rule to borrower defense applications submitted by members of the class;

E.  Set aside the Department's decision to abandon the Corinthian Job Placement Rate Rule;

F.  Order the Department to apply the Corinthian Job Placement Rate Rule to applications for borrower defense relief submitted by members of the class;

G.  Compel the Department immediately to process applications and grant discharges to members of the class pursuant to the Corinthian Job Placement Rate Rule;

H.  Award reasonable costs and attorneys' fees as authorized by law; and

I.  Grant such further relief as may be just and proper.

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF

Dated: December 20, 2017

Respectfully submitted,


/s/ _____
Noah Zinner

Noah Zinner
Megumi Tsutsui
HOUSING & ECONOMIC RIGHTS
ADVOCATES
PO Box 29435
Oakland, CA 94604
Tel.: (510) 271-8443
Fax: (510) 280-2448

Eileen M. Connor
Toby R. Merrill*
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715


*Attorneys for Plaintiffs*

*\*application for admission pro hac vice
forthcoming*

CLASS ACTION COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF