NOAH ZINNER (SBN 247581)
nzinner@heraca.org
MEGUMI TSUTSUI (SBN 299294)
mtsutsui@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*Pro Hac Vice*)
tmerrill@law.harvard.edu
JOSHUA D. ROVENGER (*Pro Hac Vice*)
jrovenger@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN CALVILLO MANRIQUEZ, JAMAL CORNELIUS, RTHWAN DOBASHI, and JENNIFER CRAIG on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) |
| *Plaintiffs*, | ) ) |
| v. | ) ) ) ) |
| ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education, | ) ) ) ) |

Case Number: C 17-cv-07210-SK

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

Date: April 30, 2018
Time: 9:30 a.m.
Ctrm: Courtroom A, 15th Floor
Judge: Sallie Kim

Date Filed: March 17, 2018

i

And )
)
)
THE UNITED STATES DEPARTMENT OF )
EDUCATION, )
)
       *Defendants.* )
)
)
)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

NOTICE OF MOTION ..................................................................................................1

RELIEF REQUESTED ...............................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................2

I.      INTRODUCTION ...........................................................................................2

II.     BACKGROUND ..............................................................................................4

     A.  Statutory and Regulatory Framework .........................................................4

         1.  "Borrower Defense" ...............................................................................4

         2.  Gainful Employment ..............................................................................5

         3.  The Privacy Act .....................................................................................8

     B.  The Department's Compounding Illegal Conduct and Plaintiffs' Litigation...........10

         1.  The Department Adopts the "Corinthian Job Placement Rate Rule" ...............10

         2.  The Department Illegally Abandons the "Corinthian Job Placement Rate Rule" ...............................................................................................15

         3.  The Department Arbitrarily and Capriciously Infringes on Plaintiffs' Privacy and Due Process Rights by Adopting and Applying the Average Earnings Rule .........17

         4.  The Department's Actions Have Harmed Named Plaintiffs and Members of the Proposed Class ...............................................................................20

         5.  Named Plaintiffs File Suit to Stop the Department's Unlawful Actions ...........23

III.    THE COURT SHOULD REQUIRE THE DEPARTMENT TO RETURN TO THE *STATUS QUO ANTE* BEFORE IT EMBARKED ON ITS CAMPAIGN OF ILLEGAL CONDUCT ...............................................................................................24

     A.  Plaintiffs are Likely to Succeed in Showing that the Department Has Repeatedly and in Bad Faith Violated the APA and Other Laws. ..................................................24

         1.  The Department has impermissibly abandoned the Corinthian Job Placement Rate Rule .......................................................................................25

         2.  The Department's application of the Average Earnings Rule, instead of the Corinthian Job Placement Rate Rule, constitutes illegal retroactive rulemaking .28

         3.  The Department's Average Earnings Rule violates the Privacy Act. .................31

             i.     The Department's reliance on secret data from the SSA to decide individual borrower defense applications constitutes a matching program subject to the Privacy Act's procedural requirements .........32

ii. The Department is violating the Privacy Act by failing to comply with the Privacy Act's procedural requirements........................................33

4. The Department's Average Earnings Rule violates class members' due process rights ...................................................................................................35

5. The Department's Average Earnings Rule is arbitrary and capricious ..............39

6. The Department has unlawfully withheld and unreasonably delayed relief under the Corinthian Job Placement Rate Rule ...............................................42

B. A Preliminary Injunction is Needed to Stop the Irreparable Harm that the Department Has Caused and Will Cause Plaintiffs ...................................................45

C. The Public Interest and Balance of the Equities Weighs in Favor of a Preliminary Injunction ...........................................................................................49

IV. CONCLUSION ...........................................................................................51

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Fed. of Labor v. Chertoff,*
 552 F. Supp. 2d 999 (N.D. Cal. 2007). ..................................................................... 26, 27

*Arrington v. Daniels,*
 516 F.3d 1106 (9th Cir. 2008) ........................................................................................ 40, 41

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,*
 950 F.2d 1401 (9th Cir. 1991) ................................................................................................. 47

*Association of Private Sector Colleges and Universities v. Duncan,*
 No. 11-1314 (D.D.C. March 19, 2013) ...................................................................................... 7

*Atkins v. Parker,*
 472 U.S. 115 (1985) ................................................................................................................... 39

*Bauer v. DeVos,*
 No. 17-1330 (D.D.C filed July 6, 2017) ................................................................................ 16

*Bd. of Regents v. Roth,*
 408 U.S. 564 (1972) ................................................................................................................... 35

*Bennett v. Spear,*
 520 U.S. 154 (1997) ................................................................................................................... 25

*Boardman v. Pac. Seafood Gp.,*
 822 F.3d 1011 (9th Cir. 2016) ................................................................................................. 45

*Bowen v. Georgetown Univ. Hosp.,*
 488 U.S. 204 (1988) ................................................................................................................... 28

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
 419 U.S. 281 (1974) ............................................................................................................. 37, 38

*Brower v. Evans,*
 257 F.3d 1058 (9th Cir. 2001) ................................................................................................. 40

*Butte Cty. v. Hogen,*

613 F.3d 190 (D.C. Cir. 2010). ........................................................................ 40

*California v. DeVos*,

No. 17-cv-07106 (N.D. Cal., filed Dec. 14, 2017) ...................................... 15, 23

*Caspar v. Snyder*,

77 F. Supp. 3d 616 (E.D. Mich. 2015)............................................................ 47

*Chang v. United States*,

327 F.3d 911 (9th Cir. 2003). ......................................................................... 28

*Comm'r. Of Internal Revenue v. Clark*,

489 U.S. 726 (1989)......................................................................................... 33

*Consumer Fin'l Prot. Bureau v. Corinthian*,

No. 1:14-cv-07194, 2015 WL 10854380 (N.D. Ill. Oct. 27, 2015). .................. 11

*Cort v. Crabtree*,

113 F.3d 1081 (9th Cir. 1997). ................................................................... 28, 29

*Doe v. Chao*,

540 U.S. 614 (2004)..................................................................................... 8, 31

*Doe v. Kelly*,

878 F.3d 710 (9th Cir. 2017) ......................................................................... 24

*Doe v. Stephens*,

851 F.2d 1457 (D.C. Cir. 1988)....................................................................... 31

*Dong v. Chertoff*,

513 F. Supp. 2d 1158 (N.D. Cal. 2007) .......................................................... 42

*Drakes Bay Oyster Co. v. Jewell*,

747 F.3d 1073 (9th Cir. 2014) ....................................................................... 49

*Echols v. Morpho Detection, Inc.* ,

No. C 12-1581, 2013 WL 1501523 (N.D. Cal. April 11, 2013)....................... 31

*Encino Motorcars, LLC v. Navarro*,

136 S.Ct. 2126 (2016).................................................................................... 26

*Ensco Offshore Co. v. Salazar*,

vi

781 F. Supp. 2d 332 (E.D. La. 2011) ................................................................ 44

*FAA v. Cooper*,

566 U.S. 284 (2012) ........................................................................................ 47

*FCC v. Fox Television Stations, Inc.*,

556 U.S. 502 (2009) ........................................................................................ 26

*Furlong v. Shalala*,

156 F.3d 384 (2d Cir. 1998) ............................................................................ 36

*Garfias-Rodriguez v. Holder*,

702 F.3d 504 (9th Cir. 2012) .......................................................................... 29

*Goldberg* v. *Kelly*,

397 U.S. 254 (1970) ................................................................................... 37, 38

*Golden v. Kelsey-Hayes Co.*,

73 F.3d 648 (6th Cir. 1996) ............................................................................ 47

*Gonzalez v. Sullivan*,

914 F.2d 1197 (9th Cir. 1990) ........................................................................ 38

*Griffeth v. Detrich*,

603 F.2d 118 (9th Cir. 1979) .......................................................................... 36

*Higgins v. Spellings*,

663 F. Supp. 2d 788 (W.D. Mo. 2009) ........................................................... 36

*Houseton v. Nimmo*,

670 F.2d 1375 (9th Cir. 1982) ........................................................................ 43

*Jicarilla Apache Nation v. U.S. Dep't of the Interior*,

613 F.3d 1112 (D.C. Cir. 2010) ...................................................................... 26

*Kapps v. Wing*,

404 F.3d 105 (2d Cir. 2005) ........................................................................... 36

*Landgraf v. USI Film Prods.*,

511 U.S. 244 (1994) ........................................................................................ 28

*Latif v. Holder*,

vii

28 F. Supp. 3d 1134 (9th Cir. 2014) ................................................................... 38

*Lavan v.. City of Los Angeles,*

797 F. Supp. 2d 1005 (C.D. Cal. 2011) .............................................................. 46

*Marsh v. Oregon Nat. Res. Council,*

490 U.S. 360 (1989)............................................................................................ 40

*Mass v. U.S. Dep't of Educ.,*

No. 17-331 (D.D.C. filed July 7, 2017) ........................................................ 16, 24

*Massachusetts v. Corinthian Colleges, Inc.,*

No. 14-1093 (Mass. Super. Ct., filed April 3, 2014) .......................................... 11

*Montgomery Ward & Co. v. FTC,*

691 F.2d 1322 (9th Cir. 1982) ............................................................................ 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*

463 U.S. 29 (1983).......................................................................................... 26, 40

*Mullane v. Central Hanover Bank & Trust Co.,*

339 U.S. 306 (1950)............................................................................................ 38

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*

465 F.3d 977 (9th Cir. 2006) .............................................................................. 25

*Patriot, Inc. v. HUD,*

963 F. Supp. 1 (D.D.C. 1997).............................................................................. 47

*People v. Corinthian Colleges, Inc.,*

No. CGC-13-534793 (Cal. Super. Ct., filed Oct. 11, 2013) ................................ 10

*People v. Corinthian Schools, Inc., et. al.,*

No. BC374999 (Cal. Super Ct., July 31, 2007). ................................................. 10

*Philadelphia v. Sessions,*

280 F. Supp. 3d 579 (E.D. Pa. 2017) .................................................................. 27

*Recticel Foam Corp. v. DOJ,*

No. 98-2523, Slip. Op. (D.D.C. Jan. 31, 2002),.................................................. 31

*Regents of Univ. of Cal. v. DHS,*

viii

279 F. Supp. 3d 1011 (N.D. Cal. 2018) .......................................................................... 26, 41

*Saravia v. Sessions*,

-- F. Supp. 3d --, 2017 WL 5569838 (N.D. Cal. Nov. 20, 2017)................................. 4, 46, 50

*Schalk v. Teledyne, Inc.*,

751 F. Supp. 1261 (W.D. Mich. 1990) ...................................................................... 47

*SEC v. Chenery Corp.*,

318 U.S. 80 (1943)........................................................................................................ 41

*Simula, Inc. v. Autoliv, Inc.*,

175 F.3d 716 (9th Cir. 1999). ..................................................................................... 45

*Telecommunications Research & Action Ctr. v. FCC*,

750 F.2d 70 (D.C. Cir. 1984)...................................................................................... 43

*United Steelworkers of Am, AFL-CIO. v. Textron, Inc.*,

836 F.2d 6 (1st Cir. 1987)........................................................................................... 47

*United Steelworkers of Am., AFL-CIO-CLC v. Rubber Mfrs. Ass'n*,

783, F.2d 1117 (D.C. Cir. 1986) ................................................................................ 45

*Vargas v. Trainor*,

508 F.2d 485 (7th Cir. 1974) ...................................................................................... 37

*Vietnam Veterans of Am. v. CIA*,

811 F. 3d 1068 (9th Cir. 2015) ................................................................................... 42

**Statutes**

5 U.S.C §552a ...................................................................................................... *passim*

5 U.S.C. § 706.............................................................................................. 25, 31, 35, 42

11 U.S.C. § 523 ........................................................................................................... 48

20 U.S.C. § 1002 ........................................................................................................... 6

20 U.S.C. § 1015c .......................................................................................................... 7

20 U.S.C. § 1070 ........................................................................................................... 4

20 U.S.C. § 1087a .......................................................................................................... 4

20 U.S.C. § 1087e ........................................................................................ 4, 31

20 U.S.C. § 1088 .............................................................................................. 6

20 U.S.C. § 1095a ........................................................................................... 48

20 U.S.C. § 6103 ......................................................................................... 7, 37

31 U.S.C. § 3270A .......................................................................................... 48

**Other Authorities**

54 Fed. Reg. 25,818 ................................................................................ 9, 32, 33

79 Fed. Reg. 64890 ................................................................................... 6, 7, 8

House Comm. on Government Operations, Report 100-802 at 3107 (July 27, 1988) ......... 8, 9, 32

**Rules**

Fed. R. Civ. P. 65 ............................................................................................. 1

**Regulations**

34 C.F.R. § 30.33 ........................................................................................... 48

34 C.F.R. § 668.32 .......................................................................................... 17

34 C.F.R. § 668.404 .......................................................................................... 6

34 C.F.R. § 668.405 .......................................................................................... 7

34 C.F.R. § 668.411 .......................................................................................... 6

34 C.F.R. § 685.206 .............................................................................. 5, 12, 48

**Constitutional Provisions**

Const. Amend. V ............................................................................................. 35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on April 30, 2018, at 9:30 a.m. at the US. District Courthouse, 450 Golden Gate Avenue, Courtroom A, 15th Floor, San Francisco, CA 94102, before the Honorable Sallie Kim, Plaintiffs will, and hereby do move the Court pursuant to Fed. R. Civ. P. 65 for a preliminary injunction.  Plaintiffs' motion is based on this submission, the accompanying declarations and exhibits, the pleadings and other documents on file in this case, and any argument presented to the Court.

