NOAH ZINNER (SBN 247581)
nzinner@heraca.org
MEGUMI TSUTSUI (SBN 299294)
mtsutsui@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*Pro Hac Vice*)
tmerrill@law.harvard.edu
JOSHUA D. ROVENGER (*Pro Hac Vice*)
jrovenger@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ) | Case Number: C 17-cv-07210-SK |
| ) | |
| MARTIN CALVILLO MANRIQUEZ, ) | **DECLARATION OF JOSHUA D.** |
| JAMAL CORNELIUS, RTHWAN ) | **ROVENGER IN SUPPORT OF** |
| DOBASHI, and JENNIFER CRAIG on behalf ) | **PLAINTIFFS' MOTION FOR** |
| of themselves and all others similarly situated, ) | **PRELIMINARY INJUNCTION** |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | |
| ) | |
| ELISABETH DEVOS, in her official ) | |
| capacity as Secretary of the United States ) | |

1  Department of Education,                          )
                                                     )
2  And                                               )
                                                     )
3  THE UNITED STATES DEPARTMENT OF                   )
   EDUCATION,                                        )
4                                                    )
                                                     )
5              *Defendants.*                         )
                                                     )
6                                                    )
                                                     )
7                                                    )

_____

8

9          I, Joshua Rovenger, make this declaration in support of the foregoing Motion for

10  Preliminary Injunction.

11

12     1.  I am an attorney at the Legal Services Center of Harvard Law School, where I am an
           Attorney in the project on Predatory Student Lending.

13

14     2.  I submit this affidavit to place before the Court documents in support of Plaintiffs' Motion
           for Preliminary Injunction.

15

16     3.  Attached as Exhibit 1, is a true and correct copy of Plaintiff Martin Calvillo Manriquez's
           Master Promissory Note for his Federal Direct Loans.

17

18     4.  Attached as Exhibit 2, is a true and correct copy of a portion of the July 30, 2012 Senate
           Committee on health, Education, Labor, & Pensions Report: "For Profit Higher Education:

19         The Failure to Safeguard the Federal Investment and Ensure Student Success." The Exhibit
           contains a portion of "Part II" of the Report, the discussion of "Corinthian Colleges, Inc."

20

21     5.  Attached as Exhibit 3, is a true and correct copy of an April 14, 2015 Department of
           Education Press Release entitled "U.S. Department of Education Fines Corinthian

22         Colleges $30 million for Misrepresentation."

23

24     6.  Attached as Exhibit 4, is a true and correct copy of an April 14, 2015 letter from the
           Department of Education to Jack D. Massimino, President/Chief Executive Officer of

25         Corinthian Colleges, Inc., entitled "Notice of Intent to Fine Heald College, OPE-ID:
           00723400."

26

27

28

DECLARATION OF JOSHUA D. ROVENGER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION Case No. 17-cv-07210-SK

7. Attached as Exhibit 5, is a true and correct copy of a November 2017 report prepared by the Offices of Senators Elizabeth Warren and Richard J. Durbin entitled, "Insult to Injury: How the DeVos Department of Education is Failing Defrauded Students."

8. Attached as Exhibit 6, is a true and correct copy of the Department of Education's "List of Heald College Programs and Enrollment Dates Covered by Department of Education Findings."

9. Attached as Exhibit 7, is a true and correct copy of the Department of Education's "List of Everest/WyoTech Programs and Enrollment Dates Covered by Department of Education Findings," as updated June 15, 2016.

10. Attached as Exhibit 8, is a true and correct copy of the Department of Education's "Attestation for Certain Heald College Students Application for Borrower Defense to Repayment Loan Discharge."

11. Attached as Exhibit 9, is a true and correct copy of the Department of Education's "Attestation for Certain Everest and WyoTech Students Application for Borrower Defense to Repayment Loan Discharge."

12. Attached as Exhibit 10, is a true and correct copy of a December 8, 2017 Report from the Office of Inspector General, Department of Education, entitled "Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process."

13. Attached as Exhibit 11, is a true and correct copy of the Department of Education's "First Report of the Special Master for Borrower Defense to Under Secretary," dated September 3, 2015.

14. Attached as Exhibit 12, is a true and correct copy of a June 4, 2015 letter from the Department of Education to the Office of Management and Budget entitled "Emergency Clearance of Information Collection to Allow for Receipt of Borrower Defense to Repayment Loan Discharge Claims," and the "Supporting Statement for Paperwork Reduction Act Submission."

15. Attached as Exhibit 13, is a true and correct copy of the Department of Education's "Third Report of the Special Master for Borrower Defense to the Under Secretary," dated March 25, 2016.

16. Attached as Exhibit 14, is a true and correct copy of a November 17, 2015 Department of Education Press Release entitled "Department of Education and Attorney General Kamala Harris Announce Findings from Investigation of Wyotech and Everest Programs."

DECLARATION OF JOSHUA D. ROVENGER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION Case No. 17-cv-07210-SK

17. Attached as Exhibit 15, is a true and correct copy of the Department of Education's "Fourth Report of the Special Master for Borrower Defense to the Under Secretary," dated June 29, 2016.

18. Attached as Exhibit 16, is a true and correct copy of a January 13, 2017 Department of Education Press Release entitled, "American Career Institute Borrowers to Receive Automatic Group Relief for Federal Student Loans."

19. Attached as Exhibit 17, is a true and correct copy of an October 28, 2016 report from the Department of Education's Federal Student Aid Enforcement Office entitled, "Report on Borrower Defense."

20. Attached as Exhibit 18, is a true and correct copy of a June 14, 2017 Department of Education Press Release entitled, "Secretary DeVos Announces Regulatory Reset to Protect Students, Taxpayers, Higher Ed Institutions."

21. Attached as Exhibit 19, is a true and correct copy of a portion of an August 23, 2017 procurement notice from the Department of Education, entitled "FAR Part 8 Sole (LIMITED) Sources Justification."

22. Attached as Exhibit 20, is a true and correct copy of a July 7, 2017 letter from James F. Manning, Acting Under Secretary of the Department of Education to U.S. Senator Richard J. Durbin.

23. Attached as Exhibit 21, is a true and correct copy of an October 24, 2017 Washington Post article entitled, "Devos Calls for another delay of rule to protect students from predatory colleges."

24. Attached as Exhibit 22, is a true and correct copy of a June 8, 2015 Department of Education "Fact Sheet" entitled, "Protecting Students from Abusive Career Colleges."

25. Attached as Exhibit 23, is a true and correct copy of a December 20, 2017 Department of Education Press Release entitled, "Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers."

26. Attached as Exhibit 24, is a true and correct copy of an e-mail from the Department of Education sent to a borrower defense applicant on March 1, 2018.

27. Attached as Exhibit 25, is a true and correct copy of an October 4, 2000 Office of General Counsel, Department of Education memorandum entitled "Interstate Business College, ND Former Students' Defense to Repayment of their Direct Loans."

28. Attached as Exhibit 26, is a true and correct copy of a December 20, 2017 Politico Pro article entitled "Education Department rules on thousands of student fraud claims."

29. Attached as Exhibit 27, is a true and correct copy of an "Amended Information Exchange Agreement Between the Department of Education and The Social Security Administration for Aggregate Earnings Data."

30. Attached as Exhibit 28, is a true and correct copy of a January 2, 2018 letter from Senator Elizabeth Warren to the Honorable Kathleen S. Tighe and the Honorable Gale Stallworth Stone.

31. Attached as Exhibit 29, is a true and correct copy of a January 30, 2018 letter from the Office of the Inspector General, Social Security Administration, to Senator Elizabeth Warren.

32. Attached as Exhibit 30, is a true and correct copy of a January 30, 2018 article by the Associated Press entitled, "Student loans: For-profit forgiveness could see major cut."

33. Attached as Exhibit 31, is a true and correct copy of a February 20, 2001 Office of General Counsel, Department of Education memorandum entitled "Interstate Business College, Defense to Repayment of her Direct Loans."

34. Attached as Exhibit 32, is a true and correct copy of a September 26, 2017 article from Inside Higher Ed entitled, "DeVos: Borrower-Defense Rule Offered 'Free Money'."

35. Attached as Exhibit 33, is a true and correct copy of a February 6, 2001 Office of General Counsel, Department of Education memorandum entitled "Interstate Business College, ND Former Students' Defense to Repayment of their Direct Loans."

36. Attached as Exhibit 34, is a true and correct copy of February 11, 2003 Office of General Counsel, Department of Education memorandum entitled "Interstate Business College, ND Former Students' Defense to Repayment of their Direct Loans."

Signed under penalties of perjury on March 16, 2018.


/s/ Joshua Rovenger

Joshua D. Rovenger

DECLARATION OF JOSHUA D. ROVENGER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION Case No. 17-cv-07210-SK

# EXHIBIT 1



**Federal Direct Stafford/Ford Loan**
**Federal Direct Unsubsidized Stafford/Ford Loan**
**Master Promissory Note**
**William D. Ford Federal Direct Loan Program**

OMB No. 1845-0007
Form Approved
Exp. Date 05/31/2011

Warning: Any person who knowingly makes a false statement or misrepresentation on this form will be subject to penalties which may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

## SECTION A: BORROWER INFORMATION          READ THE INSTRUCTIONS IN SECTION F BEFORE COMPLETING THIS SECTION

1. Driver's License State and No.
CA      F1795215

2. Social Security No.

3. E-mail Address (optional)
migo510@yahoo.com

4. Name and Address
CALVILLO MANRIQU , MARTIN
661 Foothill Blvd
Oakland CA 94606
UNITED STATES

5. Date of Birth  07/12/1993

6. Area Code/Telephone No
5106776764

7. References: List two persons with different U.S. addresses who have known you for at least three years. The first reference should be a parent or legal guardian.

| | 1. | 2. |
|---|---|---|
| Name | Maria Elena Manriquez | Victor Lopez |
| Permanent Street Address | 601 Foothill Blvd | 536 E11th st apt1 |
| City, State, Zip Code | Oakland , CA  94606  UNITED STATES | Oakland , CA  94606  UNITED STATES |
| Area Code/Telephone No. | 5104630470 | 5106931242 |
| Relationship to Borrower | MOTHER | FRIEND |

## SECTION B: SCHOOL INFORMATION -- TO BE COMPLETED BY THE SCHOOL

8. School Name and Address
WYOTECH
200 WHITNEY PLACE
FREMONT , CA  945397663

9. School Code/Branch
G07190

10. Identification No.
1M12G07190999

## SECTION C: BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS -- READ CAREFULLY BEFORE SIGNING BELOW

11. This is a Master Promissory Note (MPN) for one or more Federal Direct Stafford/Ford (Direct Subsidized) Loans and/or Federal Direct Unsubsidized Stafford/Ford (Direct Unsubsidized) Loans under this MPN not to exceed the allowable maximums under the Act ("the Act" is defined in Section E under Governing Law). My school will notify me of the loan type and loan amount that I am eligible to receive. I may cancel a loan or request a lower amount by contacting my school. Additional information about my right to cancel a loan or request a lower amount is included in the Borrower's Rights and Responsibilities Statement and in the disclosure statements that will be provided to me.

12. Under penalty of perjury, I certify that:

A. The information I have provided on this MPN and as updated by me from time to time is true, complete, and correct to the best of my knowledge and belief and is made in good faith.

B. I will use the proceeds of loans made under this MPN for authorized educational expenses that I incur and I will immediately repay any loan proceeds that cannot be attributed to educational expenses for attendance on at least a half-time basis at the school that certified my loan eligibility.

C. If I owe an overpayment on a Federal Perkins Loan, Federal Pell Grant, Federal Supplemental Educational Opportunity Grant, Academic Competitiveness Grant (ACG), National Science or Mathematics Access to Retain Talent (SMART) Grant, or Leveraging Educational Assistance Partnership Grant, I have made satisfactory arrangements to repay the amount owed.

D. If I am in default on any loan received under the Federal Perkins Loan Program (including National Direct Student Loans), the William D. Ford Federal Direct Loan (Direct Loan) Program, or the Federal Family Education Loan (FFEL) Program, I have made satisfactory repayment arrangements with the holder to repay the amount owed.

E. If I have been convicted of, or pled nolo contendere(no contest) or guilty to, a crime involving fraud in obtaining funds under title IV of the Higher Education Act of 1965 (HEA), as amended, I have completed the repayment of the funds to the U.S. Department of Education (ED) or to the loan holder in the case of a Title IV federal student loan.

13. For each Direct Subsidized Loan and Direct Unsubsidized Loan I receive under this MPN, I make the following authorizations:

A. I authorize my school to certify my eligibility for the loan.

B. I authorize my school to credit my loan proceeds to my student account at the school.

C. I authorize my school to pay to ED any refund that may be due up to the full amount of the loan.

D. I authorize ED to investigate my credit record and report information about my loan status to persons and organizations permitted by law to receive that information.

E. Unless I notify ED differently, I authorize ED to defer repayment of principal on my loan while I am enrolled at least half time at an eligible school.

F. I authorize my school and ED to release information about my loan to the references on the loan and to members of my immediate family, unless I submit written directions otherwise.

G. I authorize my schools, lenders and guarantors, ED, and their agents to release information about my loan to each other.

H. I authorize my schools, ED, and their respective agents and contractors to contact me regarding my loan request or my loan, including repayment of my loan, at the current or any future number that I provide for my cellular telephone or other wireless device using automated dialing equipment or artificial or prerecorded voice or text messages.

14. I will be given the opportunity to pay the interest that ED charges during grace, in-school, deferment, forbearance, and other periods as provided under the Act, including during in-school deferment periods. Unless I pay the interest, I understand that ED may add unpaid interest that is charged on each loan made under this MPN to the principal balance of that loan (this is called "capitalization") at the end of the grace, deferment, forbearance, or other period. Capitalization will increase the principal balance on my loan and the total amount of interest I must pay.

15. I understand that ED has the authority to verify information reported on this MPN with other federal agencies.

## SECTION D: PROMISE TO PAY

16. I promise to pay to ED all loan amounts disbursed under the terms of this MPN, plus interest and other charges and fees that may become due as provided in this MPN. I understand that more than one loan may be made to me under this MPN. I understand that by accepting any disbursement issued at any time under this MPN, I agree to repay the loan associated with that disbursement. I understand that, within certain timeframes, I may cancel or reduce the amount of a loan by refusing to accept or by returning all or a portion of any disbursement that is issued. Unless I make interest payments, interest that ED charges on my loans during grace, in-school, deferment, forbearance, and other periods will be added to the principal balance of the loan as provided under the Act. If I do not make a payment on a loan made under this MPN when it is due, I will also pay reasonable collection costs, including but not limited to attorney's fees, court costs, and other fees. I will not sign this MPN before reading the entire MPN, even if I am told not to read it, or told that I am not required to read it. I am entitled to an exact copy of this MPN and the Borrower's Rights and Responsibilities Statement. My signature certifies that I have read, understand, and agree to the terms and conditions of this MPN, including the Borrower Request, Certifications, Authorizations, and Understanding in Section C, the Notice About Subsequent Loans Made Under this MPN in Section E, and the terms and conditions described in Section E of this MPN and in the Borrower's Rights and Responsibilities Statement.

**I UNDERSTAND THAT I MAY RECEIVE ONE OR MORE LOANS UNDER THIS MPN, AND THAT I MUST REPAY ALL LOANS THAT I RECEIVE UNDER THIS MPN.**

17. Borrower's Signature    Martin Calvillo Manriqu

18. Today's Date (mm-dd-yyyy)   09/02/2011

# Direct Subsidized Loan and Direct Unsubsidized Loan MPN *(continued)*

**SECTION E: MPN TERMS AND CONDITIONS**

## GOVERNING LAW

The terms of this Application and Master Promissory Note (MPN) will be interpreted in accordance with the Higher Education Act of 1965, as amended (20. U.S.C. 1070 *et seq*), the U.S. Department of Education's (ED's) regulations, as they may be amended in accordance with their effective date, and other applicable federal laws and regulations (collectively referred to as the "Act"). Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN.

## DISCLOSURE OF LOAN TERMS

This MPN applies to Federal Direct Stafford/Ford (Direct Subsidized) Loans and Federal Direct Unsubsidized Stafford/Ford (Direct Unsubsidized) Loans. Under this MPN, the principal amount that I owe, and am required to repay, will be the sum of all disbursements that are made (unless I reduce or cancel any disbursements as explained below under Loan Cancellation), plus any unpaid interest that is capitalized and added to the principal amount.

At or before the time of the first disbursement of each loan, a disclosure statement will be sent to me identifying the amount of the loan and additional terms of the loan. Important additional information is also contained in the Borrower's Rights and Responsibilities Statement accompanying this MPN. The Borrower's Rights and Responsibilities Statement and any disclosure statement I receive in connection with any loan under this MPN are hereby incorporated into this MPN.

Loans disbursed under this MPN are subject to the annual and aggregate loan limits specified under the Act. I may request additional loan funds to pay for my educational costs up to the annual and aggregate loan limits by contacting my school's financial aid office. My school will determine if I am eligible for any additional loan funds. I will be notified of any increase or other change in the amount of my loan.

My eligibility for Direct Subsidized Loans and Direct Unsubsidized Loans may increase or decrease based on changes in my financial circumstances. My school will notify me of any changes in my eligibility. I will be notified of any increase or decrease in the amount of my loan.

I understand that each loan made under this MPN is separately enforceable based on a true and exact copy of this MPN.

## LOAN CANCELLATION

I may pay back all or part of a disbursement within the timeframes set by the Act, as explained in the Borrower's Rights and Responsibilities Statement and in a disclosure statement that I will receive. If I return the full loan amount within those timeframes, I will not incur any loan fee or interest charges. If I return part of a disbursement within those timeframes, the loan fee and interest charges will be reduced in proportion to the amount returned.

## INTEREST

Unless ED notifies me in writing of a lower rate, the interest rate for any loan I receive under this MPN is determined using a formula specified in the Act. As explained in the Borrower's Rights and Responsibilities Statement, I will be notified of the actual interest rate for each loan that I receive.

ED does not charge interest on a Direct Subsidized Loan during an in-school, grace, or deferment period, and during certain periods of repayment under the Income-Based Repayment Plan. ED charges interest on a Direct Subsidized Loan during all other periods (including forbearance periods), starting on the day after my grace period ends. ED charges interest on a Direct Unsubsidized Loan during all periods (including in-school, grace, deferment, and forbearance periods), starting on the date of the first disbursement. I agree to pay all interest that is charged to me. I will be given the opportunity to pay the interest that accrues during grace, in-school, deferment, forbearance, or other periods as provided under the Act.

If I do not pay the interest, I understand that ED may capitalize the interest at the end of the grace, deferment, forbearance, or other period.

## LOAN FEE

A loan fee is charged for each Direct Subsidized Loan and Direct Unsubsidized Loan as provided by the Act, and will be deducted proportionately from each disbursement of each of my loans. The loan fee will be shown on disclosure statements that will be issued to me. I understand the loan fee may be refundable only as permitted by the Act.

## LATE CHARGES AND COLLECTION COSTS

ED may collect from me: (1) a late charge of not more than six cents for each dollar of each late payment if I fail to make any part of a required installment payment within 30 days after it becomes due, and (2) any other charges and fees that are permitted by the Act related to the collection of my loans. If I default on my loans, I will pay reasonable collection costs, plus court costs and attorney fees.

## GRACE PERIOD

I will receive a six-month grace period on repayment of each loan made under this MPN. The grace period begins the day after I cease to be enrolled at least half time at an eligible school. I am not required to make any payments on my loan during the grace period. However, interest will accrue on my Direct Unsubsidized Loan during the grace period and will be capitalized if I do not repay it.

## REPAYMENT

I must repay the full amount of the loans made under this MPN, plus accrued interest. I will repay each loan in monthly installments during a repayment period that begins on the day immediately following my 6-month grace period on that loan. Payments made by me or on my behalf will be applied first to late charges and collection costs that are due, then to interest that has not been paid, and finally to the principal amount of the loan, except during periods of repayment under an Income-Based Repayment Plan, when payments will be applied first to interest that is due, then to fees that are due, and then to the principal amount.

ED will provide me with a choice of repayment plans. Information on these repayment plans is included in the Borrower's Rights and Responsibilities Statement.

ED will provide me with a repayment schedule that identifies my payment amounts and due dates. If I am unable to make my scheduled loan payments, ED may allow me to temporarily stop making payments, reduce my payment amount, or extend the time for making payments, as long as I intend to repay my loan. Allowing me to temporarily delay or reduce loan payments is called forbearance.

ED may adjust payment dates on my loans or may grant me forbearance to eliminate a delinquency that remains even though I am making scheduled installment payments.

I may prepay all or any part of the unpaid balance on my loans at any time without penalty. If I do not specify which loans I am prepaying, ED will determine how to apply the prepayment in accordance with the Act. After I have repaid in full a loan made under this MPN, ED will send me a notice telling me that I have paid off my loan.

## ACCELERATION AND DEFAULT

At ED's option, the entire unpaid balance of a loan made under this MPN will become immediately due and payable (this is called "acceleration") if any one of the following events occurs: (1) I do not enroll as at least a half-time student at the school that certified my loan eligibility; (2) I do not use the proceeds of the loan solely for my educational expenses; (3) I make a false representation that results in my receiving a loan for which I am not eligible; or (4) I default on the loan.

The following events will constitute a default on my loan: (1) I do not pay the entire unpaid balance of the loan after ED has exercised its option under items (1), (2), and (3) in the preceding paragraph; (2) I do not make installment payments when due, provided my failure has persisted for at least 270 days; or (3) I do not comply with other terms of the loan, and ED reasonably concludes that I no longer intend to honor my repayment obligation. If I default, ED may capitalize all the outstanding interest into a new principal balance, and collection costs will become immediately due and payable.

If I default, the default will be reported to national consumer reporting agencies and will significantly and adversely affect my credit history. I understand that a default will have additional adverse consequences to me as disclosed in the Borrower's Rights and Responsibilities Statement.

## LEGAL NOTICES

Any notice required to be given to me will be effective if mailed by first class mail to the most recent address ED has for me. I will immediately notify ED of a change of address or status as specified in the Borrower's Rights and Responsibilities Statement.

If ED fails to enforce or insist on compliance with any term of this MPN, this does not waive any right of ED. No provision of this MPN may be modified or waived except in writing by ED. If any provision of this MPN is determined to be unenforceable, the remaining provisions will remain in force.

Information about my loans will be submitted to the National Student Loan Data System (NSLDS). Information in NSLDS is accessible to schools, lenders, and guarantors for specific purposes as authorized by ED.

---

**NOTICE ABOUT SUBSEQUENT LOANS MADE UNDER THIS MPN**

This MPN authorizes ED to disburse multiple loans to me to pay my educational expenses during the multi-year term of this MPN, upon my request and upon my school's annual certification of my loan eligibility.

At schools that are authorized to use the multi-year feature of the MPN and choose to do so, subsequent loans may be made under this MPN for subsequent academic years. At any school, subsequent loans may be made under this MPN for the same academic year.

I understand that no subsequent loans will be made under this MPN after the earliest of the following dates: (1) the date ED or my school receives my written notice that no further loans may be made; (2) one year after the date I sign the MPN or the date ED receives the MPN if no disbursements are made under the MPN; or (3) ten years after the date I sign the MPN or the date ED receives the MPN.

Any amendment to the Act governs the terms of any loan disbursed on or after the effective date of the amendment, and any amended terms are considered part of this MPN.

---

## Direct Subsidized Loan and Direct Unsubsidized Loan MPN *(continued)*

*This is a Master Promissory Note (MPN) under which you may receive multiple Direct Subsidized Loans and/or Direct Unsubsidized Loans over a maximum ten-year period.*

*Print using a blue or black ink ballpoint pen or type. Do not use pencil. Report all dates as month-day-year (mm-dd-yyyy). Use only numbers. Example: June 24, 1982 = 06-24-1982.*

*Some of the items in Section A may have been completed for you. If so, review these items carefully to make sure that the information is correct. Cross out any information that is incorrect and enter the correct information. Put your initials next to any information that you change.*

### SECTION A: BORROWER INFORMATION

**Item 1.** Enter the two-letter abbreviation for the state that issued your current driver's license, followed by your driver's license number. If you do not have a driver's license, enter N/A.

**Item 2.** Enter your nine-digit Social Security Number.

**Item 3.** Enter your preferred e-mail address for receiving communications. You are not required to provide this information. If you do, we may use your e-mail address to communicate with you. If you do not have an e-mail address or do not wish to provide one, enter N/A.

**Item 4.** Enter your last name, then your first name and middle initial. Enter your permanent address (number, street, apartment number, or rural route number and box number, then city, state, zip code). If your mailing address is a post office box or general delivery, you must list **both** your street address and your mailing address. A temporary school address is not acceptable.

**Item 5.** Enter your date of birth.

**Item 6.** Enter the area code and telephone number at which you can most easily be reached. If you do not have a telephone, enter N/A.

**Item 7.** Enter the requested information for two adults with different U.S. addresses who have known you for at least three years. The first reference should be a parent or legal guardian. References who live outside the United States are not acceptable. If a reference does not have a telephone number, enter N/A.

### SECTION B: SCHOOL INFORMATION

*This section will be completed by the school that certifies your loan eligibility.*

### SECTION C: BORROWER REQUEST, CERTIFICATIONS, AUTHORIZATIONS, AND UNDERSTANDINGS

**Items 11, 12, 13, 14,** and **15.** Read these items carefully.

### SECTION D: PROMISE TO PAY

**Item 16.** Read this item carefully.

Enter **Items 17** and **18.** Sign your full legal name, in blue or black ink, and enter the date you signed this MPN.

