# EXHIBIT 21

The Washington Post

**Grade Point**

# DeVos calls for another delay of rule to protect students from predatory colleges

**By Danielle Douglas-Gabriel**  October 24, 2017

Education Secretary Betsy DeVos is proposing another delay of an Obama-era overhaul of rules to erase the federal student debt of borrowers defrauded by colleges.

In a Federal Register notice published Tuesday, the U.S. Department of Education invited public comment on a plan that would give the agency until July 1, 2019, to implement updates to a regulation known as borrower defense to repayment. The rule, which dates to the 1990s, wipes away federal loans for students whose colleges used illegal or deceptive tactics to get them to borrow money to attend.

The Obama administration revised the regulation last year to simplify the claims process and shift more of the cost of discharging loans onto schools. Those changes were slated to take effect in July, but DeVos suspended them for a year and said she would convene a new rulemaking committee to rewrite the regulation entirely. To give that committee more time, the secretary now wants to further postpone the revisions.

"This is another illegal delay by Secretary DeVos to allow predatory for-profit colleges to cheat students and taxpayers," said Massachusetts Attorney General Maura Healey (D), who is leading 19 state attorneys general in suing DeVos over the delays to the new borrower defense rule. "Our office will fight these unlawful attempts by the Department of Education to abuse vulnerable students and families who are drowning in unaffordable debt."

Case 3:17-cv-07210-SK Document 35-8 Filed 03/17/18 Page 3 of 99

The Trump administration argues that the additional delay is necessary to comply with a statute that says any regulatory change that has been finalized on or before Nov. 1 must take effect the following July, the start of the new financial aid award year.

"Given that the first negotiated rulemaking session is scheduled for November 13-15, 2017, we cannot complete the negotiated rulemaking process and the development of revised regulations by November 1, 2018," the department wrote in Tuesday's notice. "The regulations resulting from negotiated rulemaking could not be effective before July 1, 2019."

Department officials estimate that delaying the borrower defense revisions by a year will save taxpayers nearly $38 million, and pushing the rule back yet another year will save $46 million more. The Trump administration says it will continue to process borrower defense claims under the existing regulation, but critics say that pledge is meaningless as not a single claim has been approved since DeVos took office.

There are over 87,000 applications for debt relief pending at the department, according to people within the agency who were not authorized to speak publicly. At least 10,000 of those claims have been recommended for approval, but people familiar with the matter say department officials are refusing to pull the trigger.

They say leadership in the Office of Federal Student Aid and the Office of the General Counsel would prefer to grant partial relief based on the debt-to-earnings data collected from vocational programs. For example, if a former nursing student from Corinthian Colleges applied for relief, her claim could be judged based on the average salary of students in similar programs at other schools. But those familiar with the issue say there is no consensus on a path forward at the department.

The Education Department did not immediately respond to requests for comment.

Borrower defense has become a last resort for many former students of defunct for-profit schools ITT Tech and Corinthian Colleges. Both schools spent their last few years clouded by allegations of fraud, deceptive marketing and steering students into predatory loans. Their students had hoped the evidence in the state and federal cases against the schools would create a clear path for loan discharge, but for the most part it has not.

Revisions to the borrower defense rule were supposed to simplify and speed up the claims process, but DeVos said the Obama administration created "a muddled process that's unfair to students and schools, and puts taxpayers on the hook for significant costs." Consumer attorneys argue that the changes achieved the exact opposite. The new rule, for instance, expands the conditions under which colleges have to get a letter of credit

Case 3:17-cv-07210-SK Document 35-8 Filed 03/17/18 Page 4 of 99

from a bank assuring the availability of at least 10 percent of the total amount of federal financial aid funds it receives, a stipulation meant to limit financial risk to taxpayers.

"Instead of giving predatory corporations the green light to continue to take advantage of students, Secretary DeVos needs to stop these outrageous delays and start providing relief to the tens of thousands of students who have been cheated out of their education and savings," said Sen. Patty Murray (D-Wash.), ranking Democrat on the Senate Health, Education, Labor and Pensions Committee.

💬 **31 Comments**

Danielle Douglas-Gabriel covers the economics of education, writing about the financial lives of students, from when they take out student debt through their experiences in the job market. Before that, she wrote about the banking industry. 🐦 Follow @DaniDougPost

# EXHIBIT 22

Skip to main content | About Us (http://www2.ed.gov/about/landing.jhtml) |
Contact Us (http://www2.ed.gov/about/contacts/gen) | FAQs (http://answers.ed.gov) | 🖼️ Language Assistance ▾

| Search... | |
|---|---|

**ARCHIVED INFORMATION**

# Fact Sheet: Protecting Students from Abusive Career Colleges

**Administration outlines new debt relief process for Corinthian Colleges' students**

JUNE 8, 2015

**Contact:**  Press Office, Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

Over the past six years, the Education Department has taken unprecedented steps to hold career colleges accountable for giving students what they deserve: a high-quality, affordable education that prepares them for their careers. The Department established tougher regulations targeting misleading claims by colleges and incentives that drove sales people to enroll students through dubious promises. The Department has cracked down on bad actors through investigations and enforcement actions. The Department also issued "gainful employment" regulations, which will help ensure that students at career colleges don't end up with debt they cannot repay. The Department will continue to hold institutions accountable in order to improve the value of their programs, protect students from abusive colleges, and safeguard the interests of taxpayers.

> **More Resources**
>
> 🔊 Audio of Press Call (http://www2.ed.gov/news/av/au-dio/2015/06082015.mp3)
>
> 📄 Transcript of Press Call (http://www2.ed.gov/news/av/au-dio/2015/06082015.doc)

"While some for-profit career colleges play a critical role in helping students succeed in their educational and training pursuits, too often, bad actors in the sector have preyed on some of our nation's most vulnerable students and taken advantage of hard-working Americans who simply want a better future for themselves and their families," said U.S. Secretary of Education Arne Duncan. "I am committed to ensuring that every student has access to an education that will put them on solid footing for a career, and I will hold schools accountable for practices that undercut their students and taxpayers. Where students have been harmed by fraudulent practices, I am fully committed to making sure students receive every penny of relief they are entitled to under law. We will make this process as easy as possible for them, including by considering claims in groups wherever possible, and hold institutions accountable."

Today, the Education Department is announcing new steps in this work, particularly to address the

concerns of students who attended schools owned by Corinthian Colleges Inc.

**How debt relief will work for Corinthian students**

The Department has worked to rapidly develop a streamlined process for getting debt relief to Corinthian students. The Department's aim is to make the process of forgiving loans fair, clear and efficient—and to ensure that students who are eligible to participate know about this opportunity.

Some Corinthian schools closed down, while others were sold but remain open under different ownership. The announcements today are for:

- Corinthian students whose schools have closed down.
- Corinthian students who believe they were victims of fraud, regardless of whether their school closed.

**Helping Corinthian students whose schools have closed**

In general, when a college closes, students are eligible to discharge their federal student loans if they were attending when the school closed or who withdrew from the school within 120 days of the closing date. Given the unique circumstances for former Corinthian students, the Department is expanding eligibility for students to apply for a closed school loan discharge, extending the window of time back to June 20, 2014, to capture students who attended the now-closed campuses after Corinthian entered into an agreement with the Department to terminate Corinthian's ownership of its schools.

The Department's Federal Student Aid office has been and will continue to contact potentially impacted student borrowers to provide clear information about their options, including loan discharge applications, in addition to providing enhanced information on the Department's website (https://studentaid.ed.gov/sa/about/announcements/corinthian).

In addition, the Department has worked with a group of organizations and institutions—including those within the California State University system, led by CSU Fullerton and C-REAL, Beyond 12, and the National Association of Student Financial Aid Administrators and its California and Western region affiliates—as they have established an independent volunteer advising corps that will help students navigate their options. The resource is available at www.NextStepsEDU.org (http://www.nextstepsedu.org/), where students can sign up and be connected to a volunteer advisor from the field who can help students determine which option is best suited to their situation. (Note that as the Department is not managing this initiative, it cannot endorse any advice that a student may receive.)

**Helping students who believe they were victims of fraud, regardless of whether their school closed**

Provisions in the law called "defense to repayment" or "borrower's defense" allow borrowers to seek loan forgiveness if they believe they were defrauded by their college under state law. This provision has rarely been used in the past. Now, the Department is taking unprecedented action to create a streamlined process that is fair to students who may have been victims of fraud and that holds colleges accountable to taxpayers.

In taking these actions, as Under Secretary Ted Mitchell outlined in a blog post today, the Department is committed to helping support affected students. Given the pressing need presented by the unique situation for students who attended colleges owned by Corinthian, the Department is today announcing specific steps for students who attended those campuses, as well as outlining broader processes for all students that will be established moving forward.

- **Extending debt relief eligibility to groups of students wherever possible:** In order to receive loan forgiveness under a "defense to repayment," students must assert that a college's actions violated state law and affected their provision of educational services or their federal loans. Wherever possible, the Department will rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers.

For example, after analyzing the Department's findings in its investigation of Heald College and relevant California law, the Department has determined that evidence of misrepresentation exists for students enrolled in a large majority of programs offered at Heald College campuses between 2010 and 2015. Specifically, the Department has determined that students who relied on misrepresentations found in published job placement rates for many Heald programs qualify to have their federal direct student loans discharged. Students can have their loans forgiven and receive refunds for amounts paid based on a simple attestation. More information about this process—including the attestation form—is available on studentaid.gov/Corinthian (https://studentaid.ed.gov/sa/about/announcements/corinthian). Additional details will be posted on the website in the coming weeks.

- **Providing loan forbearance and pausing payments:** All former Corinthian students who apply for borrower defense have the option of having their federal loans immediately placed into forbearance, which stops their monthly payments to ensure they do not fall behind or default on their loans while the Department works to resolve the claim. For such students who are already in default on their loans, the Department will immediately halt collection activity. Students will receive a notification from their loan servicer to confirm the change in status of their loans.

- **Appointing a Special Master dedicated to borrower defense issues:** The Department will appoint a Special Master to oversee borrower defense issues and charge that person with ensuring the process is simple, streamlined, and fair to students and taxpayers. While the specific steps announced today are for former Corinthian students, the Special Master will help develop a broader system that will support students at other institutions who believe they have a defense to repayment. The Special Master will be named in the coming weeks.

- **Establishing a streamlined process:** As noted above, the Department will work to provide debt relief to groups of students wherever possible, as we already have determined is possible for many Heald College students. For other Corinthian students, with the help of the Special Master, the Department will create a simple application for debt relief, which borrowers can complete online or by email or postal mail. Starting today, former Corinthian students can visit studentaid.gov/Corinthian (https://studentaid.ed.gov/sa/about/announcements/corinthian) to learn more, and in the coming weeks, the Department will have an online form available for these borrowers. In addition, students can call a special toll-free borrower defense hotline at (855) 279-6207 to ask about their options.

- **Building a better system for debt relief for the future**: The Department will develop new regulations to clarify and streamline loan forgiveness under the defense to repayment provision, while maintaining or enhancing current consumer protection standards and strengthening those provisions that hold colleges accountable for actions that result in loan discharges. That process will begin later this year and will not slow down the loan discharge process for current applicants.

## Calling on Congress to do its part

The Department continues to take aggressive action that ensures defrauded borrowers get the debt relief they are entitled to, steps up oversight and enforcement to identify colleges that present the greatest risk to students and taxpayers, and holds schools accountable for their actions. But to fully address these issues, Congress must also take action. Congress needs to strengthen both consumer protections for students and accountability for colleges to make sure there are better oversight and enforcement tools in place to prevent colleges from harming students and leaving taxpayers holding the bag. The Department looks forward to working with Congress on such efforts, including:

- Congress should strengthen—not roll back—efforts to protect students and taxpayers from waste and fraud.
- Congress needs to enact rules that hold colleges and their executives responsible for fraudulent acts, not taxpayers.
- Students deserve truth in advertising. Congress needs to ensure students have access to meaningful information about college costs and outcomes and are not bombarded by aggressive and deceptive marketing.
- Students deserve borrower protections. Congress should also consider preventative action to protect prospective and current students by ensuring that students are not pressured into enrolling and can get relief when the program they signed up for is not what they were promised.
- Congress must protect our service members and veterans by eliminating loopholes that make them targets for aggressive marketing and recruitment by for-profit colleges.

## Additional Administration efforts to strengthen consumer protections

The Obama Administration has moved swiftly to take action on some of the most problematic practices in the for-profit industry. The steps the Department announced today are part of the Administration's comprehensive approach to protecting students, eliminating bad actors, and encouraging behavior that improves student outcomes—especially in making it easier to afford and complete a degree.

Too often, students at some of the largest career colleges—many run by for-profit companies—enroll with hopes of finding a good job but instead are left saddled with debt in exchange for a worthless degree or certificate.

- **For-profit students pay more up front**: On average, attending a two-year for-profit institution costs a student four times as much as attending a community college.
- **They borrow more often**: More than 80 percent of students at for-profits borrow federal student loans to pay for college, while less than half of students at public institutions do.
- **And they default on their student loans at disproportiontely high rates**: Ultimately, students at for-profit colleges represent only about 11 percent of the total higher education population but 44 percent of all federal student loan defaults, a clear sign that some of these colleges were not preparing students for good jobs.

Today's announcement, coupled with the work over the past six years and upcoming efforts, aim to crack down on these abuses and to strengthen consumer protections. Some of the additional steps the Department has taken and updates on its ongoing work include:

**Establishing Regulations to Protect Students from Poor-Performing Career Colleges**

Last year, the Department published regulations that will eliminate the flow of federal student aid to career training programs that leave students buried in debt with few opportunities to repay it. Those regulations take effect on July 1, 2015.

To qualify for federal student aid, the law requires that for-profit programs and certificate programs at private non-profit and public institutions prepare students for "gainful employment in a recognized occupation." In May 2015, the U.S. District Court for the Southern District of New York upheld the Department's approach to the gainful employment regulations against a challenge from a for-profit industry trade association, saying the Department's regulations represented "reasoned decisionmaking."

**Enforcing the Ban on Incentive Compensation**

In 2010, the Obama Administration released a broad set of rules to: strengthen the Department's authority to protect students from aggressive recruiting practices fueled by incentive compensation; take action against colleges engaging in deceptive advertising, marketing and sales practices; and to clarify minimum requirements for states to oversee postsecondary programs and handle student complaints.

Under Secretary Mitchell recently issued a memo encouraging the Office of Federal Student Aid to recover funds from schools that are found to have violated the incentive compensation ban. The memo reverses a more lenient approach initiated in 2002 under the Bush Administration by Education Deputy Secretary Hansen, which both the Education Department Inspector General and the Government Accountability Office found to be a barrier to effective enforcement of the law.

**Protecting military service members, veterans and their families**

For-profit colleges can obtain no more than 90 percent of their revenue from Title IV federal student aid dollars, but federal education aid from programs like the Department of Defense Tuition Assistance and Department of Veterans Affairs GI Bill Benefits is not counted toward that limit. This has made service members and veterans particularly vulnerable to aggressive marketing and recruitment by for-profit colleges, which often pursue aid targeted to such individuals to make up the required 10 percent of their revenue.

In its FY 2016 budget proposal, the Department proposed to eliminate this loophole by including DOD's tuition assistance and GI Bill benefits into the 90 percent calculation. Now, it is up to Congress to act on this plan and protect our nation's military and their families.

In addition, through Executive Order 13607 (the Principles of Excellence for Educational Institutions Serving Service Members, Veterans, Spouses, and Other Family Members), the Administration has worked to protect our nation's military families by ensuring that federal

military and veterans educational benefits programs are providing service members, veterans, spouses, and other family members with the information, support, and protections they deserve.

**Strengthening accountability and oversight across the federal government through a career college task force**

The Department has established an interagency task force, led by Under Secretary Ted Mitchell, to help ensure accountability for and oversight of career colleges and for-profit institutions. The task force will enhance the enforcement activity at the Department as well as at other federal and state agencies through tighter coordination of their activities and better information sharing to protect students from school practices and policies that are unfair, deceptive, and abusive, and that put taxpayer funds at risk.

The task force is building on efforts already under way among various federal agencies, and includes the Departments of Justice, Defense, Treasury, Veterans Affairs, and Labor, as well as the Consumer Financial Protection Bureau, Federal Trade Commission, Internal Revenue Service, and Securities and Exchange Commission. In addition, the federal partners will continue engaging with state Attorneys General and other stakeholders. The task force gathered for its first official meeting in May.

Given the important responsibilities each of these agencies has and the vital role that states play, this team will leverage their resources and expertise to continue to assist one another in the enforcement of federal criminal and civil laws and regulations, including against institutions and individuals who commit fraud or other criminal activity, thereby making the best use of scarce resources and better protecting the interests of students and taxpayers. And to allow for greater transparency and participation from the higher education community in these efforts—including institutions, consumer advocates and student groups—the task force will periodically organize opportunities for public discussions beginning this summer.

**Holding Corinthian Colleges Accountable**

In the case of Corinthian Colleges, the Department began tightening oversight of the college's practices and uncovered misrepresentation of its job placement rates. The Department acted to hold Corinthian accountable and ensured students pursuing their education did not face abrupt disruption while enforcement action was being undertaken.

Since that process began in 2014, the Department has taken a series of steps to protect students by requiring the company to sell or close all of its programs, ensuring students received more information about what was happening and their options, requiring expanded refund rights for students, and establishing an independent monitor under the leadership of former U.S. Attorney Patrick Fitzgerald, who ensured Corinthian remained accountable to students. Fitzgerald and his team ensured that students were made aware of their refund options, ensured that Corinthian's use of federal student aid was made in accordance with Department regulations, and ensured that students were provided correct information about the state of Corinthian's campuses and programs.

Most of Corinthian's campuses were acquired by the nonprofit Zenith Education Group, which agreed to provide a number of new consumer protections, such as providing refund and withdrawal opportunities to students in poorly-performing programs, and to take steps to strengthen programs and improve affordability, including by reducing tuition. The sale allowed most Corinthian students to continue pursuing their education and career goals without disruption, and the Department and the Consumer Financial Protection Bureau have worked together to provide more than $480 million in loan forgiveness for borrowers who took out Corinthian's high-cost private student loans.

In April 2015, the Department informed Corinthian that it was being fined about $30 million for misrepresenting job placement rates to current and prospective students in its Heald College system. Since then, Corinthian announced it was closing down the last of its remaining campuses. Recognizing the challenges and uncertainty facing students, the Department continues to provide information directly to Corinthian's students about their federal student aid and their options, including both transferring to another school to continue their education or discharging their loan.

### Creating options that make it easier to repay federal student loans

The Department is helping more students manage their student debt through flexible repayment options such as the Pay As You Earn plan (PAYE), which caps student loan payments at 10 percent of a borrower's monthly income. The Department is also acting on President Obama's Student Aid Bill of Rights proposal from earlier this year to support more borrowers to help borrowers enroll and participate in PAYE.

In addition, the Administration is continuing outreach to help borrowers who may be struggling to repay their loans, ensuring that they have the information they need to select the best repayment option for them and avoid default. Thanks to these comprehensive efforts, there are now 3.8 million borrowers enrolled in income-driven repayment plans, up from 760,000 in 2012.

### Providing families with clear information to make a smart college choice

The Department has provided a wealth of consumer tools designed to help students and families decide which college is right for them. In addition to requiring institutions to provide accurate information about their graduates' job placement success and the types of employment their graduates obtained, the Administration has created resources such as the College Scorecard and the Financial Aid Shopping Sheet, which can help families compare financial aid packages apples-to-apples. Since the launch of the Shopping Sheet in 2012, more than 3,000 institutions—representing more than two-thirds of the entire undergraduate population—have voluntarily adopted the Shopping Sheet to provide prospective students.

