CHAD A. READLER
Acting Assistant Attorney General

ALEX G. TSE
Acting United States Attorney

MARCIA BERMAN
Assistant Branch Director

KAREN S. BLOOM
Senior Counsel
R. CHARLIE MERRITT
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 616-8098
Facsimile: (202) 616-8460
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN CALVILLO MANRIQUEZ, *et al.*,<br><br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br><br>Defendants. | No.  17-7210<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: April 30, 2018<br>Time: 9:30 a.m.<br>Place: Courtroom A, 15th Floor<br>Magistrate Judge Sallie Kim |

Almost three months after they filed this action, Plaintiffs moved for a preliminary injunction, essentially seeking the same relief they ultimately seek in this action: an order requiring the U.S. Department of Education ("the Department" or "ED") to fully discharge the federal direct student loan debt of thousands of student borrowers. Because Plaintiffs have not shown that they will suffer irreparable injury absent the injunction, nor have they established their entitlement to the extraordinary mandatory injunction they seek, the Court should deny Plaintiffs' motion.

The Department loans billions of dollars to students annually to help them cover the educational costs of attending post-secondary schools. Where a post-secondary school engages in conduct that would be actionable under applicable state law the Department permits a borrower to raise such conduct as a defense against that borrower's repayment obligation on a Direct Loan (*i.e.* to raise a "borrower defense" claim). *See* 34 C.F.R. § 685.206(c). If the Department determines that a borrower defense claim is successful, the Secretary of Education ("Secretary") informs the borrower that s/he is relieved of the obligation to pay all or part of the loan, and the Secretary can also afford the borrower "such further relief as the Secretary determines is appropriate under the circumstances." *Id*. § 685.206(c)(2).

The regulation governing "borrower defense" was promulgated more than twenty years ago, but was rarely used until 2015. That year, Corinthian Colleges, Inc. ("Corinthian" or "CCI") announced the closure of all of the schools it operated and filed for bankruptcy. Subsequently, the Department received an unprecedented number of borrower defense claims, including 100,000 from student borrowers who had attended Corinthian operated schools. The Department responded with emergency measures to provide relief to affected borrowers on an *ad hoc* basis. Because ED determined that CCI had systemically misrepresented its job placement rates, it began fully discharging associated student loan debt of borrowers who were able to establish that they were aware of and relied on these misrepresentations. But the Department continued to explore ways to improve its process for adjudicating borrower claims, and consistently maintained its discretion to, as provided in the regulation, discharge "all or part" of a loan subject to a successful borrower defense claim.

Through its review process, the Department came to the common sense conclusion that the relief for successful borrower defense claims should be based on a measure of the actual harm suffered as a result of the school's misconduct, namely, the lack of value the borrower actually received from the educational program attended. The Department quantified that value by comparing the average earnings of Corinthian claimants who attended a given academic program with the average earnings of students who attended similar programs at schools the Department determined adequately prepare students for gainful employment. The Department utilized information provided by the Social Security Administration ("SSA") pursuant to a pre-existing information sharing agreement between the two agencies.

Plaintiffs, four individuals who borrowed federal funds to attend Corinthian schools, seek, on behalf of a putative class, wholesale changes to the Department's borrower defense process, including an order compelling the Department to "immediately" process applications and grant full discharges of all Direct Loans to thousands of former Corinthian students. Almost three months after they initially filed this action, Plaintiffs moved for a preliminary injunction, essentially seeking the same relief (*i.e.*, full loan discharge, as well as various other relief related to their outstanding loan debt) they ultimately seek in this action. Plaintiffs' motion should be denied as failing to satisfy the test for extraordinary preliminary injunctive relief.

Plaintiffs have not established irreparable harm. To the contrary, the only concrete harms they claim they will endure, absent such relief, are financial hardships that are, by definition, not irreparable. Nor have Plaintiffs shown that any of their legal claims are likely to succeed. They allege six violations of the Administrative Procedure Act ("APA"), premised on their assertion that the Defendants adopted a "rule" providing for *full* loan discharges to *all* borrowers who attended certain Corinthian programs during certain time periods, and then abandoned that rule in favor of a new one allowing, in some cases, for partial discharge. According to Plaintiffs, Defendants acted unlawfully by "abandoning" the first "rule." Plaintiffs also assert a Privacy Act claim, based on Defendants' use of data allegedly obtained through a "matching program," and a Due Process violation, based on the Defendants' current process for adjudicating borrower defense claims. But their claims are not likely to succeed.

First, Plaintiffs do not establish that the Department ever adopted a binding "rule" that it would grant *full* discharges for *all* Corinthian students in designated cohorts. Therefore, Plaintiffs' claims that the Department unlawfully abandoned that rule and unlawfully applied a replacement rule necessarily fail. Plaintiffs' claims challenging the Department's inaction fare no better because Plaintiffs, in seeking to compel the Department to discharge student loan debts for thousands of students, do not demonstrate that the Department failed to take a *discrete* agency action that it is *required* to take. Plaintiffs' Privacy Act claim is a non-starter because it seeks injunctive relief unavailable under that statute, and in any event the challenged data sharing arrangement does not meet the statutory definition for a "matching program." Moreover, their Due Process challenge is unlikely to succeed because Plaintiffs have not demonstrated a cognizable property interest in the discharge they seek and, even if they had, Defendants have afforded adequate procedural protections of such interest. And finally, because Plaintiffs have not shown that the Department adopted a new "rule," they have not shown that such adoption, or any other Department conduct, is arbitrary or capricious.

The requested injunction, which would drastically interfere with the Department's discretionary processing of borrower defense claims and drain millions of dollars from other educational programs, is not in the public interest. The Court should deny Plaintiffs' motion.

## BACKGROUND

### I. Statutory And Regulatory Background

#### A. The William D. Ford Federal Direct Loan Program

Under Title IV of the HEA, 20 U.S.C. § 1070 *et seq.*, the Department can enter into an agreement with a post-secondary school that permits students to receive federal grants and loans to pay for the cost of attendance at the school. The William D. Ford Federal Direct Loan Program is the largest student loan program authorized under Title IV, *see* 20 U.S.C. § 1087a *et seq.* This program allows students to apply for and receive Direct Loans from the federal government to pay for their educational expenses, including tuition and living expenses. *Id.* § 1087*ll*. Congress has granted the Department broad authority to implement and administer the HEA and, in particular, the Direct Loan Program. *See* 20 U.S.C. §§ 1221e-3, 3474.

**B.      Borrower Defense to Repayment**

The HEA authorizes the Secretary to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment" of a Direct Loan.  20 U.S.C. § 1087e(h).  Pursuant to this authority, the Department codified regulations permitting a borrower, "[i]n any proceeding to collect on a Direct Loan," to "assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law."  34 C.F.R. § 685.206(c).

The regulation does not set forth any process or timeline for the Department to employ in processing or adjudicating claims for borrower defense, and does not provide any standard or threshold of proof for the Department to apply in determining whether an asserted basis for borrower defense demonstrates "a cause of action against the school under applicable State law," or entitles the borrower to relief.  *See, e.g.*, 81 Fed. Reg. 39,330, 39,346 (June 16, 2016) ("2016 NPRM") (notice of proposed rulemaking recognizing that the existing borrower defense regulation "does not provide a process for claims").  Instead, the regulation simply provides that when a borrower asserts a "successful" defense against repayment, "the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all *or part* of the loan and associated costs and fees that the borrower would otherwise be obligated to pay  . . . [and] . . . affords the borrower such further relief as the Secretary determines is appropriate under the circumstances."  34 C.F.R. § 685.206(c)(2) (emphasis added).  In addition, the Secretary "may initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies."  *Id.* § 685.206(c)(3).

**C.      Gainful Employment**

The HEA conditions a proprietary school's eligibility to participate in the Title IV loan programs on such school's providing "an eligible program of training to prepare students for gainful employment in a recognized occupation."  *See* 20 U.S.C. §§ 1002(b)(1)(A)(i), 1002(c)(1)(A), 1088(b)(1)(A)(i).  To enforce this gainful employment ("GE") requirement, the Department assesses whether a particular program prepares its students to earn enough to repay

their loans, or are sufficiently low cost, such that students are not unduly burdened with debt, *i.e.*, whether it prepares them for "gainful employment in a recognized occupation." *See* Final Rule, Program Integrity: Gainful Employment, 79 Fed. Reg. 64,890, 64,892 (Oct. 31, 2014) (quoting 20 U.S.C. § 1001(b)(1)).   ED's regulations establish two "debt-to-earnings" rate measures ("D/E rates") to evaluate the amount of debt students who completed a "gainful employment" program incurred to attend that program in comparison to those same students' earnings after completing the program.  34 C.F.R. § 668.404.  A program "pass[es]" the gainful employment requirement if such students' median annual loan payment is less than or equal to 20% of discretionary income or 8% of annual earnings.  *Id.* § 668.403(c).

The Department uses data from the SSA's Master Earnings File ("MEF").  *See* 79 Fed. Reg. at 64,950.  For each award year, it determines the D/E rates for a GE program by creating a list of students who completed the program, obtaining from SSA the mean and median earnings of the students on the list, and comparing that income data with the students' median loan debt.  *See* 34 C.F.R. §§ 668.404, 668.405.  The Department publishes its D/E rates for each program, as well as the underlying earnings data as reported by the SSA, on its website.[1]

The Department and SSA share information in this manner pursuant to a written agreement designed to ensure that the information SSA provides "cannot be associated with, or otherwise identify, directly or indirectly, a particular individual."  *See* Amended Information Exchange Agreement, Aggregate Earnings Data at 1 (May 24, 2013) ("Earnings Data Agreement"), Attached as Exhibit 27 to Declaration of Joshua D. Rovenger, ECF No. 35-8 at 42-50.  In particular, the Department sends SSA a file containing certain identifying information for students enrolled in particular educational programs, and SSA computes "aggregate earnings data by specific group as provided by [the Department]" including "the mean and median income information of individuals in each group."  *Id.* at 3 (ECF No. 35-8 at 44).  SSA provides to ED only "aggregate, statistical data without any personal identifiers."  *Id.*

## II.      The Collapse of Corinthian Colleges and the Department's Response

### A.      The Department's Findings of Fraud at Corinthian Colleges

---

[1] *See* https://studentaid.ed.gov/sa/about/data-center/school/ge

In the spring of 2015, in the wake of multiple federal and state investigations into its misconduct, Corinthian announced the closure of all of its schools and filed for bankruptcy. 81 Fed. Reg. at 39,335; *see also* United States Department of Education, First Report of the Special Master for Borrower Defense to the Under Secretary[2] ("First Special Master Report") (Sept. 3, 2015). The Department's investigation concluded, in publicly released findings, that Corinthian systematically misrepresented the rates at which its graduates were employed (*i.e.*, its "job placement rates") across a number of its campuses nationwide.[3] As the Special Master appointed by the Department in 2015 to oversee borrower defense issues concluded, CCI's closure was "a landmark event for the concept of borrower defense to repayment." First Special Master Report at 5. Previously, the borrower defense regulation had been "rarely used," 81 Fed. Reg. at 39,330, but Corinthian's collapse "almost immediately produced over 1,000 claims from borrowers for a defense to repayment," First Special Master Report at 5, a number that has climbed upwards towards 100,000 total claims over the last two years. *See* U.S. Department of Education, Office of Inspector General ("OIG"), *Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process* (Dec. 8, 2017) ("OIG Report").[4]

Beginning in 2015, the Department published information on its website about the availability of and process for certain CCI borrowers to seek various avenues of relief, including through borrower defense.[5] This includes links to lists of CCI campuses and academic programs covered by the Department's findings regarding misleading job placement rates. These lists

---

[2] *See* https://www2.ed.gov/documents/press-releases/report-special-master-borrower-defense-1.pdf

[3] *See* Notice of Intent to Fine Heald College, April 14, 2015,https://www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf; *see also* https://studentaid.ed.gov/sa/about/announcements/corinthian (summarizing findings regarding Corinthian's misrepresentation of job placement rates at certain campuses).

[4] *See* https://www2.ed.gov/about/offices/list/oig/auditreports/fy2018/i04r0003.pdf

[5] *See* Federal Student Aid ("FSA"), Information about Debt Relief for Corinthian Colleges Students ("FSA Announcement"), *available at* https://studentaid.ed.gov/sa/about/announcements/corinthian

contain the name of each program and a date range to which the findings apply, and specify that a student's first date of enrollment in the program must fall within the date range for the student to be covered by the findings.[6]  In order to simplify the application process for affected students, the Department created attestation forms allowing a borrower to apply for a borrower defense loan discharge by verifying the program s/he attended and the dates of attendance, and certifying that s/he chose to enroll based, in substantial part, on the school's advertising materials and certain other available information regarding job placement rates.[7]

These attestation forms, however, do not specify whether the "loan forgiveness" they allow borrowers to apply for relates to "all" or instead "part" of the loan debt the borrower would otherwise be obligated to pay, 34 C.F.R. § 685.206(c)(2), thus mirroring ED's other public statements about the relief available to CCI borrowers.  *See, e.g.*, June 2015 Press Release;[8] FSA Announcement; First Special Master Report at 7 ("FSA conducted an email outreach campaign to … borrowers…to notify them that they may be eligible for [some] debt relief based on borrower defense.").

