# EXHIBIT A

CHAD A. READLER
Acting Assistant Attorney General

ALEX G. TSE
Acting United States Attorney

MARCIA BERMAN
Assistant Branch Director

KAREN S. BLOOM
Senior Counsel
R. CHARLIE MERRITT
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-4964
Facsimile: (202) 616-8460
E-mail: karen.s.bloom@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARTIN CALVILLO MANRIQUEZ, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>Defendants. | No. 17-7210<br><br>**DECLARATION OF JAMES F. MANNING IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, James F. Manning, hereby declare under the penalty of perjury as follows:

1.      I am over the age of 18 and competent to testify to the matters herein.

2.      I have been delegated the authority to perform the functions and duties of the Under Secretary of the United States Department of Education ("Department"), and serve as the Acting Chief Operating Officer of the Office of Federal Student Aid ("FSA").  I have served as either the Acting Under Secretary or have been delegated the authority to perform the functions and duties of the Under Secretary since April 2017.   I have been Acting Chief Operating Officer for FSA since January 2018.  Previously, I was a member of the Secretary's landing and beachhead teams, which arrived at the Department on January 20, 2017.

3.      I certify that I am duly authorized, am qualified, and have been given authority by the Department to make the statements contained in this Declaration regarding the Department's framework for processing applications for groups of borrowers who filed applications under the Department's borrower defense to repayment ("borrower defense") regulations, at 34 C.F.R. § 685.206(c), including those related to misrepresentations by schools operated by Corinthian Colleges, Inc. ("CCI").  The statements contained herein are based on my personal knowledge as an employee of the Department, and my review of the pertinent records.

4.      As having been delegated the authority to perform the functions and duties of the Under Secretary, I oversee policy development regarding Federal student financial aid and work directly with FSA, which administers Federal student financial aid programs.

5.      As Acting Chief Operating Officer for FSA, I also oversee the management of FSA's operations and support functions in its administration of Federal student financial aid programs.

6.      Through my duties as Acting Under Secretary, my duties as Acting Chief Operating Officer for FSA, my previous work as a member of the Secretary's landing and beachhead team,

Declaration of James F. Manning in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
Case No. 3:17-cv-07210-SK

2

my work on and my discussions with Department staff working on the borrower defense effort, I am generally familiar with the decisions that have been made regarding the borrower defense framework and the implementation of that framework.

7. In the winter and spring of 2017, a review panel examined the borrower defense claims and background information and made recommendations on how to resolve pending borrower defense claims and proceed in the future. I was a member of this review panel.

8. As part of the review panel's work, the review panel reviewed the criteria and bases for the approvals that had been issued by the Department since 2015, including approvals of discharges for the total amounts of borrowers' Federal student loans and reimbursement of payments for the following categories of CCI borrower defense claims:

   a. Claims related to job placement rate misrepresentations made to attendees of specified programs offered at Heald College campuses ("Heald JPR claims") under findings made by the Department;

   b. Claims related to job placement rate misrepresentations made to attendees of specified programs offered at certain Everest/WyoTech campuses under findings made by the Department ("Everest/WyoTech JPR claims");

   c. Claims related to guarantees of employment by CCI ("Guaranteed Jobs claims") at all CCI campuses between the time when CCI opened or acquired the campus and April 2015;

   d. Claims related to misrepresentations as to the transferability of credits at any Everest school or WyoTech's Laramie campus between the time when CCI opened or acquired the campus and April 2015 ("Everest/WyoTech Transfer of Credits claims"); and

Declaration of James F. Manning in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
Case No. 3:17-cv-07210-SK

3

  e. Claims related to misrepresentations as to the transferability of credits at California Heald campuses after CCI acquired the school ("Heald Transfer of Credits claims").

9. In the review panel's examination of the approvals that had been issued for these categories of CCI claims, we found that the previous approvals had been based on the assumption that CCI borrowers received a worthless education and therefore that the discharge of the total amount of borrowers' loans and reimbursement of all payments was appropriate for all CCI borrowers with valid claims.

