NOAH ZINNER (SBN 247581)
nzinner@heraca.org
MEGUMI TSUTSUI (SBN 299294)
mtsutsui@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*Pro Hac Vice*)
tmerrill@law.harvard.edu
JOSHUA D. ROVENGER (*Pro Hac Vice*)
jrovenger@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARTIN CALVILLO MANRIQUEZ, JAMAL CORNELIUS, RTHWAN DOBASHI, and JENNIFER CRAIG on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education, <br><br> And | Case Number: C 17-cv-07210-SK <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> Date: April 30, 2018 <br> Time: 9:30 a.m. <br> Ctrm: Courtroom A, 15th Floor <br> Judge: Sallie Kim <br><br> Date Filed: April 19, 2018 |

1
2  THE UNITED STATES DEPARTMENT OF )
   EDUCATION,                    )
3                                )
              *Defendants.*      )
4                                )
5                                )
                                 )
6
_____
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

## TABLE OF CONTENTS

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........................................1

    a.  A borrower defense remedy is anchored to an applicant's state law claim ........................1

    b.  The Department of Education's adoption of the Average Earnings Rule in lieu of the Corinthian Job Placement Rate Rule is unlawful ...............................................................3

    c.  The Department of Education cannot hide the Corinthian Job Placement Rate Rule and the Average Earnings Rule from judicial review.......................................................................9

II. PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS ARE SUFFERING IRREPARABLE HARM ........................................................................................................13

III. THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION ...............................................................15

IV. CONCLUSION.................................................................................................................15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed. Of Labor v. Chertoff*,
   552 F. Supp. 2d 999 (N.D. Cal. 2007) ........................................................... 10

*Am. Wild Horse Pres.. Campaign v. Perdue*,
   873 F.3d 914 (D.C. Cir. 2017) .................................................................. 9, 10

*Arc of Cali. v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) ..................................................................... 15

*Az. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ...................................................................... 1

*Bennet v. Spear*,
   520 U.S. 154 (1997) .................................................................................. 11

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000) .................................................................................... 2

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) .................................................................................... 3

*Colwell v. Dep't of Health & Human Servs.*,
   558 F.3d 1112 (9th Cir. 2014) .................................................................... 10

*Dean v. U.S.*,
   556 U.S. 568 (2009) .................................................................................... 2

*Dieffenbacher v. DeVos*,
   No. 5:17-cv-00342 (C.D. Cal.) ...................................................................... 5

*Doe v. Chao*,
   540 U.S. 614 (2004) .................................................................................... 3

*Doe v. Herman*,
   No. 97-0043-B, 1998 WL 34194937 (W.D. Va. Mar. 18, 1998) ........................... 3

*Doe v. Stephens*,
   851 F.2d 1457 (D.C. Cir. 1988) ................................................................... 3

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
 No. C 09-5191, 2010 WL 2560072 (N.D. Cal. June 22, 2010) ................................ 14

*FAA v. Cooper*,
 566 U.S. 284 (2012)......................................................................................... 3

*Gonzalez v. Sullivan*,
 914 F.2d 1197 (9th Cir. 1990) ....................................................................... 8

*Hawaii v. Trump*,
 878 F.3d 662 (9th Cir. 2017) ........................................................................ 8

*Higgins v. Spellings*,
 663 F. Supp. 2d 788 (W.D. Mo. 2009). ......................................................... 8

*Humane Soc. of U.S. v. Locke*,
 626 F.3d 1040 (9th Cir. 2010) ...................................................................... 4

In re *Murray Energy Corp.*,
 788 F.3d 330 (D.C. Cir. 2015) ...................................................................... 10

*Industrial Safety Equip. Ass'n v. EPA*,
 837 F.2d 1115 (D.C. Cir. 1988)..................................................................... 10

*Int'l Tel & Tel. Corp v. Local 134*,
 419 U.S. 428 (1975)....................................................................................... 10

*Krebs v. Rutgers*,
 797 F. Supp. 1246 (D.N.J. 1992) .................................................................. 14

*Match-E-be-nash-She-Wish Band of Pottawatomi Indian v. Patchak*,
 567 U.S. 209 (2012)....................................................................................... 3

*Melendres v. Arpaio*,
 695 F.3d 990 (9th Cir. 2012) ........................................................................ 14

*Nev. Ass'n of Ctys. v. U.S. Dep't of Interior*,
 686 F.App'x 407 (9th Cir. 2017). ................................................................. 12

*Regents of Univ. of Cal. v. DHS*,
 279 F. Supp. 3d 1011 (N.D. Cal. 2018) ........................................................ 10

