UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARTIN CALVILLO MANRIQUEZ, et al.,

Plaintiffs,

v.

ELISABETH DEVOS, et al.,

Defendants.

Case No.  17-cv-07210-SK

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Regarding Docket No. 35

Plaintiffs move the Court for a preliminary injunction returning to the *status quo ante* by requiring the Department of Education to process certain non-discharged federal student loan debt in accordance with the "Corinthian Job Placement Rate Rule."  Defendant Elisabeth Devos, Secretary of the Department of Education (hereinafter "Secretary") opposes the motion.  Having considered the parties papers, relevant legal authority, and having heard oral argument, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion.

## FACTUAL BACKGROUND

### A.  Regulatory Background.

The Department of Education (the "Department") is responsible for overseeing and implementing Title IV of the Higher Education Act of 1965 ("Higher Education Act") 20 U.S.C. § 1001 *et seq.*, including the William D. Ford Direct Loan Program ("Direct Loan Program"), 20 U.S.C. § 1087a *et seq.,* which provides loans ("Direct Loans") to borrowers for use at "participating institutions of higher education."  (Dkt. 35, at page 4.)  The Higher Education Act allows borrowers to seek cancellation of their Direct Loans based on a school's misconduct and directs that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this

part[.]" 20 U.S.C. § 1087e(h).

In 1995, the Secretary promulgated a regulation that permits a borrower to assert as a defense to repayment, "any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1). The regulation, also known as the "borrower defense rule," relieves the borrower of the obligation to repay all or part of the loan and associated costs and fees. The regulation further provides:

> If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances. Further relief may include, but is not limited to, the following:
>
> (i)     Reimbursing the borrower for amounts paid toward the loan voluntarily or through enforced collection;
>
> (ii)    Determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act.
>
> (iii)   Updating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan.

34 C.F.R. § 685.206(c)(2).

The loans that are the subject of this litigation were issued pursuant to a Master Promissory Note, which states that the borrower may assert a defense against collection of the loan, if "the school did something wrong or failed to do something that it should have done," provided that "the school's act or omission directly relates to [the] loan or the educational services that the loan was intended to pay for, and if what the school did or did not do what would give rise to a legal cause of action against the school under applicable state law." (Dkt. 35-5, at ¶ 3, Ex. 1, at page 7.)

A memorandum from James Runcie, the Chief Operating Officer of the Federal Student Aid office of the Department, dated June 4, 2015, states: "Prior to 2015, the borrower defense identified above was rarely asserted by any borrowers and no specific methods of collecting information regarding borrower defense claims had been defined or found necessary." (Dkt. 35-7, Ex. 12, at page 1.) According to the Department's Office of Inspector General's report dated December 8, 2017, from July 1, 1995 through June 24, 2015, the Department received only five

1  borrower defense claims.  (Dkt. 35-6, Ex. 10, at page 6.)

2  **B.  Corinthian Colleges.**

3      Corinthian Colleges, Inc. ("Corinthian") was a for-profit college chain, operating under the

4  brands Everest, Heald, and WyoTech.  (Dkt. 35-5, Ex. 2, at page 1.)  At its peak in 2009 and 2010,

5  Corinthian operated over 100 campuses in 25 states, enrolled over 110,000 students and collected

6  over $1.7 billion in revenue, over 80% of which was in the form of student loans provided under

7  the Direct Loan Program.  (*Id*., at page 2.)  The Corinthian schools included different campuses for

8  a wide variety of subjects.  For example, Corinthian schools included Heald Concord –

9  Accounting, Heald Fresno – IT Network Systems, Everest Los Angeles Wilshire – Dental

10  Assistant (Diploma), and WyoTech Long Beach – Plumbing Technology (Diploma). (Dkt. 35-6,

11  Exs. 6-7.)

12      In January 2014, the Department sought data supporting Corinthian's advertised job

13  placement rates.  (Dkt. 35-7, Ex. 11, at page 4.)  Corinthian refused to provide the data, and in

14  June 2014, the Secretary placed Corinthian on a heighted cash monitoring status.  (*Id*.)  In July

15  2014, the Secretary and Corinthian entered into an operating agreement, pursuant to which

16  Corinthian would cease operations "by teaching out at least a dozen of its campuses and by selling

17  as many of the rest of the schools as possible."  (*Id*.)  The Secretary also appointed a monitor to

18  oversee Corinthian's operations and its wind-down activities, "including federal student aid draws,

19  expenditures (including refunds required under the operating agreement), and [Corinthian's]

20  compliance with its obligations to the Department."  (*Id*.)

21      In March 2015, after Corinthian failed to file audited financial statements, the Secretary

22  requested a letter of credit from Corinthian.  (*Id*., at page 5.)  In April 2015, the Secretary

23  determined that Corinthian made false statements about its placement rates and issued a fine

24  against Corinthian in the sum of $30 million for "substantial misrepresentation" under 34 C.F.R.§

25  668.71-75.  (Dkt. 35-5, Exs. 3-4; Dkt. 35-7, Ex. 11.)  Specifically, the Secretary found that

26  Corinthian published falsely inflated job placement rates for 947 programs at its Heald College

27  locations.  (Dkt. 35-5, Ex. 3.)

28      Corinthian closed its colleges in April 2015, and students who had borrowed federal

United States District Court
Northern District of California

1   student loans to attend a Corinthian program asserted their rights to cancellation of their loans

2   under the borrower defense rule and terms of the Master Promissory Notes.  (Dkt. 35-5, Ex. 5, at

3   pages 2-3.)

4       **C. The Secretary's Response to the Collapse of Corinthian.**

5       Faced with the collapse of Corinthian and over 100,000 borrowers with potential borrower

6   defenses, Under Secretary Ted Mitchell ("Under Secretary") of the Department appointed a

7   special master ("Special Master") to help the Department develop the processes and systems

8   needed to provide relief to borrowers who had relied upon false and misleading statements from

9   certain career colleges, including Corinthian.  (Dkt. 35-7, Ex. 11, at page 1.)  The goal of the

10  Special Master was to develop a system for providing debt relief that was "fair, transparent, and

11  efficient, with a minimal burden on borrowers."  (*Id*.)

12      In June 2015, the Secretary requested that the Office of Management and Budget grant

13  emergency approval of an attestation form, waiving the requirement for public notice in the

14  Federal Register.  (Dkt. 35-7, Ex. 12, at page 3.)  It appears that the Office of Management and

15  Budget granted approval, as the Secretary disseminated the attestation forms and set up a process

16  to review claims and to provide expedited relief for certain Corinthian borrowers.  (Dkt. 35-5, Ex.

17  5.)  The attestation forms advise borrowers of Corinthian's publication of misleading job

18  placement rates and the location of a website containing two lists of covered programs and dates

19  of enrollment covered by the attestation (the "Lists").  (Dkt. 35-6, Exs. 6, 7, 8, 9.)  The Lists

20  include names of schools and dates of enrollment from 2010 to 2014.  (Dkt. 35-6, Exs. 6, 7.)  For

21  example, borrowers listed in the examples above were eligible for relief under the Corinthian Rule

22  only if their first dates of enrollment were as follows: (1) Heald Concord – Accounting after

23  February 13, 2014; (2) Heald Fresno – IT Network Security after July 1, 2010; (3) Everest Los

24  Angeles Wilshire – Dental Assistant (Diploma), between July 1, 2010 and September 30, 2014;

25  and (4) WyoTech Long Beach – Plumbing Technology (Diploma) between July 1, 2010 and

26  September 30, 2014.  (*Id*.)  The attestation forms state that borrowers should submit the forms

27  only if their programs and dates of enrollment are included on the Lists.  (Dkt. 35-6, Exs. 8, 9.)

28      In the case of a borrower who attended a Heald program on the Lists, the attestation form

United States District Court
Northern District of California

states as follows:

> I am submitting this attestation and additional materials in support of my application for a borrower defense to repayment discharge of my Direct Loans under 34 C.F.R. § 685.206(c).
>
> ....
>
> I believed that the job placement rates related to my program of study indicated the level of quality a Heald education offered to students.  I chose to enroll at Heald based, in substantial part, on the information I received about job placement rates related to my program of study and the quality of education I believed those placement rates represented.

(Dkt. 35-6, Ex. 8.)  The combined attestation form for the Everest and WyoTech programs is identical to the attestation form for the Heald program attestation form but substitutes the names of Everest and WyoTech for Heald.  (Dkt. 35-6, Ex. 9.)

On March 26, 2016, the Special Master reported that he had reviewed 546 claims from borrowers and recommended to the Under Secretary that "full relief (including restitution of all amounts paid) be provided for [certain] loans."  (Dkt. 35-7, Ex. 13, at page 5.)  Such loans included programs at Heald, Everest, and WyoTech.  (*Id.*)

**D.  The Department's Actions in Relieving Debt before January 20, 2017.**

The Department reached out to borrowers who were potentially eligible for discharge of their loans under the borrower defense rule by electronic mail and postal mail.  (Dkt. 35-7, Ex. 15, at pages 5-6.)  The outreach was to 280,000 Everest and WyoTech students and over 55,000 Heald students.  (*Id.*)  The Department received 72,877 claims between June 25, 2015 and January 20, 2017 and reviewed and discharged 26,964 claims.  (Dkt. 35-6, Ex. 10, at page 6.)

In October 2016, in response to the claims resulting from the collapse of the Corinthian colleges, the Secretary announced the final regulations, which were scheduled to take effect on July 1, 2017.[1]  The regulations established a new federal standard for borrower defenses and limitations periods for loans disbursed on or after July 1, 2017, but also included a separate provision for those loans disbursed prior to July 1, 2017.  81 Fed. Reg. 75926-76089 (November 1, 2016).  According to the revised, proposed regulation, 34 C.F.R. § 685.206(c), the borrower

---

[1] U.S. Department of Education: http://www2.ed.gov/policy/highered/reg/hearulemaking/2016/index.html (last visited May 25, 2018.)

United States District Court
Northern District of California

defense rule for loans made before July 1, 2017, provides a borrower defense for:

> any act or omission of the school . . . that would give rise to a cause of action against the school under applicable State law, and includes one or both of the following:
> (i)    A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part.
>
> (ii)   A claim to recover amounts previously collected by the Secretary on the Direct Loan in whole or in part.

