CHAD A. READLER
Acting Assistant Attorney General

ALEX G. TSE
Acting United States Attorney

MARCIA BERMAN
Assistant Branch Director

KAREN S. BLOOM
Senior Counsel
R. CHARLIE MERRITT
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
20 Massachusetts Ave. NW
Washington, D.C. 20530
Telephone: (202) 616-8098
Facsimile: (202) 616-8460
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARTIN CALVILLO MANRIQUEZ, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION <br><br> Defendants. | No. 3:17-cv-7210-SK <br><br> **DEFENDANTS' BRIEF IN RESPONSE TO COURT'S MAY 25, 2018 ORDER** |

On May 25, 2018, the Court entered an order granting in part the Plaintiffs' request for preliminary injunctive relief. *See* ECF No. 60 (the "May 25 Order"). In its Order, the Court stated that it "is not sure how to define the *status quo* in the absence of key documentation" and requested additional briefing on the issue, posing five specific questions to the parties. *Id*. at 37. Defendants, the United States Department of Education (the "Department") and Elisabeth DeVos, in her official capacity as Secretary of Education (the "Secretary") (collectively, "Defendants"), respectfully submit the following supplemental brief,[1] responding to the Court's five questions as follows.

**Question 1:** Does the Court have the authority to order the Secretary to produce the three documents that Plaintiffs allege constitute the Corinthian Rule: (1) a memorandum prepared by the Department's Office of General Counsel, (2) a fine action letter prepared by Federal Student Aid's Administrative Actions & Appeals Service Group, and (3) an April 2015 document prepared by the Federal Student Aid's Administrative Actions & Appeals Services Groups?

**Defendants' Response**

Plaintiffs' reference to the three documents cited above is based entirely on a report by the Department of Education's Inspector General ("IG Report"). *See* Pls.' Mot. for Prelim. Inj. at 13, ECF No. 35 ("PI Mot."). That report, which Plaintiffs attach as Exhibit 10 to their PI Motion, *see* ECF No. 35-6 at 56-97, noted that the Department's office of Federal Student Aid ("FSA") established various categories of borrower defense claims supporting a cause of action under state law. *See id*. at 68-69. The IG Report stated that the job placement rate misrepresentation claims that are at issue in the instant case were based on "a May 2015 Memorandum prepared by the OGC," "findings in a fine action letter prepared by" FSA, and "findings in an April 2015 document prepared by" FSA. *Id*. at 69. In the next section, the IG Report noted that FSA "did not maintain

---

[1] The Court ordered that these briefs be exchanged "simultaneously." May 25 Order at 37. At the time of Defendants' filing, Plaintiffs have not filed a brief. Defendants respectfully reserve the right to respond to the arguments presented in any brief that Plaintiffs might file at the oral argument scheduled for June 4, 2018.

in its documentation an OGC opinion or other documented advice supporting the amount of the loan discharges for job placement rate misrepresentation claims." *Id*. at 70.

After a thorough internal review, the Department has determined that the second and third documents to which the IG Report refers, which track documents 2 and 3 in the Court's question, are actually the same document: an April 14, 2015 letter from FSA's Administrative Actions and Appeals Service Group to the President of Corinthian Colleges, Inc., notifying Corinthian of the Department's intent to fine Heald College. This public document is already in the record because Plaintiffs submitted it as Exhibit 4 to their PI Motion. *See* ECF No. 35-5 at 47-62. There is thus no need to consider whether the Court would have the authority to order Defendants to produce it. In any event, the letter does not address the Secretary's borrower defense regulation or the relief available to particular borrowers under that regulation, and it does not establish the existence of any "Corinthian Rule" as defined by Plaintiffs. Rather, it details the Department's findings that Heald College failed to meet the fiduciary standard of conduct required of it by federal law, *see* 34 C.F.R. § 668.82, by "misrepresenting its placement rates to current and prospective students and to its accreditors, and by failing to comply with federal regulations requiring the complete and accurate disclosure of its placement rates." *Id*. at 47.

The May 2015 memorandum prepared by the Department's Office of the General Counsel ("OGC") (document 1 in the Court's question), on the other hand, is a nonpublic, internal draft agency memorandum prepared by the Department's legal counsel for the benefit of its policymakers. It is protected from disclosure by both the attorney-client privilege and the deliberative process privilege. The attorney-client privilege is "arguably the most fundamental of the common law privileges recognized under Federal Rule of Evidence 501," *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016), and is designed "to encourage candid communications between client and counsel," *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Ariz.*, 881 F.2d 1486, 1492 (9th Cir. 1989). These objectives apply to governmental clients, and "the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys." *United States v.*

1   *Jicarilla Apache Nation*, 564 U.S. 162, 169-70 (2011).  Importantly, the privilege "cannot be
2   overcome by a showing of need." *Admiral Ins. Co.*, 881 F.2d at 1494 (citation omitted).

