**Exhibit A**

# U.S. Department of Education

# Office of Federal Student Aid

# Compliance Report in response to ECF 110, *Manriquez et al. v. DeVos*, Case No. 17-cv-07210-SK, U.S. District Court for the Northern District of California

**September 18, 2019**

## Table of Contents

**Introduction and Summary** ............................................................................ 1

**Background** ........................................................................................................ 6

The Department's borrower defense to repayment process .............................. 6

A borrower's repayment status upon asserting a borrower defense ................. 7

The Department's federal loan servicers ......................................................... 8

The Department's general instructions to servicers about borrower defense in 2018 .....11

The Department's response to the Court's PI Order and Amended PI Order ................13

**Incorrect Notices of Repayment Status Changes** ........................................14

The March 2019 error and corrective steps ....................................................15

The July 2019 error and corrective steps .......................................................19

Response to the August 19 Report Order .........................................................21

**Collection or Enforcement Efforts** ................................................................23

**Current Status of *Manriquez* Class Members** ............................................24

**Department Compliance Tracking and Enhanced Oversight Efforts** ...........27

## Introduction and Summary

On August 19, 2019, the U.S. District Court for the Northern District of California ordered the U.S. Department of Education ("Department") to submit a full report detailing the Department's compliance with the preliminary injunction order issued by the Court on May 25, 2018, ECF No. 60 ("PI Order"), which was amended on June 19, 2018, ECF No. 70 ("Amended PI Order"), and clarified on August 30, 2018, ECF No. 89. *See* Order Denying Motion to Lift Stay and Requiring Compliance Report, ECF No. 110 ("Report Order"). This Report explains the state of the Department's compliance with the preliminary injunction to date, for all borrowers in the class certified in this case.[1]

In response to the Report Order, on August 21, 2019, the Department requested data on borrowers' repayment statuses since May 25, 2018, the date of the PI Order, from the federal loan servicers that manage borrowers' loan records. As a result of this review, the Department can report that a number of borrowers covered by the preliminary injunction were incorrectly informed at one time or another during the injunction period that they had payments due on their federal student loans (see Table 1). Some of those borrowers made payments on their loans (voluntarily or involuntarily through Department enforcement or collection efforts). To correct these issues, the Department has taken, or is in the process of taking, several steps. It has posted information on its website about the system errors that occurred in March and July 2019 that led to mistakes regarding repayment status of class members. The Department is also notifying impacted borrowers on a rolling basis to inform them of the situation and provide them with contact information to the extent they have any questions. Moreover, the Department is issuing

---

[1] Because the borrowers covered by the preliminary injunction are co-extensive with the borrowers covered by the order certifying the class in this case, references to class members in this Report refer to borrowers covered by the preliminary injunction. *See* Order Certifying the Class, ECF No. 96; Amended PI Order ¶¶ A-C.

refunds to borrowers who made payments when they should have been in forbearance or stopped collections status, also on a rolling basis, as they are identified.

In addition, the Department is implementing various processes to enable the Department to better track compliance with the preliminary injunction and to correct any errors on a timely basis. The Department will also be enhancing its oversight efforts over the federal loan servicers as well as its own operations and internal controls, such as by initiating an internal audit of its compliance efforts with the preliminary injunction.

In the Report Order, the Court asked the Department to answer four specific questions. The Department's answers are summarized below:

**TABLE 1**

| Question | Short Response |
|---|---|
| 1. How many people received incorrect notices that payments were due on their loans? | Since May 25, 2018, approximately 16,034 of the 74,781 total Manriquez class members[2] received a payment due notice. Of the 16,034 class members that received a payment due notice, approximately 3,289 borrowers made one or more payments.<br><br>The above number excludes borrowers who originally requested forbearance or stopped collection activity, but subsequently, on their own opted out of forbearance and/or |

---

[2] These numbers include borrower defense to repayment ("borrower defense") applicants who either (1) received partial relief under the methodology used by the Department from December 2017 to May 2018, or (2) have a pending claim and went to schools operated by Corinthian Colleges, Inc. ("Corinthian"). *See* U.S. Dep't of Educ., "Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers" (Dec. 20, 2017), *also available at* https://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers. The class that has been certified in this case does not include all Corinthian students, *see* Amended PI Order ¶¶ A-C, and thus is smaller than the group of borrowers for which the Department gathered information. However, because a Corinthian borrower's membership in the class depends upon the basis of his or her borrower defense claim (*i.e.*, whether it was based on the Department's findings that Corinthian represented job placement rates), it may not be immediately discernable whether a borrower is a member of the class without a full review of his or her borrower defense application. Thus, the Department treats all borrowers who have gone to Corinthian schools as subject to the preliminary injunction's restrictions until we have finished our review of the individual's borrower defense application. The total number of Corinthian students who either (1) received partial relief under the Department's methodology or (2) have pending borrower defense applications is approximately 74,781 borrowers (15,017 borrowers who received tiered relief and approximately 59,764 Corinthian borrowers with pending applications as of June 30, 2019).

| Question | Short Response |
|---|---|
| | stopped collections with their federal loan servicer. The number of borrowers that later contacted their federal loan servicer to opt out of forbearance and/or stopped collection activity is approximately 114. |
| 2. How were those incorrect notices remedied? Specifically, what affirmative steps did Defendants take to remedy the error? | Since May 25, 2018, the Department has corrected the status of approximately 14,887 class members' loans by putting these borrowers back into forbearance and/or stopped collection status. The Department is continuing to work with servicers to analyze (and, if necessary, to correct the status of) approximately 1,147 class members to determine whether they are in an incorrect status.  This number represents the difference between the number of borrowers that received payment notices and the number of borrowers that the Department has put back into forbearance or stopped collection status since May 25, 2018.<br><br>For class members that received notices that their forbearance was ending but for whom the Department does not have a record of receiving any payments, the Department will notify the borrowers of the situation on a rolling basis, as they are identified.<br><br>For class members that received forbearance end notices and for whom the Department has record that payment was made, the Department is in the process of refunding those payments to the class members. The Department cannot make the refunds directly but needs to ask the U.S. Department of the Treasury ("Treasury") to make the refunds.  The Department anticipates that it will complete its requests for refunds for 991 of these class members, serviced by FedLoan Servicing (PHEAA), by September 20, 2019. For the other approximately 2,298 class members whose loan records are across the other federal loan servicers, the Department will be working with their servicers to request refunds on a rolling basis, as such class members are identified. After refund requests are made by the Department, these class members should receive their refunds within approximately two weeks, as the Treasury can take up to 10 business days to process the requests once the request is received from the Department. |
| 3. How many people were subject to further collection | Since May 25, 2018: |

