JOSEPH H. HUNT
Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

MARCIA BERMAN
Assistant Branch Director

R. CHARLIE MERRITT
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
919 East Main Street, Suite 1900
Richmond, VA 23219
(202) 616-8098 (phone)
(804) 819-7417 (fax)
robert.c.merritt@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARTIN CALVILLO MANRIQUEZ, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION and BETSY DEVOS, in her official capacity as Secretary of Education, <br><br> Defendants. | No. 3:17-cv-7210-SK <br><br> **DEFENDANTS' BRIEF IN RESPONSE TO OCTOBER 8, 2019 ORDER** |

On October 8, 2019, the Court entered an order permitting Defendants to submit a brief "on the issues of contempt and sanctions no later than October 15, 2019." Order Lifting Stay, Setting Briefing Schedule, and Referring Case to Magistrate Judge for Settlement, ECF No. 118 ("October 8 Order"). In particular, the Court requested that any such brief address (1) the legal authority justifying or limiting a finding of contempt or an order of sanctions; and (2) the types of remedy available and how each one would or would not further the goals of aiding the Plaintiffs and strongly deterring future violations of the Court's orders. *Id*. at 1-2. Defendants respectfully submit the following brief in response to the Court's October 8 Order.

## **INTRODUCTION**

Defendants do not dispute that as of September 18, 2019, the day they filed their full report addressing compliance with the Court's preliminary injunction, the U.S. Department of Education ("Department") was not in substantial compliance with the Court's orders. But as detailed in that report and at the October 7, 2019 case management conference ("October 7 Hearing"), and as further discussed below, the Department has been working diligently and in good faith to correct the errors that it has discovered and has made substantial progress toward bringing itself into full compliance with the Court's preliminary injunction. The Department is dedicated to continuing that work moving forward, as well as to implementing better oversight and monitoring controls designed to prevent similar errors from occurring in the future. Given the complexity of administering a federal student loan portfolio encompassing some 45 million borrowers and the practical limitations on the Department's ability to direct the actions of its loan servicers, the Department believes that it is currently taking all reasonable steps to comply with the Court's injunction.

The Department appreciates, however, the gravity of its noncompliance and the significant impact such noncompliance has had on affected borrowers, and is committed to implementing further oversight and monitoring activities, as recommended by Plaintiffs and this Court, designed to achieve full compliance, remediate harm to affected borrowers, and deter future errors from occurring. In order to allow the Department to most efficiently direct its limited resources to

ensuring full compliance with the Court's preliminary injunction, the Department respectfully requests that any sanctions be forward-looking, realistic in light of the practical difficulties involved, and designed to achieve the goal of compliance.

## BACKGROUND

On August 19, 2019, the Court ordered Defendants to submit a full report detailing their compliance with the Court's preliminary injunction. ECF No. 110. Defendants submitted their report on September 18, 2019. ECF No. 111-2 ("Compliance Report"). In compiling the compliance report, the Department conducted a thorough review of the manner in which its loan servicers[1] have implemented the Department's instructions, consistent with this Court's preliminary injunction, to halt collection activity against Corinthian borrowers, including Plaintiff class members.[2] The report yielded disappointing results, with the Department learning that more than 16,000 individuals were subject to some form of collection activity during the pendency of the preliminary injunction. The Department understands that this is unacceptable and has been working diligently in the intervening period to remedy the effects of the noncompliance identified in its report. As discussed at the October 7 Hearing, the Department has made significant progress in doing so and, for the record, provides the following information regarding the Department's continued compliance efforts:

>  Borrowers who received incorrect notices that payments were due: The Compliance Report notes that 16,034 Corinthian borrowers received such notices and that, as of the

---

[1] As explained in previous filings, the Department contracts with multiple loan servicers to perform the administrative tasks associated with "servicing" a federal loan, including collecting payments and implementing changes to the repayment status of individual borrowers. *E.g.*, ECF No. 104-1 ¶¶ 7-13; Compliance Report at 8-11.