## RELIEF REQUESTED (CIVIL L.R. 7-2(B)(3))

Plaintiffs request that this Court issue a preliminary injunction pursuant to Fed. R. Civ. P. 65, ordering the Department of Education ("Department"): to cease all efforts to collect outstanding federal student loan debt from Plaintiffs, to ensure the removal of negative credit reporting on Plaintiffs' outstanding federal student loan debt, to restore federal student loan eligibility to Plaintiffs in the amount of their non-discharged Corinthian federal student loan debt, to stop applying its "Average Earnings Rule" to members of the proposed class, and to process Plaintiffs' claims under the "Corinthian Job Placement Rate Rule", as those terms are defined herein.  In short, Plaintiffs seek an order requiring the Department to return to the *status quo ante* before it began its illegal conduct.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Named Plaintiffs and members of the proposed class borrowed federal student loans to finance career training programs at schools operated by Corinthian Colleges, Inc. ("Corinthian"). Corinthian was a fraud and no longer exists.  However, the damage Corinthian caused to Named Plaintiffs and class members remains, and the Department is compounding it.

The Department adopted a rule to provide putative class members — borrowers who took out federal student loans for specific Corinthian programs during enumerated time periods — with full discharge of their loans pursuant to the terms of their loan contracts and Department regulations.  The Department broadly publicized this Rule, created a special application form for members of the proposed class, and engaged in extensive efforts to notify each and every class member of the availability of relief under the Rule (the "Corinthian Job Placement Rate Rule"). After receiving tens of thousands of applications, and canceling some loans pursuant to the Rule, the Department abruptly abandoned it, opting instead to experiment with illegally obtained data and a secret formula to deny class members' relief (the "Average Earnings Rule").  Perversely, the Department has gathered this data from the Social Security Administration ("SSA") pursuant to an information sharing agreement entered into for the purpose of protecting the public at large, and Named Plaintiffs specifically, from predatory institutions like Corinthian.   Members of the class who have recently received a determination under the Average Earnings Rule now face renewed collections.  Others remain in limbo while interest accrues on their loans, negative impacts on their credit continue, and their anxiety and uncertainty mounts.

The Court should enjoin this conduct because it is illegal in at least seven different ways. It constitutes impermissible retroactive rulemaking, it is an arbitrary and capricious abandonment

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

of a rule, and it denies class members the remedy on which they have relied.  The Average Earnings Rule violates the Privacy Act's prohibition on government use of personal information for non-authorized purposes, 5 U.S.C. § 552a(o-p & r-u), and the Department's reliance on aggregate information denies each member of the proposed class the rational decision-making process that the APA and Due Process requires.  Further, the Department's failure to explain its rationale, its inability to provide named Plaintiffs with the data underpinning its calculations, and its illogical reliance on this data to decide individual claims, violates the Due Process Clause and is arbitrary and capricious.

An immediate injunction is needed to prevent irreparable harm and to protect further violation of the class members' protected interests.  Corinthian initially targeted members of the proposed class because of their economic circumstances; they have no cushion against the collection — often accomplished through coercive means — of invalid loans.  Some members, including Named Plaintiff Craig, will be forced to choose: pay for her family's necessities or pay for these loans.  Members will default and their credit will be further damaged all on the basis of a decision that infringes on a constitutional right.   The Department's changed course of conduct imposes ongoing emotional and psychological harms on Named Plaintiffs and the class.

Given this, and because the Department's prior statements illustrate that the Corinthian Job Placement Rate Rule is in the public interest, Plaintiffs respectfully request that the Court enter a preliminary injunction to return to the *status quo ante*.  Specifically, Plaintiffs request an order that requires the Department to ensure that Plaintiffs are not harmed by additional delay during this litigation, that prohibits the Department from utilizing the Average Earnings Rule to decide proposed members' borrower defense applications, and that requires the Department to award

relief under the Corinthian Job Placement Rate Rule.[1]  This requested relief will mitigate the harm to Plaintiffs caused by the Department's intolerable and unjustified delay.

## II.   BACKGROUND

### A.  Statutory and Regulatory Framework

Three statutory and regulatory frameworks form the backdrop of this case: the "borrower defense" regulations, the "gainful employment" regulations, and the Privacy Act.  They are each discussed in turn.

#### 1.  "Borrower Defense"

The Department is responsible for overseeing and implementing "Title IV" of the Higher Education Act of 1965, 20 U.S.C. § 1070, *et seq*, ("HEA"), which includes the William D. Ford Direct Loan Program, 20 U.S.C. § 1087a, *et seq.*  Under the Direct Loan Program, the Department directly lends money to eligible student borrowers for use at "participating institutions of higher education," as approved by the Department.

The HEA provides for student loan borrowers to seek cancellation of their loans on the basis of school misconduct.  It directs that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part[.]"  20 U.S.C. § 1087e(h).  In 1995, the Secretary promulgated a regulation that permits a Direct Loan borrower to assert, as a defense to repayment, "any act or

---

[1] Named Plaintiffs intend to shortly move for certification of a class consisting of "all individuals who borrowed a Direct Loan to finance the cost of a program who are covered by the Department's Corinthian Job Placement Rule, who have applied, or will apply for a borrower defense, and who have not been granted the relief provided for by the Rule."  In any event, the Court may provisionally certify the proposed class for purposes of the preliminary injunction.  *See, e.g., Saravia v. Sessions*, -- F. Supp. 3d --, 2017 WL 5569838 at *20 (N.D. Cal. Nov. 20, 2017).

omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  34 C.F.R. § 685.206(c)(1).

All federal student loans issued to members of the proposed class at issue in this case are Direct Loans, and were issued pursuant to a form Master Promissory Note that informs borrowers that he or she "may assert, as a defense against collection of [the] loan, that the school did something wrong or failed to do something that it should have done" provided that "the school's act or omission directly relates to [the] loan or to the educational services that the loan was intended to pay, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law."  *See* Decl. of Joshua D. Rovenger ("Rovenger"), Manriquez Master Promissory Note at 7, (Ex. 1).[2]  A borrower defense relieves the borrower "of the obligation to repay all or part of the loan and associated costs and fees," and the Secretary may also provide additional relief including, without limitation, "[r]eimbursing the borrower for amounts paid toward the loan voluntarily or through enforced collection," "[d]etermining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act," and [u]pdating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan."  34 C.F.R. § 685.206(c)(2).

### 2.  Gainful Employment

The HEA allows institutions of higher education to participate in federal student aid programs.  A proprietary institution (*i.e.*, one that is operated as a for-profit business) is eligible to participate in Title IV programs to the extent that it provides "an eligible program of training to prepare students for gainful employment in a recognized occupation[.]" 20 U.S.C. §

---

[2] All exhibits cited herein are attached to the Rovenger Declaration, unless otherwise noted.

1002(b)(1)(A)(i); *see also* 20 U.S.C. § 1088(b)(1)(A)(1).  Vocational institutions and non-degree programs at public or nonprofit institutions may also only receive Title IV funding for "gainful employment" programs.  20 U.S.C. § 1002(c)(1)(A).

The Department's regulations set forth metrics by which it determines whether in fact a program prepares students for gainful employment. 34 C.F.R. Part 668, Subpart Q ("gainful employment regulation").  This regulation has an extensive and contested history, but in its present iteration, it establishes accountability metrics based on the ratio of student loan debt of a cohort of students from a specific program upon leaving or completing the program, to the earnings of that same cohort two years later ("D/E Metrics"). *See* 34 C.F.R. § 668.404.  Programs that do not pass the thresholds of these metrics face termination from participation in Title IV.  34 C.F.R. § 668.410.  The discussion of the statutory, regulatory, and statistical basis for the GE Metrics occupies over two hundred pages in the Federal Register.  Department of Education, Final Rule, Program Integrity: Gainful Employment, 79 Fed. Reg. 64890 (Oct. 31, 2014).  The purpose of the rule, and the specific calculations mandated thereunder, is "to assess whether a GE program has indeed prepared students to earn enough to repay their loans, or was sufficiently low cost, such that students are not unduly burdened with debt, and to safeguard the Federal investment in" Title IV. 79 Fed Reg 64891.

In order to calculate the D/E Metrics, the Department requires institutions to report information on an annual basis about students, including information needed to identify the student and institution, the program the student attended, the total amount of private and institutional debt incurred by the student, and the total amount of tuition and fees assessed against the student. 34 C.F.R. § 668.411.  After the institution is given an opportunity to correct the list compiled by the Department, the Department submits the list to the SSA. 34 C.F.R. § 668.405(d).  SSA returns to

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

the Department the mean and median annual earnings of the students on the list whom SSA has matched to SSA earnings data, "in aggregate and not in individual form," and "the number, but not the identities, of students on the list that SSA could not match." *Id.* SSA compares the social security numbers provided by the Department with earnings records in its Master Earnings File (MEF), a database that includes earnings reported by employers to SSA, and also by self-employed individuals to the Internal Revenue Service, which are then relayed to SSA. See 79 Fed. Reg. 64950. The Department has entered into an agreement with SSA pursuant to which this information is exchanged. *Amended Information Exchange Agreement between the Department of Education & the Social Security Administration for Aggregate Earnings Data* at 1 (Ex. 27) ("Gainful Employment Agreement").

The information provided by SSA to the Department must be aggregate, not individual, because SSA is barred by statute from disclosing the kind of personal data that would identify the wage earners and from disclosing their reported earnings, absent specific authorization in the Internal Revenue Code. 20 U.S.C. § 6103(a). Relatedly, Congress has barred the Department from developing, implementing, or maintaining a database of personally identifiable information. 20 U.S.C. § 1015c ("Student Unit Record Rule"). This prohibition exempts any database in use by the Department as of 2008, which is "necessary for the operation of" Title IV. 20 U.S.C. § 1015c(b). A court ruled that a prior gainful employment regulation be set aside, because it violated the student unit record prohibition by expanding the scope of personal information collected and maintained in the National Students Loan Data System ("NSLDS"). *Association of Private Sector Colleges and Universities v. Duncan*, Case No. 11-1314 (D.D.C. March 19, 2013). In recognition of this prohibition, the 2014 gainful employment regulation restricted the scope of the data

institutions would report to only such data "as needed to make a programmatic eligibility determination[.]" 79 Fed. Reg. 64976.

### 3. The Privacy Act

Congress adopted the Privacy Act, 5 U.S.C §552a, to "protect the privacy of individuals identified in information systems maintained by Federal agencies." Privacy Act of 1974, Pub. L. 93-579, 88 Stat. 1896. The Law "regulate[s] the collection, maintenance, use, and dissemination of information by such agencies," *Doe v. Chao*, 540 U.S. 614, 619 (2004) (citation omitted), in order to avoid "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." § 552a(e)(10).

In the 1980's, executive agencies were increasingly sharing individuals' personal information with one another for the purposes of deciding or verifying individual eligibility for federal benefits. Congress accordingly amended the Privacy Act to regulate "computer matching" or the "establishing or verifying eligibility for a Federal benefit program" without proper "due process." *See* Pub. Law. 100-503, *The Computer Matching and Privacy Protection Act of 1988*. The 1988 Amendments aimed to ensure that data was "independently verified before any adverse action c[ould] be taken" against individuals and that "individuals . . . [were] given notice and an opportunity to contest any findings resulting from a computer match." House Comm. on Government Operations, Report 100-802 at 3107 (July 27, 1988) ("Report 100-802"). To effectuate these goals, the law sets forth concrete procedural requirements that must be followed before an agency may render a federal benefits decision utilizing certain data.