---

By signing this MPN, you:

(1) Acknowledge that you have read, understand, and agree to the terms and conditions of the MPN, including the Borrower Request, Certifications, Authorizations, and Understanding in Section C and the accompanying Borrower's Rights and Responsibilities Statement; and

(2) Agree to repay the loan(s) in full according to the terms and conditions of the MPN.

---

### GRAMM-LEACH-BLILEY ACT NOTICE

In 1999, Congress enacted the Gramm-Leach-Bliley Act (Public Law 106-102). This Act requires that lenders provide certain information to their customers regarding the collection and use of nonpublic personal information.

We disclose nonpublic personal information to third parties only as necessary to process and service your loan and as permitted by the Privacy Act of 1974. See the Privacy Act Notice below. We do not sell or otherwise make available any information about you to any third parties for marketing purposes.

We protect the security and confidentiality of nonpublic personal information by implementing the following policies and practices. All physical access to the sites where nonpublic personal information is maintained is controlled and monitored by security personnel. Our computer systems offer a high degree of resistance to tampering and circumvention. These systems limit data access to our staff and contract staff on a "need-to-know" basis, and control individual users' ability to access and alter records within the systems. All users of these systems are given a unique user ID with personal identifiers. All interactions by individual users with the systems are recorded.

### PRIVACY ACT NOTICE

**The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you:**

The authority for collecting the requested information from and about you is §451 *et seq.* of the Higher Education Act (HEA) of 1965, as amended (20 U.S.C. 1087a *et seq.*) and the authorities for collecting and using your Social Security Number (SSN) are §484(a)(4) of the HEA (20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate.

The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, to permit the servicing of your loan(s), and, if it becomes necessary, to locate you and to collect and report on your loan(s) if your loan(s) become delinquent or in default. We also use your SSN as an account identifier and to permit you to access your account information electronically.

The information in your file may be disclosed, on a case-by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loan(s), to enforce the terms of the loan(s), to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment status, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies.

In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.

### FINANCIAL PRIVACY ACT NOTICE

Under the Right to Financial Privacy Act of 1978 (12 U.S.C. 3401-3421), ED will have access to financial records in your student loan file maintained in compliance with the administration of the Direct Loan Program.

### PAPERWORK REDUCTION NOTICE

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a currently valid OMB control number. The valid OMB control number for this information collection is 1845-0007. The time required to complete this information collection is estimated to average 0.5 hours (30 minutes) per response, including the time to review instructions, search existing data sources, gather and maintain the data needed, and complete and review the information. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving the form, please write to: U.S. Department of Education, Washington, DC 20202-4537.

If you have any comments or concerns regarding the status of *your individual submission* of this form, write directly to:

U.S. Department of Education
Common Origination and Disbursement School Relations Center
Attn: Applicant Services
PO Box 9002
Niagara Falls, NY 14302

# William D. Ford Federal Direct Loan Program
## Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

*Important Notice: This Borrower's Rights and Responsibilities Statement provides additional information about the terms and conditions of the loans you receive under the accompanying Master Promissory Note (MPN) for Federal Direct Stafford/Ford Loans (Direct Subsidized Loans) and Federal Direct Unsubsidized Stafford/Ford Loans (Direct Unsubsidized Loans). Please keep this Borrower's Rights and Responsibilities Statement for your records. You may request another copy of this Borrower's Rights and Responsibilities Statement at any time by contacting your servicer.*

Throughout this Borrower's Rights and Responsibilities Statement, the words "we," "us," and "our" refer to the U.S. Department of Education. The word "loan" refers to one or more loans made under the accompanying MPN.

**1. The William D. Ford Federal Direct Loan Program.** The William D. Ford Federal Direct Loan (Direct Loan) Program includes the following types of loans, known collectively as "Direct Loans":

- Federal Direct Stafford/Ford Loans (Direct Subsidized Loans)
- Federal Direct Unsubsidized Stafford/Ford Loans (Direct Unsubsidized Loans)
- Federal Direct PLUS Loans (Direct PLUS Loans)
- Federal Direct Consolidation Loans (Direct Consolidation Loans)

The Direct Loan Program is authorized by Title IV, Part D, of the Higher Education Act of 1965, as amended.

You must complete a Free Application for Federal Student Aid (FAFSA) before you receive a Direct Subsidized Loan or Direct Unsubsidized Loan.

Direct Loans are made by the U.S. Department of Education. Your servicer services, answers questions about, and processes payments on Direct Loans. We will provide you with the address and telephone number of your servicer after the school notifies us that the first disbursement of your loan has been made.

**2. Laws that apply to this MPN.** The terms and conditions of loans made under this MPN are determined by the Higher Education Act of 1965, as amended (20 U.S.C. 1070 *et seq.*) and other applicable federal laws and regulations. These laws and regulations are referred to as "the Act" throughout this Borrower's Rights and Responsibilities Statement. State law, unless it is preempted by federal law, may provide you with certain rights, remedies, and defenses in addition to those stated in the MPN and this Borrower's Rights and Responsibilities Statement.

**NOTE: Any change to the Act applies to loans in accordance with the effective date of the change.**

**3. Direct Subsidized Loans and Direct Unsubsidized Loans.** Direct Subsidized Loans and Direct Unsubsidized Loans are made to students to help pay for the cost of education beyond high school. To receive a Direct Subsidized Loan, you must have financial need. We do not charge interest on Direct Subsidized Loans while you are in school and during certain other periods. Direct Unsubsidized Loans are not based on financial need. We charge interest on Direct Unsubsidized Loans during all periods. For more information on interest charges, see item #9 of this Borrower's Rights and Responsibilities Statement ("Payment of interest").

**4. About the MPN.** You may receive more than one loan under this MPN over a period of up to 10 years to pay for your educational costs, as long as the school you are attending is authorized to use the multi-year feature of the MPN and chooses to do so.

If your school is not authorized to use the multi-year feature of the MPN or chooses not to do so, or if you do not want to receive more than one loan under this MPN, you must sign a new MPN for each loan that you receive.

If you do not want to receive more than one loan under this MPN, you must notify your school or your servicer in writing.

**5. Use of your loan money.** You may use the loan money you receive only to pay for your authorized educational expenses for attendance at the school that determined you were eligible to receive the loan. Authorized expenses include the following:

- Tuition
- Room
- Board
- Institutional fees
- Books
- Supplies
- Equipment
- Dependent child care expenses
- Transportation
- Commuting expenses
- Rental or purchase of a personal computer
- Loan fees
- Other documented, authorized costs

**6. Information you must report to us after you receive your loan.** You must notify your servicer and/or the financial aid office at your school about certain changes.

Until you graduate or otherwise leave school, you must notify your school's financial aid office if you:

- Change your address or telephone number;
- Change your name (for example, maiden name to married name);
- Do not enroll at least half-time for the loan period certified by the school
- Do not enroll at the school that determined you were eligible to receive the loan;
- Stop attending school or drop below half-time enrollment;
- Transfer from one school to another school; or
- Graduate.

You must also notify your servicer if any of these events occur at any time after you receive your loan. In addition, you must notify your servicer if you:

- Change your employer, or your employer's address or telephone number changes; or
- Have any other change in status that would affect your loan (for example, if you received a deferment while you were unemployed, but you have found a job and therefore no longer meet the eligibility requirements for the deferment).

**7. Amount you may borrow.** The charts that follow show the maximum amounts of Direct Subsidized Loans and Direct Unsubsidized Loans that you may borrow for a single academic year (annual loan limits), and the maximum amounts that you may borrow in total for undergraduate and graduate study (aggregate loan limits). The annual and aggregate loan limits for independent undergraduates also apply to dependent undergraduates whose parents are unable to borrow under the PLUS program. If you are enrolled in certain health professions programs, you may qualify for higher annual and aggregate limits on Direct Unsubsidized Loans.

The actual loan amount you receive will be determined by your school, based on your academic level, dependency status, and other factors such as:

- The length of the program or the remaining portion of the program in which you are enrolled, if it is less than a full academic year;
- Your cost of attendance;
- Your Expected Family Contribution;
- Other financial aid you receive; and
- Your remaining eligibility under the annual or aggregate loan limits.

The actual amount you receive for an academic year may be less than the maximum annual amounts shown in the charts.

If you are an undergraduate student, your school must determine your eligibility for a Federal Pell Grant before you may receive a Direct Subsidized Loan or Direct Unsubsidized Loan. Your school is also required to determine your eligibility for a Direct Subsidized Loan before determining your eligibility for a Direct Unsubsidized Loan.

If you have received student loans from another federal student loan program, you are responsible for informing your school and your lender of your other student loans. In some cases, you may not be eligible for loans for which you have applied.

**Annual Loan Limits for Direct Subsidized Loans and Direct Unsubsidized Loans:**

| | |
|---|---|
| **Dependent Undergraduate Students (except students whose parents cannot borrow PLUS loans)** | |
| First Year Total (maximum $3,500 subsidized) | $5,500 |
| Second Year Total (maximum $4,500 subsidized) | $6,500 |
| Third Year and Beyond (each year) (maximum $5,500 subsidized) | $7,500 |
| **Independent Undergraduate Students (and dependent students whose parents cannot borrow PLUS loans)** | |
| First Year Total (maximum $3,500 subsidized) | $9,500 |
| Second Year (maximum $4,500 subsidized) | $10,500 |
| Third Year and Beyond (each year) (maximum $5,500 subsidized) | $12,500 |
| **Graduate and Professional Students** | |
| Total Amount (each year) (maximum $8,500 subsidized) | $20,500 |

**Aggregate Loan Limits for Direct Subsidized and Direct Unsubsidized Loans:**

| | |
|---|---|
| **Dependent Undergraduate Students (except students whose parents cannot borrow PLUS loans)** | |
| Total Amount Cumulative (maximum $23,000 subsidized) | $31,000 |
| **Independent Undergraduate Students (and dependent students whose parents cannot borrow PLUS loans)** | |
| Total Amount Cumulative (maximum $23,000 subsidized) | $57,500 |
| **Graduate and Professional Students** | |
| Total Amount Cumulative (maximum $65,500 subsidized; includes Stafford Loans received for undergraduate study) | $138,500 |

**8. Interest rate.** The interest rate on Direct Subsidized Loans and Direct Unsubsidized Loans is a fixed rate. Different fixed interest rates may apply to separate loans made under this MPN depending on whether the loan is subsidized or unsubsidized, when the loan is first disbursed, and whether you are a graduate or

# William D. Ford Federal Direct Loan Program
## Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

undergraduate student. You will be notified of the actual interest rate for each loan you receive in a disclosure statement that we send to you. If you qualify under the Servicemembers Civil Relief Act, the interest rate on your loans obtained prior to military service may be limited to 6 percent during your military service. To receive this benefit, you must contact your servicer for information about the documentation you must provide to show that you qualify.

**9. Payment of interest.** We do not charge interest on a Direct Subsidized Loan while you are enrolled in school at least half time, during your grace period, during deferment periods, and during certain periods of repayment under the Income-Based Repayment Plan. Except as provided below for certain military borrowers, we charge interest on a Direct Subsidized Loan during all other periods (starting on the day after your grace period ends), including forbearance periods.

Except as provided below for certain military borrowers, we charge interest on a Direct Unsubsidized Loan during all periods (starting on the day your loan is paid out). This includes periods while you are enrolled in school at least half time, during your grace period, and during deferment and forbearance periods. Therefore, you will pay more interest on a Direct Unsubsidized Loan than on a Direct Subsidized Loan.

If you do not pay the interest as it is charged on either type of loan, we will add it to the unpaid principal amount of your loan. This is called "capitalization." Capitalization increases the unpaid principal balance of your loan, and we will then charge interest on the increased principal amount.

Under the no accrual of interest benefit for active duty service members, we do not charge interest on Direct Loan Program Loans first disbursed on or after October 1, 2008 during periods of qualifying active duty military service (for up to 60 months). For Direct Consolidation Loans, this benefit applies to the portion of the consolidation loan that repaid loans first disbursed on or after October 1, 2008.

The chart below shows the difference in the total amount you would repay on a $15,000 Direct Unsubsidized Loan if you pay the interest as it is charged during a 12-month deferment or forbearance period, compared to the amount you would repay if you do not pay the interest and it is capitalized.

| | If you pay the interest as it is charged... | If you do not pay the interest and it is capitalized... |
|---|---|---|
| Loan Amount | $15,000 | $15,000 |
| Interest for 12 months (at an interest rate of 6.8%) | $1,020 (paid as accrued) | $1,020 (unpaid and capitalized) |
| Principal to be Repaid | $15,000 | $16,020 |
| Monthly Payment (Standard Repayment Plan) | $173 | $184 |
| Number of Payments | 120 | 120 |
| Total Amount Repaid | $21,734 | $22,123 |

In this example, you would pay $11 less per month and $389 less altogether if you pay the interest as it is charged during a 12-month deferment or forbearance period.

You may be able to claim a federal income tax deduction for interest payments you make on Direct Loans. For further information, refer to IRS Publication 970, which is available at http://www.irs.ustreas.gov.

**10. Loan fee.** We charge a loan fee that is a percentage of the principal amount of each loan you receive. The percentage is determined by the Act and varies depending on when a loan is first disbursed. The specific loan fee that you are charged will be shown on a disclosure statement that we send to you. This fee will be subtracted proportionally from each disbursement of your loan.

**11. Repayment incentive programs.** A repayment incentive is a benefit that we offer to encourage you to repay your loan on time. Under a repayment incentive program, the interest rate we charge on your loan may be reduced. Some repayment incentive programs require you to make a certain number of payments on time to keep the reduced interest rate. The two repayment incentive programs described below may be available to you. Your servicer can provide you with more information on other repayment incentive programs that may be available.

*(1) Interest Rate Reduction for Automatic Withdrawal of Payments*

Under the automatic withdrawal option, your bank automatically deducts your monthly loan payment from your checking or savings account and sends it to us. Automatic withdrawal helps to ensure that your payments are made on time. In addition, you receive a 0.25 percent interest rate reduction while you repay under the automatic withdrawal option. We will include information about the automatic withdrawal option in your first bill. You can also get the information on your servicer's web site, or by calling your servicer. Your servicer's web site address and toll-free telephone number are provided on all correspondence that your servicer sends you.

*(2) Up-Front Interest Rebate*

You may receive an up-front interest rebate on your loan. The rebate is equal to a percentage of the loan amount that you borrow. This is the same amount that would result if the interest rate on your loan were lowered by a specific percentage, but you receive the rebate up front. The correspondence that you receive about your loan will tell you if you received an up-front interest rebate.

To keep an up-front interest rebate that you receive on your loan, you must make all of your first 12 required monthly payments on time when your loan enters repayment. "On time" means that we must receive each payment no later than 6 days after the due date.

You will lose the rebate if you do not make all of your first 12 required monthly payments on time. If you lose the rebate, we will add the rebate amount back to the principal balance on your loan account. This will increase the amount that you must repay.

**12. Disbursement (how your loan money will be paid out).** Generally, your school will disburse (pay out) your loan money in more than one installment, usually at the beginning of each academic term (for example, at the beginning of each semester or quarter). If your school does not use academic terms or does not have academic terms that meet certain requirements, it will generally disburse your loan in at least two installments, one at the beginning of the period of study for which you are receiving the loan, and one at the midpoint of that period of study.

In most cases, if the Direct Subsidized Loan or Direct Unsubsidized Loan that you are receiving is your first student loan under either the Direct Loan Program or the Federal Family Education Loan (FFEL) Program, you must complete entrance counseling before your school can make the first disbursement of your loan.

Your school may disburse your loan money by crediting it to your account at the school, or may give some or all of it to you directly by check or other means. Your servicer will notify you in writing each time your school disburses part of your loan money.

If your school credits your loan money to your account and the amount credited is more than the amount of your tuition and fees, room and board, and other authorized charges, the excess amount is called a credit balance. Unless you authorize your school to hold the credit balance for you, your school must pay you the credit balance within the following timeframes:

- If the credit balance occurs after the first day of class of a payment period (your school can tell you this date), your school must pay you the credit balance no later than 14 days after the date the balance occurs.

- If the credit balance occurs on or before the first day of class of a payment period, your school must pay you the credit balance no later than 14 days after the first day of class of the payment period.

**13. Canceling your loan.** Before your loan money is disbursed, you may cancel all or part of your loan at any time by notifying your school. After your loan money is disbursed, there are two ways to cancel all or part of your loan:

- If your school obtains your written confirmation of the types and amounts of Title IV loans that you want to receive for an award year before crediting loan money to your account at the school, you may tell the school that you want to cancel all or part of that loan within 14 days after the date the school notifies you of your right to cancel all or part of the loan, or by the first day of your school's payment period, whichever is later (your school can tell you the first day of the payment period). If the school does not obtain your written confirmation of the types and amounts of loans you want to receive before crediting the loan money to your account, you may cancel all or part of that loan by informing the school within 30 days of the date the school notifies you of your right to cancel all or part of the loan. In either case, your school will return the cancelled loan amount to us. You do not have to pay interest or the loan fee on the part of your loan that you tell your school to cancel within these timeframes. If you received an up-front interest rebate on your loan, the rebate does not apply to the part of your loan that you tell your school to cancel. Your loan will be adjusted to eliminate any interest, loan fee, and rebate amount that applies to the amount of the loan that was cancelled.

If you ask your school to cancel all or part of your loan outside the timeframes described above, your school may process your cancellation request, but it is not required to do so.

- Within 120 days of the date your school disbursed your loan money (by crediting the loan money to your account at the school, by paying it directly to you, or both), you may return all or part of your loan to us. Contact your servicer for guidance on how and where to return your loan money. You do not have to pay interest or the loan fee on the part of your loan that you return within 120 days of the date that part of your loan is disbursed. If you received an up-front interest rebate on your loan, the rebate does not apply to the part of your loan that you return. Your loan will be adjusted to eliminate any interest, loan fee, and rebate amount that applies to the amount of the loan that you return.

**14. Grace period.** You will receive a six-month grace period on repayment of each Direct Subsidized Loan and Direct Unsubsidized Loan that you receive. Your six-

Revised 07/2010

## William D. Ford Federal Direct Loan Program
## Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

month grace period begins the day after you stop attending school or drop below half-time enrollment. You do not have to begin making payments on your loan until after your grace period ends.

If you are called or ordered to active duty for more than 30 days from a reserve component of the U.S. Armed Forces, the period of your active duty service and the time necessary for you to re-enroll in school after your active duty ends are not counted as part of your grace period. However, the total period that is excluded from your grace period may not exceed three years. If the call or order to active duty occurs while you are in school and requires you to drop below half-time enrollment, the start of your grace period will be delayed until after the end of the excluded period. If the call or order to active duty occurs during your grace period, you will receive a full six-month grace period at the end of the excluded period.

**15. Repaying your loan.** The repayment period for each Direct Subsidized Loan and Direct Unsubsidized Loan that you receive begins on the day after your grace period ends. Your servicer will notify you of the date your first payment is due.

You must make payments on your loan even if you do not receive a bill or repayment notice. Billing information is sent to you as a convenience, and you are obligated to make payments even if you do not receive a notice or bill.

You may choose one of the following repayment plans to repay your loan:

- *Standard Repayment Plan* – Under this plan, you will make fixed monthly payments and repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. Your payments must be at least $50 a month and will be more, if necessary, to repay the loan within the required time period.

- *Graduated Repayment Plan* – Under this plan, you will usually make lower payments at first, and your payments will gradually increase over time. You will repay your loan in full within 10 years (not including periods of deferment or forbearance) from the date the loan entered repayment. No single payment will be more than three times greater than any other payment.

- *Extended Repayment Plan* – Under this plan, you will repay your loan in full over a period not to exceed 25 years (not including periods of deferment or forbearance) from the date the loan entered repayment. You may choose to make fixed monthly payments or graduated monthly payments that start out lower and gradually increase over time. If you make fixed monthly payments, your payments must be at least $50 a month and will be more, if necessary, to repay the loan within the required time period. You are eligible for this repayment plan only if (1) you have an outstanding balance on Direct Loan Program loans that exceeds $30,000, and (2) you had no outstanding balance on a Direct Loan Program loan as of October 7, 1998 or on the date you obtained a Direct Loan Program loan after October 7, 1998.

- *Income Contingent Repayment Plan* – Under this plan, your monthly payment amount will be based on your annual income (and that of your spouse if you are married), your family size, and the total amount of your Direct Loans. Until we obtain the information needed to calculate your monthly payment amount, your payment will equal the amount of interest that has accrued on your loan unless you request a forbearance. As your income changes, your payments may change. If you do not repay your loan after 25 years under this plan, the unpaid portion will be forgiven. You may have to pay income tax on any amount forgiven.

- *Income-Based Repayment Plan (effective July 1, 2009)* – Under this plan, your required monthly payment amount will be based on your income during any period when you have a partial financial hardship. Your monthly payment amount may be adjusted annually. The maximum repayment period under this plan may exceed 10 years. If you meet certain requirements over a 25-year period, you may qualify for cancellation of any outstanding balance on your loans.

If you can show to our satisfaction that the terms and conditions of the above repayment plans are not adequate to meet your exceptional circumstances, we may provide you with an alternative repayment plan.

If you do not choose a repayment plan, we will place you on the Standard Repayment Plan.

The chart at the end of this Borrower's Rights and Responsibilities Statement ("Repaying Your Loans") allows you to estimate the monthly and total amounts you would repay under the Standard, Graduated, Extended, and Income Contingent repayment plans based on various initial loan amounts.

You may change repayment plans at any time after you have begun repaying your loan. There is no penalty if you make loan payments before they are due, or pay more than the amount due each month.

Except as provided by the Act for payments made under the Income-Based Repayment Plan, we apply your payments and prepayments in the following order: (1) late charges and collection costs first, (2) outstanding interest second, and (3) outstanding principal last.

When you have repaid a loan in full, your servicer will send you a notice telling you that you have paid off your loan. You should keep this notice in a safe place.

**16. Late charges and collection costs.** If you do not make any part of a payment within 30 days after it is due, we may require you to pay a late charge. This charge will not be more than six cents for each dollar of each late payment. If you do not make payments as scheduled, we may also require you to pay other charges and fees involved in collecting your loan.

**17. Demand for immediate repayment.** The entire unpaid amount of your loan becomes due and payable (on your MPN this is called "acceleration") if you:

- Receive loan money, but do not enroll at least half-time at the school that determined you were eligible to receive the loan;
- Use your loan money to pay for anything other than expenses related to your education at the school that determined you were eligible to receive the loan;
- Make a false statement that causes you to receive a loan that you are not eligible to receive; or
- Default on your loan.

**18. Defaulting on your loan.** Default (failing to repay your loan) is defined in detail in the Terms and Conditions section of your MPN. If you default:

- We will require you to immediately repay the entire unpaid amount of your loan.
- We may sue you, take all or part of your federal and state tax refunds and other federal or state payments, and/or garnish your wages so that your employer is required to send us part of your salary to pay off your loan.
- We will require you to pay reasonable collection fees and costs, plus court costs and attorney fees.
- You may be denied a professional license.
- You will lose eligibility for other federal student aid and assistance under most federal benefit programs.
- You will lose eligibility for loan deferments.

- We will report your default to national consumer reporting agencies (see #19, "Consumer reporting agency notification").

**19. Consumer reporting agency notification.** We will report information about your loan to national consumer reporting agencies. This information will include the disbursement dates, amount, and repayment status of your loan (for example, whether you are current or delinquent in making payments). Your loan will be identified as an education loan.

If you default on a loan, we will also report this to national consumer reporting agencies. We will notify you at least 30 days in advance that we plan to report default information to a consumer reporting agency unless you resume making payments on the loan within 30 days. You will be given a chance to ask for a review of the debt before we report it.

If a consumer reporting agency contacts us regarding objections you have raised about the accuracy or completeness of any information we have reported, we are required to provide the agency with a prompt response.

**20. Deferment and forbearance (postponing payments)**

If you meet certain requirements, you may receive a deferment that allows you to temporarily stop making payments on your loan. If you cannot make your scheduled loan payments, but do not qualify for a deferment, we may give you a forbearance. A forbearance allows you to temporarily stop making payments on your loan, temporarily make smaller payments, or extend the time for making payments.

**Deferment**

You receive a deferment while you are:

- Enrolled at least half-time at an eligible school;
- In a full-time course of study in a graduate fellowship program;
- In an approved full-time rehabilitation program for individuals with disabilities;
- Unemployed (for a maximum of three years; you must be diligently seeking, but unable to find, full-time employment); or
- Experiencing an economic hardship (including Peace Corps service), as determined under the Act (for a maximum of three years).
- Serving on active duty during a war or other military operation or national emergency or performing qualifying National Guard duty during a war or other military operation or national emergency and, if you were serving on or after October 1, 2007, for an additional 180-day period following the demobilization date for your qualifying service.

If you are a member of the National Guard or other reserve component of the U.S. Armed forces (current or retired) and you are called or ordered to active duty while you are enrolled at least half time at an eligible school or within 6 months of having been enrolled at least half time, you are also eligible for a deferment during the 13 months following the conclusion of your active duty service, or until you return to enrolled student status on at least a half-time basis, whichever is earlier.

You may be eligible to receive additional deferments if, at the time you received your first Direct Loan, you had an outstanding balance on a loan made under the Federal Family Education Loan (FFEL) Program before July 1, 1993. If you meet this requirement, you may receive a deferment while you are:

- Temporarily totally disabled, or unable to work because you are required to care for a spouse or dependent who is disabled (for a maximum of three years);
- On active duty in the U.S. Armed Forces, on active duty in the National Oceanic and Atmospheric

## William D. Ford Federal Direct Loan Program
## Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

Administration (NOAA), or serving full-time as an officer in the Commissioned Corps of the Public Health Service (for a combined maximum of three years);

- Serving in the Peace Corps (for a maximum of three years);
- A full-time paid volunteer for a tax-exempt organization or an ACTION program (for a maximum of three years);
- In a medical internship or residency program (for a maximum of two years);
- Teaching in a designated teacher shortage area (for a maximum of three years);
- On parental leave (for a maximum of six months); or
- A working mother entering or re-entering the workforce (for a maximum of one year).