The Department also believes there is more to be done to help increase student access to affordable higher education and to improve student outcomes, and will continue to take action toward that goal.

**Tags:**   Press Releases (/news/press-releases)

## How Do I Find...?

- Student loans, forgiveness (http://www2.ed.gov/fund/grants-college.html?src=rn)
- College accreditation (http://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (http://www.ed.gov/essa?src=rn)
- FERPA (http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=rn)
- FAFSA (http://fafsa.ed.gov/?src=edgov-rn)
- 1098-E Tax Form (http://www.ed.gov/1098-e?src=rn)
- More... (http://www2.ed.gov/about/top-tasks.html?src=rn)

## Information About...

- Transforming Teaching (http://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (http://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)

## Search press releases

| Search... | |
|---|---|

## Find By Month

- March 2018 (/news/press-releases/monthly/201803)
- February 2018 (/news/press-releases/monthly/201802)
- January 2018 (/news/press-releases/monthly/201801)
- December 2017 (/news/press-releases/monthly/201712)
- November 2017 (/news/press-releases/monthly/201711)
- October 2017 (/news/press-releases/monthly/201710)
- September 2017 (/news/press-releases/monthly/201709)
- August 2017 (/news/press-releases/monthly/201708)
- July 2017 (/news/press-releases/monthly/201707)
- June 2017 (/news/press-releases/monthly/201706)
- May 2017 (/news/press-releases/monthly/201705)
- April 2017 (/news/press-releases/monthly/201704)
- All Press Releases (/news/press-releases)

*Our mission* is to promote student achievement and preparation for global

competitiveness by fostering educational excellence and ensuring equal access.

## Student Loans (http://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (http://studentaid.ed.gov/repay-loans?src=ft)

Defaulted Loans (http://studentaid.ed.gov/repay-loans/default?src=ft)

Loan Forgiveness (http://studentaid.ed.gov/repay-loans/forgiveness-cancellation?src=ft)

Loan Servicers (http://studentaid.ed.gov/repay-loans/understand/servicers?src=ft#who-is-my-loan-servicer)

## Grants & Programs (http://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (http://www.fafsa.ed.gov/?src=ft)

Grants Forecast (http://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (http://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)

Eligibility for Grants (http://www2.ed.gov/programs/find/elig/index.html?src=ft)

## Laws & Guidance (http://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (http://www.ed.gov/essa?src=ft)

FERPA (http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=ft)

Civil Rights (http://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

New IDEA Website (https://sites.ed.gov/idea/?src=ft)

## Data & Research (http://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (http://nces.ed.gov/?src=ft)

Postsecondary Education Data (http://nces.ed.gov/ipeds/?src=ft)

ED Data Express (http://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (http://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (http://ies.ed.gov/ncee/wwc/?src=ft)

## About Us (http://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (http://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (http://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (http://www.ed.gov/jobs?src=ft)

Press Releases (http://www.ed.gov/news/?src=ft)

FAQs (http://answers.ed.gov/?src=ft)

Recursos en español (http://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (http://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://www2.ed.gov/privacy?src=ft)

Subscribe to E-Mail Updates (https://public.govdelivery.com/accounts/USED/subscriber/new?topic_id=USED_5)

 (http://www.facebook.com/ed.gov)    (http://www.twitter.com/usedgov)   

(https://public.govdelivery.com/accounts/USED/subscriber/new?topic_id=USED_5)   

(https://www.ed.gov/feed)

Notices (http://www2.ed.gov/notices/index.html?src=ft)

FOIA (http://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)

Privacy Policy (https://www2.ed.gov/notices/privacy/index.html?src=ft)

Accessibility (http://www2.ed.gov/notices/accessibility/index.html?src=ft)

Security (http://www2.ed.gov/notices/security/index.html?src=ft)

Information Quality (http://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)

Inspector General (http://www2.ed.gov/about/offices/list/oig/index.html?src=ft)

Whitehouse.gov (http://www.whitehouse.gov/)   USA.gov (http://www.usa.gov/)

Benefits.gov (https://www.benefits.gov/)   Regulations.gov (http://www.regulations.gov/)

# EXHIBIT 23

Skip to main content | About Us (http://www2.ed.gov/about/landing.jhtml) |
Contact Us (http://www2.ed.gov/about/contacts/gen) | FAQs (http://answers.ed.gov) | 🔠A Language Assistance ▾

Search...

# Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers

**Clear evaluation criteria will expedite review process, ensure harmed students are treated fairly Department announces action related to more than 20,000 pending claims**

DECEMBER 20, 2017

**Contact:**  Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

WASHINGTON – After careful review to ensure a fair and efficient process, the U.S. Department of Education (the Department) today unveiled an improved discharge process for borrower defense to repayment (BDR) claims.

"We have been working to get this right for students since day one," said Secretary Betsy DeVos. "No fraud is acceptable, and students deserve relief if the school they attended acted dishonestly. This improved process will allow claims to be adjudicated quickly and harmed students to be treated fairly. It also protects taxpayers from being forced to shoulder massive costs that may be unjustified."

For pending claims, no changes were made to the existing approval criteria. Claims that previously would have been approved will still be approved today. However, rather than taking an "all or nothing" approach to discharge, the improved process will provide tiers of relief to compensate former Corinthian students based on damages incurred.

## NEW PROCESS FAIRLY COMPENSATES FOR DAMAGES

Students whose current earnings are less than 50 percent of their peers from a passing gainful employment (GE) program will receive full relief. Students whose earnings are at 50 percent or more of their GE program peers will receive proportionally tiered relief to compensate for the difference and make them whole (Table 1).

Table 1

| CCI Earnings as a Percentage of GE Earnings | Amount of Relief |
| --- | --- |
| 1% to 49% | 100% |
| 50% to 59% | 50% |
| 60% to 69% | 40% |
| 70% to 79% | 30% |
| 80% to 89% | 20% |
| 90% and above | 10% |

In all calculations, rounding is done to the benefit of the student, including:

- Relief is rounded up by tenths. For example, if a student had 59 percent of a passing GE program earnings, the student would receive 50 percent BDR relief.
- The better of mean or median earnings as compared to GE program peers is used to calculate relief.
- If the student was enrolled in multiple programs, the program which yields the most relief is the program used in the calculation.

Additionally, to mitigate the inconvenience for how long it has taken to adjudicate claims, the Department will apply a credit to interest that accrues on loans starting one year after the borrower defense application is filed.

The principle of relief based on value of education received is consistent with the legal authorization of BDR under the Higher Education Act and the existing BDR regulation, 34 CFR 685.206 [C][2], adopted in the Clinton Administration. Similar concepts for partial relief were proposed by the Obama Administration in its October 2016 regulation.

# RESPONDS TO CONCERNS RAISED BY INSPECTOR GENERAL

Following an internal review, the Secretary was concerned that there was no standardized process in place. In May, Secretary DeVos requested the Education Inspector General (IG) look into the existing procedures for claim adjudication.

The IG found "weaknesses with FSA's procedures for: 1. documenting the review and approval of legal memoranda establishing categories of borrower defense claims that qualified for discharge; 2. reviewing borrower defense claims; 3. processing claims approved for loan discharge and flagged for denial; and 4. establishing timeframes for claims intake, claims review, loan discharge, and claims denial processes and controls to ensure timeframes are met."

The Department has worked diligently to address the issues cited, yielding the improved discharge process.

# ACTION TAKEN TODAY

The Department has approved for discharge 12,900 pending claims submitted by former Corinthian Colleges, Inc. students, and 8,600 pending claims have been denied. This action includes claims that have been received during this administration. Many of the denied claims were identified for denial, but not acted on, by the prior administration.

Borrowers will be notified on a rolling basis as their discharge is finalized. The remaining pending claims will be adjudicated systematically under the newly announced discharge process.

# CONTINUING TO IMPROVE BORROWER DEFENSE

The borrower defense to repayment regulation currently is under negotiated rulemaking, which began Nov. 13. As Secretary DeVos stated when she announced the Department's regulatory reset on June 14, 2017, the previous regulatory process yielded a "muddled process that's unfair to students and schools and puts taxpayers on the hook for significant costs." She continued, "It is the Department's aim, and this Administration's commitment, to protect students from predatory practices while also providing clear, fair and balanced rules for colleges and universities to follow."

The negotiators will continue to work toward a new regulation that will treat students, institutions and taxpayers fairly.

**Tags:**     Regulation (/category/subject/regulation)
Student Financial Aid (/category/subject/student-financial-aid)
Student Loan Programs (/category/subject/student-loan-programs)
Borrower Defense (/category/keyword/borrower-defense)
Press Releases (/news/press-releases)

# How Do I Find...?

- Student loans, forgiveness (http://www2.ed.gov/fund/grants-college.html?src=rn)
- College accreditation (http://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (http://www.ed.gov/essa?src=rn)
- FERPA (http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=rn)
- FAFSA (http://fafsa.ed.gov/?src=edgov-rn)
- 1098-E Tax Form (http://www.ed.gov/1098-e?src=rn)
- More... (http://www2.ed.gov/about/top-tasks.html?src=rn)

# Information About...

- Transforming Teaching (http://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (http://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)

# Search press releases

| Search... | |
|---|---|

# Find By Month

- March 2018 (/news/press-releases/monthly/201803)
- February 2018 (/news/press-releases/monthly/201802)
- January 2018 (/news/press-releases/monthly/201801)
- December 2017 (/news/press-releases/monthly/201712)
- November 2017 (/news/press-releases/monthly/201711)
- October 2017 (/news/press-releases/monthly/201710)
- September 2017 (/news/press-releases/monthly/201709)
- August 2017 (/news/press-releases/monthly/201708)
- July 2017 (/news/press-releases/monthly/201707)
- June 2017 (/news/press-releases/monthly/201706)
- May 2017 (/news/press-releases/monthly/201705)
- April 2017 (/news/press-releases/monthly/201704)
- All Press Releases (/news/press-releases)

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

Student Loans (http://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (http://studentaid.ed.gov/repay-loans?src=ft)

Defaulted Loans (http://studentaid.ed.gov/repay-loans/default?src=ft)

Loan Forgiveness (http://studentaid.ed.gov/repay-loans/forgiveness-cancellation?src=ft)

Loan Servicers (http://studentaid.ed.gov/repay-loans/understand/servicers?src=ft#who-is-my-loan-servicer)

Grants & Programs (http://www2.ed.gov/fund/grants-apply.html?src=ft)

Apply for Pell Grants (http://www.fafsa.ed.gov/?src=ft)

Grants Forecast (http://www2.ed.gov/fund/grant/find/edlite-forecast.html?src=ft)

Apply for a Grant (http://www2.ed.gov/fund/grant/apply/grantapps/index.html?src=ft)

Eligibility for Grants (http://www2.ed.gov/programs/find/elig/index.html?src=ft)

Laws & Guidance (http://www2.ed.gov/policy/landing.jhtml?src=ft)

Every Student Succeeds Act (ESSA) (http://www.ed.gov/essa?src=ft)

FERPA (http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=ft)

Civil Rights (http://www2.ed.gov/about/offices/list/ocr/know.html?src=ft)

New IDEA Website (https://sites.ed.gov/idea/?src=ft)


Data & Research (http://www2.ed.gov/rschstat/landing.jhtml?src=ft)

Education Statistics (http://nces.ed.gov/?src=ft)

Postsecondary Education Data (http://nces.ed.gov/ipeds/?src=ft)

ED Data Express (http://eddataexpress.ed.gov/?src=ft)

Nation's Report Card (http://nces.ed.gov/nationsreportcard/?src=ft)

What Works Clearinghouse (http://ies.ed.gov/ncee/wwc/?src=ft)


About Us (http://www2.ed.gov/about/landing.jhtml?src=ft)

Contact Us (http://www2.ed.gov/about/contacts/gen/index.html?src=ft)

ED Offices (http://www2.ed.gov/about/offices/list/index.html?src=ft)

Jobs (http://www.ed.gov/jobs?src=ft)

Press Releases (http://www.ed.gov/news/?src=ft)

FAQs (http://answers.ed.gov/?src=ft)

Recursos en español (http://www2.ed.gov/espanol/bienvenidos/es/index.html?src=ft)

Budget, Performance (http://www2.ed.gov/about/overview/focus/performance.html?src=ft)

Privacy Program (https://www2.ed.gov/privacy?src=ft)

Subscribe to E-Mail Updates (https://public.govdelivery.com/accounts/USED/subscriber/new?topic_id=USED_5)


 (http://www.facebook.com/ed.gov)  (http://www.twitter.com/usedgov) 

(https://public.govdelivery.com/accounts/USED/subscriber/new?topic_id=USED_5) 

(https://www.ed.gov/feed)

---

Notices (http://www2.ed.gov/notices/index.html?src=ft)
FOIA (http://www2.ed.gov/policy/gen/leg/foia/foiatoc.html?src=ft)
Privacy Policy (https://www2.ed.gov/notices/privacy/index.html?src=ft)
Accessibility (http://www2.ed.gov/notices/accessibility/index.html?src=ft)
Security (http://www2.ed.gov/notices/security/index.html?src=ft)
Information Quality (http://www2.ed.gov/policy/gen/guid/infoqualguide.html?src=ft)
Inspector General (http://www2.ed.gov/about/offices/list/oig/index.html?src=ft)
Whitehouse.gov (http://www.whitehouse.gov/)   USA.gov (http://www.usa.gov/)
Benefits.gov (https://www.benefits.gov/)   Regulations.gov (http://www.regulations.gov/)

# EXHIBIT 24



**॰॰॰Il Sprint  LTE**                    **11:49 AM**



# Borrower Defense Claim –
# Adjudication Notice

Yesterday at 8:23 PM



---

March 1, 2018

SUBJECT:     Borrower Defense Claim –
Adjudication Notice

Dear                     :

The Department of Education has approved your
claim for forgiveness of your federal student loans
under the borrower defense to repayment rule, 34
C.F.R. § 685.206(c). We have determined that you
are entitled to forgiveness of the loans associated
with your enrollment at Corinthian Colleges, Inc.
("CCI") based on the school's material
misrepresentation(s) to you.



## Determination of Relief

The amount of loan relief that you will receive is based on the Department's assessment of the value of the education that you received.  The Department has determined the value of your education by comparing the average aggregate earnings of students who attended your program(s) of study to the average aggregate earnings of students who graduated from similar programs at other schools that have adequately prepared students for gainful employment, under the standard set forth by the Department's regulations at 34 C.F.R. Part 668, Subpart Q.  Further, if you enrolled in more than one program, the relief that you will receive has been determined using the Department's assessed value of the education for the program relating to your approved claim that had the lowest earnings and that, therefore, provides you with the highest percentage of relief.

## Your Relief Determination

Accordingly, based on your enrollment in the **Paralegal (Associate)** program, **50%** of the Federal Student Aid Direct Loan amounts you received for the programs of study related to your approved claim will be discharged (forgiven). The Department will

  



## Your Relief Determination

Accordingly, based on your enrollment in the
**Paralegal (Associate)** program, **50%** of the Federal
Student Aid Direct Loan amounts you received for
the programs of study related to your approved claim
will be discharged (forgiven). The Department will
notify your loan servicer of the approved amounts
for forgiveness, and the forgiveness should be
completed within the next 90-120 days. Your
servicer will send you more details about the
forgiveness, including the loan amounts that have
been forgiven.

Additionally, the Department will take steps to
reduce the amount of interest that has accrued on
your loan(s) from the time you submitted your claim.
Your servicer will provide additional information in
the coming months regarding the specific amount of
interest adjusted.

If your account has no other outstanding balances,
and your claim is not limited by a statute of
limitations, in addition to the loan forgiveness
discussed in this letter, you also may receive a refund
for prior payments made on the Direct Loans related
to your approved claim. If your claim is limited by a
statute of limitations, you may not receive a refund

# EXHIBIT 25



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE GENERAL COUNSEL

## MEMORANDUM

DATE:           October 4, 2000

TO:             Jane Holman, Acting Director of Title IV Delivery, Direct Loan Program
                Debra Wiley, Ombudsman, Office of Student Financial Assistance

FROM:           Vanessa Santos, General Attorney
                Division of Postsecondary Education

SUBJECT:        Interstate Business College, ND Former Students' Defense to Repayment
                of their Direct Loans:

**INTRODUCTION:** This memo is written in response to two former Interstate Business College (hereinafter "IBC") students' requests for a release from their obligation to repay their Direct Loans. ██████████ and ██████████ contend that IBC's misrepresentations, upon which they obtained Direct Loans, constitute a defense sufficient to avoid repayment of their Direct Loans, pursuant to 34 C.F.R. 685.206(c). Under the Direct Loan Regulations, a borrower can avoid repayment on the loan if she "asserts as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. 685.206(c). The Department will only recognize such claims as a defense against repayment if the school's act or omission has a clear, direct relationship to receipt or distribution of the loan or to the school's provision of educational services for which the loan was provided. 60 Fed. Reg. 37768 (Notice of Interpretation, July 21, 1995). Thus, Ms. ████████ and Ms. ████ have to prove three elements in order for their claims to be recognized: (1) that IBC engaged in wrongful conduct and that such conduct gives rise to a legal cause of action under North Dakota State law, (2) that IBC's actions were directly related to the receipt or distribution of their Direct Loans, and (3) that they were damaged as a result of IBC's actions.

In evaluating Ms. ████████ and Ms. ████ claims, I reviewed the following: (1) a letter from Ms. ████████ husband in which he alleges that IBC engaged in fraud when IBC staff lied to his wife about the certification and accreditation of their Medical Assistant (hereinafter "MA") program and that Ms. ████████ loan should be forgiven, (2) newspaper articles regarding IBC's closing and the criminal indictment of its owner, (3) a letter from Ms. ████ attorney wherein he alleges that IBC induced Ms. ████ into enrolling into their MA program through material misrepresentations and, as a result of IBC's wrongful conduct, Ms. ████ should be relieved of her obligation to repay her Direct loans, (4) Ms. ████ complaint initiating a lawsuit against

*Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation*

Interstate Business College Memo
October 4, 2000
Page 2

IBC, (5) the settlement agreement which ended another lawsuit brought by former students against IBC, (6) the North Dakota statutes and case law, and (7) Education's regulations and interpretation of the regulations.

After careful consideration of ███ these documents and the specific facts of Ms. Benedict and Ms.███████ cases, it appears that both students have adequately established sufficient causes of action against IBC under North Dakota law for negligent misrepresentation. Further, Ms.██████ and Ms.███ have established that IBC's wrongful actions were directly related to their receipt of the Direct Loans and that they have been damaged as a result of IBC's actions in amounts sufficient to offset the full amounts due on their Direct loans.