### B.    The Department's Processing of Borrower Defense Applications

Based on these developments, a significantly increased number of student borrowers have submitted borrower defense claims in recent years.  After receiving fewer than 10 such applications prior to 2015, the Department received, in 2016 alone, 77,340 borrower defense applications, and another 47,540 in 2017.  *See* U.S. Department of Education, Office of

---

[6] *See* https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf (last visited Apr. 12, 2018) (listing Heald College programs); https://studentaid.ed.gov/sa/sites/default/files/ev-wy-findings.pdf (listing Everest/WyoTech programs).

[7] *See* https://borrowerdischarge.ed.gov/FormWizard/RLD/RLDReview.aspx (displaying attestations for Heald College); https://borrowerdischarge.ed.gov/FormWizard/RLD/RLDReview.aspx?School=EverestWyoTech (displaying attestations for Everest/WyoTech) ("Attestation Forms").

[8] *See* https://www.ed.gov/news/press-releases/fact-sheet-protecting-students-abusive-career-colleges

Postsecondary Education *Borrower Defense Claims: Data Analysis*, at 6 (Nov. 2017).[9]  As of November 2017, the Department had resolved over 31,000 of these applications.  *Id*.  The Department continues to engage in the process of reviewing, adjudicating, and processing the remaining claims, and on December 20, 2017, announced that it had "approved for discharge 12,900 pending claims submitted by former Corinthian Colleges, Inc. students, and 8,600 pending claims have been denied.  This action includes claims that have been received during this administration."  U.S. Department of Education, Improved Borrower Defense Discharge Process Press Release (December 20, 2017) ("December Press Release"), attached as Exhibit 1 to Declaration of James F. Manning ("Manning Decl.").[10]

### C.    The Department's Improved Discharge Process

Throughout 2015 and 2016, the Department awarded full discharges of Direct Loan debt to Corinthian borrowers who were able to establish a successful defense to repayment based on the Department's findings.  *See, e.g.*, Manning Decl. ¶ 9.  As the number of claims increased, however, the Department established a "review panel" to examine the Department's existing borrower defense process and make "recommendations on how to resolve pending borrower defense claims" going forward.  *Id*. ¶ 7.  This internal review identified several "weaknesses," including a largely unsupported assumption that "all Corinthian students received nothing of value from their education."  Remarks of James F. Manning at 9-11 (Jan. 8, 2018) ("Manning Remarks"), attached as Exhibit 2 to Manning Decl.[11]  However, the available evidence, including earnings data collected through its assessment of gainful employment programs, *see* Manning Decl. ¶ 14, suggested that, in many cases, Corinthian graduates "did in fact receive

---

[9] *See* https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/borrowerdefense.html.

[10] The Manning Declaration is attached as Exhibit A.  The Court can consider post-hoc agency affidavits stating a contemporaneous explanation of the agency decision. *See, e.g.*, *Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 463-64 (D.C. Cir. 2016) (internal agency materials and affidavit submitted to court after agency initially denied, without explanation, an application for training satisfied APA requirement for brief statement of grounds for denial); *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737-740 (D.C. Cir. 2001) (deciding not to remand case due to agency decision's insufficient statement of reasons where internal agency memoranda clarified and justified the agency decision).

[11] The remarks are excerpted from a larger transcript of ED's negotiated rulemaking session on January 8, 2018, and are cited according to the document's internal pagination.

something of substantial value from their education," and that groups of students at CCI programs "in many instances performed even better than those from well-performing GE programs."  Manning Remarks at 11; *see also* Declaration of Phillip Juengst ¶ 11 ("Juengst Decl.") (attached as Exhibit B) (noting that 51 of the 106 CCI programs for which the Department had GE data for the 2015 debt measure year had passing GE ratings, while only six had failing ratings).  The Department thus determined to "reevaluate the assumption" used in fashioning relief that Corinthian students received no value from their education, Manning Decl. ¶ 15, and explore an "alternative approach," Manning Remarks at 11.

At the conclusion of this "careful review to ensure a fair and efficient process," the Secretary announced, on December 20, 2017, an "improved discharge process for borrower defense to repayment" claims.  December Press Release.  In order to tether a borrower's ultimate relief to the harm suffered as the result of attending a program that has made misrepresentations, the Department announced a system of "proportionally tiered relief" based on an assessment of a borrower's earnings capacity as a result of having attended CCI.  *Id*.  The process announced in the December Press Release is further explained in a Department memorandum, which highlights ED's conclusion that these borrowers' harm "may be determined by assessing the value students received from the education provided by CCI."  Juengst Decl. ¶ 7.  Many borrowers "failed to provide any real evidence of harm," Manning Remarks at 11, but to the extent they did, the harm alleged was generally quantified in terms of "struggles" in "finding employment because of an alleged lack of value provided" by a CCI education, Manning Decl. ¶ 11.  In order to determine the value of that education, the Department compared "average earnings of CCI claimants who attended a given academic program to the earnings of students who attended and had completed similar programs at schools the Department has determined adequately prepare students for gainful employment."  Borrower Defense Relief Methodology for CCI Claims at 1 ("Methodology Memo"), Attached as Exhibit 1 to Juengst Decl.

To perform this comparison, ED conducted an analysis to establish the appropriate "tier" of relief applicable for each program, by academic credential level, that was offered by CCI schools.  The Department first defined the set of Corinthian programs and credentials,

identifying 79 program and academic credential groups.  Methodology Memo at 2-3.  Next, it submitted information identifying the students in each program to SSA, in the same manner and pursuant to the same information sharing agreement used to calculate earnings data for the gainful employment D/E rates.  SSA then provided the Department with the "mean and median incomes" for each of the 79 groups of Corinthian programs and academic credentials.  *Id*. at 3.

This average and median earnings data provides an objective measure of the value of the education received at the relevant Corinthian program by academic credential level.  The Department then compared that average and median earnings data with the average and median earnings at comparable programs that earned a "passing" score under the Department's gainful employment regulations.  *See* Methodology Memo at 3 (explaining how Corinthian programs were mapped to "Classification of Instructional Programs," or "CIP" codes, as defined by the National Center for Education Statistics, and then compared with GE programs with the same CIP codes and academic credential levels).

On this basis, the Department was able to "ensure an apples-to-apples comparison of earnings data," Manning Remarks at 11, and establish a baseline of the average earnings a CCI student could have reasonably expected to receive when choosing an education program.  The difference between that expected average earning capacity, and the average earnings at the CCI program attended, represents the educational value, or lack thereof, of the Corinthian program.  *See* Manning Decl. ¶ 17; Juengst Decl. ¶ 7.  To the extent a student attended a CCI program at which the average earnings is less than 50% of that baseline, the Department determined that the Corinthian program did not "provide measurable value to CCI students," and will award a 100% discharge of outstanding loans related to the claim to make the affected student whole.  Methodology Memo at 4.  But to the extent a Corinthian program has yielded an average earning capacity that is 50% or more of what the student could expect to receive at a comparable gainful employment program, the Department determined that student received some amount of value from the education and suffered harm less than the full value of money borrowed to attend that program.  *Id*. at 4-5.  The amount of relief provided to the borrower would then be grouped into

tiers of 10%, rounded upward, including a minimum of 10% relief to any borrower with a successful defense to repayment claim. *Id*. at 5.

As the Department noted in the December Press Release, all rounding is done to the benefit of the student, such that a borrower who had enrolled in a program with average earnings of 59% of comparable GE program earnings would be provided with a 50% reduction in her federal student loans. *See also* Methodology Memo at 4-5; Juengst Decl. ¶¶ 25-29 (discussing various procedures Department used to implement "guiding principle" of suing earnings comparisons favoring the borrower). Finally, for certain approved loans, the Department applies a credit for the amount approximately equal to some of the interest that has accrued on the borrower's associated loans while the claim was pending prior to completing the discharge process. December Press Release.

## III.    <u>This Lawsuit</u>

Plaintiffs moved to amend their complaint on March 17, 2018, adding a new plaintiff and three new claims.[12] *See* First Amended Compl. for Declaratory & Inj. Relief ("Am. Compl."), ECF No. 33. As noted above, Plaintiffs assert seven claims for relief pursuant to the APA, the Privacy Act, and the Due Process clause. Their putative class action seeks to represent "all individuals who borrowed a Direct Loan to finance the cost of enrollment in a program who are covered by the Department's Corinthian Job Placement Rate Rule, who have applied or will apply for a borrower defense, and who have not been granted the full relief provided for by the Rule." *Id*. ¶ 257. Plaintiffs moved for a preliminary injunction the same day, asserting a likelihood of success on the merits on all seven counts and various economic and other allegedly "irreparable," harms. *See* Pls.' Notice of Mot. & Mot. for Prelim. Inj. ("PI Mot."), ECF No. 35. Plaintiffs seek an order requiring the Department to, among other things, "stop applying its 'Average Earnings Rule' to members of the proposed class, and to process Plaintiffs' claims under the 'Corinthian Job Placement Rule,'" as defined by Plaintiffs. *Id*. at 1.

---

[12] Defendants note that Plaintiffs have not yet been granted leave to amend, and are separately filing their opposition to Plaintiffs' amendment. Solely for purposes of this opposition brief, however, Defendants will assume the claims in the proposed Amended Complaint are operative.

# ARGUMENT

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns*, 559 F.3d at 1052 (citation omitted). A "possibility" of irreparable harm is insufficient; irreparable harm must be *likely* absent an injunction. *Id*; *see also Winter*, 555 U.S. at 22 (rejecting Ninth Circuit's earlier rule that the "possibility" of irreparable harm, as opposed to its likelihood, was sufficient in some circumstances to justify preliminary injunction). Alternatively, "'serious questions" going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011). Plaintiffs bear the burden of demonstrating that each of these four factors is met. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

The standard for a preliminary injunction is even higher where, as here, Plaintiffs seek a mandatory or affirmative injunction that would alter the status quo rather than preserve it. *See, e.g.*, *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994); *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014); *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 48 (D.D.C. 2013). A mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citation omitted). Such relief should be denied "unless the facts and law clearly favor the moving party." *Id.*; *see also Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (explaining that mandatory injunctions are "subject to a higher standard than prohibitory injunctions" and are only permissible when "'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case

are not 'doubtful'" (citation omitted)).

Plaintiffs here seek far more than a prohibitory injunction. They ask the Court to force the Department to remove negative credit reporting on Plaintiffs' outstanding federal loan debt, restore federal student loan eligibility to Plaintiffs (presumably regardless of whether there are other independent bars to this eligibility) and to process Plaintiffs' claims under the "Corinthian Job Placement Rate Rule" (*i.e.*, to force the Department to process the claims under a different framework than it otherwise has chosen to employ). PI Mot. at 1.; *see also* Pls.' Proposed Order Granting Pls.' Mot. for Prelim. Inj. at 4, ECF No. 35-9 (proposing that Court require, among other things, that the Department, "within 10 days, begin processing Plaintiffs' applications *and grant them the relief provided* under the Corinthian Job Placement Rate Rule" (emphasis added)). Through this requested relief, Plaintiffs seek not only to "maintain the status quo" pending litigation, but to place themselves in a better position than they were in before the onset of the current controversy through an award of "the exact same ultimate relief" they seek in their Amended Complaint. *Taiebat v. Scialabba*, 2017 WL 747460, at *2-3 (N.D. Cal. Feb. 27, 2017). "In general, that kind of judgment on the merits in the guise of preliminary relief is a highly inappropriate result." *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992).

## I.    Plaintiffs Have Not Shown They Will Be Irreparably Harmed

A preliminary injunction serves the "limited purpose" of "preserv[ing] the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, "[a]n essential prerequisite" before granting a preliminary injunction is a showing that irreparable injury is likely in the absence of an injunction. *See Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*, 774 F.2d 1371, 1375 (9th Cir. 1985); *Winter,* 555 U.S. at 19. "Irreparable harm" is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). This standard is demanding: "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to qualify as irreparable, and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable

harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs here allege that, absent a preliminary injunction, they will suffer harms in the form of violations of their constitutional rights, invasion of their privacy, dignitary and emotional harms, and financial hardships. *See* PI Mot. at 46-49. None of these putative harms are sufficiently irreparable to warrant a preliminary injunction.