10. The review panel recommended that the Department reevaluate this assumption, given the nature of the allegations of harm made in CCI borrower defense claims and the types of evaluations the Department already conducts for programs such as those attended by CCI students.

11. Generally, CCI borrowers have affirmed in their borrower defense applications that the primary reason for enrolling at CCI was to improve their careers and to make a better living. To the extent borrowers offer allegations of harm in their claims, they focus on the struggles they have had in finding employment because of an alleged lack of value provided to them by their CCI educations.

12. The Department already gathers employment-related information in the form of students' earnings for the type of academic programs offered by CCI. Under the Department's regulations at 34 C.F.R. part 668, subpart Q, the Department collects earnings information for programs, such as those offered by CCI schools, that are required to provide training that prepares students for gainful employment in a recognized occupation (a "Gainful Employment" or "GE program").

13. In January of 2017, the Department released the program earnings and debt-to-earnings ratios for the performance of GE programs for debt measure year 2015, which included many

Declaration of James F. Manning in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
Case No. 3:17-cv-07210-SK

4

CCI programs.[1] The data from those determinations revealed that reporting programs at CCI schools performed relatively well overall under the Department's GE measures. Only six of CCI's 106 programs failed the GE measures and 51 had passing rates.

14. Generally, the GE measures use the average program earnings for graduates and the average educational debt for those graduates to see if those students have the ability to repay the educational debt incurred for attending such programs. A program is "passing" under the Department's GE measures if students' annual loan payment is less than or equal to either 20% of their discretionary income or 8% of annual earnings. A program is in the "zone" if the students' annual loan payment is greater than 20% but less than or equal to 30% of their discretionary income or their annual earnings rate is greater than 8% but less than or equal to 12%. A program is "failing" if the students' annual loan payment is greater than 30% of their discretionary income and greater than 12% of their annual earnings or the students' annual earnings are zero. Programs that continue to fail or score in the zone will, over time, lose eligibility for Federal student aid.

15. I was aware of and familiar with CCI programs' overall performance in the GE program and that was a factor in the decision to reevaluate the assumption that CCI students received no value from their educations.

16. Given the statements from CCI borrower defense claimants, the availability of earnings data from the Department's analysis of such data pursuant to the GE regulations, and the knowledge that some CCI programs had passing GE rates, the Department made the determination to reevaluate the assumption that CCI students had been harmed because they had

[1] This data are available on the Department's website at https://studentaid.ed.gov/sa/sites/default/files/GE-DMYR-2015-Final-Rates.xls.

Declaration of James F. Manning in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
Case No. 3:17-cv-07210-SK

5

not received any value from their educations, and to consider such value in terms of CCI students' earnings.

17. Further, the Department made the determination that the lack of value to CCI students may be measured as the difference between the value of the education that the students received and an education that would have met students' reasonable expectations of preparation for gainful employment.

18. Given that the Department had a large number of pending borrower defense claims to process, the Department was also interested in establishing a way to determine relief that would not be overly time-consuming or difficult to apply in a consistent manner.

19. The Department was committed to using, to the extent possible, information it already had in its possession to make relief determinations to avoid adding more time to the borrower defense decision-making process.

20. Further, the Department decided not to consider the amount of Corinthian borrowers' debt in determining relief. One of the factors in this decision was the relatively strong performance of Corinthian programs under the Department's GE program, from which we concluded there may be some likelihood that determinations of harm based upon CCI students' relative debt to earnings may yield many borrowers with little to no relief.

21. These determinations informed the relief methodology and decisions documented in a December 15, 2017 memorandum authored by Phillip Juengst, Senior Advisor for the Office of the Chief Financial Officer at the Department, in collaboration with FSA and the Department's Office of the General Counsel.

22. On December 20, 2017, the Department issued a press release announcing this relief methodology. A true and correct copy of that press release is attached as Exhibit 1.

Declaration of James F. Manning in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
Case No. 3:17-cv-07210-SK

6

23. I also explained the Department's relief methodology in remarks I made on January 8, 2018 at the Department's second negotiated rulemaking session for the Department's review of the borrower defense regulations. A true and correct transcript of my remarks is attached as Exhibit 2.[2]

I declare under penalty of perjury, pursuant to the provisions of 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 12th day of April, 2018.