*Safari Club Int'l v. Jewell*,

842 F. 3d 1290 (D.C. Cir. 2016) ............................................................ 9

*Salazar v. King*,

822 F.3d 61 (2d Cir. 2016) ................................................................. 11

*Saravia v. Sessions*,

280 F. Supp. 2d 1168 (N.D. Cal. 2017) .............................................. 13

*Encino Motorcars, LLC v. Navarro*,

136 S. Ct. 2117 (2016) ......................................................................... 6

*Seminole Nation of Ok. v. Norton*,

223 F. Supp. 2d 122 (D.D.C. 2002) ...................................................... 9

*Strouchler v. Shah*,

891 F. Supp. 2d 504 (S.D.N.Y. 2012) ................................................. 13

*Texas v. United States*,

809 F.3d 134 (5th Cir. 2015) .............................................................. 11

**Statutes**

5 U.S.C § 551 ............................................................................................. 9

5 U.S.C. § 704 ............................................................................................ 3

**Other Authorities**

CJ Libassi & Ben Miller, *How Gainful Employment Reduces the Government's Loan*

*Forgiveness Costs*, Center for Am. Progress (June 8, 2017), available at:

http://perma.cc/NN7D-HKNG ............................................................ 7

*Incidental*, Merriam-Webster, Online Ed .............................................. 4

**Regulations**

34 C.F.R. § 685.206 ................................................................................... 2

54 F.R. 25,818 (June 19, 1989) ............................................................... 4

79 F.R. 64,890 (Oct. 31, 2014) ................................................................ 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In fifty pages, the Department of Education ("ED") only says three things in opposition to Plaintiffs' Motion for a Preliminary Injunction: (1) contrary to the plain language of the borrower defense regulation and ED's long-standing interpretation of it, ED, for some unexplained reason, now has plenary discretion to calculate relief; (2) average earnings data is a relevant measure of a borrower defense remedy because ED believes that average earnings data is a relevant measure of a borrower defense remedy; and, (3) despite ED's application of the Corinthian Job Placement Rate Rule ("CJPRR") to approximately 25,000 individuals, and notwithstanding its adoption of an Average Earnings Rule ("AER") under which it has partially denied 8,809 applications and has pre-calculated the loan discharge for each class member, there is still, somehow, no final agency action for this court to review.  In its quest to diminish relief to Corinthian borrowers, ED relies on arguments that are internally inconsistent, constitute an *ipse dixit*, ignore relevant APA precedent, and trivialize Plaintiffs' harms.  Immediate judicial intervention is required.

## I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

As an initial matter, and contrary to ED's argument, Plaintiffs do not ask for a "mandatory injunction" since the *status quo* before ED's illegal actions was the processing of claims under the CJPRR; put another way, Plaintiffs only ask that ED stop withholding application of the CJPRR. *Az. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061, 1068 (9th Cir. 2014) (distinguishing a "prohibitory" injunction and a "mandatory" injunction by asking whether the injunction seeks to return to the status quo "*between* the parties before the controversy arose").  Plaintiffs seek nothing more or less than a return to the *status quo ante*.  Nonetheless, an injunction is appropriate under any standard because Plaintiffs have established a clear entitlement to the requested relief.

### a.   A borrower defense remedy is anchored to an applicant's state law claim

ED's entire defense turns on it having "discretion to . . . discharge all or part of a loan subject to a successful borrower defense claim."  ECF No. 42 (hereinafter "Defs' Opp.") at 1; *see*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*id.* at 27 (abandonment); *id.* at 28-29 (retroactivity); *id.* at 31-32 (delay and withholding); *id.* at 38-39 (due process); *id.* 45-46, 48 (arbitrary and capricious).  The regulation itself does not provide the discretion ED claims:

> the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law . . . If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay.

34 C.F.R. § 685.206(c).  Contrary to ED's suggestion, the regulation does not sever borrower defense into an initial decision on the substance and then a subsequent one on the remedy; instead, the plain text of the regulation commands ED to decide both result and remedy under "applicable state law," and then to notify the applicant of the outcome.  *See Christensen v. Harris Cty.*, 529 U.S. 576, 587-88 (2000).[1]  This makes good sense because, under ED's new interpretation, an individual could establish a "successful borrower defense claim," but then be entitled no relief.[2]

The regulation's very next sentence bolsters this interpretation: "The Secretary affords the borrower such *further relief* as *the Secretary determines is appropriate* under the circumstances." § 685.206(c) (emphasis added); *see also* § 685.206(c)(3) ("the Secretary *may* initiate an appropriate proceeding…") (emphasis added).  Further relief is discretionary; borrower defense relief is not.[3]  *Cf. Dean v. U.S.*, 556 U.S. 568, 573 (2009) (stating where "particular language [is] in one section" of a legal text, but is omitted in another, "it is generally presumed that" the author "acts intentionally and purposely in the disparate inclusion or exclusion").[4]

---

[1] ED fails to mention the Master Promissory Note which, like the regulation, ties the borrower defense remedy to the state law cause of action.  ECF No. 35-5, Ex. 1 at 7.
[2] ED attempts to correct for this absurdity by randomly ascribing 10% "lost educational value" to all claimants.  ECF No. 42-2 at 10.
[3] Under the CJPRR, the Secretary *did* determine that further relief — reimbursement for payments already made — was appropriate.  ECF Doc. 42-2 at 9; § 685.206(c)(2)(i).
[4] Internal quotation marks and citations omitted unless otherwise noted.