81 Fed. Reg. 76080.

Plaintiffs claim that, before January 20, 2017, there was a "Corinthian Job Placement Rate Rule" (the "Corinthian Rule").[2]  According to Plaintiffs, the Secretary based the Corinthian Rule on the following determinations:

(1)  California is the applicable state law for purposes of determining whether there is a cause of action against the specific Corinthian school under 34 C.F.R. § 685.206(c)(1);

(2)  Corinthian misrepresented its job placement rates at specified campuses, regarding certain programs, during enumerated periods of time;

(3)  Any Corinthian borrower who submits a simple attestation form provided by the Department or otherwise submits sufficient information to establish a membership in a certain group establishes a borrower defense; and

(4)  The Department will provide relief under California law by cancelling all outstanding amounts on related loans and returning any money collected by the Department.  (Dkt. 35, at pages 12-13.)  According to Plaintiffs, the Corinthian Rule covers 800 Heald programs between 2010-2015, for the benefit of at least 50,000 borrowers, and 800 Everest and WyoTech programs in over twenty states, with 85,000 borrowers who are eligible for cancellation under the borrower defense rule.  (*Id.*, at page 14.)

Plaintiffs contend that the Corinthian Rule was "codified" in three documents:  (1) a memorandum prepared by the Department's Office of General Counsel, (2) a fine action letter prepared by Federal Student Aid's Administrative Actions & Appeals Service Group, and (3) an

---

[2] The Court understands that the Secretary challenges the very existence of the Corinthian Rule, but for purposes of this Order, the Court will refer to the Corinthian Rule as a shorthand for describing the process that was, for practical purposes, in place before January 20, 2017.

United States District Court
Northern District of California

April 2015 document prepared by the Federal Student Aid's Administrative Actions & Appeals Services Group.  (Dkt. 35, at pages 13-14 (citing Dkt. 35-6, Ex. 10); Dkt. 58 (First Amended Complaint), at ¶ 80.)  In addition, Plaintiffs claim that the Department issued consistent public statements about the existence of the Corinthian Rule.  (Dkt. 35, at pages 13-14 (citing Dkt. 35-7, Ex. 11).)

Plaintiffs do not provide the three source documents cited above for this motion because they do not possess them.  (Dkt. 58, at ¶ 80; Dkt. 48, at page 10, n. 13.)  Instead, Plaintiffs cite to secondary sources to bolster the existence of the Corinthian Rule and to show that the above-cited documents exist.  None of the secondary sources refer to the Corinthian Rule by any name, and none of the secondary sources lists the entire set of standards that Plaintiffs claim constitute the Corinthian Rule.  (Dkt. 35-5, Ex. 5; Dkt. 35-7, Exs. 11 - 15.)  For example, Plaintiffs cite to the report of the Special Master for the existence of the legal memorandum.  (Dkt. 35-7, Ex. 11, at page 5.)  That report states:  "Because Heald was headquartered in and managed from California, the Department looked to California law and determined that Heald's misrepresentation of placement rates constituted prohibited unfair competition under California Unfair Competition Law (UCL)."  (Dkt. 35-7, Ex. 11, at page 5.)  The Special Master further stated:  "Accordingly, students that relied on such misleading placement rates when they enrolled at Heald would have a cause of action under state law."  (*Id*.)

There is one area of agreement.  Plaintiffs and the Secretary agree that, if borrowers signed the attestation forms to show that they had attended the schools on the Lists and that they had relied upon the false statements, the Department did not require them to prove on an individual basis that they were defrauded.  (Dkt. 35-5, Ex. 5, at pages 2-3; Dkt. 42, at pages 6-7.)  Instead of proving their claims individually, those borrowers could assert their right to relief as part of an expedited system.  (*Id*.)

However, the Secretary challenges the existence of the Corinthian Rule.  The Secretary states that there was no rule that guaranteed full relief to any borrower who completed the attestation form.  The Secretary claims that the Department "maintained its discretion to . . . discharge 'all or part' of a loan subject to a successful borrower claim."  (Dkt. 42, at page 1.)  The

7

Secretary argues that the Department never represented to borrowers that they would be entitled to full relief if they completed the attestation forms.

"Loan forgiveness" on the attestation forms does not specify the amount of forgiveness of the debt.  (Dkt. 35-6, Exs. 8, 9; Dkt. 42, at page 7.)  None of the documents that Plaintiffs cite state that borrowers are entitled to full relief even if they attended a program on the Lists and completed the attestation form.  As a practical matter, though, it appears that, before January 20, 2017, the Department did provide full relief or total discharges for borrowers who completed the attestation forms.  The Secretary does not challenge or refute that factual statement.

**E.   The Department's Actions as of January 20, 2017.**

Starting on January 20, 2017, the Secretary stopped processing claims under the Corinthian Rule.  (Dkt. 35-6, Ex. 10, at pages 3, 13-14.)

**1.   Delay of Previous Regulations.**

In June 2017, the Secretary announced that she was undertaking further rulemaking on the issue of the borrower defense rule and delayed the regulations that were set to become effective July 1, 2017, discussed above.  (Dkt. 35-7, Ex. 18.)  One news article reported that the Secretary remarked: "Under the previous rules, all one had to do was raise his or her hands [sic] to be entitled to so-called free money."  (Dkt. 35-8, Ex. 32.)

**2.   The "Average Earnings Rule."**

**a.   Preliminary Assessment Using "Gainful Employment" Metric.**

The Secretary first reviewed a metric of "gainful employment" for Corinthian schools and determined that some students who attended Corinthian schools obtained some educational benefit.  The metric of "gainful employment" assesses whether a program "has indeed prepared students to earn enough to repay their loans, or was sufficiently low cost, such that students are not unduly burdened with debt, and to safeguard the Federal investment in" Title IV.  79 Fed. Reg. 64891.  A program passes the gainful employment requirement if students' median annual loan payments are less than or equal to 20% of discretionary income or 8% of their annual earnings.  34 C.F.R. § 668.403(c).  The Secretary examined data already within the Department for Corinthian programs and learned that many Corinthian programs had passing scores under the gainful

8

employment metric.  (Dkt. 42-1, Ex. 2, at ¶¶ 12- 16.)  For example, the Department analyzed the data for 106 Corinthian programs from 2015 and found that 51 of them had passing scores under the gainful employment metric.  (Dkt. 42-2, ¶ 11.)  This preliminary analysis suggested to the Secretary that a "more rigorous analysis of earnings" was appropriate as a test to provide relief for borrowers who asserted the borrower defense rule.  (*Id*., at ¶ 13.)

**b.  December 15, 2017 Memorandum and December 20, 2017 Press Release.**

The Secretary claims that the Department quantified the lack of value actually received from the educational program attended "by comparing the average earnings of students who attended a given academic program with the average earnings of similar programs at schools the Department determined adequately prepared students for gainful employment."  (Dkt. 42, at page 2.)  The Secretary issued a memorandum, dated December 15, 2017, authored by the Senior Advisor to the Office of the Chief Financial Officer of the Department "in collaboration with FSA [Federal Student Aid office] and the Department's Office of the General Counsel" (the "December 15, 2017 Memorandum").  (Dkt. 42-2, at ¶¶ 2, 6 and Ex. 1.)  The December 15, 2017 Memorandum details the steps that the Department took in determining the new methodology for relief.  (*Id*., at ¶ 6.)  The Secretary also issued a press release on December 20, 2017 explaining the new methodology for evaluating borrowers' claims (the "December 20, 2017 Press Release").  The Secretary stated: "This improved process will allow claims to be adjudicated quickly and harmed students to be treated fairly.  It also protects taxpayers from being forced to shoulder massive costs that may be unjustified."  (Dkt. 42-1, Ex. 1, at page 1.)

Instead of developing a "new rule" as Plaintiffs claim, the Secretary maintains that the Department came to the "common sense conclusion" that the relief for the successful borrower defense claims should be based on a measure of the actual harm that borrowers suffered as a result of Corinthian's misconduct.  (Dkt. 42, at page 2.)  Plaintiffs refer to the Secretary's new process as the "Average Earnings Rule."  (Dkt. 42-1, Ex. 1.)[3]  The Secretary maintains that the weakness of

---

[3]   For purposes of this Order, the Court will refer to the Secretary's methodology as explained in the December 15, 2017 Memorandum and the December 20, 2017 Press Release as the "Average Earnings Rule."

United States District Court
Northern District of California

the previous administration's process for assessing claims of borrower defense is that that process assumed that all Corinthian students received nothing of value, when in many cases graduates received "substantial value from their education." (Dkt. 42-1, Ex. 2, at page 11.)

###    c.   Method for Determining Relief under Average Earning Rule.

The Average Earning Rule, instead of granting full relief to borrowers who submitted attestation forms for attending schools on the Lists, is a system which provides a percentage of relief based on a comparison of earnings from a specific Corinthian program and a comparable (non-Corinthian) school with a passing gainful employment score. (Dkt. 42-2, at ¶ 14, Ex. 1, at pages 3-4.) To compare the earnings from Corinthian schools and comparable schools with a passing gainful employment score, the Department identified 79 Corinthian programs and submitted information identifying the names of 61,717 former Corinthian students to the Social Security Administration ("Social Security Administration") to obtain the data regarding the earning capacities of those students. (Dkt. 42-2, Ex. 1, at page 3.) Specifically, the Department sent information with dates of birth and Social Security numbers of the applicants who submitted attestation forms for Corinthian programs to claim the borrower defense. (*Id.*) In return, the Social Security Administration provided the Department with aggregate data regarding the "mean and median incomes" for each group of students in the Corinthian programs, based on data from 2014. (*Id.*) The Social Security Administration then provided that data "in a form that cannot be associated with, or otherwise identify, directly or indirectly, a particular individual." (Dkt. 35-8, Ex. 27, at page 41.) The Department refers to the information that the Social Security Administration sends as "aggregate earnings information." (*Id.*) The Secretary claims that the Department exchanged this information under the terms of an agreement between the two agencies: *Amended Information Exchange Agreement between the Department of Education & the Social Security Administration for Aggregate Earnings Data* (the "Gainful Employment Agreement"). (Dkt. 35-8, Ex. 27.)