3         The deliberative process privilege, which is unique to the government, protects documents
4   that are both "predecisional" and "deliberative" in order to "allow agencies freely to explore
5   possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny."
6   *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 979 (9th Cir. 2009); *see also Coastal States Gas*
7   *Corp. v. DOE*, 617 F.2d 854, 866 (D.C. Cir. 1980) (noting that one purpose of the privilege is to
8   "protect against premature disclosure of proposed policies before they have been finally
9   formulated or adopted").  The privilege can only be overcome upon a showing that "the need for
10  the [deliberative] materials to allow for accurate fact-finding outweighs the government's interest
11  in non-disclosure." *Desert Survivors v. DOI*, 231 F. Supp. 3d 368, 380 (N.D. Cal. 2017).

12        Here, the May 2015 memo goes to the heart of both asserted privileges.  It provides
13  confidential, draft legal advice from an agency's attorney to its policymaker regarding a
14  contemplated course of action.  And, because it is merely a draft document, from a time before
15  even the appointment of the Special Master tasked with advising the Department about borrower
16  defense issues, it especially reflects the Department's inchoate, evolving thinking rather than a
17  final determination of policy.  *See Electronic Frontier Found. v. DOJ*, 739 F.3d 1, 8 (D.C. Cir.
18  2014) (deliberative process privilege covers "legal memoranda that concern the advisability of a
19  particular policy, but do not authoritatively state or determine the agency's policy").  There is no
20  indication that the Plaintiffs' need for this memorandum outweighs the government's strong
21  interest in promoting "frank and independent discussion regarding contemplated policies and
22  decisions," *FTC v. Time Warner Comm'cns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984)), as
23  necessary to overcome the deliberative process privilege.  And even if there was, such a showing
24  would be insufficient to overcome the attorney-client privilege which, as noted above, does not
25  yield to a litigant's need for the privileged document.

26        Disclosure is especially inappropriate in the current APA case, which is governed by
27  review of the agency's stated bases for acting, as reflected in a properly certified administrative
28  record, rather than consideration of privileged materials.  *See In re Subpoena Duces Tecum*, 156

F.3d 1279, 1279-80 (D.C. Cir. 1998) (noting that the "reasonableness of the agency's action is judged in accordance with its stated reasons," and that "the actual subjective motivation of agency decisionmakers is immaterial as a matter of law – unless there is a showing of bad faith or improper behavior"). As noted in the parties' initial joint case management statement, the parties "agree that this APA case should be decided on the administrative record." ECF No. 31 at 6. As such, judicial review "is limited to the administrative record on which the agency based the challenged decision," *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010), and it is generally accepted that deliberative and other privileged materials "are not part of the administrative record," *Nat'l Ass'n of Chain Drug Stores v. HHS*, 631 F. Supp. 2d 23, 27-28 (D.D.C. 2009) (collecting cases); *see also Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1455-58 (1st Cir. 1992) (upholding non-inclusion in administrative record of documents that were subject to the attorney-client and deliberative process privileges); *United States v. Carpenter*, No. 3:99-cv-00547-RLH, 2011 WL 4763675, at *3 (D. Nev. Oct. 7, 2011) (denying motion to complete administrative record with documents that "are otherwise protected by privilege").

Accordingly, there is no basis for the Court to order production of the privileged OGC memo.

**Question 2:** What is the *status quo*? What is the date by which the Court measures the *status quo*? The Court directs the parties to a recent case on this subject: *Animal Legal Defense Fund v. U.S. Dept. of Agriculture*, 2017 WL 2352009, *3 (N.D. Cal. May 31, 2017).

**Defendants' Response**

Defendants agree with the formulation in *Animal Legal Defense Fund* that the status quo, which in this context refers to the "last, uncontested status which preceded the pending controversy," is "not measured from the time at which the first dispute at issue in a case arose, but from the time the complaint was filed." *Animal Legal Defense Fund v. U.S. Dept. of Agriculture*, 2017 WL 2352009, at *3 (N.D. Cal. May 31, 2017).