| Question | Short Response |
|---|---|
| or enforcement efforts on the basis of their receipt of an incorrect notice? | • Approximately 847 non-defaulted class members were subject to adverse credit reporting. <br> • 1,808 class members were subject to administrative wage garnishment ("AWG") and tax refund offset. <br> • No class members were subject to a litigation referral to the U.S. Department of Justice as a result of the forbearance or stopped collections lapses. |
| 4. How were these erroneous collection or enforcement efforts remedied? Specifically, what affirmative steps did Defendants take to remedy the error? | For the non-defaulted class members subject to adverse credit reporting when they should not have been, the Department has directed servicers to reverse the adverse credit reporting with credit reporting agencies and anticipates such work will be done over the course of September and October. <br><br> For class members that were subject to AWG or tax refund offset, the Department is directing the processing of refunds of those payments to these class members, on a rolling basis, as they are being identified. These class members should receive their refunds within approximately two weeks of such a request to Treasury from the Department, Treasury can take up to 10 business days to process the requests once received. |

In addition to the steps described briefly above, the Department is also taking the following steps to improve its ability to track compliance with the preliminary injunction on an ongoing basis:

a. The Department has established a new monthly compliance monitoring process to enhance its ability to track and monitor borrowers' forbearance and stopped collection activity requests. This process involves the creation of monthly reports on the status of borrowers subject to the preliminary injunction.  The reports will allow the Department to determine, on an ongoing basis, which borrowers are in which status in a given month (*i.e.*, forbearance or stopped collection status, deferment, in a loan repayment grace period, or in a $0 payment income-driven repayment ("IDR") plan) and for non-defaulted borrowers the beginning and end dates of the borrowers' forbearance periods.

This new process will allow the Department to:

      i.   monitor borrowers entering or exiting forbearance or stopped collections status and identify any instance when borrower defense applicants leave forbearance or stopped collections status,

     ii.   follow up on such instances to determine whether a borrower defense applicant has been erroneously taken out of forbearance or stopped collections and work with the federal loan servicers to correct any issues; and

    iii.   monitor and ensure servicer compliance in order to direct extensions of any non-defaulted borrower's forbearance period, if the borrower still has a pending borrower defense application, when the Department sees that the borrower's forbearance period is ending.[3]

b. The Department is also in the process of establishing a process for tracking borrower communications about repayment statuses with the Department on an ongoing basis. This will assist the Department in following up on forbearance or stopped collection status exceptions found in the monthly compliance monitoring report described above and will also help the Department determine whether a borrower has voluntarily opted-out of forbearance or stopped collections after having been in forbearance or stopped collections status upon the submission of a borrower defense application.

c. The Department has initiated an internal audit, also known as a quality assurance review ("QAR"), of the borrower defense process that will focus on FSA's application of the forbearance and stopped collections policies in place as a result of the preliminary injunction. The QAR will review current processes and procedures and make recommendations for longer-term solutions for ensuring compliance with the preliminary injunction and any additional borrower defense-related repayment status policies with requisite controls and reporting. The Department staff performing the QAR will also conduct an independent quality assurance check on FSA's work to confirm that all class members are in the correct repayment status.

d. The Department takes compliance with the preliminary injunction seriously and anticipates increasing its monitoring of servicers' compliance with the Department's directives as discussed in the description of our new processes above, to improve the Department's compliance with the Court's orders. To this end, the Department has issued a letter of concern to one of the federal loan servicers, FedLoan Servicing, as to the circumstances of a July 2019 system error affecting 3,000 class members and the steps the servicer will be taking to prevent future errors.  Based on their response, the Department will take corresponding corrective action, including withholding payments, demanding equitable adjustments, and moving the affected loan accounts, as appropriate. After the Department has completed a thorough analysis of the root

---

[3] These exceptions are discussed later in this Report, at page 7.  This automated report will allow the Department to track certain loan repayment statuses that were previously tracked by different Department systems in one comprehensive report.

causes of forbearance lapses, similar letters may be issued to any servicers whose errors resulted in a failure to comply with the Court's order.

The Department anticipates that these steps will ensure that the Department is overseeing and monitoring the servicers' tracking of borrowers' forbearance or stopped collection statuses on an ongoing basis and will help the Department determine the need for and develop long-term solutions to assist the Department with its compliance with the preliminary injunction.

# Background

### *The Department's borrower defense to repayment process*

Under the Department's governing statute, the Higher Education Act of 1965, as amended, and its implementing regulations, federal Direct Loan Program student loan borrowers may assert a defense to repayment, also known as a "borrower defense," to the repayment of their federal student loans.[4]  Generally, for loans first disbursed before July 1, 2017, a borrower may assert a borrower defense by demonstrating that his or her college or university, through an act or omission, violated a state law directly related to his or her federal Direct Loan or to the educational services for which the loan was provided.[5]

This type of student loan forgiveness was rarely used by borrowers prior to 2015. However, in 2015, the bankruptcy and closure of a large national school chain, Corinthian Colleges, Inc. ("Corinthian"), and the Department's findings[6] that certain Corinthian school campuses had made misrepresentations regarding the job placement rates ("JPR") of certain programs for specific time periods, led to the Department's announcement of new steps

---

[4] *See* 20 U.S.C. § 1087e(h); 34 C.F.R. § 685.206(c)(2016); 34 C.F.R. §§ 685.206(c), 685.222 (2017).
[5] *See* 34 C.F.R. § 685.206(c).  Other standards apply for loans first disbursed on or after July 1, 2017.  *Id.* at § 685.222 (2017).
[6] The schools and time periods covered by the Department's JPR findings are available online, at https://studentaid.ed.gov/sa/sites/default/files/heald-findings.pdf and https://studentaid.ed.gov/sa/sites/default/files/ev-wy-findings.pdf.

pertaining to the borrower defense process in June 2015.  For borrowers impacted by the

Corinthian JPR misrepresentation findings specifically, the Department created specialized

attestation forms to facilitate the borrowers' efforts to obtain relief through the borrower

defense process.[7]

### A borrower's repayment status upon asserting a borrower defense

Once a borrower asserts a borrower defense, it has long been the Department's policy to

automatically place that borrower's federal student loans into forbearance[8] or stopped

collections[9] status if the borrower either (a) indicates on his or her borrower defense application

that he or she wishes to be in forbearance or stopped collections status, or (b) does not make an

election as to whether she or he wishes to be in such statuses.  However, there are certain

exceptions (the "exceptions") to this process. A borrower will not be placed in forbearance or

stopped collections status if the borrower:

(1) Elects to opt-out of forbearance or stopped collections status;

(2) Is in a $0 monthly repayment income-driven ("IDR") repayment plan; or

(3) Is in deferment (for example, if the borrower went back to school).