[2] The Department collected information about all Corinthian borrowers who either received partial relief pursuant to the preliminarily enjoined "Average Earnings Rule" or who have a pending borrower defense claim. *See* Compliance Report at 2 n.2. This is due to the practical difficulty associated with identifying class members from this larger group, which requires scrutiny of each individual's borrower defense application to determine if it was asserted on the basis of the Department's job placement rate findings. Until it completes its review of each borrower defense application, the Department treats this over-inclusive set of Corinthian borrowers as subject to the Court's preliminary injunction. *Id*.

Defendants' Brief in Response to October 8, 2019 Order
No. 3:17-cv-7210-SK

date of that report, the Department had corrected the repayment status of approximately 14,887 such borrowers. Compliance Report at 2-3. As of today, the Department has completed the process of confirming with servicers that all 16,034 borrowers are either (a) in forbearance and/or stopped collections status, or (b) not in such status due to a valid exception, i.e., the borrower is either in a zero dollar payment, income-driven repayment plan, is in deferment, or has elected to opt out of forbearance or stopped collections status. *See* Compliance Report at 7-8.

<u>Borrowers who made payments on their loan when they were not required to</u>: The Compliance Report states that 3,289 Corinthian borrowers made one or more payments when they should have been in forbearance. Compliance Report at 2-3. The Department now reports that it has requested that all such borrowers receive a refund of the money they paid, and expects the process to be completed, and for all affected borrowers to receive their refund checks, within 30-45 days.[3] Borrowers will receive these checks on a rolling basis.

<u>Borrowers who were subject to involuntary collection efforts</u>: The Compliance Report notes that 1,808 Corinthian borrowers were subject to involuntary collection through administrative wage garnishment and tax refund offset. Compliance Report at 3-4. The Department now reports that it has requested refunds for all such borrowers, and that it has requested that the process be completed by October 22, 2019. In addition, the Department has sent a high level communication, from Secretary DeVos' Chief of Staff to a Deputy Secretary at the U.S. Department of the Treasury ("Treasury"), requesting that Treasury expedite these refunds with all due haste. The Department is currently working with Treasury to determine whether refunds may be issued to borrowers without being offset against other federal debts owed by the borrower, as would normally be required under the administrative offset provisions of the Debt Collection Improvement Act of 1996. Affected borrowers will receive their refund checks on a rolling basis.

<u>Borrowers who were subject to adverse credit reporting</u>: The Compliance Report states that 847 non-defaulted class members were subject to adverse credit reporting as a result of becoming delinquent on their payments. Compliance Report at 3-4. The Department now reports that it has requested that the servicers correct this issue for all 847 borrowers, and the servicers have completed the process for 718 borrowers.

The Department will continue to work diligently until it achieves full compliance with the Court's injunction, but the Department believes that it is currently in substantial compliance as a

---

[3] The Compliance Report also refers to 991 borrowers who made payments as a result of specific errors made by one servicer, FedLoan Servicing. *See* Compliance Report at 3, 19-21. As explained at the October 7 Hearing, the Department now wishes to clarify that these 991 borrowers are in addition to the 3,289 borrowers otherwise identified as having made payments during the relevant time period. The Department has requested refunds for these 991 borrowers as well, which are currently being processed.

Defendants' Brief in Response to October 8, 2019 Order
No. 3:17-cv-7210-SK

result of these efforts. The Department recognizes the need to conduct stronger oversight moving forward to ensure that the loans of all class members remain in the correct repayment status. To that end, as detailed in the Compliance Report, the Department will be implementing a new monthly compliance monitoring report; conducting an internal audit of its process for applying forbearance and stopped collections to borrower accounts that will result in recommendations for long-term solutions to ensure compliance; establishing a process to comprehensively track borrower communications; and conducting increased oversight of its servicers' activities. In addition, the Department is cognizant of the Court's desire to "aid[] the Plaintiffs and strongly deter[] future violations of the Court's orders," October 8 Order at 2, and is committed to implementing further mechanisms, as described below, to atone for its errors and ensure full compliance with the Court's preliminary injunction going forward.