These procedural requirements apply to "Matching Programs." The Act defines a "Matching Program" as "any computerized comparison of two or more automated systems of records . . . for the purpose of, or continuing compliance with statutory and regulatory requirements

by, applicants for, recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-kind assistance or payments under Federal benefit programs."  5 U.S.C. § 552a(a)(8)(A).   "Federal benefit programs" include "payments, grants, loans, or loan guarantees to individuals."  *Id.* § 552a(12).

A "Matching Program" does not include "matches performed to produce aggregate statistical data without any personal identifiers."  5 U.S.C. § 552a(a)(8)(B).  However, "to qualify under this exclusion, no information resulting from the match may be produced or retained in individually identifiable form or may be used in any way to affect the rights, benefits, or privileges of any individual."  Report 100-802 at 3130; 54 Fed. Reg. 25,818, 25,823 (June 19, 1989) (stating "implicit in this exception is that this kind of match is not done to take action against specific individuals.").

Matching Programs must satisfy several procedural requirements.  5 U.S.C. § 552a (o-p & r-u).  They include: (1) the agencies involved in the matching program must have entered into a written agreement specifying the purpose, legal authority, and cost savings of the matching program; (2) the executive department must inform applicants for a federal benefit that matching programs may be used in verifying their applications; (3) the agency must notify individuals that they have the right to contest the agency's findings from the matching program before the agency takes any adverse action; and, (4) the agency must report any new or revised matching program to the House Committee on Government Operations, the Senate Committee on Governmental Affairs, and the Office of Management and Budget ("OMB").

In addition to these procedural requirements, the Privacy Act requires an agency, irrespective of whether it is operating a Matching Program, to "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

determinations about an individual's rights, benefits, and privileges under Federal programs." 5 U.S.C. § 552a(e)(2)  And, the law mandates that agencies "inform each individual whom it asks to supply information, on the form which it uses to collect the information . . . the principal purpose or purposes for which the information is intended to be used." § 552a(e)(3).  Finally, the law generally prohibits disclosure of this information unless used for an enumerated purpose, such as "for a routine use."  § 552a(b)(3).

### B. The Department's Compounding Illegal Conduct and Plaintiffs' Litigation

#### 1. The Department Adopts the "Corinthian Job Placement Rate Rule"

Corinthian was a large for-profit college chain that cheated students and wasted taxpayer money.  It operated schools across the country and online under the brands Everest, Heald, and WyoTech, and primarily offered certificate and associate degree programs that purported to provide training in a variety of vocations.  At its peak, in the years 2009 and 2010, Corinthian operated over 100 campuses in 25 states, enrolled over 110,000 students, and collected $1.7 billion in federal student aid.  Senate Comm. on Health, Educ., Labor & Pensions, *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success: Part II, Corinthian Colleges, Inc.*, (July 30, 2012) (Ex. 2).

In January 2013, the Department investigated Corinthian's reported job placement rates.[3] After placing Corinthian on "Heightened Cash Monitoring" in June 2014, and ordering Corinthian

---

[3]  The Department was far from alone.  The Attorneys General of twenty-three states launched investigations of and/or issued subpoenas to Corinthian concerning its predatory deceptive recruiting and financial aid practices.  For example, in 2007, the Attorney General of California sued Corinthian for a "persistent pattern of unlawful conduct;" the case yielded an order preventing Corinthian from enrolling new students in specific programs, cancelled student debt owed directly to the school, and ordered further injunctive relief related to calculation of job placement rates. *People v. Corinthian Schools, Inc., et. al.*, No. BC374999 (Cal. Super Ct., July 31, 2007).  In 2013, the California Attorney General again sued Corinthian for violations of California law because it,

to post a letter of credit as a condition of continued participation in federal student aid programs in March 2015, the Department fined Corinthian approximately $30 million in April 2015 for violating the Department's prohibition on "substantial misrepresentation."  34 C.F.R. Part 668, subpart F; Dep't of Educ., *U.S. Department of Education Fines Corinthian Colleges $30 million for Misrepresentation* (April 14, 2015) (Ex. 3) ("$30 million PR").  The investigation found that Corinthian published falsely inflated job placement rates for 947 separate programs at its Heald College locations.  *Id.*  The Department concluded that "Heald College's inaccurate or incomplete disclosures were misleading to students; that they overstated the employment prospects of graduates of Heald's programs; and that current and prospective students of Heald could have relied upon that information as they were choosing whether to attend the school."  *Id.*  By way of example, Corinthian advertised that its Medical Office Administration AA Degree at Heald Hayward had a 100% job placement rate, when in reality it was only 38%.  Robin S. Minor, *Notice of Intent to Fine Heald College* at 14-16 (April 14, 2015) (Ex. 4).  Heald also paid temporary agencies to hire its graduates for periods as short as two days, and then counted those graduates as placed in their field of study.  (Ex. 3) ("$30 million PR").  Similarly, "one campus classified a 2011 graduate of an Accounting program as employed in the field based upon a food service job she started at Taco Bell in June 2006."  *Id.*

---

among other things, misrepresented job placement rates to students.  *See People v. Corinthian Colleges, Inc.*, No. CGC-13-534793 (Cal. Super. Ct., filed Oct. 11, 2013).  The following year, the Massachusetts Attorney General sued Corinthian Colleges for "unfair or deceptive acts or practices to enroll in Corinthian's Massachusetts Everest Institute schools." *Massachusetts v. Corinthian Colleges, Inc.*, No. 14-1093 (Mass. Super. Ct., filed April 3, 2014).  The Consumer Financial Protection Bureau also sued Corinthian in 2014, and a Court entered a default judgement which included numerous findings that Corinthian engaged in unfair and deceptive acts on a widespread basis.  *See Consumer Fin'l Prot. Bureau v. Corinthian*, No. 1:14-cv-07194, 2015 WL 10854380 (N.D. Ill. Oct. 27, 2015).

After Corinthian abruptly closed in April 2015, students who borrowed federal student loans to attend a Corinthian program began to assert their right to loan cancellation under the borrower defense regulation and the terms of their loan notes.  The Department found that, for at least a certain segment of such borrowers, Corinthian's clear and established misconduct so infected related student loans that those loans were presumptively eligible for complete cancellation pursuant to borrower defense.  The Department accordingly "set up a process to review" these claims and to provide a "fast track relief based on legal findings for large groups of students."  Office of Senators Elizabeth Warren & Richard J. Durbin, *Insult to Injury: How the DeVos Department of Education is Failing Defrauded Students* at 2 (November 2017) (Ex. 5) ("Warren-Durbin Report"); *see also* Dep't of Educ., *Department of Educ. and AG Kamala Harris Announce Findings from Investigation of WyoTech and Everest Programs* (Nov. 17, 2015) (Ex. 14) ("WyoTech Everest PR").  This "fast track" process would obviate the "need for these students to make any individual showing that they were affected by the school's fraud."  (Ex. 5) ("Warren-Durbin Report") at 2.

This work yielded a Rule to govern claims related to the Department's findings regarding various Corinthian programs.  The Rule consists of several interrelated determinations made by the Department:

(1)   California is the "applicable state law" for purposes of determining whether there is a cause of action against the school under 34 C.F.R. § 685.206(c)(1);

(2)   evidence established that Corinthian misrepresented job placement rates at specified campuses, respecting certain programs, during enumerated periods of time ("findings cohorts");

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

(3)   any Corinthian borrower who submits a simple attestation form provided by the Department, or otherwise submits information sufficient to establish membership in a findings cohort establishes a borrower defense; and

(4)   the Department will provide full relief under California law by cancelling all outstanding amounts on related loans and returning any money collected by the Department.

In other words, the Department concluded that all Corinthian students in a "findings cohort" were entitled to complete loan cancellation as a matter of California law, and that the submission and processing of the attestation forms would allow the Department to administratively process their claims. *See* Dep't of Educ., *Heald Findings* (Ex. 6); Dep't of Educ., *WyoTech & Everest Findings* (Ex. 7); Dep't of Educ., *Heald Attestation Form* (Ex. 8); Dep't of Educ., *WyoTech & Everest Attestation Form* (Ex. 9).[4]

This Rule was codified in legal memoranda written, approved, and relied upon by the Department, including a May 2015 memorandum prepared by the Department's Office of General Counsel, a fine action letter prepared by Federal Student Aid's Administrative Actions & Appeals Service Group, and an April 2015 document prepared by Federal Student Aid's Administrative Actions & Appeals Services Groups.  Office of Inspector Gen., U.S. Dep't of Educ., *Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process* (Dec. 8, 2017) (Ex. 10) ("IG Report").  Multiple and consistent public statements further confirm the existence of this Rule.  For example, a report by the Department-appointed Special Master for Borrower Defense explained that "the Department looked to California law and determined that Heald's

---

[4]  The attestation form for WyoTech and Everest programs show that the Rule applies to all federal Direct Loans, "including Parent PLUS loans issued to parents of Everest and WyoTech Students." (Ex. 9).

misrepresentations of placement rates constituted prohibited unfair competition under California's Unfair Competition Law (UCL).  Accordingly, students that relied on such misleading placement rates when they enrolled at Heald would have a cause of action under state law."  Dep't of Educ., *First Report of the Special Master for Borrower Defense to the Under Secretary* at 5 (Sept. 3, 2015) (Ex. 11) ("First SM Report").  And, in a submission to the OMB to continue emergency data collection from Corinthian borrowers, the Department said "borrowers who attended the Heald College programs that the Department has found made misrepresentations will have their loans discharged if they complete the attached attestation."  Dep't of Educ., *Emergency Clearance of Information Collection to Allow for Receipt of Borrower Defense Loan Discharge Claims & Supporting* (June 4, 2015) (Ex. 12) ("OMB Request").

This Rule covers approximately 800 Heald programs between 2010-2015; the Department estimated that it would benefit at least 50,000 borrowers.  Dep't of Educ., *Third Report of the Special Master for Borrower Defense to the Under Secretary* (March 25, 2016) (Ex. 13) ("Third SM Report").  The Rule also covers approximately 800 Everest and WyoTech programs in over 20 states; the Department estimated that it would cancel the loans of at least 85,000 Everest and WyoTech borrowers."  (Ex. 14) ("WyoTech & Everest PR").

Recognizing the extensive number of borrowers entitled to discharge under the Rule, the Department reached out to over 50,000 individuals who borrowed loans for Heald programs and who may have been class members.  (Ex. 13) ("Third SM Report").  Between 2015 and 2016, the Department also sent over 280,000 letters to former WyoTech and Everest borrowers who may have been members of a cohort.  Dep't of Educ., *Fourth Report to the Special Master for Borrower Defense to the Under Secretary* (June 29, 2016) (Ex. 15) ("Fourth SM Report").  In addition to its own efforts, the Department coordinated with attorneys general from 42 states and the District of

Columbia to inform more than 100,000 former Corinthian students of their eligibility for discharge, which was possible because the Department maintains individualized program-level enrollment data for majority of Corinthian borrowers.  *Id.; California v. DeVos*, No. 17-cv-07106 (N.D. Cal., filed Dec. 14, 2017), ECF No. 1 at ¶ 43.

The Department consistently applied the Rule until January 20, 2017.  Specifically, between the inception of the Rule and June 29, 2016, the Department processed approximately 3,787 claims under the Rule.  (Ex. 15) ("Fourth SM Report").  Between July 1, 2016, and January 20, 2017, the Department processed approximately 24,500 claims under the Rule.  Dep't of Educ., *American Career Institute Borrowers to Receive Automatic Group Relief for Federal Student Loans* (Jan. 13, 2017) (Ex. 16) ("ACI PR"); Dep't of Educ., Federal Student Aid Enforcement Off., *Report on Borrower Defense*, (Oct. 28, 2016) (Ex. 17) ("Borrower Defense Report").  As the Rule dictated, the Department provided the borrowers with a full cancellation of all outstanding student loan debt and a return of all money previously collected on their loans.  (Ex. 10) ("IG Report").  Notably, the Department did not reject any claims under the Rule before January 20, 2017.  *Id.*

### 2.   The Department Illegally Abandons the "Corinthian Job Placement Rate Rule"

Since January 20, 2017, the Department has failed to process any claims under the Corinthian Job Placement Rate Rule.   *Id.*   Public statements confirm that the Department has intentionally abandoned this Rule.  For example, after forming a Borrower Defense Review Panel in March 2017, the Acting Under Secretary of the Department issued a directive to the Department's Borrower Defense Unit on May 4, 2017, to cease submitting borrower defense claims to the Acting Under Secretary for approval until "interim procedures" could be developed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Id.* at 34.  Likewise, the Secretary announced on June 14, 2017, that she was undertaking further rulemaking on borrower defense and delaying borrower defense regulations that were set to become effective on July 1.[5]  Dep't of Educ., *Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions* (June 14, 2017) (Ex. 18) ("Regulatory Reset PR").  And, in August 2017, the Department issued a procurement notice seeking resources because "policy changes may necessitate certain claims already processed be revisited to assess other attributes," and that there was an "existing large backlog of claims from borrowers requesting relief from student loan debts."  Dep't of Educ., *FAR Part 8 Sole (Limited Sources Justification)* (Ex. 19).