You may receive a deferment based on your enrollment in school on at least a half-time basis if (1) you submit a deferment request form to your servicer along with documentation of your eligibility for the deferment, or (2) your servicer receives information from the school you are attending that indicates you are enrolled at least half-time. If your servicer processes a deferment based on information received from your school, you will be notified of the deferment and will have the option of canceling the deferment and continuing to make payments on your loan.

For all other deferments, you (or, for a deferment based on active duty military service or qualifying National Guard duty during a war or other military operation or national emergency, a representative acting on your behalf) must submit a deferment request form to your servicer, along with documentation of your eligibility for the deferment. In certain circumstances, you may not be required to provide documentation of your eligibility if your servicer confirms that you have been granted the same deferment for the same period of time on a FFEL Program loan. Your servicer can provide you with a deferment request form that explains the eligibility and documentation requirements for the type of deferment you are requesting. You may also obtain deferment request forms and information on deferment eligibility requirements from your servicer's web site.

If you are in default on your loan, you are not eligible for a deferment.

You are not responsible for paying the interest on a Direct Subsidized Loan during a period of deferment. However, you are responsible for paying the interest on a Direct Unsubsidized Loan during a period of deferment.

**Forbearance**

We may give you a forbearance if you are temporarily unable to make your scheduled loan payments for reasons including, but not limited to, financial hardship and illness.

We will give you a forbearance if:

- You are serving in a medical or dental internship or residency program, and you meet specific requirements;
- The total amount you owe each month for all of the student loans you received under Title IV of the Act is 20 percent or more of your total monthly gross income (for a maximum of three years);
- You are serving in a national service position for which you receive a national service award under the National and Community Service Trust Act of 1993. In some cases, the interest that accrues on a qualified loan during the service period will be paid by the Corporation for National and Community Service;
- You are performing service that would qualify you for loan forgiveness under the teacher loan forgiveness program that is available to certain Direct Loan and FFEL program borrowers;

- You qualify for partial repayment of your loans under the Student Loan Repayment Program, as administered by the Department of Defense; or
- You are called to active duty in the U.S. Armed Forces.

To request a forbearance, contact your servicer. Your servicer can provide you with a forbearance request form that explains the eligibility and documentation requirements for the type of forbearance you are requesting. You may also obtain forbearance request forms and information on forbearance eligibility requirements from your servicer's web site.

Under certain circumstances, we may also give you a forbearance without requiring you to submit a request or documentation. These circumstances include, but are not limited to, the following:

- Periods necessary for us to determine your eligibility for a loan discharge;
- A period of up to 60 days in order for us to collect and process documentation related to your request for a deferment, forbearance, change in repayment plan, or consolidation loan (we do not capitalize the interest that is charged during this period); or
- Periods when you are involved in a military mobilization, or a local or national emergency.

You are responsible for paying the interest on a Direct Subsidized Loans and Direct Unsubsidized Loans during a period of forbearance.

**21. Discharge (having your loan forgiven).** We will discharge (forgive) your loan if:

- You die. Your servicer must receive acceptable documentation of your death, as defined in the Act.
- Your loan is discharged in bankruptcy. However, federal student loans are not automatically discharged if you file for bankruptcy. In order to have your loan discharged in bankruptcy, you must prove to the bankruptcy court that repaying the loan would cause undue hardship.
- You become totally and permanently disabled (as defined in the Act) and meet certain other requirements.

In certain cases, we may also discharge all or a portion of your loan if:

- You could not complete a program of study because the school closed;
- Your loan eligibility was falsely certified by the school;
- A loan in your name was falsely certified as a result of a crime of identity theft; or
- The school did not pay a refund of your loan money that it was required to pay under federal regulations.

We may forgive a portion of any student loans you received under the Direct Loan or FFEL program after October 1, 1998 if you teach full time for five consecutive years in certain low-income elementary and/or secondary schools and meet certain other qualifications, and if you did not owe a Direct Loan or FFEL program loan as of October 1, 1998, or as of the date you obtain a loan after October 1, 1998.

A public service loan forgiveness program is also available Under this program, the remaining balance due on your eligible Direct Loan Program loans may be cancelled after October 2, 2007) under certain repayment plans while you are employed in certain public service jobs.

The Act may provide for certain loan forgiveness or repayment benefits on your loans in addition to the benefits described above. If other forgiveness or repayment options become available, your servicer will provide information about these benefits.

To request a loan discharge based on one of the conditions described above (except for discharges due to death or bankruptcy), you must complete an application that you may obtain from your servicer.

In some cases, you may assert, as a defense against collection of your loan, that the school did something wrong or failed to do something that it should have done. You can make such a defense against repayment only if the school's act or omission directly relates to your loan or to the educational services that the loan was intended to pay for, and if what the school did or did not do would give rise to a legal cause of action against the school under applicable state law. If you believe that you have a defense against repayment of your loan, contact your servicer.

We do not guarantee the quality of the academic programs provided by schools that participate in federal student financial aid programs. You must repay your loan even if you do not complete the education paid for with the loan, are unable to obtain employment in the field of study for which your school provided training, or are dissatisfied with, or do not receive, the education you paid for with the loan.

**22. Loan consolidation.** A Direct Consolidation Loan Program is available that allows you to consolidate (combine) one or more of your eligible federal education loans into one loan. Consolidation allows you to extend the period of time that you have to repay your loans, and to combine several loan debts into a single monthly payment. This may make it easier for you to repay your loans. However, you will pay more interest if you extend your repayment period through consolidation, since you will be making payments for a longer period of time. Contact your servicer for more information about loan consolidation.

**23. Department of Defense and other federal agency loan repayment.** Under certain circumstances, military personnel may have their federal education loans repaid by the Secretary of Defense. This benefit is offered as part of a recruitment program that does not apply to individuals located on their previous military service or to those who are not eligible for enlistment in the U.S. Armed Forces. For more information, contact your local military service recruitment office.

Other agencies of the federal government may also offer student loan repayment programs as an incentive to recruit and retain employees. Contact the agency's human resources department for more information.

**24. AmeriCorps program education awards.** Under the National and Community Service Act of 1990, you may receive an education award that can be used to repay a Direct Subsidized Loan or Direct Unsubsidized Loan if you successfully complete a term of service in an AmeriCorps program. For more information, contact an official of your program.

Revised 07/2010

## William D. Ford Federal Direct Loan Program
### Direct Subsidized Loan and Direct Unsubsidized Loan Borrower's Rights and Responsibilities Statement

### Repaying Your Loans[1]

| Initial Debt When You Enter Repayment | Standard | | Extended[2,3] | | Graduated | | Income Contingent[5,6] Income = $15,000 | | | | Income Contingent[5,6] Income = $25,000 | | | | Income Contingent[5,6] Income = $45,000 | | | |
| | | | | | | | Single | | Married/HOH[7] | | Single | | Married/HOH[7] | | Single | | Married/HOH[7] | |
| | Per Month | Total | Per Month | Total | Per[4] Month | Total | Per Month | Total | Per Month | Total | Per Month | Total | Per Month | Total | Per Month | Total | Per Month | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,500 | 50 | 4,471 | Not Available | | 25 | 5,157 | 21 | 6,939 | 20 | 6,673 | 27 | 6,092 | 25 | 6,405 | 36 | 5,128 | 36 | 5,128 |
| 5,000 | 58 | 6,905 | Not Available | | 40 | 7,278 | 30 | 9,912 | 29 | 9,533 | 38 | 8,703 | 36 | 9,150 | 51 | 7,326 | 51 | 7,326 |
| 5,500 | 63 | 7,595 | Not Available | | 43 | 8,007 | 33 | 10,903 | 30 | 10,463 | 42 | 9,574 | 40 | 10,065 | 56 | 8,059 | 56 | 8,059 |
| 7,500 | 86 | 10,357 | Not Available | | 59 | 10,919 | 45 | 14,868 | 30 | 14,019 | 57 | 13,055 | 54 | 13,725 | 76 | 10,989 | 76 | 10,989 |
| 10,500 | 121 | 14,500 | Not Available | | 83 | 15,283 | 64 | 20,815 | 30 | 18,877 | 80 | 18,277 | 76 | 19,215 | 107 | 15,385 | 107 | 15,385 |
| 15,000 | 173 | 20,714 | Not Available | | 119 | 21,834 | 87 | 29,685 | 30 | 25,229 | 114 | 26,110 | 108 | 27,451 | 153 | 21,978 | 153 | 21,978 |
| 18,500 | 213 | 25,548 | Not Available | | 146 | 26,929 | 87 | 35,992 | 30 | 29,465 | 140 | 32,203 | 134 | 33,856 | 188 | 27,106 | 188 | 27,106 |
| 23,000 | 265 | 31,762 | Not Available | | 182 | 33,479 | 87 | 43,141 | 30 | 34,128 | 174 | 40,036 | 166 | 42,091 | 234 | 33,699 | 234 | 33,699 |
| 30,000 | 345 | 41,429 | Not Available | | 237 | 43,668 | 87 | 52,340 | 30 | 39,756 | 228 | 52,221 | 197 | 55,743 | 407 | 43,956 | 407 | 43,956 |
| 40,000 | 460 | 55,239 | 277 | 83,289 | 316 | 58,229 | 87 | 62,005 | 30 | 44,827 | 253 | 72,717 | 197 | 84,352 | 468 | 58,608 | 468 | 58,608 |
| 46,000 | 529 | 63,524 | 319 | 95,782 | 363 | 66,956 | 87 | 66,084 | 30 | 46,378 | 253 | 89,828 | 197 | 105,472 | 509 | 67,399 | 509 | 67,399 |
| 50,000 | 575 | 69,048 | 347 | 104,111 | 395 | 72,778 | 87 | 68,153 | 30 | 46,860 | 253 | 103,268 | 197 | 111,575 | 587 | 73,260 | 587 | 73,260 |
| 60,000 | 690 | 82,858 | 391 | 140,816 | 474 | 87,334 | 87 | 71,219 | 30 | 46,934 | 253 | 136,615 | 197 | 124,085 | 587 | 88,251 | 587 | 88,251 |
| 70,000 | 806 | 96,667 | 456 | 164,285 | 535 | 101,890 | 87 | 71,721 | 30 | 46,934 | 253 | 148,551 | 197 | 133,106 | 587 | 106,551 | 587 | 106,551 |
| 80,000 | 920 | 110,477 | 522 | 187,754 | 632 | 116,445 | 87 | 71,721 | 30 | 46,934 | 253 | 157,373 | 197 | 138,907 | 587 | 128,146 | 587 | 128,146 |
| 90,000 | 1,036 | 124,287 | 587 | 211,224 | 711 | 131,002 | 87 | 71,721 | 30 | 46,934 | 253 | 163,227 | 197 | 141,925 | 587 | 152,967 | 587 | 152,967 |
| 100,000 | 1,151 | 138,096 | 652 | 234,693 | 790 | 145,556 | 87 | 71,721 | 30 | 46,934 | 253 | 166,457 | 197 | 142,386 | 587 | 181,224 | 587 | 181,224 |
| 110,000 | 1,266 | 151,906 | 717 | 258,162 | 869 | 160,111 | 87 | 71,721 | 30 | 46,934 | 253 | 167,172 | 197 | 142,386 | 587 | 213,485 | 587 | 213,485 |
| 120,000 | 1,381 | 165,716 | 782 | 281,632 | 948 | 174,668 | 87 | 71,721 | 30 | 46,934 | 253 | 167,172 | 197 | 142,386 | 587 | 250,281 | 587 | 250,281 |
| 130,000 | 1,496 | 179,525 | 848 | 305,101 | 1,024 | 189,224 | 87 | 71,721 | 30 | 46,934 | 253 | 167,172 | 197 | 142,386 | 587 | 292,313 | 587 | 292,313 |
| 138,500 | 1,594 | 191,264 | 903 | 325,050 | 1,094 | 201,596 | 87 | 71,721 | 30 | 46,934 | 253 | 167,172 | 197 | 142,386 | 587 | 332,912 | 587 | 332,912 |

[1] The estimated payments were calculated using a fixed interest rate of 6.80%.
[2] This repayment plan is available only to borrowers who have an outstanding balance on Direct Loan Program loans that exceeds $30,000, and who had no outstanding balance on a Direct Loan Program loan as of October 7, 1998 or on the date they obtained a Direct Loan Program loan on or after October 7, 1998.
[3] These amounts are fixed, rounded to the nearest dollar, and calculated based on a 25-year repayment term.
[4] This is your beginning payment, which may increase during your 10-year repayment term.
[5] Assumes a 5% annual income growth (Census Bureau).
[6] The estimated payments were calculated using the formula requirements in effect during 2006.
[7] HOH is Head of Household; assumes a family size of two.

### TRANSACTION HISTORY

| | |
|---|---|
| Your identity was confirmed by the PIN Web site on | September 02 2011, 17:07:03 |
| You agreed to use an electronic MPN on | September 02 2011, 17:07:24 |
| You reviewed your draft MPN and confirmed that you read, understood, and agreed to the Borrower Request, Certifications, Authorizations, and Understandings, Promise to Pay, MPN Terms and Conditions, Important Notices and Borrower's Rights and Responsibilities Statement on | September 02 2011, 17:14:56 |
| You signed your MPN on | September 02 2011, 17:15:47 |
| You reviewed your signed MPN on | September 02 2011, 17:15:52 |
| You confirmed your acceptance of the terms and conditions of this MPN and submitted it to us on | September 02 2011, 17:15:59 |

Revised 07/2010

# EXHIBIT 2

# Corinthian Colleges

## Introduction

Corinthian Colleges, Inc. ("Corinthian") offers Certificate and Associate programs in many areas as well as a small Bachelor's program both online and at on-ground campus locations. Like many for-profit education companies, Corinthian has experienced significant growth in student enrollment, Federal funds collected, and profit realized. Although Corinthian College Inc. offers primarily Certificates and 2-year degrees, the company's tuition prices are among the highest the committee examined. This forces many students to both borrow the maximum available Federal financial aid and to take on additional private debt. The student withdrawal rates for the Associate programs are among the highest analyzed by the committee staff and the withdrawal rates for the Certificate programs are above the sector average. The company also had unusually high rates of students defaulting on student loans during the period examined. It is unclear that Corinthian delivers an educational product worth the rapidly growing Federal investment taxpayers and students are making in the company.

## Company Profile

Corinthian is a publicly traded, for-profit education company headquartered in Santa Ana, CA. Corinthian operates a total of 105 campuses in 25 States, along with an online division, and offers diploma and degree programs in health care, business, criminal justice, transportation technology and maintenance, construction trades, and information technology.[1521] Committee staff estimates that approximately 34 percent of Corinthian students are enrolled online, and 64 percent are enrolled in diploma (non-degree) programs.

| Brands |
| --- |
| Everest |
| Heald College |
| Wyotech |

Individual Corinthian-branded campuses are primarily accredited through two national accreditors: the Accrediting Commission of Career Schools and Colleges (ACCSC) and the Accrediting Council for Independent Colleges and Schools (ACICS). The current chair of the board of ACCSC also serves as the executive vice president of operations for Corinthian. Some of the Everest College campuses are also regionally accredited by the Higher Learning Commission (HLC), a division of the North Central Association of Colleges and Schools. Heald College campuses are regionally accredited by the Western Association of Schools and Colleges (WASC).

---

[1521] Corinthian Colleges, Inc., *Company History*, http://www.cci.edu/about/history (accessed June 18, 2012).

Corinthian was founded in 1995 and went public in 1999.  The current CEO and chairman of the board is Jack D. Massimino.  Before joining Corinthian, Mr. Massimino was an executive in the health care industry.



In the fall of 2010, 113,818 students were enrolled at Corinthian.[1522]  Enrollment quadrupled in 10 years, growing from 28,372 in 2001.  Enrollment fell to 94,000 in 2011.[1523]

Corinthian's growth strategy focuses on expanding short-term Diploma program offerings across its campuses in healthcare and trades.[1524]  It is also piloting three new Diploma programs in personal care, IT, and business, and is continuing to increase the number of Associate degree offerings.[1525]  The growth in enrollment led to growth in revenue.  In 4 years, revenue nearly doubled, from $909 million in 2006 to $1.76 billion in 2010.[1526]

---

[1522] Enrollment is calculated using fall enrollment for all unit identifications controlled by the company for each year from the Department of Education 's Integrated Postsecondary Data System (hereinafter IPEDS).  See Appendix 7.
[1523] The most current enrollment data from the Department of Education measures enrollment in fall 2010.  In 2011 and 2012, news accounts and SEC filings indicated that many for-profit education companies experienced a drop in new student enrollment.  This has also led to a decrease in revenue and profit at some companies.
[1524] Corinthian Colleges, Inc., August 23, 2012, Q4 Investor Call; See also Corinthian Colleges, Inc., August 25, 2009, Q4 Investor Call.
[1525] Id.
[1526] Revenue increased in 2011 from $1.8 billion to $1.9 billion.  Profit fell to a net loss of $83 million in the same year. Revenue figures for publicly traded companies are from Securities and Exchange Commission annual 10-K filings.  Revenue figures for privately held companies are taken from the company financial statements produced to the committee.  See Appendix 18.

**Federal Revenue**

Nearly all for-profit education companies derive the majority of revenues from Federal financial aid programs. Between 2001 and 2010, the share of title IV Federal financial aid funds flowing to for-profit colleges increased from 12.2 to 24.8 percent and from $5.4 to $32.2 billion.[1527] Together, the 30 companies the committee examined derived 79 percent of revenues from title IV Federal financial aid programs in 2010, up from 69 percent in 2006.[1528]

In 2010, Corinthian reported 81.9 percent of revenue from title IV Federal financial aid programs.[1529] However, this amount does not include revenue received from the Departments of Defense and Veterans Affairs education programs or revenue the company was allowed to temporarily discount pursuant to the Ensuring Continued Access to Student Loans Act (ECASLA).[1530] Department of Defense Tuition Assistance and post-9/11 GI bill funds accounted for approximately 1.2 percent of Corinthian's revenue, or $21.2 million.[1531] With these funds from the Departments of Defense and Veterans Affairs included, 83.1 percent of Corinthian's total revenue was comprised of Federal education funds.[1532] Based on information the company provided, the committee estimates that Corinthian may have discounted up to 8 percent of revenue, or $137.7 million, pursuant to ECASLA.

---

[1527] Senate HELP Committee staff analysis of U.S. Department of Education, Federal Student Aid Data Center, *Title IV Program Volume Reports by School*, http://federalstudentaid.ed.gov/datacenter/programmatic.html, 2000-1 and 2009-10. Figures for 2000-1 calculated using data provided to the committee by the U.S. Department of Education. "Federal financial aid funds" as used in this report means funds made available through title IV of the Higher Education Act, including subsidized and unsubsidized Stafford loans, Pell grants, PLUS loans and multiple other small loan and grant programs. See 20 U.S.C. §1070 et seq.

[1528] Senate HELP Committee staff analysis of Proprietary School 90/10 numerator and denominator figures for each OPEID provided to the U.S. Department of Education pursuant to section 487(d)(4) of the Higher Education Act of 1965. Data for fiscal year 2006 provided to the committee by each company; data for fiscal year 2010 provided by the Department of Education on October 15, 2011. See Appendix 9.

[1529] Senate HELP Committee staff analysis of fiscal 2010 Proprietary School 90/10 numerator and denominator figures for each OPEID provided to the U.S. Department of Education pursuant to section 487(d)(4) of the Higher Education Act of 1965. Data provided by the Department of Education on October 15, 2011. See Appendix 9.

[1530] Pursuant to the Ensuring Continued Access to Student Loan Act (ECASLA), for-profit education companies were allowed to exclude $2,000 in increased Stafford loan eligibility for each student during fiscal years 2009 and 2010.

[1531] Post-9/11 GI bill disbursements for August 1, 2009-July 31, 2010 provided to the Committee from the Department of Veterans Affairs on November 5, 2010; post-9/11 GI bill disbursements for August 1, 2009-June 15, 2011 provided to the Committee from the Senate Committee on Veterans' Affairs via the Department of Veterans Affairs on July 18, 2011; Department of Defense Tuition Assistance Disbursements and MyCAA disbursements for fiscal years 2009-11 provided (by branch) by the Department of Defense on December 19, 2011. Committee staff calculated the average monthly amount of benefits collected from VA and DOD for each company, and estimated the amount of benefits received during the company's 2010 fiscal year. See Appendix 11 and 12.

[1532] "Federal education funds" as used in this report means Federal financial aid funds combined with estimated Federal funds received from Department of Defense and Department of Veterans Affairs military education benefit programs.



The Pell grant program, the most substantial Federal program to assist economically disadvantaged students with college costs, is a significant source of revenue for for-profit colleges. Over the past 10 years, the amount of Pell grant funds collected by for-profit colleges as a whole increased from $1.4 billion to $8.8 billion; the share of total Pell disbursements that for-profit colleges collected increased from 14 to 25 percent.[1533] Part of the reason for this increase is that Congress has repeatedly increased the amount of Pell grant dollars available to a student over the past 4 years, and, for the 2009-10 and 2010-11 academic years, allowed students attending year-round to receive two Pell awards in 1 year. Poor economic conditions have also played a role in increasing the number of Pell eligible students enrolling in for-profit colleges.

Corinthian tripled the amount of Pell grants it collects in just 3 years, from $170.2 million in 2007 to $509.3 million in 2010. [1534]

---

[1533] Senate HELP Committee staff analysis of U.S. Department of Education, Federal Student Aid Data Center, *Title IV Pell Grant Program Volume Reports by School*, 2001-2 and 2010-11, http://federalstudentaid.ed.gov/datacenter/programmatic.html.
[1534] Senate HELP Committee staff analysis of U.S. Department of Education, Federal Student Aid Data Center, *Title IV Pell Grant Program Volume Reports by School*, 2006-7 and 2009-10, http://federalstudentaid.ed.gov/datacenter/programmatic.html.



## Spending

While the Federal student aid programs are intended to support educational opportunities for students, for-profit education companies direct much of the revenue derived from these programs to marketing and recruiting new students and to profit.   On average, among the 15 publicly traded education companies, 86 percent of revenue came from Federal taxpayers in fiscal year 2009.[1535]   During the same period those companies spent 23 percent of revenue on marketing and recruiting ($3.7 billion) and dedicated 19.7 percent to profit ($3.2 billion).[1536]   These 15 companies allocated a total of $6.9 billion to marketing, recruiting and profit in fiscal year 2009.

In 2009, Corinthian allocated 9.1 percent of its revenue, or $119.2 million, to profit, and 22.5 percent, or $294.7 million, to marketing and recruiting.[1537]

---

[1535] Senate HELP Committee staff analysis of fiscal year 2009 Proprietary School 90/10 numerator and denominator figures plus all additional Federal revenues received in fiscal year 2009 provided to the committee by each company pursuant to the committee document request of August 5, 2010.
[1536] Senate HELP Committee staff analysis of fiscal year 2009 Securities and Exchange Commission annual 10-K filings. Marketing and recruiting includes all spending on marketing, advertising, admissions and enrollment personnel.  Profit figures represent operating income before tax and other non-operating expenses including depreciation.
[1537] Id.  On average, the 30 for-profit schools examined spent 22.7 percent of revenue on marketing and 19.4 percent on profit.  The "other" category in the chart below includes administration, instruction, executive compensation, student services, physical plant, maintenance and other expenditures.



As a percentage of revenue, Corinthian spends close to the average of the 30 companies examined on marketing and recruiting, and allocates a lower proportion than most to profit. However, the amount of profit Corinthian generated rose rapidly over the last several years. In 2007, Corinthian reported a profit of $21 million, and by 2010 that profit had increased 11-fold, growing to $240.8 million. Due to a drop in enrollment, Corinthian had a net loss of $83 million in 2011.[1538]

---

[1538] Corinthian announced the net loss for 2011, attributing it in part to the company's decision to no longer enroll higher risk "Ability to Benefit" students. See Corinthian Colleges, Inc., November 1, 2011, *Corinthian Colleges Reports Fiscal 2012 First Quarter Results*, http://newsroom.cci.edu/releasedetail.cfm?ReleaseID=619610 (accessed June 18, 2012). Corinthian's decision regarding Ability to Benefit students was taken to help reduce the company's cohort default rates. See Corinthian Colleges, Inc. Investor Call, Q3 May 3, 2011.



## Executive Compensation

Executives at Corinthian, like most for-profit executives, are more generously compensated than leaders of public and non-profit colleges and universities. Executive compensation across the for-profit sector drastically outpaces both compensation at public and non-profit colleges and universities, despite poor student outcomes at many for-profit institutions.[1539]  In 2009, Corinthian's current CEO Jack Massimino received $3.3 million in compensation, more than eight times as much as the president of the University of California at Irvine, who received $382,980 in total compensation for 2009-10.

The chief executive officers of the large publicly traded for-profit education companies took home, on average, $7.3 million in fiscal year 2009.[1540]  Massimino's $3.3 million compensation package for 2009 is under half the average for the publicly traded companies. Moreover, compensation agreements make clear that pay is based on enrollment and profit goals, not student success.[1541]  In fact, 75 percent of Mr. Massimino's compensation is based on "operating profit performance."