**DISCUSSION: Factual Background:** IBC closed on January 22, 1998. The owner of the school, Susan Jensen, later pled guilty to failing to return to Education unearned financial aid for 278 students who either withdrew or stopped attending before they completed their educational program between February 16, 1996 and November 20, 1997. Ms. Jensen was sentenced to 18 months in prison and was ordered to pay $914,000.00 in restitution to Education. As a result of IBC's closure, Education gave those students who qualified a "Closed School Discharge" or a credit for the unpaid refunds owed by IBC as a partial defense to repayment. Ms.███████ was not eligible for a closed school discharge because she had withdrawn from IBC more than 90 days prior to its closing in January, 1998. See 34 C.F.R. 682.408(d)(1)(i). However, she was given a $2,121.00 credit on her loan balance as a result of a credit balance she had with IBC or an unpaid refund due to her from IBC. (It is unclear from letter from Direct Loans which type of credit Ms.██████ received). See 34 C.F.R. 685.306. Thus, Ms.██████ loan balance was reduced from $6,625.00 to $4,504.00. Despite this credit, however, Ms.██████ still claims that she should not have to pay the remaining balance on her loan account. With regard to Ms.███, she was not eligible for a closed school discharge because she had withdrawn or completed the program more than 90 days prior to IBC's closing in January, 1998. We do not have any information about whether she was among those students who received a credit or an unpaid refund, however her name does not appear on the Inspector General's list of students who received a refund or credit balance. Regardless, Ms.███ is currently claiming that she should not have to pay the balance on her student loan account.

(1)██████████████: According to correspondence received from ████████████, Ms.███████ husband, Ms.███████ enrolled in the MA program at IBC in Fargo, North Dakota in 1996. According to the correspondence, Ms.██████ was told that at the end of the program, she would obtain her certificate as an MA. Ms.██████ took out two Direct loans (one for $4,000.00 and one for $2,625.00) to finance the program at IBC. However, the program in which Ms.██████ had actually enrolled was not an MA program but an administrative assistant program. Ms.██████ did not learn the truth about the program until she and her husband discovered that the IBC staff had lied about the MA program's accreditation. Mr.██ stated in his letter that he later learned that "the reason the Direct Loan Program made payments to the school was due to the fact that IBC was billing under an accredited program for administrative assistants." Ms.██████ withdrew from the school on March 1, 1997 upon learning that the MA program was not accredited. She is now seeking to avoid repayment of her Direct loan.

Interstate Business College Memo
October 4, 2000
Page 3

(2) ██████████████ River Educational Services, Inc., at North Dakota Corporation, d/b/a Interest Business College: On July 5, 2000, Ms. ████ through her attorney, Gene Doeling, served Susan Jensen with a Complaint in the above-titled lawsuit. Mr. Doeling sent a letter to Shon Hastings, an Assistant United States Attorney in Fargo, North Dakota, asserting that Ms. ████ has a defense to repayment of her loan under 34 C.F.R. 685.206(c). He enclosed a copy of Ms. ████ Complaint. Mr. Doeling also stated that he had obtained judgments for approximately 40 former IBC students against IBC based on a Stipulation, which he enclosed. See Discussion 3. Ms. Hastings forwarded Mr. Doeling's letter to our office on July 27, 2000 for review and comment. Ms. ████ suit against IBC is still pending.

In her Complaint, Ms. ████ contends that in the summer of 1995, she enrolled in IBC's Medical Administrative Assistant program (presumably the same program which Mr. ██████ refers to as a Medical Assistant program). In her Complaint, Ms. ████ states that she obtained $15,000.00 in Direct loans to cover the cost and expenses of the program. Education's records show that Ms. ████ obtained five Direct Loans totaling $11,925.00. Ms. ████ states that she was induced into enrolling in IBC based upon the staff's false representations. Apparently, the IBC representative told Ms. ████ that the MA program was fully accredited, that she would be "taught by experienced instructors who were MA's themselves," that she would be "supplied with computers equipped with the most advanced computerized accounting and MA software," and that IBC had a "90% placement rate for their graduates." Ms. ████ alleges in her Complaint that none of the above assertions were true. She states that she ceased attending IBC in March 1997.[1]

(3) ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████ v. Red River Educational Services,
Interstate Business College, and Susan Jensen individually and, dba Interstate Business
College (hereinafter 40 plaintiff lawsuit): As stated above, in his letter to Shon Hastings, Mr. Doeling stated that he had obtained judgments for approximately 40 former IBC students, including 31 students in the MA program, in a separate lawsuit against IBC. In that lawsuit, the parties settled the suit and stipulated, in a settlement agreement adopted by the plaintiffs and IBC through their attorney, to the following facts which established a pattern of negligent misrepresentation:

(1) that IBC misrepresented the number of graduates who had jobs "in their field" and that they applied that term loosely;
(2) that the term "in the field" is a term of art defined by the Accrediting Counsel for Independent Colleges and Schools as requiring "a direct use of the skills taught in the

---

[1] It is uncertain from the Complaint whether Ms. ████ completed the MA program or she withdrew. Regardless, we will use the March 1997 date as her date of separation from IBC.

Interstate Business College Memo
October 4, 2000
Page 4

program." Also, ACICS defines "related field" as employment as a position that requires "an indirect use of the skills taught in the program;"

(3) that based on the representations by the enrollment counselor, the Plaintiffs signed an agreement enrolling in the Medical Administrative Assistant program (MAA) and incurring thousands of dollars in loan debt;

(4) that the program was not accredited by any accrediting agency;

(5) that the graduates of this program were ineligible to take the certification exam as an MA until they had one year of full-time work experience in a position "in their field";

(6) that graduation with a degree as an MA, without being certified, gives candidates no greater chance of employment or pay grade, than would be available without the degree;

(7) that it was critical that the training received at IBC enable plaintiffs to secure employment qualifying graduates for the exam;

(8) that IBC's past employment placement was lower than stated during the enrollment interview;

(9) that the enrollment counselor had no personal knowledge of the placement statistics or of the meaning of "in the field" as defined by the accrediting agencies nor did she intend to deceive the students with her misstatements;

(10) that there was no evidence that Susan Jensen personally participated in the preparation of the enrollment materials or that she had any intent to deceive;

(11) that the Plaintiffs should be awarded damages in the amount of three times their enrollment contract, pursuant to NDCC 15-20.4-09[2], lost wages, books and travel expenses and miscellaneous expenses;

(12) that the lawsuit be dismissed.

The court entered the consent settlement agreement and issued judgments in favor of the plaintiffs, thus, concluding the lawsuit. The facts in this suit were conclusively established by the stipulation agreement between the litigation parties and not by a court or jury. However, because IBC's stipulated to engaging in negligent misrepresentation in this lawsuit and the court issued judgments against it as a result, IBC cannot argue in any future lawsuits that IBC *did not* engage in negligent misrepresentation (under the legal theory of collateral estoppel). Thus, if Ms. ▬▬▬lawsuit moves forward, IBC would not be able to successfully argue that IBC did not engage in the same negligent misrepresentation with her.

Further, it should be noted that the damage amount set forth in the stipulation is based solely on an agreement between the litigation parties and the provable facts of each plaintiff's case. In the stipulation, IBC admitted to engaging in negligent misrepresentation. Yet, IBC agreed to give the plaintiffs treble damages pursuant to NDCC 15-20.4-09 which is a damage provision for defendants who engage in fraud. *See* Footnote 2. Fraud requires a finding of an *intent to deceive*. IBC did not admit to such an intent and specifically included in the stipulation that neither Susan Jensen nor the IBC recruitment staff intended to deceive the students. It is not clear from Mr. Goeling's letter how the litigation parties agreed on the damage amount. However, perhaps during the negotiations, the plaintiffs would only agree to settle if they received treble damages

---

[2] North Dakota Century Code, section 15-20.4-09 states: Any person defrauded by any advertisement or circular issued by a postsecondary educational institution, or by any person who sells textbooks to the institution or to the pupils thereof, may recover from such institution or person three times the amount paid.

Interstate Business College Memo
October 4, 2000
Page 5

or the amount of damages that they would have received had they prevailed on a fraud claim.
Regardless, there is an inconsistency between IBC's stipulation to negligent misrepresentation
and the damage awards, which would only be warranted if IBC had stipulated to engaging in
fraud. Therefore, given the discrepancy, the damage figure from the 40 plaintiff suit will not be
used in our analysis of Ms. ████ and Ms. ████ claims.

## LEGAL ANALYSIS:

**(1) IBC's Actions Violate the Applicable State Law:** In evaluating a claim for a defense
against repayment of a Direct loan, one must look to the law of the state where the alleged
wrongful act or omission occurred. In this case, IBC's alleged wrongful actions occurred in
North Dakota. Thus, we must evaluate Ms. ████ and Ms. ████ claims under North Dakota
law.

Under the North Dakota Code, a negligent misrepresentation is a statement made for the
guidance of others which is not warranted by the information of the person making it. NDCC 8-
03-08(2). The North Dakota courts have recognized a statutory claim for relief based on
negligent misrepresentation. See Bourgois v. MDU, 466 N.W.2d 813 (N.D. 1991). In Bourgois,
the court found that the plaintiff, Bourgois, had sufficiently established that the Defendant,
MDU, had induced Bourgois into entering into a contract to demolish MDU's closed steam plant
by making false statements about the demolition project which were unwarranted by the
information available to MDU. (MDU knew that there was buried concrete in the area where
Bourgois was to perform the demolition that would have made the contract much more costly for
Bourgois to perform). However MDU, never disclosed this fact during the contract
negotiations).

The alleged facts of Ms. ████ and Ms. ████ cases fit within the definition of negligent
misrepresentation under the North Dakota law. Moreover, in the 40 plaintiff lawsuit, IBC
stipulated to facts similar to those alleged by ████ and ████ that established a negligence-
based cause of action. Here, IBC staff made statements to both students that it had an accredited
MA program which fulfilled the requirements of an MA certificate. IBC staff also told Ms. ████
that IBC had a 90% success rate placing MA graduates in their field. The stipulation establishes
that neither of these statements were warranted by the information available to the IBC staff.
However, relying on these same statements, both Ms. ████ and Ms. ████ enrolled in IBC and
obtained student loans to participate in the MA program. When Ms. ████ discovered that the
MA program was not accredited, she withdrew from IBC in March 1997 owing about $6,000.00
in student loans. Likewise, Ms. ████ separated from IBC in March 1997, owing about
$12,000.00 in student loans.

**(2) IBC's Wrongful Actions are Directly Related to Ms. ████ and Ms. ████ Receipt of
the Direct Loans:** If IBC had not misrepresented the accreditation and qualifications of its MA
program, Ms. ████ and Ms. ████ would not have enrolled in its program. If Ms. ████
and Ms. ████ had not enrolled in IBC, they would not have obtained Direct Loans. Therefore,
IBC's negligent misrepresentation is directly related to Ms. ████ and Ms. ████ receipt of
their Direct Loans. Thus, both students have satisfied the requirement under Education's

Interstate Business College Memo
October 4, 2000
Page 6

interpretation of its regulations that the cause of action against the school be directly related to the receipt or distribution of the loan or the school's educational services.

**(3) Ms. ███████ and Ms. ████ were damaged as a result of IBC's Negligent Misrepresentation**: Ms. ███████ and Ms. ████ took out loans to pay for tuition for IBC's MA program. The stipulated facts from the 40 plaintiff lawsuit establish that had they completed the program, their degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) they would have been ineligible for a certificate, (3) they would have had to work for a full year in the medical assistant field to be able to sit for the certification exam, and (4) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms. ███████ and Ms. ████ were damaged by incurring debts to pay tuition for an education that has no value.

To quantify their damages, we have to determine the amount of damages they could recover from IBC under state law. The recoverable damages from IBC must then be used to offset their loan obligations. Under North Dakota law, a person who has been misled by another is entitled to damages under a tort claim theory. Under this theory, a person is entitled to receive damages in an amount that will compensate her for all of her losses directly caused by the misrepresentation, whether the damages could have been anticipated or not, absent exceptional circumstances. NDCC 32-03-20. *See also* Delzer v. United Bank, 559 N.W.2d 531 (N.D. 1997)(case involved a contract to loan money, paid out in two installments, to the Dezler's to operate their ranch. The Delzers pledged all of their assets and ranch equipment as collateral, but the Bank never advanced the second installment of the loan. The Delzers lost all of their collateral and their ranch. During the trial, the evidence revealed that the Bank never intended to make the second installment to the Delzers. The court held that the Bank's actions were deceitful and that the Delzer's damages were foreseeable. The court awarded the Delzer's a judgment for $1,076,000, twice the amount of their compensatory or actual damages).

Here, both Ms. ███████ and Ms. ████ would be entitled to receive damages from IBC in an amount that would compensate them for all the losses directly caused by IBC's negligent misrepresentation. Given the fact that their education from IBC has virtually no value, the amount of their damages is at least the amount of tuition they paid to obtain that education. Presumably, the total amount of both Ms. ███████ and Ms. ████ Direct loans were used to pay for their tuition. Thus, Ms. ███████ damages equal the principal amount of the Direct loans she obtained to pay for her tuition minus her credit, or $4,504.00. Likewise, Ms. ████ damages equal the principal amount of the Direct Loans she obtained to pay for her tuition, or $11,925.00. These amounts are then used to offset the loan balances due and owing to Education on each student's account, notwithstanding unpaid, accrued interest. Therefore, Ms. ███████ and Ms. ████ loan obligations are fully offset by the amount of their damages against IBC.

**CONCLUSION:**  Based on the foregoing, we believe that Ms. ███████ and Ms. ████ have adequately established that: (1) IBC engaged in negligent misrepresentation which is a valid cause of action under North Dakota state law, (2) IBC's actions had a direct connection to their receipt of the Direct loans, and  (3) they were damaged by IBC's misrepresentations in the amount of their Direct Loans. We believe that Ms. ███████ and Ms. ████ claims should be recognized as a defense to collection of their loans. Further, we recommend that Ms. ███████

Interstate Business College Memo
October 4, 2000
Page 7

and Ms. ▉▉ be relieved of their obligation to repay their Direct loans, provided, however, that the allegations which they have asserted against IBC are not later proven to be false.  If it is proven that Ms. ▉▉▉▉ and Ms. ▉▉ fabricated their assertions against IBC, their Direct Loan obligations should be immediately reinstated in the amount due and owing at the time relief was provided to them pursuant to the recommendation in this memo.

I have attached to this Memorandum a draft copy of a letter to Mr. ▉▉▉▉▉ and Mr. Doeling in response to their inquires.  I recommend that this letter or a similar one be sent to these gentlemen with regard to Ms. ▉▉▉▉ and Ms.▉▉▉▉ loans.

If you have any questions or concerns about the contents of this memo or its conclusion, please feel free to contact me at (202) 401-6007.



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE OMBUDSMAN
OFFICE OF STUDENT FINANCIAL ASSISTANCE

October 4, 2000

Gene W. Doeling, Esq.
1111 Westrac Drive, Suite 108
P.O. Box 29
Fargo, North Dakota 58107-0029

Re:    United States v. Heather Gust
       Civil No. A3-00-36

Dear Mr. Doeling:

I am in receipt of the letter which you sent to Shon Hastings in the U.S. Attorney's Office in Fargo. She has asked our legal office to look into your inquiry about a defense to repayment of Ms. ████ loan, pursuant to 34 C.F.R. 685.206(c). In conjunction with our legal counsel, the officials in the Direct Loan program have reviewed the specific facts of Ms. ████ case, the materials you have provided, and the current law in North Dakota. After careful consideration of Ms. ████ specific situation, Education has determined that she has adequately established a sufficient cause of action against IBC for negligent misrepresentation under North Dakota law. As a result, she will be relieved of her obligation to repay her loans provided, however, that it is not later proven that her allegations against IBC were false. If, at some point in the future, it is proven that Ms. ████ allegations against IBC were untrue, her Direct Loan obligation will be reinstated retroactive from the date she was relieved of that obligation.

A copy of this letter will be forwarded to the appropriate official at the Direct Loan office to credit Ms. ████ account. If you have any further questions or comments, please feel free to contact me, toll free, at (877) 557-2575.

Sincerely,

Debra Wiley
Ombudsman
Student Financial Assistance

cc: Shon Hastings, AUSA
    Jane Holman, Director Loan Program



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE OMBUDSMAN
### OFFICE OF STUDENT FINANCIAL ASSISTANCE

October 4, 2000

████████████████████████████████

124 Woodland Court
Highlands Ranch
Denver, Colorado 80126

      Re:    Defense to Repayment of Direct Loans

Dear Mr. ████████ and Ms. ███████:

This letter is the belated response to your inquiry of November 15, 1999. On behalf of the Department, I apologize for the delay in getting this response to you and appreciate your patience. In conjunction with our legal counsel, the officials within the Direct Loan program have carefully reviewed the specific facts of your case, the materials you have provided to us and the current law in North Dakota. As a result, Education has determined that Ms. ███████ has adequately established a sufficient cause of action against IBC for negligent misrepresentation under North Dakota law. Therefore, Ms. ████████ will be relieved of her obligation to repay her Direct loans, provided, however, that it is not later proven that her allegations against IBC were false. If, at some point in the future, it is proven that Ms. ███████ allegations against IBC were untrue, her Direct Loan obligation will be reinstated retroactive from the date she was relieved of that obligation.

     A copy of this letter will be forwarded to the appropriate official at the Direct Loan office to credit Ms. ███████ account. If you have any further questions or comments, please feel free to contact me, toll free, at (877) 557-2575.

                                  Sincerely,

                                    Debra Wiley
                                    Ombudsman
                                    Student Financial Assistance

cc: Jane Holman, Direct Loan Program

# EXHIBIT 26

# POLITICO

## POLITICO PRO



LOG IN

## EDUCATION

**CALENDAR  DATAPOINT  DOCUMENTS  LEGISLATION**



The administration has denied some 8,600 claims — marking a new practice as only two claims have ever before been denied, department officials said. | Getty

## Education Department rules on thousands of student fraud claims

By **BENJAMIN WERMUND** | 12/20/2017 01:30 PM EST

The Education Department announced Wednesday that it has ruled on more than 21,000 fraud claims from former for-profit college students — denying thousands of claims outright and, for the first time, offering only partial relief to some defrauded borrowers.

The Trump administration said it is using a new "tiered relief" system for fraud claims that officials argue is fairer and will protect taxpayers from "runaway costs."

The system is sure to draw heavy scrutiny, however, as the administration is currently rewriting the "borrower defense" rules meant to provide debt relief to defrauded students. Until now, the administration had yet to act on more than 100,000 pending "borrower defense" claims — some of which had been sitting untouched for more than a year — and the delay has drawn lawsuits and criticism from lawmakers.

Officials said Wednesday they have now settled more than 20 percent of the pending claims, and all that were settled were from students who attended Corinthian Colleges, Inc. That includes approving 12,900 of the claims. Many of those borrowers, however, will only have their loans partly forgiven.

The administration has also denied some 8,600 claims — marking a new practice as only two claims have ever before been denied, department officials said.

"We have been working to get this right for students since day one," said Education Secretary Betsy DeVos in a statement. "No fraud is acceptable, and students deserve relief if the school they attended acted dishonestly. This improved process will allow claims to be adjudicated quickly and harmed students to be treated fairly. It also protects taxpayers from being forced to shoulder massive costs that may be unjustified."

The department's Inspector General earlier this month criticized parts of the process by which the Obama administration evaluated claims, but it also urged the Trump administration to unfreeze its approval of pending claims.

The administration says its new system is aimed at correcting the parts of the process highlighted in the IG report. Officials point to a Clinton-era statute that says borrowers can get full or partial relief and regulations written during the Obama administration that say defrauded borrowers are entitled to "appropriate relief" based on the value of the education they received.

Under the system, borrowers that the department determines were defrauded will have all or part of their loans forgiven based on how much the department believes that borrower to be earning, versus how much graduates of similar programs are making.

There are six tiers, ranging from 10 percent loan forgiveness to total forgiveness. If a student is earning 50 percent or less of what the department determines he or she should be earning, the student will have all of his or her loans forgiven. The department says it will strive to make the math work in favor of borrowers in every way possible — by rounding down on income, for instance, or using median income for comparable groups if it's more than the mean income, or vice versa.