### A.  Alleged Economic Harms Are Not Beyond Remediation

Plaintiffs claim they are entitled to a preliminary injunction because absent such injunction they will suffer "financial damages." *Id.* at 48 (alleging that the Department seeks to reduce the amount of loan cancellation afforded to Plaintiffs). However, it is well established that "monetary harm" and "financial hardship" are not irreparable injuries. *Elias v. Connett*, 908 F.2d 521, 526 (9th Cir. 1990); *Monge v. Smyth*, 229 F.2d 361, 367 (9th Cir. 1956); *Sampson*, 415 U.S. at 90; *see also Stanley*, 13 F.3d at 1320 (holding that plaintiff had adequate remedy at law for claims seeking money damages and back pay for the loss of her job); *Loft v. Stationary Eng'rs, Local 39*, 2014 WL 709980, at *4 (N.D. Cal. Feb. 24, 2014) (loss of job and pension benefits is not irreparable); *Belzer v. Am. Airlines*, 2007 WL 685865, at *2 (E.D. Cal. Mar. 5, 2007). Plaintiffs acknowledge as much. *See* PI Mot. at 47 ("economic harm does not generally constitute an irreparable injury").

Nevertheless, Plaintiffs attempt to argue that they will be irreparably harmed absent an injunction because, based on decisions of courts in other circuits, they believe economic harm "*may* be grounds for an injunction where a Plaintiff lives on a fixed income and minimal increases in their cost of living creates … *possible* 'deprivation of life's necessities' and concomitant 'emotional distress.'" *Id.* (emphasis added). Such a tentative, speculative argument cannot establish irreparable harm.[13] *Volis v. City of Los Angeles Hous. Auth.*, 2013 WL 12214417

---

[13] Plaintiffs' papers do not support the conclusion that any named Plaintiff may face a possible deprivation of "life's necessities," as a result of Defendants' conduct. And even if they did with respect to one particular borrower, this would not support an injunction as to other borrowers. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) ("[I]n the absence of a foundation from which one could infer that all (or virtually all) members of a group are irreparably harmed, we do not believe that a court can enter a mass preliminary injunction.").

1   (C.D. Cal. May 6, 2013) ("Speculative injury does not constitute irreparable injury"); *see also*

2   *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013).[14]

### B.   Neither Invasion Of Privacy, Nor Dignitary And Emotional Harms Are Irreparable

Plaintiffs allege that the financial harm the Department is causing them creates "immeasurable" "overlapping" "stress and worry."  *See* PI Mot. at 46, 48.  They also allege that the Department's infringement of Plaintiffs' privacy caused "dignitary and emotional harms" "by denying them relief based on that very infringement."  *Id.* at 46.  But Plaintiffs do not cite any authority in support of these vague notions, and the Supreme Court has made clear that a showing of reputational harm, even coupled with lost earnings, "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction." *Sampson*, 415 U.S. at 91-92; *see also Volis*, 2013 WL 12214417, at *2 ("Conclusory affidavits are insufficient to demonstrate irreparable harm.").  Applying *Sampson*, the Ninth Circuit has rejected assertions of irreparable harm stemming from reputational damage (*i.e.*, dignitary harms), and psychological injury.  *See, e.g.*, *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985) (lost income, lost retirement and relocation pay, and damage to a military service member's *reputation* resulting from the stigma of a less-than-honorable discharge did not constitute irreparable harm); *Kennedy v. Sec'y of Army*, 191 F.3d 460 (9th Cir. 1999) (unpublished table decision); *See also Heineke v. Santa Clara Univ.*, 2017 WL 4098887, at *2-5, 7 (N.D. Cal. Sept. 15, 2017).

### C.   Alleged Constitutional Violations Are Not Per Se Irreparable

Plaintiffs allege that "[a]bsent an injunction returning to the *status quo ante*" they will suffer irreparable violations of their constitutional rights.  PI Mot. at 46.  Even if Plaintiffs clearly

---

[14] Plaintiffs also allege that they are suffering "financial damages" that they "will be unable to recover from the government."  PI Mot. at 48.  But "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm."  *Save Jobs USA v. DHS*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015) (citation omitted).  Indeed, a rule to the contrary would "effectively eliminate the irreparable harm requirement" in a suit against a defendant with sovereign immunity.  *Air Trans. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).

demonstrated that Defendants' conduct violated the Due Process clause, which they do not, the nature of this violation is not, in any sense, irreparable.  Plaintiffs sidestep their obligation to show that the constitutional violations they allege actually yield irreparable harm, relying instead on their erroneous and unsupported over-statement that "the prospect of that constitutional violation *alone* justifies a preliminary injunction."  *Id*.  But the mere assertion of a due process violation is not sufficient to establish irreparable harm.  *See, e.g.*, *Mitchell v. Cate*, 2014 WL 2895232 (E.D. Cal. June 25, 2014) (rejecting plaintiffs' contention that they "are likely to face irreparable injury because they have alleged that Defendants will violate their equal protection rights absent an injunction"); *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484-85 (1st Cir. 2009) ("[I]t cannot be said that violations of plaintiffs' rights to due process and equal protection automatically result in irreparable harm"); *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000) (violating constitutional rights does not always constitute irreparable harm); *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction.").  Instead, the relevant inquiry is whether Plaintiffs have alleged harm resulting from the constitutional violation that is in fact irreparable.  *See Koff v. Ahern*, 2015 WL 1050167, at *3 (N.D. Cal. Mar. 9, 2015).

Unlike in the cases upon which Plaintiffs rely, in which courts relied on finding(s) that the allegedly continuing constitutional violation was irreparable, Plaintiffs here make no showing that irreparable injury is likely, and impermissibly seek to show irreparable harm on the basis of an *alleged* constitutional violation.  In *Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017), for example, the plaintiffs, undocumented minors, were arrested and transported across the country to be detained in a secure facility without adequate notice and an opportunity to be heard.  A declaration established that the longer children remained in custody, the more likely they were to experience negative mental health repercussions, and that if the plaintiffs remained in custody when they turned eighteen they would be transferred to Immigration and Customs Enforcement custody and lose the protections afforded to juveniles.  On this basis, the court found plaintiffs had made the requisite showing of irreparable harm.  *Id* at 1200.

The second case that Plaintiffs cite, *Lavan v. City of Los* Angeles, 797 F. Supp. 2d 1005 (C.D. Cal. 2011), is similarly distinguishable. *See* PI Mot. at 46. There, the court noted, without any specific analysis, that in various cases, courts have presumed irreparable harm from alleged violations of constitutional rights. But the case it relied on cited *Goldie's Bookstore, Inc. v. Superior Ct. of Cal.,* 739 F.2d 466, 472 (9th Cir.1984), involving a "purposeful unconstitutional suppression of speech" that the court found constituted irreparable harm, and said nothing about whether a putative due process violation that at most yielded economic harm could be remedied by any subsequent ultimate relief. *See Johnson v. San Francisco*, 2010 WL 3078635, at *3 (N.D. Cal. Aug. 5, 2010) ("it cannot be said that violations of the right to due process and equal protection automatically result in irreparable harm."). Here, the harm alleged to result from the putative due process violation is that some borrower may have to repay some portion of his federal student loans while the Court evaluates Plaintiffs' arguments that all such loans should be forgiven in full. Alleged "due process" violations in such contexts are not irreparable.

Because Plaintiffs have not made the required threshold showing of irreparable harm, the Court need not even address the other three factors of the test for whether a preliminary injunction is appropriate, and should deny Plaintiffs' motion. *See Heineke*, 2017 WL 4098887, at *4 ("If a plaintiff does not or cannot demonstrate irreparable harm if a preliminary injunction is not granted, the injunction will not be granted." (citation omitted)).

## II.     Plaintiffs Have Not Demonstrated A Likelihood Of Success

Even if the Court proceeds to evaluate Plaintiffs' other arguments, Plaintiffs' motion should still be denied because Plaintiffs do not show that their claims are likely to succeed.

### A.     Plaintiffs Have Not Established That The Department Created and Abandoned Any "Rule" Applicable To Their Borrower Defense Claims

The Department has not issued any binding rule, through notice and comment or otherwise, providing for the full cancellation of loans for Corinthian borrowers in cohorts covered by the Department's misrepresentation findings ("findings cohorts"). Nor has it issued any formal pronouncement indicating that such relief (full loan discharge) will be unavailable in all future cases relating to such borrowers. Plaintiffs' claim, then, is premised on their ability to

show that (1) the Defendants, through multiple "public statements," Am. Compl. ¶ 81, and past adjudication of claims, formulated a binding rule to govern the adjudication of all future claims submitted by all Corinthian borrowers in covered cohorts; and (2) the Defendants have made a final determination to abandon this "rule" in all future cases, again through various "public statements and actions," including their alleged failure to award full discharge on "successful" claims since January 20, 2017, *see id.* ¶¶ 267-68.  According to Plaintiffs, this "abandonment" constitutes final agency action subject to review under the APA.  *See* PI Mot. at 25.

But Plaintiffs have failed to establish that the Department created any rule, binding in all future borrower defense adjudications and entitling the Plaintiffs to full discharge of their Direct Loan debt.  Therefore, the Department's subsequent decision to calculate relief for a successful defense to repayment based upon the value of the education received (resulting, at least in some cases, in partial rather than full discharge of a student's loan) constitutes no unlawful abandonment.  The Court therefore lacks jurisdiction to review Plaintiffs' claims because "allegations of noncompliance with an agency statement that is not binding on the agency" are unreviewable.  *United States v. Alameda Gateway Ltd.*, 213 F.3d 1161, 1167 (9th Cir. 2000).

### 1.   There Is No "Corinthian Job Placement Rate Rule," As Defined By Plaintiffs

Plaintiffs assert that the Department formulated a "Rule to govern claims related to the Department's findings regarding various Corinthian programs."  PI Mot. at 12.  In reality, the Department's process for adjudicating these claims lacked this level of formality.  It is true that the Department made findings that certain CCI-operated campuses systematically misrepresented job placement rates at specific programs during specific periods of time; and the Department did conduct outreach, providing information and a simple attestation form, to assist potentially affected students in asserting a borrower defense on that basis.  But these efforts were made on an *ad hoc* basis as part of the Department's evolving response to the "flood of borrower defense claims submitted by [CCI] students" following its closure, 2016 NPRM, 81 Fed. Reg. at 39,330-331, and it was precisely because the existing regulatory scheme "is silent on the process … to assert a borrower defense claim," *id.* at 39,335-336, that the Department found it necessary to engage in rulemaking in 2016 to "establish a more accessible and consistent borrower defense

standard and clarify and streamline the borrower defense process," *id*. at 39,331.

To the extent there was any "[r]ule to govern" claims submitted by Corinthian borrowers, PI Mot. at 12, it was that such borrowers could establish a defense to repayment by attesting to their date of enrollment in a covered program during a covered time, as well as their reliance on the relevant campus' representations regarding job placement rates – ground rules that remain in effect. Because the Department's own findings determined that these campuses had engaged in actionable wrongdoing under state law, affected students were relieved of their normal obligation to prove their school's misconduct in order to establish a borrower defense. *See, e.g.*, First Special Master Report at 7. But even that determination was never codified through any formal agency process, and in any event stopped well short of "prospectively determin[ing] that all class members," PI Mot. at 29 (*i.e.*, all students enrolled in findings cohorts who have submitted *or will submit* a borrower defense claim) were entitled to full discharge of associated loan debt.

Nor is such a "full discharge" rule created by the governing regulation, which explicitly authorizes the Secretary, upon a borrower's successful defense to repayment, to relieve the borrower of the obligation to repay "*all or part* of the loan and associated costs and fees that the borrower would otherwise be obligated to pay," and further grants the Secretary discretion to "afford[] the borrower such further relief *as the Secretary determines is appropriate under the circumstances*." 34 C.F.R. § 685.206I(2) (emphasis added). *Se La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of Interior*, 2013 WL 4500572, at *9 (C.D. Cal. Aug. 16, 2013) (grant of authority to gather information "as appropriate" demonstrated that "the extent of information gathering . . . is committed to the discretion of the agency").

Instead, Plaintiffs are forced to cobble their "rule" out of "multiple" of the Department's "public statements." PI Mot. at 13.[15] But Plaintiffs' motion cites only two such "statements,"

---

[15] Plaintiffs also allege, on "information and belief," that the "rule" was "codified" in certain "legal memoranda written, approved, and relied upon by the Department." Am. Compl. ¶ 80. While Plaintiffs' motion relies upon these documents, it does not provide any evidence of their content. *See* PI Mot. at 15. And Plaintiffs' "belief" about the existence and contents of such documents does not carry their burden of "identifying specific federal conduct and explaining how such conduct constitutes final agency action within the meaning of the APA," *Chance v.*

an offhand explanation that certain Corinthian borrowers "would have a cause of action under state law" and a notation in an administrative request to collect information from student borrowers, *see id.* at 14, neither of which states that any Corinthian borrower who makes the required attestation is entitled to "full relief …by cancelling all outstanding amounts on related loans," *id.* at 13.   In any event, such "public statements" "are not final agency action because they are not definitive of legal rights or duties," "do not have the force of law," and "do not impose any burden[,]" on their own, on students with pending or anticipated claims for borrower defense.  *Ammons v. Great Lakes Chemical Corp.*, 1986 WL 10743, at *3 (W.D. Wash. July 23, 1986); *see also In re Murray Energy Corp.*, 788 F.3d 330, 336 (D.C. Cir. 2015) (agency statement regarding legal authority, "unconnected to any final rule or other final agency action[,] do not impose any legal obligations or prohibitions").  Indeed, Plaintiffs do not contend that the "rule" from which they seek to benefit should have gone through the notice-and-comment procedures that are applicable to "substantive rules," *i.e.*, those that "create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 449 (9th Cir. 1994).  In conceding that their alleged "rule" was validly created outside the confines of notice-and-comment rulemaking, Plaintiffs also concede that it did not "establish[ ] a binding norm."  *Sacora v. Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010); *see also Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1014 (9th Cir. 1987) (notice-and-comment proceedings required for any agency directive that "effectively replaces agency discretion with a new 'binding rule of substantive law'" (citation omitted)).