James F. Manning
Delegated the Authority to Perform the Functions and Duties of the Under Secretary
Acting Chief Operating Officer, Office of Federal Student Aid
United States Department of Education

[2] These remarks are also available on the Department's website at https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/manningopeningremarks.docx, and in the unofficial transcript of the proceedings, available at https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/bdday1session2.docx.

Declaration of James F. Manning in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
Case No. 3:17-cv-07210-SK

7

# EXHIBIT 1

3/28/2018 Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers | U.S. Department of Education

Skip to main content | About Us (http://www2.ed.gov/about/landing.jhtml) | Contact Us (http://www2.ed.gov/about/contacts/gen) | FAQs (http://answers.ed.gov) | Language Assistance

Search...

# Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers

**Clear evaluation criteria will expedite review process, ensure harmed students are treated fairly**
**Department announces action related to more than 20,000 pending claims**

DECEMBER 20, 2017

**Contact:** Press Office, (202) 401-1576, press@ed.gov (mailto: press@ed.gov)

WASHINGTON – After careful review to ensure a fair and efficient process, the U.S. Department of Education (the Department) today unveiled an improved discharge process for borrower defense to repayment (BDR) claims.

"We have been working to get this right for students since day one," said Secretary Betsy DeVos. "No fraud is acceptable, and students deserve relief if the school they attended acted dishonestly. This improved process will allow claims to be adjudicated quickly and harmed students to be treated fairly. It also protects taxpayers from being forced to shoulder massive costs that may be unjustified."

For pending claims, no changes were made to the existing approval criteria. Claims that previously would have been approved will still be approved today. However, rather than taking an "all or nothing" approach to discharge, the improved process will provide tiers of relief to compensate former Corinthian students based on damages incurred.

## NEW PROCESS FAIRLY COMPENSATES FOR DAMAGES

Students whose current earnings are less than 50 percent of their peers from a passing gainful employment (GE) program will receive full relief. Students whose earnings are at 50 percent or more of their GE program peers will receive proportionally tiered relief to compensate for the difference and make them whole (Table 1).

Table 1

| CCI Earnings as a Percentage of GE Earnings | Amount of Relief |
|---|---|
| 1% to 49% | 100% |
| 50% to 59% | 50% |
| 60% to 69% | 40% |
| 70% to 79% | 30% |
| 80% to 89% | 20% |
| 90% and above | 10% |

In all calculations, rounding is done to the benefit of the student, including:

- Relief is rounded up by tenths. For example, if a student had 59 percent of a passing GE program earnings, the student would receive 50 percent BDR relief.
- The better of mean or median earnings as compared to GE program peers is used to calculate relief.
- If the student was enrolled in multiple programs, the program which yields the most relief is the program used in the calculation.

Additionally, to mitigate the inconvenience for how long it has taken to adjudicate claims, the Department will apply a credit to interest that accrues on loans starting one year after the borrower defense application is filed.

The principle of relief based on value of education received is consistent with the legal authorization of BDR under the Higher Education Act and the existing BDR regulation, 34 CFR 685.206 [C][2], adopted in the Clinton Administration. Similar concepts for partial relief were proposed by the Obama Administration in its October 2016 regulation.

## RESPONDS TO CONCERNS RAISED BY INSPECTOR GENERAL

Following an internal review, the Secretary was concerned that there was no standardized process in place. In May, Secretary DeVos requested the Education Inspector General (IG) look into the existing procedures for claim adjudication.

The IG found "weaknesses with FSA's procedures for: 1. documenting the review and approval of legal memoranda establishing categories of borrower defense claims that qualified for discharge; 2. reviewing borrower defense claims; 3. processing claims approved for loan discharge and flagged for denial; and 4. establishing timeframes for claims intake, claims review, loan discharge, and claims denial processes and controls to ensure timeframes are met."

The Department has worked diligently to address the issues cited, yielding the improved discharge process.