ED has agreed with this interpretation since at least October 2000.  *See* ECF No. 35-8 at 32, Ex. 25 ("To quantify [borrowers'] damages, we have to determine the amount of damages they could recover from [the school] under state law.  The recoverable damages from [the school] must then be used to offset their loan obligations"); *see also id.* at 68, Ex. 31; *id.* at 81, Ex. 33; *id.* at 92, Ex. 34.  It reiterated in 2015 that "it is the cause of action under state law against the school that establishes an equivalent right to relief[.]"  ECF No. 35-7 at 5, Ex. 11.  Neither the AER nor ED's *post hoc* rationales: (1) mention this evidence; (2) refer to ED's prior interpretation; (3) explain why ED has now changed course (another APA abandonment problem in itself); or (4) argue why its new, unsupported interpretation is entitled to any deference.  This is untenable.  *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (agency position that "conflicts with a prior interpretation" may "not reflect the agency's fair and considered judgment").

### b.  ED's adoption of the AER in lieu of the CJPRR is unlawful

The AER — ED's new Rule in which it partially denies borrower defense applications using third-party earnings data from 2014 — is illegal in at least four ways.  *First,* the AER violates the Privacy Act.[5]  ED implies that it can do anything it desires with the SSA data because the Gainful Employment ("GE") Agreement states that it "is not a matching program."  Defs' Opp.

---

[5] ED argues that the court cannot issue an injunction against ED's violation of the Privacy Act under the APA, citing four cases in which the plaintiff was seeking relief expressly provided by the Privacy Act, and one case that does not occur in the context of the Act.  Here, however, there is no mechanism under the Privacy Act to prevent ED's ongoing violations and ED does not contend otherwise.  *See* 5 U.S.C. § 704 (agency action reviewable when "no other adequate remedy"); *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988 (APA injunction to stop information release under § 552a(b)(3) of the Privacy Act); *Doe v. Herman*, No. 97-0043-B, 1998 WL 34194937 at *5-7 (W.D. Va. Mar. 18, 1998)  Instead, ED relies on *Match-E-be-nash-She-Wish Band of Pottawatomi Indian v. Patchak*, 567 U.S. 209 (2012) to say that the Privacy Act implicitly forbids such injunctions; this is a curious argument because, that very term, the Supreme Court hypothesized (for the second time) that Congress did not include additional forms of injunctive relief in the Privacy Act precisely because such relief is already permitted under the APA.  *FAA v. Cooper*, 566 U.S. 284, 303 n.12 (2012) (citing *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004).

35-36.  ED cannot seek cover in an agreement that it has blatantly abused.  The Agreement limits ED's use of the data to: (a) informational disclosures to the public, and (b) institutional eligibility determinations.  ECF No. 35-8 at 42, Ex. 27.  But, in 2017, ED sent the names of 61,717 former Corinthian students, organized into 79 "CIP" categories, to the SSA,  ECF No 42-2 at 15, in order to obtain their average earnings data and then to resolve their individual applications for loan cancellation, Defs' Opp. at 9-10, 36, 41-42.  The SSA itself notes that such use was not "foreseen" at the time it entered the agreement, nor was SSA aware, as of January 2018, that ED was using the data for this *ultra vires* purpose.  ECF No. 35-8 at 55, Ex. 29.

ED's alternative argument — that the information sharing is not a "matching program" because the SSA data is used in a manner that only has an "incidental" effect on class members — is absurd.  The existence of a "matching program" turns on whether ED is obtaining the data "*to take action* against specific individuals." 54 Fed. Reg. 25,818, 25,823 (June 19, 1989) (emphasis added).  As ED repeatedly acknowledges, *see, e.g.,* Defs' Opp. at 9-10, 36, 41-42, its entire purpose in this data exercise was to resolve individual applications.  It is not "merely by chance" or "without intention" that individuals are affected.  *See Incidental*, Merriam-Webster, Online Ed. (retrieved Apr. 16, 2018) ("occurring merely by chance or *without intention or calculation*") (emphasis added).[6]

*Second*, the AER is illegal because ED fails to justify its abandonment of the CJPRR in favor of the AER.  *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010) (arbitrary and capricious where the agency "has not offered a satisfactory explanation . . . [nor] adequately explained its finding").  ED suggests that the CJPRR resulted from "ad hoc" actions,

---

[6] ED does not substantively address that it: (1) released personal identifying information to the SSA without individuals' written consent, § 552a(b); (2) failed to obtain income information from individuals, § 552a(e); and, (3) failed to fully notify individuals of the purpose for which their data would be used, *id.*