Using the data from the Social Security Administration, the Department compared the earnings under four different formulas, using the mean and median earnings for Corinthian students with the mean and median earnings of students at comparable programs with passing

gainful employment scores.  (Dkt. 42-2, Ex. 1, at pages 3-4.)  Although the process is more complicated than this general description, the general, relevant parameters are that the Department analyzed the difference between the earnings of Corinthian borrowers and the earnings of students from schools with passing gainful employment scores.  If the earning from the passing school was higher than the earning of the Corinthian students, this difference represented the educational value or lack of educational value of the Corinthian program.  (*Id*.)

Based on the methodology above, those borrowers in a Corinthian group who earned less than 50% of the earnings of comparable programs with passing gainful employment scores received 100% relief from their loans.  (Dkt. 42-2, Ex. 1, at pages 4-5.)  Borrowers in a Corinthian group who earned between 50% and 90% of the earnings of comparable programs with passing gainful employment scores received relief in amounts inverse to their earnings.  (*Id*., at page 4.) For example, if the average Corinthian borrower earned 60% of the average received in the comparable program, the Corinthian borrower received 40% relief.  (*Id*., at page 4.)  All approved borrowers receive a minimum of 10% in relief.  (*Id*., at page 5.)   The Secretary issued a table in the December 20, 2017 Press Release that shows in graphic form the amount of relief:

| CCI Earnings as a Percentage of GE [Gainful Employment] Earnings | Amount of Relief |
| --- | --- |
| 1% to 49% | 100% |
| 50% to 59% | 50% |
| 60% to 69% | 40% |
| 70% to 79% | 30% |
| 80% to 89% | 20% |
| 90% and above | 10% |

(Dkt. 42-1, Ex. 1.)

The December 20, 2017 Press Release reported that the Department approved 12,900 pending claims for discharge and denied 8,600 claims.  (*Id*.)  Many of the denials were ones that the previous administration had identified but for which the previous administration had not yet

United States District Court
Northern District of California

1   acted.  (*Id.*)  The Secretary advised borrowers that the Department would notify them on a rolling

2   basis as the Department finalized their discharges.  (*Id.*)

3       **d.  Current Status.**

4       As of April 1, 2018, borrowers filed over 147,000 claims under the borrower defense rule,

5   and 99,000 claims remained pending.  (Dkt. 42-3, at ¶ 4.)

6       **3.  Claimants' Discharges under the Average Earnings Rule.**

7       Plaintiffs submit several declarations from borrowers who attended Corinthian programs,

8   borrowed Direct Loans, and asserted a borrower defense to obtain relief from repayment.

9       **a.  Plaintiff Jennifer Craig.**

10      Named Plaintiff Jennifer Craig submitted a claim for relief from her student loan under the

11  borrower defense.  (Dkt. 35-1.)  She attended Everest College in California and relied upon

12  statistics that Corinthian's representatives showed her about the success of graduates in getting

13  jobs in medical insurance and billing.  (*Id.*, at ¶¶ 7-10.)  She enrolled in the Everest program in

14  April 2014 and borrowed $9,019 to pay for her education.  (*Id.*, at ¶¶ 10-11.)  Although she

15  completed her course of study, she did not receive a diploma because Corinthian closed in 2015

16  before she could get her diploma.  (*Id.*, at ¶¶ 14-17.)  Craig was not able to find work in the area of

17  study – medical insurance billing – and later learned that, in order to get a job, she needed at least

18  one year of experience that she had not obtained in her practical training at Corinthian.  (*Id.*, at ¶¶

19  18 - 19.)  Craig submitted an attestation form to the Department for relief from repayment of her

20  Direct Loan, and she received notice that the Department had discharged only 20% of her Direct

21  Loan.  (*Id.*, at ¶¶ 21, 23, Ex. 1.)  The letter from the Department does not provide a detailed

22  explanation for the determination of relief of only 20%, but it states:

23          The amount of loan relief that you will receive is based on the Department's
       assessment of the value of the education that you received.  The Department has
24          determined the value of your education by comparing the average aggregate
       earnings of students who attended your program(s) of study to the average
25          aggregate earnings of students who graduated from similar programs at other
       schools that have adequately prepared students for gainful employment, under the
26          standard set forth by the Department's regulations at 34 C.F.R. Part 668, Subpart
       Q.
27
    (*Id.*, Ex. 1.)  There is no more information about the way in which the relief was calculated and no
28

1    information about a process of appealing or challenging the decision.  The letter states:

2    "If you have questions about this notice, please contact the Department of Education at

3    FSAOperations@ed.gov or at 1-855-279-6027."  (*Id.*)  Craig and her husband have a very limited

4    income or no income, and their expenses for their family exceed their income.  (*Id.*, at ¶¶ 26 - 30.)

5    They appear to live, by any definition, in poverty.  The existence of loans with the obligation to

6    repay 80% of her Direct Loan causes Craig stress on a daily basis.  (*Id.*, at ¶¶ 31-32.)

7            **b.  Plaintiff Jamal Cornelius.**

8            Plaintiff Jamal Cornelius attended a Heald College program in information technology

9    because recruiters told him that he could obtain a high-paying job.  (Dkt. 35-2, at ¶ 6.)  He began

10   his program in July 2013 and borrowed a total of $25,555 in federal student loans and $2,000.26

11   in private loans.  (*Id.*, at ¶ 13.)  In 2015, Cornelius began making repayments of $273.64 per

12   month.  (*Id.*, at ¶ 14.)  Cornelius submitted his attestation form in the summer of 2016 and

13   resubmitted it in August 2016.  (*Id.*, at ¶¶ 16-18.)  Cornelius initially paid the loans but then

14   requested loan forbearance because he was not able to make the payments.  (*Id.*, at ¶¶ 22-23.)  He

15   learned that the only forbearance program he could seek would capitalize the interest on his loan.

16   (*Id.*, at ¶ 24.)  Cornelius is still waiting for a decision on his request for discharge and repayment

17   of his federal loans.  (*Id.*, at ¶ 25.)  Cornelius has not been able to obtain a job in information

18   technology and is working at Taco Bell in Hercules, California.  (*Id.*, at ¶¶ 11-12.)

19           **c.  Plaintiff Rthwan Dobashi.**

20           Plaintiff Rthwan Dobashi attended a WyoTech program in automotive technology in

21   Fremont, California, after seeing advertisements about high-paying jobs.  (Dkt. 35-3, at ¶ 5.)

22   Dobashi borrowed $22,184 in federal student loans and $3,183.73 in private loans.  (*Id.*, at ¶ 11.)

23   He made monthly repayments, even though he was not able to find a job in the area where he

24   trained.  (*Id.*, at ¶¶ 10, 12.)  Dobashi wants to return to school but cannot do so because of the

25   loans he has to repay.  (*Id.*, at ¶ 13.)  He submitted an attestation form for discharge of his loans

26   and also asked for forbearance of his loans in April 2016.  (*Id.*, at ¶¶ 16, 17.)  The Department

27   notified him that his loans were in forbearance but accruing interest at the rate of $76.27 per

28   month.  (*Id.*, at ¶ 18.)  He has not received a response from the Department, even though he

United States District Court
Northern District of California

13

1   submitted his attestation form over two years ago.  (*Id*., at ¶¶ 16, 19-21.)

2           **d.  Plaintiff Alina Farajian.**

3           Plaintiff Alina Farajian attended Everest College to become a medical assistant.  (Dkt. 35-

4   4, ¶ 23.)  Everest's recruiters assured Farajian that she could attend even though she had a learning

5   disability and assured Farajian that Everest had a job placement program that could assist her in

6   getting a job.  (*Id*., at ¶¶ 9, 10, 12-13.)  Farajian also reviewed brochures that listed very high job

7   placement rates.  (*Id*., at ¶ 18.)  Farajian finally enrolled in the summer of 2013 and borrowed

8   $5,000 in federal Direct Loans.  (*Id*., at ¶ 24.)  Her mother borrowed $10,000 in PLUS loans.  (*Id*.,

9   at ¶ 24.)  Farajian  completed her program and received a diploma, but the only job she was able to

10   obtain in her field of study was a one-month, temporary job.  (*Id*., at ¶¶ 26-27.)  Farajian began

11   repaying her loans in 2015 but then submitted an attestation form and asked for forbearance of her

12   loans.  (*Id*., at ¶¶ 30, 32.)  Farajian's mother also submitted an attestation form, and her entire

13   PLUS loan was discharged.  (*Id*., at ¶ 33.)  On March 1, 2018, Farajian received a letter from the

14   Department indicating that only 30% of her loan would be discharged.  (*Id*., at ¶ 37.)  Farajian is

15   working as a driver for Lyft but makes only $250 per month over her expenses.  (*Id*., at ¶¶ 39-40.)

16   Farajian is suffering from stress as a result of the loans.  (*Id*., at ¶¶ 41.)

17                    **PLAINTIFFS' PROPOSED INJUNCTION**

18           Plaintiffs seek class-wide preliminary injunctive and declaratory relief to return to the

19   *status quo ante*.  The proposed class of Plaintiffs is defined as:

20           all individuals who borrowed a Direct Loan to finance the cost of enrollment in a
           program who are covered by the Department's Corinthian Job Placement Rule,
21           who have applied or will apply for a borrower defense, and who have not been
           granted the full relief provided for by the Rule.
22
23   (Dkt. 58, at ¶ 257.)  Plaintiffs identify the class of borrowers who attended programs in the Lists

     for the time periods in the Lists.  (Dkt. 35-6, Exs. 6-7)  Plaintiffs seek an injunction ordering the
24
     Department:
25
           to cease all efforts to collect outstanding federal student loan debt
26           from Plaintiffs, to ensure the removal of negative credit reporting on
           Plaintiffs' outstanding federal student loan debt, to restore federal
27           student loan eligibility to Plaintiffs in the amount of their non-
           discharged Corinthian federal student loan debt, to stop applying the
28           "Average Earnings Rule" to members of the proposed class, and to

United States District Court
Northern District of California

14

1   process Plaintiffs' claims under the "Corinthian Job Placement Rate
    Rule[.]"