Here, Plaintiffs filed their original complaint challenging the Department's processing of claims submitted by Corinthian students on December 20, 2017, the same date on which the Department announced its "improved discharge process for borrower defense to repayment"

claims. *See* Exhibit 1 to Declaration of James F. Manning ("Manning Decl."), Defs.' Opp. to Pls.' Mot. for Prelim. Inj., ECF No 42-1 at 10-11. The May 25 Order found that some aspects of the data exchange that underlies this new process, referred to as the "Average Earnings Rule," violates the Privacy Act, and the Order enjoins the Department from using the "rule" as it currently exists. The Court also determined, however, that the current record does not show that, prior to the filing of this lawsuit, all borrowers in the proposed class "were entitled to full relief as a matter of stated policy." May 25 Order at 30; *see also id*. at 25-26. And, as discussed above, the further documentation upon which Plaintiffs rely also fails to establish that Plaintiffs (or any of the borrowers in the putative class) are entitled to such relief: the April 2015 fine letter simply does not address borrower defense relief, and the privileged OGC memo is a draft document that does not represent the final, official policy of the agency. Thus, the relevant status quo in this case is directly prior to the Department's adoption and application of the partial discharge methodology on December 20, 2017, and not at any point before.

At that time, the Department was not processing the claims of members of the putative class according to Plaintiffs' alleged "Corinthian Rule" or any other rule of decision; rather, as even Plaintiffs recognize, the Department had, for several months, "halted the processing of the applications of Named Plaintiffs and other students" who the Plaintiffs allege are eligible for loan relief. Class Action Compl. for Declaratory & Inj. Relief ¶ 3, ECF No. 1. This "short term hiatus" in claims adjudication allowed the Department to assess inadequacies in its process for considering borrower defense claims and to make adjustments to it designed to yield long term improvements and efficiencies. Remarks of James F. Manning at 13 (November 14, 2017) ("Manning November Remarks").[2]

Plaintiffs' argument in their PI briefing that the relevant status quo is "the processing of claims under" their putative "Corinthian Rule," Pls.' Reply in Supp. of Mot. for Prelim. Inj. at 1, ECF No. 48, falls flat. An injunction ordering that type of relief, which would be inconsistent with

---

[2] Available at https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/bdtranscriptnov14.pdf. The remarks are excerpted from a larger transcript of the Department's negotiated rulemaking session on November 14, 2017, and are cited according to the document's internal pagination.

1  the Court's finding that the record does not support the existence of a "Corinthian Rule" to begin
2  with, *see* May 25 Order at 26, would require the Department to "take affirmative action" that it
3  was not taking prior to the litigation. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015);
4  *see Animal Legal Defense Fund*, 2017 WL 2352009, at *4 (where agency removed documents
5  from public database, and plaintiffs filed suit twenty days later seeking to have the agency "repost
6  the documents it had previously made available," *i.e.*, return to a status quo it had already
7  abandoned, court found that the plaintiffs were altering the status quo, and thus seeking a
8  mandatory injunction, to the extent they sought "to compel the [agency] to do something
9  affirmative"). Accordingly, the status quo to which a prohibitory injunction would return the
10 parties does not entail the Department processing claims and awarding relief under any rule other
11 than 34 C.F.R. § 685.206. Indeed, the status quo would be an evaluation period during which the
12 Department would be engaged in a process of determining how to adjudicate borrower defense
13 claims moving forward.

**Question 3:** If the Court enjoins the Secretary from using the Average Earnings Rule and the Secretary does not return to the Corinthian Rule, what steps will the Secretary take to assess claims from Plaintiffs?

**Defendants' Response**

The Department is currently complying with the Court's Order enjoining it from using the "Average Earnings Rule" and is reviewing its options for how to continue assessing borrower defense applications submitted by borrowers, including borrowers who are either Plaintiffs in this action or are members of Plaintiffs' putative class, in light of that ruling. The Department will continue to engage in those aspects of its claims processing that do not implicate the "Average Earnings Rule," and in particular will process borrower defense applications to determine their eligibility for relief based on borrower defense, *i.e.*, whether "the borrower's defense to repayment is successful." 34 C.F.R. § 685.206(c). As noted elsewhere in this supplemental brief, the Department will provide forbearance to individuals with pending borrower defense claims and to the named Plaintiffs. It has also halted, pursuant to the Court's order, collection activity against the named Plaintiffs in this lawsuit.