The Department does not put borrowers who have a $0 monthly payment under their IDR plan

into forbearance on their federal student loans, as those $0 payments count towards the number

---

[7] More information about the process for borrowers asserting borrower defense on the basis of the JPR findings can be found on the Department's webpage, at https://studentaid.ed.gov/sa/about/announcements/corinthian#debt-relief. Data on the borrower defense process is available at https://studentaid.ed.gov/sa/about/data-center/student/loan-forgiveness/borrower-defense-data.

[8] Forbearance allows a borrower to temporarily stop making payments on the borrower's federal student loan or temporarily reduce the borrower's monthly payment amount for his or her federal student loan for a specified period of time.

[9] Stopped collections status is when the Department stops engaging in involuntary debt collection against a borrower who has defaulted on a federal student loan, including through administrative wage garnishment and administrative offset. Stopped collections also stops the Department's expectation of voluntary payments (*i.e.*, billing), although voluntary payments are accepted, and the Department will at the borrower's request send a payment notice if desired even if the borrower is in stopped collection status.

of consecutive required payments, which can result in a discharge of the balance of the borrower's federal student loan.[10]  If a borrower is in deferment because he or she is enrolled in additional postsecondary education, the Department directs the federal loan servicer to annotate the borrower's account and apply the forbearance after the deferment or grace period ends. A borrower may elect to opt-out of forbearance or stopped collections status at any time after the borrower submits his or her borrower defense application.

Absent the exceptions noted above, individuals who file borrower defense applications are supposed to be in forbearance or stopped collection until the Department has issued a decision on the borrower's application.[11]

In December 2017, the Department announced a policy that, for borrower defense applicants whose applications had been pending for over a year, the Department would apply an interest credit for the interest that had accrued on those applicants' loans during the forbearance period after that first year.[12]

### The Department's federal loan servicers

As of March 2019, the Department's office of Federal Student Aid ("FSA") was responsible for overseeing a portfolio comprised of approximately $1,476.6 billion in federal student loans.[13]  Currently there are nearly 45 million federal student loan borrowers.  The Department does not manage the servicing of these loans directly, but contracts with loan servicing entities.  The Department maintains responsibility for the administration of its student loan portfolio.  20 U.S.C. § 3472.   The federal student loan servicers are responsible for

---

[10] *See, e.g.,* 34 C.F.R. §§ 685.208, 685.209, 685.219, and 685.221.
[11] *See* 34 C.F.R. § 685.222(e)(2), (4).
[12] *See* U.S. Dep't of Educ., "Improved Borrower Defense Discharge Process Will Aid Defrauded Borrowers, Protect Taxpayers" (Dec. 20, 2017).
[13] Information on the federal student loan portfolio can be found here, https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

collecting payments on the loans, advising borrowers on how to better manage their federal student loan obligations, responding to customer service inquiries, and performing other administrative tasks associated with maintaining a loan on behalf of the Department.

The Department works with nine different federal loan servicers for borrowers who are not in default on their federal student loans, also known as non-defaulted borrowers: CornerStone, FedLoan Servicing (PHEAA), Granite State – GSMR, Great Lakes Educational Loan Services, Inc. (Great Lakes), HESC/ Edfinancial, MOHELA, Navient, Nelnet, and OSLA Servicing. The Department also currently works with one contractor, Maximus, to assist in the management of defaulted federal student loans. Maximus is also generally known as the Default Resolution Group (DRG), and its system is sometimes referred to as the Debt Management and Collections System (DMCS). Collectively, the servicers manage millions of loan records for federal student loan borrowers.[14]

The federal loan servicers each have their own systems, processes, and procedures, as well as their own unique contract with the Department. The Department does not have the ability to directly input directions or controls into the non-default servicers' systems.[15]  Instead, when the Department needs to perform follow-up with a servicer or directs the servicer to take a particular action, the Department communicates directly with the servicer and the servicer has

---

[14] An individual federal student loan borrower may have loan records with more than one servicer, and a loan account may include more than one loan record.

[15] In the Declaration of Sara Hayhurst in Support of the Department's Opposition to Plaintiffs' Motion to Lift Stay and Enforce Preliminary Injunction ("Hayhurst Declaration") filed previously in this case, it was represented that the Department does not have access to servicers' systems.  *See* Hayhurst Decl. ¶ 10, ECF No. 104-1.  To clarify, the Department does not have direct access that allows it to make changes to servicers' records or systems, but some users at the Department have read-only access to certain non-default servicers' systems.  For defaulted borrowers, the Department has employees that have direct access to enter data and direct work on a defaulted borrower's loan records.  However, this type of activity for borrower defense applicants with federal student loans in default has been managed through the new borrower defense platform, the Customer Engagement Management System ("CEMS"), since the Department's transition of its interactions with the federal loan servicers for borrower defense purposes to that platform in the fall of 2018, as described later in this section.

the responsibility to make the necessary changes to the servicer's system or follow up on individual borrower issues. As a result, to put in place any loan servicing changes that would impact many borrowers, the Department works with the federal loan servicers individually to implement such changes.[16]

Since the fall of 2018, servicers have received Department requests for repayment status changes and other issues related to borrower defense applicants' loan records through the Department's current borrower defense application platform, the Customer Engagement Management System ("CEMS"). Because the CEMS platform is not integrated into the servicers' systems and does not provide the Department with the ability to directly access, or input directions or controls, into the servicers' systems, servicers review and respond to directives from the Department related to borrower defense applicants' loan records through a servicer-specific, limited access portal in the platform. Servicers are expected to log in into the platform on a daily basis and review directives from the Department to make specific loan servicing changes, including repayment status changes, as to certain borrowers.[17]  Once servicers have completed the necessary changes, the servicers then enter updates into their own individual systems, which subsequently update the Department's National Student Loan Database System ("NSLDS") as to the status of the CEMS platform request.