## ARGUMENT

### I.    The Court's Contempt Authority

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Defendants believe that civil contempt would be the appropriate vehicle through which to address the Department's noncompliance with the Court's preliminary injunction. It is true that district courts also have the "power to punish disobedience to courts orders" through "criminal contempt," *United States v. Rose*, 806 F.2d 931, 933 (9th Cir. 1986), but a finding of criminal contempt "requires the procedural safeguards applicable in criminal proceedings, including proof beyond a reasonable doubt," *Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016); *see also* Fed R. Crim. P. 42 (setting forth procedural requirements for criminal contempt proceedings and generally requiring that a person be punished only "after prosecution on notice"). Thus, "knowledge or notice of the court order in question and a willful disobedience of that order are the essential elements of criminal contempt." *United States v. Rylander*, 714 F.2d 996, 1003 (9th Cir. 1983). "Willfulness in this context means a deliberate or intended violation, as distinguished from an accidental, inadvertent, or negligent violation of an order." *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770,

5

782 (9th Cir. 1983); *see also Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992) (criminal contempt only appropriate where an actor "defies the public authority and willfully refuses his obedience" (citation omitted)). Defendants respectfully submit that the Department's Compliance Report, undersigned counsel's representations at the October 7 Hearing, and the further information contained in this brief establish that the compliance errors at issue here were not the result of any willful or intentional conduct on the part of the Department, but, as the Court has recognized, gross negligence, including negligent oversight of the Department's servicers.[4] *See* Tr. of Oct. 7 Hearing at 6 (Court stating that Department's conduct has amounted to "gross negligence," but expressing "doubt that it's an intentional flouting of my order").

Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1130 (9th Cir. 2006) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). While a party's behavior "need not be willful" to constitute civil contempt, there is no contempt when the party's action "appears to be based on a good faith and reasonable interpretation of the court's order." *In re Dual-Deck*, 10 F.3d at 695 (citations omitted). In addition, "[s]ubstantial compliance with a court order is a defense to an action for civil contempt." *Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 466 (9th Cir. 1989).

Upon a finding of civil contempt, a court may impose sanctions to "(1) compel or coerce obedience to a court order, and/or (2) compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance." *Ahearn ex rel. NLRB v. Int'l Longshore & Warehouse Union*, 721 F.3d 1122, 1131 (9th Cir. 2013). Unlike in the context of criminal contempt, where the purpose of the sanction is "to punish past defiance and to vindicate the court's judicial authority," *Whittaker*, 953 F.2d at 517, a civil contempt sanction is generally "conditional and must be lifted if the contemnor obeys the order of the court," *United States v. Powers*, 629 F.2d

---

[4] Although a district court retains the "inherent authority to impose sanctions for bad faith," *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001), Defendants respectfully submit that such sanctions are not warranted here because, as explained above, bad faith has not been established.

6

Defendants' Brief in Response to October 8, 2019 Order
No. 3:17-cv-7210-SK

619, 627 (9th Cir. 1980); *see also Falstaff Brewing*, 702 F.2d at 778 ("A contempt adjudication is plainly civil in nature when the sanction imposed is wholly remedial, serves only the purposes of the complainant, and is not intended as a deterrent to offenses against the public."). "[W]here the elements of both civil and criminal are mixed, the sanctions are reviewed under the procedural requirements of criminal contempt." *Whittaker*, 953 F.2d at 518.

In a civil contempt proceeding, the "moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply." *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (quoting *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992)). "[G]ood faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019).

## II.     Appropriate Sanctions in this Case

As indicated above, Defendants take responsibility for and regret deeply the errors that have caused the Department to fail to comply with the Court's preliminary injunction. Since the time it filed the Compliance Report, the Department has made significant progress towards achieving compliance with the Court's orders, but acknowledges that further work is required and does not oppose the imposition of sanctions aimed at bringing the Department into full compliance and ensuring that the resulting harms to borrowers are appropriately remedied.