As of January 20, 2017, there were 16,000 claims that the Department had administratively approved pursuant to the Rule, but that had not yet gone through the mechanics of the discharge process.  (Ex. 10) ("IG Report").  As of July 7, 2017, the Department had received but not processed over 45,000 borrower defense claims from former Corinthian students.  Office of the Under Secretary, Dep't of Educ., *Letter to Senator Richard J. Durbin* (July 7, 2017) (Ex. 20).  By November 2017, the Department had received but not processed 87,000 borrower defense claims (which, assuming a continuation of the prior trends, would be comprised 60% by borrowers covered by the Rule). (Ex. 5) ("Warren-Durbin Report"); (Ex. 17) ("Borrower Defense Report"); Danielle Douglas-Gabriel, *DeVos Calls for Another Delay of Rule to Protect Students from Predatory Colleges*, The Washington Post (Oct. 24, 2017) (Ex. 21).

---

[5] This rulemaking does not impact the already-issued loans of class members, and the lawfulness of the Defendants' delay of the regulation is being challenged by students, *Bauer v. DeVos*, No. 17-1330 (D.D.C filed July 6, 2017), and by a multi-state group of Attorneys General, *Mass v. U.S. Dep't of Educ.*, No. 17-331 (D.D.C. filed July 7, 2017).

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

This abandonment has not been without cost.  Although the Department reached out to borrowers with the promise of full cancellation, a significant number of class members have subsequently heard nothing from the Department. *See* Decl. of Jamal Cornelius ("Cornelius") ¶ 25; Decl. of Rthwan Dobashi ("Dobashi") ¶ 21.  The uncertain status of their loans and the accumulating interest is damaging.  Dobashi ¶ 22; Cornelius ¶ 24.  Many lack the ability to apply for additional federal student loans until this is resolved, their credit has been harmed, and their ability to manage their finances — a particularly stressful task for a group of individuals who were targeted by Corinthian precisely because they were the most vulnerable — is impossible given this uncertainty.  *See* 34 C.F.R. § 668.32(g) (noting that an individual who is in default on student loans is not eligible for further federal student loans); *see also* Cornelius ¶¶ 19-24; Decl. of Alina Farajian ("Farajian") ¶¶ 12-21; Dep't of Educ., *Fact Sheet: Protecting Students from Abusive Career Colleges* (June 8, 2015) (Ex. 22) ("Fact Sheet").

### 3.  The Department Arbitrarily and Capriciously Infringes on Plaintiffs' Privacy and Due Process Rights by Adopting and Applying the Average Earnings Rule

On December 20, 2017, the Department re-confirmed its abandonment of the Corinthian Job Placement Rate Rule and announced its replacement: the "improved" Average Earnings Rule. Press Release, Dep't of Educ., *Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers* (Dec. 20, 2017) (Ex. 23) ("Improved Process PR").  Under this Rule, the Department separates the question of whether a borrower has established a defense from the question of what consequences follow from that conclusion.  After determining that a defense exists, by some undisclosed process and standard, the Department then purports to calculate the "value" of the education received by the borrower.  It does this by comparing the average income of borrowers from the applicant's program of study with the average income data from borrowers

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

at an undefined "peer" school with a "passing gainful employment (GE) program."[6]  *Id.*; Dep't of Educ., *Borrower Defense Claim E-mail*  (Ex. 24) ("Sample Partial Denial").  For applicants who otherwise show that they were victimized by a predatory school and satisfy the requirements of the borrower defense regulation, but whose "earnings are at 50 percent or more of their GE program peers," the Department partially denies the application and requires the individual to repay a portion of their fraudulent loans.  Of course, because the D/E metrics permit an inexpensive school to "pass" based on one part of a fraction, and irrespective of its students' earnings, a student from a "peer" school may not be saddled with the same debt as a Corinthian borrower.  And, this would mean that a hypothetical average Corinthian borrower who earned $10,000 but had $30,000 in debt, would receive a partial denial if the average "peer" earned $5,000 and had no debt.[7]

Nowhere in the attestation form published in the Federal Register, posted on the Department's website, and provided to members of the proposed class does the Department solicit information from an individual borrower about their earnings.  Indeed, the attestation form does not ask for any information regarding either the "value" of having attended Corinthian, or the harm caused by Corinthian's illegal behavior.  *See* (Ex. 8) (Heald Attestation Form); (Ex. 9) (WyoTech

[6] The Department has kept secret the underlying information it is sending over for the calculations and it is thus not clear whether the Department is sharing the applicant's information when it provides data to obtain the mean and median income for a borrower's specific program.  Logic would suggest it does and that it is thereby infringing directly on the individual applicant's privacy rights. If not, however, the Department would run head first into an even larger due process problem than it already faces by issuing individual decisions on the basis of an assessment of the circumstances of *other* people.

[7] Nor does this calculation account for an individual's field of employment and area of study, so "if a borrower attends a nursing program, but couldn't find a nursing job and ended up in another field, the department has no way of knowing that."  Benjamin Wemund, *Education Department rules on thousands of student fraud claims*, Politico Pro (Dec. 20, 2017) (Ex. 26) ("Politico Article").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

& Everest Attestation Form).  The same is true regarding the Department's Universal Borrower Defense form, another OMB-approved form used by some Corinthian borrowers to apply for loan cancellation under borrower defense.

In order to obtain the data to implement the Average Earnings Rule, the Department has relied on the Information Exchange Agreement with the Social Security Administration (SSA) that was designed to determine eligibility under the gainful employment rule.  (Ex. 27) ("Gainful Employment Agreement") (entered into to "provid[e] aggregate disclosures of earnings information to the public to assist them in evaluating institutions that participate in the federal student aid programs").  Utilizing the procedure provided in that Agreement, the Department has sent over data for cohorts of students, and then, based on SSA's income information, has decided individual borrower defense applications.  (Ex. 23) ("Improved Borrower Process"); Senator Elizabeth Warren, *Letter to Inspector Generals* (Jan. 2, 2018) (Ex. 28) ("Warren letter"); Office of the Inspector Gen. of the SSA, *Letter to Senator Warren* (Jan. 30, 2018) (Ex. 29) ("SSA OIG Letter").  The Department has utilized the data in this way even though it lacks an information sharing agreement permitting them to do so. (Ex. 28) ("Warren letter"); (Ex. 29) ("SSA OIG Letter").  It has taken this action without reporting it to the House Committee on Government Operations, the Senate Committee on Governmental Affairs, and the OMB.  And, the Department has determined proposed class members' borrower defense claims without obtaining the income data directly from the impacted individuals or informing the individuals that their income information would be used in this manner.  (Ex. 8) ("Heald Attestation"); (Ex. 9) ("WyoTech/Everest Attestation").

The Department has just recently started applying this Rule to class members.  *See* Decl. of Jennifer Craig ("Craig") ¶ 23; Farajian ¶ 35.  The precise number of partial denials is known

only to the Department, although the Department has indicated that it intends to apply the Aggregate Earnings Rule to claims moving forward.   (Ex. 23) ("Improved Process PR"). Strikingly, the Department has issued these partial denials without releasing any of the data underlying its decisions.   And, in its notice informing applicants of their partial denial, the Department has failed to provide information about their right to appeal, has referenced a legal standard of "material misrepresentation(s)" rather than having a "cause of action . . . under applicable State law," has discounted individualized evidence submitted to the Department, and has required the applicant to continue making payments on *all* loans "until [they have] received notice from [their] loan servicer that the appropriate loans have been discharged." Craig ¶ 34, Dep't of Educ., *Email from Dep't of Educ. To Jennifer Craig, Borrower Defense Claim* (March 8, 2018) (Ex. 1) ("Craig Partial Denial"); (Ex. 24) ("Sample Partial Denial").   Perhaps unsurprisingly, the Department proudly estimates that the new Rule will "cut the overall amount of relief granted to students by around 60 percent." Maria Danilova, *Student Loans: For-profit Forgiveness Could See Major Cut,* The Associated Press (Jan. 30, 2018) (Ex. 30) ("AP Article").

### 4.  The Department's actions have harmed Named Plaintiffs and Members of the Proposed Class.

The Department's illegal abandonment of the Corinthian Job Placement Rate Rule, and the adoption of the Average Earnings Rule, has caused and is causing substantial harm to putative class members.   Class members have spent their time, money, and eligibility for federal student aid on sham programs.  Dobashi ¶ 23; Farajian ¶¶ 12-17 & 26-29.  They must forgo or defer further education.  34 C.F.R. § 668.32(g); Craig ¶ 33; Dobashi ¶ 13l.  They are unable to qualify for loans (or can only obtain the most predatory ones) and they have damaged credit.   *See, e.g.,* (Ex. 5) ("Warren-Durbin Report") at 13.   They are living on limited incomes and cannot absorb the

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

financial shock of the Department's actions.  Craig ¶¶ 28-33; Cornelius ¶¶ 12-13 & 22; Farajian ¶¶ 39-40.  Many members who have had their claims denied under the Average Earnings Rule, will now face the choice of putting food on their table or paying these invalid loans.  Craig ¶¶ 28-33; Farajian ¶ 39-40.  Corinthian's behavior caused the putative members financial, emotional, and dignitary harms; the Department's illegal and deceitful actions compound those injuries.

The Named Plaintiffs' harms and experiences are typical of the proposed class. Mr. Calvillo Manriquez enrolled in the Applied Automotive Technology Diploma Program at Corinthian's WyoTech-Fremont campus after school representatives promised him a top-notch education with a well-paid career in automotive technology.  To pay for this illusory education — one that he did not even finish because of his concerns with the quality of the program — Mr. Calvillo Manriquez took out two federal Direct Loans totalling $6,418.  He has since defaulted on those loans.  Because he is entitled to relief as a member of the Department's finding cohort for the Applied Automotive Technology Diploma Program at WyoTech-Fremont between July 1, 2010 and September 30, 2013, (Ex. 7) (WyoTech & Everest Findings"), he applied for borrower defense on January 3, 2017 utilizing the Rule's prescribed attestation form.  Although the government has seized approximately $7,500 from him through forced collection, it has yet to discharge his loans pursuant to the Rule.

Mr. Cornelius enrolled in the Technology-Emphasis in Network Security AAS Program at Heald College's Concord campus after school representatives promised him a rewarding and well-paid career in information technology. Cornelius ¶¶ 7-9.  His financing for this sham included $25,555 in federal Direct loans, $6,375 in Federal Pell Grants, and $2,000.26 in private student loans.  *Id.* ¶ 13. As the school was shutting down in early 2015, it informed Mr. Cornelius that he had completed his program and issued him a degree.  *Id.* ¶ 10.  Mr. Cornelius has unsuccessfully

attempted to find a job in information technology; he currently works at a fast food restaurant. *Id.* ¶¶ 11-12.   Because he is entitled to relief as a member of the Department's cohort for the Information Technology-Emphasis in Network Security AAS program offered at Heald-Concord after July 1, 2010, (Ex. 6) ("Heald Findings"), and based on a letter from the Department informing him that he was eligible to have his federal loans discharged if he completed an attestation form, Mr. Cornelius applied for borrower defense during the Summer of 2016 utilizing the Rule's attestation form.  Cornelius ¶ 16.  Concerned about the lack of any response from the Department, he signed and sent a second attestation form around August 24, 2016. *Id.* ¶ 18.  The Department has responded with silence. *Id.* ¶25.