---

[1539] Senate HELP Committee staff analysis of fiscal year 2009 Securities and Exchange Commission annual proxy filings and Chief Executive salary surveys published by the Chronicle of Higher Education for the 2008-9 school year.  See Appendix 17a.
[1540] Includes compensation information for 13 of 15 publicly traded for-profit education companies.  Kaplan, owned by the Washington Post Company, does not disclose executive compensation for its executives.  And National American University was not listed on a major stock exchange in 2009.
[1541] Corinthian Colleges, Inc., Form DEF 14A, October 6, 2011.

| Executive | Title | 2009 Compensation | 2010 Compensation |
|---|---|---|---|
| Jack Massimino | Executive Chairman; also CEO after Nov. 2010 | $3,343,434.00 | $3,032,703.00 |
| Peter Waller | Chief Executive Officer | $1,984,619.00 | $4,463,882.00 |
| Kenneth S. Ord | Executive Vice President and Chief Financial Officer | $1,472,628.00 | $1,605,529.00 |
| Beth Wilson | Executive Vice President | $1,409,213.00 | $1,516,676.00 |
| Matt Ouimet | President and Chief Operating Officer | $1,406,812.00 | $2,021,538.00 |
| Total[1542] | | $9,616,706.00 | $12,640,328.00 |

## Tuition and Other Academic Charges

Compared to public colleges offering the same programs, the price of tuition is higher at Corinthian. The Medical Assistant diploma program at Corinthian's Heald College in Fresno, CA, costs $22,275.[1543] A comparable program at Fresno City College costs $1,650.[1544] An Associate degree in paralegal studies at Corinthian-Owned Everest College in Ontario, CA, costs $41,149[1545], compared to $2,392 for the same degree at Santa Ana College.[1546] Everest College charges $82,280 for a Bachelor's Degree in Business.[1547] The same degree is available at the University of California – Irvine for $55,880.[1548] Corinthian's cost for a diploma was among the highest surveyed by the committee, and the cost of an Associate degree at Corinthian was the highest surveyed, surpassing the next highest-cost school (ITT) by 17 percent. Moreover, Corinthian was extremely lacking in transparency regarding these costs. Prior to new regulations requiring tuition disclosures, committee staff struggled to accurately determine the cost of most Corinthian programs.[1549]

---

[1542] Senate HELP Committee staff analysis of fiscal year 2009 and 2010 Securities Exchange Commission annual proxy filings. Information analyzed includes figures for named executive officers.  See Appendix 17b.

[1543] See Appendix 14; see also, Corinthian Colleges, Inc., *Program Disclosures: Heald College, Fresno*, http://disclosures.heald.edu/disclosures/heald-college-fresno.pdf (accessed June 18, 2012).

[1544] See Appendix 14; See also, Fresno City College, *Fresno City College*, http://www.fresnocitycollege.edu/ (accessed June 18, 2012).

[1545] See Appendix 14; See also, Corinthian Colleges, Inc., *Program Disclosures: Everest College, Ontario Metro*, http://disclosures.everest.edu/disclosures/everest-college-ontario-metro.pdf (accessed June 18, 2012).

[1546] See Appendix 14; See also, Santa Ana College, *Santa Ana College*, http://www.sac.edu/Pages/default.aspx (accessed July 12, 2012).

[1547] See Appendix 14; See also, Everest University, *Program Disclosures*, http://disclosures.everest.edu/disclosures/everest-university-tampa.pdf?cache1342188115 (accessed July 13, 2012).

[1548] See Appendix 14; See also, University of California – Irvine, *University of California – Irvine*,  http://www.uci.edu/ (accessed July 13, 2012).

[1549] Committee staff examined internal documents produced by the company, Corinthian's schools' Web sites, and academic and course catalogues in an attempt to determine the cost of the programs.  However, committee staff was unable to reliably determine the cost of completing a degree at the Corinthian's schools prior to new regulations requiring tuition disclosures.





The sharply higher tuition that Corinthian charges is reflected in the amount of money that Corinthian collects for each veteran that it enrolls.  From 2009-11, Corinthian trained 4,676 veterans and received $60 million in post-9/11 GI bill benefits, the eighth-largest dollar amount collected by any company.  Corinthian collected an average of $12,885 per veteran, compared to an average of $4,642 per veteran trained at a public college in the same period.[1550]

Corinthian implemented a 12 percent tuition increase in February 2011, and like much of the industry, increases its tuition regularly.[1551]  However, recruiters are trained to discourage and deflect questions about cost from students.  In an admissions representative training document, in the section on "Common Objections and Responses," recruiters are trained to deflect the question "How much does it cost" using the following script:

> John, the cost of the program will vary depending on several factors. Is your question really how much is it going to cost you in out-of-pocket dollars? (Response). In order for me to answer the question, first we would have to determine the right program for you. Second, we would have to determine what time-frame you expect to complete the program  (only true if credit hour charging is used); and finally, the Student Finance office would determine the types of financial assistance you may be eligible for. Could you tell me why you are asking about the cost?" (Proceed with phone script).[1552]

## Recruiting

Enrollment growth is critical to the business success of for-profit education companies, particularly for publicly traded companies that are closely watched by Wall Street analysts.  In order to meet revenue and profit expectations, for-profit colleges recruit as many students as possible to sign up for their programs.

Internal company documents from the 2005-10 period make clear that recruiters employed by Corinthian were trained that selling the program, not advising students, is the primary responsibility of the position.  One 2005 hiring manual states: "remember that this is a sales position and the new hire must understand that from the very beginning." [1553]  Once a recruiter is hired, managers check the numbers of "appointments being set, interviews conduct[ed], applications taken and daily enrollment" twice a day.[1554] Moreover, Corinthian also recommended that managers not "distribute an equal amount of [leads] to a new Ad Rep nor an Ad Rep that in underperforming versus a top producing Ad Rep [sic]." [1555]

It is possible that these aggressive recruiting tactics result in a student body that is underprepared for college.  On June 26, 2012, the first set of data from the Department of Education, regarding the gainful employment regulations, indicated that 5 percent of programs (193 programs at 93 institutions)

---

[1550] See Appendix 11. Post-9/11 GI bill disbursements for August 1, 2009-June 15, 2011 provided to the Committee from the Senate Committee on Veterans' Affairs via the Department of Veterans Affairs on July 18, 2011.
[1551] Corinthian Colleges, Inc., February 1, 2011, Q2 Investor Call; See Department of Education, *College Affordability and Transparency Center*, http://collegecost.ed.gov/catc/Default.aspx# (accessed June 18, 2012).
[1552] Corinthian Colleges, Inc., October 2005, *Admissions Representative Training Manual* (CCi-00046774, at CCi-00046777); See also Corinthian Colleges, Inc., *Phone Script* (CCI-00047154), Corinthian Colleges, Inc., *Overcoming Phone Obstacles* (CCI-00046688).
[1553] Corinthian Colleges, Inc., *Admissions Representative Training Manual* (CCi-00045716) describing the job as "a sales position"; See also Corinthian Colleges, Inc., *CCI Director of Admissions Operations* (CCi-00045638).
[1554] Id.
[1555] Id.

387

all operated by for-profit colleges failed to meet all three gainful employment criteria.[1556]  These three standards include: (1) at least 35 percent of the program's former students are repaying their loans; (2) the estimated annual loan payment of a typical graduate does not exceed 12 percent of his or her total earnings; and (3) the estimated annual loan payment of a typical graduate does not exceed 30 percent of his or her discretionary income.  According to analysis from *Inside Higher Ed*, Corinthian was the company with the most programs, 43 in total, failing all three criteria.[1557]

## Outcomes

While aggressive recruiting and high cost programs might be less problematic if students were receiving promised educational outcomes, committee staff analysis shows that tremendous numbers of students are leaving for-profit colleges without a degree.  Because 98 percent of students who enroll in a 2-year degree program at a for-profit college, and 96 percent who enroll in a 4-year degree program, take out loans, hundreds of thousands of students are leaving for-profit colleges with debt but no diploma or degree each year.[1558]

Two metrics are key to assessing student outcomes: (1) retention rates based on information provided to the committee, and (2) student loan "cohort default rates."  An analysis of these metrics indicates that many people who enroll in at Corinthian are not achieving their educational and career goals.

<u>Retention Rates</u>

---

[1556] U.S. Department of Education, "Five Percent of Career Training Programs Risk Losing Access to Federal Funds; 35 Percent Meet All Three Standards Under Gainful Employment Regulation," Press Release, June 26, 2012, http://www.ed.gov/news/press-releases/five-percent-career-training-programs-risk-losing-access-federal-funds-35-percen (accessed July 6, 2012).
[1557] US Department of Education, Federal Student Aid Data Center, *2011 Gainful Employment Informational Metrics*, http://federalstudentaid.ed.gov/datacenter/gainful1.html (accessed July 6, 2012); See also Libby A. Nelson, Missing the Mark on 'Gainful,' *Inside Higher Ed*, June 26, 2012, http://www.insidehighered.com/news/2012/06/26/education-department-releases-data-gainful-employment-rule (accessed July 6, 2012).  On June 30, 2012, the District Court for the District of Columbia struck down the gainful employment rule stating that the Department had failed to provide sufficient justification for the requirement that 35 percent of students are repaying loans. *Association of Private Colleges and Universities v. Duncan*, 2012 DC D 1:11-CV-01314-RC U, p. 29-31, available at http://big.assets.huffingtonpost.com/judgeordergainful.pdf (accessed July 6, 2012).
[1558] Patricia Steele and Sandy Baum, "How Much Are College Students Borrowing?," *College Board Policy Brief*, August 2009, http://advocacy.collegeboard.org/sites/default/files/09b_552_PolicyBrief_WEB_090730.pdf (accessed June 18, 2012).

| Status of Students Enrolled in Corinthian Colleges, Inc. in 2008-09, as of 2010 | | | | | | |
|---|---|---|---|---|---|---|
| Degree Level | Enrollment | Percent Completed | Percent Still Enrolled | Percent Withdrawn | Number Withdrawn | Median Days |
| Associate Degree | 44,436 | 6.9% | 26.6% | 66.5% | 29,547 | 124 |
| Bachelor's Degree | 3,139 | 6.1% | 34.8% | 59.2% | 1,889 | 138 |
| Certificate | 83,291 | 56.6% | 1.7% | 41.7% | 34,714 | 79 |
| All Students[1559] | 130,920 | 39% | 11% | 50.5% | 66,150 | 101 |

The dataset does not capture some students who withdraw and subsequently return, which is one of the advantages of the for-profit education model. The analysis also does not account for students who withdraw after mid-2010 when the data were produced.

Information Corinthian provided to the committee indicates that, of the 130,920 students who enrolled at Corinthian in 2008-9, 50.5 percent, or 66,150 people, withdrew by mid-2010. The median withdrawn student was enrolled for just over 3 months.[1560] Overall, Corinthian's retention rate was slightly lower than the average withdrawal rate of 54 percent across the 30 companies. Corinthian's Associate degree student withdrawal rate was one of the 10 worst among the companies examined, with 66.5 percent withdrawing. The smaller Bachelor's program also had a high withdrawal rate of 59.2 percent.

Because two-thirds of Corinthian's students enrolled in Certificate programs, with a much lower withdrawal rate of 41.7 percent, the overall withdrawal rates are better than might be expected. However, the withdrawal rate for Certificate programs is still higher than the average of 38 percent. The Certificate students who withdrew did so very quickly, with the median student withdrawing in 2.5 months, one of the fastest rates noted. While a rapid withdrawal rate reduces the debt load for the student, it also suggests problems with the quality of the program and raises questions about recruitment practices.

## Student Loan Defaults

The number of students leaving Corinthian with no degree correlates with the exceptionally high rates of student loan defaults by students who attended Corinthian. The Department of Education tracks and reports the number of students who default on student loans (meaning that the student does not make payments for at least 360 days) within 3 years of entering repayment, which usually begins 6 months after leaving college.

---

[1559] The Committee analyzed data for students who enrolled at each company between July 1, 2008 and June 30, 2009. This dataset did not include Corinthian students who enrolled prior to July 1, 2008. The inclusion of these students could potentially have resulted in a lower overall percentage of students withdrawing.
[1560] Senate HELP Committee staff analysis. See Appendix 15. Rates track students who enrolled between July 1, 2008 and June 30, 2009. For-profit education companies use different internal definitions of whether students are "active" or "withdrawn." The date a student is considered "withdrawn" varies from 10 to 90 days from date of last attendance. Two companies provided amended data to properly account for students that had transferred within programs. Committee staff note that the data request instructed companies to provide a unique student identifier for each student, thus allowing accurate accounting of students who re-entered or transferred programs within the school. The dataset is current as of mid-2010, students who withdrew within the cohort period and re-entered afterward are not counted. Some students counted as withdrawals may have transferred to other institutions.

Slightly more than 1 in 5 students who attended a for-profit college (22 percent) defaulted on a student loan, according to the most recent data.[1561]  In contrast, 1 student in 11 at public and non-profit schools defaulted within the same period.[1562]  On the whole, students who attended for-profit schools default at nearly three times the rate of students who attended other types of institutions.[1563]  The consequence of this higher rate is that almost half of all student loans defaults nationwide are held by students who attended for-profit colleges.[1564]

Beginning in 2014, any school will lose eligibility for Federal financial aid if its 3-year cohort default rate is greater than 40 percent in a single year, or if the cohort default rate is greater than 30 percent for each of the 3 most recent years.[1565]  Corinthian's trial 3-year cohort default rates for students entering repayment in 2008 were over 40 percent at 13 campuses and over 30 percent at an additional 65 campuses.[1566]  Further, all 14 of Corinthian's Everest campuses in California, as well as two Heald and two Wyotech campuses in California, were recently removed from eligibility for California's student grant program because those campuses had a default rate of more than 24.6 percent.[1567]

The default rate across all 30 companies examined increased each fiscal year between 2005 and 2008, from 17.1 percent to 22.6 percent.  This change represents a 32.6 percent increase over 4 years.[1568]  Corinthian's default rate has similarly increased, growing from 22.9 percent for students entering repayment in 2005 to 36.1 percent for students entering repayment in 2008.[1569]  This is by far the highest default rate of any publicly traded company examined, and the second highest overall.[1570]  The default rate is 64 percent higher than the rate for all for-profit colleges.  While the company's high default rate is likely due in part to the high cost of Corinthian' programs, it also raises serious questions regarding the quality of the programs Corinthian provides, and whether its students who complete programs earn high enough wages to repay the debt they take on.  Had the 3-year cohort default rate provision been in effect in 2011, Corinthian would have faced the loss of access to title IV financial aid dollars.

---

[1561] Senate HELP Committee staff analysis of U.S. Department of Education Trial Cohort Default Rates fiscal year 2005-8, http://federalstudentaid.ed.gov/datacenter/cohort.html.  Default rates calculated by cumulating number of students entered into repayment and default by sector.
[1562] Id.
[1563] Id.
[1564] Id.
[1565] H.R. 4137, *The Higher Education Opportunity Act,* 110th Congress, (2008).
[1566] Department of Education 3-year cohort default rate, for students entering repayment in fiscal year 2008.
[1567] Corinthian owns more than one-fourth of the schools removed from the Cal Grant program.  Nanette Asimov, "Some For-Profit Colleges Booted from Cal Grants," *San Francisco Chronicle,* February 6, 2012, http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2012/02/05/BAU11N1V83.DTL (accessed May 14, 2012).
[1568] Department of Education 3-year cohort default rate, for students entering repayment in fiscal years 2005, 2006, 2007 and 2008.  Senate HELP Committee staff analysis of U.S. Department of Education Trial Cohort Default Rates fiscal year 2005-08, http://federalstudentaid.ed.gov/datacenter/cohort.html.  Default rates calculated by cumulating number of students entered into repayment and default for all OPEID numbers controlled by the company in each fiscal year.  See Appendix 16.
[1569] Department of Education consolidated cohort default rates.  In March 2012 Corinthian announced that its 2009 3-year default rate had fallen by 7.3 percent to 28.8 percent.
[1570] Med-Com or Drake University has the highest 3-year default rate.



The default picture at some individual campuses is particularly dire. Corinthian's Everest Institute campus in San Antonio, TX, had 32.7 percent of its students default within 3-years for students entering repayment in 2005. That campus' proportion of students defaulting jumped to 54.5 percent for students entering repayment in 2008. Aggressive tactics led to a significant drop, though to a still high 37 percent of students from the campus in default from the 2009 cohort.[1571] Six additional campuses also had draft 2009 cohort default rates at or above 35 percent, according to the company's March 2012 SEC filings: Everest College in Los Angeles, CA (37 percent); Everest College in Ontario, CA (35.4 percent); Everest College in Renton, WA (37.2 percent); Everest College in Resada, CA (35 percent); Everest College in Thornton, CO (35.2 percent); and WyoTech in Long Beach, CA (36.6 percent).[1572]

## Default Management

Corinthian has focused significant resources on finding ways to eliminate students from its reported default rates. Helping get delinquent students into repayment, deferment, or forbearance prior to default is encouraged by the Department of Education. However, many for-profit colleges appear to be investing in aggressive tactics for the sole purpose of ensuring that borrowers do not default within the 3-year regulatory window.

Default management is primarily accomplished by putting students who have not made payments on their student loans into temporary deferments or forbearances. While the use of deferment and forbearance is fairly widespread throughout the sector, documents produced indicate that a number of companies also pursue default management strategies that include loan counseling, education, and

---

[1571] Corinthian Colleges, Inc., Form 8-K, June 30, 2012.
[1572] Id.

alternative repayment options.  Default management contractors are paid to counsel students into repayment options that ensure that students default outside the 2-year, soon to be 3-year, statutory window in which the Department of Education monitors defaults.

Forbearances may not always be in the best interest of the student.  This is because during forbearance of Federal loans, as well as during deferment of unsubsidized loans, interest still accrues.  The additional interest accrued during the period of forbearance is added to the principal loan balance at the end of the forbearance, with the result that interest then accrues on an even larger balance.  Thus, some students will end up paying much more over the life of their loan after a forbearance or deferment.

Confronted with a default rate that was beginning to cause investor concern, Corinthian executives announced in 2010 that they would start investing $10 million per year in their existing default management program.[1573]  The company has been up front that those efforts are focused on moving students into forbearance or deferment, rather than counseling students on how to begin making payments on their loans.  As Corinthian executives told investors in May 2011, "Forbearance, as you well know, is a pretty easy, just a question you have to agree to it and you're on your way" [sic].[1574]  The company made it clear that while the company was seeing benefits from the effort, the number of students *repaying* their loans changed little: "Our payment rate really has not moved a whole heck of a lot from where it was prior to this effort." [1575]

Like many other for-profit colleges, Corinthian contracted with the General Revenue Corporation (GRC), a subsidiary of Sallie Mae, to "cure" students who were approaching default.[1576]  Corinthian also hired two additional contractors to manage their default rates and instituted an in-house effort as well.[1577]   Documents indicate GRC devoted 60 full-time employees to call former Corinthian students who were late making payments but not yet in default.  The two additional firms, ROI and TEAM Enterprises, sent out 30 or more people to knock on former students' doors to secure "cures." [1578]  This same document reveals that students in late stages of delinquency but not yet in default—when they are the biggest threat to Corinthian's default rate—could be contacted up to 110 times per month.[1579]  Another internal document shows that, in order to achieve the company's desired default rate, the call center run by GRC would make between 2 and 2.5 million calls a year, or 429 calls per employee per day to former Corinthian students.[1580]

Corinthian also built its own internal default management operation, complete with a call center and dozens of employees.[1581]  Compensation was directly tied to the number of students an employee successfully eliminates from the company's default rate.  Emails show that managers pushed employees to secure as many "cures" as possible. "Team Central . . . you did it!" reads one email sent to dozens of

---

[1573] Corinthian Colleges, Inc., May 4, 2010, Q3 Investor Call.

[1574] Corinthian Colleges, Inc., May 3, 2011, Q3 Investor Call.

[1575] Id.

[1576] While a "cure" means that a student is moved from delinquency to forbearance, deferment, or payment status, few students are actually being placed in payment status.

[1577] Corinthian College, Inc., Internal Default Prevention Operations Presentation (CCi-00056216) discussing "FY2010 Key Accomplishments"; see also Corinthian Colleges, Inc., Contract with GRC (CCi-00067423; Corinthian Colleges, Inc. Internal E-mail, January 18, 2012, *Update on Outside Default Aversion Vendors & Student Loan Specialist Team* (CCi-00067498).

[1578] Id.

[1579] Id.

[1580] Corinthian Colleges, Inc., *Default Prevention Staff Presentation* (CCi-00057049).

[1581] Corinthian College, Inc., *Default Prevention Operations Presentation* (CCi-00056216).

line-level default management employees, "We cured 243 students on Wednesday . . . our Division is leading CCi and that is a direct reflection of your daily efforts to drive down our CDR." [1582]

Emails also demonstrate a willingness to reprimand if targets are not hit: "Tuesday saw the lowest number of staff calling in the past several days. This led to less calls and less students we talked to. We all know two truths: This must be a campus-wide effort and this is definitely a numbers game [sic]."[1583] In an internal training presentation, the last step when contacting a former student is to "close the sale".[1584] Corinthian also began offering students gift cards to McDonald's in February 2010, for campuses with high default rates, to incentivize students to contact the default management department.[1585] The campaign was conducted by email and mobile phone text messages, which explicitly referred to postponing student loan payments.[1586]

These investments in default rate management are working.[1587] In the company's August 2011 investor call, the CFO forecast that the company expected to lower its average default rate from 36.1 percent for students entering repayment in 2008 to between 18-20 percent by the 2010 cohort.[1588] In March 2012, the company announced progress towards this goal, with a 2009 rate of 28.8 percent a 1-year decrease of 7.3 percent.[1589] Additionally, executives recently announced that these efforts have resulted in a reduction of the 2-year default rates from 21.5 percent to 6.7 percent between the 2009 and 2010 cohorts.[1590]

Corinthian was especially successful in reducing the default rate of its worst performing OPEIDS. The company went from 13 to 0 OPEIDs above 40 percent, and 29 to 7 OPEIDs above 35 percent, significantly reducing their risk of violating the cohort default rate rule.[1591]

| Corinthian Colleges Institutions by Default Rate | | |
|---|---|---|
| | 2008 3-Year Default Rates | 2009 3-Year Default Rates |
| Number of Institutions with a Default Rate above 40 Percent | 13 | 0 |
| Number of Institutions with a Default Rate above 35 Percent | 29 | 7 |
| Number of Institutions with a Default Rate above 30 Percent | 36 | 25 |
| Number of Institutions with a Default Rate above 25 Percent | 40 | 36 |
| Number of Institutions with a Default Rate below 25 Percent | 9 | 13 |

This practice is troubling for taxpayers. The cohort default rate is designed not just as a sanction but also as a key indicator of a school's ability to serve its students and help them secure jobs. If schools

---

[1582] Corinthian Colleges Internal E-mail, April 29, 2010, *CDR Daily Activity 4-28-10* (CCi-00068416).

[1583] Corinthian Internal Email, April 2010, re: *CDR Daily Activity 4-20-10* (CCi-00068830).

[1584] Corinthian Colleges, Inc., *Counseling At Risk Borrowers* (CCi-00056493).

[1585] Corinthian Colleges, Inc., January 28, 2010, *E-mail and Text Incentive Plan* (CCi-00056773). The company notes that this plan was altered before implementation.

[1586] Id.

[1587] On February 28, 2012, Corinthian announced the sale of Everest College Campuses in Hayward, San Jose, San Francisco, and the Wilshire Area of Los Angeles. Three of the four sale schools have 3-year CDRs over 30 percent. Corinthian also announced the closure of Everest Campuses in Ft. Lauderdale, Decatur, and Arlington for falling below the company's student outcome or financial performance standards. The sale or closure of these seven campuses is likely to have a further positive effect on Corinthian's CDR rates.

[1588] Corinthian Colleges, Inc., August 23, 2011 Q4 Investor Call.

[1589] Corinthian Colleges, Inc., Form 8-K, March 5, 2012.

[1590] Corinthian Colleges, Inc., Form 8-K, February 28, 2012.

[1591] For some purposes including cohort default rates, the U.S. Department of Education identifies schools by "Office of Postsecondary Education Identification" number (OPEID). One OPEID number may consist of a main campus and branch campuses.

actively work to place students in forbearance and deferment, that means taxpayers and policymakers fail to get an accurate assessment of repayment and default rates. A school that has large numbers of its students defaulting on their loans indicates problems with program quality, retention, student services, career services, and reputation in the employer community. Aggressive default management undermines the validity of the default rate indicator by masking the true number of students who end up defaulting on their loans. Critically, schools that would otherwise face penalties—including loss of access to further taxpayer funds—continue to operate because they are able to manipulate their default statistics.

## Instruction and Academics

The quality of any college's academics is difficult to quantify. However, the amount that a school spends on instruction per student compared to other spending and what students say about their experience are two useful measures. Unfortunately, despite repeated requests and in contrast to most other companies Corinthian failed to produce student complaints.[1592] By looking at the instructional cost that all sectors of higher education report to the Department of Education, it is possible to compare spending on actual instruction.

Corinthian spent $3,969 per student on instruction in 2009, compared to $2,465 on marketing and $998 on profit.[1593] The amount that publicly traded for-profit companies spend on instruction ranges from $892 to $3,969 per student per year. Thus Corinthian's per student spending is in the upper range of the for-profit colleges the committee examined. In contrast, public and non-profit 4-year colleges and universities generally spend a higher amount per student on instruction, while community colleges spend a comparable amount but charge far lower tuition than for-profit colleges. By comparison, on a per student basis, the public University of California in Los Angeles spent $30,331 per student on instruction, the private University of Southern California spent $35,920, and local community college Orange Coast College spent $3,272 per student.[1594]

A large portion of the faculty at many for-profit colleges is composed of part-time and adjunct faculty. While a large number of part-time and adjunct faculty is an important factor in a low-cost education delivery model, it also raises questions regarding the academic independence they are able to exercise to balance the colleges' business interests. Among the 30 schools examined by the committee, 80 percent of the faculty is part-time, with higher percentages in some companies.[1595] In 2010,

---

[1592] The committee sought student complaints from each of the 30 companies examined, which provided valuable information regarding the quality concerns, if any, of students. However, Corinthian declined to comply with this part of the committee's document request, and further failed to comply after follow-up conversations with committee staff noted the company's omission.