The department, however, does not have income information for individual students, so the amount officials assume the borrower to be making will be based on the mean or median incomes of others in the same program.

The system also does not account for what career field a borrower ends up in. Officials argued that if a borrower attends a nursing program, but couldn't find a nursing job and ended up in another field, the department has no way of knowing that. They said, however, they will consider each claim on a case-by-case basis and if a borrower challenges their decision and provides additional information, they will consider it.

The administration will also begin denying claims, which officials said has only ever been done twice before, both during this administration's tenure. Officials claimed that many of the 8,600 claims they have denied so far were already flagged for denial under the Obama administration, but were left pending for the Trump administration to handle.

Officials said many of the denied claims were submitted with very little information. Borrowers whose claims have been pending for more than a year before they are denied will receive an interest credit.

Terms of Service

Privacy Policy

About Us

Corrections

Support

---

© 2018 POLITICO LLC

# EXHIBIT 27

FINAL VERSION

**AMENDED INFORMATION EXCHANGE AGREEMENT
BETWEEN
THE DEPARTMENT OF EDUCATION
AND
THE SOCIAL SECURITY ADMINISTRATION**

**FOR AGGREGATE EARNINGS DATA**

**ED Agreement No. 10012
SSA IEA No. 325**

## I.  Purposes

This Amended Information Exchange Agreement establishes the conditions, safeguards, and procedures under which the Social Security Administration (SSA) will disclose to the Department of Education (ED) certain aggregate earnings information, in a form that cannot be associated with, or otherwise identify, directly or indirectly, a particular individual. ED will use this information to provide aggregate disclosures of earnings information to the public to assist them in evaluating institutions that participate in the federal student aid programs authorized under Title IV of the Higher Education Act of 1965, as amended (HEA), and programs at those institutions that enroll students who receive HEA funds. ED will also use the information to consider policy options for revising the regulations for programs that are required to prepare students for gainful employment in recognized occupations, and through those regulations to determine each educational aid program's institutional eligibility as measured under 34 C.F.R. Part 600.

Because SSA will provide ED with aggregate, statistical data without any personal identifiers, this information exchange is not a "matching program" as that term is defined in the Privacy Act of 1974, as amended (5 U.S.C. 552a(a)(8)).

The responsible component in SSA for this data exchange is the Office of Data Exchange Programs.

The responsible component in ED for this data exchange is the Office of Federal Student Aid, Policy Liaison and Implementation.

## II.  Legal Authority

The legal authority for ED to enter into this agreement is Section 431 of the General Education Provisions Act (GEPA) (20 U.S.C. § 1231a) (gathering program data and informing the public); Section 111(b)((1)(C) of the Education Sciences Reform Act of 2002 (20 U.S.C. § 9511(b)(1)(C)) (evaluating effectiveness of educational programs); Section 132(i) of the HEA (20 U.S.C. § 1015a(i)) (promoting availability of institutional information); and Sections 101 and 102 of the HEA (20 U.S.C. § 1101) (evaluating programs preparing students for gainful employment in recognized occupations).

The legal authority for SSA to provide the information and services under this agreement is section 1106 of the Social Security Act (42 U.S.C. § 1306). The earnings information disclosed under this agreement is in form that cannot be associated with, or otherwise identify, directly or indirectly, a particular individual or taxpayer and, therefore, is not "return information" as defined in the Internal Revenue Code, 26 U.S.C. § 6103(b)(2).

## III.   Definitions

A. "EARN" is a process to extract earnings information from the Master Earnings File.

B. "EVS" is the Enumeration Verification System that accesses the NUMIDENT file and validates the incoming Social Security Number (SSN), name, and date of birth (DOB).

C. "Mean" is the mathematical average of all numbers in a set. This computation includes the use of $0 earnings.

D. "Median" is the middle value in a set of numbers. This value includes the use of $0 earnings.

E. "MEF" is the Master Earnings File containing the amount of an individual's earnings from wages and self-employment, which constitutes the individual's return information.

F. "NUMIDENT" is a sub- file of the Master Files of SSN Holders and SSN Applications containing information on all individuals who have ever submitted an application for an SSN.

## IV.   Responsibilities of the Parties

A. ED

1. ED will provide SSA with the names, DOB, SSN, and requested earnings report year of students who were enrolled in, or graduated from educational institutions that participate in the federal student aid programs. ED will provide this information in a file or files, approximately four (4) times a year, pursuant to the procedures set out in the Business Requirements Social Security Interface document Version 2.0, dated April 15, 2013, **Attachment A** to this agreement. This file or files will contain a minimum of 10 individuals per group provided to SSA.

2. ED will submit information for approximately 17,500 programs or groupings, and for approximately 6,000 institutions that participate in the federal student aid programs.

2

B. SSA

1. SSA will verify the submitted SSNs via EVS using the name, DOB, and SSN for individuals in the file(s) provided by ED. If SSA cannot verify the SSNs via EVS, it will not use the data set for those individuals in extracting the earnings data.

2. Using the verified SSNs, SSA will extract their earnings data from the MEF and compute aggregate earnings data by specific group as provided by ED for the requested earnings report year. Verified SSNs with the presence of a death indicator will not be included in the aggregate computations. From the computation, SSA will provide ED with a file of ED identified groups, the number of verified individuals in each group, the number of verified individuals with $0 earnings in each group, the number of unverified individuals in each group, the earnings report year, the mean and median income information of individuals in each group, and the threshold indicators, each of which can be provided so long as the numbers and mean and median information is in a form that cannot be associated with, or otherwise identify, directly or indirectly, a particular individual.

3. If SSA determines that any errors were made in the data provided to ED under this agreement, SSA will notify ED as soon as possible, but no later than 3 business days thereafter, and include with that notification a description of the error in enough detail to enable ED to determine whether to request a new calculation of the earnings data.

V.   **Description of the Records to be Matched**

A. Systems of Records (SOR)

1. SSA

SSA will match ED data with the Master Files of Social Security Number (SSN) Holders and SSN Applications (Numident), System No. 60-0058, last published 75 Federal Register (FR) 82121 (December 29, 2010) and the Earnings Recording and Self-Employment Income System, SSA/OEEAS 09-60-0059.

2. ED

ED will provide SSA with a finder file from the ED SOR, entitled the National Student Loan Data System (18-11-06), last published in the Federal Register on June 24, 2011 (76 FR 37095-37100). ED will amend this SOR before disclosing to SSA a finder file for the purpose of calculating aggregate earnings information for institutions based on students who enrolled in their Title IV, HEA programs.

Prior to any disclosure of a record from the SORs specified in this Section, the SORs associated with that disclosure will have routine uses permitting such disclosure.

B.  Number of Records

ED will send an annual finder file to SSA via batch mode.  The finder file will contain the identifying information for approximately 6.3 million records representing participants enrolled in educational programs at institutions participating in the federal student aid programs.

C.  Data Elements

1.  ED's file will consist of the name, DOB, SSN, and the requested earnings report year of each student in groups that represent either educational aid programs, or collections of educational programs grouped by institutions offering those programs, for which ED is seeking aggregate earnings data.  The groups will not identify the specific programs or institutions associated with those students, but will instead use identifiers assigned by ED to each group.

2.  SSA's return file will consist of a file of ED identified groups, the number of individuals whose information was verified and used in the calculation for each group, the number of verified individuals with $0 earnings in each group, the number of unverified individuals whose information was not used in the calculation for each group, the earnings report year, the mean and median income information of individuals in each group, and threshold indicators in a form that cannot be associated with, or otherwise identify, directly or indirectly, a particular individual.

D.  Education Records

ED's file will contain personally identifiable information (PII) from students' education records that is protected by the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g and 34 C.F.R. Part 99.  Pursuant to 20 U.S.C. §§ 1232g(b)(1)(C) and (3) and 34 C.F.R. §§ 99.31(a)(3) and 99.35, ED designates SSA to be ED's authorized representative, solely for the purpose of providing aggregate and statistical data under this agreement to assist ED in providing information to the public about educational programs and the institutions offering those programs, to formulate policies to evaluate programs under ED's regulations, and to establish and enforce requirements for programs that prepare students for gainful employment in recognized occupations.

VI.  **Procedures for Retention and Timely Destruction of Identifiable Records**

The data files exchanged under this agreement remain the property of the providing agency.  SSA will retain the electronic files received from ED only for the time required for any processing related to the information exchange under this agreement and will

electronically dispose of the data. SSA will destroy the data received from ED under this agreement after completing the information exchange activity under this program. Within 30 days after the expiration or termination under section XI of this agreement, SSA will destroy the data received from ED under this agreement.

The data files SSA provides to ED will contain no personally identifiable records. Neither SSA nor ED will create a separate file or system that consists solely of information concerning those individuals involved in this information exchange.

## VII.    Security Procedures

SSA and ED will comply with the requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. §§ 3541-3549; related Office of Management and Budget (OMB) circulars and memoranda, such as Circular A-130, Management of Federal Information Resources (Nov. 28, 2000), and Memorandum M-06-16, Protection of Sensitive Agency Information (June 23, 2006); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations. These laws, directives, and regulations include requirements for safeguarding Federal information systems and personally identifiable information (PII) used in Federal agency business processes, as well as related reporting requirements. Both agencies recognize and will implement these laws, regulations, NIST standards, and OMB directives, including those published subsequent to the effective date of this agreement.

FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. Both agencies are responsible for oversight and compliance of their contractors and agents with FISMA requirements.

A. Loss Reporting

Each agency will follow its own security procedures to respond to a loss of PII by that agency, or in response to notification from the other agency about a loss of PII. If either agency experiences a loss of PII provided by the other agency under this agreement, the agency experiencing the loss of PII will follow the OMB loss reporting guidelines (OMB M-06-19, "Reporting Incidents Involving Personally Identifiable Information and Incorporating the Cost for Security into IT Investments") and notify the United States Computer Emergency Readiness Team (US-CERT) within one hour of discovering the incident. In addition, the agency experiencing the loss of PII will notify the other agency's Information Security Contact named in this agreement. If ED is unable to speak with the SSA Information Security Contact within one hour or if for some other reason notifying the SSA Information Security Contact is not practicable (e.g., it is outside of the normal business hours), ED will call SSA's Network Customer Service Center toll free at 1-877-697-4889. If SSA is unable to speak with ED's Systems Security Contact within one hour, SSA will contact the alternate Information Security Contact listed in this agreement.

FINAL VERSION

B. Breach Notification

SSA and ED will follow PII breach notification policies and related procedures as required by OMB M-07-16 (May 22, 2007). If the agency that experienced the PII breach determines that the risk of harm requires notification to affected individuals and/or other remedies, that agency will carry out these remedies without cost to the other agency.

C. Administrative Safeguards

SSA and ED will restrict access to the data provided or created under this agreement to only those authorized employees and officials who need it to perform their official duties in connection with the uses of the data authorized in this agreement. Further, SSA and ED will advise all personnel who have access to the data of the confidential nature of the data, the safeguards required to protect the data, and criminal sanctions for noncompliance contained in the applicable Federal laws.

D. Physical Safeguards

SSA and ED will store the data provided or created under this agreement in an area that is physically and technologically secure from access by unauthorized persons during duty hours as well as non-duty hours or when not in use (e.g., door locks, card keys, biometric identifiers, etc.). Only authorized personnel will transport the data provided or created under this agreement. SSA and ED will establish appropriate safeguards for such data, as determined by a risk-based assessment of the circumstances involved.

E. Technical Safeguards

SSA and ED will process the data provided or created under this agreement under the immediate supervision and control of authorized personnel in a manner that will protect the confidentiality of the data, so that unauthorized persons cannot retrieve any data by computer, remote terminal, or other means. Electronic files will be encrypted using the FIPS 140-2 standard and, to the extent possible, will be interoperable with ED's personal identity verification logical access control card (PIV LAC) for Government Employees and support contractors authorized to have an HSPD-12 card. Systems personnel must enter unique identification and authentication information when accessing data on the agencies' systems.

F. Application of Policy and Procedures

SSA and ED will adopt policies and procedures to ensure that each agency uses the information contained in their respective records or obtained from each other solely as provided in this agreement. SSA and ED will comply with these guidelines and any subsequent revisions.

G. Onsite Inspection

SSA and ED have the right to monitor the other party's compliance with FISMA and OMB M-06-16 requirements and to make onsite inspections of the other party for purposes of auditing compliance, if necessary, during the lifetime or any renewal of this agreement.

## VIII.   Records Usage, Duplication and Redisclosure Restrictions

A. SSA and ED will use and access the data only for the purposes described in this agreement.

B. Neither SSA nor ED will extract information from the electronic data files concerning the individuals described therein for any purpose not stated in this agreement.

C. Except as provided in this agreement, SSA will not duplicate or disseminate the data provided by ED without ED's permission. ED shall not give such permission unless law requires such redisclosure. In such cases, SSA will specify in writing to ED what records it will redisclose if permission is given, to whom, and the reasons that justify the redisclosure. Because the information provided by SSA to ED under this agreement is not personally identifiable information, ED may disseminate the information without restriction under the authority delegated to ED in the Higher Education Act of 1965, as amended.

## IX.   Comptroller General Access

The Government Accountability Office (Comptroller General) may have access to all SSA and ED records, as necessary, in order to verify compliance with this agreement.

## X.   Reimbursement

Prior to any performance of information exchange activities under this agreement, the parties will execute a Form SSA-1235 for fiscal year (FY) 2013 that will cover the estimated reimbursable amounts and ED will pay that amount using ED form BS-008. SSA will collect, through the Intra-Governmental Payment and Collection (IPAC) system, on a quarterly basis, the amounts sufficient to reimburse SSA for the costs incurred for performing services through the date of billing. SSA will mail a copy of the IPAC billing and all original supporting documentation to ED at the FSA Accounting and Finance contact identified in this agreement, no later than five (5) calendar days following the processing of the IPAC transaction. At least quarterly, but no later than 30 days after an accountable event, SSA will provide ED with a performance report (e.g. a billing statement) that details all work performed to date. Additionally, at least quarterly, the parties will reconcile balances related to revenue and expenses for work performed under the agreement.

This agreement does not authorize SSA to incur obligations through the performance of the services described herein. Only the execution of Form SSA-1235, Agreement Covering Reimbursable Services, authorizes the performance of such services. Accordingly, made part of this agreement, is an executed Form SSA-1235 that provides authorization for SSA to perform services under this agreement in FY 2013. Because this agreement spans multiple fiscal years, SSA will prepare a new Form SSA-1235 prior to the beginning of each succeeding fiscal year that this agreement remains in effect. SSA's ability to perform work beyond FY 2013 is subject to the availability of funds.

## XI.   Duration and Modification of the Agreement

A. Effective Date:  The effective date of this agreement is May 24, 2013.

B. Duration:  The duration of this agreement is 5 years, expiring on May 24, 2018.

C. Modification:  The parties may modify this agreement at any time by a written modification agreed upon by both parties.

D. Termination:  The parties may terminate this agreement at any time with the consent of both parties. Either party may unilaterally terminate this agreement upon written notice to the other party, in which case the termination shall be effective 90 days after the date of that notice or at a later date specified in the notice. If ED terminates the agreement, SSA is authorized to collect costs incurred prior to the effective date of the termination plus any termination costs.

Either party may make an immediate, unilateral termination of this agreement if either agency has determined that there has been: 1) an unauthorized use of the information by the other party or 2) a violation of, or failure to follow, the terms of this agreement. Either party also may make an immediate, unilateral suspension of this agreement if either agency suspects that the other agency breached the terms for security of data until such time either agency makes a definite determination regarding a breach. If either party unilaterally terminates or suspends this agreement, it shall notify the other party in writing within three business days, and provide written notice to the other party describing the basis for that action within five business days following the termination or suspension.

## XII.   Disclaimer

Each party to the agreement will be liable for damages or loss resulting from acts and omissions of its own employees in accordance with Federal statutory authority.  All information furnished to ED is subject to the limitations and qualifications, if any, transmitted with such information.  If SSA must re-perform the services because of any errors in the information that SSA submits to ED or any loss or destruction of data that is attributable to SSA, SSA will provide ED with written notification of the additional costs for the services, the reason(s) why SSA will incur the additional costs, and steps that SSA has taken to ensure that ED will not have to pay again for the re-performance of the same

services in the future.  ED will reimburse SSA for such additional costs as part of the full costs incurred by SSA in compiling and furnishing data to ED.

**XIII.    Dispute Resolution**

Disputes related to this agreement will be resolved in accordance with instructions provided in the Treasury Financial Manual (TFM) Volume I, *Intragovernmental Business Rules* Bulletin, available on the TFM Web site at **http://www.fms.treas.gov/tfm/vol1/bull.html**.

**XIV.    Interconnection Security Agreement**

SSA and ED will jointly develop and sign an Interconnection Security Agreement to document the technical details of the interconnection of their systems.

**XV.    Integration Clause**

This agreement, the accompanying Form SSA-1235, ED Form BS-008, and the Interconnection Security Agreement constitute the entire agreement of the parties with respect to its subject matter and supersede all other data exchange agreements between the parties that pertain to the disclosure of identity information made between SSA and ED for the purposes described herein.  This agreement amends, supersedes, and replaces in its entirety the Information Exchange Agreement No. 10012 between the parties, dated effective as of January 16, 2012.  There have been no representations, warranties, or promises made outside of this agreement.  This agreement will take precedence over any other documents that may be in conflict with it.

**XVI.    Persons to Contact**

A.  ED Contacts

Systems Issues

Valerie Sherrer, Director
Systems Integration Division
US Department of Education
Federal Student Aid
830 First Street NE
Washington, D.C.  20202
Ph: 202.377.3547
Email: Valerie.Sherrer@ed.gov

Operational Issues

Keith Wilson, NSLDS System Owner
US Department of Education
Federal Student Aid
830 First Street NE
Washington, D.C.  20202

# EXHIBIT 28

# United States Senate

WASHINGTON, DC 20510

January 2, 2018

The Honorable Kathleen S. Tighe
Inspector General
U.S. Department of Education
550 12th Street, SW
Washington, DC 20202

The Honorable Gale Stallworth Stone
Acting Inspector General
U.S. Social Security Administration
1100 West High Rise
6501 Security Boulevard
Baltimore, MD 21235

Dear Inspectors General Tighe and Stallworth Stone:

I write to request that you inspect and examine whether the Department of Education ("the Department" or ED) violated its information exchange agreements with the U.S. Social Security Administration ("SSA") in order to establish a scheme to limit relief to thousands defrauded borrowers under its Borrower Defense for Repayment ("Borrower Defense") authority.