To the extent that Plaintiffs rely on the Department's alleged "consistent[ ]" application of the purported rule in individual adjudications of borrower defense claims, PI Mot. at 15, Plaintiffs have not carried their burden of showing that the Department created a binding "full

---

*Zinke*, 263 F. Supp. 3d 1178, 1192-93 (N.D. Okla. 2017) (rejecting allegations about agency action made upon "information and belief"), nor can it be used to demonstrate their entitlement to the extraordinary preliminary injunctive relief they seek.  *See, e.g.*, *Bal. Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 543 (D. Md. 2011); *Sprint Nextel Corp. v. Ezcom, Inc.*, 2012 WL 12882422, at *1 (C.D. Cal. Feb. 13, 2012) (rejecting request for preliminary injunction based upon allegations made "[u]pon information and belief," and not upon any "evidence" in support of such allegations).

discharge" rule of decision.  First, Plaintiffs clearly claim that their "Corinthian Job Placement Rate Rule is a 'rule' within the meaning of the APA, 5 U.S.C. § 551(4)."  Am. Compl. ¶ 271. This definition is distinct from an "adjudication," which "results in an order [and] is virtually any agency action that is not rulemaking."  *Yesler Terrace Cmty. Council*, 37 F.3d at 448.  In any event, the Department's history of exercising its discretionary authority to grant relief on successful borrower defense claims, does not establish a "rule."  As noted above, the operative regulation vests the Secretary with significant discretion to determine the measure of relief appropriate for borrowers who can establish a successful defense to repayment based on the misconduct of their school.  Prior to the collapse of Corinthian, which represented a "landmark event for the concept of borrower defense to repayment," First Special Master Report at 5, the Department's dearth of experience with such claims gave it little opportunity to develop standards to govern the exercise of its discretion.  *See id.* (noting that "the Department did not have in place an established infrastructure for accepting, processing, and reviewing large numbers" of borrower defense claims).  In the months thereafter, however, the Department was flooded with an unprecedented number of claims for relief in this area, and took emergency measures to provide relief to affected students on an *ad hoc* basis.[16]

These emergency relief measures generally included fully discharging associated student loan debt of Corinthian borrowers able to attest to their membership in covered findings cohorts and reliance on CCI's misrepresentations.  But this does not mean that the agency bound itself, forever, to award relief on precisely the same basis, and in exactly the same measure, once it had an opportunity to engage in further review of this process.  The Department retained (and retains) the discretion to award full or partial discharge of student loan debts, as appropriate in the circumstances, notwithstanding the fact that it awarded full discharges to Corinthian borrowers in the past.  "Where, as here, the agency's rule gives it the discretion either to consider or to ignore certain factors, [a court] would be remiss to eliminate this discretion by requiring the

---

[16] See FSA Announcement (recognizing the "pressing need presented by the unique situation for students who attended colleges owned by Corinthian," and "taking unprecedented action to create a streamlined process that is fair to students who may have been victims of fraud").

agency to *always* ignore certain factors just because it has 'often' ignored these factors in the past." *Cal. Trout v. FERC*, 572 F.3d 1003, 1025-26 (9th Cir. 2009).

Simply put, Plaintiffs have not identified an agency rule entitling them, or any other members of the proposed class, to a full discharge of their loans.  And without such a binding, legally effective rule to govern future relief determinations, Plaintiffs cannot claim that such non-existent rule was "abandoned" by the Defendants' subsequent actions.  *See Indus. Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1120 (D.C. Cir. 1988) (Congress "clearly" did not intend for the APA's "definition of a rule [to] be construed so broadly that every agency action would be subject to judicial review," and citing *Int'l. Tel. & Telegraph Corp. v. Local 134*, 419 U.S. 428, 442-48 (1975), for the proposition that "agency process without binding effect, even if it leads to significant 'practical consequences,' is not reviewable under 5 U.S.C. § 551").

## 2.   Plaintiffs Have Identified No Final Agency Action "Abandoning" Any "Rule" Entitling Them To Full Discharge

Just as Plaintiffs have failed to identify any "rule" entitling them to full discharge, they have failed to establish that, even if such rule had been created, the Department has engaged in any final agency action, reviewable under the APA, "abandoning" that "rule" in all future cases. Under the APA, "[o]nly certain agency actions are subject to judicial review," *Sierra Forest Legacy v. U.S. Forest Serv.*, 598 F. Supp. 2d 1058, 1067 (N.D. Cal. 2009), and a plaintiff must "identify some 'agency action' that affects him in the specified fashion," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990).   Because agency action must be "circumscribed" and "discrete," *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004), a plaintiff cannot "seek *wholesale* improvements of [a federal program] by court decree, rather than in the offices of the [agency] or the halls of Congress, where programmatic improvements are normally made," *Lujan*, 497 U.S. at 891.   Moreover, judicial review is only available over agency action that is "final."  *See, e.g.*, *Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006).   In order for an action to meet this finality requirement, it must "mark the consummation of the agency's decision-making process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citations omitted).  "As a practical matter, this means that final

agency decisions are virtually always written and generally published." *Navajo Nation v. U.S. Dep't of Interior*, 819 F.3d 1084, 1098-99 (9th Cir. 2016) (Ikuta, J., dissenting).

Plaintiffs' challenge to the Defendants' assorted statements and actions over the past several years are insufficient to establish that the Department adopted and abandoned any binding rule of decision to govern their claims. As discussed above, Plaintiffs do not establish that the Department created a rule that would entitle them to their preferred measure of relief (*i.e.*, full discharge of their loan debts) for a successful defense against repayment. And further, they fail to demonstrate that such a rule was "abandoned" by any final agency action made reviewable by the APA. As such, their attempt to impose a rule of their own making upon the Department, and have it govern the relief available to thousands of current and future applicants for otherwise discretionary relief is an impermissible programmatic challenge. *See Nev. Ass'n of Ctys. v. U.S. Dep't of Interior*, 686 F. App'x 407, 408 (9th Cir. 2017).

###### i.      *Neither Defendants' alleged inaction, nor their "public statements" constitute final agency action*

Plaintiffs have not identified with specificity any particular agency action that allegedly violates the APA. They note that the Department "has failed to process any claims under the Corinthian Job Placement Rate Rule," PI Mot. at 15, but they do not style Count I as a challenge to agency inaction or seek, through that Count, to compel any agency action. Rather, they allege that the fact of this *inaction* suggests that the Department has taken the *affirmative action* of abandoning the rule of decision allegedly applicable to all Corinthian borrowers covered by the Department's findings. But the mere fact that the Department has not yet approved claims does not equate to a final determination that "the beneficiaries of the Rule were no longer able to obtain relief under it." *Id*. at 25-26. Until the Secretary actually determines the amount of relief a borrower will receive based on a successful borrower defense, she retains the broad discretion to afford whatever relief is "appropriate under the circumstances," including relieving a borrower of her obligation to repay "part" of a loan. 34 C.F.R. § 685.206(c). Within that discretionary scheme, Plaintiffs cannot establish that mere inaction has altered their rights or constituted the "functional equivalent of final agency action." *Hi-Tech Pharmacal, Inc. v. FDA*, 587 F Supp.

2d 1, 10 (D.D.C. 2008); s*ee also Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1111 (D.

Ariz. 2009) ("[T]here can be no final agency action, where the agency retains the discretion to

accept or reject the challenged action." (citing *Bennett*, 520 U.S. at 178)).

Plaintiffs' theory of abandonment is also premised on various "public statements" allegedly expressing an intent to abandon Plaintiffs' purported "rule." PI Mot. at 15. But as discussed, these types of statements, "unconnected to any final rule or other agency action," are not "definitive of legal rights or duties" and are not "final agency action." *In re Murray Energy Corp.*, 788 F.3d at 336; *Ammons*, 1986 WL 10743, at *3. Without tying these public comments to some definitive agency statement, carrying the force of law and definitively determining the measure of relief available, Plaintiffs cannot establish that the Department impermissibly "abandoned" a prior rule requiring it to award a specific measure of relief.

### ii.   *The December Press Release is not subject to review*

Perhaps realizing this, Plaintiffs focus their preliminary injunction motion on the Department's newly announced procedure for calculating the relief available to Corinthian borrowers. *See* PI Mot. at 26. In particular, Plaintiffs argue that the December 20, 2017 press release constitutes an unexplained change in policy from the so-called "Corinthian Job Placement Rate Rule*." Id*. at 26-27. But, once again, Plaintiffs' unsupported conclusions are insufficient to establish reviewable final agency action. Put simply, the December 20 press release is a general statement of the Department's policy and is not itself final agency action. As the D.C. Circuit has explained:

> An administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent . . . [and] presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

*Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974); *see also Mada-Luna*, 813 F.2d at 1013-14 (general statement of policy "provides guidance to agency officials in exercising their discretionary powers while preserving their flexibility and their opportunity to make individualized determination[s]").

The purpose of the press release, which was issued neither through rulemaking nor as a final decision regarding any particular borrower's claim for defense to repayment, is clearly to "announce[] the course which the agency intends to follow in future adjudications." *Pac. Gas*, 506 F.2d at 38. In particular, it "unveil[s] an improved discharge process," and announces the Department's intention, in the future, to "adjudicate[] [claims] systematically under the newly announced discharge process." December Press Release; *See Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009) (noting that a general statement of policy "does not have a present-day binding effect, that is, it does not impose any rights and obligations" (citations omitted)). The press release calls for a tiered system of relief for CCI borrowers asserting defenses to repayment; depending on the value of the education received at the relevant CCI program, a borrower could qualify for full discharge of his/her loans, or a partial discharge (*i.e.*, full discharge offset by the value of the education received). December Press Release. Given this range of relief potentially available, the December press release does not, on its own, "determine any rights or obligations." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 808 (D.C. Cir. 2006). Instead, specific determinations will be necessary to determine the agency's "final word" on the measure of relief actually available to specific students in particular programs. *See Mada-Luna*, 813 F.2d at 1013 (notice-and-comment not required for general statement of policy because "parties can challenge the policy determinations made by the agency only if and when the directive has been applied specifically to them"). Therefore, the Department's "general policy statement[]" "cannot be taken as 'final agency action'" that this Court has jurisdiction to review. *Ctr. for Auto Safety*, 452 F.3d at 808.[17]

Thus, Plaintiffs whose claims have not yet been adjudicated and who have not received notification of their measure of relief cannot establish a likelihood of success on the merits to the extent they challenge the December press release and not any particularized application of that press release to them individually.

        3.    <u>The Department's Determination Of Relief For Plaintiff Craig Is Not An Irrational Departure From Prior Decisions</u>

---

[17] In any event, a facial challenge to the press release is not "ripe" for judicial review, without further evidence of how the policy is applied in particular cases. *See Colwell*, 558 F.3d at 1128.

Named Plaintiff Craig, on the other hand, does allege that she received a decision from the Department indicating that it would only discharge 20% of her outstanding loans.   Am. Compl. ¶ 254.   This alone, however, is not enough to establish that the Department has impermissibly "abandoned" a prior rule of decision.   As discussed above, the Department never established any binding "rule" to award full discharges to borrowers in the findings cohorts, so there was no rule from which the Department departed when it issued Ms. Craig's determination. Moreover, "agencies are free to announce new principles during adjudication," so long as they do not "impose undue hardship by suddenly changing direction, to the detriment of those who have relied on past policy."   *Cities of Anaheim, Riverside, Banning, Colton & Azusa, Cal. v. FERC*, 723 F.2d 656, 659 (9th Cir. 1984); *see also Ca. Trout*, 572 F.3d at 1023 (inquiry is whether agency "departed irrationally" from its "usual rules of decision to reach a different, unexplained result in a single case" (citations omitted)).