## ACTION TAKEN TODAY

https://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers 1/2

3/28/2018 Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers | U.S. Department of Education
Case 3:17-cv-07210-SK Document 42-1 Filed 04/13/18 Page 11 of 18

The Department has approved for discharge 12,900 pending claims submitted by former Corinthian Colleges, Inc. students, and 8,600 pending claims have been denied. This action includes claims that have been received during this administration. Many of the denied claims were identified for denial, but not acted on, by the prior administration.

Borrowers will be notified on a rolling basis as their discharge is finalized. The remaining pending claims will be adjudicated systematically under the newly announced discharge process.

## CONTINUING TO IMPROVE BORROWER DEFENSE

The borrower defense to repayment regulation currently is under negotiated rulemaking, which began Nov. 13. As Secretary DeVos stated when she announced the Department's regulatory reset on June 14, 2017, the previous regulatory process yielded a "muddled process that's unfair to students and schools and puts taxpayers on the hook for significant costs." She continued, "It is the Department's aim, and this Administration's commitment, to protect students from predatory practices while also providing clear, fair and balanced rules for colleges and universities to follow."

The negotiators will continue to work toward a new regulation that will treat students, institutions and taxpayers fairly.

**Tags:** Regulation (/category/subject/regulation) Student Financial Aid (/category/subject/student-financial-aid) Student Loan Programs (/category/subject/student-loan-programs) Borrower Defense (/category/keyword/borrower-defense) Press Releases (/news/press-releases)

## How Do I Find...?

- Student loans, forgiveness (http://www2.ed.gov/fund/grants-college.html?src=rn)
- College accreditation (http://www.ed.gov/accreditation?src=rn)
- Every Student Succeeds Act (ESSA) (http://www.ed.gov/essa?src=rn)
- FERPA (http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=rn)
- FAFSA (http://fafsa.ed.gov/?src=edgov-rn)
- 1098-E Tax Form (http://www.ed.gov/1098-e?src=rn)
- More... (http://www2.ed.gov/about/top-tasks.html?src=rn)

## Information About...

- Transforming Teaching (http://www.ed.gov/teaching?src=rn)
- Family and Community Engagement (http://www.ed.gov/family-and-community-engagement?src=rn)
- Early Learning (https://www2.ed.gov/about/inits/ed/earlylearning/index.html?src=rn)

## Search press releases

Search...

## Find By Month

- March 2018 (/news/press-releases/monthly/201803)
- February 2018 (/news/press-releases/monthly/201802)
- January 2018 (/news/press-releases/monthly/201801)
- December 2017 (/news/press-releases/monthly/201712)
- November 2017 (/news/press-releases/monthly/201711)
- October 2017 (/news/press-releases/monthly/201710)
- September 2017 (/news/press-releases/monthly/201709)
- August 2017 (/news/press-releases/monthly/201708)
- July 2017 (/news/press-releases/monthly/201707)
- June 2017 (/news/press-releases/monthly/201706)
- May 2017 (/news/press-releases/monthly/201705)
- April 2017 (/news/press-releases/monthly/201704)
- All Press Releases (/news/press-releases)

*Our mission* is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

Student Loans (http://www2.ed.gov/fund/grants-college.html?src=ft)

Repaying Loans (http://studentaid.ed.gov/repay-loans?src=ft)

Defaulted Loans (http://studentaid.ed.gov/repay-loans/default?src=ft)

Loan Forgiveness (http://studentaid.ed.gov/repay-loans/forgiveness-cancellation?src=ft)

Loan Servicers (http://studentaid.ed.gov/repay-loans/understand/servicers?src=ft#who-is-my-loan-servicer)

https://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers 2/2

# EXHIBIT 2

Proceedings

(9:00 a.m.)

Ms. Miller: Good morning, everybody. Welcome to Session 2 of Borrower Defense Negotiated Rulemaking. Welcome back to a lot of you.

So we're going to go ahead and get started. We have a few negotiators who are in transit and aren't here yet. But we're going to keep the process moving. We don't want to hold on too long and we'll catch them up once they get here.

Does that sound good? Okay. So before we begin I would like to turn it over to the Department to welcome us.