Defs' Opp. at 1, 18, 21, and a "largely unsupported assumption" that Corinthian students received nothing of value, *Id.* at 8. But the "weaknesses with FSA's procedures," Defs' Opp. at 8, cited as justification for the change, have nothing to do with the substance of the CJPRR or its supposed "assumption" about value. ECF No. 42-1 at 11 (citing "concerns raised by Inspector General"). To the contrary, the CJPRR was the result of "legal analysis and conclusions by OGC documented in a formal memorandum," ECF No. 42-2 at 18. Abandonment is not justified simply because "the number of claims increased," Defs' Opp. at 8, especially because ED was aware of the full universe of borrowers with loans subject to cancellation at the time it adopted the CJPRR. Pls' Memo at 14. Nor can the occurrence of "activity encouraging borrowers to flood ED," ECF No. 42-1 at 15, justify abandonment, because this activity was undertaken *at the behest of ED*. ECF No. 46-1 at 4-5 (Cal. *et al.*, Amicus). Similarly, the fact that some Corinthian programs passed GE metrics based on 2014 data is no rational ground for abandonment, given the overall dearth of Corinthian-related GE data. ECF No. 42-1 at 16 ("Corinthian programs were not generally part of GE").[7]

And, ED is not "entitled to evaluate priorities in light of its philosophy," Defs' Opp. at 26, by pretending to write on a blank slate. ED did not even attempt to explain why average earnings is the correct measure of relief *under California law* or, alternatively, why after 20 years it no longer believes that state law is relevant to the loan discharge calculation.[8] In fact, its new

---

[7] The December 2017 memo notes a cost savings around $60 million from applying the AER, rather than the CJPRR, to approximately 9,000 class members. But ED does not explain why such consideration is a permissible one under the regulation.

[8] ED accuses Plaintiffs of "selective amnesia" in highlighting its use of the wrong legal standard in its notices. Defs' Opp. at 49 n.26. But, ED's *post-hoc* characterization of "material misrepresentation" as a "shorthand" reference to the state law cause of action forming the borrower defense, *id.*, might be plausible if ED limited its use of the "shorthand" to members of the findings cohorts. But, it does not. *See* ECF No. 42-2 at 18; Pl's Opp. To Mot. to Dismiss, *Dieffenbacher v. DeVos*, No. 5:17-cv-00342 (C.D. Cal.), ECF No. 54 at 8-9 (using the same "shorthand" language for borrower outside of the findings cohort).

approach, "to offset the value of any discharge" by "value actually received," Defs' Opp. at 46, is exactly the opposite of its prior one, which "offset th[e] loan obligation" by "the amount of damages [recoverable] under state law," ECF No. 35-8 at 32, Ex. 25.  This "unexplained inconsistency" is fatal.[9]  *See, e.g., Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change").

   *Third*, and for similar reasons, the AER is illegal because ED's reliance on average earnings is arbitrary and capricious.  In fifty pages of briefing and over 200 pages of exhibits, ED refers to "common sense," but provides no actual explanation of why average earnings is a rational measure of the relief due to borrowers.  *See, e.g.,* Defs' Opp. at 8-9, 10, 26-27, 36, 42, 45-46, 50. It has failed to explain, for instance, how it is a valid standard when it does not account for an individual's personal work history, "whether a student was employed in their field of study, or whether a student's earnings were low for the field of study within their geographic location." *See* Defs' Opp., Ex 2 at ¶ 17.  It claims the AER methodology bases outcomes on "demonstrated, individualized harm," Defs' Opp. at 44, but the "average earnings" data: (a) rely on averages for Corinthian borrowers that, by definition, exclude the experience of applicants who applied (or will apply) after July 31, 2017, ECF No. 42-2 at 5-6; (b) exclude those who attended a program for which fewer than ten people have applied, or for which ED "lacked sufficient data" to perform an analysis, *id*. at 6; and (c) discount individuals who, like Plaintiff Craig, attended after 2014—a time period when Corinthian's misconduct only increased, *id*.;  ECF No. 35-1, Exs. 3-5, Craig

---

[9] ED cursorily mentions California law near the end of its brief, but it: (1) does not show that ED considered California law at the time it enacted the AER (or at any point since then), and (2) ignores that California law would restore a plaintiff to her *status quo ante*.  ECF No. 46-1 at 2.

PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. 17-cv-07210-SK

Decl. ¶¶ 10, 14.[10]  ED does not explain why the earnings it averaged are representative of these individuals excluded from the calculations, or why the earnings of applicants are assumed to be representative of all who are eligible and may apply.  Instead, ED acknowledges the flaws, shrugs its shoulders, and simply decides to give every borrower at least 10% cancellation.  ECF No. 42-2 at 10.[11]

The AER is further arbitrary and capricious in that it relies on one half of a ratio that is meaningless absent an accounting of a student's debt.  *See* 79 F.R. 16426, 16641 (March 25, 2014) (The GE metric accounts for "the relationship between total student loan debt and earnings."); 79 FR. 64890, 64915 (Oct. 31, 2014) (the GE thresholds are "related to the debt that the individual accumulates and the earnings achieved as a result of the program's preparation").[12]  Although ED speciously contends that it "does take debt into account, in providing relief as calculated as a percentage of a particular borrower's debt[,]" Defs' Opp. at 46, debt plays no part in ED's "calculation" of the borrower's "harm."  ED then adds that "earnings provides a better proxy for lost educational value . . . than an analysis of how those earnings interact with debt," *id.*, but never explains why.