2   (Dkt. 35, at page 1.)

3                                    **ANALYSIS**

4          A preliminary injunction requires that Plaintiffs establish: "(1) likely success on the merits;

5   (2) likely irreparable harm absent preliminary relief; (3) [that] the balance of equities tips in

6   [Plaintiffs'] favor; and (4) that an injunction is in the public's interest." *Doe v. Kelly,* 878 F.3d

7   710, 719 (9th Cir. 2017) (citations omitted).  A "possibility" of irreparable harm is insufficient;

8   rather it must be "likely" absent an injunction. *Am. Trucking Ass'n, Inc. v. City of L.A.,* 559 F.3d

9   1046, 1052 (9th Cir. 2009).  Alternatively, "'serious questions going to the merits' and a balance

10  of hardships that tip sharply towards the plaintiff can support issuance of a preliminary injunction,

11  so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

12  injunction is in the public interest." *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th

13  Cir. 2011).  Plaintiffs bear the burden to show that these factors are met.  *DISH Network Corp. v.*

14  *FCC,* 653 F.3d 771, 776-77 (9th Cir. 2011).

15        **A.  Likelihood of Success on the Merits.**

16         Plaintiffs attack the actions of the Secretary under the Administrative Procedures Act (the

17  "APA").  The APA allows a court to set aside an "agency action" only under limited

18  circumstances:

19         To the extent necessary to decision and when presented, the reviewing court shall
20         decide all relevant questions of law, interpret constitutional and statutory
           provisions, and determine the meaning or applicability of the terms of an agency
21         action. The reviewing court shall --

22         (1) compel agency action unlawfully withheld or unreasonably delayed; and

23         (2) hold unlawful and set aside agency action, findings, and conclusions found to
               be –

24             (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
25                 with law; [or]

26             (B)  contrary to constitutional right, power, privilege, or immunity[.]

27  5 U.S.C. § 706. Section 704 of the APA states that agency action is "subject to judicial review" if

28  the action is a "final agency action for which there is no other adequate remedy in a court."  5

United States District Court
Northern District of California

1    U.S.C. § 704.  Plaintiffs allege that the Average Earnings Rule is a "final agency action" that

2    violates §§ 706(2)(A) and (B).  Specifically, Plaintiffs allege that the Average Earnings Rule is

3    unlawful under the APA for three reasons:  (1) the Average Earnings Rule violates (A) because it

4    is "arbitrary and capricious," (2) the Average Earnings Rule is unlawful under (A) because it

5    violates the Privacy Act, and (3) the Average Earnings Rule violates (B) by violating Plaintiffs'

6    Constitutional rights to due process.

7         **1.  Is the Average Earnings Rule a Final Agency Action?**

8         The threshold question for any action under the APA is whether the challenged action is

9    the type of action – a "final agency action" – which the Court can review.  Plaintiffs argue that the

10   Department's abandonment of the Corinthian Rule and adoption of the Average Earning Rule

11   constitute a final agency action that is subject to judicial review.  (Dkt. 35, at pages 26-27).  A

12   "final agency action" is one that "mark[s] the consummation of the agency's decision-making

13   process" and "one by which rights or obligations have been determined or from which legal

14   consequences will flow."  *Bennett v. Spear,* 520 U.S. 154, 177-78 (1977) (citations omitted).  The

15   question of whether an action is final is "pragmatic and flexible" with the focus on "practical and

16   legal effects of agency action."  *Or. Nat'l Desert Ass'n v. U.S. Forest Serv.,* 465 F.3d 977, 982

17   (9th Cir. 2006) (citation omitted).

18        The Secretary argues that the adoption of the Average Earnings Rule is not a "final agency

19   action" and thus not subject to review.  The Secretary's argument fails under *Bennett.*  First, the

20   adoption of the Average Earnings Rule marks the consummation of the Secretary's decision-

21   making – that the Secretary will review and analyze applications from borrowers under a specific

22   plan.  Second, legal consequences will follow based on these calculations for those borrowers.  *See*

23   *Salazar v. King,* 822 F.3d 61, 83-84 (2d Cir. 2016) ("The APA does not require that the

24   challenged agency action be the agency's final word on the matter for it to be 'final' for the

25   purposes of judicial review.").

26        As noted above, the Secretary documented the Average Earnings Rule in the December 15,

27   2017 Memorandum and in the December 20, 2017 Press Release.  (Dkt. 42-1, Ex. 1; Dkt. 42-2,

28   Ex. 1.)  These two documents show that the Secretary made a final decision about how to evaluate

United States District Court
Northern District of California

claims for borrowers who attended Corinthian schools on the Lists and show that the Secretary adopted specific methodology for that evaluation.  Thus, the first part of the test is satisfied because the Secretary consummated decision-making.  Second, there is no dispute that legal consequences flow from the Department's adoption of the Average Earnings Rule, as the Department has applied and is applying the Average Earnings Rule to determine the amount of relief each borrower obtains.  (Dkt. 42-2, at ¶¶ 23-34.)  *See Salazar,* 822 F.3d at 82 (2d Cir. 2016) ("The second requirement of the *Bennett* test is also met, because legal consequences flow from the [Department's] decision not to suspend the collection of the loans of the putative class members.").

Because the Average Earnings Rule is a "final agency action" subject to review, the Court must then analyze the three arguments that Plaintiffs make to attack the Average Earnings Rule.

### 2.  Does the Average Earnings Rule Violate the Privacy Act?

Plaintiffs argue that the Average Earnings Rule is "otherwise not in accordance with law" pursuant to 5 U.S.C. § 706 and specifically that the Average Earnings Rule violates the Privacy Act.  The Privacy Act of 1974, 5 U.S.C. § 552a, "regulate[s] the collection, maintenance, use, and dissemination of information by [governmental] agencies."  *Doe v. Chao,* 540 U.S. 614, 618 (2004).  The purpose is to avoid "substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained."  5 U.S.C. § 552a(e)(10).

### a.  Does the Privacy Act Allow this Type of Injunctive Relief?

Before even addressing the merits of the Privacy Act, the Secretary argues that Plaintiffs cannot seek injunctive relief here because the Privacy Act provides a "comprehensive remedial scheme" that limits injunctive relief to two narrow areas not sought here.  In *Doe v. Chao,* the Court held that the Privacy Act authorizes injunctive relief only in the following circumstances: (1) to order an agency to amend inaccurate, incomplete, irrelevant or untimely records, or (2) to order an agency to allow an individual access to his or her records.  540 U.S. at 635.  *See also See Cell Assoc., Inc. v. Nat'l Inst. of Health*, 579 F.2d 1155, 1160 (9th Cir. 1978) ("the detailed remedial scheme adopted by Congress [in the Privacy Act] would make little sense" if a party could seek general injunctive relief.)  Neither situation applies here, as Plaintiffs seek to enjoin the

United States District Court
Northern District of California

1    Department from using data compiled as a result of disclosing information to the Social Security

2    Administration and receiving information from the Social Security Administration to make

3    decisions about Plaintiffs' claims under the borrower defense rule.

4           Despite this restriction under the Privacy Act, the Supreme Court indicated in two later

5    cases that a party can seek injunctive relief *under the APA* – and not under the Privacy Act – to

6    attack a rule that violates the Privacy Act.  *FAA v. Cooper*, 566 U.S. 284, 303 n. 12 (2012); *Doe v.*

7    *Chao*, 540 U.S. at 619, n.1.  In *Doe v. Chao*, the plaintiff sued under the Privacy Act because the

8    Department of Labor used the plaintiff's Social Security number in "multicaptioned" notices sent

9    to people other than the plaintiff.  *Id*. at 617.  The  Supreme Court noted in a footnote that the

10   Privacy Act contains no specific standards for equitable relief because the APA provides those

11   standards.  *Id*.  In *FAA v. Cooper*, the Supreme Court again addressed the issue of the APA's

12   relation to the Privacy Act and stated in a footnote:  "The [Privacy] Act deters violations of its

13   substantive provisions in other ways – for instance, by permitting recovery for economic injury;

14   by imposing criminal sanctions for some violations . . . and possibly by allowing for injunctive

15   relief under the Administrative Procedures Act (APA)[.]"  566 U.S. at 303, n. 12.  The Supreme

16   Court interpreted *Doe v. Chao* as "noting the absence of equitable relief in suits under §

17   552a(g)(1)(C) or (D) may be explained by the availability of such relief under the APA."  *Id.* at

18   619, n.1.

19          Thus, a plaintiff cannot seek injunctive relief *under the Privacy Act* if that injunctive relief

20   exceeds the scope of the remedies allowed under the Privacy Act, but a plaintiff may seek

21   injunctive relief *under the APA* if an agency has taken an action in violation of the Privacy Act.

22   The Court therefore finds that Plaintiffs can seek injunctive relief under the APA for a final

23   agency action that violates the Privacy Act.

24                   **b.  Does the Privacy Act Allow Disclosure?**

25          The Privacy Act provides:  "No agency shall disclose any record which is contained in a

26   system of records . . . to another agency."  5 U.S.C. § 552a(b).  As noted above, the Department

27   sent to the Social Security Administration the following: names, dates of birth, and Social Security

28   numbers of the claimants who submitted attestation forms to obtain relief under the borrower

1    defense rule.  (Dkt. 42-2, Ex. 1, at page 3.)  The Social Security Administration then provided the

2    Department with the mean and median annual earnings of the students in aggregate form, without

3    any personal identifying information.  (Dkt. 35-8, Ex. 27, at page 1.)  Plaintiffs challenge this

4    exchange of information as a violation of the Privacy Act.  There are two acts of disclosure:  (1)

5    the Department's sending of names, Social Security numbers, and dates of birth of claimants to the

6    Social Security Administration, and (2) the Social Security Administration's sending of aggregate

7    statistical data about earnings to the Department.