1    With respect to relief, the Department is considering what steps may be appropriate, consistent with the Court's May 25 Order. The Court recognized that it is a "legitimate exercise of the Secretary's discretion under the Higher Education Act" to determine such relief on the basis of whether Corinthian students obtained educational value, and if so, how much. *See* May 25 Order at 27. The Court similarly found that "the Secretary's attempts to devise a more narrowly tailored system for determining the amount of relief is not arbitrary and capricious." *Id*. at 29. In light of these determinations, as well as the Court's Privacy Act analysis, the Department is considering how best to proceed.[3]

At this point, it would be premature for the Department to say with certainty what steps it will take with respect to determining borrower defense relief. Any steps it does take, however, will seek to comply with the May 25 Order and any other relevant Court orders. In particular, the Department is exploring the possibility of using earnings data to assess educational value in a manner that would not implicate the Privacy Act, such as by relying on publicly available earnings statistics and/or requesting individualized earnings information directly from borrowers who submitted borrower defense applications. The Department is also assessing the extent to which, going forward, it may avoid the Privacy Act concerns referenced in the Court's May 25 Order for any future data exchanges.

For example, the Court determined that the Department violated 5 U.S.C. § 552a(b), which prevents an agency from disclosing records contained in a system of records unless the disclosure is authorized by a statutory exemption, such as a disclosure made for a "routine use," *see* 5 U.S.C. § 552a(b)(3). May 25 Order at 18-19. Even before the Court made that determination, the Department had begun work on a modified system of records notice to clarify that any prospective disclosures of borrower records to Federal agencies – such as the Social Security Administration

---

[3] The Defendants respectfully note that they are also considering what appellate or other options they may pursue, subject to the authorization, as relevant, of the United States Solicitor General, *see* 28 C.F.R. § 0.20(b), if the injunction entered in the May 25 Order stands, and/or if a further injunctive ruling is issued. Defendants' response to the Court's questions about the steps the Department intends to take in response to the Court's injunction is made without prejudice to Defendants' ability to argue, in any subsequent appellate or other proceedings, that their actions have not violated the Privacy Act.

1 – for the purpose of determining relief for borrower defense claims, as well as for other claims processing purposes in the context of borrower defense, is a permissible routine use. As counsel for the Department noted at the hearing on Plaintiffs' preliminary injunction motion, such use was already contemplated by several routine uses under the applicable system of records notice,[4] *see* 81 Fed. Reg. 60,683-60,691 (Sep. 2, 2016), but the revised notice would offer greater specificity about this point for any disclosures in the future. And while the Department maintains that the method by which it obtained statistical data from SSA did not constitute a "matching program," in light of the Court's ruling, *see* May 25 Order at 20, the Department, going forward, is considering the feasibility of complying with the Privacy Act's procedural requirements for matching programs. The Department will carefully evaluate the extent to which it can accomplish the objective of determining educational value based on comparative earnings data in an efficient and economically feasible manner, consistent with the Court's May 25 Order.

**Question 4:** Do Plaintiffs contend that the Secretary has a mandatory duty to provide forbearance pending a determination of the discharge amount? If so, what is the authority for that position? Does the Secretary dispute that she has a mandatory duty to provide forbearance pending a determination of the discharge amount? If so, what is the authority for that position?

**Defendants' Response**

The Secretary does not have a mandatory duty to provide forbearance pending a determination of a borrower's eligibility for a discharge and the amount of the discharge on a claim for a borrower defense. The currently effective borrower defense regulation provides, in certain circumstance, for loan forbearance. *See* 34 C.F.R. § 685.205(a). In general, such forbearance is granted upon the borrower making a request, providing "sufficient documentation" to support the request, and the Secretary making a determination that the borrower meets one or more of the qualifying circumstances, such as the borrower's inability to make scheduled payments due to "poor health or other acceptable reasons." *Id*. In some situations, however, the regulations

---

[4] For example, the notice provides for disclosures to other federal agencies for such "routine uses" as to permit "discharging a loan" (programmatic routine use (1)(e)), to "investigate possible fraud and abuse" by participating schools (programmatic routine use 1(g)), and to "ensure that HEA program requirements are met by educational" institutions (programmatic routine use 1(k)). 81 Fed. Reg. at 60,686.

authorize the Secretary to grant administrative forbearance "without requiring documentation from the borrower." *Id*. § 685.205(b). Although the Department's 2016 borrower defense rule would have expanded these circumstances to include periods of time "necessary for the Secretary to determine the borrower's eligibility for discharge," 2016 Borrower Defense Rule, 81 Fed. Reg. 75,926, 76,080 (Nov. 1, 2016), the regulation currently in effect does not provide for forbearance during the pendency of a borrower defense application. *See* 34 C.F.R. § 685.205(b).