The CEMS platform does not, on its own, update either the servicers' system or NSLDS directly.  Rather, it shows Department users the direct responses servicers provide in the CEMS

---

[16] As described in footnote 15, this has consistently been the case for non-default servicers.  For defaulted borrowers, prior to the fall of 2018, Department staff made changes to defaulted borrower defense applicants' loan records directly in the DCMS.  Since the fall of 2018, the Department has facilitated repayment status changes for defaulted borrower defense applicants through request to Maximus through the CEMS platform, in the same way such requests are made to other loan servicers for non-default borrowers.

[17] See U.S. Department of Educ., Change Request (CR) 4753:  FSA CEMS Borrower Defense Enhancements Impacting Servicers ¶ 1 (June 27, 2018) ("The servicer shall access FSA's Customer Engagement Management System (CEMS/system) Salesforce.com Partner Portal daily to identify any tasks assigned to the servicer.").  A copy of this document is included as Attachment 1 to this Report.

platform as to whether they have responded to the Department's directives and reflects the changes servicers have made in their own systems to borrowers' records to respond to the Department's CEMS system requests in the CEMS system. The new platform ensures the Department tracks and manages the borrower defense requests and provides a portal to securely manage borrowers' personally identifiable information.

Prior to the implementation of the CEMS system in the fall of 2018, the Department implemented changes to the repayment statuses of non-defaulted borrower defense applicants by communicating directly with their servicers, as appropriate.  For defaulted borrowers, prior to the fall of 2018, at times Department staff made changes directly to the loan records in DCMS to put defaulted borrowers in stopped collections status.  Since the fall of 2018 and the transition of the Department's borrower defense-related servicer communications to the CEMS platform, the Department uses the CEMS platform to communicate needed changes to defaulted borrowers' repayment statuses to the defaulted loan federal loan servicer, Maximus, and relies on that servicer to make the requested changes.

***The Department's general instructions to servicers about borrower defense in 2018***

As noted above, even before the Court issued its preliminary injunction, the Department's practice was to place borrowers who submitted borrower defense applications into forbearance and stopped collections status, as appropriate.  Under the Department's standard forbearance policy, a forbearance is limited to 12 months to balance federal taxpayers' exposure and mitigate potential harm to a borrower with extended forbearances as interest continues to accrue on the loans. If forbearance or stopped collections status is still necessary at the end of the 12 months, such as because a borrower defense application is still pending, the Department would send

additional requests or reminders to servicers to extend the forbearance period at the end of the 12 months.

To resolve immediate issues (unrelated to the PI Order that would eventually be ordered in *Manriquez*) with pending applicants in forbearance status that appeared to be lapsing or ending in March of 2018, the Department contacted its non-defaulted loan servicers and directed that they extend the 12-month forbearance status of all borrower defense applicants with pending applications (the "March 2018 requests"). The Department sent the non-defaulted loan servicers lists of those borrowers.[18]  At the time, the Department was able to implement on its own such changes as needed for defaulted loan borrowers.[19]

To further prevent borrower defense applicants' forbearances from lapsing and to facilitate the transition to the new CEMS platform, which had been in development since January 2018, on or about June 27, 2018, FSA sent servicers additional directions and guidance, in the form of a business operations change request to the Department's contracts with the servicers.[20] In the June 27, 2018 change request,[21] the Department requested that the servicers implement a solution to indefinitely extend borrower defense applicants' forbearance status until notified by the Department that a determination had been made on the borrower's pending borrower defense application for any forbearance request that was applied in response to a request from the new CEMS platform.  The change request specifically directed servicers to continue to apply an

---

[18] A copy of the emails the Department sent to non-defaulted loan servicers is included as Attachment 2 to this Report.

[19] As described previously, at this point of time the Department made changes to defaulted borrowers' repayment statuses directly in DCMS. As with the other loan servicers, since the fall of 2018 the Department has managed its requests to servicers related to borrower defense applicants' loan records through the CEMS platform.

[20] *See* Attachment 1.

[21] The June 27, 2018 change request was put in place to update servicers' requirements for processing FSA's borrower-defense related requests generally. As discussed later in this Report, because the Department's processes as to forbearance and stopped collections were generally in accord with the Court's instructions in the Amended PI Order for pending applications, it appeared that this change request would also facilitate the Department's compliance with the preliminary injunction.

administrative forbearance to all loans for borrowers with pending borrower defense applications who were not in default on their federal student loans, until instructed otherwise by FSA. For borrowers who had defaulted on their federal student loans, FSA instructed servicers to process the Department's stop collection requests.

***The Department's response to the Court's PI Order and Amended PI Order***

The PI Order and the Amended PI Order enjoined the Department from applying the borrower defense relief methodology that it developed in December 2017 (the "December 2017 methodology") and that provided for a proportionate, or tiered, amount of relief to certain borrowers with approved borrower defense applications. Under the terms of the preliminary injunction, the Department is to put into forbearance or stopped collections status the relevant loans of Direct Loan borrowers who (a) received discharges for less than their total loan amounts pursuant to the December 2017 methodology (the "partial relief" or "tiered relief" recipients), (b) have pending borrower defense applications seeking loan relief, on the basis of the Department's Corinthian JPR findings; or (c) will subsequently file borrower defense to repayment applications on the basis of the JPR findings, once those applications are filed.  The Amended PI Order also provides that a borrower is to be in forbearance or stopped collections status on his or her relevant loans, unless the Department has determined that the borrower is not eligible for loan relief on the basis of the JPR findings or the borrower has not successfully completed his or her borrower defense application, or the Department provides full relief to the borrower.

After the PI Order was entered, the Department sent guidance on May 29, 2018, to its loan servicers directing them to place the named class representatives and declarants supporting the Plaintiffs' filings in this case in forbearance and stopped collections status.[22]  After the

---

[22] The Department's May 29, 2018 guidance, in the form of emails with personally identifiable information redacted, is included as Attachment 3.