The Department believes, however, that any sanction imposed should be aimed at expeditiously achieving and maintaining full compliance with the Court's injunction, without diverting unnecessarily the Department's resources from these compliance efforts. *See* Tr. of Oct. 7 Hearing at 6 (Court stating that it does not "want to divert more resources from the Department of Education to solving the problem" or "take away resources who would be helping the people who need to be helped"); *see also Falstaff Brewing*, 702 F.2d at 781 ("every precaution should be taken that [civil contempt] orders issue . . ., only after legal grounds are shown and only when it appears that obedience is within the power of the party being coerced by the order" (quoting

7

*Maggio v. Zeitz*, 333 U.S. 56, 59 (1948)); *Whittaker*, 953 F.2d at 517 ("Generally, the minimum sanction necessary to obtain compliance is to be imposed."). Defendants respectfully submit that such forward-looking sanctions, as described below, will best aid Plaintiff class members affected by the Department's noncompliance.

The Court has "wide discretion to fashion an equitable remedy for contempt that is appropriate to the circumstances." *Tatung Co., Ltd. v. Hsu*, No. 13-cv-1743-DOC (ANx), 2016 WL 1047343, at *5 (C.D. Cal. Mar. 16, 2016) (quoting *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir. 1987)). Defendants believe the following remedial measures are appropriate to remedy the harm suffered by Plaintiff class members and to enforce compliance with the preliminary injunction:

<u>Compliance reporting</u>:  In its October 8 Order, the Court stated that it would "devise a system under which Defendants will be required to report the status of their compliance with the injunction." October 8 Order at 2. As noted at the October 7 Hearing, Defendants are prepared to report to the Court the status of the Department's compliance on a monthly basis[5] until further Order from the Court. Defendants can agree to provide high-level reports (devoid of personally identifying information to protect borrowers' privacy interests) that detail, with respect to individuals the Department deems subject to the Court's preliminary injunction, *see supra* p. 3 n.2, (1) repayment status; (2) how many covered borrowers entered or exited forbearance or stopped collections status during the reporting period; (3) whether any covered borrower who is not in forbearance or stopped collections status is in that status because of a valid exception; (4) the status of refunds for all covered individuals who were erroneously requested to make payments on their loans as a result of the Department's noncompliance; (5) the status of refunds for all covered

---

[5] The Court noted at the hearing that it would require the Department to file a "monthly report" regarding its compliance. Tr. of Oct. 7 Hearing at 11. Defendants agree that this is an appropriate time interval to allow the Department to report on its progress without unnecessarily diverting resources from its other compliance efforts. In order to allow the Department adequate time to get its monthly compliance monitoring program up to speed, analyze the results, and provide accurate, up-to-date information, *see* Compliance Report at 4-5, 27-28, Defendants respectfully request that the Department be permitted to submit its first monthly report by no later than November 22, 2019.

Defendants' Brief in Response to October 8, 2019 Order
No. 3:17-cv-7210-SK

individuals who were erroneously subject to wage garnishment and administrative offset as a result of the Department's noncompliance; (6) the status of credit reporting corrections for all covered individuals who were subject to adverse credit reporting as a result of the Department's noncompliance; (7) the status of individualized notifications to all borrowers affected by the Department's noncompliance in the manner set forth in (4)-(6) above; (8) the status of individualized notifications to all covered borrowers regarding the Department's noncompliance; and (9) the overall status of the Department's progress in achieving and maintaining compliance with the preliminary injunction.

<u>Notifying covered borrowers of noncompliance</u>:  The Court also stated in its October 8 Order that it would "devise a system under which Defendants will be required to report . . . the method in which Defendants notify plaintiffs in the class." October 8 Order at 2.  The Department understands that the Court is dissatisfied with the manner in which the Department has conducted, and proposed to conduct, outreach to covered borrowers.  The Department has consulted with an integrated communications working group to enhance existing borrower communications and develop new communications related to this litigation.  Communications include emails and web content, and the Department is currently working to update these outreach mechanisms to make them simpler, clearer, and, in the case of the Department's website, more prominent and easier to find.  Starting with a meet and confer on October 10, 2019, Defendants have engaged counsel for the Plaintiffs in this process and anticipate further communications with counsel to assist in creating effective borrower communications.  Once the language is finalized, the Department can, if the Court deems it appropriate, submit its proposed outreach communications to the Court for further review.