Mr. Dobashi attended the Applied Automotive Technology Diploma Program after school representatives promised him a rewarding and well-paid career in the field.  Dobashi ¶¶. 6-9. Based on representations about the value of a second program focusing on high-performance engines, he enrolled in the Applied Automotive Technology-Advanced Diagnostics Program at WyoTech-Fremont campus. *Id.* ¶¶ 6-8.  He financed these useless programs through $22,184 in federal Direct loans, $11,100 in Federal Pell Grants, and $3,183.73 in private student loans. *Id.* ¶ 11.  Mr. Dobashi has tried and failed to find employment in the field of automobile repair. *Id.* ¶ 10.  Because Mr. Dobashi is entitled to relief as both a member of the Department's finding cohort regarding the Applied Automotive Technology Diploma Program and the Applied Automotive Technology-Advanced Diagnostics Program at Corinthian's WyoTech-Fremont campus between July 1, 2010 and September 30, 2013, (Ex. 7) ("WyoTech & Everest Findings"), he applied for borrower defense utilizing the Rule's prescribed attestation form in April 2016. *Id.* ¶¶ 14-17. Nearly two years later, he is still waiting for a response. *Id.* ¶ 21.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ms. Craig attended the Medical Insurance Billing and Coding Diploma Program after school representatives promised her a rewarding career in the field. Craig ¶¶ 6-10. Her financing for her program included two federal Direct Loans totalling $9,019. *Id.* ¶ 11. Ms. Craig graduated from the program in February 2015 and she has been unable to find a job in this line of work. *Id.* ¶¶ 16-20. Indeed, she has been told repeatedly that she lacks the requisite training to be employed in the field. *Id.* Ms. Craig is currently unemployed and raising three young children with her recently-unemployed husband. *Id.* ¶¶ 28, 30. Because she started her program in April 2014 and is thus entitled to relief as a member of the Department's Cohort for the Medical Insurance Billing and Coding Diploma Program offered at Everest-City of Industry Campus, (Ex. 7) ("WyoTech & Everest Findings"), she applied for borrower defense in or around June 2016 using the Rule's attestation form. Craig ¶ 21. On March 8, 2018, the Department of Education e-mailed Ms. Craig informing her that her application was partially denied. *Id.* ¶ 23. Despite its prior findings, it concluded that Ms. Craig was only entitled to a discharge of 20% of her loans. *Id.* Ms. Craig had anticipated that the Department of Education would forgive all her fraudulently obtained loans and is not in a position to start paying the remaining amount she owes. *Id.* ¶¶ 22, 25-32. She does not understand how the Department calculated her relief. *Id.* ¶ 24. She anticipates that she will default shortly after repayment begins. *Id.* ¶ 33.

### 5.   Named Plaintiffs File Suit to Stop the Department's Unlawful Actions

On December 20, 2017 — approximately 21 months after Mr. Dobashi submitted his application — the Named Plaintiffs filed this suit on behalf of a class of similarly situated borrowers. ECF No. 1.[8] Named Plaintiffs filed an Amended Complaint on March 17, 2018. ECF

---

[8] On January 3, 2018, the Court administratively related the case to *People of the State of California v. Dep't of Educ., et.al.*, No. 17-cv-07106-SK. ECF Dkt. No. 10. A similar case is also pending

1
2
3

No. 33.   They seek class-wide preliminary injunctive and declaratory relief requiring the Department to stop applying the Average Earnings Rule to the class and to timely provide relief under the Corinthian Job Placement Rate Rule.  *Id.*

4
5
6

### III. THE COURT SHOULD REQUIRE THE DEPARTMENT TO RETURN TO THE STATUS QUO ANTE BEFORE IT EMBARKED ON ITS CAMPAIGN OF ILLEGAL CONDUCT

7
8
9
10

To obtain a preliminary injunction, Plaintiffs must show: "(1) likely success on the merits; (2) likely irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public's interest." *Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (citations omitted).

11
12
13
14
15
16
17
18
19
20

Plaintiffs satisfy all of the requirements for immediate equitable relief.  *First*, Plaintiffs are likely to succeed in showing that the Department's abandonment of the Corinthian Job Placement Rate Rule, and its adoption of the Average Earnings Rule, violate the law in at least seven different ways.  *Second*, members of the proposed class are likely to continue suffering irreparable harm as a result of these actions — ranging from ongoing Privacy Act and constitutional violations to catastrophic economic harm and emotional distress — that warrant an injunction.  Finally, the Department's own statements about the importance of the Corinthian Job Placement Rate Rule leave little doubt that an injunction is in the public interest.

21
22

### A. Plaintiffs are Likely to Succeed in Showing that the Department Has Repeatedly and in Bad Faith Violated the APA and Other Laws

23
24

Plaintiffs need only show that they are likely to succeed on *one* claim to support a preliminary injunction.   Here, Plaintiffs will succeed on seven claims under the APA. The

25
26
27
28

in the District Court for the District of Columbia.  *See Massachusetts, et. al. v. Dep't of Educ., et. al.,* No. 17-2679.

Department has impermissibly abandoned the Corinthian Job Placement Rate Rule; the Department's application of the Average Earnings Rule is unlawful retroactive rulemaking; the Department's recent adoption and ongoing application of the Average Earnings Rule to the proposed class violates the Privacy Act; the Department's Average Earnings Rule is an unconstitutional infringement on due process; the Department's Average Earnings Rule is unlawfully arbitrary and capricious; the Department has unlawfully withheld relief under the Corinthian Job Placement Rate Rule; and, the Department has unlawfully and unreasonably delayed providing relief under the Corinthian Job Placement Rate Rule.   Collectively, these improprieties manifest the Department's bad faith in handling class members' claims and require the Court's immediate intervention.

**1.   The Department has impermissibly abandoned the Corinthian Job Placement Rate Rule.**

A court may set aside final agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).   The Department's abandonment of the Corinthian Job Placement Rate Rule constitutes a final agency action that is subject to judicial review.  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (explaining that a "final agency action" is one that "mark[s] the consummation of the agency's decision making process," and "one by which rights or obligations have been determined or from which legal consequences will flow.") (internal quotation marks and citations omitted).   The question of whether an action is "final" is "pragmatic and flexible" and the focus is on the "practical and legal effects of agency action." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.,* 465 F.3d 977, 982 (9th Cir. 2006) (citation omitted).   The Department's abandonment of the Corinthian Job Placement Rate Rule marked the final decision that the beneficiaries of the Rule were no longer able to obtain

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

relief under it.  And, the decision has a significant legal impact on the approximately 110,000 individuals who were entitled to a full loan discharge under the rule, but are unlikely to receive it.

Given that, the Department could only abandon the policy in favor of the Average Earnings Rule in accordance with the APA.  When changing course, an agency must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (internal citation omitted).  In fact, when a change is "abrupt," and "terminates a program on which so many people rely, the APA requires a more detailed justification." *Regents of Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1046 (N.D. Cal. 2018) (internal quotation marks and citations omitted); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2126 (2016); *Am. Fed. of Labor v. Chertoff*, 552 F. Supp. 2d 999, 1009 (N.D. Cal. 2007).  The Supreme Court has made clear that agencies must: show an "awareness that it is changing position," establish that "the new policy is permissible under the statute [and that it] believes the new policy is better," and if "the new policy rests upon factual findings that contradict those which underlay its prior policy . . . [it must provide] a reasoned explanation  . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

The Department fails to satisfy these requirements.  It has refused to provide any explanation for its departure, let alone a reasoned one.  Indeed, it has not explained how or why it is disregarding the extensive findings underpinning the Corinthian Job Placement Rate Rule, why it is discounting its prior conclusion that all individuals in a findings cohort are entitled to full cancellation, why it believes abandoning the Rule in favor of the Average Earnings Rule is the

"better" policy, or how the new policy comports with the law. *See* (Ex. 6) ("Heald Findings"); (Ex. 7) ("WyoTech & Everest Findings"); (Ex. 14) ("WyoTech Everest PR"); (Ex. 16) ("ACI PR"); (Ex. 22) ("Fact Sheet"). This failure to explain the change is enough to invalidate the departure. *See Am. Fed. of Labor*, 552 F. Supp. 2d at 1009-10; *Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 620 (E.D. Pa. 2017) (stating that "[a]n agency's departure from prior practice can serve as a basis for finding an agency's interpretation to be arbitrary and capricious, so long as the change in policy constitutes an unexplained inconsistency) (internal citation and quotations omitted).

Nor could the Department rationally explain the change if it tried. After a lengthy investigation, the Department found that Corinthian made substantial misrepresentations and published falsely inflated job placement rates for a significant number of programs. (Ex. 3) ("$30 million PR"). It concluded that the statements were misleading to students and that current and prospective students could have relied upon that information in choosing a school. *Id.* And, it determined that once an individual established that they were part of one of the programs that involved deceit, California law necessarily required the discharge of all outstanding loans. (Ex. 11) ("First SM Report"); (Ex. 12) ("OMB Request"). The Department has not pointed to any evidence, nor are Plaintiffs aware of any, contradicting, undermining, or even questioning these conclusions.

After communicating with over one hundred thousand individuals who were potentially entitled to relief, and then discharging loans for 25,000 people in a findings cohort, the Department cannot possibly explain how the class members are no longer eligible for relief. *See* (Ex. 10) ("IG Report"); (Ex. 16) ("ACI PR"); (Ex. 17) ("Borrower Defense Report"). Given the absence of any

justification for its decision, and the dearth of evidence undercutting its prior findings, the Department's abandonment of the Rule in favor of the Average Earnings Rule must be set aside.

### 2. The Department's application of the Average Earnings Rule, instead of the Corinthian Job Placement Rate Rule, constitutes illegal retroactive rulemaking.

It is well-established that "[r]etroactivity is not favored in the law . . . and courts should be reluctant to find such authority [for retroactive rulemaking] absent an express statutory grant." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988).  Retroactive rulemaking is impermissible where it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).  In this circuit, courts evaluate: "(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard." *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1333 (9th Cir. 1982) (citation omitted); *accord Chang v. United States*, 327 F.3d 911, 928 (9th Cir. 2003).

The Ninth Circuit's decision in *Cort v. Crabtree* is particularly instructive. 113 F.3d 1081 (9th Cir. 1997).  There, the Bureau of Prisons maintained a policy of reducing sentences for "nonviolent" offenders if they completed a substance abuse program. *Id.* at 1082.  After the plaintiffs started the program, but before they were able to finish, "the Bureau altered its interpretation of nonviolent offenses" and denied the plaintiffs their early release.  *Id.*  The court declared this impermissible. It noted, "It is clear that the Bureau could and did determine

prospectively that appellants and others already in the program were eligible for sentence reduction subject only to their successful completion of the [substance abuse] program." *Id.* at 1085.  The court therefore decided that the new interpretation of "nonviolent offenses" could not "be applied to prisoners already in the treatment program on the date of its adoption," *id.* at 1086.

Like *Cort*, the Department prospectively determined that all class members were entitled to relief under the Corinthian Job Placement Rate Rule.  It contacted thousands of class members with the promise of full relief under the Corinthian Job Placement Rate Rule.  It told class members that all they had to do was sign and submit an attestation form.  It placed no time limit on class members' ability to seek cancellation.  Class members submitted their attestation forms relying on the Rule and with the expectation that the Department would grant them relief under the Rule. Craig ¶ 25; Cornelius ¶¶ 15-18; Dobashi ¶¶ 14-16 & 19-20; Farajian ¶¶ 30-32.  They structured their lives under the Rule anticipating that their loans would quickly be discharged.  Craig ¶ 29; Cornelius ¶ 19.  In response, the Department has upended these expectations and is retroactively denying complete cancellation under the Average Earnings Rule.  Such retroactive rulemaking must be set aside.

All of the relevant factors also support this conclusion.[9]  *First*, the Department's actions constituted an abrupt departure from well-established practice that class members reasonably and substantially relied upon.  *See Garfias-Rodriguez v. Holder*, 702 F.3d 504, 521 (9th Cir. 2012) (explaining that "the second and third factors are closely intertwined [since] [i]f a new rule represents an abrupt departure from well established practice, a party's reliance on the prior rule

---

[9] The analysis of whether this particular case is one of first impression appears to be more suited for adjudicatory actions and "not be suited to our situation." *See Garfias-Rodriguez v. Holder*, 702 F.3d 504, 520 (9th Cir. 2012)

is likely to be reasonable.") (internal quotation marks and citation omitted).  The Department concluded in 2015 that all individuals in a findings cohort were entitled to loan cancellation.  It undertook substantial efforts to notify class members on an individual basis of their eligibility for loan cancellation.  It then, without exception until January 20, 2017, granted full relief to individuals whose claims it considered under the Rule.  *See* (Ex. 10) ("IG Report"); (Ex. 16) ("ACI PR"); (Ex. 17) ("Borrower Defense Report").  This was true between the adoption of the Rule in 2015 and January 20, 2017.  Named Plaintiffs reasonably relied on the Corinthian Job Placement Rate Rule because the Department broadly publicized this Rule, created a special application form for members of the proposed class, and engaged in extensive efforts to notify each and every member of the proposed class of the availability of relief under the Rule.  As noted, individuals applied using the attestation form and then planned their lives accordingly.