[1593] Senate HELP Committee staff analysis. See Appendix 20, Appendix 21, and Appendix 22. Marketing and profit figures provided by company or Securities and Exchange filings, instruction figure from IPEDS. IPEDs data for instruction spending based on instructional cost provided by the company to the Department of Education. According to IPEDS, instruction cost is composed of "general academic instruction, occupational and vocational instruction, special session instruction, community education, preparatory and adult basic education, and remedial and tutorial instruction conducted by the teaching faculty for the institution's students." Denominator is IPEDS "full-time equivalent" enrollment. Because Corinthian purchased Heald Colleges recently, this data excludes enrollment from those campuses.

[1594] Senate HELP Committee staff analysis. See Appendix 23.

[1595] Senate HELP Committee staff analysis of information provided to the committee by the company pursuant to the committee document request of August 5, 2010. See Appendix 24.

Corinthian employed 2,577 full-time and 3,857 part-time faculty, meaning that it employed more full-time faculty than the average.[1596]

Nonetheless, a review of documents from an undercover GAO investigation raises serious questions about the academic quality of Corinthian's programs. In the investigation, undercover GAO employees enrolled in 12 different online colleges using fictitious identities and academic credentials, including an online program at Corinthian's Everest University.[1597]

The course structure at Everest consisted of self-directed reading from books and Web sites, online discussion-threads, online tests, individual written assignments or power-points and some courses included group assignments.[1598]  Interaction with the teacher was primarily through text-based chat rooms, discussion posts and direct emails.  Few of the courses featured video or audio lecture components.

The GAO's employees used various tactics to examine academic standards, including submitting obviously plagiarized, non-responsive or objectively incorrect work and failing to submit assignments. The employees' experiences reflect, in many cases, a lack of academic integrity and rigor on the part of Corinthian's Everest College, as well as other for-profit schools.[1599]

GAO employees enrolled in three different courses at Corinthian's Everest University.[1600]  These employees repeatedly submitted plagiarized work for each of those courses.  Two of the three courses granted full or partial credit for multiple plagiarized assignments, and instructors in one of those courses never acknowledged the plagiarism in any way.  In line with the methodology established by GAO the student ultimately failed the courses, the failure to discipline the student is contrary to Everest's academic honesty policy which provides for discipline ranging from expulsion to reduced credit.[1601]

These failures were not due to the plagiarism being difficult to detect.  For instance, as the main component of an assignment for a psychology course, students were asked to answer the question: "Why do psychologists study the brain and the nervous system?"  The agent responded with the following, copied verbatim from Answers.com, with a link to the page included:

> It is because our body affects our behavior, cognition, perception. different moods and certain reactions that we do are governed by certain neurotransmitters that depends on the brain and the nervous system, so that it will be of use [sic]. The brain is the command center of our whole body so whatever its state or nature is very important in

---

[1596] Id.

[1597] GAO employees attempted to enroll at 15 different institutions using fictitious (and unverifiable) proof of graduation from high school or its equivalent. Only 3 of the 15 schools declined or rescinded the students' admission as a result of those unverifiable credentials, while the other 12 institutions allowed admission. *See* U.S. Government Accountability Office, *For Profit Schools: Experiences of Undercover Students Enrolled in Online Classes at Selected Colleges*, Report to the Chairman, Committee on Health, Education, Labor and Pensions, October 2011, http://www.gao.gov/assets/590/586456.pdf (accessed, June 18, 2012) [hereinafter GAO II].

[1598] GAO Investigation Documentation, CFS 2167 Computer Application Course Syllabus (DALLAS-334171).

[1599] GAO additionally provided work papers to the Chairman, including screenshots and printouts of submitted coursework and communications with the school.

[1600] While the identity of individual companies were not made public at the time of the release of the GAO report *For-Profit Schools - Experiences of Undercover Students Enrolled in Online Classes at Selected Colleges*, the information was provided to the committee.  Corinthian-owned Everest College was school number 7 in the report.

[1601] GAO II at 20.  While GAO's undercover employees received full or partial credit for many plagiarized assignments, none received passing final grades for a course.  The employee's failing grades were partly due to their submission of objectively incorrect or non-responsive assignments, and partly due to their failure to submit any work for other assignments.

understanding behavior and mental processes. In addition, psychology is the study of
behavior and mental processes so it makes sense,

http://wiki.answers.com/Q/Why_do_psychologist_study_the_brain_and_nervous_system
[1602]

The professor awarded a B+ for the assignment and provided the following feedback regarding
the copied material: "you did an excellent job detailing this post-please do not use wiki or other sources
which are not credible such as about.com or answerbag." [1603]   The professor did not note the plagiarism
in this or several other assignments during the course.  After consistently submitting plagiarized work
each week, the professor finally noted the misconduct during the final week of the course, and submitted
an incident report to the school.[1604]  However, the school did not follow up with disciplinary action.[1605]

The professor of a Computer Science course failed to notice plagiarized submissions that were
copied verbatim from other students' discussion posts for the same assignment.  For example, for a
discussion post assignment in a Computer Science course at Everest University, the agent copied a short
post submitted by another student 24-hours earlier.[1606]  The professor gave a low grade for the post
(10/25), but only critiqued it for being short and incomplete.[1607]

The most responsible reaction to the plagiarized work came from a teacher of a "Learning
Strategies and Techniques" course, who consistently noted the dishonest conduct and gave little or no
credit for plagiarized assignments.  However, even though the teacher filed incident reports for multiple
assignments, Everest failed to follow-up with disciplinary action.[1608]

Further, because of the structure of these courses, there is often little interaction with teachers.
What interaction does occur is typically via email or text-chat, but those communications often reflect
little time or attention from the teacher.  Given the examples described above, it is unclear whether some
teachers even reviewed assignments prior to awarding grades for those assignments.  While other
teachers regularly offered help to students, at least one seemed to do so by copying-and-pasting the
exact same feedback for multiple assignments, including identical grammatical and typographical errors
in the teacher's comments.[1609]  This teacher included the following feedback for 5 of 10 discussion
assignments, usually with just one or two additional sentences identifying the assignment in question:

Remember that you must response to entire of the main question as well as two responses
to other people's posts.  As we learn from each other responses to the course material.
Please let me know if there is any assistance I can provide to assist you in succeeding in
the course next discussion [sic].[1610]

---

[1602] GAO Investigation Documentation, CFS 2167 Computer Application Course Syllabus (DALLAS-334889).
[1603] Id.
[1604] GAO Investigation Documentation, Week 2 Graded Activity: Class Discussion (DALLAS-334889).
[1605] GAO II.
[1606] GAO Investigation Documentation, Week 5 Graded Activity: Class Discussion (DALLAS-336134).
[1607] GAO Investigation Documentation, Everest Professor Feedback 335023 (DALLAS-335023).
[1608] GAO Investigation Documentation, Everest Professor Feedback 335083 (DALLAS-335083).
[1609] GAO Investigation Documentation, Everest Professor Feedback 335023 (DALLAS-335023).
[1610] Id.

## Staffing



While for-profit education companies employ large numbers of recruiters to enroll new students, the companies have far less staff to provide tutoring, remedial services, or career counseling and placement.  In 2010, with 113,818 students, Corinthian employed 2,811 recruiters, 784 career services employees, and 711 student services employees.[1611]  That means each career counselor was responsible for 145 students, and each student services staffer was responsible for 160 students.  Meanwhile, the company employed one recruiter for every 40 students.

Career Services

For-profit schools promote themselves as career-oriented, skill-focused training centers.  Indeed, most for-profit education advertising focuses on "getting the job" after graduating from school.  With one career services employee for every 145 students, Corinthian has a relatively robust career services program compared to other education companies examined the committee.  However, investigations from the attorney general of California and the Texas Workforce Commission have both documented serious problems with the integrity of the campuses' job placement claims.  Those investigations are discussed below in the section on Enforcement Actions.

---

[1611] Senate HELP Committee staff analysis of information provided to the Committee by the company pursuant to the Committee document request of August 5, 2010.  See Appendix 7 and Appendix 24.

## Regulatory Strategies

For-profit education companies are subject to two key regulatory provisions: that no more than 90 percent of revenue come from title IV Federal financial aid programs, and that no more than 25 percent of students default within 2 years of entering loan repayment. Many schools employ a variety of tactics to meet the requirement that no more than 90 percent of revenues come from title IV Federal financial aid programs.

Corinthian is clearly struggling to ensure that the amount of title IV Federal financial aid dollars it receives does not exceed 90 percent ("90/10"). Corinthian has been very upfront that it raised tuition as a means to comply with 90/10. The result is that the campuses' Certificate and Associate programs have some of the highest tuition of any comparable programs at either non-profit or for-profit colleges. One financial analyst, Ariel Sokol, called Corinthian's 2011 decision to raise tuition 12 percent "perhaps the most counterproductive public negotiating tactic that we've ever witnessed." [1612] He noted Corinthian announced the tuition increase "as if they are somehow the victims" when in reality the company knowingly pursued this kind of a revenue growth strategy notwithstanding the existence of 90/10.[1613] "It's not as if it happened by surprise," and now, "students are being burdened with debt they can't repay."[1614] For the company, "that's not a viable long-term strategy." [1615]

Documents provided by the company show that some of the school's administrators were concerned about tuition increases and the effect it would have on students. The director of one of the company's programs sent an email in May of 2008 raising those concerns. "I know that for the RN program we have seen more credit worthy students and some are paying over $600/month cash. Again with the [6% tuition increase] I don't know if they could continue to do this." [1616] The company's response to this concern was to claim: "The only way we have available to us" to manage 90/10 exposure "is to create a gap by raising tuition." [1617]

Tuition is so high that Federal financial aid will not always cover the program costs, so students must often find alternate financing. Thus, Corinthian offers students institutional loans to help cover the gap. Under the Higher Education Act (HEA), schools were allowed to count 50 percent of institutional loans to the non-Federal revenue side of the 90/10 ratio from July 1, 2008 until July 1, 2012.[1618] Corinthian partnered with a third-party lender to create the Genesis loan program in 2008. Corinthian estimates that 55 percent of those loan balances will default at some point.[1619] Nonetheless, the CFO of Corinthian explained to investors: "under the current rules we can have these institutional loans count as part of the 10 percent. So, again, we get the benefit of the incremental dollars net of the discount. So if

---

[1612] Goldie Blymenstyk, "Colleges Scramble to Avoid Violating Federal-Aid Limit: For-Profits Tactics to Comply With 90/10 Rule Raise Questions," *The Chronicle of Higher of Education*, April 2, 2011, http://chronicle.com/article/Colleges-Scramble-to-Avoid/126986/ (accessed May 8, 2012).
[1613] Id.
[1614] Id.
[1615] Id.
[1616] Corinthian Colleges Internal E-mail, May 13, 2008, *FW: Tuition Increase Nursing* (CCi-00053436). The company notes that the final tuition increases for 2008 differ from what was reflected in this document.
[1617] Id.
[1618] The Act allows schools to count the "net present value" of the loans at the time of disbursement. The net present value is an estimation of the ultimate value of the payments over the life of the loan taking into account defaults and inflation. The Education Department later enacted a regulation allowing schools to simply count 50 percent of the value of an institutional loan instead of going through the net present value calculation. Most schools have elected this approach.
[1619] Corinthian Colleges, Inc., August 24, 2009, Q4 Investor Call.

on an ongoing basis 45 percent of that price increase came to us after discount, we get the benefit of that in our 90/10 calculation as part of the 10 percent." [1620]

In 2009, Corinthian Colleges lent $65 million to its students through the Genesis program at an average interest rate of 14.8 percent, with some students paying as much as 18 percent. [1621]   For comparison, the Federal Reserve calculated that the average interest rate on a credit card in 2009 was 13.4 percent, and the interest rate on a Federal Stafford Loan was 5.6 percent (currently 3.4 percent).

Corinthian partnered with another third party lender, ASFG, in June of 2011 to arrange a more complicated loan program. [1622]   Corinthian was clear about the reasons for entering into the transaction; the company told investors: "the ASFG arrangement helped us meet our 90/10 requirement of generating at least 10 percent of revenue from non-title IV sources." [1623]   The arrangement called for $450 million to lend to Corinthian students over 2 years.  According to ASFG's Web site, their loans carry an interest rate of 11.9 to 17.9 percent, nearly three and a half times the current Federal subsidized interest rate of 3.4 percent. [1624]   Corinthian is obligated to purchase every loan on which no payment has been made for 90 days.

The company expects that it will be obligated to buy back about 55 percent of the ASFG loans, in line with its previous Genesis institutional loan program in which the company set the reserve at 55 percent based on their own internal analysis of expected defaults. [1625]

## Enforcement Actions

In 2007, the California attorney general entered into a settlement with Corinthian schools after establishing evidence that the company deliberately and persistently misled prospective students about the schools' placement rates. [1626]   Margaret Reiter, former supervising deputy attorney general, testified at the committee's June 24, 2010, hearing that every single program the AG examined had inflated its placement numbers by as much as 37 percent.  For most programs, only a third to a half of students obtained employment.  Ms. Reiter further testified that, in her long experience with consumer fraud cases, the for-profit college industry was among the "most persistent, egregious, and widespread" consumer abuses she had ever seen. [1627]

In 2010, Corinthian also admitted that administrators at one of its Everest College campuses in Texas falsified the employment records of 288 graduates over 4 years.  Of those graduates, 176 allegedly worked for a business that had been created by a friend of the school's career services director; this business did not have any actual employees.  The other 119 graduates were said to be working for a company that only employed a total of seven Everest College students. [1628]

---

[1620] Corinthian Colleges, Inc., February 1, 2011 Q2 Investor Call.
[1621] Note that in 2010 Corinthian has since lowered its rate to 6.8 percent.
[1622] However, Corinthian does not directly issue these loans.
[1623] Corinthian Colleges, Inc., August 23, 2011, Q4 Investor Call.
[1624] See, for example, FinAid, *Private Student Loans*, The SmartStudent Guide to Financial Aid, http://www.finaid. org/loans/privatestudentloans.phtml.
[1625] Corinthian Career Colleges, Form 8-K, June 30, 2011.
[1626] Margaret Reiter, Testimony before the Senate Committee on Health, Education, Labor, and Pensions, *Hearing on Waste, Fraud, and Abuse in the For-Profit Education Sector*, 112th Congress (2010).
[1627] Id.
[1628] HigherEd Watch, "Statement by Corinthian Colleges Regarding Everest College: Arlington Mid-Cities Campus," October 11, 2010,

As of 2012, the attorney general of Florida is investigating Corinthian's Everest College regarding "Alleged misrepresentations regarding financial aid; alleged unfair/deceptive practices regarding recruitment, enrolment, accreditation, placement, graduation rates, etc." [1629] The U.S. Consumer Financial Protection Bureau is also investigating Corinthian to determine whether the company engaged in "unlawful acts or practices relating to the advertising, marketing, or origination of private student loans." [1630]

## Conclusion

Corinthian charges some of the highest tuition prices of any of the companies the committee analyzed. Until new regulations requiring cost disclosures went into effect, it was very difficult to accurately determine the cost of Corinthian's programs. The high cost of Corinthian's programs is particularly troubling given that the bulk of the programs are non-degree Certificate and diploma programs and 2-year Associate degree programs that yield lower increases in earning power. The cost of attending Corinthian is so high that the company has created its own loan program to enable students to borrow money in excess of Federal lending limits.

The company has some of the highest student withdrawal rates of any company examined, with 67 percent of Associates students who enrolled in 2008-9 leaving the company by mid-2010. The company also has by far the highest rate of students defaulting on student loans of any publicly traded education company, with 36 percent of students who entered repayment in 2008 defaulting with 3 years of leaving the company's schools. This likely reflects the high cost of attending and the inability of some students to find jobs that allow then to repay the debt they incur. Corinthian has engaged in a transparent effort to lower its rate of student defaults by aggressively working to contact students and have them enter forbearance and deferment but it is unclear whether those policies lead to more students repaying loans or lead to future defaults. It is unclear whether taxpayers or students are obtaining value from the $1.7 billion investment that taxpayers made in Corinthian in 2010.

---

http://higheredwatch.newamerica.net/sites/newamerica.net/files/articles/1011_corinthian_statement%5B1%5D.pdf (accessed June 18, 2012).
[1629] Florida Office of the Attorney General, *Active Public Consumer-Related Investigation*, http://www.myfloridalegal.com/lit_ec.nsf/investigations/3B283CFAC6AF9709852577C00072A46E (accessed June 18, 2012).
[1630] Corinthian Colleges, Inc., Form 10-Q, May 4 2012.

# EXHIBIT 3

Skip to main content | About Us (http://www2.ed.gov/about/landing.jhtml) |
Contact Us (http://www2.ed.gov/about/contacts/gen) | FAQs (http://answers.ed.gov) | 📖 Language Assistance ▾

| Search... | |
|---|---|

**ARCHIVED INFORMATION**

# U.S. Department of Education Fines Corinthian Colleges $30 million for Misrepresentation

**Action complements ongoing steps to protect students and consumers against predatory for-profit colleges**

APRIL 14, 2015

**Contact:** (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

The U.S. Department of Education took additional steps today to protect students and taxpayers and crack down on abuses within the for-profit sector by continuing its enforcement actions against Corinthian Colleges Inc. After a comprehensive review, the U.S. Department of Education has confirmed cases of misrepresentation of job placement rates to current and prospective students in Corinthian's Heald College system. The Department found 947 misstated placement rates and informed the company it is being fined about $30 million.

Specifically, the Department has determined that Heald College's inaccurate or incomplete disclosures were misleading to students; that they overstated the employment prospects of graduates of Heald's programs; and that current and prospective students of Heald could have relied upon that information as they were choosing whether to attend the school. Heald College provided the Department and its accreditors this inaccurate information as well.

The Department has also notified Corinthian it intends to deny Corinthian's pending applications to continue to participate in the Title IV federal student aid programs at its Heald Salinas and Stockton locations. Corinthian has 14 days to respond to the Department's notice, after which the Department will issue its final decision. Moreover, the Department has determined that Heald College is no longer allowed to enroll students and must prepare to help its current students either complete their education or continue it elsewhere.

The Obama Administration has led unprecedented efforts to protect consumers from predatory career colleges. It has established new gainful employment regulations (http://www.ed.gov/news/press-releases/obama-administration-announces-final-rules-protect-students-poor-performing-career-college-programs) to hold career training programs accountable and ensure that students are not saddled with debt they cannot repay. These regulations ensure that programs improve their outcomes

for students – or risk losing access to federal student aid. Last year, the Department announced a new federal interagency task force to help ensure proper oversight of for-profit institutions, which will be led by Under Secretary Ted Mitchell.

"This should be a wake-up call for consumers across the country about the abuses that can exist within the for-profit college sector," U.S. Secretary of Education Arne Duncan said of the Department's enforcement action against Corinthian. "We will continue to hold the career college industry accountable and demand reform for the good of students and taxpayers. And we will need Congress to join us in that effort."

"Instead of providing clear and accurate information to help students choose which college to attend, Corinthian violated students' and taxpayers' trust," said Under Secretary Mitchell. "Their substantial misrepresentations evidence a blatant disregard not just for professional standards, but for students' futures. This is unacceptable, and we are holding them accountable."

As part of these ongoing efforts to ensure that career colleges prepare students for the workforce, institutions are required to provide accurate information about their graduates' job placement success and the types of employment their graduates obtained. The Department expects all institutions to adhere to the highest standard of care and diligence in following the requirements of participating in federal student aid programs to ensure colleges are always doing right by students and taxpayers.

After initial concerns about Corinthian Colleges' job placement rates were raised in January 2014, the Department has taken a series of steps to protect students and hold Corinthian accountable, including increasing the Department's financial oversight of Corinthian and requiring the company to sell or close all of its programs. The Department also mandated the establishment of an independent monitor – under the leadership of former U.S. Attorney Patrick Fitzgerald – to ensure Corinthian met its obligations to the Department, including proper, limited use of federal student aid dollars and providing valid information to students regarding their options during Corinthian's transition. The majority of Corinthian's campuses were sold to the nonprofit Zenith Education Group, which agreed to provide a number of new consumer protections, such as providing refund and withdrawal opportunities to students in poorly-performing programs, and has taken steps to strengthen programs and improve affordability, including by reducing tuition. The sale allowed most students to continue pursuing their career goals without disruption, and the Department and the Consumer Financial Protection Bureau have since worked to provide more than $480 million in loan forgiveness for borrowers who took out Corinthian's high-cost private student loans.

In its investigation of Corinthian Colleges, the Department found numerous causes for concern with practices throughout the Heald College system. Some examples include:

- **Heald paid temporary agencies to hire its graduates to work at temporary jobs on its own campuses – and counted these graduates as placed.** For example, Heald paid companies to hire graduates for temporary positions as short as two days, asked them to perform tasks like moving computers and organizing cables, and then counted those graduates as "placed in field."
- **Heald College counted placements that were clearly out of the student's field of study as in-field placements.** For example, one campus classified a 2011 graduate of an Accounting program as employed in the field based upon a food service job she started at Taco Bell in June 2006. Another campus counted a 2011 Business Administration graduate as placed in the field

based upon a seasonal clerk position she obtained in Macy's Shipping and Receiving Department during November 2010, which the student stated ended prior to her graduation.

- **Heald College failed to disclose that it counted as "placed" those graduates whose employment began prior to graduation, and in some cases even prior to the graduate's attendance at Heald.** The Department's analysis revealed that, according to Corinthian's own data for 2012 graduates, over one-third of the graduates reported to have been "placed in field" started their jobs prior to January 1, 2012, and over one-quarter started their jobs prior to January 1, 2011. And in follow-up interviews with some of those students, they told the Department that their jobs were not related to their field of study, nor had they received promotions or increased responsibilities or otherwise progressed in those jobs because of their Heald education.

- **In some of its disclosures, Heald failed to state that it had excluded students from its placement rate calculations who the college said had deferred employment for one reason or another.** In one case, a criminal justice program claimed a placement rate of 100 percent, but it had classified almost 60 percent of the graduates as unavailable for employment. In another case, a medical assisting program claimed a placement rate of 100 percent based upon 51 graduates having been placed, but it had classified almost 43 percent, or 38 of the 89 total graduates of the program, as unavailable for employment.

Throughout this process, the Department has sought a wind down of Corinthian Colleges that protects students, safeguards the investment taxpayers have made in their success, and creates opportunities for students to finish what they started. In the coming days, the Department will provide more information to Corinthian's students to help answer questions about their federal student aid and their options. The Department is also working on a process to help federal student loan borrowers submit a defense to repayment of their federal student loans.

"We have kept students at the heart of every decision we have made about Corinthian, and we will continue to do so as we move forward," Under Secretary Mitchell said. "When our borrowers bring claims to us that their school committed fraud or other violations of state law against them, we will give them the relief that they are entitled to under federal law and regulations."

More details will be posted soon on www.studentaid.gov/corinthian (http://www.studentaid.gov/corinthian). A copy of the letter sent to Corinthian today is posted on the Department's website (http://www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf).

**Tags:**   Postsecondary Education (/category/subject/postsecondary-education)
Student Financial Aid (/category/subject/student-financial-aid)
Corinthian Colleges (/category/keyword/corinthian-colleges)
Press Releases (/news/press-releases)

## How Do I Find...?

- Student loans, forgiveness (http://www2.ed.gov/fund/grants-college.html?src=rn)
- College accreditation (http://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (http://www.ed.gov/essa?src=rn)
- FERPA (http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=rn)

- FAFSA (http://fafsa.ed.gov/?src=edgov-rn)
- 1098-E Tax Form (http://www.ed.gov/1098-e?src=rn)
- More... (http://www2.ed.gov/about/top-tasks.html?src=rn)

## Information About...

- Transforming Teaching (http://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (http://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)

## Search press releases

Search...