On December 20th, 2017, the Department announced a new plan and formula to limit debt relief to former Corinthian College students and other defrauded student borrowers by comparing their average earnings to students who graduated from similar vocational programs of study.[1]

The Department stated in its press release that, "[s]tudents whose earnings are at 50 percent or more of their [Gainful Employement] program peers will receive proportionally tiered relief to compensate for the difference and make them whole."[2] It appears the Department plans to use federal earnings data produced from federal tax records to calculate partial relief for defrauded student borrowers. The Department obtained these federal earnings data through an information exchange agreement between the Department and SSA for aggregate earnings data.[3]

I have a number of concerns with this plan, including whether it is allowed under the current information exchange agreement between the Department and SSA. On December 20th, 2017, *The Washington Post* reported that SSA provided an "unofficial, non-legal, staff-level" opinion that SSA staff "do[es] not believe [the Education Department] would be authorized to use earnings information [SSA] provide[s] under any current agreement to make decisions about whether or not to grant debt relief to borrowers in certain vocations."[4]

---

[1] "Improved Borrower Defense discharge process will aid defrauded borrowers, protect taxpayers." *U.S. Department of Education.* (2017, December 20). Online at: https://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers.
[2] *Id.*
[3] "Amended Information Exchange Agreement Between the Department of Education and the Social Security Administration for Aggregate Earnings Data." ED Agreement No. 10012/SSA IEA No. 325.
[4] Douglas-Gabriel, D. (2017, December 20). "Betsy DeVos takes action on backlog of student debt relief claims." *The Washington Post.* Online at: https://www.washingtonpost.com/news/grade-point/wp/2017/12/20/betsy-devos-takes-action-on-backlog-of-student-debt-relief-claims/?utm_term=.c47ceed968a5.

I am troubled by the Department's potential misuse of federal earnings data acquired from SSA through an information exchange agreement in order to limit loan relief for defrauded students. The information exchange agreements between the Department and SSA, including Agreement No. 10012/SSA IEA No. 325, allow for the sharing of information "For Aggregate Earnings Data."[5] Agreement No. 10012/SSA IEA No. 325 aims to:

> "[A]ssist [ED] in evaluating institutions that participate in the federal student aid programs authorized under Title IV of the Higher Education Act of 1965... ED will also use the information to consider policy options for revising the regulations for programs that are required to prepare students for gainful employment in recognized occupations, and through those regulations to determine each educational aid program's institutional eligibility as measured under 34 CFR § 668.405 Part 600."

Notably, this information exchange agreement explicitly and exclusively allows federal earnings data to be used for the Gainful Employment Rule as finalized by the Department in October 2014.[6] The information exchange agreement makes no mention of Borrower Defense or any use for student loan discharge determinations. And the information exchange agreement is clear that "SSA and ED will use and access the data only for purposes described in this agreement."[7]

There is no evidence of a new data exchange agreement between the Department and SSA for use in Borrower Defense determinations, nor has there been a revision to the Gainful Employment information exchange agreement. Despite these facts, an Education Department spokeman told the *Washington Post*, "This use is fully consistent with the department's agreement with the Social Security Administration."[8] Based on the plain text of the agreement, this does not appear to be true.

I am seeking clarity on this situation. In light of all of this, I request that you inspect and examine the circumstances by which the Department is using SSA federal earnings data to make partial relief determinations under Borrower Defense and whether this is an authorized use of SSA federal earnings data under the current information exchange agreements between the agencies.

Thank you for your prompt attention to this matter.

Sincerely,

ELIZABETH WARREN
United States Senator

---

[5] ED Agreement No. 10012/SSA IEA No. 325.
[6] 34 CFR 600; 34 CFR 668
[7] ED Agreement No. 10012/SSA IEA No. 325.
[8] Douglas-Gabriel, D. (2017, December 20).

# EXHIBIT 29



OIG  Office *of the* Inspector General
SOCIAL SECURITY ADMINISTRATION

January 30, 2018

The Honorable Elizabeth Warren
United States Senate
Washington, DC  20510

Dear Senator Warren:

I am writing in response to your January 2, 2018 letter requesting that we examine whether the Department of Education (ED) violated its information exchange agreement[1] with the Social Security Administration (SSA).

In response to your letter, we obtained a copy of the agreement.  Under the terms of the agreement, SSA provides ED aggregate earnings information in a form that cannot be associated with, or otherwise identify, a particular individual.

- The Purpose section of the agreement states that ED will use the aggregated earnings information "…to assist them in evaluating institutions that participate in the federal student aid programs authorized under Title IV of the *Higher Education Act of 1965*, as amended (HEA), and programs at those institutions that enroll students who receive HEA funds."

- The Responsibilities of the Parties section of the agreement allows ED to request, and SSA to provide, aggregated earnings information for "…students who were enrolled in, or graduated from educational institutions that participate in the federal student aid programs."

At this time, we do not know whether ED has used SSA aggregate earnings data in its planned program related to borrower relief.  However, since the new ED program did not exist when this agreement was established in May 2013, this use of SSA's data could not have been foreseen at the time the agreement was established.  This agreement expires in May 2018, so it must be renegotiated soon between SSA and ED to continue the exchange.

Oversight of such agreements falls under the authority of SSA's Data Integrity Board, which has responsibility over all matching programs in which SSA participates, either as a source or recipient agency, as well as any alleged violation of such agreements.  SSA's Data Integrity Board is also responsible for approving any renewal, suspension, or termination of new or existing electronic information exchange and matching programs.  Further, the Data Integrity

---

[1] *Information Exchange Agreement Between the Department of Education and the Social Security Administration for Aggregate Earnings Data (ED Agreement No. 10012 SSA IEA No. 325).*

Page 2—The Honorable Elizabeth Warren

Board Chair serves as the focal point for the Congress on all matters pertaining to SSA's electronic information exchange and computer matching programs.

We believe SSA's Data Integrity Board is the appropriate party to review the information provided in your letter; therefore, we have referred your letter to that entity for appropriate action and response.  We have asked the Data Integrity Board Chair for a copy of its response to you. Once the Data Integrity Board reviews the existing agreement in light of your concerns, we will be able to determine if further action on our part is warranted.

If you have any questions, please call me, or have your staff contact Walter Bayer, Congressional and Intragovernmental Liaison, at (202) 358-6319.

Sincerely,

Gale Stallworth Stone
Acting Inspector General

# EXHIBIT 30



AP Top News    Sports    Entertainment    Explore ⌄

# For-profit loan forgiveness program could see major cut



By MARIA DANILOVA
Jan. 30, 2018



**RELATED TOPICS**
Business
Education
Politics
North America

More from
**Lifestyle**

WASHINGTON (AP) — The Education Department's plan to provide only partial loan forgiveness to some students defrauded by for-profit colleges could reduce overall payments by about 60 percent, according to a preliminary analysis obtained by The Associated Press.

The agency announced in December that it was discontinuing the Obama administration's practice of fully wiping out the loans of students deceived by the now-defunct Corinthian Colleges under the borrower defense rule.



✴ Citizens Bank

Education Refinance Loan

You could save
an average of

$3,252

PER YEAR*

and go

shopping.

Get My Rate

The department said some students will now be getting only partial loan forgiveness to make the process fair and protect taxpayers from excessive costs. The agency will look at average income for specific programs to determine if the loans should be forgiven fully or partially.

A department document drafted in the fall and viewed by the AP shows that such an approach could cut the overall amount of relief granted to students by around 60 percent. To arrive at the initial estimate, officials looked at student loans that had been forgiven in their entirety to determine the impact had partial relief been granted.

Education Department press secretary Liz Hill said in a statement Tuesday, "This is not an official calculation from the Department of Education. It is an impossible calculation to make at this stage in the process as we continue to adjudicate claims."

Critics said the idea of partial relief was unfair since thousands of Corinthian students had already had their loans canceled in full under President Barack Obama. The agency said in December that it had tens of thousands of claims from Corinthian students pending.

The action comes as Education Secretary Betsy DeVos rewrites regulations governing student protections with regard to for-profit schools. Last year she froze two

For-profit loan forgiveness program could see major cut                    Page 3 of 7

Obama-era rules that were meant to put additional checks on for-profits. Critics point to the Trump administration's ties with the for-profit sector and accuse the department of protecting industry interests, but DeVos says the Obama-era rules were too broad and could be misused at taxpayers' expense.

Eileen Connor, a litigator at Harvard University's Project on Predatory Student Lending, which has represented hundreds of defrauded Corinthian students, criticized the projections.

"I think that is terrible. It's another example of the Department of Education picking the side of fraudulent schools and not doing right by those who have been hurt by them," Connor said. "And we have every intention of channeling the department's action in this regard."



Rick Hess, director of education policy at the conservative American Enterprise Institute, praised the program as defending the interests of taxpayers.

"If I borrow money and I go to a college in which I don't get a good education or don't receive a diploma, should any of that responsibility lie with me?" Hess said. "What I see here is the department trying to responsibly determine when individuals are defrauded and when they should be responsible for the funds they borrowed."

When announcing the partial relief program, DeVos said,
"No fraud is acceptable, and students deserve relief if the
school they attended acted dishonestly." But she added
that the process also "protects taxpayers from being
forced to shoulder massive costs that may be unjustified."

———

Follow Maria Danilova on Twitter at
https://twitter.com/m_education_ap

## More From AP                                    by Taboola

**Body of wife of Nobel-winning professor found
at landfill**

**Cops: Man got girl out of school 10 times; now
both missing**

**DeVos gets cold shoulder from White House
after interviews**

**Prosecutor: After boy, 8, shot sister, mom went
back to work**

## Ad Content                      Sponsored Links by Taboola

**3 Ways Your Dog Asks For Help**
Dr. Marty

**Massachusetts Launches No Cost Solar Program**
Energy Bill Cruncher Solar Quotes

**This Photo Is Not Edited. Look Closer**

# EXHIBIT 31



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE GENERAL COUNSEL

## MEMORANDUM

DATE:    February 20, 2001

TO:      Dan Hayward, Director, Student Channel Repayment,
         Student Financial Assistance

FROM:    Vanessa Santos, General Attorney
         Division of Postsecondary Education

SUBJECT: Interstate Business College; ███████████ Defense to Repayment
         of her Direct Loans

**INTRODUCTION:** This memorandum is a follow-up to my memorandum dated February 6, 2000 with regard to attorney Dale Craft's 25 clients' defenses to repayment of their Direct Loans pursuant to 34 C.F.R. §685.206(c). In my February 6th memo, I indicated that I did not have enough information on the student, ███████████, to evaluate her claim. However, on February 12, 2000 I received a copy of a Stipulation for Entry of Judgment resolving Ms. ███████████ suit against IBC. After reviewing the stipulation, I have determined that Ms. ███████████ has adequately established that IBC violated North Dakota law for fraud; that IBC's wrongful actions were directly related to her receipt of the Direct Loans and that she has been damaged as a result of IBC's actions in amounts sufficient to offset the full amount due on her Direct loans. I hereby incorporate by reference the Factual Background and Legal Analysis Sections of my February 6th Memorandum and find that Ms. ███████████ claim should be recognized as a defense to repayment of her Direct Loan.

**DISCUSSION:** Ms. ███████████ was a Plaintiff in a separate lawsuit against IBC for personal injuries resulting from IBC's fraudulent conduct with regard to it's Business Management Program (BMP). On February 12, 2001 the parties signed a Stipulation for Entry of Judgement in which IBC admitted to engaging in fraud, as defined under North Dakota law. In the stipulation, the following facts were stipulated to:

1.    That based on the representations by IBC staff, Ms. ███████████ signed an agreement enrolling in the BMP and incurred in excess of $15,428.00 in student loan debt;

2.    That IBC agents and employees negligently made oral and/or written representations which were positive assertions, in a manner not warranted by the

Interstate Business College Memo
In Re: Rebekka Bauer Hill
February 20, 2001
Page 2 of 4

information of the person making it, of that which was not true though the person believed it to be true, for the purpose of inducing Ms. ████████ into contracting with IBC for educational services;

3. That IBC agents represented that Ms. ████████ would be placed in a curriculum designed specifically and exclusively for persons interested in becoming experts in Business Management;

4. That IBC agents represented that the program was taught by experienced instructors who were themselves experts in Business Management;

5. That IBC agents represented that Ms. ████████ would be supplied with computers equipped with the most advanced computerized accounting and business management software;

6. That IBC agents represented that the school had a 90% success rate in placing BMP graduates in-the-field;

7. That IBC agents represented that the program was fully accredited;

8. That IBC's BMP program had not been specifically and exclusively designed for persons interested in becoming experts in business management, that the instructors were not experts in business management, that the computers were not loaded with the most advanced computerized accounting and business management software, that IBC had not experienced a 90% success rate in placing BMP graduates in-the-field, and that the BMP was not fully accredited;

9. That IBC's affirmative misstatements induced Ms. ████████ to enroll in its program and as a direct and proximate result of her reliance on IBC's fraudulent statements of material facts, she sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;

10. That Ms. ████████ should be awarded damages in the amount of three times her enrollment contract, pursuant to NDCC §15-20.4-09, lost wages, books and travel expenses and miscellaneous expenses.

As in the other cases discussed in my previous memorandum, the facts in this suit were conclusively established by the stipulation agreement between the litigation parties and not by a court or jury.  Also, the damage amount set forth in the stipulation is based solely on an agreement between the litigation parties and the provable facts of Ms. ████████ case.

## LEGAL ANALYSIS:

**(1) IBC's Actions Violate the Applicable State Law:** Since IBC admitted in the Stipulations that it engaged fraud, Ms. ████████ has satisfied the legal analysis necessary to determine that IBC's action violated North Dakota law.

**(2) Ms. ████████ Relied on IBC's Misrepresentations to Obtain the Direct Loans:** IBC admitted in the Stipulation that Ms. ████████ relied upon the IBC staff's "positive assertions of fact" about the Business Management program and based on these assertions was induced into

Interstate Business College Memo
In Re: ████████
February 20, 2001
Page 3 of 4

enrolling in the program and incurring student loan debt. Thus, pursuant to IBC's admissions and the Stipulation, Ms. ████████ has proven that IBC's wrongful conduct was directly related to her enrollment in IBC and her receipt of the Direct Loans.

### (3) Damages:

### (a) Ms. ████████ was damaged as a result of IBC's Fraud

Ms. ████████ obtained Direct loans to pay for IBC's Business Management program. The stipulated facts from this lawsuit established that if she had completed the BMP program, her degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) the program was not designed to make the students experts in business management, the computer programs were not the most advanced and the staff were not experts in business management, and (3) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, she was damaged because she incurred a debt to pay tuition for an education that has no value.

### (b) Amount of Damages

Pursuant to the Stipulation, the damages owed to Ms. ████████ has been quantified as being three times her enrollment contract, plus lost wages, books, travel expenses and miscellaneous school expenses. Thus, the damage awards should be used to offset Ms. ████████ loan balance that is due and owing to Education, notwithstanding unpaid, accrued interest. Thus, her loan obligation is fully offset by the amount of her damages against IBC.

**CONCLUSION:** Based on the foregoing, I believe that Ms. ████████ has adequately established that: (1) IBC engaged in negligent misrepresentation which is a valid cause of action under North Dakota state law, (2) IBC's actions had a direct connection to her receipt of the Direct loans, and (3) that she was damaged by IBC's misrepresentations in the amount of her Direct Loans. I believe that Ms. ████████ claim should be recognized as a defense to repayment of her Direct loans only. Further, we recommend that Ms. ████████ be relieved of her obligation to repay her Direct loans, provided, however, that the allegations that she has asserted against IBC are not later proven to be false. If it is proven that she fabricated her assertions against IBC, her Direct Loan obligation should be immediately reinstated in the amount due and owing at the time relief was provided to her pursuant to the recommendation in this memorandum.

I have attached to this Memorandum a draft copy of a letter to Mr. Craft. I recommend that this letter or a similar one be sent to him with regard to his clients' loan obligations. If you have any questions or concerns about the contents of this memo or its conclusion, please feel free to contact me at (202) 401-6007.

Exhibits/Attachments

Interstate Business College Memo
In Re: ███████████
February 20, 2001
Page 4 of 4


cc: Rosa Wright, Direct Loan Program
   Adam Evans, AWG Branch Chief
   Debra Wiley, OSFA Ombudsman
   Naomi Randolph, Closed Schools



# UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE OMBUDSMAN
### OFFICE OF STUDENT FINANCIAL ASSISTANCE

February 20, 2001

Dale J. Craft, Esq.
1111 Westrac Drive, Suite 108
P.O. Box 29
Fargo, North Dakota 58107-0029

    Re: Defense to Repayment of Direct Loan Debt
       Student Name: ███████████

Dear Mr. Craft:

I am in receipt of your request, on behalf of your client, ██████████████ to recognize her defense to repayment of her Direct loans, pursuant to 34 C.F.R. §685.206(c). In conjunction with our legal counsel, the officials in the Direct Loan program have reviewed the specific facts of Ms. ██████████ case, the materials you have provided, and the current law in North Dakota. After careful consideration of her specific situation, we have determined that Ms. ████████ has adequately established a sufficient cause of action against IBC for fraud under North Dakota law. As a result, she will be relieved of her obligation to repay her Direct Loans provided, however, that it is not later proven that her allegations against IBC were false. If, at some point in the future, it is proven that her allegations against IBC were untrue, her Direct Loan obligation will be reinstated retroactive from the date she was relieved of that obligation.

A copy of this letter will be forwarded to the appropriate official at the Direct Loan office to credit your clients' accounts. If you have any further questions or comments, please feel free to contact me, toll free, at (202) 205-2672.

          Sincerely,

          Dan Hayward
          Director, Student Channel Repayment
          Student Financial Assistance

Interstate Business College Memo
In Re: ███████████
February 20, 2001
Page 3 of 4

enrolling in the program and incurring student loan debt. Thus, pursuant to IBC's admissions and the Stipulation, Ms. █████████ has proven that IBC's wrongful conduct was directly related to her enrollment in IBC and her receipt of the Direct Loans.

### (3) Damages:

(a)  **Ms. ███████ was damaged as a result of IBC's Fraud**

Ms. ██████ obtained Direct loans to pay for IBC's Business Management program. The stipulated facts from this lawsuit established that if she had completed the BMP program, her degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) the program was not designed to make the students experts in business management, the computer programs were not the most advanced and the staff were not experts in business management, and (3) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, she was damaged because she incurred a debt to pay tuition for an education that has no value.

### (b)  Amount of Damages

Pursuant to the Stipulation, the damages owed to Ms. ████████ has been quantified as being three times her enrollment contract, plus lost wages, books, travel expenses and miscellaneous school expenses. Thus, the damage awards should be used to offset Ms. █████████ loan balance that is due and owing to Education, notwithstanding unpaid, accrued interest. Thus, her loan obligation is fully offset by the amount of her damages against IBC.

**CONCLUSION:** Based on the foregoing, I believe that Ms. ████████ has adequately established that: (1) IBC engaged in negligent misrepresentation which is a valid cause of action under North Dakota state law, (2) IBC's actions had a direct connection to her receipt of the Direct loans, and (3) that she was damaged by IBC's misrepresentations in the amount of her Direct Loans. I believe that Ms. ████████ claim should be recognized as a defense to repayment of her Direct loans only. Further, we recommend that Ms. ████████ be relieved of her obligation to repay her Direct loans, provided, however, that the allegations that she has asserted against IBC are not later proven to be false. If it is proven that she fabricated her assertions against IBC, her Direct Loan obligation should be immediately reinstated in the amount due and owing at the time relief was provided to her pursuant to the recommendation in this memorandum.

I have attached to this Memorandum a draft copy of a letter to Mr. Craft. I recommend that this letter or a similar one be sent to him with regard to his clients' loan obligations. If you have any questions or concerns about the contents of this memo or its conclusion, please feel free to contact me at (202) 401-6007.

Exhibits/Attachments

# EXHIBIT 32

DeVos: Borrower-Defense Rule Offered 'Free Money'                    Page 1 of 2



(https://www.insidehighered.com)



# DeVos: Borrower-Defense Rule Offered 'Free Money'

Submitted by Andrew Kreighbaum on September 26, 2017 - 3:00am

Education Secretary Betsy DeVos's comments that Obama administration regulations written to protect student borrowers entitled anyone who sought relief to "free money" are drawing fire.