Here, the decision announced in Ms. Craig's case was not such an "irrational departure" from its prior adjudications to warrant reversal.   The current administration is entitled to "evaluate priorities in light of [its] philosophy," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part), and accordingly convened a panel to review the Department's process for adjudicating borrower defense claims and awarding relief.   Manning Decl. ¶ 7.   Through that review, as described above, the Department discovered evidence that caused it to reevaluate the conclusion that Corinthian borrowers received worthless educations.   A lack of information regarding specific harms suffered by such borrowers, combined with earnings data showing that Corinthian programs "performed relatively well overall under the Department's GE measures," Manning Decl. ¶ 13; *see also* Juengst Decl. ¶ 11, led the Department to conclude that "graduates from many of Corinthian's academic programs did in fact receive something of substantial value from their education.   Manning Remarks at 11.   On this basis, the Department developed an improved "methodology used to calculate the amount of relief to award former [Corinthian] students," rooted in a determination of the value provided by the relevant Corinthian program, measured by comparing average earnings of students at that program to the average earnings they

reasonably could have expected to receive at a non-Corinthian program that prepares its students for gainful employment.  Methodology Memo at 1; Manning Decl. ¶ 17.  As the Department recognized, a student may receive some value in a Corinthian education notwithstanding the school's misconduct, and to that extent the harm suffered is not equivalent to the full amount of loans taken out to attend the program.

The Department explained this rationale in Ms. Craig's adjudication notice, which states that "[t]he amount of loan relief you will receive is based on the Department's assessment of the value of the education that you received.  The Department has determined the value of your education by comparing the average aggregate earnings of students who attended you program(s) of study to the average aggregate earnings of students who graduated from similar programs at other schools that have adequately prepared students for gainful employment").  *See* ECF No. 35-1 at 9.  The rationale the Department set forth in its individual determination letter to Ms. Craig, within the context of the Department's larger reassessment of the value of a Corinthian education, thus sets forth a reasonable explanation for the Department's decision, and provides assurance that it did not "depart[] irrationally from its prior decisions."  *Cal. Trout*, 572 F.3d at 1023.  As noted above, the Department retains discretion to award appropriate relief for borrower defense claims, including to award partial discharges, and has created no binding rule of decision requiring it to award a full discharge in all cases.  In light of that framework, its determination to offset Ms. Craig's discharge based on the value of her education received, a result contemplated by the governing regulation, is not an arbitrary departure, and the rationale set forth justifying the partial discharge is sufficient to satisfy the agency's minimal burden under the APA.  *See, e.g.*, *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 554 (9th Cir. 2016) (APA's "arbitrary and capricious" standard establishes a "high threshold" for setting aside agency action, pursuant to which such action is "presumed valid and is upheld if a reasonable basis exists for the decision," and a court "must not substitute its judgment for that of the agency").

### B.   Plaintiffs Are Not Likely To Succeed In Establishing That The Department Conducted Impermissibly Retroactive Rulemaking

Plaintiffs' next claim that the Department's "application of the Average Earnings Rule, instead of the Corinthian Job Placement Rate Rule, constitutes illegal retroactive rulemaking."

PI Mot. at 28.  As discussed above, however, the December Press Release is not the type of final agency action that is subject to review under the APA.  And in any case, the policy it announces does not operate retroactively, much less impermissibly so.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("statutory grant of *legislative rulemaking authority* will not, as a general matter, be understood to encompass the power to *promulgate retroactive rules* unless that power is conveyed by Congress in express terms" (emphasis added)).

On its face, the partial discharge policy for awarding relief on borrower defense claims operates prospectively, providing that "remaining pending claims will be adjudicated systematically under the newly announced discharge process."  December Press Release.  This change in the process[18] the Secretary employs to award discretionary relief under a statutory and regulatory scheme that sets forth no standards to guide that discretion does not operate retroactively because it does not "alter the *past* legal consequences of past actions."  *Nat'l Medical Enters., Inc. v. Sullivan*, 957 F.2d 664, 671 (9th Cir. 1992) (quoting *Bowen*, 488 U.S. at 219) (Scalia, J., concurring)).  For the press release to have had retroactive effect, Plaintiffs would need either (1) to claim a "vested right[]" in receiving full discharge in advance of the Department's December announcement or  (2) to show that some *past* legal consequence has resulted from that announcement.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70 (1994) (rule operatives "retrospectively" where it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past" (citation omitted)).

Neither is true.  As discussed above, Plaintiffs cannot claim any "vested right" in a particular form of relief (as alleged here, full discharge) based on a successful borrower defense.  The governing regulation vests discretion in the Secretary to grant either full or partial discharges, as well as complete discretion to fashion such other relief as she deems appropriate.  *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 44 n.10 (2006) (the term "vested rights," in the

---

[18] Plaintiffs argue the Court should evaluate the appropriateness of the Department's retroactive application of the "Corinthian Job Placement Rate Rule" under a five-prong test. *See* PI Mot. at 28.  But the Court does not need to reach this analysis, because Plaintiffs have not actually alleged that any agency determination is being retroactively applied.

retroactivity analysis, "describes something more substantial than inchoate expectations and unrealized opportunities[;]" rather, it describes "an immediate fixed right of present or future enjoyment"); *cf. Bloch v. Powell*, 348 F.3d 1060, 1069 (D.C. Cir. 2003) ("[W]hen a statute leaves a benefit to the discretion of a government official, no protected property interest in that benefit can arise."). And, as discussed above, neither has the Department, through its prior practice of adjudication, taken definitive action to cabin that discretion or make the binding, "prospective[] determin[ation] that all class members" – including those on whose applications the Department had not yet acted and those who have not yet submitted applications – are "entitled to [full] relief." PI Mot. at 29. *See, e.g., Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 537 (D.C. Cir. 1986) ("An agency pronouncement is not deemed a binding regulation merely because it may have 'some substantive impact,' as long as it 'leaves the administrator free to exercise his informed discretion.'" (citation omitted)). Likewise, the only legal consequence attached to this determination is the amount of discharge that a borrower can expect to receive and what repayment obligations will exist going forward. *See Nat'l Medical Enters.*, 957 F.2d at 671 (in general, an effect on the "*future* legal consequences of past transactions" is "an entirely lawful consequence of much agency rulemaking"); *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1067 (9th Cir. 1997) (no retroactive effect where agency determination, even as applied to pending claims, affects only the applicant's "prospective interest" in the outcome of the claim).

Plaintiffs' reliance on *Cort v. Crabtree*, 113 F.3d 1081 (9th Cir. 1997), actually underscores this point because, as Plaintiffs recognize, *see* PI Mot. at 28-29, its retroactivity analysis turned on the government applying a new rule to reverse course on an eligibility determination it had already made. In particular, the Bureau of Prisons ("BOP") sent the plaintiffs notifications indicating that they were eligible for a discretionary sentence reduction available to prisoners convicted of "nonviolent offenses" who successfully completed a substance abuse treatment program. *Cort*, 113 F.3d at 1082. Subsequently, BOP updated its definition of "nonviolent offense," applied that definition to the plaintiffs, and notified them that they were no longer eligible for the sentence reduction. *Id*. at 1083. The Ninth Circuit determined that it was impermissible to apply this new definition retroactively to the plaintiffs

because BOP had already "determine[d] prospectively" that they were eligible for the sentence reduction, creating a "right" to "*consideration* for early release." *Id*. at 1085.  Nothing in the court's decision suggests that had BOP not sent these notifications to the plaintiffs, but had sent eligibility notifications to other similarly situated prisoners, that would have sufficed to preclude BOP's applying the new policy to the plaintiffs.

This decision is inapposite because the Department has not denied Plaintiffs any opportunity to seek a full discharge of their loans based on a borrower defense to repayment; nor has it made a final determination that all Corinthian borrowers are no longer eligible for full discharges.  Because this is not a case where Defendants retroactively determined that the Plaintiffs, whose eligibility to seek relief they had already confirmed, can no longer be considered for discretionary relief, applying the new methodology to govern the amount of relief available imposes no retroactive effect.  *See Torres v. Chater*, 125 F.3d 166, 170 (3d Cir. 1997) (finding, in response to argument against retroactive application of a rule to deny a claimed right to a future government benefit that can be terminated at any time by statute, that "it follows that an applicant who has never been declared eligible may as well be deprived of an inchoate right").

## C. Plaintiffs Have Not Established That Their Section 706(1) Claims Are Likely To Succeed

A claim under the APA to compel agency action, whether unlawfully withheld or unreasonably delayed, can proceed "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take." *SUWA*, 542 U.S. at 64.  "The agency action must be pursuant to a legal obligation 'so clearly set forth that it could traditionally have been enforced through a writ of mandamus.'" *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1075-76 (9th Cir. 2015) (citation omitted); *see also Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir. 1994) ("A writ of mandamus is appropriately issued only when (1) the plaintiff's claim is 'clear and certain'; (2) the defendant official's duty to act is ministerial, and 'so plainly prescribed as to be free from doubt'; and (3) no other adequate remedy is available.").  In the absence of such a command to carry out "a ministerial or non-discretionary act," about which the agency has "no discretion whatever," *SUWA*, 542 U.S. at 63-64, agency action cannot be deemed "*unlawfully*

withheld," *id.* at 63, or "unreasonably delayed," *id* at 63 n.1. In light of these statutory commands, when presented with an unreasonable delay claim, "a court does not reach the question of whether a delay was unreasonable until it has found that the agency has failed to take a discrete, non-discretionary action." *Cloverdale Rancheria of Pomo Indians of Cal. v. Salazar*, 2011 WL 1883196, at *3 (N.D. Cal. May 17, 2011) (citing *SUWA*, 542 U.S. at 63 n.1).

Plaintiffs allege that the Department has both unlawfully withheld and unreasonably delayed "relief [due] under the Corinthian Job Placement Rate Rule," (*i.e.*, "full loan discharge,"), PI Mot. at 42-43 ("Not only has the Department unlawfully withheld [full] relief, but it has done so for an unreasonable period of time."); *id.* at 44. Thus, the specific agency action that Plaintiffs seek to compel, through both Section 706(1) claims, is the granting of "full loan discharge to [all] individuals" who "submitted an attestation form establishing that they fell into one of the findings cohorts." *Id.* at 43. But that action, potentially applicable to thousands of as-yet unidentified Corinthian borrowers is not *discrete*. *SUWA*, 542 U.S. at 64 (discrete agency action requirement precludes a "broad programmatic attack"). Nor is the Department in any sense "required" to award full discharge of any loan based on a borrower's defense to repayment. Accordingly, Plaintiffs have not established their entitlement to the extraordinary remedy they seek, much less their entitlement to such a *mandatory* injunction in the present *preliminary* proceeding. *See Taiebat*, 2017 WL 747460, at *3 (request, under Section 706(1) for mandatory injunction adjusting immigration status "not 'temporary' or 'preliminary'" and is "inappropriate . . . at the preliminary-injunction stage" (citations omitted)).

Defendants are under no mandatory duty to award any particular relief based upon a successful borrower defense claim. To the contrary, the HEA merely directs the Secretary to specify "which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment," and the regulations promulgated thereunder grant the Secretary discretion to determine the measure of relief appropriate upon a borrower's assertion of a successful defense to repayment. Moreover, as discussed above, the Department has not otherwise established a mandatory duty to award particular relief through its informal announcements and past treatment of borrower defense claims, which do not carry the force of

law with respect to future adjudications. *See Vietnam Veterans of Am.*, 811 F.3d at 1081 ("We recognize that the operation of § 706(1) is restricted to discrete actions that are *unequivocally compelled by statute or regulation*." (emphasis added)); *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 21 (D.D.C. 2017) (noting that while source of "law" creating mandatory duty necessary to sustain a Section 706(1) claim need not be a statute, it is limited to "agency regulation that ha the force of law" (quoting *SUWA*, 542 U.S. at 64)).   Because a court, in response to a Section 706(1) claim, cannot compel action "not clearly mandated" by law, *Hells Canyon Pres. Council*, 593 F.3d at 933, Plaintiffs cannot compel the Department to award them their preferred relief for their asserted defenses to repayment.  *See CREW v. SEC*, 916 F. Supp. 2d 141, 148-49 (D.D.C. 2013) ("If the duty requires a 'ministerial or non-discretionary act,' a court may order the agency to take that specific action, but if the duty is simply to 'take action upon a matter' but 'the manner of its action is left to the agency's discretion,' the court 'has no power to specify what the action must be.'" (quoting *SUWA*, 542 U.S. at 64-65)).

### D.    Plaintiffs Have Not Established That They Are Likely To Succeed On Their Privacy Act Claim

Plaintiffs' Privacy Act claim is premised on their contention that Defendants "are rendering decisions about individual borrower defense applications in violation of the Privacy Act's restrictions on Matching Programs," Am. Compl. ¶ 298, and in particular seeks preliminary relief based on asserted violations of 5 U.S.C. § 552a(o)-(p), (r)-(u).  PI Mot. at 3. As a remedy, Plaintiffs request that the Court "declare that the Department's Average Earnings Rule violates the Privacy Act," and, accordingly, set aside that "rule."  See Am. Compl. at 56, Prayer for Relief (E-I).  Plaintiffs' claim fails for two reasons.  First, Plaintiffs' requested declaratory and injunctive relief is not available under the Privacy Act's comprehensive remedial scheme, which also precludes Plaintiffs from seeking such relief under the APA.  Second, in any event, Plaintiffs have not demonstrated a likelihood of success on the merits because the Department's agreement with SSA is not a "matching program," as defined by the Privacy Act.