Welcome and Remarks

Mr. Manning: Good morning and welcome back and Happy New Year. I hope you all had a restful holiday and are ready to dive back into the important work of this committee.

In November I addressed you concerning the status of the pending borrower defense claims, the Department's efforts to reduce the backlog and the general plans for administering borrower defense until the new rule takes effect.

Since then you have undoubtedly heard of the Department's execution of the plans I previewed to you then. I am sure you have many questions about the Department's approach and as important stakeholders on this issue I felt it important to provide you with another update.

On December 20th after a careful review taking into account the interests of both borrowers and taxpayers, the Department announced it was resuming the approval process for borrower defense claims, particularly for those from former Corinthian students.

As we've noted, the Department has identified approximately 21,500 claims for approval or denial, 12,900 of which are approvals and 8,600 of which are denials.

As of today, we have notified approximately 657 borrowers of the approval of their claim and approximately 500 borrowers have been notified of the denial with several thousand in the pipeline to be acted on soon.

Of the 500 borrowers informed of their denial claims pending for less than a year, so the interest on the deduction process I described to you in November was not applicable because those 500 borrowers, as I said, were less than a year.

The Department will continue on a rolling basis as quickly as we can to notify those borrowers who have yet to hear from the Department about the resolution of their claim. The Department will also apply the already mentioned interest deduction to the denied claims that have been pending for greater than a year.

Our hope for claims moving forward is that borrowers will not need to take advantage of that offering because their claim should be dispensed with within a year's time. The Department will also continue to review the approximately 35,577 Corinthian claims that to date it has not adjudicated under the framework recently announced.

However, now that the Department has the right business process and a solid infrastructure in place we expect to move the existing claims steadily as well as any claims submitted by Corinthian borrowers in the future.

We've seen an approximate 36 percent reduction in the number of pending Corinthian claims as a result of our recent actions and the downward trend should continue. I thank the borrower defense unit at FSA for its hard work in continuing to process these claims.

Now I would like to address a few specifics to improve borrower defense discharge process. First, I'm happy to announce the Department has largely addressed the weaknesses in the existing borrower defense procedures identified in both the Department's own internal review as well as the recent report of the Inspector General.

While some in the press portrayed the IG report as critical of the current administration's handling of the program the truth is that

Secretary DeVos herself requested the IG review because of her concerns regarding the program she inherited.

She was particularly dismayed by the haphazard approach taken by the previous administration exacerbated by activity encouraging borrowers to flood the Department with claims without a proper infrastructure in place to manage them.

I thank the IG for its work and helpful recommendations. I also applaud the work of the Department staff, including those at FSA, to correct weaknesses identified in the IG's report related to improving documentation in the review process.

Establishing time frames for claims intake, review and discharge and shoring up other areas of the program. Next I want to turn off my phone and emphasize that the Department has not changed the existing approval criteria for Corinthian borrowers.

Let me repeat that again. The Department has not changed the existing approval process for Corinthian borrowers. Claims approved under the previous administration will be claims approved under this one.

While some may not agree with facets of our approach the Department has not instructed staff to review claims with extra scrutiny. I would also like to add that many of the claims now being denied were flagged for denial in the previous administration.

As the IG noted in its report, the previous administration had not set up a process to act on denials. We now have. Now I know I'm speaking to an audience that has already been educated on the approach the Department is taking regarding relief to borrowers.

So I'll proceed assuming you have some knowledge of the basics. I would like to make a few points regarding what we call the make whole relief approach.

First, the Secretary was simply not comfortable with an either all or nothing approach. So while the Department does not dispute its own finding regarding Corinthian's wrongful conduct it was skeptical of the prior conclusion that assumed all Corinthian students received nothing

of value from their education.

Given the Secretary's discretion to determine relief owed to borrowers we looked at an alternative approach. The Department engaged in the process you have likely read about which compared aggregate program level earnings data of Corinthian borrowers with peer groups from passing gainful employment programs.