---

[10] Almost ten percent of applicants were excluded from the average earnings calculations (7,119 out of 68,836 applicants).

[11] Despite claiming that its Corinthian data was grouped in a manner "equivalent of a GE program" or the "same . . . as GE cohorts," ECF No. 42-1 at 16; ECF No. 42-2 at 13, ED actually cobbled together different programs from various locations and time periods into "CIP Program/Credential Group[s]."  To the extent it is at all clear how ED is grouping the GE programs in the denominator of the formula (a dubious proposition), it is not an "apples to apples comparison in earnings data." Indeed, even assuming it were valid to use earnings as a sole metric of educational value (it is not), and even if offset of loans by an average earnings metric were the appropriate formula for determining relief (it is not), a true apples-to-apples comparison would entail assessment of a borrower's earnings before attending a school and her earnings after leaving the school.

[12] And, in fact, it is debt, not earnings, that is shown to drive whether a program passes or fails GE. *See* CJ Libassi & Ben Miller, *How Gainful Employment Reduces the Government's Loan Forgiveness Costs*, Center for Am. Progress (June 8, 2017), available at: http://perma.cc/NN7D-HKNG.

*Finally*, the Average Earnings Rule is unlawful because it violates class members' due process rights.  Plaintiffs have a property interest "in the outcome of their borrower defense application." Pls' Memo at 35.  Like in *Higgins*, the regulation here *requires* the Secretary to provide relief once a borrower defense is established.  *Higgins v. Spellings*, 663 F. Supp. 2d 788, 794-95 (W.D. Mo. 2009) (property interest in disability discharge of federally guaranteed student loans).  ED's additional publication and outreach regarding the CJPRR, ECF No. 46-1 at 2-4, along with the Master Promissory Note's borrower defense language, only bolstered class members' expectation and entitlement, Pls' Memo at 35-36, Ex. 1.

Contrary to ED's assertion, applicants were not on notice that income information or "harm" could be relevant.  Nowhere in the attestation form, ECF No. 35-6, Exs. 8-9, in the universal borrower defense application, in the federal register, or in any other public document that Plaintiffs are aware of, does ED ever state, suggest, imply, or intimate that this information would be relevant.   Pls' Memo at 38.  ED's post-decision notice is likewise deficient because it gives Plaintiffs no way of understanding the "CIP Program/Credential Group" they were assigned to, and it provides no way to verify or contest the underlying data.  *Id.* at 37.  Despite these fatal flaws, and though the notice does not advise applicants of any appeal rights, *id.* at 35, it is no matter, says ED, because applicants can send an email or call if they have questions, Defs' Opp. at 42-43 n. 23; *but see Gonzalez v. Sullivan*, 914 F.2d 1197, 1203 (9th Cir. 1990)

ED also contends that due process is satisfied because further individualizing its relief assessment and its forms would be costly.  Defs' Opp. at 44-45.  To be clear, any cost of returning to the *status quo ante* has been occasioned by ED's own illegal behavior; ED cannot apply an unlawful rule and then claim an unfair burden in having to rectify its error.  *See Hawaii v. Trump*, 878 F.3d 662, 700 (9th Cir. 2017) (explaining the public interest in "curtailing unlawful executive action"), <u>cert. granted</u>, 136 S.Ct. 923 (Mem.) (Jan. 19, 2018).  In any event, Plaintiffs do not assert

that this kind of individualized assessment is necessary.  Instead, Plaintiffs simply request that ED

continue to review applications under its prior (streamlined and easier to administer) rule and not

use irrelevant third-party data to require people to pay a portion of an invalid loan.  It does not

comport with due process to order Ms. Craig to pay 80% of an invalid loan based on "an evaluation

of her educational value" constructed from the earnings of *other* students who finished the program

*before* she even started.  Nor does it comport with due process to require Alina Farajian to repay

70% of her debt after ED cancelled 100% of her mother's, when the loans financed the exact same

program, for the same dates, at the same campus, for the same student.  *See* ECF No. 35-4, Farajian

Decl. at ¶¶ 35-36; *see also* Decl. of Marta Mercado ("Mercado Decl.") ¶¶ 14-16 (100% student

discharge & 30% for Ms. Mercado).