8            There is no question that the Department and the Social Security Administration are both

9    agencies for purposes of the Privacy Act.  There is no question that, with regard to the first act of

10   disclosure, the Department disclosed to the Social Security Administration a "record" contained in

11   its "systems of records."  The Department disclosed to the Social Security Administration the

12   names of applicants with dates of birth and Social Security numbers.  Section 552a(a)(4) defines a

13   "record" as "any item . . . of information about an individual that is maintained by an agency . . .

14   that contains . . . [an] identifying number . . . or other identifying particular assigned to the

15   individual."  Section 552a(a)(5) defines a "system of records" as "a group of any records under the

16   control of any agency from which information is retrieved by the name of the individual or by

17   some identifying number, symbol, or other identifying particular assigned to the individual."

18   When the Department disclosed to the Social Security Administration information about the

19   applicants' Social Security numbers and dates of birth from the Department's files, that disclosure

20   violated the Privacy Act unless the Privacy Act exempts the disclosures.

21           The Privacy Act lists several specific exceptions to the prohibition of disclosure of

22   information, none of which apply here.  5 U.S.C. § 552a(b)(1) – (12).  The exception the Secretary

23   asserts here is the alleged ability to share "aggregate statistical data."   That term arises only in the

24   Privacy Act in a discussion of a process in which federal agencies may share data in "matching

25   programs."  5 U.S.C. § 552a(o).  The Privacy Act defines "matching programs" as "any

26   computerized comparison of . . .  two or more automated systems of records . . . for the purpose of,

27   . . . or continuing compliance with statutory and regulatory requirements by, applications for,

28   recipients or beneficiaries of, participants in, or providers of services with respect to, cash or in-

kind assistance or payments under Federal benefit programs, or recouping payments or delinquent debts." 5 U.S.C. § 552a(a)(8)(A).  "Federal benefit programs" include "payments, grants, loans, or loan guarantees to individuals." 5 U.S.C. § 552a(12).  On the face of the description, the Department's sharing of information is a matching program under the Privacy Act.  The Department shared information with the Social Security Administration for the purpose of recouping payments or delinquent debts – collection of student loans.

Matching programs must satisfy several procedural requirements: (1) the agencies must have entered into a written agreement specifying the purpose, legal authority and cost savings of the matching program, 5 U.S.C. § 552a(o); (2) the executive department must inform applicants for a federal benefit that matching programs may be used to verify their applications, 5 U.S.C. § 552a(o)(1)(D); (3) the agency must notify individuals that they have the right to contest the agency's findings from the matching program before the agency take any adverse action, 5 U.S.C. § 552a(p); and (4) the agency must report any new or revised matching program to the House Committee on Government Operations, the Senate Committee on Governmental Affairs, and the Office of Management and Budget.  5 U.S.C. § 552a(o)(2)(A); 5 U.S.C. § 552a(r).

Thus, if the sharing of data between the Social Security Administration and the Department is a matching program as defined by the Privacy Act, the agencies must comply with the requirements listed above.  It is undisputed that the Department and Social Security Administration did not comply with the requirements above and thus violated the Privacy Act.

Probably because the Department did not adhere to the requirements of a matching program, the Secretary argues that the sharing of information by the Department with the Social Security Administration does *not* constitute a matching program, and the Gainful Employment Agreement specifically disclaims that it is a matching program.  (Dkt. 35-8, Ex. 27, at page 1.) Instead, the Secretary argues that agencies generally may share aggregate statistical data, which is what the agencies did here.  Even if the Secretary is correct that the Department's sharing of information with the Social Security Administration was not a matching program and even if the Secretary is correct that agencies may share aggregate statistical data, the Privacy Act nonetheless bars the disclosure.

First, there is no simply no portion of the Privacy Act that states that agencies may share aggregate statistical data.  The Secretary has a convoluted reading of the Privacy Act, which relies upon an exception to an exception that creates the alleged ability to share data.  But the clear terms of the Privacy Act lay out exceptions and do not include an exception for sharing of aggregate statistical data.

But even assuming for the sake of argument that sharing of aggregate statistical data is allowed, the Department did not share aggregate statistical data with the Social Security Administration.  The Department sent names, dates of births, and Social Security numbers to the Social Security Administration.  The Privacy Act defines a "statistical record" as information "maintained for statistical research or reporting purposes only and not used in whole or in part in making any determination about an identifiable individual."  5 U.S.C. § 552a(a)(6).  In addition, the express terms of section 552a(a)(8)(B)(ii) forbid use of data to make decisions concerning the "rights, benefits or privileges of specific individuals."  Here, the information the Department disclosed to the Social Security Administration was used to make a determination about a specific individual – how much of the borrower's loan that the Department would forgive.

And with respect to the Social Security Administration's sending of information to the Department, which did not contain personal identifiers, the disclosure again violated the Privacy Act because the disclosure was made to make a determination about an individual.

Thus, even if the Privacy Act allows agencies to share aggregate statistical data, the Privacy Act prohibits the disclosures the Secretary made here to the Social Security Administration because the Department then uses that information to make determinations about the benefits of specific individuals.  For the same reason, the Privacy Act also prohibits the Social Security Administration's disclosure of aggregate statistical data to the Department because again, the Department used that information to determine benefits.

In conclusion, Plaintiffs have met their burden to show that they are likely to succeed on the merits of their argument that the Privacy Act bars the Department's disclosure of information about applicants to the Social Security Administration and the receipt and use of information from the Social Security Administration.  First, the plain language of the statute bars the disclosure.

1   Second, even if the sharing of information between the Department and the Social Security

2   Administration falls under the exception of the matching program, the Department and the Social

3   Security Administration did not comply with the requirements of a matching program.  Finally,

4   even if there is an exception that allows agencies to share aggregate statistical data, the Privacy

5   Act expressly forbids the use of that aggregate statistical data to make determinations about

6   individuals, as here the Secretary did under the Average Earnings Rule.  The Secretary simply

7   fails to point to an exception to the Privacy Act that allows disclosure of the specific information

8   about the applicants to the Social Security Administration and that allows the disclosure of the

9   aggregate data from the Social Security Administration to the Department for the Department's

10   use in determining relief for borrowers.

### 3.  Does the Average Earnings Rule Violate Plaintiff's Due Process Rights?

12   Separate and independent from their arguments under the APA, Plaintiffs contend that the

13   Secretary violated their due process rights by failing to provide them with "adequate procedural

14   protections" in evaluating their claims for relief under the borrower defense rule.  (Dkt. 35, at page

15   35.) Plaintiffs allege that they have a "property interest" in the "outcome of their borrower defense

16   application[s]."  (*Id*.)  Plaintiffs have a slightly shifting definition of their property rights, as they

17   also contend that they have a right to the relief under the Corinthian Rule, which Plaintiffs claims

18   is full relief or total discharge:  "Plaintiffs simply request that the [Department of Education]

19   continue to review applications [for relief under the borrower defense rule] under its prior

20   (streamlined and easier to administer) rule[.]"  (Dkt. 48, at page 9.) The "prior . . . rule" is the

21   Corinthian Rule.

### a.  Do Plaintiffs Have a Property Right?

23   In order to proceed with a due process claim, Plaintiffs must show that they have a

24   protected interest in property or liberty and that the Secretary denied them adequate procedural

25   protections in depriving them of that right.  *Bd. of Regents v. Roth*, 408 U.S. 564, 569-71 (1972).

26   A party does not have a property interest if the party has a "unilateral expectation" or an "abstract

27   desire or need for it."  *Foss v. Nat'l Marine Fisheries Serv.,* 161 F.3d 584, 588 (9th Cir. 1998).

28   Where a regulation creates the alleged entitlement, the question is whether the benefit is

United States District Court
Northern District of California

1   "mandatory in nature." *Foss*, 161 F.3d at 588.  An individual asserting a loss of due process must

2   show that "an existing law, rule, or understanding makes the conferral of benefit mandatory." *U.S.*

3   *v. Guillen-Cervantes*, 748 F.3d 870, 872 (9th Cir. 2014) (citation omitted).

4          Here, by definition, there can be no "right to an outcome" that is mandatory in nature.

5   Thus, by the way that Plaintiffs frame their purported property interest as a "right to an outcome,"

6   they cannot show that it is mandatory in nature.  To the extent that Plaintiffs claim that they are

7   entitled to relief, they cannot show that they are entitled to full relief or total discharge.  Plaintiffs

8   do not have a property interest in total discharge of their loans.  Although they do have a property

9   interest in "some" relief once they establish their borrower defense, there is no property right to

10  the amount of relief because the Higher Education Act provides discretion to the Secretary to

11  determine the amount of relief.  The Higher Education Act states that the "Secretary shall specify

12  in regulations which acts or omissions of an institution of higher education a borrower may assert

13  as a defense to repayment of a loan made under this part[.]"  20 U.S.C. § 1087e(h).  The

14  regulations do not require complete discharge but instead provide discretion to the Secretary.  The

15  regulation states that a borrower may assert, as a defense to repayment of a student loan, "any act

16  or omission of the school attended by the student that would give rise to a cause of action against

17  the school under applicable state law."  34 C.F.R. § 685.206(c)(1).  The regulation further

18  provides:

19          If the borrower's defense against repayment is successful, the Secretary notifies the
            borrower that the borrower is relieved of the obligation to repay *all or part of the*
20          *loan* and associated costs and fees that the borrower would otherwise be obligated
            to pay.

21  34 C.F.R. § 685.206(c)(1) (emphasis added).  The Secretary is allowed - but not required - to

22  reimburse the borrower for amounts already paid, determine that the borrower is not in default,

23  and update reports to consumer reporting agencies to remove any negative reporting.  34 C.F.R. §

24  685.206(c)(2).

25          Plaintiffs, once they establish their claims for relief under the borrower defense rule by

26  completing the attestation forms, have a mandatory right to *some* relief.  Based on the language of

27  the regulations, they also have a mandatory right to be notified about the amount of the relief they

28

United States District Court
Northern District of California

23

are receiving.  However, the regulations do not provide a mandatory right to a full discharge. The Secretary has made clear in the Average Earnings Rule that borrowers who successfully complete the attestation forms will be afforded relief in the form of 10% reduction at a minimum. (Dkt. 42-2, Ex. 1, at page 5.)  Even if the Secretary gives a borrower the minimum amount of relief under the Average Earnings Rule, that borrower still receives some relief from that partial discharge.  Plaintiffs do not allege that the Secretary refused to provide at least *some* relief to borrowers who successfully completed the attestation form.  Because borrowers do not have a mandatory right or entitlement to a specific amount of relief, as long as they are provided *some* relief, they do not have a right to procedural safeguards to regarding the relief amount, including the decision to provide less than a full discharge.