Nonetheless, the Department has determined, in an exercise of administrative discretion, to provide borrowers the option of placing their loans into forbearance during the pendency of a borrower defense application (and for borrowers already in default, the option to halt collection activities). *See* FSA Enforcement Office, Report on Borrower Defense at 2 (Oct. 28, 2016)[5] (once a borrower defense claim is submitted, the "borrowers' loans are placed in forbearance or stopped collection until their claim is resolved unless they opt out"). It is thus the policy of the Department to provide forbearance pending the determination of a borrower defense application, even though it has no mandatory obligation to do so.

**Question 5:** Should the Secretary treat in a different manner the borrowers who were not able to complete a program or receive a diploma or certification on the Lists because the school or program closed? If the students who were not able to complete their program did receive some value, would it be arbitrary to treat them the same (provide the same discharge amount) as those students who were able to complete their programs?

**Defendants' Response**

The Higher Education Act of 1965 ("HEA") treats borrowers who were unable to complete a program due to the school's closure differently for purposes of student loan discharges. The HEA requires the Department to "discharge [a] borrower's liability on [a] loan" where that student borrower "is unable to complete the program in which such student is enrolled due to the closure of the institution." 20 U.S.C. § 1087(c) (closed school discharge under the Federal Family Education Loan [FFEL] Program); 20 U.S.C. § 1087e(a) (parallel terms, conditions, and benefits in the FFEL Program apply in the Direct Loan Program). Pursuant to this express statutory

---

[5] https://www2.ed.gov/documents/press-releases/borrower-defense-report.pdf.

delegation, the Secretary's regulations provide that borrowers who are unable to complete a program because of a school's closure are eligible to receive what is known as a closed school discharge.[6] *See* 34 C.F.R. § 685.214. Thus, borrowers who were not able to complete a program because of a school's closure are eligible for closed school discharges and borrowers who were able to complete their programs are not.

A closed school discharge is distinct from a borrower defense discharge issued under Section 455(h) of the Higher Education Act of 1965 (HEA), 20 U.S.C. § 1087e(h) and 34 C.F.R. § 685.206(c). The Department's closed school discharge regulations provide an expedited process, as compared with the borrower defense regulations. Moreover, in contrast with the borrower defense regulations, pursuant to which the Department has discretion to determine the appropriate measure of relief, *see* May 25 Order at 27-28, the closed school discharge regulations provide that the Department will discharge the entire remaining balance of an eligible borrower's Direct Loans and provide reimbursement of amounts paid on the loans, 34 C.F.R. § 685.214(b).

The process for closed school discharge is also more streamlined and certain. For example, so long as the borrower meets the regulatory requirements for the closed school discharge, the Department will grant the discharge and refund as opposed to borrower defense, where the Department assesses whether a borrower has asserted a cause of action under state law.

Qualifying Corinthian borrowers have applied for and received closed school discharges. *See* 2016 Borrower Defense Rule, 81 Fed. Reg. 75,926, 75,985 (Nov. 1, 2016) ("The Department has to date granted closed school discharges of some $103.1 million for some 7,858 Corinthian borrowers, with the average discharge some $13,114."). Because Congress in the HEA has provided this remedy specifically for students who are unable to complete their programs because of school closures, the provision of relief for eligible Corinthian borrowers pursuant to the closed

---

[6] A borrower qualifies for a closed school discharge if the borrower did not complete his or her program because of the school's closure while the student was enrolled or if the borrower withdrew within 120 days of the school's closure, and if the borrower did not complete the program of study through a teach-out arrangement at another school or by transferring his or her academic credits to another school. 34 C.F.R. § 685.214(c). The Corinthian schools closed on April 27, 2015. For Corinthian students, the window during which a student may have withdrawn from the school yet still be eligible for closed school discharge was extended to June 20, 2014. *See* https://studentaid.ed.gov/sa/about/announcements/corinthian.

school discharge process, even if the loan discharge amount is different from what may have been received under the Department's borrower defense process, is not arbitrary. Indeed, students who are unable to complete their programs are differently situated from students who are able to do so.

Dated: May 31, 2018                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
KAREN S. BLOOM
Senior Counsel
R. CHARLIE MERRITT
Trial Attorney (VA # 89400)
Civil Division, Federal Programs Branch
U.S. Department of Justice
20 Massachusetts Ave. NW
Washington, D.C. 20530
Telephone: (202) 616-8098
Facsimile: (202) 616-8460
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*