Amended PI Order was entered, the Department sent lists on July 5, 2018, of all tiered relief borrowers to its non-defaulted loan servicers[23] and instructed the servicers to put the borrowers in forbearance indefinitely (by applying a non-capping administrative forbearance), until instructed otherwise by FSA.[24] The Department's instructions also incorporated the Department's general exceptions in applying forbearance and stopped collections status, described above, in order to benefit borrower defense applicants. Because this communication pre-dated the Department's transition to the CEMS platform, the communications were through email. The Department received email confirmation from eight of the nine non-defaulted servicers that they had followed the Department's instructions. The Department's interactions with borrowers serviced by ESA, the ninth non-defaulted loan servicer, in the time after the Department's instructions do not indicate that ESA did not implement the Department's instructions. FSA did not send specific instructions to loan servicers about placing the relevant loans of *Manriquez* class members with pending borrower defense applications (as opposed to those who had already received tiered relief) into forbearance on an indefinite basis, because this instruction would not have differed from the Department's approach regarding changes to the repayment statuses of borrowers with pending borrower defense applications generally.

## Incorrect Notices of Repayment Status Changes

Generally, since May 25, 2018, approximately 16,034 of the 74,781 total Manriquez class members received a payment due notice. Of the 16,034 class members that received a payment due notice, approximately 3,289 borrowers made one or more payments.  To remediate these issues, the Department will be sending notices to class members who received incorrect notices

---

[23] The Department worked internally to put defaulted borrower members of the *Manriquez* class in stopped collections status.

[24] A copy of the July 5, 2018 instructions, without any attachments that may contain personally identifiable information, are included as Attachment 4.

to inform them of the situation on a rolling basis, as they are identified.  Further, the Department has determined to issue refunds to all class members who made payments on their loans during a period of time when the Court's preliminary injunction placed them into forbearance.  The Department will also be sending such borrowers notices informing them that they will be receiving refunds, also on a rolling basis, as the borrowers are identified.

**The March 2019 error and corrective steps**

On March 26, 2019, counsel for the Plaintiffs in this case informed the Department that some *Manriquez* class members were incorrectly being taken out of forbearance or stopped collections status. After investigating the issue, the Department determined that the error was the result of several different factors. First, although the Department had issued its June 2018 change request that was implemented during the fall of 2018, servicers' systems were not applying administrative forbearances to borrower defense applicants, including those covered by the *Manriquez* preliminary injunction, on an indefinite basis. Second, the new CEMS system had not been set up in time to send reminders or requests to servicers to extend certain borrower defense applicants' forbearance and stopped collection periods for an additional 12 months, before the forbearance end notices and stopped collection periods that had been put in place in response to the March 2018 requests had lapsed. Specifically, this issue impacted borrower defense applicants who had submitted applications before the Department began using the CEMS platform, whose data (the "legacy data") had been transferred over to the CEMS platform.

To correct the situation, the Department took steps to verify that borrowers covered by the preliminary injunction were in the correct repayment status.  Specifically, the Department immediately set up a new system instruction to be executed via the CEMS platform, so that the platform would send automated notifications to servicers' systems in order to revalidate that all

Corinthian borrower defense applicants with pending applications that should be in forbearance were confirmed as being in forbearance or stopped collection status.  The automatic notifications also included an instruction to the servicers that if the borrower was not in the correct status, the borrower's account was to be placed into the correct status and backdated to December 1, 2018,[25] thus renewing the borrowers' forbearances or stopped collection status. Further, the system instruction also provided that the servicers could use the CEMS platform to monitor the borrower's forbearance status, which would allow them to renew, in their systems, borrower defense applicants' forbearance statuses indefinitely, every 12 months, until a determination is made on the borrower's application. The Department completed testing the system instruction and implemented the automatic system instruction on Sunday, March 31, 2019, prioritizing the *Manriquez* class borrowers.

The Department also sent the Department's loan servicers guidance, in the form of letters informing them of the issue, on April 1 and 8, 2019. The letters also noted that the Department had already sent a notification to confirm that *Manriquez* class members are in the correct forbearance or stopped collections status and reminded the servicers to apply an administrative forbearance to covered borrowers, subject to the exception for borrowers in deferment or in a $0 IDR payment plan, until instructed otherwise by the Department.[26]  Because the Department does not have direct access to the servicers' systems to make changes, in order to confirm that servicers had addressed the issue the Department also requested that the servicers send updates confirming the effective date of the forbearance related to all the tiered relief recipients and those Corinthian borrowers with pending borrower defense applications that were supposed to be in

---

[25] The backdating to December 1, 2018, was to ensure that borrowers whose data was part of the legacy data that had been transferred over to the new CEMS platform would be in forbearance for the entirety of the period FSA thought might have been impacted by the December 2018 legacy data transfer.
[26] Copies of the April 2019 letters are included as Attachment 5.

forbearance or stopped collections status. The servicers were to fill in the requested fields in order to allow the Department to confirm that their work ensuring that all such borrowers were in forbearance or stopped collection status had been completed and confirm the date the action was completed. If the servicer was unable to complete the required action as to a specific loan record, the servicer was to flag the loan record as appropriate. All servicers responded in the CEMS platform with confirmations that the *Manriquez* class borrowers had been placed in the correct forbearance status.

Since late April 2019, the Department has been working to re-confirm that the Department's servicers had indeed put *Manriquez* class members in the correct repayment status. As described in more detail later in this Report, the Department requires additional time to re-validate this work to confirm that all 74,781 of the *Manriquez* class borrowers are in the correct status.

Further, on September 6, 2019, the Department put information on its website informing borrowers of the situation and asking borrowers to contact the Department's borrower defense customer service number or email with any questions and to correct any related issues. This information is available at StudentAid.gov/corinthian, and appears in a question and answer format within the information relating to this litigation and the PI Order, as amended:



Clicking on the specific subheading on the webpage brings the user to the information itself:



The Department's main borrower defense to repayment webpage, which is available at

StudentAid.gov/borrower-defense, also includes a link directing borrowers with questions to the

information above:



The Department is beginning the process of sending emails to notify impacted class members that received incorrect notices (but who did not make payments) of the situation, as those borrowers are identified, on a rolling basis. The Department will also be sending separate notices to borrowers who made payments informing them of the situation and making them aware that the Department will be refunding their payments.[27] As described above, the Department has determined to issue refunds to all borrowers who made payments on their loans during a period of time when the Court's preliminary injunction placed them into forbearance.