In addition, the Department is updating its currently-existing borrower defense hotline to add a new menu item specifically devoted to the *Manriquez* injunction and issues associated with the Department's noncompliance.  The Department will make borrowers aware of this new hotline through a variety of communications to borrowers potentially affected by the compliance issues.

Defendants' Brief in Response to October 8, 2019 Order
No. 3:17-cv-7210-SK

<u>Quality Assurance Review</u>:  As discussed in the Compliance Report, the Department has commissioned a "quality assurance review" ("QAR") of the Department's procedures for applying forbearance and stopped collections status to borrower defense claimants.  This internal audit will "review current processes and procedures and make recommendations for longer-term solutions for ensuring compliance with the preliminary injunction and any additional borrower defense-related repayment status policies with requisite controls and reporting."  Compliance Report at 5.  The Department is willing to engage and solicit the views of counsel for the Plaintiffs as part of this process.  Because this is an internal review of the processes and procedures of the Department and its contractors, the Department does not believe that formal participation by outside actors, such as Plaintiffs' counsel, is consistent with the Department's quality assurance review and internal audit guidance.  *See generally* ECF No. 111-10.  Subject to any appropriate redactions as needed to protect confidential or privileged information, the Department is willing to file the completed QAR report with the Court.

Given that the QAR process is already in progress, the Department does not believe that a special master is necessary.  *See* Tr. of Oct. 7 Hearing at 5 (Court considering whether a "special master" is needed to "oversee" the process of ensuring that potential class members "are actually getting the relief they need in a timely manner").  Although the staff performing the QAR are Department employees, they are independent of the business units that they are auditing (i.e., the entities that are responsible for the implementation of the Department's efforts to comply with the preliminary injunction).  The QAR staff report directly to Department leadership and as a result are able to retain objectivity and independence in conducting their review and reporting the results of that review.  The Department respectfully submits that oversight and review by a special master would be unnecessarily duplicative of the QAR process.

<u>Increased oversight of servicers</u>:  The Department is committed to increasing its oversight of servicers, including exploring all available contractual remedies for the errors that have occurred to date.  These remedies include equitable adjustments to contract payments (i.e., decreasing payments to servicers for improper servicing under the Department's contracts); reallocation of

borrowers' accounts to other servicers; adverse performance reporting via the Contract Performance Assessment System, a federal government-wide system that allows all government entities to see an agency's review of a contractor's performance, which in many cases may affect the contractor's future business opportunities with the federal government; and the ability to demand corrective action plans to address how the servicer may improve performance and reduce the risk that the issues that have occurred to date will reoccur.  The Department has also created a new team, dedicated to servicer oversight and management, to monitor servicers' compliance with any directions from the Department pursuant to the Court's orders.  Subject to any appropriate redactions as needed to protect confidential or privileged information, the Department is willing to file the responses its servicers provide to any "letters of concern" with the Court.  *See* ECF No. 115 at 6.  As the Department continues to explore these options, it proposes reporting to the Court any steps it has taken with respect to its servicers in its first monthly compliance report.

In addition, the Court inquired at the October 7 Hearing about its ability to bring the Department's servicers under its jurisdiction.  The Department believes that, pursuant to Federal Rule of Civil Procedure 65, the servicers are, as agents of the Department, subject to this Court's injunction.  Fed. R. Civ. P. 65(d) (injunctions are, so long as notice is provided, binding on a party's "officers, agents, servants, employees, and attorneys," as well as "other persons who are in active concert or participations" with such officers, agents, servants, employees, and attorneys).  This is true regardless of whether the servicers were "parties to the original proceeding."  *See, e.g.*, *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945).  If the Court deems it appropriate, however, it has the authority to modify its preliminary injunction order to name specifically the Department's servicers.  *See Wash. Metro. Area Transit Comm'n v. Reliable Limousine Serv., LLC.*, 985 F. Supp. 2d 23, 30 (D.D.C. 2013) (finding that "if an injunction already binds a non-party by operation of Rule 65(d)(2), a court may clarify the injunction to make explicit what is

already implicitly so," and clarifying its order to "make explicit" that third-party agent was bound).[6] Defendants do not oppose such a modification here.