*Second*, class members will be significantly burdened by retroactive application of the Average Earnings Rule.  As explained, class members have spent their time, money, and eligibility for federal student aid on these programs.  They are forgoing and deferring education and are unable to qualify for loans because of their damaged credit.  They have financial, emotional, and dignitary harms.  Although nothing could fully redress their harms, the Department's application of the Corinthian Job Placement Rate Rule is a good and necessary first step.

*Third*, the Average Earnings Rule undermines the HEA and its associated regulations, whereas the Corinthian Job Placement Rate Rule furthers its purposes.  The Average Earnings Rule contravenes the statute by absurdly telling students that they were victims of consumer deception, had causes of action under California law entitling them to full relief, and yet they still have to pay money on their loans.  Conversely, the Corinthian Job Placement Rate Rule attempts to make the borrowers whole, thereby "serv[ing] the interests of distressed borrowers and

taxpayers and that . . . promote[s] public trust and confidence in th[e] process and in the federal student loan program." (Ex. 13) ("Third SM Report").[10]   There is simply no statutory interest that would support the Department's decision to apply this new Rule retroactively.

Accordingly, the Department's abandonment of the Corinthian Job Placement Rate Rule, and its application of the Average Earnings Rule to class members, unfairly backtracks on a promise made to the class, and constitutes impermissible retroactive rulemaking.  The Court should enjoin the Department's conduct.

### 3.   The Department's Average Earnings Rule violates the Privacy Act.

The Average Earnings Rule is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), because the Department's method of implementing the Rule violates the Privacy Act, 5 U.S.C. § 552a(o)-(r).   Injunctive relief is available under the APA to force compliance with the Privacy Act,[11] and is appropriate here because the Department's data sharing constitutes a "matching program" that fails to comply with the Privacy Act's procedural demands.  *See Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988); *Recticel Foam Corp. v. DOJ*, No. 98-2523, Slip. Op. at 9 (D.D.C. Jan. 31, 2002), appeal dismissed, No. 02-5118 (D.C. Cir. April 25, 2002); *but see Echols v. Morpho Detection, Inc.*, No. C 12-1581, 2013 WL 1501523 at *2-3 (N.D. Cal. April 11, 2013) (finding that the Privacy Act provided

---

[10] Nor does this statute authorize this type of retroactive rulemaking.  *See* 20 U.S.C. § 1087e(h).
[11] The Privacy Act expressly permits injunctions for correcting an individual's record and producing records improperly held.  The Supreme Court has speculated, without fully deciding, that injunctive relief through the APA is permitted for other violations of the Privacy Act because "it may be that this inattention [in failing to provide additional injunctive relief options in the Privacy Act] is explained by the general provisions for equitable relief within the Administrative Procedure Act (APA), 5 U.S.C §706." *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004).

sufficient remedies for an individual challenging the lack of process under the Privacy Act after being denied a security clearance).

> ### i. *The Department's reliance on secret data from the SSA to decide individual borrower defense applications constitutes a matching program subject to the Privacy Act's procedural requirements.*

A matching program exists when two agencies electronically compare data with one another, and then use the results of the comparison to make some determination relating to a federal benefit program. *Supra* at 8-10 (providing background on the Privacy Act). The *sine qua non* of a matching program is the purpose for which the data will be used. (Report 100-802) (summarizing the intent of the Privacy Act as focused on the purpose of the computerized comparison and noting that "[m]atches performed for statistical, research, law enforcement, tax, and certain other purposes are not subject to the act.")

By definition, the Department's data sharing program with the SSA is a matching program. In order to obtain the data for the calculations under the Average Earnings Rule, the Department and SSA utilize a computerized comparison of at least two automated systems of records (the Department's information relating to the applicants and their programs, and the SSA's information relating to the individual's income). (Ex. 27) ("Gainful Earnings Agreement"). Once the comparison is complete, the Department uses those data for one purpose: to determine whether a specific borrower defense applicant receives full discharge of her federal student loans. (Ex. 23) ("Improved Process PR").

That the Department aggregates its data is of no import. Although the law excludes from the definition of matching programs, "matches performed to produce aggregate *statistical* data without any personal identifiers," 5 U.S.C. § 552a(a)(8)(B)(i) (emphasis added), this safe harbor only applies where the aggregate data is *not* then used for the purposes of an individual's federal

benefits determination.  54 Fed. Reg. 25,818, 25,823 (June 19, 1989) ("implicit in this exception

is that this kind of match is not done to take action against specific individuals."); (Report 100-

802) ("To qualify under this exclusion, no information resulting from the match may be produced

or retained in individually identifiable form or may be used in any way to  affect the rights, benefits,

or privileges of any individual).[12]  This makes good sense.  Absent such a limitation, there would

be a significant hole in the definition of a "matching program" that would allow agencies to evade

the Privacy Act's procedural requirements. *See Comm'r. Of Internal Revenue v. Clark*, 489 U.S.

726, 739 (1989) (reading statutory exception "narrowly in order to preserve the primary operation

of the provision").

> ii. *The Department is violating the Privacy Act by failing to comply with the Privacy Act's procedural requirements.*

The Department fails to satisfy several of the Law's procedural requirements. 5 U.S.C. §

552a (o-p & r-u).  As detailed, the Law requires (1) that the agencies involved in the matching

program must have entered into a written agreement specifying the purpose, legal authority, and

cost savings of the matching program; (2) the executive department must inform applicants for a

federal benefit that matching programs may be used in verifying their applications; (3) the agency

must notify individuals that they have the right to contest the agency's findings from the matching

program before the agency takes any adverse action; and (4) the agency must report any new or

revised matching program to the House Committee on Government Operations, the Senate

---

[12] The OMB report clarifies that statistical data may have "consequences for the subjects of the match as members of a class or group," such as providing statistical analyses for future agency policies or rulemaking, but that the data may not be used in individual assessments of federal benefits. 54 Fed. Reg. at 25,823.

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

Committee on Governmental Affairs, and the OMB.  *Supra* at 8-10 (describing requirements for Matching Programs under the Privacy Act).

By its plain terms, the pre-existing written agreement between the SSA and the Department, entered into in furtherance of the gainful employment regulation, does not cover the Department's use of the data as part of the Average Earnings Rule.  As the agreement states, the information is "to provide aggregate disclosures of earnings information to the public to assist them in evaluating institutions that participate in the federal student aid programs."  (Ex. 27) ("Gainful Employment Agreement.")  The Agreement notes that "ED will also use the information to consider policy options for revising the regulations for programs that are required to prepare gainful employment in recognized occupations, and through these regulations to determine each educational aid program's institutional eligibility."  *Id.*  Nothing in this agreement — nor any that Plaintiffs are aware of — contemplates using the aggregate earnings data to evaluate an individual's borrower defense application.  (Ex. 29) ("SSA OIG Letter") ("[S]ince the new ED program did not exist when this agreement was established in May 2013, this use of SSA's data could not have been foreseen at the time the agreement was established."); *see also* (Ex. 28) ("Warren letter").

Nor did the Department properly inform applicants that it would be using the applicants' income as part of this matching program to determine eligibility for borrower defense.  The attestation forms include a "Privacy Act Notice" that informs an applicant that the information "in your file may be disclosed, on a case-by-case basis or under a computer matching program as authorized under routine uses in the appropriate systems of records notices."  But, the attestation forms do not disclose (nor, since it does not seek income information, could it disclose) that the individual's income information *will* be disclosed or utilized in a matching program.  *See* (Ex. 8)

("Heald Attestation"); (Ex. 9) ("WyoTech & Everest Attestation").  Additionally, neither NSLDS nor any other systems of records notices published by the Department or SSA in the federal register, § 552a(b)(3), identify as a routine use the disclosure of data under a matching program used here to deny relief on the basis of aggregate earnings.

In line with its due process violations, *infra* at 37-39 (discussing the Department's due process violations), the Department has also failed to notify individuals that they have the right to contest the agency's finding from the matching program before any adverse action is taken.  In fact, the Department has not even disclosed to applicants that it is engaging in this type of matching program.

Finally, the Department has kept this process secret from both the public and its congressional and executive oversight.  Under the Law, the Department is required to disclose any new matching program to the Committee on Governmental Affairs of the Senate, the Committee on Government Operations in the House, and the OMB. 5 U.S.C. § 552a(r).  It has not done so. (Ex. 28) ("Warren letter"); (Ex. 29) ("SSA OIG Letter").

Ultimately, the Department's abandonment of the Corinthian Job Placement Rate Rule in favor of one that utilizes a secret process and violates the Privacy Act must be set aside.

### 4.  The Department's Average Earnings Rule violates class members' due process rights.

Plaintiffs will also succeed in establishing that the department has violated the due process clause and, accordingly, the APA.  *See* 5 U.S.C. § 706(2)(B); Const. Amend. V.  Under the due process clause, Plaintiffs must show: (1) a protected liberty or property interest and (2) a denial of adequate procedural protections.  *See Bd. of Regents v. Roth*, 408 U.S. 564, 569-71 (1972).

Plaintiffs have a property interest in the outcome of their borrower defense application.  *Cf. Higgins v. Spellings*, 663 F. Supp. 2d 788, 794-95 (W.D. Mo. 2009) (finding that student borrowers

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

had a property interest in discharge of federally guaranteed student loans).  "[Property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Griffeth v. Detrich*, 603 F.2d 118 (9th Cir. 1979) (citation omitted); *see also Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998) (finding a property interest in acquiring a fishing permit); *Furlong v. Shalala*, 156 F.3d 384 (2d Cir. 1998) (finding property interest based on "constant, consistent pattern of ALJ decisions" related to Medicare rule).  Plaintiffs have a clear property interest based on: (1) the statutory and regulatory standards entitling individuals to a loan discharge once they satisfy the elements of the regulation, (2) the Department's Corinthian Job Placement Rate Rule, (3) the Department's consistent application of the Rule to 25,000 individuals, and (4) the Department's outreach to class members informing them about their eligibility and entitlement to relief under the Rule.

The Department is denying Plaintiffs proper process in at least three different ways.  First, the Department is failing to provide proper notice of its decisions.  Second, the Department is ignoring individualized evidence of class members' injuries, instead relying on third-party data that does not reflect their individual circumstances.  Finally, the Department failed to inform individuals how their information would be used and what information would impact the Department's decision-making.

*First,* in order to be constitutionally adequate, a notice of benefits determination must provide claimants with enough information to understand the reasons for the agency's action. *Kapps v. Wing*, 404 F.3d 105, 123-26 (2d Cir. 2005) (*citing Goldberg* v. *Kelly*, 397 U.S. 254, 267-68 (1970) (further citation omitted).  This is so because "[c]laimants cannot know *whether* a challenge to an agency's action is warranted, much less formulate an effective challenge, if they

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

are not provided with sufficient information to understand the basis for the agency's action." *Id.* (*citing Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir. 1974)).  Indeed, "the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 288 n.4 (1974); *Goldberg*, 397 U.S. at 270-71.

Here, Plaintiffs have no way of verifying: (1) whether the income data that the Department considered is accurate for each individual applicant; (2) whether the individuals selected to be included in the aggregate mean for a program did, in fact, attend the identical program (*i.e.*, was the individual involved in the same course of study, at the same time, on the same campus, and for the same cost?); (3) how many and what grouping of individuals did the Department select for the comparison; (3) whether the "peer school" actually reflects anything resembling a comparable entity; or, (4) whether the student data considered from the "peer school" is correct.  It is not even clear that the Department is comparing the earnings at the same point in time, or in the same geographic region.  The Department has adopted a procedure that makes it impossible for Plaintiffs to challenge the Department's decision and that "forecloses an[y] opportunity to offer a contrary presentation."  *Bowman Transp., Inc.*, 419 U.S. at 288 n.4.