## Find By Month

- March 2018 (/news/press-releases/monthly/201803)
- February 2018 (/news/press-releases/monthly/201802)
- January 2018 (/news/press-releases/monthly/201801)
- December 2017 (/news/press-releases/monthly/201712)
- November 2017 (/news/press-releases/monthly/201711)
- October 2017 (/news/press-releases/monthly/201710)
- September 2017 (/news/press-releases/monthly/201709)
- August 2017 (/news/press-releases/monthly/201708)
- July 2017 (/news/press-releases/monthly/201707)
- June 2017 (/news/press-releases/monthly/201706)
- May 2017 (/news/press-releases/monthly/201705)
- April 2017 (/news/press-releases/monthly/201704)
- All Press Releases (/news/press-releases)

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

Student Loans (http://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (http://studentaid.ed.gov/repay-loans?src=ft)

Defaulted Loans (http://studentaid.ed.gov/repay-loans/default?src=ft)

Loan Forgiveness (http://studentaid.ed.gov/repay-loans/forgiveness-cancellation?src=ft)

Loan Servicers (http://studentaid.ed.gov/repay-loans/understand/servicers?src=ft#who-is-my-loan-servicer)

## Grants & Programs (http://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (http://www.fafsa.ed.gov/?src=ft)

Grants Forecast (http://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (http://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)

Eligibility for Grants (http://www2.ed.gov/programs/find/elig/index.html?src=ft)

## Laws & Guidance (http://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (http://www.ed.gov/essa?src=ft)

FERPA (http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=ft)

Civil Rights (http://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

New IDEA Website (https://sites.ed.gov/idea/?src=ft)

## Data & Research (http://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (http://nces.ed.gov/?src=ft)

Postsecondary Education Data (http://nces.ed.gov/ipeds/?src=ft)

ED Data Express (http://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (http://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (http://ies.ed.gov/ncee/wwc/?src=ft)

## About Us (http://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (http://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (http://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (http://www.ed.gov/jobs?src=ft)

Press Releases (http://www.ed.gov/news/?src=ft)

FAQs (http://answers.ed.gov/?src=ft)

Recursos en español (http://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (http://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://www2.ed.gov/privacy?src=ft)

Subscribe to E-Mail Updates (https://public.govdelivery.com/accounts/USED/subscriber/new?topic_id=USED_5)

 (http://www.facebook.com/ed.gov)  (http://www.twitter.com/usedgov) 

(https://public.govdelivery.com/accounts/USED/subscriber/new?topic_id=USED_5) 

(https://www.ed.gov/feed)

Notices (http://www2.ed.gov/notices/index.html?src=ft)
FOIA (http://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)
Privacy Policy (https://www2.ed.gov/notices/privacy/index.html?src=ft)
Accessibility (http://www2.ed.gov/notices/accessibility/index.html?src=ft)
Security (http://www2.ed.gov/notices/security/index.html?src=ft)
Information Quality (http://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)
Inspector General (http://www2.ed.gov/about/offices/list/oig/index.html?src=ft)
Whitehouse.gov (http://www.whitehouse.gov/)   USA.gov (http://www.usa.gov/)
Benefits.gov (https://www.benefits.gov/)   Regulations.gov (http://www.regulations.gov/)

# EXHIBIT 4



April 14, 2015

Jack D. Massimino                                        UPS Tracking #
President/Chief Executive Officer                        1ZA879640192788623
Corinthian Colleges, Inc.
6 Hutton Circle Drive, Suite 400
Santa Ana, CA  92707

RE:  Notice of Intent to Fine Heald College, OPE-ID:  00723400

Dear Mr. Massimino:

This is to inform you that the United States Department of Education (Department) intends to
fine Heald College, San Francisco, California, $29,665,000 based upon the violations set forth in
this letter.  Heald College participates in the federal student financial assistance programs
authorized under Title IV of the Higher Education Act of 1965 (HEA), as amended, 20 U.S.C. §§
1070 *et seq.* and 42 U.S.C. §§ 2751 *et seq.* (Title IV, HEA programs).  The Department is taking
this fine action pursuant to 20 U.S.C. § 1094(c)(1)(F) and 34 C.F.R. § 668.84.

This fine action is based upon the results of the Department's analysis of documentation
submitted by Heald College's owner, Corinthian Colleges, Inc. (CCI), to the Department
regarding Heald College's placement rates, and upon the findings of a program review conducted
by the San Francisco-Seattle School Participation Division at Heald College's Stockton location
and Heald College's Salinas location.  As discussed in detail below, the Department's findings
demonstrate that Heald College failed to meet the fiduciary standard of conduct by
misrepresenting its placement rates to current and prospective students and to its accreditors, and
by failing to comply with federal regulations requiring the complete and accurate disclosure of
its placement rates.  Therefore, as described below, I have determined that due to the serious
violations committed by Heald College, a fine in the amount of $29,665,000 is warranted.

## HEALD COLLEGE FAILED TO ADHERE TO A FIDUCIARY STANDARD OF CONDUCT

On January 4, 2010, CCI purchased the Heald chain of schools (Heald), which then participated
in the Title IV, HEA programs as individual entities with their own OPE–ID numbers.[1]  The
Heald chain comprised Heald Concord (OPE-ID 02187500); Heald Fresno (OPE-ID 00809300);
Heald Hayward (OPE-ID 00853200), with additional location Heald Modesto (OPE-ID
00853202); Heald Milpitas (San Jose) (OPE-ID 02593200); Heald Rancho Cordova (OPE-ID

---

[1] The OPE-ID is the institution's Office of Postsecondary Education Identification Number.  This is an eight-digit
number assigned to an institution upon application to participate in Federal Student Aid programs.  It is used
throughout multiple systems to identify a school entity (the first six digits) and its individual locations (the last two
digits).



Jack D. Massimino
Corinthian Colleges, Inc.
Page 2

00747700); Heald Roseville (OPE-ID 02593100); Heald Salinas (OPE-ID 03034000); Heald San
Francisco (OPE-ID 00723400), with additional locations Heald Honolulu (OPE-ID 00723401)
and Heald Portland (OPE-ID 00723402); and Heald Stockton (OPE-ID 02593300).  Heald and
the Department executed temporary Program Participation Agreements (PPAs) for each of the
Heald schools, effective February 22, 2010, and upon the Department's approval of CCI's
application for ownership, executed provisional PPAs for each of these schools, effective May 4,
2010.  On June 24, 2013, Heald and the Department executed Heald College's current
provisional PPA, which merged the participating Heald schools into one participating entity
under OPE-ID 00723400.  Hereinafter in this letter, "Heald College" and "Heald" are used
interchangeably to refer to the Heald chain of schools before and after the Department's approval
of the merger.

By entering into a PPA with the Department, an institution and its officers accept the
responsibility to act as fiduciaries in the administration of the Title IV programs.  As fiduciaries,
an institution and its officers are subject to the highest standard of care and diligence in
administering the Title IV, HEA programs.  34 C.F.R. §§ 668.82(a) and (b).  In order to meet its
fiduciary responsibilities to the Department, an institution must comply with all Title IV
statutory and regulatory requirements.  34 C.F.R. § 668.16(a).  As described below, Heald
College and its officers have failed to adhere to a fiduciary standard of conduct with regard to the
calculation and disclosure of its job placement rates.

## HEALD COLLEGE FAILED TO COMPLY WITH THE REGULATIONS GOVERNING DISCLOSURE OF ITS JOB PLACEMENT RATES

Effective July 1, 2010, institutions participating in the Title IV, HEA programs are required to
make available to enrolled or prospective students, through appropriate publications, mailings, or
electronic media, information concerning the placement of, and types of employment obtained
by, graduates of the institution's degree or certificate programs.  34 C.F.R. § 668.41(d)(5).  The
information can be gathered from the institution's placement rate for any program, if it
calculated such a rate, or other relevant sources.  34 C.F.R. § 668.41(d)(5)(i).  The institution is
required to identify the source of the information, as well as any timeframes and methodology
associated with it.  34 C.F.R. § 668.41(d)(5)(ii).  An institution is required to disclose any
placement rate it calculates.  34 C.F.R. § 668.41(d)(5)(iii).  An institution may satisfy the
requirement to disclose the information required under 34 C.F.R. § 668.41(d) to enrolled
students by posting the information on an internet website or an intranet website that is
reasonably accessible to the individuals to whom the information must be disclosed; and to
prospective students by posting the information on an internet website.  34 C.F.R. §§
668.41(b)(1) and (2).  Note that this regulatory provision applies to all types of institutions, not
simply those which offer "gainful employment" programs.

All of Heald College's programs are gainful employment programs subject to the provisions of
34 C.F.R. § 668.6(b).  Beginning July 1, 2011, an institution that offers an educational program
that prepares students for gainful employment in a recognized occupation, and that is required by
its accrediting agency or State to calculate a placement rate on a program basis, must disclose the
rate and identify the accrediting agency or State agency under whose requirements the rate was

Jack D. Massimino
Corinthian Colleges, Inc.
Page 3

calculated. 34 C.F.R. § 668.6(b).  The institution must include the information required under 34 C.F.R. § 668.6(b)(1) in promotional materials it makes available to prospective students, post this information on its website, prominently provide the information in a simple and meaningful manner on the home page of its program website, and provide a prominent and direct link on any other Web page containing general, academic, or admissions information about the program to the single Web page that contains all the required information. 34 C.F.R. § 668.6(b)(2).

By entering into a PPA with the Department, an institution agrees, among other things, that:

> In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment…the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and…relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students.

34 C.F.R. § 668.14(b)(10).

On January 23, 2014, the Department sent a letter to CCI in which the Department requested that CCI provide a copy of school performance disclosure documents for every CCI location, including Heald College institutions, for the calendar years 2010, 2011, 2012, and, when available, 2013.  The Department also asked that CCI provide the evidence upon which CCI relied to derive each of the placement rates cited in the disclosures, including a list of all students either placed or omitted from the placement calculation due to any type of waiver, and the academic, employment, and/or waiver information specified by the Department.  The Department provided CCI 30 days to submit the required documentation and information, and sent reminder letters to CCI on April 11, 2014, April 22, 2014, May 13, 2014, June 12, 2014, July 23, 2014, and August 25, 2014.

Eventually, in its responses to the Department's requests, CCI assured the Department that CCI and its institutions "take pains to track and accurately report job placements."  Letter to Martina Fernandez-Rosario and Gayle Palumbo, p. 2 (Apr. 15, 2014).  CCI stated that, because many of its institutions' institutional and programmatic accreditors required annual reporting of placement outcomes in order to measure the school's or program's outcomes against a benchmark, CCI and its institutions had developed a robust process to confirm, and re-verify, the accuracy of the reported placement results.  CCI represented that it went to great lengths in an effort to ensure that its internal and external reporting of placement statistics was accurate and reliable. *Id. See also* Letter to Robin Minor, p. 2 (February 11, 2014), Letter to Charles Engstrom (Feb. 1, 2013).  Despite CCI's representations, the Department has found that CCI and Heald College failed to fully and accurately disclose its placement rates and the methodology used to calculate them in its school performance disclosure documents.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 4

1. **Heald College's placement rate disclosures omitted essential and material information concerning the methodology Heald used to calculate the rates.**

In response to the Department's requests for Heald College's school performance disclosure documents and backup documentation, CCI provided, for each of its institutions, documents entitled "2010 Annual Placement Disclosure," documents entitled "Program Disclosures," carrying an effective date of July 1, 2011, and documents entitled "Program Disclosures," carrying a publication date of July 1, 2012.

In the documents entitled "2010 Annual Placement Disclosure," which had neither a publication date nor an effective date, each Heald institution disclosed that, because it was accredited by the Accrediting Commission for Community and Junior Colleges of the Western Association of Schools and Colleges (WASC-Jr), and WASC-Jr had no prescribed placement rate methodology, it was the institution that determined the formula used to calculate its placement statistics. These disclosures each stated that the placement rates reported therein were the placement statistics for the most recent complete calendar year, and that Heald outcomes are calculated by calendar year, tracking graduate cohorts from January 1-December 31. These disclosures also stated that employment is calculated by taking the total number of graduates placed in the field and dividing this number by the total number of graduates less the number of graduates deferred for employment because of continuing education, military, health, incarceration, moving outside of the U.S., non-citizenship, or death.

Heald College also provided for each institution documents entitled "Program Disclosure," carrying an effective date of July 1, 2011, which affirmatively stated that the program disclosures contained therein were provided pursuant to federal regulations, effective July 1, 2011. These Program Disclosures also stated, in a footnote entitled "Institutional Accreditor," that, because WASC-Jr. had no prescribed methodology for calculating placement outcomes, the methodology used was at Heald's discretion. In each case, the Program Disclosure stated that placement rates were calculated as follows: "Heald College placement rate is calculated by taking the total graduates placed in the field, divided by the total number of graduates, minus graduates deferred for employment because of continuing education, military, health, incarceration, moving outside of the U.S., ineligibility to work in the U.S., or death. Time Frame: the cohort used are those graduates of a calendar year. Employment statuses are recorded up until June 30th of the following year." These Program Disclosures also stated that "Placement Rate NA" meant that there was no data to disclose because the program was too new or the placement rate was not required to be calculated.

Heald College further provided for each institution Program Disclosures with a publication date of July 1, 2012, which similarly stated that the program disclosures contained therein were being provided pursuant to federal law. These Program Disclosures also represented, in a footnote entitled "Institutional Accreditor," that because WASC-Jr. had no placement rate methodology, Heald College determined the placement rates. These Program Disclosures stated that Heald determined its placement rates by taking the total graduates placed in the field, divided by the total number of graduates, minus graduates deferred for employment because of continuing education, military, health, incarceration, moving outside of the U.S., ineligibility to work in the

Jack D. Massimino
Corinthian Colleges, Inc.
Page 5

U.S., or death; that the cohort used was the graduates of a calendar year; and that the employment statuses were recorded up until June 30th of the following year.

The Department has determined that in late 2013, Heald College switched to a web-based placement disclosure format. The web-based disclosures Heald College posted on its website contained the following language: "The job placement rate for students who completed this program in 2012-2013 is [] %." The placement rate disclosures also contained a link that stated "For further information about this job placement rate, <u>click here</u>." The link led to the following box:



After review of Heald's program disclosure documents and backup documentation, the Department has determined that Heald omitted from its school performance disclosure documents essential and material information concerning the timeframe and methodology used to determine its placement rates. Even more serious, Heald did not adhere to the methodology that it did set forth in those disclosures.

    a. **Heald College failed to disclose in its 2013/2014 web-based disclosures that its placement rates excluded students it classified as having deferred employment.**

The Department has determined that Heald's 2013/2014 web-based placement disclosures[2] failed to disclose that students whom the institution deemed to have deferred employment were excluded from the placement rate calculations. This information was material, and Heald College's omission of it was misleading, because the supporting documentation provided by Heald disclosed that Heald in fact classified high percentages of its graduates as having deferred employment. The Department has determined that Heald represented with regard to many of its programs that it placed 100% of its graduates in jobs, when in fact many of the graduates decided to continue their education, or been determined by Heald to be unavailable for employment prior to the end of the tracking period for one reason or another. For instance, Heald Portland's disclosure for the Criminal Justice AA program stated that the placement rate was 100%. And

---

[2] Heald College updated its web-based placement disclosures in early 2014.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 6

yet 58% of the graduates for that program were unavailable for employment. The Department
has concluded that Heald's failure to disclose the exclusion of students determined to have
deferred employment in its 2013/2014 web-based disclosures was particularly egregious because
Heald disclosed this aspect of its methodology in its prior placement rate disclosure documents
and thus clearly understood how to properly describe its methodology.

**b. Heald College falsely represented in its 2013/2014 web-based disclosures that its
placement rates were supported by attestations.**

In its 2013/2014 web-based disclosures, Heald College stated in answer to the question, "How
were completers tracked," that "confirmation of graduate employed is obtained from the
employer and/or graduate via attestation." The Department's review of Heald College's backup
documentation, however, revealed that this was not the case. In many instances, the only
documentation Heald produced to substantiate the graduate's employment consisted of a
standardized Heald form, HC-CSV-120, with a section entitled "Employment Validation and
Verification Contact Info," which was signed only by Heald College Career Services personnel
and did not document any attestation by the employer or the student. In other instances, the only
documentation provided was a screen shot from Heald's CampusVue system purportedly
representing that the student had been placed.

**c. Heald College failed in all of its placement rate disclosures to identify with
specificity the cohort whose results were being reported.**

In the 2013/2014 web-based placement disclosures, Heald stated that the report covered
"....students who completed the program in 2012-2013," then indicated in its answer to the
question, "Who is included in the calculation of this rate?," that the cohort consisted of
"Graduates through 6/30/13 placed in field." And then, in answer to the question, "When were
the students employed," stated, "Schools can place graduates until June 30[th] for graduates of the
preceding calendar year." It is not possible to discern from these statements the beginning and
ending dates of the cohort of Heald graduates whose results were being tracked and reported in
the disclosure.

The same is true with regard to Heald College's July 1, 2011 and July 1, 2012 Program
Disclosures, and its 2010 Annual Placement Disclosure. In particular, although the timeframe
specified is a calendar year, none of these disclosure indicates *which* calendar year's graduates
were being covered in the disclosure. This is in contrast to the descriptions in the July 1, 2011
and July 1, 2012 Program Disclosures regarding the programmatic, as opposed to institutional,
placement rates disclosed in those documents. For example, the July 1, 2012 Program
Disclosure specified, with respect to the placement rates calculated for the Commission on
Accreditation of Allied Health Education Programs (CAAHEP)/Medical Assisting Education
Review Board (MAERB), a timeframe of July 1, 2009 through June 30, 2010, and the July 1,
2011 Program Disclosure specified, with respect to the placement rate calculated for the
Commission on Dental Accreditation (CODA), that the most recent statistics covered those
students who were scheduled to complete their programs in 2009.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 7

> **d. Heald College failed in all of its placement disclosures to state that it counted as placed graduates whose employment began prior to graduation, and in some cases even prior to the graduate's attendance at Heald.**

The Department has determined that in all of its placement disclosures, Heald failed to disclose that it counted as placed graduates who had obtained their jobs prior to graduation from the school, and in some cases, graduates who had obtained their jobs prior to the date they commenced their studies at Heald. With respect to the 2013/2014 web-based disclosures, Heald referred only to "Graduates...placed in the field" and "completers hired for jobs within the field." Similarly, in the July 1, 2011 and July 1, 2012 Program Disclosures, Heald referred only to the "percentage of graduates securing employment" and the "total graduates placed in the field."

The fact that Heald counted graduates who had obtained their employment prior to graduation as having been "placed" by the institution in its placement rates is material, and omission of this information is therefore misleading, because it is an indication that a Heald credential may not have been necessary in order for the graduate to secure the employment used to categorize the individual as having obtained employment in the field. The Department thus considers these placement rates to be false and misleading statements. *See* 34 C.F.R. § 668.71(c) (definition of "misrepresentation").

Of additional concern, however, is that the Department's review of Heald's backup documentation disclosed that while some previously-employed Heald graduates signed documents indicating that they were waiving placement assistance because they were already working in the field, other previously-employed graduates' placement documents simply reflected verification by Heald Career Service personnel of the student's employment, with no indication that the students had waived placement services and were content with their prior job. Of even more concern is that follow-up interviews conducted with some of the previously-employed graduates revealed that although Heald staff made cursory notations on the employment validation forms to support their conclusion that the graduates were employed in the field, the graduates' jobs were not related to their field of study, nor had the students received promotions or increased responsibilities or otherwise progressed in those jobs because of their Heald education.

The number of graduates who obtained the jobs used to characterize them as placed prior to graduation was considerable and therefore also material to the placement rates. The Department's analysis of Heald's backup documentation revealed that, according to CCI's own data for 2012 graduates, over one-third (33.8%) of the graduates reported to have been "placed in field" started their jobs prior to January 1, 2012, and over one-quarter (25.5%) started their jobs prior to January 1, 2011.

> **e. Heald paid temporary agencies to hire its graduates to work at unsustainable temporary jobs at its own campuses and counted these graduates as placed.**

Jack D. Massimino
Corinthian Colleges, Inc.
Page 8

Follow-up interviews conducted with Heald graduates in order to determine the accuracy of Heald's reported placement rates and supporting documentation revealed that in some instances, Heald paid temporary agencies to hire Heald graduates and place them at temporary jobs at Heald locations, in order to allow Heald to falsely and misleadingly count these graduates as placed in their field of study in its placement rate disclosures. Heald failed to disclose this information when it published its placement rates, and the Department considers this to be a misleading statement that has the likelihood or tendency to deceive. 34 C.F.R. § 668.71(c) (definition of "misrepresentation").

In particular, the Department determined that during 2011, Heald paid agencies named Aerotek and Ultimate Staffing to place ten graduates from Heald's IT-Network Systems Administration (IT-NSA) programs in brief, temporary positions at its Fresno campus. Heald then counted these graduates as "placed in field" in its placement statistics. These ten graduates represented 35% of the total 28 graduates of the IT-NSA program at Fresno that Heald represented were placed in field. When interviewed, one of these graduates confirmed that he was employed for just two days moving computers, organizing cables, and replacing network cables, and another graduate confirmed that Aerotek employed him for less than two weeks.

> **f. Heald College counted placements that were clearly out of the student's field, as in-field placements in its placement statistics.**

Although Heald claimed in all of its placement rate disclosures that the students reported as placed were employed in their field of study, the Department has determined through student interviews that in fact, Heald routinely and misleadingly characterized out-of-field placements jobs as in-field placements. Examples of this are as follows:

> Heald Honolulu classified a 2011 graduate of an Accounting program as employed in the field based upon a food service job at Taco Bell, where she started working in June 2006. The graduate stated that her job was to provide food service to customers, that she had not received a promotion or pay increase as a result of her Heald degree, and that the position was not in her field of study. Yet Heald counted her as placed in her field of study, based upon the employment validation form signed by Career Services personnel. Heald provided no documents substantiating that the student had waived placement services based upon her employment at Taco Bell.

> Heald Hayward counted a 2011 Business Administration graduate as placed in the field based upon a retail grocery position at Safeway, which the graduate stated was not in his field of study, and Heald substantiated the in-field placement by stating that the graduate's program's major skills were a component of his "primary job function or used at least half the time" by listing, as program skills, among other things, "providing customer service and problem-solving skills, knowledge of store's product and be approachable (sic)." The back-up documentation included an internal email chain, in which Heald Career Services staff forwarded information concerning the graduate's employment obtained through the work number to Heald's Corporate Director of Career

Jack D. Massimino
Corinthian Colleges, Inc.
Page 9

Services, who replied: "Not sure if this will fly.  See what he does as a Courtesy Clerk –
Money Transactions, etc…"

Heald Hayward counted another 2011 Business Administration graduate as placed in the
field based upon a seasonal clerk position she obtained in Macy's Shipping and
Receiving Department during November 2010, which the student stated ended prior to
her graduation.  The student also stated that she requested job placement assistance from
Heald in order to find a job in her field of study, but was unsuccessful, and that Heald
stopped returning her calls for assistance.  Heald's backup documentation regarding the
placement consisted of an employment validation signed by Heald Career Services
personnel that justified the in-field placement by stating she "uses business software,
apply accounting concepts balancing till and ringing up purchases, collecting money,
merchandise the products and upsale (sic)."

2.  **Heald Stockton misrepresented the job placement rates for its medical assistant
    program to its programmatic accreditor**

Heald Stockton advertised in its catalogs that "The Medical Assisting program is accredited by
the Commission on Accreditation of Allied Health Education Programs (CAAHEP) upon the
recommendation of the Medical Assisting Education Review Board (MAERB)."[3]  MAERB
requires that approved programs report annual placement rates of its medical assisting graduates.
A program review conducted by the Department at Heald Stockton from July 29, 2013 to August
2, 2013 revealed that in its 2012 Annual Report to MAERB, which Heald Stockton submitted to
MAERB on November 21, 2012, Heald Stockton reported that, of the 359 medical assisting
students who graduated between January 1, 2007 through December 31, 2011, 281 students were
placed, resulting in a 78.27% placement rate, which exceeded the MAERB minimum placement
rate of 60%.

Upon review of documentation obtained during the program review, however, the Department
determined that as an initial matter, Heald Stockton's backup data reflected only 209 placements
rather than 281.  In addition, of those 209 placements, (1) Heald Stockton reported as placed at
least 23 students who had in fact completed Heald Stockton's diploma program in Medical
Assisting, which is not accredited by MAERB, rather than the 98 credit-hour Associates in
Applied Science (AAS) program; (2) Heald Stockton counted 13 students twice, and counted one
student three times;[4] (3) although Heald Stockton's 2012 Annual Report was only to include
those students placed between January 1, 2007 and December 31, 2011, Heald Stockton claimed
70 placements that occurred after December 31, 2011; and, (4) according to notations made on
the backup data, Heald Stockton reported four students as placed when in fact they had waived
placement. The Department's recalculation revealed that the correct number of placements was
only 109, rather than 281, and that the correct number of graduates was 333, rather than 359.

---

[3] This accreditation entitles an individual to take the state medical assisting test without first obtaining two years of
medical assisting experience.
[4] A number of these students were either in the unaccredited program or were placed after the end of the cohort
period (December 31, 2011).  The net duplications represent over-reporting of three placements.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 10

The correct placement rate was thus only 32.7%, far below MAERB threshold of 60%. Heald Stockton therefore misrepresented the 2012 programmatic placement rate for its Medical Assisting program to MAERB.

### 3. CCI and Heald's backup documentation did not support its claimed placement rates

The failure of Heald's backup documentation to support the placement rates that Heald disclosed for its educational programs was not limited to the programmatic placement rate that Heald Stockton reported to the MAERB. The Department's review of the backup documentation revealed numerous instances wherein, even if all of the placements were accepted as bona fide in-field placements, the data still do not support the placement rates that Heald calculated and disseminated. The placement data were missing key fields, most notably the level of the student's program of study, and contained numerous duplicates. Enclosure A contains examples of placement rates that were not supported by Heald's backup data, and the actual rate that Heald's backup data did support.

Title IV regulations define misrepresentation as, among other things, any false, erroneous or misleading statement an eligible institution makes directly or indirectly to a student, prospective student or any member of the public, or to an accrediting agency, to a State agency, or to the Secretary. A misleading statement includes any statement that has the likelihood or tendency to deceive. 34 C.F.R. § 668.71(c) (definition of "misrepresentation"). A substantial misrepresentation is any misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment. 34 C.F.R. § 668.71(c) (definition of "substantial misrepresentation.") An eligible institution is deemed to have engaged in substantial misrepresentation when the institution makes a substantial misrepresentation about the nature of its educational program, its financial charges, or the employability of its graduates. 34 C.F.R. § 668.71(b).

The Department has determined that Heald's inaccurate or incomplete placement rate disclosures were misleading or false; that they overstated the employment prospects of graduates of Heald's programs; and that current and prospective graduates of Heald could reasonably have been expected to rely to their detriment upon the information in Heald's placement rate disclosures. Therefore, the Department has determined that the statements in these disclosures constituted substantial misrepresentations by Heald.