The so-called borrower-defense rule was set to take effect July 1. But DeVos in June said she would block the rule [1] and pursue a rewrite through a bureaucratic process known as negotiated rule making.

Speaking at the Mackinac Republican Leadership Conference Friday, DeVos defended her actions and said the rule was "rushed" through without review by Congress, according to reporting on her remarks [2] by *The Detroit News.* She also said the rule could have cost the federal government $17 billion -- a reference to estimated costs over 10 years. "While students should have protections from predatory practices, schools and taxpayers should also be treated fairly as well," she said. "Under the previous rules, all one had to do was raise his or her hands to be entitled to so-called free money."

Democratic attorneys general from 18 states and the District of Columbia have sued [3] DeVos, seeking to have the Obama-era rule enforced. Meanwhile, more than 65,000 borrower-defense claims made under previously existing regulations are pending review. But a Department of Education official told Democratic lawmakers in July [4] that no claims had been reviewed since the beginning of the Trump administration.

Ben Miller, the senior director for postsecondary education at the Center for American Progress, said the comments from the secretary showed an inability to express basic levels of empathy for suffering borrowers. "Even a cursory review of Obama policies on this matter would reveal a structured, lengthy process for forgiveness," he said.

Senator Patty Murray, the ranking Democrat on the Senate education committee, said in a statement that it was telling that DeVos would blame students who were victims of fraud over for-profit colleges. "Secretary DeVos needs to stop listening to the for-profit and corporate executives she hired at the Department of Education and start providing the legally required relief to the students who have been cheated out of their education and savings," Murray said.

**Ad keywords:**
forprofit [5]

DeVos: Borrower-Defense Rule Offered 'Free Money'                                    Page 2 of 2

<u>institutionalfinance</u> [6]
<u>studentaid</u> [7]
**Is this diversity newsletter?:**
**Hide by line?:**
**Is this Career Advice newsletter?:**

**Source URL:** <u>https://www.insidehighered.com/quicktakes/2017/09/26/devos-borrower-defense-rule-offered-%</u>
<u>E2%80%98free-money%E2%80%99?width=775&height=500&iframe=true</u>

**Links:**
[1] https://www.insidehighered.com/news/2017/06/15/education-department-hit-pause-two-primary-obama-regulations-aimed-profits
[2] http://www.detroitnews.com/story/news/politics/2017/09/22/mackinac-devos-romney-mcdaniel/105897636/
[3] https://www.insidehighered.com/quicktakes/2017/07/07/attorneys-general-sue-devos
[4] https://www.insidehighered.com/quicktakes/2017/07/27/trump-administration-has-approved-no-borrower-defense-claims
[5] https://www.insidehighered.com/ad-keywords/forprofit
[6] https://www.insidehighered.com/ad-keywords/institutionalfinance
[7] https://www.insidehighered.com/ad-keywords/studentaid

# EXHIBIT 33



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE GENERAL COUNSEL

## MEMORANDUM

**DATE:**        **February 6, 2001**

**TO:**          **Dan Hayward, Director, Student Channel Repayment,**
                 **Student Financial Assistance**

**FROM:**        **Vanessa Santos, General Attorney**
                 **Division of Postsecondary Education**

**SUBJECT:**     **Interstate Business College, ND Former Students' Defense to**
                 **Repayment of their Direct Loans**

**INTRODUCTION:** This memorandum is written in response to correspondence from attorney Dale Craft on behalf of his 25 clients who were former Interstate Business College ("IBC") students. He is requesting that we recognize his clients' defense to repayment of their Direct Loans pursuant to 34 C.F.R. §685.206(c). The 25 students include:[1]



1.
2.
3.
4.
5.
6.
7.
8.
9.
10.
11.
12.
13.
14.
15.
16.
17.

---

[1] Two of the 25 "students", Linda Barth and Vicki Bergman, are actually parents who obtained PLUS loans for their daughters, Christy Tursso and Dawn Weaver respectively, to attend IBC. All references to "the students" will include these two parents.

Interstate Business College Memo
February 6, 2001
Page 2 of 11

18.
19.
20.
21.
22.
23.
24.
25.



These students' are presenting the same defense to repayment of their Direct Loans as ████
██ and ████████████did, which was addressed in my October 4, 2000 Memorandum.
Attached as Exhibit A.  As Ms. ████ and Ms.████████did, these 25 students contend that IBC's
false representations, which induced them to enroll into IBC and obtain Direct Loans, constitute
a defense sufficient to avoid repayment of their Direct Loans.  Under the Direct Loan
Regulations, a borrower can avoid repayment on the loan if he or she "asserts as a defense
against repayment, any act or omission of the school attended by the student that would give rise
to a cause of action against the school under applicable State law." 34 C.F.R. §685.206(c).  The
Department will only recognize such claims as a defense against repayment if the school's act or
omission has a clear, direct relationship to receipt or distribution of the loan or to the school's
provision of educational services for which the loan was provided. 60 Fed. Reg. 37768 (Notice
of Interpretation, July 21, 1995).  Thus, these 25 students have to prove three elements in order
for their claims to be recognized: (1) that IBC engaged in wrongful conduct and that such
conduct gives rise to a legal cause of action under State law (in this case North Dakota law); (2)
that IBC's actions were directly related to the receipt or distribution of their Direct Loans; and
(3) that they were damaged as a result of IBC's actions.

In evaluating the students' claim, I reviewed the following: (1) my October 4, 2000
memorandum and underlying documentation; (2) letters from Mr. Craft wherein he alleges that
IBC induced the students into enrolling into their educational programs and obtain Direct Loans
through material misrepresentations and, as a result of IBC's wrongful conduct, the students
should be relieved of their obligation to repay their Direct loans; (3) Stipulation agreements,
which ended four different lawsuits brought by former students against IBC; (4) the North
Dakota statutes and case law; and (5) Education's relevant regulations and interpretation of those
regulations.

After careful consideration of these documents and the specific facts of these students' cases, all
of the 25 students, [2] except████████████ have adequately established sufficient causes of
action against IBC under North Dakota law for negligent misrepresentation.  Further, these 24
students have established that IBC's wrongful actions were directly related to their receipt of the
Direct Loans and that they have been damaged as a result of IBC's actions in amounts sufficient
to offset the full amounts due on their Direct loans.  Since████████████ suit against IBC

---

[2] According to the records I received from the Direct Loan Program, ████████████does not have any Direct
Loans.  Therefore, this Memo, and the decision herein, does not apply to her.  If it is determined that she does have
Direct Loans that are due and owing, given the fact that IBC admitted to engaging in negligent misrepresentation
with regard to her enrollment, she should be relieved of her obligation to repay her Direct loans.

Interstate Business College Memo
February 6, 2001
Page 3 of 11

has not yet been reduced to a judgment or a Stipulation, I am unable to make a recommendation on her defense to repayment. If, at some point in the future, IBC stipulates or it is determined that IBC engaged in fraud or negligent misrepresentation, her claim will be reviewed at that time.

**DISCUSSION: Factual Background:** IBC closed on January 22, 1998. The owner of the school, Susan Jensen, later pled guilty to failing to return to the Department unearned financial aid for 278 students who either withdrew or stopped attending before they completed their educational program between February 16, 1996 and November 20, 1997. Ms. Jensen was sentenced to 18 months in prison and was ordered to pay $914,000.00 in restitution to Education. As a result of IBC's closure, Education gave those students who qualified a "Closed School Discharge" or a credit for the unpaid refunds owed by IBC as a partial defense to repayment. The following students received a credit for unpaid refunds: ███████ ($278.75) and ██ ██████ ($1,200.24). The following students received a refund for their Direct Loans: ██████ ($2,741.00), ████████ ($3,472.00), and ████████ ($4,017.00).[3] We do not have any information about whether the remaining students were among the ones who received a credit or an unpaid refund, however their names do not appear on the Inspector General's list of students who received a refund or credit balance. Regardless, all of the students are claiming that they should not have to pay the balance on their student loan accounts.

**(1)** ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████: These seventeen students were part of a lawsuit against IBC, along with 23 other former students (hereinafter "40 plaintiff lawsuit"). In January 2000, the parties settled the suit and stipulated, in a settlement agreement adopted by the plaintiffs and IBC through their attorney, to the following facts which established a pattern of negligent misrepresentation under North Dakota law:

1. that IBC misrepresented the number of graduates who had jobs "in their field" and that they applied that term loosely;
2. the Accrediting Counsel for Independent Colleges and Schools defines the term "in the field" as requiring "a direct use of the skills taught in the program." Also, ACICS defines "related field" as employment as a position that requires "an indirect use of the skills taught in the program";
3. that based on the representations by the enrollment counselor, the Plaintiffs signed an agreement enrolling in the Medical Administrative Assistant program (MAA) and incurring thousands of dollars in loan debt;
4. that the program was not accredited by any accrediting agency;
5. that the graduates of this program were ineligible to take the certification exam as a Medical Assistant until they had one year of full-time work experience in a position "in their field";

---

[3] According to the Inspector General's audit report, Ms. Bauer Hill did receive a $1,531.00 refund.

Interstate Business College Memo
February 6, 2001
Page 4 of 11

6.  that graduation with a degree as an MAA, without being certified, gives
    candidates no greater chance of employment or pay grade, than would be
    available without the degree;

7.  that it was critical that the training received at IBC enable plaintiffs to secure
    employment qualifying graduates for the exam;

8.  that IBC's past employment placement was lower than stated during the
    enrollment interview;

9.  that the enrollment counselor had no personal knowledge of the placement
    statistics or of the meaning of "in the field" as defined by the accrediting agencies
    nor did she intend to deceive the students with her misstatements;

10. that there was no evidence that Susan Jensen personally participated in the
    preparation of the enrollment materials or that she had any intent to deceive;

11. that the Plaintiffs should be awarded damages in the amount of three times their
    enrollment contract, pursuant to NDCC §15-20.4-09[4], lost wages, books and
    travel expenses and miscellaneous expenses;

12. that the lawsuit be dismissed.

The court entered the Stipulation and issued judgments in favor of the plaintiffs, thus, concluding
the lawsuit.[5]  The facts in this suit were conclusively established by the stipulation agreement
between the litigation parties and not by a court or jury.  However, because IBC stipulated to
engaging in negligent misrepresentation in this lawsuit and the court issued judgments against it
as a result, IBC cannot argue in any future lawsuits that it *did not* engage in negligent
misrepresentation (under the legal theory of collateral estoppel).  Thus, IBC is bound by its
admission of negligent misrepresentation in all future lawsuits.

Further, it should be noted that the damage amount set forth in the Stipulation is based solely on
an agreement between the litigation parties and the provable facts of each plaintiff's case.  In the
Stipulation, IBC admitted to engaging in negligent misrepresentation.  Yet, IBC agreed to give
the Plaintiffs treble damages pursuant to NDCC15-20.4-09, which is a damage provision for
defendants who engage in fraud.  *See* Footnote 4.  Fraud requires a finding of an *intent to
deceive.*  IBC did not admit to such intent and specifically included in the Stipulation that neither
Susan Jensen nor the IBC recruitment staff intended to deceive the students.  Perhaps during the
negotiations, the plaintiffs would only agree to settle if they received treble damages or the
amount of damages that they would have received had they prevailed on a fraud claim.
Regardless, there is an inconsistency between IBC's stipulation to negligent misrepresentation
and the amount of the damage awards, which would only be warranted if IBC had stipulated to

---

[4] North Dakota Century Code, section 15-20.4-09 states: Any person defrauded by any advertisement or circular
issued by a postsecondary educational institution, or by any person who sells textbooks to the institution or to the
pupils thereof, may recover from such institution or person three times the amount paid.

[5] According to Mr. Craft, ▌▌▌▌▌▌▌▌, ▌▌▌▌▌▌▌, ▌▌▌▌▌▌▌ and ▌▌▌▌ did not have their
claims reduced to judgment because of other pending claims in their individual cases against IBC. However, since
IBC admitted to engaging in negligent misrepresentation and inducing these four students into enrolling into the MA
program and because IBC agreed to pay them damages based on the Stipulation, these four students will be
considered in the same category as their co-plaintiffs for purposes of this Memo.

Interstate Business College Memo
February 6, 2001
Page 5 of 11

engaging in fraud. Therefore, given the discrepancy, the damage figure from this lawsuit will not be used in our analysis of other student's claims that were not part of this lawsuit.

(2)██████████████: These two students were Plaintiffs in a separate lawsuit against IBC for allegations of fraud with regard to IBC's Computer Aided Drafting (CAD) program. On January 10, 2000 the parties signed a Stipulation for Entry of Judgement in which IBC admitted to engaging in actual fraud, as defined under North Dakota law. In the stipulation, the following facts were stipulated to:

1. That based on the representations by the enrollment counselor, Ms.████and Mr.████ signed an agreement enrolling in the CAD program and incurred in excess of $15,428.00 each in debt;
2. That IBC agents and employees negligently made oral and/or written representations which were positive assertions, in a manner not warranted by the information of the person making it, of that which was not true though the person believed it to be true, for the purpose of inducing Ms.████ and Mr.████into contracting with IBC for educational services;
3. That IBC agents represented that Ms.████and Mr.████ would be placed in a curriculum designed specifically and exclusively for persons interested in becoming experts in CAD;
4. That IBC agents represented that the program was taught by experienced instructors who were themselves experts in CAD;
5. That IBC agents represented that Ms.████ and Mr.████ would be supplied with computers equipped with the most advanced CAD software;
6. That IBC agents represented that the school had a 90% success rate in placing CAD graduates in-the-field;
7. That IBC agents represented that the program was fully accredited;
8. That IBC's CAD program had not been specifically and exclusively designed for persons interested in becoming experts in CAD, that the instructors were not experts in CAD, that the computers were not loaded with the most advanced CAD software, that IBC had not experienced a 90% success rate in placing CAD graduates in-the-field, and that the CAD program was not fully accredited;
9. That IBC's affirmative misstatements induced Ms.████ and Mr.████to enroll in their CAD program and as a direct and proximate result of their reliance on IBC's fraudulent statements of material facts, they sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;
10. That Ms.████ and Mr.████should each be awarded damages in the amount of three times their enrollment contracts, pursuant to NDCC §15-20.4-09, lost wages, books and travel expenses and miscellaneous expenses.

On June 14, 2000 the North Dakota court entered the Stipulation for Entry of Judgment in favor of Ms.████and Mr.████ thus, concluding the lawsuit. As in the 40-plaintiff suit against IBC, the facts in this suit were conclusively established by the stipulation agreement between the litigation parties and not by a court or jury. Also, as in the 40-plaintiff lawsuit, it should be

Interstate Business College Memo
February 6, 2001
Page 6 of 11

noted that the damage amount set forth in the stipulation is based solely on an agreement between the litigation parties and the provable facts of Ms. Glines and Mr. Engle's case.

(3)█████████████████████: These two students were Plaintiffs in a separate lawsuit against IBC for allegations of fraud with regard to IBC's Computer Information Specialist (CIS) program. The parties signed a Stipulation for Entry of Judgement in which IBC admitted to engaging in actual fraud, as defined under North Dakota law. IBC admitted:

1. That it made "positive assertions, in a manner not warranted by the information of the person making it, of that which was not true through the person believed the representation to be true, for the purpose of inducing the Plaintiffs into contracting with IBC for educational services";

2. That IBC's staff made material misrepresentations that were not true; that the CIS program was specifically and exclusively designed for persons interested in becoming experts in CIS, that the instructors were experts in CIS, that the computers were loaded with the most advanced CIS software, that IBC had experienced a 90% success rate in placing CIS graduates in-the-field, and that the CIS program was fully accredited;

3. That IBC's affirmative misstatements induced Ms.█████ and Ms.██████████ to enroll in the CIS program and as a direct and proximate result of their reliance on IBC's fraudulent statements of material facts, they sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;

4. That IBC would pay Plaintiffs money damages, which would include the amount of their enrollment contract, trebled, pursuant to NDCC §15-20.4-09, lost wages books and travel expenses and miscellaneous expenses.

The stipulation was reduced to a judgment on June 14, 2000 in favor of Ms.█████ and against IBC in the amount of $52,200.00, inclusive of costs and disbursements. Judgment was also entered in favor of Ms.████████ and against IBC in the amount of $52,200.00, inclusive of costs and disbursements. As in the 40-plaintiff suit against IBC, the facts in this suit were conclusively established by the stipulation agreement between the litigation parties and not by a court or jury. Also, as in the 40-plaintiff lawsuit, it should be noted that the damage amount set forth in the stipulation is based solely on an agreement between the litigation parties and the provable facts of Ms.█████ and Ms.████████ case.

(4)████████████: Ms.██████ was a Plaintiff in her own lawsuit against IBC for allegations of fraud with regard to IBC's Medical Transcriptionist (MT) program. She and a representative from IBC signed a Stipulation for Entry of Judgement in which IBC admitted to engaging in actual fraud, as defined under North Dakota law. IBC admitted:

1. That it made "positive assertions, in a manner not warranted by the information of the person making it, of that which was not true through the person believed the

Interstate Business College Memo
February 6, 2001
Page 7 of 11

representation to be true, for the purpose of inducing Plaintiff into contracting with IBC for educational services";

2. That IBC's staff had made material misrepresentations that were not true; that the MT program had been specifically and exclusively designed for persons interested in becoming experts in MT, that the instructors were experts in MT, that the computers were loaded with the most advanced MT software, that IBC had experienced a 90% success rate in placing MT graduates in-the-field, and that the MT program was fully accredited;

3. That IBC's affirmative misstatements induced Ms. ▮▮▮ to enroll in the MT program and as a direct and proximate result of her reliance on IBC's fraudulent statements of material facts, she sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;

4. That IBC would pay Ms. ▮▮▮ money damages, which would include the amount of her enrollment contract, trebled, pursuant to NDCC §15-20.4-09, lost wages, books and travel expenses and miscellaneous expenses.

The stipulation was reduced to a judgment on June 14, 2000 in favor of Ms. ▮▮▮ and against IBC in the amount of $23,175.00 inclusive of costs and disbursements. As in the other lawsuits against IBC, the facts in this suit were conclusively established by the stipulation agreement between the litigation parties and not by a court or jury. Also, as in the other lawsuits, it should be noted that the damage amount set forth in the stipulation is based solely on an agreement between the litigation parties and the provable facts of Ms. ▮▮▮ case.

(5) ▮▮▮ and ▮▮▮: According to correspondence from Mr. Craft and NSLDS, in 1996 these two women obtained PLUS loans for their daughters to attend IBC. ▮▮▮ daughter is ▮▮▮ and ▮▮▮ daughter is ▮▮▮. Both Ms. ▮▮▮ and Ms. ▮▮▮ were part of the 40-plaintiff suit against IBC. According to Mr. Craft, after obtaining the judgment in the 40-plaintiff lawsuit, he learned that these two women had PLUS loans for two of the plaintiffs in that suit. He argues that Ms. ▮▮▮ and Ms. ▮▮▮ claims arise out of the misrepresentations made to their daughters and thus, their obligations on the PLUS loans should be relieved. Ms. ▮▮▮ obtained a PLUS loan for her daughter totaling $8,350.00 and Ms. ▮▮▮ obtained a PLUS loan for her daughter totaling $4,800.00.

## LEGAL ANALYSIS:

(1) **IBC's Actions Violate the Applicable State Law**: In evaluating a claim for a defense against repayment of a Direct loan, one must look to the law of the state where the alleged wrongful act or omission occurred. In this case, IBC's alleged wrongful actions occurred in North Dakota. Thus, we must evaluate these 24 students' claims under North Dakota law. Since IBC admitted in the Stipulations of four lawsuits referenced above, that it engaged either in negligent misrepresentation or actual fraud, the students in those lawsuits have satisfied the legal analysis necessary to determine that IBC's action violated North Dakota law. However, Ms.