#### 1.    The Injunctive Relief Plaintiffs Seek Is Not Available Under The Privacy Act Or The APA

The Privacy Act provides "comprehensive private remedies for unwarranted disclosures

of personal information." *Dittman v. California*, 191 F.3d 1020, 1028 (9th Cir. 1999) (quoting *Polchowski v. Gorris*, 714 F.2d 749, 752 (7th Cir. 1983)); *see also Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008). This "comprehensive remedial scheme," *Libby*, 535 F.3d at 703, authorizes injunctive relief in only two specific circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records, and (2) to order an agency to allow an individual access to his records – neither of which applies here. As the Ninth Circuit and other circuits have held, a plaintiff cannot seek other equitable relief for any Privacy Act violation, including under the catchall provision set out at 5 U.S.C. § 552a(g)(1)(D), which provides for civil remedies when an agency "fails to comply with any other provision of [the Privacy Act.]" *See Cell Assocs., Inc. v. Nat'l Inst. of Health*, 579 F.2d 1155, 1161 (9th Cir. 1978) ("[W]e think it plain that Congress limited injunctive relief to the situations described in 5 U.S.C. § 552a(g)(1)(A) and (2) and (1)(B) and (3)."); *see also Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988); *Edison v. Dep't of the Army*, 672 F.2d 840, 846-47 (11th Cir. 1982).

These holdings are consistent with the principle that "[w]here . . . [a] 'statute provides for certain special types of equitable relief but not others, it is not proper to imply a broad right to injunctive relief.'" *Parks v. IRS*, 618 F.2d 677, 684 (10th Cir. 1980) (citing *Cell Assoc.*, 579 F.2d at 1161-62). This is especially true with the Privacy Act because Congress "link[ed] particular violations of the Act to particular remedies in a specific and detailed manner[,]" which "points to a conclusion that Congress did not intend to authorize the issuance of [other] injunctions." *Cell Assocs.*, 579 F.2d at 1159. Indeed, were other injunctive relief available for violations of the Privacy Act generally, "the detailed remedial scheme adopted by Congress would make little sense. We think it unlikely that Congress would have gone to the trouble of authorizing equitable relief for two forms of agency misconduct and monetary relief for all other forms if it had intended to make injunctions available across the board." *Id.* at 1160. Accordingly, Plaintiffs' requests for declaratory and injunctive relief should be rejected.

Nonetheless, Plaintiffs assert that "[i]njunctive relief is available under the APA to force compliance with the Privacy Act." PI Mot. at 31. Not so. While the APA generally waives the federal government's immunity from a lawsuit, 5 U.S.C. § 702, that waiver "comes with an

important carve-out[.]"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).  It "does not 'confer authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  *City of Oakland v. Lynch*, 798 F.3d 1159, 1165 (9th Cir. 2015) (quoting 5 U.S.C. § 702).  "That provision prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes."  *Patchak*, 567 U.S. at 215; *see also Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 & n.22 (1983).  "When Congress has dealt in particularity with a claim and has intended a specified remedy – including its exceptions – to be exclusive, that is the end of the matter; the APA does not undo the judgment."  *Patchak*, 567 U.S. at 216 (citation omitted).

Plaintiffs' claim to relief under the APA is entirely derivative of the asserted Privacy Act violation.  *See, e.g.*, PI Mot. at 31 (arguing that the "Average Earnings Rule" violates the APA "because" it violates the Privacy Act).  But they may not use the APA to obtain types of relief for alleged Privacy Act violations that Congress has not made part of that statute's comprehensive remedial scheme.  Following these principles, numerous federal courts have held that the Privacy Act precludes injunctive relief under the APA, and thus a plaintiff cannot bring an APA claim to obtain injunctive relief for an alleged Privacy Act violation.  *See, e.g.*, *Echols v. Morpho Detection, Inc.*, 2013 WL 1501523, at *2-3 (N.D. Cal. Apr. 11, 2013); *Ware v. U.S. Dep't of Interior*, 2006 WL 1005091, at *3 (D. Or. Apr. 14, 2006); *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014); *Mittleman v. U.S. Treasury*, 773 F. Supp. 442, 449 (D.D.C. 1991); *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 119 (D. Conn. 2010).[19]

Finally, Plaintiffs cannot rescue their Privacy Act claim by pointing to the Supreme Court's dicta in *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004).  *See* PI Mot. at 31 n.11.  *Chao* was

---

[19] Plaintiffs cite *Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988) in support of their claim that injunctive relief is available under the APA, PI Mot. at 31, but the circumstances in that case are distinguishable.  Notably, while the court concluded that a plaintiff could be awarded injunctive relief for a statutory violation under the APA, the statute at issue was not the Privacy Act, but rather the Veterans' Records Statute.  *Stephens*, 851 F.2d at 1467.  And Plaintiffs do not mention is that the *Doe* court explicitly recognized that injunctive relief was not available for a *Privacy Act* violation absent the specific circumstances set out in the statute.  *Id*. at 1463.  *See also Sussman v. U.S. Marshals Serv*., 494 F.3d 1106, 1122 (D.C. Cir.2007) (noting that *Doe* held that "only monetary damages ... are available to § 552a(g)(1)(D) plaintiffs.")

a case about monetary damage and, as Plaintiffs recognize, the Court did not need to reach, and thus did not reach, the issue of whether equitable relief was otherwise available. As discussed above, the Supreme Court has since made clear that a detailed remedial scheme, such as that provided by the Privacy Act, preempts alternative remedies, *see Patchak*, 567 U.S. at 215-17, and that directive should control here rather than any "speculat[ive]" dicta. PI Mot. at 31 n.11.

2.      Plaintiffs Are Not Otherwise Entitled To Relief Under the Privacy Act

Plaintiffs' Privacy Act claim also fails on the merits because it is entirely dependent upon their allegations that the Department's use of earnings data from the SSA constitutes a "matching program." *See* PI Mot. at 32; Am. Compl. ¶ 298. But this is not the case. The partial discharge methodology that Plaintiffs seek to challenge, which simply produces aggregate statistical data of the earnings at relevant Corinthian programs and has only incidental effects on individual borrowers based on their membership within the group of students whose earnings are assessed, does not rely on information compared through a matching program.

Plaintiffs rely on provisions of the Privacy Act enacted pursuant to the Computer Matching and Privacy Protection Act of 1988, which "establish[ed] procedural safeguards affecting agencies' use of Privacy Act records in performing certain types of computerized matching programs." OMB Guidance, 54 Fed. Reg. 25,818-01, 25,818 (June 19, 1989). The Privacy Act expressly excludes from its "matching program" definition several types of "matches" between computerized information contained in agencies' systems of records. Most pertinent here, it excludes "matches performed to produce aggregate statistical data without any personal identifiers." 5 U.S.C. § 552a(a)(8)(B)(i). OMB has clarified that this exclusion does not require that the "data bases used in the match must be stripped *prior to* the match"; only that the ultimate results of the match "not contain individually identifiable data."[20]  54 Fed. Reg. 25,823 (emphasis added). As discussed above, SSA provides the Department with "certain aggregate earnings information, in a form that cannot be associated with, or otherwise identify, directly or indirectly, a particular individual." Earnings Data Agreement at 1 (ECF No. 35-8 at

---

[20] It is well-established that OMB guidance documents implementing the Privacy Act "are owed the deference usually accorded interpretation of a statute by the agency charged with its administration." *Baker v. Dep't of Navy*, 814 F.2d 1381, 1383 (9th Cir. 1987) (citation omitted).

42).  As such, as the agreement itself recognizes, the "information exchange" between the two agencies "is not a 'matching program' as that term is defined in the Privacy Act."  *Id.*

Plaintiffs correctly point to OMB's guidance that although the statutory text contains no further limitations, it includes the "implicit" restriction that aggregate statistical data matches not be "done to take action against specific individuals."  *See* PI Mot. at 32-33 (citing 54 Fed. Reg. 25,823).  But while Plaintiffs acknowledge that OMB further recognized that "the statistical inferences drawn from the data may have consequences for the subject of the match as members of a class or group" and still be excluded from the Act's definition of a "matching program*," id*. at 33 n.12 (citing 54 Fed. Reg. 25,823), they do not analyze how that applies here.

This is in fact precisely what is happening here.  As discussed above, the Department extracted certain identifying information from groups of students at relevant Corinthian programs, grouped according to the program they attended and the credential they received. Methodology Memo at 3; *see also* Earnings Data Agreement at 2 (ECF No. 35-8 at 43).  The Department requested mean and median income data for 79 "Corinthian Program/Credential Groups," and SSA provided this program-level information, without any personal identifiers or earnings information about specific, individual students.  Methodology Memo at 3; Earnings Data Agreement at 3 (ECF No. 35-8 at 44) (describing process by which SSA produces earnings data to the Department in a form "that cannot be associated with, or otherwise identify, directly or indirectly, a particular individual").

The Department then used the aggregate statistical data to determine the value of the education provided at each of the Corinthian programs for which the Department sought earnings data for the year 2014.  In particular, the Department compared that average earnings information with earnings information that is part of "gainful employment" data for comparable non-Corinthian programs in order to assess the value of the education received at particular Corinthian programs.  Methodology Memo at 3.  Based on that calculation, the Department determined a common percentage of discharge offset for the associated federal student loans for all borrowers within each particular program at an academic credential level, as a calculation of the actual harm the borrowers suffered from attending that program in reliance on the subject

school's misrepresentations under state law. The Department's process for discharging outstanding loan balances based on successful borrower defenses going forward will thus parallel the manner in which it has recognized the existence of valid defenses to date.  Just as that initial determination was based on misconduct at entire Corinthian programs, and the individual borrowers' attestations that they attended a covered program and relied on that misconduct, so too will the ultimate remedy be calculated at the program level.  That the Department used aggregate statistical data from SSA, devoid of any personal identifiers, to answer this objective question (*i.e.*, the educational value that each Corinthian program provided) does not violate the Privacy Act because any consequence it had on individual borrowers was based only on "statistical inferences" that applied to the borrowers only as "members of [the] class or group" of students that attended the relevant Corinthian program.  54 Fed. Reg. at 25,823.

### E.   Plaintiffs Fail To Show That The Department's Discretionary Review Of Borrower Defense Applications Violates Due Process Rights

Plaintiffs' Due Process claim is similarly unlikely to succeed.  To establish a violation of procedural due process a plaintiff must demonstrate: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections.  *Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055, 1061 (9th Cir. 2006).  In evaluating whether the Government has provided adequate procedural protections, the Court considers, (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail.  *Mathews v. Eldridge*, 424 U.S. 319, 321 (1976).  Due process "is not a technical conception with a fixed content unrelated to time, place, and circumstances."  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (citation omitted).  Instead, due process procedures may vary "depending upon the importance of the interests involved and the nature of the subsequent proceedings."  *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 378 (1971)).  At bottom, the due process evaluation "is flexible and calls for such procedural protections as the particular situation demands."  *Buckingham v. Sec'y of U.S. Dep't of Agric.*,

603 F.3d 1073, 1083 (9th Cir. 2010) (quoting *Mathews*, 424 U.S. at 334).

Because Plaintiffs have not established the deprivation of any property interest, and in any event the process provided was adequate, their claim is not likely to succeed.

### 1. Plaintiffs Fail To Establish A Deprivation Of A Property Interest That Would Trigger Procedural Due Process

A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution. *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 569 (1972); *Kraft v. Jacka,* 872 F.2d 862, 866 (9th Cir. 1989). To claim a property interest in a particular benefit, a plaintiff must have "a legitimate claim of entitlement to," as opposed to "a unilateral expectation of," the benefit. *Roth*, 408 U.S. at 577. "This typically requires an individual to demonstrate that an existing law, rule, or understanding makes the conferral of a benefit mandatory." *United States v. Guillen-Cervantes*, 748 F.3d 870, 872 (9th Cir. 2014) (citation omitted). Plaintiffs' claim is not likely to succeed because they fail to demonstrate a protected property interest in any particular amount of loan forgiveness.

As an initial matter, Plaintiffs fail to identify with clarity the property interest that has allegedly been deprived. *Compare* PI. Mot. at 35 (asserting that plaintiffs have "a property interest in the outcome of their borrower defense application"), *with id*. at 39 (discussing an individual's "right to a full discharge"). Such indeterminacy about the nature of the alleged property interest undermines any argument that it is constitutionally significant. *See Allison v. Shabazz*, 2016 WL 2957121, at *6 (N.D. Cal. May 23, 2016) (dismissing case because "it is still unclear what liberty or property interest [plaintiff] alleges she was deprived"). Imprecision aside, what Plaintiffs ultimately assert they are being deprived of is their preferred level of relief, *i.e.*, full discharge under the "Corinthian Job Placement Rule." Because the Secretary retains the discretion to "grant or deny [such relief] in [her] discretion," Plaintiffs have not, and cannot, establish that they have a constitutionally protected property interest in having their federal loans discharged. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).