I understand questions have arisen that Corinthian programs were not generally part of GE. That is true. But the Department obtained aggregate earnings data from cohorts of Corinthian borrowers grouped together in the same way as GE cohorts to ensure an apples to apples comparison on earnings data.

Our findings revealed that graduates from many of Corinthian's academic programs did in fact receive something of substantial value from their education. Groups of graduates from Corinthian programs in many instances performed even better than those well performing GE programs.

Given its responsibility to the taxpayer the Department simply could not ignore what the data revealed. And given the fact that borrowers by and large failed to provide any real evidence of harm it has proceeded based on what evidence it does have in its possession.

Likewise the Secretary believed a nothing approach also seemed unfair even for those attendees of Corinthian programs who are earning as much or more than graduates of GE passing programs.

Accordingly, we devised a relief methodology that recognizes that those with valid claims suffered some basic harm by virtue of the misrepresentations. That is why all borrowers with approved claims, even those in groups who earned more than their GE counterparts, will receive at least ten percent relief.

Moreover, within the broad parameters of our approach for relief the Department has made additional assumptions in favor of the borrower leading to awarding more relief. Let me provide some examples.

First, if a borrower had been enrolled in multiple academic programs we would assess relief using their program with the lowest earnings so

as to provide the borrower the greatest amount of relief.

Second, the Department calculated both Corinthian and GE earnings four possible ways using mean or median and weighted approaches and went with the results that provided the most relief for the borrowers in the program. Another, within our tiered relief system all borrower's relief is rounded up to the nearest tenth percentile point.

For example, the Corinthian borrower in a program who averaged earnings of 59 percent of the GE program average earnings could be entitled to only 41 percent relief using a purely one to one inverse relief methodology.

But under our approach that borrower is entitled to 50 percent relief. And as I've said, borrowers whose earnings exceed those of their GE counterparts will receive ten percent relief at least.

There are other examples where the Department made these types of decisions in favor of the borrower. But they begin to get extremely technical and you have a long day ahead of you so I will spare you some of the details now.

In sum, the relief approach outlined is fair to both borrowers and taxpayers and is the product of a data-driven approach that makes the most of a difficult and complex situation. The Department is also working to assess claims from schools other than Corinthian.

We have roughly 46,000 pending claims from non-Corinthian schools. And while we are working diligently to adjudicate those claims, I do not have any more specific information to share with you today.

On behalf of Secretary DeVos I want to thank you all again for the work on this committee. After the slow start last time I realized that there was a lot of thoughtful and fruitful discussion in your first meeting in November and I'm confident that will continue over the next week.

So again, on behalf of Secretary DeVos I want to thank you all again for your work on this committee. After the slow start we're looking forward to another thoughtful and fruitful discussion over the course of the next several days.

So thanks again for your work and your commitment to this very important effort. I look forward to following your progress. Thank you very much.

Mr. Bantle: Okay, thank you. And for those who I have not seen this morning, good morning. Next thing we want to do just as we do have people streaming in with various travel and weather delays, we want to go around the room.

This will also serve to make sure everyone's microphone works and just quickly if the negotiator who is sitting at the table could introduce him or herself and state if you are the primary or the alternate negotiator. So we'll start with Kelli.

Ms. Hudson Perry: Kelli Hudson Perry, primary negotiator for chief business officers.

Mr. McComis: Michale McComis, primary negotiator for the accreditation community of interest.

Mr. Bush: Stevaughn Bush, Howard School of Law, alternate negotiator for United Students Association.

Ms. Hall: Good morning. Wanda Hall, the primary for lenders and secondary markets on the FFEL side.

Ms. O'Connell: Jaye O'Connell, primary for guaranty agencies.

Mr. Busada: Mike Busada, primary for small private for-profit schools under 450 students.

Mr. Murray: Good morning. Lodriguez Murray, alternate for historically black colleges, universities, MSIs. My primary, Mr. Flanigan is not here this week so the alternate has to become the primary.

Ms. Shafroth: Abby Shafroth, primary for legal services organizations that represent students and borrowers.

Mr. Hubbard: Will Hubbard representing the military affiliated community.

Ms. Weisman: Annmarie Weisman representing the Department.