### c.  ED cannot hide the CJPRR and AER from judicial review

Clearing ED's smoke away, ED leaves the court with two critical facts: (1) Under its

CJPRR, ED granted full loan discharges to all attestation applicants who attended a program in a

findings cohort, *see, e.g.,* Defs' Opp. at 8, and, (2) ED "re-evaluated" that approach and adopted

the AER, which pre-calculates the discharge amount for each cohort through its SSA data

experiment, *see, e.g., id.* at 9.  Under the APA, the change from (1) to (2) is reviewable.  *See* Pls'

Memo at 26 (citing cases); *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923

(D.C. Cir. 2017) ("[W]hen an agency decides to depart from . . . past practices and official policies,

the agency must . . . acknowledge the change and offer a reasoned explanation for it.")

Specifically, the CJPRR constituted a "past practice" and "official policy" that could have

been reviewed itself, 5 U.S.C § 551(4); *Safari Club Int'l v. Jewell*, 842 F. 3d 1290, 1289-90 (D.C.

Cir. 2016) (yearly blanket statement that it would not give permits challengeable); *Seminole Nation

of Ok. v. Norton*, 223 F. Supp. 2d 122, 142-43 (D.D.C. 2002) (letter from DOI constituting

challengeable action), and the abandonment of which is also subject to judicial review, *Regents of*

*Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018) (abandonment of agency memo); *Am. Fed. Of Labor v. Chertoff*, 552 F. Supp. 2d 999, 1014-15 (N.D. Cal. 2007) (abandonment of practice in guidance letters reviewable).  Indeed, given the codification of the Rule in internal memoranda,[13] ED's public pronouncements, ED's outreach, and the implementation of the rule (and, therefore ED's clear "past practice[] and official polic[y]"), *see* Pls' Memo at 12-15, it is irrelevant that the Rule did not go through the notice and comment process.  *See Wild Horse*, 873 F.3d at 928 (explaining that the "assumption that a purported past mistake would excuse the agency's current missteps is wrong").[14]

ED's own brief and exhibits do not contradict any of Plaintiffs' evidence.  To the contrary, they consistently imply and refer to the existence of the CJPRR.  For instance, ED apparently undertook a "re-evaluation" but, if there was no past practice and official policy, what was ED reassessing? *See, e.g.,* Defs' Opp. at 1 ("[B]ecause ED determined that [Corinthian] had systematically misrepresented its job placement rates, it began fully discharging associated student loan debt…"); *id.* at 8 ("[T]hroughout 2015 and 2016, [ED] awarded full discharges of Direct Loan debt to Corinthian borrowers…based on the [ED's] findings"); *id.* at 30 (borrowers "are *no longer eligible* for full discharges") (emphasis added).  While ED attempts to alter reality by hedging that its past practice "*generally* included fully discharging" loans of class members, Defs' Opp. at

---

[13] ED's decision to blame Plaintiffs for not providing additional detail about these memos is exasperating given that ED has (and knows it has) sole access to them and has refused to disclose them.  ED could have easily submitted the memos to rebut Plaintiffs assertion; that it did not implies that these documents are as the Inspector General (and Plaintiffs) described.

[14] The cases the ED cites on this question are readily distinguishable. *See, e.g.,  Int'l Tel & Tel. Corp v. Local 134*, 419 U.S. 428 (1975) (determining the meaning of "final disposition" within "order" and "adjudication"); In re *Murray Energy Corp.*, 788 F.3d 330 (D.C. Cir. 2015) (challenge to a *proposed* rule); *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112 (9th Cir. 2009) (evaluating a general, unapplied policy guidance for prudential ripeness); *Industrial Safety Equip. Ass'n v. EPA*, 837 F.2d 1115 (D.C. Cir. 1988) (challenge to a guide of information on respiratory protection against asbestos).

21 (emphasis added), and averring that its "outreach efforts" "promise[d] no particular amount of relief," *id.* at 39; *see also id.* at 7 (ED told class members "they may be eligible for [some] relief") (ED inserting bracketed text into quote of Special Master Report), the exhibits themselves contradict these distortions.  ED ultimately concedes, as it must, that the rule was consistently applied until it was abandoned.  Defs' Opp. at 1, 8.  This abandonment is subject to judicial review. *Wild Horse*, 873 F.3d at 924-28 (looking collectively at the agency's actions).

ED is ultimately left arguing that the AER is not final agency action, and that it may continue to illegally apply the rule until plaintiffs individually challenge each partial denial.[15] Broadly, this argument fails under *Bennet v. Spear*, 520 U.S. 154 (1997), because: (1) the adoption of the AER in lieu of the CJPRR marked the consummation of ED's decision-making (that is, ED has decided that a full discharge is not mandated and it has calculated the precise partial denial that each finding cohort will receive); and (2) legal consequences will follow based on these calculations for individuals in each cohort; namely "the amount of discharge that a borrower can expect to receive and what repayment obligations will exist," Defs' Opp. at 29; *see* Pls' Memo at 25-26; *see also Salazar v. King*, 822 F.3d 61, 82-84 (2d Cir. 2016) (noting that "the APA does not require that the challenged agency action be the agency's final word on the matter for it to be 'final' for the purposes of judicial review"); *Texas v. United States*, 809 F.3d 134, 163 n.82 (5th Cir. 2015) (noting that the government agreed DAPA was "final agency action" even though it set the policy that would be applied when individuals applied for deferred action).