Plaintiffs cite to a case in which the Court held that the plaintiffs, who sought discharge of their loans under the Higher Education Act, had a "protected property interest" in their right to discharge.  *Higgins v. Spellings*, 663 F. Supp. 2d 788, 795 (W.D. Mo. 2009).  *Higgins* addressed a different section of the Higher Education Act that provided no discretion to the Secretary in discharging a student loan in full.  In *Higgins*, the Higher Education Act mandated that the Secretary provide full relief to a borrower who is disabled.  The Higher Education Act provides that, if a borrower dies or becomes permanently disabled or unable to work under certain circumstances, "then the Secretary *shall* discharge the borrower's liability on the loan  by repaying the amount owed on the loan." 20 U.S.C. 1087(a)(1) (emphasis added).  Where a borrower can prove that she or he falls under those circumstances, a borrower has a property interest in the complete discharge of the debt because the Secretary has no discretion to refuse to discharge the debt in full.  *Higgins*, 663 F. Supp. 2d at 794.

The right in *Higgins*, based on the section of the Higher Education Act which required a full discharge, is different from the right here, which is the mandatory right to some relief but not a full discharge, under the separate section of the Higher Education Act and its regulations.

Therefore, because Plaintiffs have not met their burden to show that they have a "property right" in the "outcome" of the adjudication of their claims for relief under the borrower defense rule, Plaintiffs cannot show likelihood of success on the merits of their argument that the

United States District Court
Northern District of California

Secretary's adoption and implementation of the Average Earnings Rule violates their due process rights.

### b. Did the Corinthian Rule Create a Property Interest?

Plaintiffs then argue that the Corinthian Rule created their "right." However, there is much uncertainty about the contours of the Corinthian Rule. As noted above, Plaintiffs allege that the Corinthian Rule was based on documents that they do not have, and Plaintiffs infer the existence of the Corinthian Rule from secondary sources that do not discuss the Corinthian Rule in detail. As a practical matter, it appears that the Secretary did provide full relief or total discharge for borrowers who completed attestation forms before 2017. The documentation that even the Secretary submits shows that the Secretary considered the implementation of the Average Earnings Rule to be a change in policy from previous policy. (Dkt. 41-1, at ¶¶ 9-10.) In reviewing the previous approvals of borrower's applications for relief, the Secretary found that "previous approvals had been based on the assumption that CCI borrowers received a worthless education and therefore that the discharge of the total amount of borrowers' loans and reimbursement of all payments was appropriate for all CCI borrowers with valid claims." (*Id.*, at ¶ 9.) The Secretary then evaluated that assumption as incorrect and created a new methodology to determine the value that students gained. (*Id.*, at ¶¶ 16-17.) The Secretary essentially admits that there was a previous policy, even if informal, for full discharge of debt of borrowers who completed the attestation forms.

For purposes of this motion, though, the Court is troubled by the fact that there is no document in the record that lists or describes the Department's previous policy. The missing element that matters most for this motion is whether the Secretary in the previous policy reserved to the Secretary the ability to change the analysis at a later time. The Secretary has the power under the regulations to determine the amount appropriate for discharge, and it is possible that the Secretary could devise a policy that relinquished the Secretary's right to determine whether borrowers who completed the attestation forms could have partial or full relief. It is also possible that the Secretary could impose a policy that provides full relief but specifically reserves the Secretary's power under the statute and regulations to override the relief for individual borrowers

at any time.[4]  Without any clear indication that the Secretary specifically gave up discretion to determine the amount appropriate for relief, the Court cannot find that the Corinthian Rule existed in such a way that bound the Secretary.  An "agency process without binding effect" is not reviewable under 5 U.S.C. § 551 even if it leads to "significant practical consequences."  *Indus. Safety Equip. Ass'n, Inc. v. EPA*, 837 F.2d 1115, 1120 (D.C. Cir. 1988) (citation omitted).

Therefore, Plaintiffs do not meet their burden to show likelihood of success on the merits of their argument that they have a "property right" based on the Corinthian Rule.  Because Plaintiffs have not met that burden, the Court will not address their argument that the Secretary in implementing the Average Earnings Rule violated their procedural rights.

**4.  Is the Average Earnings Rule Arbitrary and Capricious?**

Because the Court finds that Plaintiffs demonstrated a likelihood of the merits that the Secretary violated the Privacy Act in her implementation of the Average Earnings Rule, it may appear that the Court need not discuss the issue of whether the Secretary's adoption of the Average Earning Rule is arbitrary and capricious.  However, as discussed below, the Court will need to determine the remedy to the Privacy Act violation.  The Court finds that a discussion of the arbitrary and capricious standard is helpful to understand the scope of the Secretary's permissible remedial actions.

The scope of review under the "arbitrary and capricious" standard is "narrow and deferential."  *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008).  The court in reviewing an agency's action "is not empowered to substitute its judgment for that of the agency."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99, 105 (1977).  The reviewing court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Arrington,* 516 F.3d at

---

[4] That the Department made no public statement of any kind indicating that borrowers would receive full discharge of loans or full refund of loans is telling.  For example, the attestation forms do not state what relief the borrowers will receive.  (Dkt. 35-6, Exs. 8-9.)  In addition, Arne Duncan, the previous Secretary, stated: "[If] you've been defrauded by a school, we'll make sure that you get every penny of the relief you are entitled to through a streamlined process – as streamlined as possible."  (Dkt. 35-5, Ex. 5, at page 2.)  There was no explanation about what relief was.

United States District Court
Northern District of California

United States District Court
Northern District of California

1112 (internal citation and quotation omitted).  A rule is arbitrary and capricious if the agency:  (1) "has relied on factors which Congress has not intended it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) offers an explanation that is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

Plaintiffs argue that the Secretary fails to meet the standard to show that the new policy, the Average Earnings Rule, is better than the old policy, the Corinthian Rule.  When an agency changes policy, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better[.]" *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (italics in original).  As noted above, there is not sufficient evidence to determine that a Corinthian Rule existed as Plaintiffs describe it.

However, even assuming that the Secretary had previously adopted a Corinthian Rule, the Secretary met the burden necessary to change the policy.  In reviewing the previous approvals of borrower's applications for relief, the Secretary found that "previous approvals had been based on the assumption that CCI borrowers received a worthless education and therefore that the discharge of the total amount of borrowers' loans and reimbursement of all payments was appropriate for all CCI borrowers with valid claims." (Dkt. 41-1, at ¶ 9.)  The Secretary then evaluated that assumption and determined that the assumption was false and made a new methodology for determining the value gained.  (*Id*., at ¶¶ 16-17.)  The Secretary provided a justification for the Average Earnings Rule: the assumption that students who attended the Corinthian schools obtained no value is not factually accurate for all students and thus basing relief from loans on that assumption is a bad policy.  (*Id*., ¶¶ 15-17 and Ex. 1.)  The Secretary's concern is genuine, and the attempt to create a policy to determine whether students obtained value and if so, how much, is also a legitimate exercise of the Secretary's discretion under the Higher Education Act.  As noted above, the regulations promulgated under the Higher Education Act provide that the Secretary can

27

relieve "all or part" of the loan of a borrower who successfully asserts a borrower defense and provides that the Secretary has discretion to provide relief "as the Secretary determines is appropriate under the circumstances." 34 C.F.R. § 685.206(2). Here, there is no question that the Secretary has the power to determine the amount of relief a borrower can obtain.

Nonetheless, Plaintiffs challenge the actions in implementing that discretion as arbitrary and capricious. First, Plaintiffs challenge the Average Earnings Rule on a legal basis, since Plaintiffs claim that the Department had previously issued a legal memorandum concluding that California's Unfair Competition law is the applicable law for determining borrower's relief, and specifically that borrowers who were defrauded were entitled to a full discharge of their debt. As discussed above, Plaintiffs do not provide the legal memorandum, so the Court cannot determine if that legal memorandum was the basis for the Secretary's decision for the Corinthian Rule. The Court also cannot determine what the legal memorandum concluded or whether it was the basis for the Secretary's decision for the Corinthian Rule. The specific regulation addressing the amount or type of relief does not reference state law. *See* 34 C.F.R. § 685.206(c)(2).[5] Moreover, even if the Secretary were bound to apply California law, either by the legal memorandum or regulation, California's Unfair Competition law does not require full discharge in cases of fraud. California's Unfair Competition law, Cal. Bus. & Prof. Code § 17200 *et seq.*, provides either equitable relief or restitution as a remedy. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003). Restitution is defined as "the excess of what the plaintiff gave the defendant over the value of what the plaintiff received" in order to "restore the defrauded party to the position he would have absent the fraud." *Pulaski & Middleman LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) (citations omitted). Here, the Average Earnings Rule, in attempting to determine the value of what plaintiff received, is not arbitrarily inconsistent with a restitution calculation under California's Unfair Competition law. Even if the percentage awarded under the Average Earnings Rule is somewhat less than the Plaintiffs' calculation of restitution under

---

[5]In contrast, the specific regulation addressing the right to relief does reference state law. 34 C.F.R. § 685.206(c)(1). In addition, the Master Promissory Note references state law but does not specify that the state law governs the amount of discharge. (Dkt. 35-5, Ex. 1, at page 7.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    California's Unfair Competition law, this differential does not render the Secretary's

2    determination arbitrary and capricious.  Even if the Court disagrees with the relief amount, the

3    Court "is not empowered to substitute its judgment for that of the agency."  *Citizens to Preserve*

4    *Overton Park*, 401 U.S. at 416.