**The July 2019 error and corrective steps**

The Department also learned from Plaintiffs' counsel in July 2019 that a class member, Erica Maupin, had been taken out of forbearance by her servicer, FedLoan Servicing, when she should not have been. Ms. Maupin's servicer had provided an update to FSA through NSLDS and thereby through the CEMS platform that pursuant to the Department's March 2019 instruction, Ms. Maupin was in the correct repayment status (forbearance) and that the effective date of that

---

[27] Templates of the notices to be issued to borrowers who, during the period of time that the preliminary injunction has been in place, (a) received erroneous notices but did not make payments, or (b) who made payments, are included as Attachment 6.

forbearance was March 2019.  However, in investigating this issue, the Department learned that one of the specific batches FedLoan Servicing had run in its system to apply renewed forbearance periods in response to the Department's March 2019 request had erroneously been run for a July 4, 2019 forbearance end date. As a result, each borrower that was covered by that job—3,000 borrowers, including Ms. Maupin—all had their forbearances end in July, notwithstanding the Department's instruction to FedLoan Servicing.  This issue was unique to FedLoan Servicing and to the borrowers covered by that one batch.

FedLoan Servicing informed the Department that, as of July 25, 2019, it had remediated the issue and that the 3,000 borrowers that had been improperly taken out of forbearance in early July were back in forbearance. As part of its overall work to re-confirm the statuses of all *Manriquez* class members, the Department has also re-confirmed the work of FedLoan Servicing as to the 3,000 class members affected by the issued flagged in July 2019, and all 3,000 are currently in the correct repayment status.

As a result of this issue, FedLoan Servicing proactively identified for the Department the number of borrowers that made payments while they should have been in forbearance or stopped collections from May 2018 to July 2019. According to FedLoan Servicing's records, 991 borrowers made payments during this time period, when they should have been in forbearance. To remediate the situation, the Department has worked with FedLoan Servicing to ensure that all 991 borrowers will be receiving refunds of their payments.[28]  By September 20, 2019, FedLoan will submit requests, for the Department, to the Treasury for all 991 borrowers to refund payments

---

[28] Due to the technical error discovered in July 2019, FedLoan Servicing took the step of identifying which potential *Manriquez* class members made repayments while they were in the wrong repayment status. As a result of this work, the Department and FedLoan Servicing decided to proactively issue refunds for such payments to borrowers. As the Department's work to confirm with class members whose loan records are being serviced by other federal loan servicers is ongoing, the Department will issue refunds to such class members and provide them with notices on a rolling basis as they are identified.

made between May 31, 2018, and July 26, 2019. The Treasury can take up to 10 business days to process the requests once the request is received from the Department.  The Department will be sending a communication to these borrowers to inform them that an error was made and that they will be receiving a refund.[29]

***Response to the August 19 Report Order***

To comply with the Court's order, on August 21, 2019, FSA had a meeting with representatives for the federal loan servicers to request that the servicers provide certain information in the servicers' loan records for Corinthian borrower defense applicants by September 4, 2019 (two weeks from the date of the Department's request). At the meeting, FSA requested that, for borrowers that attended a Corinthian institution (including Heald College, Everest Institute, and WyoTech) with at least one open loan who had either received partial relief or had a pending borrower defense application, each servicer indicate whether, since May 25, 2018, the borrower: had received a forbearance or stopped collections end notice; had received a repayment due notice; had made a payment(s); had gone into delinquency or default; had been reported to a credit reporting agency as a result of being in default on a federal student loan; had been put back into forbearance or stopped collections status after the receipt of a forbearance or stopped collections end notice or payment due notice; or had voluntarily opted out of forbearance or stopped collection status.  After the meeting, the Department provided the federal loan servicers with meeting minutes and a template for the servicers to use for their report.[30] Subsequently, one of the servicers, FedLoan Servicing, requested two additional days for its production of the requested data, until September 6, 2019.

---

[29] The letter that will be sent out will be the letter to class members addressing refunds in Attachment 6.

[30] A copy of the original email sent to servicers with the meeting minutes and report template are included as Attachment 7.

Additionally, as a result of that meeting, some servicers indicated that they wanted to provide the Department a list of all borrowers that were pending borrower defense applicants, not just the *Manriquez* class members, to comply with the request. The Department anticipated being able to analyze the *Manriquez* class members from the list of overall borrower defense applicants to comply with the Court's Report Order. A few servicing contractors wanted a list of *Manriquez* class members to use for the reporting request. The Department agreed to these servicer requests believing it would facilitate servicer responses and assist the Department in its efforts to comply with the Court's Report Order by September 18, 2019.

Given the volume of loan records attributable to the borrowers covered and potentially covered by the preliminary injunction entered in this case, the Department determined that at least two weeks was the minimum amount of time that the servicers would need to provide the data. The Department also anticipated at the time of its request to the federal loan servicers, without having seen the data, that while it would be difficult to fully analyze the data from servicers within the remaining two weeks before the Court's deadline, it would be able to comply with the Court's order in the mandated timeframe.

FSA received the requested data from all the federal loan servicers except FedLoan Servicing on September 4, 2019, and from FedLoan Servicing on September 6, 2019.  Upon analyzing the data, the Department found that each federal loan servicer did at least one of the following: incorrectly told borrowers their forbearances were ending; incorrectly told borrowers that payments were due; incorrectly reported borrowers as past due to the credit bureaus; or incorrectly initiated wage garnishment or offset against them. However, the Department also found that the overwhelming majority of borrowers had already been placed back in forbearance or stopped collections status.

22

The Department is in the process of confirming that the appropriate remedial action has been provided for each affected borrower by reconciling information that servicers reported with other information at our disposal, as well as providing the servicers with detailed instructions about how to remedy the harm to borrowers.

## Collection or Enforcement Efforts

Generally, the Department uses the Treasury Offset Program ("TOP") operated by the U.S. Department of the Treasury ("Treasury") to collect defaulted federal student loans, through the use of administrative offset of federal nontax and tax refund payments and certain state payments, or collects through administrative wage garnishment ("AWG").[31]  The Department also uses its federal loan servicers to report information regarding debts arising under the federal student loan programs that are held by the Department to consumer reporting agencies, which is a process known as credit reporting,[32] and may also refer debts to the U.S. Department of Justice ("DOJ") for litigation.[33]

Since May 25, 2018, the Department's servicers have engaged in the following collection or enforcement efforts regarding the affected borrowers, and the Department has taken the following remedial steps:

- Adverse credit reporting: 847 borrowers have been subject to adverse credit reporting since May 25, 2018 (the original date of the PI Order) to date.