Defendants respectfully submit that this package of remedial measures is sufficient to coerce the Department from substantial to full compliance with the Court's injunction, to remedy the harm suffered by covered borrowers, and to prevent future lapses. Further compensatory sanctions, such as fines and the payment of attorneys' fees, would merely "divert more" of the Department's resources away from "solving the problem." Tr. of Oct. 7 Hearing at 6; s*ee also McKeon v. Cent. Valley Cmty. Sports Found.*, No. 1:18-cv-00358-BAM, 2019 WL 1208986, at *2 (E.D. Cal. Mar. 14, 2019) ("In imposing civil contempt sanctions, the court must impose the most minimal sanction necessary to coerce the contemnor to comply with the order."). In particular, Plaintiffs' request that the Court require Defendants to pay fines until they demonstrate that they "have refunded all illegally seized money and are in full compliance with the Court order," should be denied. ECF No. 115 at 6. As explained above and at the October 7 Hearing, *see* Tr. of Oct. 7 Hearing at 7-11, the Department has already done in its part in requesting such refunds, which must now be processed by its servicers and, ultimately, Treasury. While the Department has communicated with Treasury in an attempt to expedite this process, it lacks the ability to control how quickly Treasury will complete the refunds. Thus, the type of coercive fine Plaintiffs propose would not hasten the processing of refund payments.[7] *See United States v. Ayres*, 166 F.3d 991,

---

[6] This is true notwithstanding the pending appeal of the Court's preliminary injunction orders. *Wash. Metro. Area Transit Comm'n*, 985 F. Supp. 2d at 29-30.

[7] In the parties' most recent Joint Case Management Statement, Plaintiffs stated that they had requested that the Department "discharge the loans for the 1,808 Students subject to unlawful involuntary collections" as a show of "good faith." ECF No. 115 at 6 n.8. Defendants do not believe that such action is an appropriate civil contempt sanction. The Court's preliminary injunction does not require the Department to discharge any loan debts (which is the ultimate relief Plaintiffs seek in this lawsuit), so an order requiring the Department to take such action would not further compliance with the Court's injunction. Nor would it compensate borrowers for any losses resulting from the Department's noncompliance, which are limited to amounts improperly collected and which the Department is already in the process of refunding.

997 (9th Cir. 1999) ("Civil contempt sanctions . . . are only appropriate where the contemnor is able to purge the contempt by his own affirmative act . . . .").

Defendants also believe that the sanctions described above would further the Court's interest in "strongly deterring future violations of the Court's orders." October 8 Order at 2. As the Ninth Circuit has recognized, "[v]irtually every punishment has a concomitant deterrent purpose." *Bingman v. Ward*, 100 F.3d 653, 656 (9th Cir. 1996). Here, remedial measures that require the Department to, among other things, report on a regular basis the status of its compliance with the Court's preliminary injunction and put affected borrowers directly into contact with Plaintiffs' counsel, coupled with the continued threat of further sanctions for future noncompliance, serve a strong deterrence value in preventing future violations.

In light of all of these considerations, Defendants respectfully submit that any sanctions order that the Court ultimately imposes should allow the Department to continue the progress it is making toward achieving full compliance by dedicating increased resources to that effort.

Dated:  October 15, 2019                               Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar # 89400)
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
919 East Main Street, Suite 1900
Richmond, VA 1900
(202) 616-8098 (phone)
(804) 819-7417 (fax)
robert.c.merritt@usdoj.gov

*Counsel for Defendants*

13

Defendants' Brief in Response to October 8, 2019 Order
No. 3:17-cv-7210-SK