Nor would it be possible for the Department to cure these flaws because the law forbids the Department from releasing the individual income data that its decisions are built on.  *See* 5 U.S.C. § 552a(b) & 20 U.S.C. § 6103(a); *cf.* 20 U.S.C. § 1015c.  Although the Department theoretically could release the aggregate data, the same gaps in Plaintiffs' ability to challenge the

decision would remain.  In adopting a Rule that uses secret data that cannot be released, the Department has attempted to create a process that evades all form of meaningful review.[13]

*Second*, and under the same legal standards and logic, the Department is failing to provide proposed class members with information allowing them to "know the issues on which decision will turn." *Bowman Transp., Inc.*, 419 U.S. at 288 n.4.  In particular, the Department did not provide class members information about how the applicants' information would be used or how the Department would evaluate their claims at either the time the Department reached out to the class members about their entitlement to relief under the Corinthian Job Placement Rate Rule, or at the point it solicited attestation forms.  In doing so, the Department has precluded members from providing additional evidence with their attestation forms that might have impacted the Department's decision-making.  *See Latif v. Holder*, 28 F. Supp. 3d 1134, 1160-62 (9th Cir. 2014) (emphasizing the import of proper notice even when considered in the national security context).

*Finally*, the Department is violating class members' due process rights by relying on third-party data that fails to reflect Plaintiffs' individualized circumstances.[14]  *Goldberg*, 397 U.S. at

---

[13] The notices of decision are constitutionally defective in yet another, independent way: they fail to appraise individuals of their right to appeal. "One of the fundamental requirements of procedural due process is that a notice must be reasonably calculated to afford parties their right to present objections. *Gonzalez v. Sullivan*, 914 F.2d 1197, 1203 (9th Cir. 1990) (*citing Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950)). This requirement demands that a notice "accurately state how a claimant might appeal an initial burden," and that "the form of the notice . . . is [not] sufficiently misleading that it introduces a high risk of error into the . . . decision making process." *Id*.  Thus, for example, a Social Security denial notice that "does not clearly indicate that if no request for reconsideration is made, the determination is final," violated the constitution. *Id*.  Here, the Departments' notice does not provide any detail as to how an individual can appeal a partial denial and, accordingly, misleadingly implies that the decision is final.

[14] Irrespective of whether there was a matching program, the Department was required to both "collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs," and separately  "inform each individual whom it asks to supply information, on the form which it uses to collect the information . . . the principal purpose

264 (individualized hearing was required for termination of federal benefits); *cf. Atkins v. Parker*, 472 U.S. 115, 129 (1985) (finding that Congress has power to alter the scope and duration of food-stamp benefits without individualized treatment, but critically noting that the case did "not concern the procedural fairness of individual eligibility determinations."). In utilizing aggregate income data, the Department improperly anchors an individual's right to a full discharge to the average income of her undefined cohort and the attendees of some other, unknown program.

This due process problem is magnified when compared to similar contexts. For instance, suppose the SSA decided that an individual, irrespective of her own disability, was only entitled to full benefits if the "average individual with her disorder" was able to work less than "the average healthy individual." Or, assume that a state determination of an individual's eligibility for the Supplemental Nutrition Assistance Program turned, not on the applicant's own income, but on whether the applicant lived in a city where the average income was lower than "peer cities." Or, imagine that the Centers for Medicare and Medicaid Services decided that, irrespective of an individual's age, the extent of her Medicare coverage hinged on whether the average age in her home was higher than her neighbors. The Department's action is akin to these absurd examples and equally impermissible. Due process and basic notions of fairness prevent the government from relying on third-party data to decide an individual's eligibility for benefits in this way.

### 5. The Department's Average Earnings Rule is arbitrary and capricious.

Even if the new Average Earnings Rule satisfied the Privacy Act and the Constitution, it is entirely irrational and fails under the APA's arbitrary and capricious standard. Under the APA, a

---

or purposes for which the information is intended to be used." 5 U.S.C. § 552a(e)(2&3). The law further prohibits disclosures of this information unless used (among other purposes) "for a routine use." § 552a(b)(3). The Department has failed on these three fronts.

court must "carefully review[] the record [to] satisfy[] [itself] that the agency has made a reasoned decision[.]" *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989).   There must be a "rational connection between the facts found and the choice made[,]" S*tate Farm Mut. Auto. Ins. Co*., 463 U.S. at 43 (1983) (citation omitted), and the agency cannot "entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, or [adopt a rule that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Brower v. Evans*, 257 F.3d 1058, 1065 (9th Cir. 2001) (citation omitted).  Ultimately, an "agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706 [of the APA]." *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

The Department's adoption and application of the Average Earnings Rule is irrational in countless ways.  Here are just a few:

- The manner in which the Rule relies on the gainful employment standard is irrational. To determine whether a borrower is entitled to full relief, the Department compares the average income from a specific program, to the average income from a "GE passing peer school." But, a "GE passing" school could conceivably have a passing average debt to earnings ratio if it has relatively low earning graduates but charges virtually nothing to attend. By then deciding eligibility for a full loan discharge solely based on the Average Earnings Rule formulation, the Department is essentially saying that a Corinthian borrower who earns $10,000 but has $30,000 in loans "received a better education", and is in a better position, than an individual from a "peer" school who earns $5,000, but has nothing in loans. And, the Department reasons, this means that the Corinthian borrower is not entitled to a full discharge of her loans. There is no rational connection between the facts before the Department and this calculation that it has adopted.  *See Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008) (noting that there must be a "rational connection between the facts found and the choices made") (internal quotation marks and citation omitted).

- The Rule ignores all of the evidence and findings that the Department adopted in concluding that members of the findings cohorts were entitled to full discharge. The Department has both failed to explain why it departed from those findings and conclusions, or how a partial denial could be justified given those findings

and conclusions.  In perhaps the clearest example of the Department's irrational policy, it provided one class member's mother a full discharge of her Parent PLUS loans under the Corinthian Job Placement Rate Rule, but then denied the class member full relief.  Farajian ¶¶ 35-38. The loans were financing the exact same program for the exact same student.  *Id.*

- As highlighted above in the due process analysis, the Average Earnings Rule irrationally relies on third-party data that do not reflect Plaintiffs' circumstances and that ignore the requirements of the HEA and associated regulations.  And, the Department has applied this rule irrespective of any individualized information that individuals may submit.  In that way, it violates the law and is arbitrary and capricious.

- The Rule applies the wrong legal standard in evaluating claims. When partially denying claims, the Department has informed class members that they are entitled to some loan forgiveness "based on the school's material misrepresentation(s) to you."  (Ex. 24) ("Sample Partial Denial"); Craig (Ex. 1) ("Craig Partial Denial"). However, as explained, the relevant legal standard is not whether any school materially misled an individual, but whether the individual had a state law claim against the school. The Department's failure to apply the correct legal standard, alone, is reason to set aside the rule. *See Regents of the Univ. of Cal.*, 279 F. Supp. at *1037* (finding an action violates the APA if it is "based on the flawed legal premise").

- The Rule, in looking only at average incomes, fails to take into account whether an individual is actually working in the field of study they went to school for, (Ex. 26) ("Politico Article"), or whether any past experiences impact an individual's income.  In other words, and as the Department fully admits, the aggregate incomes of Corinthian borrowers could conceivably be higher than "peer" schools for reasons entirely unrelated to the "education" they received.  Moreover, under the Gainful Employment rule, an individual with no reportable income who therefore did not file a return is not counted in a program's D/E metric. This skews the average data by artificially increasing the average income, which in turn artificially depresses the amount of relief that is offered under the Average Earnings Rule.  The Department lacks a rational basis to therefore use this data as the sole mechanism to determine eligibility for a full loan discharge. *See Arrington*, 516 F.3d at 1112.

- Also as highlighted above, the Department is failing to provide a full explanation for its decision, nor is it providing the underlying data for its decisions.  And, as noted, it is precluded under the law from ever fully and meaningfully doing so. Because "the grounds upon which the administrative agency acted [must be] clearly disclosed and adequately sustained[,]" this failure also violates the APA. *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

- Finally, the Department's Average Earnings Rule is an irrational and impermissible interpretation of the regulation. The Department seemingly believes that the remedy it employs can be divorced from the state law cause of action that a borrower can assert under the regulation. This is wrong. The plain terms of the regulation show that the borrower defense remedy is tethered to the borrower's defense (*i.e.*, the state law claim). Indeed, the Department has shared this interpretation for nearly two decades. *See* (Office of the Gen. Counsel, U.S. Dep't of Educ., Interstate Business College; Defense to Repayment of her Direct Loans (Feb. 20, 2001) (Ex. 31) ("GC Memo 2/21/01"); Office of General Counsel, U.S. Dep't of Educ., *Interstate Business College, ND Former Students' Defense to Repayment of their Direct Loans* (Feb. 6, 2001) (Ex. 33); Office of General Counsel, U.S. Dep't of Educ., *Interstate Business College, ND Former Students' Defense to Repayment of their Direct Loans* (Feb. 11, 2003) (Ex. 34); Office of General, *Interstate Business College, ND Former Students' Defense to Repayment of their Direct Loans* (Oct. 4, 2000) (Ex. 25). And, in any event, the Department's concept conflicts with the facts (as discussed above), and is outside the scope of the law.

Ultimately, because the Department's new rule is illogical in countless ways, Plaintiffs are likely to succeed on the merits.

### 6.  The Department has unlawfully withheld and unreasonably delayed relief under the Corinthian Job Placement Rate Rule

Finally, in adopting the Average Earnings Rule in lieu of the Corinthian Job Placement Rule, the Department has been unlawfully withholding and unreasonably delaying the remedy to which class members are entitled. Section 706(1) of the APA states that a court "shall compel agency action unlawfully withheld or unreasonable delayed[.]" 5 USC § 706(1). Plaintiff must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take.*" *Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1161 (N.D. Cal. 2007) (citation and quotations omitted) (emphasis in original). In other words, "[a] court can compel agency action . . . if there is a specific, unequivocal command placed on the agency to take a 'discrete agency action,' and the agency has failed to take that action." *Vietnam Veterans of Am. v. CIA*, 811 F. 3d 1068, 1075 (9th Cir. 2015) (citation omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Here, the Department's Corinthian Job Placement Rate Rule was specific and unequivocal: upon receiving an attestation form showing that an individual was in a findings cohort, the Department was required to grant full loan discharge to individuals.  *See Id.* at 1078-79 (finding the Army's regulation to be sufficiently specific and unequivocal to justify action under section 706(1) and stating that a regulatory legal directive is still sufficiently specific even where it leaves "discretion in the manner in which the duty may be carried out[.]").  The Department concluded that, with respect to the specific programs enumerated in its findings, Corinthian violated California law through its misrepresentations; borrowers in those cohorts were thus entitled to full relief.  (Ex. 11) ("First SM Report") ("[T]he Department looked to California law and determined that Heald's misrepresentations of placement rates constituted prohibited unfair competition under California's Unfair Competition Law (UCL).  Accordingly, students that relied on such misleading placement rates when they enrolled at Heald would have a cause of action under state law."); (Ex. 12) ("OMB Request") (stating that "borrowers who attended the Heald College programs that the Department has found made misrepresentations to have their loans discharged if they complete the attached attestation.")  The Rule specifically and unequivocally commands the Department to grant full relief where an individual in a findings cohort submitted an attestation form establishing that they fell into one of the findings cohorts.

Not only has the Department unlawfully withheld this relief, but it has done so for an unreasonable period of time.  The Department's recent adoption of the Average Earnings Rule exacerbates the delay.  To evaluate an APA "delay" claim, courts apply a "rule of reason . . . tak[ing] into account the nature and extent of the interests prejudiced by the delay," among other considerations.  *Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC"); *Brower v. Evans*, 257 F.3d 1058, 1068–69 (9th Cir. 2001) (utilizing the TRAC

considerations to evaluate the reasonableness of agency delay); *Houseton v. Nimmo*, 670 F.2d 1375 (9th Cir. 1982) (finding a 16-month delay in processing a request for reconsideration to be the equivalent of a dismissal of the request); *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 337-40 (E.D. La. 2011) (finding a delay of four to nine months unreasonable where permits were generally processed in two weeks' time).

The Department is taking more time to grant relief under the Corinthian Job Placement Rate Rule than is reasonable. The Department has concluded that individuals in a findings cohort are entitled to relief. They need no time to make specific findings related to applicants. They need no time to make specific findings about the school. They need no time to engage in additional legal analysis. Instead, they must simply process an attestation form and then grant the relief. Speed is precisely why the Department adopted the Rule in the first place, *see* (Ex. 14) ("WyoTech & Everest PR") (the rule provides for "a streamlined form of student loan relief"); (Ex. 5) ("Warren-Durbin Report") (describing it as providing "fast track relief"), and why the Department was able to process over 4,000 applicants a month between July 2016 and January 2017. (Ex. 16) ("ACI PR"); (Ex. 17) ("Borrower Defense Report"). Indeed, the Department noted that "ED's first priority was to expedite relief of eligible loans to former students of Heald who were enrolled in programs that are covered by ED's finding and relied on misleading placement rates." (Ex. 13) ("Third SM Report"). However, instead of applying the Rule, the Department has diverted its resources to undermining it and to crafting the Average Earnings Rule. (Ex. 19) ("Procurement Notice"). Its failure to apply the Rule to any individual for over 14 months is unreasonable given the Department's own statements.