Congress enacted the statutory consumer information requirements, and misrepresentation provisions, in order to ensure that institutions fully disclose information needed by students to inform their decision whether to attend an institution, and to hold institutions accountable for false information that they provide. Heald College's substantial misrepresentations concerning its placement rates evidence a blatant disregard for the statutes and regulations governing the Title IV, HEA programs.

Jack D. Massimino
Corinthian Colleges, Inc.
Page 11

As of October 2, 2012,[5] the Title IV, HEA program regulations permit a fine of up to $35,000 for each violation of any provision of Title IV, or of any regulation or agreement implementing that Title. 34 C.F.R. § 668.84(a). In determining the amount of a fine, the Department considers both the gravity of the offense and the size of the institution. 34 C.F.R. § 668.92. Pursuant to the Secretary's decision in *In the Matter of Bnai Arugath Habosem*, Dkt. No. 92-131-ST (Aug. 24, 1993), the size of an institution is based on whether an institution is above or below the median funding levels for the Title IV, HEA programs in which it participates. Thus, if the institution's funding levels for the Title IV, HEA programs in which it participates is below the median amount for institutions participating in those programs, the institution will be considered small.

In the case of Heald College, the latest year for which complete funding data is available is the 2013-14 award year. According to Department records, students enrolled at Heald College received $66,944,957 in Federal Pell Grant funds, $139,462,899 in Direct Loan program funds, and $3,713,508 in campus-based program funds during the 2013-14 award year. The latest information available to the Department indicates that the median funding level for schools participating in the Federal Pell Grant program for the 2013-14 award year is $1,571,915; for institutions participating in the Direct Loan programs, it is $2,964,093, and for institutions participating in the campus-based programs, it is $266,597. Accordingly, Heald College is not a small institution, because its Federal Pell Grant, Direct Loan, and campus-based funding levels exceed the median funding levels.

The violations involved in this case are severe, and the potential harm to the government and to students is also severe. After considering the gravity of the violations and the size of Heald College, I have set the fine amount as follows:

For Heald's dissemination of program disclosure documents that did not meet regulatory requirements concerning disclosure of the institution's methodology, and which disclosed rates that were false or misleading, as set forth in this letter, I have set the fine amount at $27,500 for each of the 464 placement rates discussed in this letter that were disclosed in the documents disseminated prior to October 2, 2012, and $35,000 for each of the 482 placement rates discussed in this letter that were disseminated after October 2, 2012, totaling $29,630,000.[6] The Department requires that institutions fully disclose the method used to calculate its placement rates, count only bona fide placements in its placement rates, and accurately calculate those rates.

For Heald Stockton's misrepresentation of its job placement rates for its medical assistant program to its programmatic accreditor, I have set the fine amount at $35,000. Heald's failure to provide MAERB with accurate placement data deprived MAERB of important information required to evaluate the success of Heald Stockton's program.

---

[5] See 77 Fed. Reg. 60047 (2012), http://www.gpo.gov/fdsys/pkg/FR-2012-10-02/pdf012-24248.pdf. The amount was previously $27,500.
[6] The amounts per violation represent the maximum amounts allowed under the HEA for the time periods in question. See n.5 and accompanying text, *supra.*

Jack D. Massimino
Corinthian Colleges, Inc.
Page 12

The fine of $29,665,000 will be imposed on May 5, 2015, unless by that date the Department receives a request for a hearing or written material indicating why the fine should not be imposed. Heald College may submit both a written request for a hearing and written material indicating why the fine should not be imposed. If Heald College chooses to request a hearing or to submit written material, you must write to me, via overnight mail, at:

> Administrative Actions and Appeals Service Group
> U.S. Department of Education
> Federal Student Aid/PC/SEC
> 830 First Street, NE
> Room 84F2
> Washington, DC 20002-8019

If Heald College files a timely request for a hearing, the case will be referred to the Office of Hearings and Appeals, which is a separate entity within the Department. That office will arrange for assignment of Heald College's case to an official who will conduct a hearing. Heald College is entitled to be represented by counsel at the hearing and otherwise during the proceedings. If Heald College does not request a hearing, but submits written material instead, I shall consider that material and notify Heald College of the amount of the fine, if any, that will be imposed.

**Any request for a hearing or written material that Heald College submits must be received by May 5, 2015; otherwise, the $29,665,000 fine will be imposed on that date.**

Heald College has applied for recertification to continue to participate in the student financial assistance programs authorized pursuant to Title IV of the Higher Education Act of 1965, as amended, 20 U.S.C. §§ 1070 *et seq*. (Title IV, HEA programs). Heald College's PPA will continue to operate on a month-to-month basis while the Department considers the application for recertification in light of the findings addressed in this letter, along with pending program reviews. *See* 34 C.F.R. § 668.13(b)(2).

If Heald has any questions or desires additional explanation of Heald College's rights with respect to this action, please contact Kathleen Hochhalter of my staff at 303/844-4520.

> Sincerely,
>
>
>
> Robin S. Minor
> Acting Director
> Administrative Actions and Appeals Service Group

Enclosure

cc: Dr. Mary Ellen Petrisko, President, WASC Senior College and University Commission, via mepetrisko@wascsenior.org

Jack D. Massimino
Corinthian Colleges, Inc.
Page 13

   Bobbi Lum-Mew, Program Administrator, Hawaii Post-Secondary Education Authorization
      Program, via Bobbi.Lum-Mew@dcca.hawaii.gov
   Juan Báez-Arévalo, Director of Private Post-secondary Education, Office of Degree
      Authorization, Oregon Office of Student Access and Completion, via
      juan.baez-arevalo@ode.state.or.us
   Department of Defense, via osd.pentagon.ousd-p-r.mbx.vol-edu-compliance@mail.mil
   Department of Veteran Affairs, via INCOMING.VBAVACO@va.gov
   Consumer Financial Protection Bureau, via CFPB_ENF_Students@cfpb.gov

Enclosure A

PLACEMENT RATES BASED ON CCI'S DATA

| Grad. Year | Campus Name | Program | No. of Grads | Reported Campus Placement Rate | Adjusted Placement Rate from CCI's Data |
|---|---|---|---|---|---|
| 2010 | Heald San Jose | Medical Insurance Billing and Coding (AA Degree) | 60 | 100% | 64% |
| 2010 | Heald Concord | Business Administration - Software Technologies Emphasis (AA Degree) | 3 | 100% | 66% |
| 2010 | Heald Concord | Medical Insurance Billing and Coding (AA Degree) | 33 | 100% | 66% |
| 2010 | Heald Concord | Office Skills (Certificate) | 8 | 100% | 71% |
| 2010 | Heald Hayward | Medical Insurance Billing and Coding (AA Degree) | 43 | 100% | 75% |
| 2010 | Heald San Francisco | Office Skills (Certificate) | 7 | 67% | 50% |
| 2010 | Heald Portland | Medical Assisting (AA Degree) | 61 | 73% | 57% |
| 2010 | Heald Rancho Cordova | Office Skills (Certificate) | 5 | 75% | 60% |
| 2011 | Heald Hayward | Medical Office Administration (AA Degree) | 48 | 100% | 38% |
| 2011 | Heald Hayward | Paralegal (AA Degree) | 33 | 100% | 63% |
| 2011 | Heald Rancho Cordova | Medical Office Administration (AA Degree) | 38 | 100% | 70% |
| 2011 | Heald Concord | Pharmacy Technology (AA Degree) | 22 | 100% | 73% |
| 2011 | Heald San Francisco | Medical Office Administration (AA Degree) | 29 | 100% | 75% |
| 2011 | Heald Rancho Cordova | Medical Insurance Billing and Coding (AA Degree) | 27 | 100% | 78% |
| 2011 | Heald Concord | IT Network Systems Administration (AA Degree) | 11 | 100% | 80% |
| 2011 | Heald Hayward | IT Network Systems Administration (AA Degree) | 34 | 100% | 82% |
| 2011 | Heald Fresno | Office Skills (Certificate) | 4 | 67% | 50% |
| 2011 | Heald San Jose | Paralegal (AA Degree) | 26 | 100% | 83% |

Enclosure A
PLACEMENT RATES BASED ON CCI'S DATA

| Grad. Year | Campus Name | Program | No. of Grads | Reported Campus Placement Rate | Adjusted Placement Rate from CCI's Data |
|---|---|---|---|---|---|
| 2011 | Heald Honolulu | Business Administration - Sales/Marketing Emphasis (AA Degree) | 18 | 100% | 83% |
| 2011 | Heald Rancho Cordova | Paralegal (AA Degree) | 20 | 100% | 85% |
| 2012 | Heald Hayward | IT Network Systems Administration (AA Degree) | 30 | 100% | 73% |
| 2012 | Heald Salinas | Business Administration - Entrepreneurship Emphasis (AA Degree) | 5 | 75% | 50% |
| 2012 | Heald Roseville | IT Network Security (AA Degree) | 45 | 100% | 85% |

**INSTITUTIONAL RATES**

| Grad. Year | Campus Name | Program | No. of Grads | Reported Institutional Placement Rate | Adjusted Rate from CCI's Data |
|---|---|---|---|---|---|
| 2010 | Heald Hayward and Modesto | Medical Insurance Billing and Coding (AA Degree) | 43 | 100% | 75% |
| 2010 | Heald San Francisco, Honolulu, and Portland | Criminal Justice (AA Degree) | 66 | 80% | 62% |
| 2010 | Heald Hayward and Modesto | Medical Office Administration (AA Degree) | 47 | 93% | 82% |
| 2010 | Heald Hayward and Modesto | Business Administration - Sales/Marketing Emphasis (AA Degree) | 12 | 100% | 89% |
| 2011 | Heald Hayward and Modesto | Medical Office Administration (AA Degree) | 48 | 100% | 38% |
| 2011 | Heald Hayward and Modesto | Paralegal (AA Degree) | 34 | 100% | 63% |
| 2011 | Heald San Francisco, Honolulu, and Portland | Medical Office Administration (AA Degree) | 65 | 100% | 68% |
| 2011 | Heald Hayward and Modesto | IT Network Systems Administration (AA Degree) | 34 | 100% | 82% |

Enclosure A
PLACEMENT RATES BASED ON CCI'S DATA

| Grad. Year | Campus Name | Program | No. of Grads | Reported Institutional Placement Rate | Adjusted Rate from CCI's Data |
|---|---|---|---|---|---|
| 2011 | Heald San Francisco, Honolulu, and Portland | Business Administration - Sales/Marketing Emphasis (AA Degree) | 18 | 100% | 83% |
| 2011 | Heald San Francisco, Honolulu, and Portland | IT Network Systems Administration (AA Degree) | 64 | 100% | 86% |

# EXHIBIT 5

# Insult to Injury: How the DeVos Department of Education is Failing Defrauded Students





Prepared by the Offices of Senators Elizabeth Warren and Richard J. Durbin

November 2017

# Table of Contents

Executive Summary ...................................................................................1

Introduction.............................................................................................1

Borrower Defense ....................................................................................2

Legal Sidebar ...........................................................................................4

Methodology ............................................................................................5

Findings....................................................................................................5

    Data on Pending Borrower Defense Claims ..........................................5

    Borrower Profiles ..................................................................................9

Recommendations................................................................................ 15

Endnotes ...................................................................................................i

# Executive Summary

What happens when a predatory college deceives a student in order to get that student to enroll?

For tens of thousands of students, this deception results in a useless education, academic credits that do not transfer, and a massive student loan debt with few options for help.

The Department of Education, however, has legal authority to provide defrauded students with complete, immediate, and automatic relief from their federal student loan debt under the Borrower Defense to Repayment provision of the Higher Education Act. Although this authority went largely unused for decades, following the collapse of for-profit giants Corinthian Colleges and ITT Technical Institute ("ITT Tech"), there has been a surge in Borrower Defense applications from defrauded students seeking relief from their loans.

This staff report examines the current status of Borrower Defense discharges under Education Secretary Betsy DeVos and the Trump Administration. It includes recent data on the tens of thousands of unprocessed claims for relief, and profiles of student borrowers currently being held in limbo as Secretary

DeVos and the Trump Administration refuse to act on their claims for loan cancellation. This report finds:

- According to data sent by the Department of Education to Senate Democrats, there were 65,169 borrower defense claims pending as of July 7, 2017. Since July, the number of pending claims has dramatically increased. According to recent reports, the number of pending borrower defense claims has ballooned to more than 87,000 as of October 24, 2017. **The total number of pending borrower defense claims are increasing under the Trump Administration, growing from 65,169 to 87,000 between July 2017 and October 2017.**

- **Since the Trump Administration took office, <u>zero</u> borrower defense claims have been approved.** In contrast, nearly 32,000 applications were approved by the Obama Administration between December 2015 and January 2017.

- Some borrowers have been waiting more than two years to hear whether their loans will be forgiven. **Individuals note significant mental and financial distress as they await the outcome of their Borrower Defense claim request.**

# Introduction

On May 4, 2015, almost a year after it became clear the company could not survive, for-profit giant Corinthian Colleges, Inc. filed for bankruptcy, closing nearly 30 campuses and leaving tens of thousands of students to pick up the pieces.[1] At the time, it was the largest collapse of an institution of higher education in American history.

For years before collapsing beneath the weight of its own wrong-doing, Corinthian was under investigation or being sued by nearly two dozen state and federal agencies, including the U.S. Department of Education ("the Department"), for defrauding students and exhibited the warning signs of financial mismanagement. The subsequent meltdown left an estimated 350,000 students with worthless degrees or credits and mountains of fraudulent student loan debt.[2]

Federal courts found that fraud was central into Corinthian's entire operation. In October 2015, a

federal judge granted the Consumer Finance Protection Bureau default judgment against Corinthian for violating federal consumer protection labor laws. The judge ordered the defunct company to pay $531 million for defrauding students.[3] And, in March 2016, then-California Attorney General Kamala Harris obtained a $1.1 billion default judgment against the company for its predatory and unlawful practices.[4] Among Harris' findings was Corinthian's practice of providing prospective students with job placement rates that were 80% higher than the actual rate.[5] Unfortunately, the company's bankruptcy letter meant Corinthian would never pay what it owed to students under these judgements.

Corinthian's dramatic collapse left tens of thousands of students who had relied on what later turned out to be lies, misrepresentations, and false information—including falsified job placement rates and false guarantees of credit transferability—deep in student

loan debt without a meaningful degree or useable credits to show for it. As more and more fraud came to light, students, veterans, legal aid attorneys, consumer advocates, and Members of Congress began urging the Department to use its existing Borrower Defense legal authority to provide complete, immediate, and automatic relief to all students who were the victims of Corinthian's fraud arguing that students should not be left holding the bag for Corinthian's predatory and fraudulent practices.

## Borrower Defense

In 1992, Congress amended the Higher Education Act to add the Borrower Defense provision, which directed the Secretary of Education to establish rules to allow students who were defrauded by their colleges to receive a discharge of their federal student loans, giving borrowers the legal right to have their loans cancelled due to their schools' misconduct:

**"Notwithstanding any other provision of State or Federal law, the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part,** except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan."[6]

In 1994, the Department of Education—following Congressional directive—promulgated a regulation specifying the circumstances under which a student may assert a borrower defense. The 1994 regulation specifies that, "the borrower may assert as a defense against repayment, **any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."[7]**

In other words, the Department decided in 1994 that if a college or university engaged in behavior that would violate state law, borrowers could have their federal student loans obtained to attend that institution cancelled. The regulation also specified the defrauded borrower "is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay." The Department can also "[r]eimburs[e] the borrower for amounts paid toward the loan," "[d]etermin[e] that the borrower is not in default on the

loan," (making them again eligible for federal loans and grant), and "[u]pdat[e] reports to consumer reporting agencies" if the Department had made an adverse credit report with regard to the borrower's student loan.[8] Around the same time, the Department added language to reflect this new regulation in its student loan contracts.[9] Since then, all federal student loan contracts with students have specified that borrowers can assert a defense against repayment. Over the years, the Borrower Defense Provision has been rarely used, but Corinthian's implosion resulted in an avalanche of tens of thousands of claims into the Department of Education.

### A Standard Process

In June 2015, the Department announced a standard process and application for federal student loan borrowers, including Corinthian borrowers, to assert a Borrower Defense claim.[10] The Department also announced it would provide expedited relief through a simple attestation form for certain Corinthian borrowers covered by official Department findings against the school.[11]

"[If] you've been defrauded by a school, **we'll make sure that you get every penny of the debt relief you are entitled to through a streamlined process** – as streamlined a process as possible. We're going to make that as simple as we legally can, while also safeguarding the interest of taxpayers…" – Arne Duncan, Former Secretary of Education[12]

"[W]e are working to **find ways to fast track relief based on legal findings for large groups of students,** such as those enrolled in the whole program at a particular school at a particular time and place. That means that **there's no need for these students to make any individual showing that they were affected by the school's fraud,**

which will make for a much simpler and quicker process." – Ted Mitchell, Former Under Secretary of Education[13]

On December 3, 2015, the Department of Education finally announced its first wave of Borrower Defense discharges. The Department initially discharged the loans of 1,312 students who had attended Heald, a school within the Corinthian network, and had submitted a Borrower Defense application.[14]

In March 2016, the Department announced additional findings of fraud and expanded its expedited relief program for additional Corinthian students who the Department acknowledged were defrauded at 91 former campuses.[15] Throughout 2016, the Department slowly approved more claims from former Corinthian College students, but the rate of incoming claims for discharge far outpaced the Department's sluggish approval process as Members of Congress continued to call for automatic group relief for defrauded Corinthian borrowers that would not require an individual application.[16]

On September 6, 2016, after years of its own financial and legal troubles, ITT Technical Institute ("ITT Tech") announced that it was shutting down all 130 of its campuses across the United States. The company filed for bankruptcy on September 16, 2016. ITT Tech's well documented misconduct unleashed a new wave of viable Borrower Defense claims. Together, Corinthian and ITT Tech account for approximately 80% of pending borrower defense claims. As more misconduct from other for-profit schools has come to light, students from every state in the country have submitted Borrower Defense claims related to a slew of for-profit institutions.

On January 13, 2017, the Department announced that it had granted discharges for roughly 28,000 Corinthian students across the country and was beginning to award the first discharges to ITT Tech students.[17] The Department also announced its first automatic group discharge, meaning borrowers did not have to submit an individual Borrower Defense application to the Department, for 4,000 students at the American Career Institute in Massachusetts. This group discharge stemmed from an investigation conducted by Massachusetts Attorney General Maura Healey.[18]

## The Trump Administration Hits the Brakes

Upon taking office on January 20, 2017, the Trump Administration abruptly hit the brakes, halting relief. **Since President Trump's inauguration nearly ten months ago, the Department of Education has not approved a single borrower defense claim for relief.**

Despite the growing backlog of borrower defense claims, the Department of Education, under Secretary Betsy DeVos, has demonstrated little interest in helping students get the relief to which they are legally entitled. Instead, the Department is reportedly developing – behind closed doors – a convoluted and legally dubious to grant partial relief to defrauded borrowers based on a Department judgment about how much student loan relief defrauded borrowers "deserve" rather than the full amount of their loans.[19] The Administration has also illegally delayed a set of Borrower Defense rules that would have established a federal standard for relief and would have further outlined a process for discharges.

Secretary DeVos has mischaracterized the ease by which students can get approved under borrower defense, suggesting:

**"Under the previous rules, all one had to do was raise his or her hands to be entitled to so-called free money."[20] – Secretary Betsy DeVos**

In reality, there are reportedly over 87,000 students with claims for relief pending before the Department. [21]They include students who attended Corinthian and ITT Tech, but also schools like DeVry and the University of Phoenix and the defunct Westwood Colleges. While their claims for relief languish at the Department, their lives go on – the rent needs to be paid, children need to be fed.

They wake up every day with their enormous student loan burden hanging over their heads. Their time in college certainly changed their lives, but not in the way the glossy, colorful college brochure told them it would. This report tells a few of those stories - though for every student profiled in this report, there are countless other defrauded students out there living with student loan debt who qualify for relief, but for one reason or another have not yet applied.

## Legal Sidebar

- Borrower Defense is the process for student loan borrowers to have their federal student loan debts cancelled because the school they attended defrauded them and broke the law.

- The consumer protection principle that forms the basis of Borrower Defense is that someone who borrowed money for the purchase of a good or service, from someone other than the seller, should be released from that debt if the good or service turns out to be fundamentally defective. In the context of student loans, this principle means that student loan borrowers cannot be forced to repay their debt if their school broke the law by using unfair and deceptive practices.

- Borrower Defense applies to all federal student loans covered by 20 U.S.C. §1087e(h). The Department is legally bound to honor the right of borrowers to have their loans cancelled based on schools' unlawful activity where it is a term of student loan contracts.

- The Department has the legal authority to write the rules around Borrower Defense, but it cannot eliminate Borrower Defense altogether because it is a provision in the Higher Education Act, and Congress has specified that the Department must find a way to recognize school misconduct as a defense to loan repayment.

- Even absent the Higher Education Act, other federal consumer protection laws, such as the Federal Trade Commission Act, provide legal rights for student loans taken out to attend colleges that must follow these laws. Furthermore, the Department's

relationship with schools participating in the federal student loan program is a basis for borrowers to raise severe misconduct of schools to nullify the Department's right to collect on related loans.

- School misconduct that creates a Borrower Defense includes misleading students or prospective students about employment prospects, program costs and the nature of loans, ability to transfer credits, availability of career services, and quality of educational services. These misrepresentations have been essential in convincing students to attend fraudulent schools.

- Participation agreements between the Department of Education and schools that receive federal student aid dollars require schools to act lawfully towards students, and give the Department the right to take money back from schools that violate these rules. The Department has the legal right to recover directly from the school every dollar of loans cancelled because of school misconduct. The Department also can limit or terminate a school's participation.

### *Why Students Don't Sue*

Students often don't bring lawsuits against fraudulent schools because schools may go out of business before students have the chance to even bring a lawsuit. And students of for-profit schools generally cannot bring lawsuits – either individually or as part of a class – because for-profit schools force students to sign away these rights as a condition of enrollment, as was the case with Corinthian and ITT Tech. Instead, students are forced to agree to pre-dispute arbitration. Arbitration lacks the procedures and precedents of the court system and stacks the deck in favor of the institution. The outcomes of these proceedings are often secret, which limits public disclosure of fraud and abuse and prevents appropriate scrutiny by accreditors and regulators.

## Methodology

This report consists of two main parts. It presents the most recent data on pending Borrower Defense claims. These data were received by Senate Democrats from the Department of Education through several data requests.

The second part of this report consists of profiles of borrowers with pending Borrower Defense claims. The profiles included in this report were compiled using 40 to 60 minute interviews conducted during the Fall of 2017. Respondents identified in the report gave their permission to be listed and quoted, when applicable. Where necessary, minor edits to responses have been made for style and consistency.

## Findings

**I.  Thousands of Borrowers Have Pending Borrower Defense Claims with the Department of Education**

### Data on Pending Borrower Defense Claims (As of July 7th, 2017) [22]

According to data sent by the Department of Education to Senate Democrats, since the collapse of Corinthian Colleges through July 7, 2017, 96,944 borrowers have submitted Borrower Defense claims to the Department of Education. The Obama Administration received 81,995 claims, while the Trump Administration has received 14,949. Importantly, these totals are individual borrower claims for relief and may not include thousands of group claims from state Attorneys General and legal aid attorneys.



Among the 14,949 claims submitted under the Trump Administration, California submitted the most claims (2,605), followed by Florida (1,258), Texas (1,054), Illinois (877), Georgia (540), Washington State (507), New York (499), Ohio (477), North Carolina (476), and Michigan (468).



Across the two administrations, the data also reveal that as of July 7th, 2017, there were 65,169 borrower defense claims pending with the Department of Education.

The majority of these claims are from borrowers associated with for-profit colleges: Corinthian borrowers were the highest (45,092 or 69.2%), followed by ITT Tech borrowers (7,186 or 11.0%), and Education Management Corporation (EDMC) borrowers (2,175 or 3.3%).



Since July, the number of pending claims has dramatically increased. According to recent reports, the number of pending borrower defense claims has ballooned to more than 87,000 as of October 24, 2017.[23] The total number of pending borrower defense claims are increasing under the Trump Administration, growing from 65,169 to 87,000 between July 2017 and October 2017.

However, since the Trump Administration has taken office, zero borrower defense applications have been approved. In contrast, 31,773 applications were approved by the Obama Administration between December 2015 and January 2017, including around 4,500 claims in connection with the American Career Institute in Massachusetts.



Among states submitting claims, California submitted the most (25,653 total claims, 15,465 claims pending), followed by Florida (7,811 total claims, 5,744 claims pending), and Texas (6,274 total claims, 4,489 claims pending).



---

Insult to Injury: How the DeVos Department of Education is Failing Defrauded Students

However, there are notably pending borrower defense claims in all 50 states and the District of Columbia.



On September 1, 2017, Senate Democrats received an update from the Department of Education on the status of claims that had been approved by the Obama Administration but not yet discharged.

This update revealed that up to 1,855 borrower defense claims had been approved by the Obama Administration before January 20, 2017, but still had not been discharged by the Trump Administration as of September 1, 2017.