Interstate Business College Memo
February 6, 2001
Page 9 of 11

**(a)  The students were damaged as a result of IBC's Negligent Misrepresentation:**

The students in the 40-plaintiff lawsuit obtained Direct loans to pay for IBC's MA program.  The stipulated facts from this lawsuit established that had these students completed the MA program, their degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) they would have been ineligible for a certificate, (3) they would have had to work for a full year in the medical assistant field to be able to sit for the certification exam, and (4) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, the students were damaged because they incurred debts to pay tuition for an education that has no value.

Likewise, Ms. ████ and Mr. ████ obtained Direct Loans to pay for IBC's CAD program.  The Stipulation of Judgment established that had they completed the CAD program, their degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) the program was not designed to make the students experts in CAD, the computer software was not the most advanced and the staff were not experts in CAD, and (3) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms. ████ and Mr. ████ were damaged because they incurred debts to pay tuition for an education that has no value.

Ms. ████ and Ms. ████ obtained Direct Loans to pay for IBC's CIS program.  The Stipulation of Judgment established that had they completed the CIS program, their degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) the program was not designed to make the students experts in CIS, the computer software was not the most advanced and the staff were not experts in CIS, and (3) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms. ████ and Ms. ████ were damaged because they incurred debts to pay tuition for an education that has no value.

Similarly, Ms. ████ obtained Direct Loans to pay for IBC's MT program.  The Stipulation of Judgment established that had she completed the MT program, her degree or education from IBC would have no value given the fact that: (1) the program was unaccredited, (2) the program was not designed to make the students experts in MT, the computer software was not the most advanced and the staff were not experts in MT, and (3) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms. ████ was damaged because she incurred debts to pay tuition for an education that has no value.

Ms. ████ and Ms. ████ both obtained PLUS loans for their daughters to be trained as ████ Assistants.  As explained in the first paragraph of this section, Ms. ████ and Ms. ████ degrees from IBC would have been worthless given that (1) the program was unaccredited, (2) they would have been ineligible for a certificate, (3) they would have had to work for a full year in the medical assistant field to be able to sit for the certification exam, and (4) the job placement rate for IBC graduates was low, therefore employment was not guaranteed. Thus, Ms. ████ and Ms. ████ were damaged in that they obtained PLUS loans to pay for their daughters' tuition for an education that has no value.

Interstate Business College Memo
February 6, 2001
Page 10 of 11

**(b) Amount of Damages**

Pursuant to the Stipulations filed in all four of the lawsuits against IBC, the damages owed to these students has been quantified as being three times their enrollment contract, plus lost wages, books, travel expenses and miscellaneous school expenses. However, as stated previously, the amount of the damages awarded in the lawsuits was governed by an agreement of the parties, not by the court or a jury. Thus, the damage awards and the formula used in these lawsuits will not be used as a measure of damages for students who were not parties to the suit.

To quantify Ms. ▆▆ and Ms. ▆▆▆▆▆ damages, we have to determine the amount of damages they could recover from IBC under state law. The recoverable damages from IBC must then be used to offset their loan obligations. Under North Dakota law, a person who has been misled by another is entitled to damages under a tort claim theory. Under this theory, a person is entitled to receive damages in an amount that will compensate her for all of her losses directly caused by the misrepresentation, whether the damages could have been anticipated or not, absent exceptional circumstances. NDCC §32-03-20. *See also* Delzer v. United Bank, 559 N.W.2d 531 (N.D. 1997)(case involved a contract to loan money to the Dezler's to operate their ranch. The loan was to be paid out in two installments. The Delzers pledged all of their assets and ranch equipment as collateral, but the Bank never advanced the second installment of the loan. The Delzers lost all of their collateral and their ranch. During the trial, the evidence revealed that the Bank never intended to make the second installment to the Delzers. The court held that the Bank's actions were deceitful and that the ▆▆▆ damages were foreseeable. The court awarded the Delzer's a judgment for $1,076,000, twice the amount of their compensatory or actual damages).

Here, both Ms. ▆▆ and Ms. ▆▆▆▆ would be entitled to receive damages from IBC in an amount that would compensate them for all the losses directly caused by IBC's negligent misrepresentations to their daughters. Given the fact that Ms. ▆▆ and Ms. ▆▆▆▆ education from IBC has virtually no value, the amount of their damages is at least the amount of tuition they paid to obtain that education. Presumably, the total amount of the PLUS loans was used to pay for a portion of Ms. ▆▆ and Ms. ▆▆▆ tuition at IBC. Thus, Ms. ▆▆▆ damages equal the principal amount of the PLUS loan she obtained to pay for her daughter's tuition minus any credit given, or $8,350.00. Likewise, Ms. ▆▆▆▆ damages equal the principal amount of the PLUS Loans she obtained to pay for her daughter's tuition, or $4,521.25. These amounts are then used to offset the loan balances due and owing to Education on Ms. ▆▆ and Ms. ▆▆▆ student loan accounts, notwithstanding unpaid, accrued interest. Therefore, both Ms. ▆▆ and Ms. ▆▆▆▆ PLUS loan obligations are fully offset by the amount of their damages against IBC.

For the students in the lawsuits, there damage awards are also used to offset the loan balances due and owing to Education, notwithstanding unpaid, accrued interest. Thus, their loan obligations are fully offset by the amount of their damages against IBC.

**CONCLUSION:** Based on the foregoing, we believe that 24 students have adequately established that: (1) IBC engaged in negligent misrepresentation which is a valid cause of action under North Dakota state law, (2) IBC's actions had a direct connection to their receipt of the

Interstate Business College Memo
February 6, 2001
Page 11 of 11

Direct loans, and  (3) that they were damaged by IBC's misrepresentations in the amount of their
Direct Loans.  We believe that these students' claims should be recognized as a defense to
collection of their Direct loans only.  Further, we recommend that these students be relieved of
their obligation to repay their Direct loans, provided, however, that the allegations that they have
asserted against IBC are not later proven to be false.  If it is proven that these students fabricated
their assertions against IBC, their Direct Loan obligations should be immediately reinstated in
the amount due and owing at the time relief was provided to them pursuant to the
recommendation in this memorandum.

I have attached to this Memorandum a draft copy of a letter to Mr. Craft in response to his
inquires.  I recommend that this letter or a similar one be sent to him with regard to his clients'
loan obligations.

If you have any questions or concerns about the contents of this memo or its conclusion, please
feel free to contact me at (202) 401-6007.


Exhibits/Attachments

cc: Rosa Wright, Direct Loan Program
    Adam Evans, AWG Branch Chief
    Debra Wiley, OSFA Ombudsman
    Naomi Randolph, Closed Schools



### UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE OMBUDSMAN
OFFICE OF STUDENT FINANCIAL ASSISTANCE

February 6, 2001

Dale J. Craft, Esq.
1111 Westrac Drive, Suite 108
P.O. Box 29
Fargo, North Dakota 58107-0029

Re:    Defense to Repayment of Direct Loan Debt  on behalf of:

███████████████████████████████████

Dear Mr. Craft:

I am in receipt of your requests, on behalf of your 25 clients, to recognize their defense to repayment of their Direct loans, pursuant to 34 C.F.R. §685.206(c).  In conjunction with our legal counsel, the officials in the Direct Loan program have reviewed the specific facts of your clients' cases, the materials you have provided, and the current law in North Dakota.  After careful consideration of each student's specific situation, we have determined that all 25 of your clients, except ███████████████ have adequately established a sufficient cause of action against IBC for negligent misrepresentation under North Dakota law.  As a result, they will be relieved of their obligations to repay their Direct Loans provided, however, that it is not later proven that their allegations against IBC were false.  If, at some point in the future, it is proven that their allegations against IBC were untrue, their Direct Loan obligation will be reinstated retroactive from the date they were relieved of that obligation.  At this  time, we are unable to make a determination about Ms. ████ claim given the posture of her suit against IBC.  If her suit against IBC is resolved in her favor, we will be reconsider her defense  to repayment and make a final determination.

A copy of this letter will be forwarded to the appropriate official at the Direct Loan office to credit your clients' accounts.  If you have any further questions or comments, please feel free to contact me, toll free, at (202) 205-2672.

Sincerely,

Dan Hayward
Director, Student Channel Repayment
Student Financial Assistance

# EXHIBIT 34



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE GENERAL COUNSEL

## MEMORANDUM

TO:    Dan Hayward
      Student Channel Repayment
      Federal Student Aid

FROM:   Vanessa A. Santos
      Division of Postsecondary Education

DATE:    February 11, 2003

SUBJECT:  Interstate Business College, ND Former Students' Defense to Repayment
      of their Direct Loans

## INTRODUCTION:

This memorandum addresses correspondence dated February 20, 2002 from attorney Dale Craft on behalf of his clients, former Interstate Business College ("IBC") students. He requests that we recognize his clients' claims as a complete defense to repayment of their Direct Loans pursuant to 34 C.F.R. §685.206(c). Like Craft's other clients,[1] the 58 borrowers listed in Attachment A to this memorandum[2] contend that IBC's false representations induced them to enroll into IBC and obtain Direct Loans and constitute fraud under North Dakota law, which permits them to avoid repayment of their Direct Loans under 34 C.F.R. §685.206(c).

Direct Loan regulations provide that a borrower may avoid repayment on a Direct loan to the extent that he or she "asserts as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. §685.206(c). The Department will only recognize such claims as a defense against repayment if the school's act or omission has a clear, direct relationship to receipt or disbursement of the loan or to the school's provision of educational services for which the loan was provided. 60 Fed. Reg. 37768 (Notice of Interpretation, July 21, 1995). Thus, in order to establish a defense to repayment, these 58 students must prove three elements: (1) that IBC engaged in wrongful conduct that gives rise to a legal cause of action under State law (in this case North Dakota law); (2) that IBC's actions were directly related to the receipt or distribution of their Direct Loans or the provision of educational services paid for with those loans; and (3) that they were in fact injured as a result of IBC's actions, and that those injuries

---

[1] Mr. Craft's previous clients (see my February 2001 memo) as well as ██████ and ██████ (see my October 4, 2000 Memorandum)
[2] Eleven of the 58 are actually parents who obtained PLUS loans for their children. All references to "the students" will include these parents.

*Our mission is to ensure equal access to education and to promote educational excellence throughout the Nation*

Interstate Business College Memo
February 11, 2003
Page 2 of 8

can be measured as a specific damage amount. If the borrowers prove all three elements, the amount of that damage is the amount recognized as a defense to repayment.

In evaluating the borrowers' claims, I reviewed the following: (1) my October 4, 2000 and February 2001 memoranda and underlying documentation; (2) letter from Mr. Craft dated February 20, 2002; (3) the Complaint and Default Judgment from the lawsuit brought by these 58 students against IBC, *Holzer et al. v. Red River Educational Services, Inc.*, Civil Case No. 09-02-C-476, District Court, County of Cass, State of North Dakota; (4) the North Dakota statutes and case law; (5) Education's relevant regulations and interpretation of those regulations; and (6) IBC's prior stipulations of fraud in previous lawsuits.

After careful consideration of these documents and the specific facts of these students' cases, I conclude that all 58 borrowers have adequately established each prong of the three-part test and should be relieved of the full amount of their Direct Loan obligations.

## DISCUSSION:

**Factual Background:** As stated in my previous Memos, IBC closed on January 22, 1998. The owner of the school, ▇▇▇▇▇▇ later pled guilty to failing to return to the Department unearned financial aid for 278 students who either withdrew or stopped attending before they completed their educational program between February 16, 1996 and November 20, 1997. Ms. Jensen was sentenced to 18 months in prison and was ordered to pay $914,000.00 in restitution to Education. As a result of IBC's closure, Education gave those students who qualified a "Closed School Discharge" or a credit for the unpaid refunds owed by IBC as a partial defense to repayment. Of the 58 students involved here, eight received a credit for unpaid refunds.[3]

We do not have any information about whether the remaining students were among the ones who received a credit for an unpaid refund; however their names do not appear on the Inspector General's list of students who were owed a refund or had a credit balance. Regardless, all 58 students now claim that they should not have to pay any remaining balance on their Direct student loan accounts.

**Programs in which claimants were enrolled:** The 58 students involved in the instant case were enrolled in one of the following 9 programs:



[3] ▇▇▇▇▇▇ SSN ▇▇▇▇▇▇ ($1,883.00)
▇▇▇▇▇▇ SSN ▇▇▇▇▇▇ ($506.00)
▇▇▇▇▇▇ SSN ▇▇▇▇▇▇ ($655.00)
▇▇▇▇▇▇ SSN ▇▇▇▇▇▇ ($188.57)
▇▇▇▇▇▇ SSN ▇▇▇▇▇▇ ($3,127.00)
▇▇▇▇▇▇ SSN ▇▇▇▇▇▇ ($791.00)
▇▇▇▇▇▇ SSN ▇▇▇▇▇▇ ($238.68)
▇▇▇▇▇▇ SSN ▇▇▇▇▇▇ ($80.06).

Interstate Business College Memo
February 11, 2003
Page 3 of 8

1. Medical Administrative Assistant Program (MAAP): (30)[4]

2. Business Management Program (BMP): (9)[5]

3. Computer Information Specialist Program (CISP) (1)[6]

4. Computer Travel Business Management Program: (8)[7]

5. Computer Accounting Program: (3)[8]

6. Dental Assistance Program: (1)[9]

7. Administrative Legal Assistant Program: (4)[10]

8. Computer Programming Program: (2)[11]

**Mr. Craft's Prior Litigation with IBC:** Mr. Craft has represented numerous IBC students and/or graduates in their suits against IBC for fraud.[12] IBC stipulated to fraudulent conduct with regard to five of its academic programs: the MAAP, BMP, CISP, the Computer Aided Drafting Program (CADP), and the Medical Transcription Program (MTP). The specific acts which IBC stipulated to committing differ somewhat from case to case, but generally include misrepresentations regarding its placement success, the accreditation status of the program, and whether completion of the IBC program qualified or otherwise equipped the student to gain and



---

[4] ███████ (PLUS loan), ████████████ ███████████████ ███████ (PLUS loan), ████████ (PLUS Loan), ██████████ ████████ (PLUS loan), ██████ (PLUS loan), ███████ ████████████ ██████ (PLUS), ████████ ████████ (PLUS loan), ████████ (PLUS), ██████████ (PLUS),

[5] ████████████████████████████████████ ████████ (PLUS), ███████████ ██.

[6] ██████████████

[7] █████████████████████████████████████████████████████████

[8] ████████████████████████

[9] ███████████

[10] ██████████████████████████████████

[11] ████████████████████

[12] In a telephone call on January 21, 2003, Mr. Craft indicated that he did not have any other clients seeking relief from the Department due to IBC's misconduct. He stated that had retired from the practice of law and that his partner, Gene Doeling, was doing corporate work and was not interested in taking any more of these IBC cases.

Interstate Business College Memo
February 11, 2003
Page 4 of 8

retain employment in the field.   The five cases and the specific stipulations are described in detail in Attachment B.

## LEGAL ANALYSIS:

### 1. Are the Actions Allegedly Taken by IBC Those for Which Applicable State Law Permits a Party to Sue a School for Damages?

The first step in evaluating a claim against a school for a defense against repayment of a Direct loan is determining whether the grievance raised by the borrower describes an injury for which State law would permit the borrower to sue the school for a financial recovery.   To do so, one must look to the law of the state where the alleged wrongful act or omission occurred.   In the instant case, IBC's alleged wrongful actions occurred in North Dakota.   Thus, we must evaluate these 58 students' claims under North Dakota law, in conjunction with IBC's previous admissions of fraud with regard to the MAAP, BMP, CISP, CADP and MTP.

Under the North Dakota Code, §9-03-08, actual fraud "consists of any of the following acts committed by a party to a contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into a contract:

1. The suggestion as a fact of that which is not true by one who does not believe it to be true;
2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true;
3. The suppression of that which is true by one having knowledge or belief of the fact;
4. A promise made without any intention of performing it; or
5. Any other act fitted to deceive."

Under paragraph 2 of this section, North Dakota courts have recognized a statutory claim for relief based on negligent misrepresentation when the misrepresentation is given to induce a person into a contract.   See *Bourgois v. MDU*, 466 N.W.2d 813 (N.D. 1991).   The 58 borrowers claim that IBC made misrepresentations of various kinds, and withheld the truth of other facts, which induced them to enroll in IBC and borrow Direct Loans to finance that enrollment.   The grievance would appear to be one that North Dakota law recognizes as a valid basis for a suit for damages.

### 2. Were IBC' Alleged Actions Directly Related to the Students' Receipt of the Direct Loans or the Provision of Educational Services Financed by those Loans?

The second step is determining whether the cause of action against the school is one related to the receipt of the loan or the provision of services paid for with the loan.   The stipulations in the prior lawsuits help resolve this question.   In the lawsuits referenced above, IBC admitted that the students who were plaintiffs in those cases had relied on the IBC staff's misrepresentations regarding the MAAP, BMP, CISP, CADP, and MTP and based on these assertions were induced into enrolling in the programs and incurring student loan debt.   IBC admitted that its "agents and employees negligently made oral and/or written representations which were positive assertions

... for the purpose of inducing the plaintiff[s] into contracting with IBC for educational services." IBC further admits that the "affirmative misstatements ... induced the plaintiff[s] to enroll in IBC's program and as a result [the plaintiffs] were damaged." Thus, by virtue of IBC's previous admission of fraud, the students in the instant case who were enrolled in the MAAP, BMP, CISP, CADP, and MTP have proven that IBC's actions were directly related to the receipt or distribution of their Direct Loans. With regard to the students in this case who were enrolled in IBC's other programs, in the default judgment the court found that IBC's false assertions of material facts as to the various programs induced the students to enroll into contracts with IBC and to obtain loans. See §C-D of Judgment. Based on the default judgment and IBC's prior admissions, I believe it is reasonable to conclude that these 18 students have shown that IBC's actions were directly related to the receipt or disbursement of their Direct Loans and the provision of services paid for with those loans.

(3)  Damages:

(a) Did the borrowers prove that they were injured as a result of IBC's Negligent Misrepresentations?

The third step in analyzing whether a school-related grievance is in fact a defense to repayment of specific borrowers' Direct Loans is a two-part test of the facts: have the borrowers proven that the offending conduct of the school actually occurred, and if so, how much injury have they proven? To determine whether the claimed misconduct actually occurred in this instance, one looks to the stipulated facts from previous lawsuits against IBC, which established that students in the MAAP, BMP, CISP, CADP, or MTP who completed or would have completed their academic programs gained little or no value from their degree or education from IBC because: (1) the programs were not accredited, (2) they would have had to work for a full year in the medical assistant field to be able to sit for the certification exam (MAAP ), (3) the program was not designed to make the students experts in the CISP, CADP, or MTP; (4) the computer software was not the most advanced and the staff were not experts in their fields, and (5) the job placement rate for IBC graduates was significantly lower than 90% pronounced, therefore employment was not guaranteed. Here, because IBC previously stipulated to committing fraud with regard to the MAAP, BMP, CISP, CADP, and MTP, that stipulation prevents IBC from disputing in any future lawsuit whether it engaged in such fraud with regard to these programs.[13] Of the 58 students involved in this particular case, 40 of them obtained loans for the MAAP, BMP and CISP. Given IBC's previous admission of fraud with respect to these programs, the 40 students in the MAAP, BMP, and CISP have proven that IBC actually engaged in the wrongful conduct they allege, as well as that such conduct gives rise to a legal cause of action under North Dakota law.