Plaintiffs first claim that such property interest is based on "the statutory and regulatory standards entitling individuals to a loan discharge once they satisfy the elements of the regulation." PI. Mot. at 36. While Plaintiffs are correct that legislative enactments may create a

property interest, they conveniently ignore that such interests are only created if the relevant statute or regulation *mandates* that a benefit will be provided whenever specific non-discretionary factual criteria are met, and the statute or regulation must contain "'particularized standards or criteria'" to create such a property interest. *Doyle v. City of Medford*, 606 F.3d 667, 673 (9th Cir. 2010) (citation omitted). As discussed above, neither the HEA nor the borrower defense regulation set forth any particular standards making any particular award of relief based upon a successful borrower defense mandatory, and instead confer discretion upon the Secretary to discharge a borrower's loan obligation in full or in part, and to afford such other discretionary relief as she deems appropriate.[21] *See* 20 U.S.C. § 1087e(h); 34 C.F.R. § 685.206(c).

Recognizing that the requisite mandatory language is absent here, Plaintiffs' try to cobble together an "entitlement" (in the same way they attempted to conjure a "rule" entitling them to the same full discharge remedy) based on various aspects of the purported "Corinthian Job Placement Rate Rule." PI Mot. at 36. But as discussed above, no such "rule" exists entitling Plaintiffs to the full discharge they seek, and, for the same reasons, they can claim no constitutionally cognizable property interest in the various public statements and adjudications allegedly giving rise to that rule. The Department at most established that Corinthian borrowers who fall within the Department's findings would be entitled to *some* relief from, including *some* amount of discharge of, their loans. Within a regulatory scheme that expressly provides for the Secretary to discharge a borrower's repayment obligation either in full or in part, these outreach efforts, which promise no particular amount of discharge, cannot establish Plaintiffs' entitlement to full discharge. *See supra* p. 7 (summarizing ED's various statements and outreach efforts, which reference "relief," "discharge," or "forgiveness" in unspecified amounts).

Finally, the Department's alleged "consistent application" of full discharges does not create a cognizable property interest because "a government body's past practice of granting a government benefit is insufficient to establish a legal entitlement to that benefit." *Gerhart v. Lake Cty.*, 637 F.3d 1013, 1021 (9th Cir. 2011); *see also Stevens Cty. v. U.S. Dep't of Interior*,

---

[21] This situation is thus distinguishable from the examples Plaintiffs present, *see* PI Mot. at 39, which involve statutorily mandated benefits like Social Security and Medicare payments.

507 F. Supp. 2d 1127 (E.D. Wash. 2007) (declining to recognize alleged property interest in grazing permits, even though plaintiffs alleged certain grazing permits have been *consistently renewed* for more than 60 years).  "A constitutional entitlement cannot be created – as if by estoppel – merely because wholly and *expressly* discretionary state privilege has been granted generously in the past."  *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981).[22]

Plaintiffs reference only one case in support of their purported property interest: *Higgins v. Spelling*, 663 F. Supp. 2d 788 (W.D. Mo. 2009).  But at issue there was a provision of the HEA that *required* the Secretary, upon a borrower's death or disability, to discharge the borrower's liability on a loan.  *See* 20 U.S.C. § 1087 (emphasis added).  Applicable regulations provided that, upon satisfaction of certain delineated criteria, the loan *is* "conditionally discharged" for up to three years.  *Higgins*, 663 F. Sup. 2d at 792 (citing 34 C.F.R. § 685.213(a)(1)).  Based on the mandatory statutory language and clearly defined criteria, the court found an "expectation" in discharge for an individual who meets the eligibility requirements.  *Id.* at 794.  Because the plaintiffs were initially determined to be permanently and totally disabled, and were notified of this determination, the court found a protected property right.

Here, on the other hand, neither the statute nor regulation contains mandatory language requiring the Department to completely discharge a loan if the borrower meets certain delineated criteria.  Moreover, other courts have confirmed that *Higgins* should be limited to its facts. *See, e.g.*, *Washington v. Duncan*, 2016 WL 324989 (E.D. Wis. Jan. 26, 2016); *Konashenko v. Duncan*, 2016 WL 4543793, at *6 n.3 (E.D.N.Y. July 20, 2016) (while *Higgins* "acknowledged that a property interest  *may* exist in a borrower's right to be discharged from his or her student loans [based on disability discharge provisions]" that may only be applicable where a borrower had already been personally notified by the  Department "that he satisfied the criteria for a

---

[22] The Department is granted significant discretion under the regulatory framework to award appropriate relief based on borrower defenses to repayment, and has not taken definitive action to cabin that discretion, undercutting Plaintiffs' claim that the Department's actions have created a cognizable property interest in full discharges.  *See Howard v. City of Coos Bay*, 2011 WL 899619, at *8 (D. Or. Mar. 14, 2011) (no property interest in job where employee handbook or personnel policy includes disclaimer that employment is at will).

disability discharge" (emphasis added)).

Because Plaintiffs have not shown that they have been deprived of any property interest, the Court can end its inquiry: the due process claim is not likely to succeed.

### 2.    Plaintiffs Do Not Establish A Risk Of Erroneous Deprivation

Even if Plaintiffs had a cognizable property interest in the discharge of the full amount of their federal student loans, they have not shown that the Defendants are infringing that right without providing adequate procedural protections.  Specifically, they have not demonstrated the risk of an erroneous deprivation of such interest through the procedures the Department uses, or the probable value, if any, of additional procedural requirements. *See Mathews*, 424 U.S. at 321.

To the extent the putative deprivation at the heart of Plaintiffs' due process claim is the Department's granting partial, as opposed to full, discharges of certain borrowers' student loans, Plaintiffs do not establish a likelihood that any particular class members have received such a partial discharge.  Under the Department's improved relief methodology, borrowers still qualify for full discharges where they attended Corinthian programs whose former attendees' earnings are 1% to 49% of the earnings of completers of a comparable, passing gainful employment program.  *See* December Press Release.  Plaintiffs ignore this fact and fail to establish why borrowers who have not yet received determinations on their borrower defense applications are more likely to receive partial, rather than full, discharges.  That Plaintiffs identify two borrowers who received a partial discharge, without further information about which CCI programs *other* putative class members attended, does not prove that other deprivations of the putative property interest are likely.  *See Mathews*, 424 U.S. at 344 ("[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions."); *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 (1985).

Moreover, Plaintiffs have not established that the additional processes they seek would minimize any risk of erroneous deprivation.  With respect to information from ED about how the borrowers' information would be used, PI Mot. at 36, Plaintiffs do not specify what information they seek and how it would minimize the risk of erroneous partial discharge.  In any event, the attestation forms already contain information about how the Department might use

information provided thereon. *See, e.g.*, Attestation Forms, *supra* p.7 n. 7 ("information in your file may be disclosed, on a case-by-case basis or under a computer matching program").  And with respect to the information that Plaintiffs would have the Department provide regarding its evaluation of claims, PI Mot. at 36, Plaintiffs similarly fail to offer any explanation for how such information would minimize the risk of erroneous deprivation.  The conclusory argument that the Department "precluded members from providing additional evidence with their attestation forms that *might* have impacted the Department's decision-making," PI Mot. at 38 (emphasis added), is too speculative to establish a likelihood of success on the merits, especially given that those forms expressly invite borrowers to submit "any other information" about their experience at CCI programs that they "believe is relevant."  Attestation Forms.

Plaintiffs also assert that the Department's procedure makes it difficult for them to challenge partial discharge determinations and "offer a contrary presentation" of evidence.  PI Mot. at 37.  But Plaintiffs overstate what is constitutionally required.  The Department need only provide information "sufficient to permit each [p]laintiff to respond meaningfully" to the putative deprivation, and is not required to provide all data underlying its calculations and determination.  *See, e.g. Latif v. Lynch*, 2016 WL 1239925, at * 14 (D. Or. Mar. 28, 2016); *Buchanon v. Prudential Ins. Co. of Am.*, 2016 WL 4087233, at *4 (E.D. Mich. Aug. 2, 2016).  In any event, notices like the one received by plaintiff Jennifer Craig are sufficient to permit the plaintiff to meaningfully respond.  As noted above, *supra* p. 27, that notice explains that the determination is based on the value of the education received at CCI, as determined by a comparison of aggregate average earnings data for students who attended the program with aggregate average earnings data for students who completed comparable GE programs.  *See* ECF No. 35-1.  To the extent a borrower believes that this information is inaccurate or that the Department made a mistake, for example, in assigning her to a particular program, the notification offers an email address and phone number to raise this issue.[23]  *See id*.

---

[23] Plaintiffs argument that due process is absent because the notices "fail to appraise individuals of their right to appeal" and "misleadingly impl[y] that the decision is final," PI Mot. at 38, n.13, is undercut by the notice itself, which explicitly provides that "If you have questions about

1    Plaintiffs do not establish that they are entitled to anything else.  They cite no binding

2    authority requiring the Department to provide additional information, relying instead on a

3    footnote, *see* PI Mot. at 37-38 (citing *Bowman Transp. Inc. v. Ark-Best Freigh Sys., Inc*., 419

4    U.S. 281, 288 n.4 (1974)) and a non-binding Second Circuit opinion, *Kapps v. Wing*, 404 F.3d

5    105, 123-24 (2d Cir. 2005), in which the court explicitly recognized that "the specific type of

6    notice required will vary depending on the circumstances of each given case" and "what [is]

7    constitutionally required in one context, may not be in another."   The court ordered a more

8    detailed notice of benefit determination because it found that such a notice would not be unduly

9    burdensome.  *Id*. at 124.  But here, as described above, some of the requested information is

10   already provided and the provision of other information that Plaintiffs seek may be prohibited

11   by law.   *See* 5 U.S.C. § 552a(b); 20 U.S.C. § 6103(a); 20 U.S.C. § 1015c (provisions that

12   Plaintiffs allege forbid the Department from releasing the individual income data that its

13   decisions are built on); *Latif*, 2016 WL 1239925, at * 13 (additional notice not required where it

14   would unduly jeopardize other government interests).[24]

15   Plaintiffs' final alleged procedural deficiency – that the Department errs in not soliciting

16   information from individual borrowers about their earnings and instead relying on third-party

17   data – also does not show a serious risk of erroneous deprivation.  In this Circuit, individualized

18   determination are *not* always required. *See, e.g., United States v. Strong*, 489 F.3d 1055, 1063

19   (9th Cir. 2007) (rejecting plaintiff's argument that statute was unconstitutional because it

20   required mandatory result without giving the court an opportunity to assess the defendant's

21   individualized circumstances); *Am. Council of the Blind v. Astrue*, No. C 05–04696 WHA, 2009

---

this notice, please contact the Department of Education" by phone or email. *See, e.g.*, ECF No. 35-1 at 10 (Plaintiff Craig's adjudication notice). Moreover, the notice's explanation of the process ("The Department will notify your loan servicer of the approved amounts for forgiveness, and the forgiveness should be completed within the next 90-120 days") makes sufficiently clear that, absent further steps, the decision is final.  *See id.*

[24] Contrary to Plaintiffs' assertions, the mere fact that some underlying data might not be releasable to Plaintiffs does not violate due process.  *See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 981 (9th Cir. 2012) (rejecting plaintiffs' contention that if information underlying a designation cannot be revealed to the designee, the relevant agency must either decline to designate the individual or reveal the information).

WL 3400686, at *22 (N.D. Cal. Oct. 20, 2009).  This is especially true here, where ED's process for discharging outstanding loan balances based on successful borrower defenses parallels the manner in which it has recognized the existence of valid defenses to date, which similarly focused on programmatic misconduct and assumed, rather than demonstrated, individualized harm.  In any event, Plaintiffs have not clearly demonstrated, as is necessary to warrant a PI, that additional procedures would minimize the risk of an erroneous deprivation, or that existing procedures are otherwise constitutionally insufficient.