---

[15] ED's retroactivity argument appears to be a restatement of this final agency action contention. But, its discussion of *Cort* crystalizes the problem: ED reached out to individuals and prospectively determined that they were entitled to relief upon submitting an attestation form.  In calculating partial denials utilizing information that it did not seek, ED has both retroactively altered what was legally required of Plaintiffs and shattered their settled expectations.

Moreover, the AER is "documented" in a "memorandum authorized by" the Chief Financial Officer of ED "in collaboration with FSA and ED's Office of the General Counsel." ECF No. 42-1 at 7. ED has signaled that this is the end of its decision-making process. *See* Defs' Opp. at 44 (explaining why the decision was made on a programmatic and not individual level); *id.* at 49 (same); *id.*, Ex. B at 16-17 (discussing steps four and five of its decision-making process, showing that the calculations of relief have been determined); *id.*, Ex. B at 31-60 (showing final calculations for each cohort); ECF No. 42-2 at 11 (author of memorandum "concluded its role" in December 2017 and "is not involved in the implementation" of the rule). And though ED argues that there is not a "likelihood that any particular class members have received such a partial [denial]," Defs' Opp. at 41, ED has already issued 8,809 partial denials, *id.*, Ex. D at 5, and designated 89% of Everest and WyoTech cohorts, and 84% of Heald cohorts, for partial denials, *id.*, Ex. B at 31-61. The idea that ED intends to do anything other than apply this rule to all class members, Defs' Opp. at 17, 19, 23, 25, is implausible at best.

ED's last ditch-attempt to cry "programmatic challenge" fares no better because Plaintiffs are not seeking "judicial oversight and direction of virtually the entire federal [program at issue]." *Nev. Ass'n of Ctys. v. U.S. Dep't of Interior*, 686 F.App'x 407, 408 (9th Cir. 2017). Nor does ED's argument that there is "no discrete" or "unequivocal" action to support a § 706(1) claim hold water. ED refers to "yet unidentified Corinthian borrowers," despite having records detailing who these individuals are. Defs' Opp., Ex. B at 6; ECF No. 46-1 at 3-4. Further, the regulation commands the Secretary to provide borrowers relief after making a borrower defense determination. Here, ED has already made these determinations under the CJPRR, and must now provide the relief.[16]

---

[16] These arguments also apply to Plaintiffs' Motion to Amend Complaint, though Plaintiffs note that the "futility" standard is distinct from "likelihood of success on the merits."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   PLAINTIFFS AND MEMBERS OF THE PROPOSED CLASS ARE SUFFERING IRREPARABLE HARM

ED's flippant attitude towards Plaintiffs' harm mirrors its callous treatment of Corinthian borrowers.  First, the government ignores the extreme financial shock that it is causing to a vulnerable group unable to absorb even minor financial changes, and it discounts the emotional distress and fear associated with that shock.  Craig Decl ¶¶ 25-32; Mercado Decl. ¶¶ 17-23; ECF No. 45 (Debt Collective Amicus) at 8 (Jessica Madison), 10-11 (Erica Clark) & 13 (Devin Ezzell); ECF 46-1 at 5, 7; ECF 43-1 (Legal Aid Amicus) at 7-9; Decl. of Prof. Dora Gicheva, PhD ("Gicheva Decl.") ¶¶ 24-28.  ED bypasses the case law establishing such injury as irreparable harm and, contrary to the law and facts, improperly tries to limit any allegations to Ms. Craig.  *But see Saravia v. Sessions*, 280 F. Supp. 2d 1168, 1200 (N.D. Cal. 2017) (considering harms to putative class members and expert analysis regarding those harms); *Strouchler v. Shah*, 891 F. Supp. 2d 504, 519  (S.D.N.Y. 2012) (considering evidence of putative class members and named plaintiffs for purposes of preliminary injunction before class certification).

ED next argues that Plaintiffs' lost opportunities and other monetary damages are not irreparable, even though such harms cannot be recovered against the government.  *Contra Brewer*, 757 F.3d at 1068 (finding loss of professional opportunity to constitute irreparable harm).  ED improperly seeks unlimited immunity from "the lost opportunities and wealth . . . during the entire duration of [ED's] delay" including putative class members likely "delay making significant purchases, taking out additional money for schooling, [] taking certain jobs . . . [or] divert[ing] their income to pay for the loans . . . rather than use their income to invest in their financial future." Decl. of Prof. Katrina Walsemann, PhD, MPH, ("Walsemann Decl."), Ex. 2 at 5-6 (expert report discussing the irreparable harms that ED's actions will likely have on the class); Gicheva Decl. ¶¶ 24-26 (same); ECF No. 45 at 4-5, 7-8; ECF No. 46-1 at 6-7.  Members of the proposed class were targeted by Corinthian precisely because of their vulnerability, ECF No. 43-1 at 6; ECF No. 45 at

6, ECF No. 46-1 at 6, and, like *Brewer*, the irreparable nature of these lost opportunities "is heightened by Plaintiffs' . . . fragile socioeconomic position." *Brewer*, 757 F.3d at 1068.