5          Plaintiffs also argue that the Average Earnings Rule is arbitrary and capricious because:

6    (1) the  Average Earnings Rule is "irrational" in the manner in which the Average Earnings Rule

7    applies the gainful employment standard, (2) the Average Earnings Rule ignores previous findings

8    and leads to inconsistent results for borrower who submitted claims before the Average Earnings

9    Rule and after the Average Earnings Rule, (3) the Average Earnings Rule relies upon data from

10   third parties that is not relevant or specific to the borrowers, and (4) the Average Earnings Rule

11   fails to take into account whether the borrower is working in the field she or he studied in

12   determining the amount of forgiveness.  (Dkt. 35, at pages 40-42.)  All of these attacks are

13   attempts to second-guess the Secretary's decision-making and substitute the Court's judgment for

14   the judgment of the Secretary.  The Secretary, in adopting the Average Earnings Rule, provided a

15   rational reason for the Average Earnings Rule and a method – imperfect in many ways and illegal

16   under the Privacy Act – to assess the value of what the borrower actually received as compared to

17   the loans.  However, aside from the illegal disclosure of information to the Social Security

18   Administration and use of that data from the Social Security Administration, the Secretary's

19   attempts to devise a more narrowly tailored system for determining the amount of relief is not

20   arbitrary and capricious.

21         Therefore, Plaintiffs do not meet their burden to show likelihood of success on the merits

22   of their argument that the Secretary's adoption and implementation of the Average Earnings Rule

23   is arbitrary and capricious.

24         **5.  Does the Average Earnings Rule Constitute Retroactive Rule Making?**

25         Plaintiffs argue also that, separate from the alleged violations of the APA, the Secretary's

26   use of the Average Earnings Rule constitutes impermissible, retroactive rulemaking.  Plaintiffs

27   argue that an agency cannot create a new rule and apply it retroactively.  *Cort v. Crabtree*, 113

28   F.3d 1081 (9th Cir. 1997).  The issue before the Court is whether the Secretary is applying the

Average Earnings Rule retroactively.  It is undisputed that the Secretary is not clawing back any funds or changing any decisions made and communicated before the Average Earnings Rule was put in place with regard to borrowers who submitted their attestation forms before the Average Earnings Rule was put in place.  Plaintiffs argue that the Average Earnings Rule is retroactive because the Secretary is applying the Average Earnings Rule to all borrowers in the proposed class of plaintiffs – whether they have submitted an attestation form or not.  Plaintiffs' argument turns on whether they have a vested right in a full discharge of their loans and that the adoption of the Average Earnings Rule took away that right.  *See*, *e.g*., *Landgraf v. USI Film Prods*., 511 U.S. 244, 269-70 (1994) (a rule is "retrospective" if it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past") (citation omitted).  This analysis is similar to the analysis of due process rights discussed above, as a vested right is similar to a mandatory right.  Because Plaintiffs cannot show, with the evidence before the Court now, that all borrowers in the proposed class were entitled to full relief as a matter of stated policy, Plaintiffs cannot show that the Average Earnings Rule is retroactive in nature.

The main case Plaintiffs cite, *Cort*, is distinguishable because in *Cort*, the plaintiffs[6] had already received letters notifying them that they were eligible for relief, but the governmental agency (Bureau of Prisons) then changed its interpretation of a statute and determined that the plaintiffs were no longer eligible.  *Cort,* 113 F.3d at 1082.  The plaintiffs had a right that the Bureau of Prisons then took away.  Here, because Plaintiffs cannot show – based on the record before the Court now –  that they had a vested right or a mandatory right to full relief, they cannot show the Secretary engaged in retroactive rule making by taking away that right.  Therefore, Plaintiffs do not meet their burden to show likelihood of success on the merits of their argument that the Secretary's adoption and implementation of the Average Earnings Rule constitutes retroactive rule-making.

/ / /

_____

[6] The plaintiffs in *Cort* were three individuals who did not assert a class action.  *Cort,* 113 F.3d at 1081-82.

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.  A Preliminary Injunction Is Necessary to Stop Irreparable Harm.**

Because the Court finds that Plaintiffs have shown a likelihood of success on the merits of the APA claim, the Court must determine whether they can show irreparable harm to justify a preliminary injunction.  A plaintiff seeking a preliminary injunction must demonstrate that irreparable injury is likely in the absence of preliminary relief.  *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 21 (2008).  A mere possibility of irreparable injury is insufficient.  *Id.* "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act v. Brewer,* 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted).  Further, the irreparable nature of a plaintiff's injury is heightened when it involves the plaintiff's "young age and fragile socioeconomic position." *Ariz. Dream Act,* 757 F.3d at 1068.  Plaintiffs claim irreparable injury because Plaintiffs are suffering extreme financial hardship, emotional distress, loss of opportunity, and invasion of Plaintiffs' privacy rights.[7] Because the Court finds that the Average Earnings Rule violates the Privacy Act, the Court will examine the harm largely in that context.

**1.    Do Privacy Act Violations and Emotional Distress Constitute Irreparable Harm?**

Plaintiff Mercado states that, when she learned that her own Social Security information was used against her to forgive only 30% of her loan, she was "sad, distressed and betrayed." (Dkt. 48-1, ¶ 17.)  She felt that the use of her own information against her in determining the amount of her loan forgiveness was a "slap in the face."  (*Id.*)

As noted above, the Court finds that the Secretary's disclosure to the Social Security Administration and receipt and use of data from the Social Security Administration violates the Privacy Act because the results are used in determining borrowers' benefits – relief from loans.  In this situation, borrowers can feel emotional distress, similar to Mercado's sentiments.  Here, Plaintiffs Craig, Farajian, and Dobashi discuss in general terms the emotional stress that the repayment system is causing them.  (Dkt. 35-1 at ¶¶ 17, 32; Dkt. 35-3 at ¶¶ 22-23; Dkt. 35-4 at ¶¶

---

[7]  Plaintiffs contend that they are suffering irreparable harm of violation of their due process rights.  Because the Court finds that Plaintiffs do not have a property interest in the outcome of their applications for borrower defenses, the Court will not analyze that harm.

36, 41.)[8]  Plaintiffs cannot recover for emotional distress under the Privacy Act, even if there is a final determination that the Secretary violated the Privacy Act, because the government had provided only limited avenues for relief in waiving sovereign immunity.  *FAA v. Cooper*, 566 U.S. at 303-304 (no mental or emotional distress allowed under the Privacy Act).  Where sovereign immunity bars certain types of damages, those damages can constitute irreparable harm.  *See, e.g., Caspar v. Snyder*, 77 F. Supp. 3d 616, 641 (E.D. Mich. 2015) (if sovereign immunity bars damages, damages can be irreparable). *See also Krebs v. Rutgers*, 797 F. Supp. 1246, 1259 (D. N.J. 1992) (Privacy Act harms are irreparable). Thus, the emotional distress that Plaintiffs are suffering from the violation of the Privacy Act is irreparable, and an injunction is warranted.

### 2.    Does Economic Harm Constitute Irreparable Harm?

Both parties discuss the economic harm from denial of full relief from debt.  Because the Court finds that the Secretary has discretion to determine the amount of relief a borrower can receive – as long as the rule does not violate laws – the issue of economic harm is not necessarily relevant here.  The Secretary's action in adopting the Average Earnings Rule is unlawful and therefore invalid under the APA, but the harm – loss of privacy – does not necessarily cause economic injury.  The Secretary could devise a lawful rule to evaluate and determine relief for borrowers that does not provide full relief.  Even if the Secretary were to devise a lawful rule for Plaintiffs, they might still suffer some economic harm.

However, the Court notes that, because the Court finds that the Average Earnings Rule is invalid, Plaintiffs whose claims are evaluated under the Average Earnings Rule might be forced to repay higher amounts than they would under a validly constructed rule.  If that is the case, then economic harm is relevant.  The Court finds that Plaintiffs have shown that they are suffering

---

[8] With their Reply, Plaintiffs also submit the declarations of two mental health professionals, both of whom discuss the psychological effects of student loans on individuals in general. (Dkt. 48-2; Dkt. 48-3.)  Neither mental health professional examined the Plaintiffs but rather only reviewed their declarations.  (Dkt. 48-2, 5; Dkt. 48-3, at ¶ 23.)  Given that the Court has found that Plaintiffs have submitted evidence of emotional distress, there is no need for the Court to review the declarations of mental health professionals.  Moreover, the Court is not inclined to accept these additional declarations on reply without giving the Secretary a chance to address them, because they contain more than factual allegations and provide expert opinions that are subject to attack.

1    irreparable harm in the form of economic harm.  Although economic harm generally does not

2    constitute irreparable injury, economic injury may be the basis for an injunction where a plaintiff

3    lives on a fixed income and where minimal increases in the cost of living creates a "potential [for]

4    financial disaster" and the possible deprivation of "life's necessities."  *United Steelworkers of Am.,*

5    *AFL-CIO v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987); *see also Golden v. Kelsey-Hayes Co.*, 73

6    F.3d 648, 657 (6th Cir. 1996) (economic harm satisfied factor of irreparable injury because

7    plaintiffs were "unable to absorb even relatively small increases in their expenses without extreme

8    hardship").  Here, Plaintiffs Craig and Farajian provide detailed information to show that they are

9    living in dire circumstances.  (Dkt. 35-1; Dkt. 35-4.)  In addition, Plaintiff Cornelius, who is

10   working at a Taco Bell in Hercules, California, faces payments of at least $273.64 per month.

11   (Dkt. 35-2, at ¶¶ 2, 14.)  It is difficult for workers at fast food restaurants to make ends meet in the

12   San Francisco bay area, one of the most expensive areas in the country, even without a monthly

13   loan payment of $273.64 per month.  These detailed declarations from Craig, Farajian, and

14   Cornelius, show that repayment of loans threatens these borrowers' ability to pay for basic life

15   expenses like food and rent.[9]

16          The Secretary argues that Plaintiffs have not shown that the repayment of loans is causing

17   the harm that they are suffering because they have other financial problems that caused the harm.

18   This argument seems meaningless given the dire financial circumstances that Plaintiffs describe.

19   Given their financial situations, any additional dollar they are required to repay takes away from

20   basic need for food and shelter.  In economic terms, the marginal utility of each dollar is extremely

21   high to the Plaintiffs.