    - *Remedial steps*:  The Department is currently working with the federal loan servicers to put such borrowers in the correct repayment status (forbearance or stopped collections) and remove any record of adverse credit reporting from the affected borrowers' credit reports over the course of September and October 2019.

---

[31] See 31 U.S.C. § 3720A (tax refund offset); § 3716 (offset of federal non-tax payments and certain state payments); 31 C.F.R Part 285, Subpart A.  See also 34 C.F.R. Part 30, Subpart A (describing the Department's administrative actions to collect debt) and Subpart B (describing the Department's process for administrative offset and adverse credit reporting).

[32] *See* 34 C.F.R. § 30.35.

[33] *See* 34 C.F.R. § 30.1(a)(3).

- <u>AWG and tax refund offset</u>: 1,808 borrowers have been subject to AWG and tax refund offset.  The Department is investigating the root cause of this issue and is working with the federal servicer for defaulted loans to validate that these borrowers are in the proper stopped collection status.

  - *Remedial steps:*  The Department will correct these borrowers' statuses by individually reviewing their loan records to validate and confirm if the borrower was subject to any wage garnishment or offset. If the borrower was subject to these enforcement actions, the Department will work with the federal loan servicer to request refunds of any improper wage garnishments or offsets.  Generally, such refunds can be issued within two to three weeks once a determination has been made by the Department that a refund should be issued.

- <u>Litigation Referral to the Department of Justice</u>: Since May 25, 2018, no borrowers covered by the preliminary injunction have been referred for litigation for enforcement of a delinquent federal student loan as a result of their receipt of an incorrect notice. However, in the course of its review, the Department discovered that two class members had been referred for litigation prior to the PI Order. The Department has directed that the litigation efforts, if any, against these borrowers be stopped.

## Current Status of *Manriquez* Class Members

There are approximately 15,017 borrowers who received tiered relief (partial relief) from December 2017 to May 2018, and approximately 59,764 Corinthian borrowers with pending applications as of June 30, 2019.[34]  Collectively, there are over a million loan records associated with borrowers (1) with pending borrower defense applications, who took out student loans to attend schools operated by Corinthian , or (2) who are tiered relief recipients. Because, as noted above, the Department cannot know whether a borrower is covered by the PI Order, as amended, until it reviews a borrower's borrower defense application, at present the Department treats all

---

[34] This number may have increased since this date.  Because the Manriquez class includes borrowers who have filed borrower defense applications on the basis of the Department's JPR findings, once filed, the number of members in the class generally grows each day.

borrower defense applicants who took out loans to attend Corinthian schools as if they are a part of the *Manriquez* class and are covered by the PI Order.

Over the past several months, as issues have been brought to the its attention and as explained in more detail below, the Department has requested that all servicers confirm that all borrowers covered by the PI Order are in the correct repayment status, and place any borrowers not properly in forbearance/stopped collections into the correct repayment status. The servicers have confirmed that they have done so. The Department has been engaged in a manual process, however, of confirming the servicers' representations, which includes verifying whether borrowers reported as not being in forbearance are in that status for a legitimate reason.  The work to re-confirm borrowers' repayment statuses has been complicated by the fact that a borrower may not be in forbearance or stopped collections status for a number of different reasons. The reasons vary and require individualized research on each loan record as described below.

Generally, to determine whether a borrower is legitimately not in forbearance or stopped collections status, Department staff must review the individual loan data for each borrower. To perform this review, FSA has tasked a group of borrower defense specialists at the Department's borrower defense customer service center to examine the "exceptions," *i.e.*, the class members reported as not being in forbearance, to determine their legitimacy. This group of specialists, which ranges from five to seven people depending on FSA's available resources, work with each borrower's servicer and request confirmation on why the borrower's individual loans are not in forbearance or stopped collection activity status. A servicer can take up to five business days to reply to each request for research and confirmation to confirm why the non-defaulted borrower is not showing in a forbearance status in NSLDS for non-defaulted borrowers and hence in the

CEMS platform, or, for defaulted borrowers, for DMCS to confirm the stopped collection status was processed in its system.[35]  If the servicer needs to make an update because a borrower is not in the correct repayment status, the borrower defense specialist will monitor the Department's systems to ensure the update has been entered into NSLDS for non-defaulted borrowers, or to work with DMCS on defaulted borrowers, and monitor whether updates have been updated into the CEMS platform.  For any individual borrower, it can take over a month to investigate the borrower's case and to confirm with the borrower's servicer that the borrower's repayment status on his or her loans is updated accurately due to lags in the information updates from the servicer's system to NSLDS to the CEMS platform, or with DCMS since that system currently does not update loan status in NSLDS.  If corrective action is required, the Department also directs the borrower's servicer to make the corrective action (*e.g*., backdate the forbearance to cover a potential lapse).  After such updates are made, generally borrowers are sent an email informing them that they have been placed back in forbearance or stopped collections status.[36]

For borrowers that the Department discovered were in the incorrect repayment status, the Department has worked with the borrowers' servicers to place them in the correct forbearance or stopped collection activity status.  The Department will be continuing its work to re-confirm servicers' representations that all the class members are in the correct repayment status, and to correct any errors it finds on an ongoing basis.  As described below, for class members who are found to be in the incorrect status, the Department will be sending notices to such borrowers informing them of the situation and will be issuing refunds to any borrowers that made payments

---

[35] *See* June 27, 2018 Change Request ¶¶ 3(a), 4(a).
[36] Defaulted borrowers are generally not sent a new stopped collections activity notice.

(whether voluntarily or involuntarily through Department enforcement or collection efforts) on a rolling basis, as such borrowers are identified.[37]

Additionally, the Department will continue its efforts to improve its processes and internal controls, including new compliance monitoring and QAR processes which will assist the Department in the re-validation efforts. There are at least ten different contractors (the federal loan servicers) supporting the Department and borrowers across non-defaulted and defaulted borrower segments that require coordination and data to be pulled and analyzed across multiple systems. The analysis at times requires servicers and Department staff to review individual loan records to review any exceptions. This type of detailed analysis, regardless of any system automation or reporting put in place by the Department, requires time and careful consideration. The Department and its contractors will incorporate lessons learned from the prior attempts to ensure the data requested from the servicers comply with the Department's data request and desired format in the future.