Finally, the delay has severe and intolerable harms on proposed members' health and welfare, and is causing significant prejudice to class members. As noted, many class members

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

applied for relief only after the Department reached out to them with the promise of a quick resolution. *See United Steelworkers of Am., AFL-CIO-CLC v. Rubber Mfrs. Ass'n*, 783, F.2d 1117, 1119 (D.C. Cir. 1986) ("the court considers the specifics of the agency's proposed timetable highly relevant information."); Cornelius ¶ 15; Farajian ¶¶ 30-32.  For instance, some class members did not request forbearance of their loans on the promise of a quick decision, and are now enduring stress and payments that they are unable to afford. Cornelius ¶¶ 19, 22-24.   Others have seen the interest accrue on their loans and suffer the corresponding anxiety and stress.  Dobashi ¶¶ 21-22.

The Department's actions since January 20, 2017 reflect an entity that is simply unwilling to grant the relief that Plaintiffs are entitled to.  The Court must step in to force the Department to comply with the law.

### B. A Preliminary Injunction is Needed to Stop the Irreparable Harm that the Department Has Caused and Will Cause Plaintiffs.

A Plaintiff seeking a preliminary injunction must show that there is "immediate threatened injury" which occurs where the plaintiff "is likely to suffer irreparable harm before a decision on the merits can be reached." *Boardman v. Pac. Seafood Gp*., 822 F.3d 1011, 1022-23 (9th Cir. 2016) (citation and emphasis omitted).  The analysis focuses solely on whether the harm is irreparable "irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 725 (9th Cir. 1999).

Although Plaintiffs need not show any government malfeasance to establish irreparable harm, Plaintiffs pause to note that the Department's actions since January 20, 2017 are *intentionally* compounding Plaintiffs' various harms.  Defendants seemingly have one goal: reduce the amount of loan cancellation afforded to Plaintiffs.  *See* (Ex. 30) (noting that the adoption of the new rule would "cut the overall amount of relief granted to students by around 60 percent"); Andrew Kreighbaum, *DeVos: Borrower-Defense Rule Offered 'Free Money'* Inside Higher Ed

(Sept. 26, 2017) (Ex. 32) (Secretary DeVos explaining that, pursuant to the borrower defense regulation, "all one had to do was raise his or her hands to be entitled to so-called free money"). To plot how best to do so, they stopped acting on *any* borrower defense applications for nearly a year.  Then, they adopted a rule that is so painfully illogical, plainly irrational, and patently unconstitutional, that their actions evidence their bad faith and their complete unwillingness to provide (let alone timely provide) Plaintiffs full relief.  Absent an injunction returning to the *status quo ante*, the Defendants will just endure and continue to:

1.  Irreparably violate class members' constitutional rights;

2.  Irreparably invade Plaintiffs' privacy rights and cause dignitary and emotional harms by denying them relief based on that very infringement;

3.  Irreparably cause extreme financial hardships for members of the class and overlapping emotional distress; and,

4.  Irreparably cause financial damages that Plaintiffs cannot recover from the government.

Specifically, the Department's Due process violation is ongoing and, given that the Department is processing applications under the Average Earnings Rule, will likely occur in the midst of litigation.  Because one can never recover from the loss of one's procedural due process rights, the prospect of that constitutional violation *alone* justifies a preliminary injunction.  *See Saravia v. Sessions*, -- F. Supp. 3d --, 2017 WL 5569838 at *19 (N.D. Cal. Nov. 20, 2017) (finding that deprivation of procedural due process was "generally sufficient to demonstrate irreparable injury") (citations omitted); *Lavan v.. City of Los Angeles*, 797 F. Supp. 2d 1005, 1019 (C.D. Cal. 2011) (explaining that in the Ninth Circuit "an alleged constitutional infringement will often alone constitute irreparable harm," and preliminarily enjoining a city practice based on an ongoing

procedural due process violation) (*citing Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (further citation omitted).

Absent an injunction, the Department will continue to irreparably invade Plaintiffs' privacy rights, and then cause dignitary and emotional harms by denying them relief based on that very infringement.  In abandoning the Corinthian Job Placement Rate Rule in favor of the Average Earnings Rule, the Department is engaged in an ongoing violation of the Privacy Act.  The emotional distress stemming from the Department's partial denials are not compensable against the government and warrant injunctive relief.  *See FAA v. Cooper*, 566 U.S. 284, 303-04 (2012) (finding that the government did not waive sovereign immunity for mental or emotional distress damages under the Privacy Act); *Caspar v. Snyder*, 77 F. Supp. 3d 616, 641 (E.D. Mich. 2015) (noting that damages that cannot be recovered from the government on account of sovereign immunity are irreparable).

Moreover, while economic harm does not generally constitute an irreparable injury, it may be grounds for an injunction where a Plaintiff lives on a fixed income and minimal increases in their cost of living creates "potential financial disaster," the possible "deprivation of life's necessities," and concomitant "emotional distress." *United Steelworkers of Am, AFL-CIO. v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987) (Breyer, J.); *see also Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 657 (6th Cir. 1996) (finding irreparable harm where a cost of insurance coverage was irreparable because plaintiffs "primarily because of their fixed incomes, are unable to absorb even relatively small increases in their expenses without extreme hardship."); *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261 (W.D. Mich. 1990) (highlighting the uncertainty and worry over new costs as irreparable); *cf Patriot, Inc. v. HUD*, 963 F. Supp. 1, 5 (D.D.C. 1997) (stating that "economic harm rises to the level of irreparable harm where it threatens the very existence of [plaintiff's] business")

(citation omitted).  Here, members of the putative class were targeted precisely because they were the most vulnerable. (Ex. 22) ("Fact Sheet").  They live on a fixed income and cannot "absorb" any increase in their expenses without extraordinary hardship.  Craig ¶¶ 26-33; Dobashi ¶ 13, 22-23; Cornelius ¶ 19-24; Farajian ¶¶ 39-40.  For instance, Ms. Craig's family relies on public benefits, often has to leave bills unpaid or borrow from friends and family, and "any additional monthly expenses would be a huge hit" to her, her husband, and their three children.  Craig ¶¶ 26-33.  Mr. Dobashi lacks finances to return to school and now suffers the anxiety of trying to put away money to account for the Department's actions.  Dobashi ¶¶ 13, 22-23.  And, Mr. Cornelius has been unable to maintain payments on his loans as is.  Cornelius ¶¶ 19-23.  The Department is causing Plaintiffs financial harm from which they cannot recover and which creates immeasurable stress and worry.[15]

Finally, the Department's conduct is causing financial damages that Plaintiffs will be unable to recover from the government.  That is, the Department's ongoing delay in providing Plaintiffs complete cancellation — a delay that has now been compounded by its adoption of an illegal Rule — has led, and will likely lead, to lost opportunities and value that cannot be financially recoup.  For instance, class members who have defaulted are categorically barred from seeking further federal loans to seek more education; they cannot recover the possible wage differential against the government.  Nor can Mr. Dobashi recover the lost earnings from the years

---

[15] The consequences of student loan default are stark, and include negative credit reporting, seizure of tax refunds, and administrative (non-judicial) wage garnishments.  *See* 20 U.S.C. § 1095a (authorizing administrative wage garnishment); 31 U.S.C. § 3270A & 34 C.F.R. § 30.33 (authorizing tax refund offset); 11 U.S.C. § 523(a)(8) (making student loans presumptively non-dischargeable in bankruptcy).  Ironically, class members whose claims are partially denied under the Average Earnings Rule will be unable to assert those claims under *res judicata* principles in involuntary procedures.  *Cf.* 34 C.F.R. § 685.206.

that he has had to delay any further education.  Dobashi ¶ 13.  And, Ms. Craig will not be able to recover from the lost opportunities that will follow from her eventual default.  None of these costs will ever be recoverable against the government and are thus irreparable. *See Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) ("Where . . . the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity[,] . . . any loss of income suffered by a plaintiff is irreparable *per se*.").

Any one of these irreparable harms would support Plaintiffs' request for an injunction. Combined, they show the urgency for the Court to stop the Department's unlawful conduct.

### C. The Public Interest and Balance of the Equities Weighs in Favor of a Preliminary Injunction

"When the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  The government's own statements emphasize the importance of the Corinthian Job Placement Rate Rule to taxpayers and consumer protection, and show that the proposed preliminary injunction is in the public interest and the equities weigh in Plaintiffs' favor.

The Department has routinely emphasized the importance of its work regarding Corinthian and has consistently explained why providing complete cancellation to such borrowers is in the public interest.  By way of example:

- "We have kept students at the heart of every decision we have made about Corinthian, and we will continue to do so as we move forward," Under Secretary Mitchell said. "When our borrowers bring claims to us that their school committed fraud or other violations of state law against them, we will give them the relief that they are entitled to under federal law and regulations." (Ex. 3) ("$30 million Fine PR").

- "I believe that we are proceeding in a way that will serve the interests of distressed borrowers and taxpayers and that will promote public trust and confidence in this

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

process and in the federal student loan program . . . ED's first priority was to expedite relief of eligible loans to former students of Heald who were enrolled in programs that are covered by ED's findings and relied on misleading placement rates." (Ex. 13) ("Third SM Report").

- "I commend Attorney General Kamala Harris and her team for their collaboration with our team to help defrauded Corinthian students receive the relief they are entitled to . . . . The results of our joint investigation will allow us to get relief to more students, more efficiently. Helping wronged students is much easier when everyone – Congress, state attorneys general, accreditors, authorizers and the Department – does their part to protect students and works together. Our team welcomes help from anyone who wants to follow her lead."  (Ex. 14) ("WyoTech & Everest PR").

- As a citizen and taxpayer, I can think of no better use of public funds than the opening of educational opportunity to all Americans. Unfortunately, although the college investment still pays off for most students who graduate, any students that enroll in colleges that engage in the deceptive, fraudulent practices evidenced at CCI risk having their investment do more harm than good – leaving them with worthless degrees and substantial debt. This result not only harms the students affected, it harms our country as a whole. I am confident that the creation of the Enforcement Office and growth of the BD program—along with numerous other ED efforts, including gainful employment, increased accreditor accountability, and others—will go a long way toward ensuring that that the federal student loan program does what it was designed to do: help students build a better life for themselves, their families, and the nation…" (Ex. 15) ("Fourth SM Report").

Plaintiffs agree with the Department: providing full borrower relief is essential to the public.  And, as highlighted above, while Plaintiffs are experiencing significant and continued harm as a result of Defendants' actions, the Department lacks an interest in acting inconsistently with its findings.  The Department's continued application of an illegal and unconstitutional policy also contravenes the public interest.  *See Saravia*, 2017 WL 5569838 at *19 (highlighting the "public interest in ensuring the protection of constitutional rights").  A preliminary injunction in this case merely returns the Department to the position that it believed was in the public's interest, and the equities thus favor Plaintiffs' position.

IV.    **CONCLUSION**

The Department properly concluded that the roughly 110,000 putative class members were victims of predatory recruitment practices and entitled to a full discharge of their student loans.  In abandoning that rule for one that is illogical, illegal, and unconstitutional, the Department is causing ongoing and irreparable damage to members of the proposed class.  In order to curb this damage, the Court must prevent the Department from denying class members' claims for loan cancellation and prevent the irreparable harm from illegal delay.  Simply stated, the Court must order the Department to return to the *status quo ante* before it began its campaign of unlawful activities.

Dated: March 17, 2018                        Respectfully submitted,


                                             /s   Joshua Rovenger


                                             Noah Zinner
                                             Megumi Tsutsui
                                             HOUSING & ECONOMIC RIGHTS
                                             ADVOCATES
                                             PO Box 29435
                                             Oakland, CA 94604
                                             Tel.: (510) 271-8443
                                             Fax: (510) 280-2448

                                             Eileen M. Connor
                                             Toby R. Merrill
                                             Joshua D. Rovenger
                                             LEGAL SERVICES CENTER OF
                                             HARVARD LAW SCHOOL
                                             122 Boylston Street
                                             Jamaica Plain, MA 02130
                                             Tel.: (617) 390-3003
                                             Fax: (617) 522-0715


                                             *Attorneys for Plaintiffs*