## II. Defrauded Borrowers Note Significant Mental And Financial Distress As They Await The Outcome Of Their Request.

# Borrower Profiles

### Erika C., Massachusetts

**Institution:** Everest College (Corinthian)[24]
**Degree(s):** Diploma, Medical Administrative Assistant
**Total loan debt:** $9,000

*"I was lied to…When we sign up for these schools we only know what we are getting because of what they tell us: 'You're going to get out in the field and make this much money'… I was excited, breaking my back, staying up late, and carrying all these books around, taking notes, for what? For nothing. At the end of the day all we end up with is debt."*

Erika, a single mother of three, heard about Everest on TV. In the hope of starting a new career in a hospital, she enrolled in the medical administrative assistant program. The enrollment counselor emphasized job placement rates and suggested "there is going to be resources if they didn't hire you from the externship." Despite these lofty claims, Erika was quickly disappointed: **"everything felt like a waste. It was not useful information, when we had a test, we had a cheat sheet, and everyone had good grades. It felt like we were in elementary school."**

When Erika was supposed to enter her externship, she had a medical emergency and was out of school for 2 weeks. Upon returning, Everest **"failed to put me in my externship because you couldn't miss more than 5 days, even though I had a medical excuse. I ended up finding my own externship…I was in a dental office, Everest said I would be in a hospital—that was my goal."**

After graduating, Erika discovered the real value of her Everest diploma: **"people kind of brushed [my education] off like it was nothing. Sometimes I don't even mention that I went there."** Erika's diploma is "in my junk drawer." When Erika tried to transfer to a Massachusetts Community College, no credits transferred, despite Everest telling her that "any credits would roll over if I wanted to go to college."

Erika borrowed around $15,000 in federal student loans: **"It made me feel nervous, it made me nervous**

that I would not have the money to pay it back." Erika has been in repayment "faithfully," leaving her with a current balance of $9,000. She thinks about her student loans "almost every day": **"it puts a dent in my income, but I was trying to pay as much as I can."**

**"[Everest] failed to teach us valuable information, we thought we would all get good paying jobs, when we would call them [for job assistance], no one would help. We would call them and they never called back."**

Erika submitted her Borrower Defense application in October 2016 but has received only one email from the Education Department explaining that her application is being reviewed. Erika is frustrated by the lack of communication and action by the Department of Education: **"I am not asking for the money I paid, but if they can eliminate the money I owe now that would help [with my expenses and taking care of my kids]."**



**Claims Status, Massachusetts (All Claims) as of July 7th, 2017**

1,000   1,309

■ Approved   ■ Pending

### Mr. Brown, Tennessee

**Institution:** ITT Technical Institute
**Degree(s):** A.A.S., Computer Network Systems; B.A.S., Data Communication System Technology
**Total loan debt:** $100,000

*"I put all my blood and sweat into that education and all I have is debt… My daughter asked, 'why did you take your degrees off the wall?' I said, 'I want to do things the right way and these schools did everything the wrong way.'"*

Brown, a first-generation college student, began his education at ITT Technical Institute ("ITT Tech") as a full-time, night student. Due to program offerings, ITT Tech was his first choice school. Brown thought he was in a unique situation because he "was pretty much working in my field" prior to enrolling. He also noted his boss "believed in hiring people from technical schools," so he thought the degree would be worthwhile.

Brown's optimistic outlook on his education changed: "If I did not get a masters [from another school], I would be in a world of trouble. If you only have ITT Tech on your resume, it is a problem…**The brand integrity of [ITT Tech] has been compromised. I am not going to pay this back…I have a resume that has degrees from ITT Tech. I fight with taking them off.**" Although Brown had some knowledge about loans, the process around repayment was less clear. He attributed this, in part, to being a night student and not having "the full onslaught of financial aid folks." Subsequently, Brown was repeatedly contacted by a debt collection company about his student loans until he submitted an application for Borrower Defense in December 2016.

Brown submitted an application for Borrower Defense in December 2016, along with 36 documents— far more than required—but received limited communication from the Department of Education. In September 2017, after contacting the Education Department, the Department told Brown that the Borrower Defense process takes "one year at best, maybe two years."

**"It has been a year, what are we waiting on? The application requires four documents!"**



**Claims Status, Tennessee (All Claims) as of July 7th, 2017**

224
785

▪ Approved ▪ Pending

### Ami Schneider, Illinois
**Institution:** The Illinois Institute of Art (EDMC)
**Degree(s):** B.F.A., Digital Photography
**Total loan debt:** $30,000

***"The school defrauded me plain and simple, and I have the evidence."***

Ami is a first-generation college student, who enrolled at The Illinois Institute of Art due to its geographic proximity to home and ability to fit with her work schedule. She believed it would allow her to save money on housing and room and board.

Ami was disappointed by her poor education experience: "**In class, we did not learn the skills we were supposed to be learning…The industry was over saturated and I did not have the skills to be a good photographer.**"

Despite being on the Dean's list and graduating with honors, Ami found it nearly impossible to find a job upon graduation: "Employers don't see it as a reputable institution…If it is on my resume, it looks bad or they don't care. The degree has never opened any gainful employment."

Ami is now saddled with debt. "[Illinois Institute of Art] convinced my mom that I would get grants… **Grants and scholarships barely did anything. $76,000 was the tuition they quoted. Ended up with loans over $100,000…They just took us out of classes and had us sign things…**[We] only met with financial aid at the beginning of school…"

"[M]y loans ran out. They had [my mom] come in and write a check for $5,000."

Since graduating, Ami recalled being harassed by Navient about her student loans: "They would robocall me all hours of the day, sometimes 20 times a day. They called my grandparents in Florida. They had nothing to do with my loans."

Ami ended up filing for bankruptcy, but that only discharged $5,000 of her debt. Ami's financial struggles have caused significant distress in her relationships and with her personal health: "[My mother and I] would fight about finances every time we talked. I got really depressed. **I was hospitalized for depression. I thought maybe I am better off dead.**"

Ami learned about borrower defense from the news following the closure of Corinthian Colleges and applied in August 2015. She has received a "generic email a couple months ago" with no other communication with the Department of Education.

Ami's loans, which are now in forbearance, still cast a shadow over her head: "**I thought eventually my claim would be discharged... I was starting to feel hopeful. Now, [my debt] is impacting [my family] because we can't get married, we can't sign for anything together and have a normal life without having this huge burden over our heads... I cannot move forward and fix my credit. It is a huge sacrifice of my time and my life.**"



Claims Status, Illinois (All Claims)
as of July 7th, 2017

956

3,882

■ Approved  ■ Pending

## Nino, California
**Institution:** ITT Technical Institute
**Degree(s):** A.A.S., Computer Networking Systems
**Total loan debt:** $29,000

*"The whole [education] was basically a scam, it ruined my life and I wasted two years and a half of my life. They didn't even say that I will be in debt after graduation. At the beginning they told me not to worry about having a loan because I was eligible for the highest financial aid. The whole thing was just a blur... The two years and a half of my life were all lies."*

Nino attended ITT Tech because he "wanted to pursue a Bachelor's or Master's [degree]" in computer network systems. Upon graduating, the institution "**guaranteed**" he would have a job, "**won't be in debt,**"

and that "**the credits transfer to most universities.**" However, his experience did not match these basic expectations.

Nino explained: "My education experience was basically there was one teacher that taught most of the classes. No matter what the title of the class was, he taught the same topic. You can imagine that was a waste of time. We had only 3-4 teachers overall. One was teaching 80% of the classes. If you didn't go to class it did not impact your grade. It was not that serious of a school. Whatever you turned in would get a decent grade no matter how wrong you were. **I took a calculus class and I did not learn anything about calculus. At the end of the semester I did not even know what the symbols were. I do not think the teacher even knew calculus. I ended up getting an A.**"

ITT Tech also misrepresented the job prospects of graduates to Nino: "They gave a percentage, it was pretty high. Whoever graduates, they find a job, they have career services and they help you find a job. **They made it sound like after graduation you would be guaranteed a job, they even said 'guaranteed.'**" When Nino called ITT Tech to get information about jobs, ITT Tech told him they'd send job offers to his email. The job information emails from ITT Tech to Nino contained jobs unrelated to Nino's field of study—including a job as a cashier at Walgreens—or jobs for which Nino was not qualified."[E]ven if I applied, I did not get a call, they required experience and tests and skill sets that were not even close to what the school taught us."

Nino applied for Borrower Defense but did not receive any useful information from the Department of Education: "I called them one time and they did pick up... They responded that they can't give me any information...**After a year, they emailed me saying that my file is still in progress.**"

"This is just going to be in a loophole until [Trump Administration is] not in office... Since other students have been forgiven, I feel like this will work but this is just going to drag longer."

Nino's life has been severely impacted by his student debt burden: "I know it is affecting my life...**If I knew it would be forgiven, I would be more comfortable in**

making life decisions, for instance, going on vacation, buying a new car, not having to work two jobs. I want to be prepared if there is a day I have to pay. The total amount will be $600-700 per month. I am constantly thinking about this…If they unfreeze all of it, I don't know how I will pay."



Claims Status, California (All Claims) as of July 7th, 2017

15,465   10,188

■ Approved   ■ Pending

### Heather Beckstead, Arizona

Institution: Art Institute of Phoenix (EDMC)
Degree(s): B.A., Multimedia and Animation
Total loan debt: $67,000 federal; $21,000 private

*"I was defrauded. I was lied to. I was promised something I didn't get. My government should care about that. I want to feel that my government has my interests in mind but it does not feel that way now."*

Heather Beckstead enrolled at the Art Institute of Phoenix to fulfill a lifelong dream of becoming an animator: "I wanted to be an animator since I was old enough to hold a crayon. After I graduated high school, I was so excited to start the journey towards my career and live my dream of going to school to be trained in animation…I thought it would lead to a job in a studio… working on movies, animated shorts, or commercials."

However, the Art Institute did not provide students the resources necessary to succeed: "**There were not enough tools to be successful. I would show up to class and there would not be enough computers. I went a whole semester fighting for a seat at a computer…All the tools were old, outdated, or broken and they did not make any attempts to fix**

them. Some teachers had work experience in the field but their knowledge was very limited, not as qualified as we were led to believe. A lot of the time students taught the class or we watched tutorial videos on YouTube."

As a first-generation college student, Heather relied heavily on the admissions counselor to help her through the process: "[The admissions counselor] told me they had a very high graduation rate and successful job placement program. That most students found jobs pertaining to their degrees. The job placement counselor never got back to me about my questions… I was fresh out of high school. I didn't know anything. I was looking to them to help me get set up… They shoved all of these papers at me with tiny print. Every time I went into the financial aid office, I left more confused than before I went in."

When Heather was forced to take a leave of absence, she faced additional charges: "I had to take off time when my mom had breast cancer. **When I came back to school, they hit me with an 'out of school balance'…They charged me about $3,000 per semester that I took off…They did not disclose that information when I told them I needed to take time off.**"



**Claims Status, Arizona (All Claims) as of July 7th, 2017**

807   197

■ Approved   ■ Pending

Heather applied for borrower defense in October 2016 after reading about it on Facebook. She received confirmation from the Department of Education a "couple months ago" saying they are still working on

her application. Heather explained her student debt burden: "[it] has been hell…Knowing that I can't achieve my dream [of becoming an animator] and that I was taken advantage of, it has been hard for me…**This experience has made me feel worthless, like I am a failure. I don't have a degree, it is been hard to get a job anywhere. I am 28, this is not where I wanted to be in life…I feel like I am in a corner, I can't go back to school, I can't go to a different school. There is no option for me in regards to education.**"

<u>Amy Kennedy-Palma, Washington</u>
Institution: Everest (Corinthian)
Degree(s): A.S., Paralegal; B.S., Criminal Justice (Kennedy-Palma completed her Paralegal degree, but Everest closed before she was able to complete her Criminal Justice degree)
Total loan debt: $63,000

*"I've been waiting for almost 2 years, how much longer can I possibly be expected to wait? It is ridiculous to offer people a way out of something completely fraudulent [but not follow through with it]…It is ridiculous that this is even a process with everything Everest has been found guilty of."*

Amy is a military wife and mother who dreamed of becoming an attorney. When she decided to go to college, Amy received big promises from Everest: "the credits you get here can transfer to everywhere else… we do things other colleges do not do: we place you in a job that pays at least $20/hour and we buy your books for you."

Amy is hesitant to refer to her experience at Everest as "educational": "I had one instructor through the entire experience. She was a Washington state attorney who did not want to go to private practice. Everest offered her a job to teach the paralegal program…"

But after Amy graduated with her associate's degree, she was unable to find employment in the profession she intended: "**Every attorney in the area knew about Everest…One attorney literally laughed me out the door.**"

Amy decided to pursue a bachelor's degree in criminal justice, but things did not go as planned: "I was one term from graduating, I went to log in for my bachelor's

program and it said I could not log in. I called the number and it had a machine that said 'sorry, your school has been closed.' **I had only three classes left, but could not transfer them—I could not find a single school online or in-person that would transfer credits and cannot start over.**"

It took Amy 4 years to become a paralegal, and she was only able to get her job through a family friend and a personal favor.

Amy is currently responsible for $63,000 in student loan debt from Everest, despite the fact that the financial aid office estimated cost of attendance was "$13,000-14,000 for 2-year paralegal degree."

Everest took out loans on students' behalf: "[**Everest] Vancouver…had students sign an agreement with financial aid that [the office] would take out loans on our behalf to cover the costs of attendance. The amounts that they took out were far above what they should have been.**" Consequently, Amy is now responsible for loans she never knew about. Amy now has difficulty getting credit cards, loans, and believes "if there was a medical emergency and I had to pay $5,000 for surgery, I would die."

Amy applied for borrower defense in March 2015: "As soon as I figured out it was available, I applied, because Everest lied." She received a confirmation that her application was received by the Department of Education, and she receives from the Department "a letter every 6 months saying, 'sorry we are delayed.'"



Claims Status, Washington State (All Claims) as of July 7th, 2017

2,482        1,471

■ Approved  ■ Pending

### Ethan, Wisconsin
**Institution:** ITT Technical Institute
**Degree(s):** A.A.S., Drafting and Design Technology
**Total loan debt:** $50,000

*"After the collapse of ITT knowing that my degree is worthless, other employers may feel the same way. Personally, I do not feel that it is a proud sticker on my resume...At first, it was probably helpful but now it is hard to say if employers will find value in the degree."*

Ethan enrolled at ITT Tech believing he would have a "$60,000 job in two years' time...possibly even moving forward after ITT Tech to continue at a 4-year or 6-year college...[with the] end goal to be an architect."

**"Many of my colleagues have not gotten jobs in the field. 4 of the 30 that started with me in my degree graduated and only 1 or 2 are currently employed."**

Although Ethan has paid his loans on time, he admits he thinks about them "every day, twice a day."

Ethan submitted his borrower defense application because he knew he was being "messed with" weeks before ITT Tech shut down in September 2016. He received an auto reply email from the Department of Education and was told by a borrower defense counselor not to expect an answer for "a while...much longer than 6 months." When Ethan called back several months later, he was told he **"should expect an answer in a year or two."**



**Claims Status, Wisconsin (All Claims) as of July 7th, 2017**

148
779

■ Approved  ▪ Pending

Ethan has higher levels of anxiety. We went from "expecting an answer" to "maybe I shouldn't get my hopes up" to now, "just angry."

"[I am a] victim not getting justice...**I helped make billions for a CEO of ITT Tech. I feel robbed.**"

### Heather Drattlo, Indiana
**Institution:** The Art Institute of Indianapolis
**Degree(s):** B.A., Interior Design
**Total loan debt:** $75,000 (with additional private loan debt)

*"Any time you enter into a contract both sides have to follow it. It was a breach of contract, I did not get what I paid for. I took out loans for a quality education and that is not what I got."*

Heather was leaving military service when she decided to pursue a degree in interior design at the Art Institute of Indianapolis. She decided to enroll at the Art Institute because she viewed the institution as a pathway to a master's degree.

The enrollment manager told her that credits would "absolutely" transfer and that the school had a "98% job placement." Unfortunately for Heather, none of these assurances or promises of employment in her field became reality: **the closest I worked [in interior design] was an internship for a guy who ended up being a druggie who had a cabinet shop."**

Heather attempted to further her education and transfer to a different program, but "got emails saying I could not transfer credits because the [Art Institute] was not accredited."

**"The school as a whole just did not care. It was all about the money."**

Heather knew she was going to have to borrow money to fund her education, but the financial aid office was not forthcoming with her about her rapidly growing debt burden. The financial aid office "always said [my loans] were going to be lower than it was...I don't know how much I borrowed because they were constantly adding more each quarter."

Student loans have a significant impact on Heather's life. Besides being constantly contacted by debt



**Claims Status, Indiana (All Claims) as of July 7th, 2017**

319

1,184

■ Approved  ■ Pending

collectors, Heather was dealing with wage garnishment of upwards of 25% of each paycheck: **"It was awful, I was already living paycheck to paycheck and it made** it worse. Not only is my credit absolutely ruined, but I am no longer able to take care of myself...Nobody wants to get into a relationship with someone with over $100,000 in loan debt and it limits where I can work."

Heather found out about Borrower Defense on Facebook and submitted her application originally in October 2016, then again in December 2016. So far, she has received an email from the Department of Education acknowledging receipt of her application and another email stating that her application was still under review.

**"My entire life is on hold until I know one way or the other. I can't invest in anything, I can't do anything... It is like standing on top of an avalanche."**

## Recommendations

- *Immediately provide full discharges for borrowers with borrower defense claims approved prior to January 20, but who have still not received relief.*
  Of the borrower defense claims approved by the Obama Administration, several thousand had not been discharged prior to January 20.[25] These borrowers, however, received email notification that their claim had been approved and would be discharged within 60-120 days.[26] While that deadline has long since passed, Secretary DeVos has publicly stated the Department will honor these approvals and provide the discharges these students have been promised.[27] Unfortunately, up to 1,855 of these students still have not received discharges.

- *Immediately begin processing pending borrower defense claims.*
  Since taking office on January 20, the Trump Department of Education has not approved a single borrower defense claim. In July, the Department reported a backlog of more than 65,000 pending claims.[28] On October 24, *The Washington Post* reported the backlog has grown to nearly 87,000.[29]

- *Provide full relief for approved borrower defense claims.*
  On October 24, The Washington Post reported that rather than provide students with the full discharges to which they are entitled when a borrower defense claim is approved, Department officials "would prefer to grant partial relief" and are working behind closed doors to develop metrics on which to base a partial relief determination.[30]

- *Provide full, automatic discharges to Corinthian students covered by Department of Education findings.*
  As part of its investigation of Corinthian, the Department of Education under the Obama Administration issued a set of findings against the company that entitle covered students to borrower defense discharges. In addition to thousands of these borrowers having pending claims before the Department, thousands more still may not know they are eligible and have not yet applied. Attorneys General from 43 states and the District of Columbia have painstakingly matched these findings to the covered borrowers in their states and engaged in direct outreach to them. The Secretary has the legal

authority and, with the work of the state Attorneys General, the reliable student data needed to issue full, automatic discharges to covered all students—regardless of whether or not a student has submitted a claim.

- *Issue findings of wrongdoing against ITT Tech that will allow the Department to provide full, automatic discharges to covered students.*
  After Corinthian, the largest batch of borrower defense claims currently pending at the Department are associated with ITT Tech.[31] In addition to the Department itself, numerous state Attorneys General and federal agencies including the Consumer Financial Protection Bureau and Securities and Exchange Commission have evidence of ITT Tech wrongdoing.[32] As it did with Corinthian, the Department should work with these agencies to issue specific findings of wrongdoing against the now-defunct company and identify students covered by these findings in order to provide full, automatic discharges.

- *Extend forbearance for all borrowers with pending claims.*
  Students with pending applications for borrower defense have the option to place their loans in forbearance...However, in July 2017 the Department noted that as many as 31,000 borrowers may need to have their forbearance extended in the near future due to the delay in processing claims and that interest and fees for borrowers with pending claims totals $143.2 million.[33]

- *Use evidence and information submitted by state Attorneys General to provide full, group discharges to affected students.*
  State Attorneys General have been at the forefront of holding for-profit colleges accountable for wrongdoing and seeking relief for students. These chief state law enforcement officers have amassed troves of evidence detailing the misconduct of Corinthian, ITT Tech, and other schools. Many have submitted this evidence to the Department—seeking relief for students. The Department must review and respond to this information, make its own findings where appropriate, and provide full, group discharges to defrauded borrowers on the basis of this evidence.

- *Immediately implement the directive in the Fiscal Year 2018 Senate Labor, HHS, Education Appropriations Subcommittee Report (S. Rept. 115-137) to provide quarterly public reports on the receipt and processing of borrower defense claims.*
  Upon taking office, the Trump Administration discontinued the previous Administration's practice of providing regular reports to Congress and the public on borrower defense. The move left Congress and the public without reliable information and data about how the Department is fulfilling its responsibilities under the Higher Education Act to provide relief to defrauded borrowers. In response, the Senate Appropriations Committee unanimously approved an addition to the report accompanying the FY18 Labor-HHS-Education appropriations bill to require regular public reporting by the Department on borrower defense.[34]

- *Immediately halt collections activity on defaulted borrowers with pending applications for borrower defense and all defaulted Corinthian borrowers*
  Last year, the Department of Education released data revealing that nearly 80,000 former Corinthian students who were enrolled during the time that the Department found widespread fraud were in some form of debt collection with the Department.[35] This included over 30,000 borrowers whose tax refunds, EITC payments, and other government benefits like Social Security have been seized in order to pay off their debts, and more than 4,000 borrowers whose wages are being garnished. The Department should remove from debt collection all defaulted borrowers who have applied for Borrower Defense and defaulted Corinthian borrowers.

# Endnotes

1   https://www.washingtonpost.com/news/business/wp/2015/05/04/for-profit-corinthian-colleges-files-for-bankruptcy/?utm_term=.32747f044df0

2   https://www.nytimes.com/2015/06/09/education/us-to-forgive-federal-loans-of-corinthian-college-students.html

3   Consumer Financial Protection Bureau v. Corinthian Colleges, Inc., case number 1:14-cv-07194, U.S. District Court for the Northern District of Illinois (2005).

4   People of the State of California v. Heald College, LLC. et al., case number CGC-13-534793, Superior Court of the State of California, County of San Francisco (2016).

5   People of the State of California v. Heald College, LLC. et al., case number CGC-13-534793, Superior Court of the State of California, County of San Francisco (2016).

6   Higher Education Act Section 455(h), 20 U.S. Code 1087e(h)

7   34 C.F.R. § 685.206(c)

8   34 C.F.R. § 685.206(c)(2)

9   EN - MPN

10   https://www.ed.gov/news/press-releases/fact-sheet-protecting-students-abusive-career-colleges

11   https://www.ed.gov/news/press-releases/fact-sheet-protecting-students-abusive-career-colleges

12   http://www2.ed.gov/news/av/audio/2015/06082015.doc

13   http://www2.ed.gov/news/av/audio/2015/06082015.doc

14   https://www2.ed.gov/documents/press-releases/report-special-master-borrower-defense-2.pdf

15   https://www.ed.gov/news/press-releases/us-department-education-announces-path-debt-relief-students-91-additional-corinthian-campuses

16   https://www.republicreport.org/wp-content/uploads/2015/05/House-Corinthian-ltr-9-28-15.pdf; https://www.warren.senate.gov/files/documents/2016-9-29_Letter_to_ED_re_Corinthian_data.pdf

17   https://www.ed.gov/news/press-releases/american-career-institute-borrowers-receive-automatic-group-relief-federal-student-loans

18   https://www.ed.gov/news/press-releases/american-career-institute-borrowers-receive-automatic-group-relief-federal-student-loans

19   https://www.washingtonpost.com/news/grade-point/wp/2017/10/24/devos-calls-for-another-delay-of-rule-to-protect-students-from-predatory-colleges/?utm_term=.e06010b329e2

20   https://www.insidehighered.com/quicktakes/2017/09/26/devos-borrower-defense-rule-offered-%E2%80%98free-money%E2%80%99

21   https://www.washingtonpost.com/news/grade-point/wp/2017/10/24/devos-calls-for-another-delay-of-rule-to-protect-students-from-predatory-colleges/?utm_term=.0308c1abd6e2.

22   Data received by Senate Democrats from the Department of Education

23   https://www.washingtonpost.com/news/grade-point/wp/2017/10/24/devos-calls-for-another-delay-of-rule-to-protect-students-from-predatory-colleges/?utm_term=.abfd2472acef

24   Erika enrolled Aug 2010, so she was enrolled within the Education Department's fraud findings for Corinthian students (https://studentaid.ed.gov/sa/sites/default/files/ev-wy-findings.pdf. The list includes Everest Brighton-Medical Administrative Assistant (Diploma) 7/1/2010 – 9/30/2014).

25   https://www.ed.gov/news/press-releases/american-career-institute-borrowers-receive-automatic-group-relief-federal-student-loans

26   https://www2.ed.gov/documents/press-releases/approved-borrower-defense.pdf

27    https://appropriations.house.gov/calendar/eventsingle.aspx?EventID=394884

28   https://www.durbin.senate.gov/imo/media/doc/17-010570%20Durbin%20Outgoing.pdf

29   https://www.washingtonpost.com/news/grade-point/wp/2017/10/24/devos-calls-for-another-delay-of-rule-to-protect-students-from-predatory-colleges/?utm_term=.1840775c7db7

30   https://www.washingtonpost.com/news/grade-point/wp/2017/10/24/devos-calls-for-another-delay-of-rule-to-protect-students-from-predatory-colleges/?utm_term=.1840775c7db7

31   https://www.durbin.senate.gov/imo/media/doc/17-010570%20Durbin%20Outgoing.pdf

32   https://www.republicreport.org/2014/law-enforcement-for-profit-colleges/

33   https://www.durbin.senate.gov/imo/media/doc/17-010570%20Durbin%20Outgoing.pdf

34   https://www.appropriations.senate.gov/imo/media/doc/FY2018%20Labor%20HHS%20Education%20Appropriations%20-%20Report%20115-150.pdf

35    https://www.warren.senate.gov/files/documents/2016-9-29_Letter_to_ED_re_Corinthian_data.pdf