The remaining 18 students who were enrolled in the Computer Travel Business Management Program, Computer Accounting Program, (Executive) Administrative Legal Assistant Program, Dental Assistance Program, and Computer Programming programs, do not have the benefit of IBC's prior admission of fraud. Thus, we must evaluate whether the claimed misconduct

---

[13] IBC is considered to be "collaterally estopped" from disputing in any other lawsuit – even one involving different plaintiffs – those facts established against IBC in a prior lawsuit involving the school.

Interstate Business College Memo
February 11, 2003
Page 6 of 8

actually occurred using other available evidence. These borrowers did obtain a default judgment against IBC in *Holzer v. Red River Educational Services, Inc.* On December 26, 2001 Mr. Craft's firm issued a Summons on The Red River Educational Services, Inc., IBC to answer the complaint filed by his clients. The summons was served on January 8, 2002 to Susan Jensen at 3518 Serene Way in Lynnwood, Washington. In the complaint, the students alleged that IBC made affirmative misstatements to induce them to enroll in IBC's programs and that, as a result, they were damaged. IBC failed to answer. On February 13, 2002, a default judgment was entered in favor of the students due to IBC's failure to answer the complaint. The Judgment included a detailed description of IBC's fraudulent actions as to each student and the treble damage amount that each student was entitled to, which totaled $1,847,850.00 plus costs of $155.00.

A default judgment is a judgment entered against a party who has failed to defend against a claim that has been brought by another party. Blacks Law Dictionary, 6th ed. Under North Dakota law, once a complaint is filed and a summons is issued on a defendant, the defendant has 20 days in which to answer the complaint. If the defendant fails to answer the complaint within the stated time frame, the plaintiff may file a motion with the court to enter judgment in its favor due to the defendant's failure to file a timely answer.[14] If the plaintiff shows that the summons and complaint were properly served on the defendant to satisfy due process and the defendant is not on active military duty, the court will enter a default judgment.

The courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their own orders. *Phoceene Sous-Marine v. U.S. Phosmarine, Inc.*, 682. F.2d 802 (9th Cir. 1982)(citing *Landis v. North American Co.*, 299 U.S. 248, 81 L. Ed. 153, 57 S. Ct. 163 (1936); *Fendler v. Westgate-California Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975); *O'Brien v. Sinatra*, 315 F.2d 637, 641 (9th Cir. 1963). A default judgment is awarded not because the court is necessarily satisfied that the claim has substantive merit (although it may scrutinize the claim before awarding judgment) but because the party in default failed to offer any defense. Restatement 2d of Judgments, §3.

A default judgment binds the defendant like any other judgment. However, because a default judgment is not the result of actual opposition by the defendant, it lacks the credibility of, for example, those judgments in the other four cases against IBC (see Attachment B), which were based on stipulations agreed to the defendant (IBC) in the course of active defense of those cases. In this instance, although the court had the opportunity to scrutinize the students' claims prior to entering default judgment, there is no way to determine whether the court in fact scrutinized the complaint, or simply relied on IBC's failure to answer. Particularly where a default judgment is entered after a school has closed and under circumstances in which the

---

[14] Under North Dakota law "when a defendant fails to answer or appear within the time prescribed, the court upon proof of default by affidavit may render judgment against defendant. If action is upon written instrument, same must be produced and filed. In other cases, proof must be submitted and court may in its discretion submit any question involved to a jury. If any appearance is entered by defendant, he must be given eight days notice of application for default judgment. If summons was served by publication plaintiff may be required to file satisfactory security to abide the order of the court relating to restitution of any property or money which may be collected in case defendant is thereafter permitted to defend and shall succeed in his defense." N.D.R., Civ. P., Rule 55 (2002).

Interstate Business College Memo
February 11, 2003
Page 7 of 8

principals of the school would have little economic motive to defend against the suit, a default judgment simply proves that the defendant – or those in control of the defendant – either lacked the resources to defend or saw no reason to defend.   Accordingly, we see little in the default judgment itself that would be persuasive evidence that IBC committed the misconduct charged by these 18 borrowers.

However, we can also look to other evidence that has been provided to determine whether these 18 students have proven that their charges against IBC actually occurred.[15]  In four other cases that IBC actually defended, as stated previously, IBC admitted to engaging in fraud with regard to the MAAP, BMP, CISP, CADP and MTP, that induced students to enroll on those programs and obtained student loans and caused them damage.  It is reasonable to infer that if IBC was engaging in fraud and making material misstatements with regard to instructors' qualifications, quality of the equipment, graduate placement rate, and accreditation with respect to five other programs, that it did so with respect to it's other programs as well.   The complaint and default judgment entered against IBC in *Holzer v. Red River* cite the same kind of fraudulent misrepresentations and inducements with regard to each student, as those stipulated to in other cases with respect to the MAAP, BMP, CISP, CADP, and MTP.  Thus, it is reasonable to infer, based on the scope of IBC's misconduct as proven from the stipulated judgments and the criminal investigation and prosecution, that IBC actually committed fraud and made the misrepresentations charged by these 18 students in their programs.

(b) Amount of Damages:

To quantify the students' damages, we have to determine the amount of damages they could recover from IBC under state law.  The recoverable damages from IBC must then be used to offset their loan obligations. Under North Dakota law, a person who has been misled by another is entitled to damages under a tort claim theory.  Under this theory, a person is entitled to receive damages in an amount that will compensate her for all of her losses directly caused by the misrepresentation, whether the damages could be anticipated or not, absent exceptional circumstances.  NDCC §32-03-20.  *See, e.g., Delzer v. United Bank*, 559 N.W.2d 531 (N.D. 1997)(case involved a contract to loan money to the Dezlers to operate their ranch.  The loan was to be paid out in two installments. The Delzers pledged all of their assets and ranch equipment as collateral, but the Bank never advanced the second installment of the loan.  The Delzers lost all of their collateral and their ranch.  During the trial, the evidence revealed that the Bank never intended to make the second installment to the Delzers. The court held that the Bank's actions were deceitful and that the Delzer's damages were foreseeable.  The court awarded the Delzer's a judgment for $1,076,000, twice the amount of their compensatory or actual damages).  In the educational arena, North Dakota law permits a person defrauded by any advertisement or circular issued by a postsecondary educational institution to recover three times the amount of the actual damages.  See N.D.C.C. §15-20.4-09.

---

[15] In a letter dated September 4, 2002 I asked Mr. Craft to provide me with additional evidence of IBC's fraud with regard to these 18 students and the programs in which they were enrolled, beside the complaint and entry of judgment, but he has not been able to obtain any such evidence.

Interstate Business College Memo
February 11, 2003
Page 8 of 8

Here, the students can demonstrate the amount of their damages by pointing to the amount they borrowed to attend IBC. Given that their education from IBC has virtually no value, the amount of their damages is at least the amount of tuition they paid to obtain that education times three pursuant to §15-20.4-09. Presumably, the total amount of the loans was used to pay for a portion of the tuition at IBC. Thus, the students' damage award should equal the principal amount of the loans they obtained to pay for the tuition minus any credit given, times three. This amount is then used to offset the loan balances due and owing to Education on the student loan accounts, including unpaid, accrued interest. Therefore, the students' loan obligations are fully offset by the amount of their damages against IBC.

## CONCLUSION:

Based on the foregoing, I conclude that all 58 students in *Holzer v. Red River* have adequately established that: (1) the students charged IBC with conduct that would constitute fraud under North Dakota state law; (2) IBC's actions as charged had a direct connection to their receipt of the Direct loans; and (3) IBC actually committed the conduct charged, and the borrowers were injured in an amount that at least equals the amount they borrowed on their Direct loans. These students' claims should be recognized as a defense to collection of their Direct loans only, pursuant to 34 C.F.R. 685.206(c).

These conclusions rest in large part on inferences drawn from other cases involving IBC but not these individuals. It is therefore possible that these individuals were not in fact injured by the conduct they charged, or even that the conduct did not occur as to them. In the unlikely event that evidence emerges later that these students fabricated their assertions against IBC, their Direct Loan obligations should be immediately reinstated in the amount due and owing at the time relief was provided to them pursuant to the recommendation in this memorandum.

I have attached to this Memorandum a draft copy of a letter to Mr. Craft in response to his inquires. I recommend that this letter or a similar one be sent to him with regard to his clients' loan obligations.

If you have any questions or concerns about the contents of this memo or its conclusion, please feel free to contact me at (202) 401-6007.

Exhibits/Attachments

cc: Rosa Wright, Direct Loan Program (electronically)
    Debra Wiley, OSFA Ombudsman (electronically)
    Naomi Randolph, Closed Schools (electronically)

Attachment B

In a January 10, 2000 Stipulation[1] IBC admitted to engaging in fraud with regard to the Medical Administrative Assistant (MAA) program.  In that document, IBC admitted to the following:

1. that IBC misrepresented the number of graduates who had jobs "in their field" and that they applied that term loosely;
2. that the Accrediting Counsel for Independent Colleges and Schools defines the term "in the field" as requiring "a direct use of the skills taught in the program," as well as that ACICS defines "related field" as employment as a position that requires "an indirect use of the skills taught in the program";
3. that based on the representations by the enrollment counselor, the Plaintiffs signed an agreement enrolling in the MAA and incurring thousands of dollars in loan debt;
4. that the program was not accredited by any accrediting agency;
5. that the graduates of this program were ineligible to take the certification exam as a Medical Assistant until they had one year of full-time work experience in a position "in their field";
6. that graduation with a degree as an MAA, without being certified, gives candidates no greater chance of employment or pay grade, than would be available without the degree;
7. that it was critical that the training received at IBC enable plaintiffs to secure employment qualifying graduates for the exam;
8. that IBC's past employment placement was lower than stated during the enrollment interview;
9. that the Plaintiffs should be awarded damages in the amount of three times their enrollment contract, pursuant to NDCC §15-20.4-09[2], lost wages, books and travel expenses and miscellaneous expenses;
10. that the lawsuit be dismissed.

In a February 12, 2001 Stipulation in a second case[3] IBC admitted to engaging in fraud with regard to the Business Management Program (BMP).  In this stipulation, the following facts were stipulated to:

---

[1] ████████████ et al. v. Red River Educational Services, Inc., Interstate Business College, C. A. No. 97-02501 (District Court, County of Cass, North Dakota).

[2] North Dakota Century Code, section 15-20.4-09 states: Any person defrauded by any advertisement or circular issued by a postsecondary educational institution, or by any person who sells textbooks to the institution or to the pupils thereof, may recover from such institution or person three times the amount paid.

[3] ████████████ v. Red River Educational Services, Inc., Interstate Business College, C. A. No. CV-00-000119, (District Court, County of Cass, North Dakota).

1.     That based on the representations by IBC staff, the borrower signed an agreement enrolling in the BMP and incurred in excess of $15,428.00 in student loan debt; the borrower was enrolled at IBC from August 1996 to April 1997;

2.     That IBC agents and employees negligently made oral and/or written representations which were positive assertions, in a manner not warranted by the information of the person making it, of that which was not true though the person believed it to be true, for the purpose of inducing the student into contracting with IBC for educational services;

3.     That IBC agents represented that the borrower would be placed in a curriculum designed specifically and exclusively for persons interested in becoming experts in Business Management;

4.     That IBC agents represented that the program was taught by experienced instructors who were themselves experts in Business Management;

5.     That IBC agents represented that the borrower would be supplied with computers equipped with the most advanced computerized accounting and business management software;

6.     That IBC agents represented that the school had a 90% success rate in placing BMP graduates in-the-field;

7.     That IBC agents represented that the program was fully accredited;

8.     That IBC's BMP program had not been specifically and exclusively designed for persons interested in becoming experts in business management, that the instructors were not experts in business management, that the computers were not loaded with the most advanced computerized accounting and business management software, that IBC had not experienced a 90% success rate in placing BMP graduates in-the-field, and that the BMP was not fully accredited;

9.     That IBC's affirmative misstatements induced the borrower to enroll in its program and as a direct and proximate result of her reliance on IBC's fraudulent statements of material facts, she sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;

10.     That the borrower should be awarded damages in the amount of three times her enrollment contract, pursuant to NDCC §15-20.4-09, lost wages, books and travel expenses and miscellaneous expenses.

IBC made similar admissions of fraud in a stipulation filed in a third case;[4] here IBC stipulated to committing fraud with regard to the CIS program, specifically --

1.     That it made "positive assertions, in a manner not warranted by the information of the person making it, of that which was not true through the person believed the representation to be true, for the purpose of inducing the borrowers into contracting with IBC for educational services";

2.     That IBC's staff made material misrepresentations that were not true; that the CIS program was specifically and exclusively designed for persons interested in becoming

[4] ▬▬▬▬▬▬ v. *Red River Educational Services, Inc., Interstate Business College*, C. A. No. CV-00-00118 (District Court, County of Cass, North Dakota).

experts in CIS, that the instructors were experts in CIS, that the computers were loaded with the most advanced CIS software, that IBC had experienced a 90% success rate in placing CIS graduates in-the-field, and that the CIS program was fully accredited;

3. That IBC's affirmative misstatements induced the borrowers to enroll in the CIS program and as a direct and proximate result of their reliance on IBC's fraudulent statements of material facts, they sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;

4. That IBC would pay the borrowers money damages, which would include the amount of their enrollment contract, trebled, pursuant to NDCC §15-20.4-09, lost wages books and travel expenses and miscellaneous expenses.

The stipulation was reduced to a judgment on June 14, 2000 in favor of the borrowers and against IBC.

In a January 2000 stipulation filed in a fourth case,[5] IBC admitted to engaging in fraud with regard to the Computer Aided Drafting (CAD) program. IBC admitted to the following:

1. That based on the representations by the enrollment counselor, Engle and Glines signed agreements enrolling in the CAD program and incurred in excess of $15,428.00 in debt;

2. That IBC agents and employees negligently made oral and/or written representations which were positive assertions, in a manner not warranted by the information of the person making it, of that which was not true though the person believed it to be true, for the purpose of inducing Engle and Glines into contracting with IBC for educational services;

3. That IBC agents represented that the students would be placed in a curriculum designed specifically and exclusively for persons interested in becoming experts in CAD;

4. That IBC agents represented that the program was taught by experienced instructors who were themselves experts in CAD;

5. That IBC agents represented that the students would be supplied with computers equipped with the most advanced CAD software;

6. That IBC agents represented that the school had a 90% success rate in placing CAD graduates in-the-field;

7. That IBC agents represented that that the program was fully accredited;

8. That IBC's CAD program had not been specifically and exclusively designed for persons interested in becoming experts in CAD, that the instructors were not experts in CAD, that the computers were not loaded with the most advanced CAD software, that IBC had not experienced a 90% success rate in placing CAD graduates in-the-field, and that the IBC CAD program was not fully accredited;

---

[5] ███████ v. Red River Educational Services, Inc., Interstate Business College, C. A. No. CV-00-00120 (District Court, County of Cass, North Dakota.)

Attachment B
Page 4 of 4

9. That IBC's affirmative misstatements induced Engle and Glines to enroll in their CAD program and as a direct and proximate result of their reliance on IBC's fraudulent statements of material facts, they sustained pecuniary injury in the form of loss or diminution of previous employment, loss of employment during school, failure to receive compensation in accordance with representations and costs and expenses of schooling;

10. That Engle and Glines should be awarded damages in the amount of three times their enrollment contract, pursuant to NDCC §15-20.4-09, lost wages, books and travel expenses and miscellaneous expenses.

On June 14, 2000 the North Dakota court entered the Stipulation for Entry of Judgment in favor of the plaintiffs, thus, concluding the lawsuit.

Lastly, in a fifth case,[6] IBC signed another Stipulation, also on January 10, 2000, admitting to fraud with regard to the Medical Transcription Program (MT Program). In the Stipulation, IBC admitted to engaging in fraud that induced Ms. ███████ to enroll in IBC. Judgment was entered on June 14, 2000 on this Stipulation, which was very similar to the other Stipulations. Damages were awarded to Ms. Rubin in the amount of $23,175.00.

---

[6] ███████ v. *Red River Educational Services, Inc. and Interstate Business College*, C. A. No. 00-00117 (District Court, County of Cass, North Dakota).



**Craft
Doeling, PC**

Attorneys At Law
Licensed in ND & MN

February 20, 2002

**Dale J. Craft
Gene W. Doeling**

1111 Westrac Drive, Suite 108
P.O. Box 29
Fargo, North Dakota  58107-0029
(701) 293-8050
(701) 293-3708  Fax
E-Mail:  cdpc@myexcel.com

Dan Hayward, Director
Student Financial Assistance
United States Department of Education
7th and D Street
ROB 3, Room 4025
Washington, DC  20202

Re:    Student Defense to Debt Pursuant to 34 C.F.R. §685.206(c)

Dear Mr. Hayward:

This firm represents a number of students who attended Interstate Business College in Fargo, North Dakota.  The Department of Education suspended the school from participating in Student Loan Programs and it closed in January 1998.   In 1999, the owner of the school, Susan Jensen, was sentenced in South Dakota and Federal Courts for theft of student money.   The students we represent who claim a defense to repayment of their student loans pursuant to 34 C.F.R.  § 685.206(c) are:



The student/debtors listed above have outstanding loans under the Federal Direct Student Loan Program.  Each student's name, address, social security number and dates of attendance are attached to this correspondence.  The students assert, based on the enclosed Complaint dated December 26, 2001, and Judgment dated February 13, 2002, that they have a defense pursuant to 34 C.F.R.  § 685.206(c),  which regulation recognizes a defense based on any act or omission

Dan Hayward, Director
February 20, 2002
Page Two

of the school that would give rise to a cause of action against the school under applicable state law. We submit that the Judgment in favor of the students and against the school on the grounds of fraud in the inducement is evidence these borrowers have claims against the school recognized by state law. We would also assert that Interstate Business College's pattern of engaging in this type of fraud is known to the Department of Education since other students who attended Interstate Business College have asserted this defense based on similar claims of misrepresentation.

Please note that the enclosed Judgment states specific material assertions of fact which were made by Interstate Business College representatives before the students enrolled at Interstate Business College. Each student relied on those assertions of fact when deciding to sign their enrollment contracts. The Judgment establishes that those assertions were not true. Under North Dakota law negligent misrepresentation inducing a person into a contract is actual fraud. NDCC § 9-03-08(2); Bourgois v. Montana-Dakota Utilities Co., 466 NW2d 813, 818 (N.D. 1991).

Please review these materials promptly, and tell us whether your agency acknowledges the defenses based on these documents. We hope the Department will, at a minimum, determine that these students do have a potential defense to its collection actions, and not make any formal attempts to collect on the notes. Our ultimate request is that the Department determine that the notes are not collectable, refund all payments made, and void the notes. As you will probably recall, these students claims of misrepresentation are based on the same representations that were made by Interstate Business College to ▓▓▓▓▓▓▓, ▓▓▓▓▓▓, ▓▓▓▓▓▓▓ and approximately twenty other former Interstate Business College students who were granted forgiveness of their Direct Loan obligations as set forth in your letter dated February 28, 2001.

As the students have retained this office with respect to their claims against the school and their defense under your regulations, please make your response to this office and not directly to the students.

Sincerely,

Gene W. Doeling

GWD/ck
Enc.
98152let.011