3.    The Government's Interests Outweigh Any Benefits of Added Process

With respect to the third *Mathews* factor, the Department has a strong interest in maintaining its procedures and the Court should "lean heavily on the agency's expertise in fashioning its application" and award process.  *Foss v. Nat'l Marine Fisheries Serv*., 161 F.3d 584, 589 (9th Cir. 1998).  In evaluating the process for determining the amount of relief awarded successful borrower defense claimants, the Department reasonably determined that the amount of discharge awarded should be assessed in terms of the lack of value the Corinthian program afforded, as compared to the value provided by other comparable programs.  Requiring the Department to analyze each borrower's entitlement to relief on an individualized basis and to review individualized earnings documentation, as Plaintiffs seek, would be significantly more burdensome than the Department's chosen process, and would severely tax its resources.  *See* Declaration of Julian Schmoke ("Schmoke Decl.") (attached as Exhibit C) ¶¶ 10-12 (noting that the Department does not currently have in place a conceptual framework to guide it in "making individualized determinations of relief for borrower defense claims," and that putting such procedures in place would be "administratively burdensome," insofar as it would require the "development of a general framework for relief determinations, the hiring and training of personnel, and likely changes to the Department's systems and processes"); Declaration of Frank D. Curran ("Curran Decl.") (attached as Exhibit D) ¶ 4 (estimating that it would cost over one million dollars to modify existing templates and intake processes to add requests for information "that would need to be individualized by applicant").  Granting Plaintiff's motion could also be administratively burdensome for the Department, if it means the Department must re-process

large volumes of claims it has already adjudicated.  Plaintiffs do not even acknowledge these burdens, much less attempt to balance them, as required by *Mathews*.  They have not shown their Due Process claim is likely to succeed.[25]

### F.     Plaintiffs Fail To Establish A Likelihood of Success On Their Claim That The Department's Partial Discharge Process Is Arbitrary and Capricious

Finally, Plaintiffs assert that they are likely to succeed on their claim that the "Average Earnings Rule" is arbitrary and capricious.  *See* PI Mot. at 39.  This argument is largely derivative of arguments asserted elsewhere in Plaintiffs' Motion, and is unlikely to succeed on the merits for many of the same reasons described above.

According to Plaintiffs, the "Average Earnings Rule" that they seek to challenge "is the procedure the Department publicly announced on December 20, 2017."  Pls.' Proposed Order at 3.  As discussed above, however, *supra* Sec. II.A.2.ii, the December Press Release is not final agency action subject to APA review.  Indeed, because it does not on its face determine any rights or obligations, and provides for tiered relief based on the value of particular programs, the instant facial challenge is not fit for judicial resolution without further particularized evidence of how the policy is applied in individual cases.  *See Colwell*, 558 F.3d at 1126-28.

To the extent Plaintiffs seek to challenge the "application" of this so-called Rule, as in cases such as named Plaintiff Jennifer Craig and declarant Alina Farajian, *see* PI Mot. at 40-41, Plaintiffs fail to demonstrate the Department has "departed irrationally" from its "usual rules of decision" in adjudicating applications for borrower defenses.  *Cal. Trout*, 572 F.3d at 1023.  As discussed above, the Department's decision to base the amount of discharge awarded in these cases on the lack of value of the education received at the relevant Corinthian program, determined through a comparison of average earnings data at that program with average earnings data at a passing GE program, was reasonable in light of its discretion under the governing regulation to relieve a borrower of the obligation to repay "all or part of the loan"

---

[25] Plaintiffs assert, in a footnote, that the Department "failed" to take various actions Plaintiffs assert were required under the Privacy Act.  PI Mot. at 38-39 n. 14.  They do not explain, however, if or why they believe these failures are actionable under the Due Process clause, and this conclusory allegation, without more, cannot demonstrate a likelihood of success on the merits or entitle Plaintiffs to the extraordinary remedy of preliminary injunctive relief.

upon assertion of a successful borrower defense.  The Department was within its discretion to determine to offset the value of any discharge awarded (*i.e.*, determine that a successful claimant is relieved of the obligation to repay "part" of his/her loan) by the actual harm suffered as the result of attending a particular educational program on the basis of documented misrepresentations, measured by the educational value actually received, as opposed to assuming that such an education is completely without value.  Indeed, the evidence in front of the agency suggested that many Corinthian graduates "did in fact receive something of substantial value from their education," Manning remarks at 11, and in some cases attended Corinthian programs for which the average earnings exceeded those for students in comparable GE programs.  *Id.; see also* Juengst Declaration ¶¶ 11-13.  The Department has demonstrated a "rational connection between the facts found and the choice made." *All. Against IFQs v. Brown*, 84 F.3d 343, 345. (9th Cir. 1996).

Plaintiffs assert that the Department's reliance on the GE standard was "irrational" insofar as it focused on average earnings without comparison to debt.  PI Mot. at 40.  Plaintiffs' assertion that the relief methodology does not consider a borrower's debt is incorrect; the Department's relief methodology does take debt into account, in providing relief calculated as a percentage of a particular borrower's debt.   And this approach is rational because the Department's analysis revealed that many Corinthian programs performed well under the GE program, *see* Juengst Decl. ¶ 11 (noting that 51 out of 106 such programs had passing GE ratings and that only six failed), and the Department accordingly determined that a relief methodology based on the full GE debt-to-earnings ratio might yield little to no relief for many borrowers. *See* Manning Decl. ¶ 20.  A program's ability to prepare a student for gainful employment is not the same thing as the educational value a student receives at that program, for purposes of determining the relief appropriate in response to a school's misconduct, and it was reasonable for the Department to conclude that earnings provides a better proxy for lost educational value, *i.e.*, the harm suffered by borrowers, than an analysis of how those earnings interact with debt.

Agency action should only be set aside as arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency" or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The Department's adjudication of Ms. Craig's claim, on the basis of its improved discharge process, did none of these things. It did not rely on any "factors which Congress has not intended it to consider," for, as described above, Congress did not provide any relevant factors; and it did not "entirely fail[] to consider an important aspect of the problem" (in contrast to prior practice, the improved relief methodology takes into account the value of the education received and the measure of harm suffered before determining the appropriate amount of loan discharge based on the school's misconduct). Nor did the Department "offer[] explanation for its decision that runs counter to the evidence before the agency" (its process is consistent with its finding that "graduates from many of Corinthian's academic programs did in fact receive something of substantial value from their education," and that, in "many instances," "groups of graduates from Corinthian programs" performed even better than those from well-performing GE programs," Manning remarks at 11) or render a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (as described, the agency brought its expertise to bear in determining the objective value of Corinthian educational programs). *Id*. Accordingly, its determination is neither arbitrary nor capricious.

The Department did not create any binding rule entitling Plaintiffs to "full discharge," *see supra* Sec. II.A.1, and thus did not (and could not have), in awarding some members of Plaintiffs' proposed class a partial discharge, arbitrarily depart from any legal requirement to award different relief. *See* PI Mot. at 40-41. Similarly, Plaintiffs' contention that the Department's alleged due process violations (*i.e.*, its alleged improper use of "third-party data" and failure to "provide a full explanation" for its determinations) further render its partial relief determinations arbitrary and capricious, *id*. at 41, lacks merit for the reasons set forth *supra* Sec. II.E; *see also Weinberger v. Salfi*, 422 U.S. 749, 785 (1975) (declining to impose requirement that agency make "individualized determinations" regarding the distribution of social insurance where associated difficulties "outweigh the marginal increments" in effectiveness that such

individual determinations could be expected to produce).  In any event, the Department was careful to employ, where possible, presumptions favorable to the borrower when making its average earnings comparison, such as excluding CCI program from the set of passing GE programs and including all CCI students with borrower defense claims in the CCI earnings data (as opposed to only those who had completed their program), *see generally* Juengst Decl. ¶¶ 25-29, and reasoned that instead applying relief based on individualized earnings would remove such presumptions and "most likely lower the total amount of the payout to borrowers." Schmoke Decl. ¶ 19.  This balancing of the costs and benefits associated with providing more individualized relief is not arbitrary and capricious.

Finally, Plaintiffs argue that the Department "irrational[ly]" and "impermissibl[y]" interprets its borrower defense regulation to the extent that "the remedy it employs can be divorced from the state law cause of action that a borrower can assert under the regulation." *Id*. at 42.  This argument has no basis in either law or fact.  As discussed above, neither the HEA nor the plain text of the borrower defense regulation establish that state law must dictate the Secretary's provision of relief, but rather provide the Department with broad discretion to determine the relief appropriate for a successful borrower defense claim.  In any event, the state law cause of action on which Plaintiffs' defense to repayment are based is the California Unfair Competition Law ("UCL"), which prohibits unfair competition, and the Department has determined that Corinthian's misrepresentation of job placement rates constitutes such unfair competition.  *See* First Special Master Report at 5.  California law provides that a UCL action is "equitable in nature," and that remedies are "generally limited to injunctive relief and restitution." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003) (citation omitted).  Restitution under the UCL, in turn, is "the excess of what the plaintiff gave the defendant over the value of what the plaintiff received," and is designed to, *inter alia*, "restore the defrauded party to the position he would have had absent the fraud." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) (citations omitted).  Plaintiffs provide no support for their contention that the Department's award of partial discharges to CCI borrowers, based on assessment of the value received from the CCI education and thus a

determination of what those borrowers gave to CCI "*over the value* of what [they] received," *id*. (emphasis added), somehow untethers the Department's award of relief from the underlying cause of action on which the borrower defense is based.  Plaintiffs are thus unlikely to succeed on their arbitrary and capricious challenge to the Department's partial discharge process.[26]

### III.    The Balance of Equities and the Public Interest Weigh Strongly Against Entry of a Preliminary Injunction

Plaintiffs likewise cannot show the balance of equities tips in their favor.  Under the third prong of the preliminary injunction inquiry, courts "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.  Under the fourth prong, the courts consider the public interest.  Where the federal government is a party, the balance of equities and public interest factors may be merged.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  As noted above, Plaintiffs are not seeking merely to preserve the status quo, but instead seek a mandatory injunction compelling specific actions to be undertaken by the agency within arbitrarily limited time periods. *See* Pls.' Proposed Order at 4 (requesting that ED begin processing applications and granting relief "within 10 days").  These actions will be costly for the Department, in that they will divert resources to borrowers (in excess of the amount the Department has determined is necessary to make them whole) and away from other educational programs, thus running counter to the public interest.  As described above, the Department's method of calculating relief for Corinthian borrowers saves the Department significant costs it would otherwise incur in analyzing each borrower's entitlement to relief on an individualized basis and reviewing individualized earnings documentation.  Moreover, granting Plaintiffs their requested relief

---

[26] Plaintiffs further contend that the Department applied the "wrong legal standard in evaluating claims," referencing language in Ms. Craig's adjudication notice indicating that she was entitled to relief based on Corinthian's "material misrepresentation(s) to you." PI Mot. at 41.  Plaintiffs conveniently ignore the Department's findings that various Corinthian-operated programs violated state law by making misrepresentations about job placement rates. *See, e.g.* First Special Master Report at 5.  Plaintiffs' selective amnesia notwithstanding, ED's use of the "material misrepresentations" shorthand to describe Ms. Craig's claim simply indicates that, in her case (as with all other borrowers in Plaintiffs' proposed class), the conduct giving rise to a cause of action under state law is, as Plaintiffs recognize, CCI's material misrepresentation of job placement rates. *See, e.g.*, PI Mot. at 12 (summarizing Department's findings).

would frustrate the Department's objective of tying discharge amounts to the worth of the relevant programs, and will cost the Department millions of dollars.  *See* "Curran Decl." ¶¶ 10-11 (awarding full discharges to the approximately 8,809 borrower defense claimants who have been approved for partial discharges under the improved methodology would yield more than $70 million in discharged loans, and subject the Department to approximately $500,000 in additional administrative costs).   These savings are in the public interest and demonstrate that a preliminary injunction is inappropriate.  *See Pacific Aerospaec & Elect. v. Taylor*, 295 F.2d 1198, 1203 (E.D. Wash.) (economic concerns are "valid public interest concerns in the context of preliminary injunctive relief").  *See also* Schmoke Decl. ¶¶ 10-18 (regarding burden to the Department and Department's interest in a manageable, straightforward process); Manning Decl. ¶¶ 13,15 (regarding Department's interest in providing appropriate amounts of relief to borrowers in light of evidence of value for some CCI programs).

Plaintiffs' rely on the Department's statements to show that their requested relief is in the public interest, but those statements merely demonstrate that there is public interest in "the relief that [such borrowers] are entitled to under federal law and regulations." *See* PI Mot. at 49. But the relevant "law and regulations" provide that the Department has discretion to determine the amount of full or partial discharge appropriate for a successful claim for borrower defense. Allowing the court, by issuing the requested injunction, to substitute its judgment for the Department's is not in the public interest.  *See Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme of Congress "is in itself a declaration of public interest which should be persuasive" to courts).  The injunction Plaintiffs seek would frustrate and displace the Secretary's exercise of discretion, by replacing the Secretary's determination of what relief is due.  *See* Pls.' Proposed Order at 1.  The public interest, therefore, weighs heavily against the entry of the injunctive relief Plaintiffs seek here.

## CONCLUSION

For these reasons, Defendants respectfully request that Plaintiffs' Motion be denied.

Dated:  April 12, 2018                          Respectfully submitted,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
KAREN S. BLOOM
Senior Counsel
R. CHARLIE MERRITT
Trial Attorney
United States Department of Justice

*Attorneys for the Defendants*