To avoid the consequences of these harms, ED mischaracterizes them as mere reputational damage. Defs' Opp. at 15.  But, Plaintiffs do not assert reputational damage; they allege harms to their mental and physical health, to their emotional well-being, and to their dignity.  Walsemann Decl., Ex. 2 at 5-6 (discussing the likely impact of ED's actions on class members' mental and physical health); Mercado Decl. ¶ 17; ECF No. 43-1 at 9 (anxiety and fear over seizure of tax refund); *see also Chalk v. U.S. Dist. Ct. C.D. Cal.*, 840 F.2d 701, 710 (9th Cir. 1988) (noting that "emotional and psychological  . . . injury cannot be adequately compensated by a monetary award after trial"); *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, No. C 09-5191, 2010 WL 2560072 at *2-3 (N.D. Cal. June 22, 2010); *Krebs v. Rutgers*, 797 F. Supp. 1246, 1259 (D. N.J. 1992) (Privacy Act harms as irreparable).

Finally, ED invokes out-of-circuit cases to argue that a constitutional violation is not irreparable.  Despite ED's best efforts to show otherwise, the Ninth Circuit has stated, repeatedly, that an ongoing constitutional violation can itself be irreparable harm.  *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (noting that "deprivation of constitutional rights unquestionably constitutes irreparable injury," and that "it is always in the public interest to prevent the violation of a party's constitutional rights.").  But, even assuming that Plaintiffs needed to show some additional harm, the government's dismissive gloss that "the harm alleged . . . is that some borrower may have to repay some portion of his federal student loans," is a further insult as it completely ignores all of the harms discussed.[17]

---

[17] Contrary to ED's assertions that Plaintiffs did not timely move for an injunction, Plaintiffs filed this motion as soon as they had evidence that ED was applying the AER to proposed class members in early March 2018. *See* Craig Decl.¶ 34 (learned March 8); Farajian Decl. ¶ 35 (learned March

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.    THE PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH IN FAVOR OF GRANTING A PRELIMINARY INJUNCTION

ED's post-hoc arguments on the equities are belied by its consistent public statements while implementing the CJPRR.  Pls' Memo at 49-50.  Nonetheless, its alleged "burdens" of correcting its own unlawful conduct, do not outweigh the harms to Plaintiffs.  For instance, ED does not explain why its alleged financial losses would necessarily be diverted from some undefined "educational program," or why the public interest is better served by financing this hypothetical program than by treating class members fairly. Defs' Opp. at 49-50.  On the contrary, applying the CJPRR would begin to rectify the harms that ED is causing.  ED says it best: discharging the loans will "ensur[e] that the federal student loan program does what it was designed to do: help students build a better life for themselves, their families, and the nation."  ECF No. 35-7, Ex. 15.[18]

## IV.    CONCLUSION

Corinthian "intentionally targeted people of limited financial means, many of whom were the heads of single-parent families and had annual incomes near the federal poverty line.  ECF No. 46-1 at 7.  The company brought in hundreds of millions of federal dollars and left vulnerable individuals with nothing.  Rather than discharge the invalid debt stemming from a worthless program, ED is unjustifiably and illegally going out of its way — going so far as to bamboozle their colleagues at another federal agency — to compound the harms that Corinthian caused.  The Court must immediately enjoin ED's cascading unlawful conduct because putative class members' financial survival, their psychological well-being, and their ability to escape the hold that Corinthian and ED have on their lives, depends on it.

Dated: April 19, 2018                                        Respectfully submitted,

                                                             *Joshua D. Rovenger*

---

1); *See also Arc of Cali. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) ("the injury [Plaintiff] alleges here is inherently cumulative, turning on the aggregate effect over time . . .").

[18] Although ED notes a potential cost of $70 million to correct its unlawful action, this is a drop in the bucket compared to the $509.3 million Corinthian received from the government in the form of Pell Grants in 2010 alone.  ECF No. 35-5, Ex. 2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Noah Zinner
Megumi Tsutsui
HOUSING & ECONOMIC RIGHTS
ADVOCATES
PO Box 29435
Oakland, CA 94604
Tel.: (510) 271-8443
Fax: (510) 280-2448

Eileen M. Connor
Toby R. Merrill
Joshua D. Rovenger
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

*Attorneys for Plaintiffs*