22          Under these circumstances, the Court finds that Plaintiffs have shown irreparable harm

23   because the economic harm they are suffering affects their ability to pay for life's most basic

24   necessities.

25   / / /

26

27          [9] The briefs of *amici curiae* - the Debt Collective and Public Law Center - also provide
     examples of individual borrowers who are suffering economic hardships.  (Dkt. 43; Dkt. 45.)

28   These individual borrowers did not submit declarations under penalty of perjury, and therefore
     Court will not consider that information.

United States District Court
Northern District of California

### 3.    Does Loss of Opportunity Constitute Irreparable Harm?

Plaintiffs also claim that they are suffering a loss of opportunity and that loss constitutes irreparable injury.  Again, the harm that Plaintiffs assert in this area is linked to the failure to obtain a full discharge and not linked to the violation of their privacy rights.  But for the same reasons as discussed with regard to the economic harm, the loss of opportunity for Plaintiffs who are forced to repay more for their loans under the invalid Average Earnings Rule, compared with the amount that they would repay under a valid rule, is relevant harm.  Lost opportunities can constitute irreparable injury.  *Brewer,* 757 F.3d at 1068 (holding that loss of professional opportunity constitutes irreparable harm); *see also Enyart v. Nat'l Conf. of Bar Examiners, Inc.,* 630 F.3d 1153, 1163 (9th Cir. 2011) (loss of opportunity to pursue one's chosen profession constitutes irreparable harm).  The Secretary argues that Plaintiffs fail to meet their burden of proof to assert this area of damage as irreparable injury.  However, Plaintiffs submitted, with their Reply, an additional declaration of Plaintiff Mercado in which she explains that she has not been able to obtain a mortgage for a home because of the existence of her loans.  (Dkt. 48-1, at ¶ 23.)  Although the Mercado Declaration was submitted in such a way that the Secretary did not have a chance to rebut it, the Court will accept the factual allegations of the Mercado Declaration.  The Mercado Declaration shows that Plaintiffs can suffer loss of opportunities similar to the type the Court in *Brewer* found to constitute irreparable injury.

Under these circumstances, the Court finds that Plaintiffs have shown irreparable harm because they cannot recover their lost opportunities.

### C. Public Interest and Balance of Equities Weigh in Favor of Preliminary Injunction.

The Court finds that the balance of equities weighs in favor of a preliminary injunction and that the public interest weighs in favor of a preliminary injunction.  Although normally courts consider the third and fourth factors of the test for a preliminary injunction separately, where the federal government is a party, the last two factors of the balance of equities and public interest merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  There is a strong public interest in ensuring that agencies comply with the law in enacting rules and regulations, and here, preventing the use of data in violation of the Privacy Act is a compelling interest.  The

Secretary argues that forcing the Secretary to forgive all loans to Plaintiffs costs the government money that the government should not pay, given that some Plaintiffs received some benefit from their education through the Corinthian schools. The Secretary argues that the relief Plaintiffs seek will divert resources from other educational programs, and that there is a strong public interest in saving funds. Saving money does not justify a violation of the law – the Privacy Act. The Court here, as discussed more fully below, is not ordering the Secretary at this time to return to the Corinthian Rule. The Court recognizes that the Secretary has discretion to enact rules regarding the amount of relief as long as the rules are lawful and not arbitrary and capricious. Given that the injunction below is narrowly tailored to the violation of the Privacy Act and temporary in nature, the Court finds that the balance tips in favor of Plaintiffs for an injunction.

**D. The Appropriate Remedy.**

Plaintiffs seek an injunction ordering the Secretary to take cease two actions and to take three other affirmative actions. As described above, Plaintiffs seek an injunction in five main areas:  (1) to stop "all efforts to collect outstanding federal student loan debt from Plaintiffs," (2) to remove negative credit reporting of "Plaintiffs' outstanding federal student loan debt", (3) "to restore federal student loan eligibility to Plaintiffs in the amount of their non-discharged Corinthian federal student loan debt," and (4) to stop using the "Average Earnings Rule," and (5) to apply the Corinthian Rule to Plaintiffs' claims.

**1. Is Removal of Negative Credit Reporting and Restoring Eligibility for Student Loans the Correct Relief?**

The Court will not order the Secretary to take the actions Plaintiffs seek with regard to the requests for removal of negative credit reporting and restoring eligibility for further student loans. Even if the Court were to assume that the Corinthian Rule existed, Plaintiffs' definition of the Corinthian Rule does not include this relief.  (Dkt. 35, at pages 12-13.)  There is no other evidence in the record to show that the Corinthian Rule included these provisions.

Furthermore, the regulation provides that the Secretary has discretion to provide that relief. Section 685.206(c)(2) states that "[f]urther relief may include, but is not limited to, the following . . . . Determining that the borrower is not in default on the loan and is eligible to receive assistance

United States District Court
Northern District of California

1  under Title IV of the Act," and "Updating reports to consumer reporting agencies to which the

2  Secretary previously made adverse credit reports with regard to the borrower's Direct Loan."

3  Under the clear terms of the regulation, the Secretary can, but is not required, to provide this relief.

4  The Court cannot, in the absence of any evidence, force the Secretary to take action that the

5  Secretary is not required to do.  The Court therefore **DENIES** Plaintiffs' request for preliminary

6  injunction to the extent that Plaintiffs seek an order requiring the Secretary to remove negative

7  reports from Plaintiffs' reports with credit reporting agencies and to restore Plaintiffs' eligibility

8  for further student loans.

9     **2.   Is Enjoining Use of Average Earnings Rule, Return to the Corinthian Rule
         and Immediate Cessation of Collection of Plaintiffs' Debts Appropriate?**

10     Because Plaintiffs have met their burden to show likelihood of success on the merits of the

11  argument that Secretary violated the APA by implementing a rule, the Average Earnings Rule, that

12  violates the Privacy Act, that implementation of the Average Earning Rule is causing irreparable

13  harm, and that the balance of equities tips in favor of Plaintiffs on this serious issue, the Court

14  **ENJOINS** the Secretary from using the Average Earnings Rule as it currently exists.  Normally,

15  when a court issues an injunction, the injunction orders a return to the *status quo*.  In this case, it is

16  unclear what the *status quo* is, since there is no clear documentation outlining the parameters of

17  the Corinthian Rule.

18     At this time, the Court cannot compel the Secretary to return to the Corinthian Rule, since

19  the parameters of the Corinthian Rule are not clearly defined.  *See Norton v. Southern Utah*

20  *Wilderness Alliance,* 542 U.S. 55, 64 (2004) (court can compel agency action "only where a

21  plaintiff asserts that an agency failed to take a discrete agency action that it required to take.")

22  The action that the plaintiff seeks to compel must be so clear that it is subject to the traditional test

23  of mandamus.  *Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1075-76 (9th Cir. 2015).  A *writ*

24  *of mandamus* is appropriate only when "(1) the plaintiff's claim is clear and certain, (2) the

25  defendant official's duty to act is ministerial, and so plainly prescribed as to be free from doubt,

26  and (3) no other adequate remedy is available."  *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir.

27  1994) (internal quotations and citations omitted).  Here, the Court cannot compel the Secretary to

28  take specific actions allegedly under the Corinthian Rule when there is no evidence to show that

the Corinthian Rule included those specific actions.  The Court therefore **DENIES** Plaintiffs' request for preliminary injunction to the extent that Plaintiffs seek an order requiring the Secretary to implement the Corinthian Rule in assessing claims under the borrower defense rule, filed by borrowers who attended schools on the Lists.

Thus, the Court **GRANTS** Plaintiffs' motion for preliminary injunction to prevent the Secretary from using the Average Earnings Rule but **DENIES WITHOUT PREJUDICE** Plaintiffs' motion for preliminary injunction to return to the Corinthian Rule.  With regard to the injunction for the Secretary to stop all efforts to collect Plaintiffs' loans, the Court temporarily **GRANTS** this request.  The Secretary is **ORDERED** to cease all efforts to collect debts from Plaintiffs until the Court can determine the proper course of action.

The Secretary has the right to assess claims for relief from borrowers who attended Corinthian schools on the Lists who seek relief under the borrower defense rule as long as the Secretary does not violate the Privacy Act or other laws in doing so.  At this time, though, because the Court is not sure how to define the *status quo* in the absence of key documentation, the Court requests additional briefing on this issue and will hear oral argument on this issue on June 4, 2018, the date currently scheduled for a case management conference.  The hearing will be specially set for 2:30 p.m.  Parties may submit supplemental briefing on this subject, to be exchanged simultaneously, on May 31, 2018.  At the hearing on June 4, parties should be prepared to address the following questions:

(1) Does the Court have the authority to order the Secretary to produce the three documents that Plaintiffs allege constitute the Corinthian Rule: (1) a memorandum prepared by the Department's Office of General Counsel, (2) a fine action letter prepared by Federal Student Aid's Administrative Actions & Appeals Service Group, and (3) an April 2015 document prepared by the Federal Student Aid's Administrative Actions & Appeals Services Groups?

(2) What is the *status quo*?  What is the date by which the Court measures the *status quo*?  The Court directs the parties to a recent case on this subject:  *Animal Legal Defense Fund v. U.S. Dept. of Agriculture*, 2017 WL 2352009, *3 (N.D. Cal. May 31, 2017).

United States District Court
Northern District of California

(3) If the Court enjoins the Secretary from using the Average Earnings Rule and the Secretary does not return to the Corinthian Rule, what steps will the Secretary take to assess claims from Plaintiffs?

(4) Do Plaintiffs contend that the Secretary has a mandatory duty to provide forbearance pending a determination of the discharge amount?  If so, what is the authority for that position?  Does the Secretary dispute that she has a mandatory duty to provide forbearance pending a determination of the discharge amount?  If so, what is the authority for that position?

(5) Should the Secretary treat in a different manner the borrowers who were not able to complete a program or receive a diploma or certification on the Lists because the school or program closed?  If the students who were not able to complete their program did receive some value, would it be arbitrary to treat them the same (provide the same discharge amount) as those students who were able to complete their programs?

**IT IS SO ORDERED**.

Dated:  May 25, 2018

_____
SALLIE KIM
United States Magistrate Judge

United States District Court
Northern District of California