### Department Compliance Tracking and Enhanced Oversight Efforts

The Department takes its compliance with the preliminary injunction seriously and, in addition to the steps described above, is taking several measures to ensure its compliance with the terms of the Court's order on an ongoing basis.

First, the Department has established a new monthly compliance monitoring process to enhance its ability to track and monitor borrowers' forbearance and stopped collection activity status. This process involves the creation of monthly reports for borrowers subject to the preliminary injunction and will allow the Department to determine, on an ongoing basis, which borrowers are in in certain statuses in a given month (*i.e.*, forbearance or stopped collection

---

[37] Templates of letters we anticipate sending are included as Attachment 6.

status, deferment, in a loan repayment grace period, or in a $0 payment IDR plan during a given

month) and (for non-default borrowers) the end dates of the borrowers' forbearance periods. This

new process will allow the Department to:

    i.   monitor borrowers entering or exiting forbearance or stopped collections status and when borrowers enter into certain statuses that are exceptions to the Department's policy to place borrower defense applicants in forbearance or stopped collections status,

    ii.   follow up on any changes, if any, to determine whether a borrower has been erroneously taken out of forbearance or stopped collections and work with the federal loan servicers to correct any issues; and

    iii.   monitor and ensure servicer compliance in order to direct extensions of any non-default borrower's forbearance period, if the borrower still has a pending borrower defense application, when the Department sees that the borrower's forbearance period is ending.

Second, the Department is also establishing a process for tracking borrower

communications about repayment statuses, whether with a servicer or with the Department, on

an ongoing basis. As described above, to date the Department's process for investigating whether

a borrower is correctly not in forbearance or stopped collections has been a manual process that

requires extensive communication with third-party federal loan servicers and cross-checks across

multiple Department systems. While the monthly automated compliance report will help reduce

the burden for the Department's staff in performing part of that investigation, some part will

continue to be a manual process due to the number of ways a borrower can change statuses. The

Department believes that the added tracking it has added to its systems of borrower

communications, with both the Department and servicers, will assist the Department in following

up on forbearance/stopped collection status exceptions found in the monthly compliance

monitoring report described above and will also help the Department determine whether a

borrower has voluntarily opted-out of forbearance or stopped collections after having been in

forbearance or stopped collections status upon the submission of a borrower defense application. While the Department anticipates that the process of investigating whether a specific borrower has voluntarily opted-out of forbearance will continue to be a labor-intensive and time-consuming process, this tracking will allow the Department to more easily gather relevant communications from the borrower to assist in its investigation. Such tracking will also help the Department identify any potential servicing-related issues.

Third, the Department has initiated an independent internal audit process, also known as a quality assurance review ("QAR"), of the borrower defense process that will focus on FSA's application of the forbearance and stopped collections policies in place as a result of the preliminary injunction. The Department staff conducting the QAR are independent of the business units in FSA and the federal loan servicers responsible for implementing the terms of the preliminary injunction and are directly accountable to FSA leadership. The QAR will review current processes and procedures and make recommendations for longer-term solutions for ensuring compliance with the preliminary injunction and any additional borrower defense-related repayment status policies with requisite controls and reporting.[38]  The QAR staff will also be involved in follow up on any recommendations and subsequent remedial actions to manage and ensure their progress.  In addition, the QAR staff will independently perform a quality assurance check on FSA's work to re-confirm that all class members are in the correct status, to provide a separate review of that process.

Fourth, the Department anticipates increasing its monitoring of servicers' compliance with the Department's requests, to assist the Department's efforts to comply with the Court's Orders.  To this end, the Department has requested information from one of the federal loan

---

[38] A copy of FSA's preliminary plan for the QAR is included as Attachment 8.

servicers, FedLoan Servicing, as to the circumstances of the July 2019 system error affecting 3,000 class members and the steps the servicer will be taking to prevent future errors.[39]  Based on their response, the Department will take corresponding corrective action, including withholding payments, demanding equitable adjustments, and moving the affected loan accounts, as appropriate.  The Department intends to follow this model and will not hesitate to demand further action from the federal loan servicers in the future to ensure compliance with the preliminary injunction.

Further, the Department plans to submit a change request to the servicers and impacted systems (e.g., servicer systems, DMCS, and NSLDS) in order to create new suspension codes (e.g., forbearance and stopped collection activity codes) that can be used exclusively for borrower defense and will accommodate an indefinite suspension period for forbearances and suppress the sending of forbearance end notices and payment notices unless the borrower voluntarily requests a payment notice. These new suspension codes would require the Department to migrate borrowers in the existing suspension codes to the new code for borrower defense. By adding new suspension codes, instead of relying on the existing codes, the Department will be able to remediate through a technology solution the pain points in the previous legacy and existing forbearance and stopped collection status. It will also allow for the Department to further automate the compliance monitoring processes to reduce the amount of labor and time to review the exceptions and establish a further foundation for future enhancements to reduce the systems complexity as further described below.

The Department also anticipates its eventual implementation of a single loan servicing platform to be managed by the Department, the Next Generation Processing and Servicing

---

[39] A copy of the Department's letter to FedLoan Servicing is included as Attachment 9.

Environment ("NextGen").  This system will improve the Department's ability to quickly update borrowers' loan repayment statuses, because of reasons such as a pending borrower defense application, in the future. As described above, the Department's efforts to comply with the preliminary injunction and to obtain information on class members' repayment statuses have been complicated by the number of different loan servicers and multiple systems through which the Department has to obtain information and manage borrowers' loan records. NextGen will eliminate the complexity caused by the multiple different systems by bringing the borrower data for all federal borrowers onto one platform. By reducing the complexity of the multiple-sourced systems, the Department will also be able to eliminate potential synchronization and timing error updates relating to forbearance and stopped collection activities.

The Department anticipates that these steps will ensure that the Department is overseeing and monitoring the servicers' tracking of borrower's forbearance or stopped collection activity status on an ongoing basis and help the Department determine the need for and develop long-term solutions to assist the Department with its compliance with the preliminary injunction.  The Department is also anticipating increasing its monitoring of federal loan servicers as issues arise, in a manner similar to its communication to FedLoan Servicing regarding the July 2019 error.