# EXHIBIT A

# U.S. Department of Education

# Office of Federal Student Aid

# Second Monthly Compliance Report in response to ECF 130, *Manriquez et al. v. DeVos*, Case No. 17-cv-07210-SK, U.S. District Court for the Northern District of California

**December 1, 2019**

## Introduction and Summary

Pursuant to the Court's Order of October 24, 2019, ECF No. 130, the U.S. Department of Education (the "Department") through its Federal Student Aid office ("FSA") submits its second monthly status report regarding its attempts to comply with the preliminary injunction in this case, *see* ECF No. 60. That injunction, as amended on June 19, 2018, ECF No. 70, and clarified on August 30, 2018, ECF No. 89, prevents the Department from collecting relevant student loan debts from members of the class that has been certified in this case.[1] *See also* Order Granting Mot. for Class Cert., ECF No. 96.

This report includes a spreadsheet containing a list of the currently known potential class members, which the Department will separately move to file under seal due to the personally identifying information contained therein. For each potential class member, the spreadsheet includes information the Court has requested about the Department's attempts to comply with the preliminary injunction. Throughout the spreadsheet, "1" is used to answer "Yes," and "0" is used to answer "No." The spreadsheet contains three sections. The first section (pages 1 through 1724) lists each potential class member and then provides answers for the Court's first, second, and seventh questions. The second section (pages 1725 through 2303) lists the subset of potential class members who were impacted by the Department's non-compliance. For these impacted borrowers, the spreadsheet provides answers to the Court's third, fourth, fifth, and sixth questions. Finally, the third section (page 2304) contains an index of shorthand terms and abbreviations used throughout the spreadsheet.

---

[1] Because the borrowers covered by the preliminary injunction are co-extensive with the borrowers covered by the order certifying the class in this case, references to class members in this Report refer to borrowers covered by the preliminary injunction. *See* Order Certifying the Class, ECF No. 96; Amended PI Order ¶¶ A-C.

The Department has been working diligently to implement the oversight and compliance tracking measures it discussed in its November 1, 2019 report ("November Report") with the goals of ensuring compliance with the injunction and refining the Department's estimate of the number of potential and impacted class members. As a result of those efforts, the Department now has an improved understanding of those figures. The number of potential class members has decreased by approximately 10,000 since the November Report, and while there has been a significant increase in the number of impacted borrowers identified, the Department has already remedied harm incurred by the vast majority of these newly identified impacted borrowers.

The Department has corrected the repayment status of all the approximately 29,000 additional borrowers who it has newly identified as having been erroneously taken out of forbearance or stopped collection status; has had the U.S. Department of the Treasury ("Treasury") issue refunds to the vast majority of the approximately 11,500 additional borrowers who the Department has newly identified as having made a voluntary payment (only 76 borrowers have yet to be issued a refund); has had Treasury issue refunds to the vast majority of the approximately 550 additional borrowers who it has newly identified has having made an involuntary payment (only 18 borrowers have yet to be issued a refund); and has corrected the credit reports of all the approximately 5,000 additional borrowers who it has newly identified as having been erroneously subject to adverse credit reporting.

The Department's reverification and revalidation efforts recently revealed that an isolated miscommunication between FSA and its servicers and other logistical issues caused this underestimate in the number of impacted borrowers. FSA has corrected the miscommunications with the loans servicers and developed systems to ensure borrowers stay in the correct repayment status, allowing the Department to quickly take these remedial steps.

In addition, the Department is preparing to send a revised notice of noncompliance to the potential class by the end of December, in accordance with this Court's November 20, 2019 Order approving the revised notice. Also, the improvements the Department made to its website and hotline in October continue to be available to assist potential class members obtain information regarding this case.

The Department has continued to work to improve its servicer oversight and compliance tracking. On November 21, 2019, the Department, including the Secretary and Under Secretary of Education, held an all-day, in person meeting with executives of each of the Department's loan servicers to discuss the errors made relating to this case and how both the Department and the servicers can improve in the future. Similar meetings between the Department and its servicers will continue on a quarterly basis. Also, FSA has created a mechanism to comprehensively track the potential class by validating specific information across FSA's data warehouse and the various loan servicer data systems, and has implemented a process for verifying the class membership without having to rely upon communications with or actions by FSA's loan servicers.

**1.     Defendants' progress toward identifying which of the 74,781 potential class members are class members**

As indicated in column D in the first section of the spreadsheet, FSA's current estimate is that there are 78,737 potential class members, which is approximately 10,000 fewer than the Department's previous estimate in its November Report.[2] While the Department is reviewing

---

[2]     The Department's estimate that there are 78,737 potential class members, and its estimate of the number of borrowers in that potential class who were affected by the Department's non-compliance, is based on data that the Department obtained from its borrower defense database and loan servicers on November 5, 2019, so that the Department would have time to analyze, verify, and prepare that data for this report. If the size of the potential class has changed since November 5, 2019, it would be the result of the Department's receipt of additional, qualifying borrower defense applications since that time. As the Department has explained, because the certified class in this case includes qualifying borrowers who file borrower defense applications in the future, and given that the

the borrower defense applications of these potential class members to determine if they are actually class members, its efforts to this point have been focused on ensuring that it has an accurate count of the potential class and the number of those individuals that have been impacted by the Department's noncompliance, and on remediating harm to affected borrowers.

To that end, since the November Report, the Department has continued to reverify and revalidate all information regarding the potential class. FSA has established a reliable and repeatable process to define, track, and continue to monitor potential class members by name, Social Security number (SSN), and loan servicer within FSA's data warehouse. While FSA has an automatic system for placing and keeping borrower defense applicants in unending forbearance, FSA now separately sends the current list of potential class members to its student loan servicers each month with instructions to confirm that all members are still in forbearance, adding an additional layer of confirmation to ensuring compliance with the injunction. These rigorous processes are designed to prevent compliance problems from recurring in the future and to identify and remediate any such problems that do occur.

The Department's efforts are working. Since October, the Department has identified and corrected errors in its previous estimates of the number of potential and affected class members and has remedied harm incurred by the vast majority of all newly identified impacted class members. For example, in advance of the November Report, the Department determined that new individuals were potentially subject to the Court's injunction, pending the Department's data verification efforts. As the Department explained in the November Report, many of these individuals were added based on factors that the Department determined would likely make such individuals excludable from the class, such as whether they received a Direct Loan since May

---

Department receives approximately 1,200 borrower defense applications per week, the size of the class is always in flux and can only be measured at a discrete point in time.

2010, had a completed borrower defense application, or had already received a student loan discharge for their loans. Because the Department had not yet had the opportunity to analyze its data and confirm that these individuals were properly excluded from the class, the Department provided information about them in the November Report, bringing the total size of the potential class to 88,809.

Since then, FSA has completed its verification work and has removed from the class list (contained in section one of the spreadsheet attachment) those borrower defense applicants who are ineligible to be included in the class, including borrowers without any Direct Loans, borrowers who already received student loan discharges (e.g., closed school discharges) or borrowers with incomplete borrower defense applications. This intensive data verification effort has also ensured that the list of potential class members includes new borrower defense applicants. In section one of the spreadsheet attachment, borrowers who are new additions to the class and borrowers who are ineligible to be included in the class are marked accordingly in the first section under the "Added to Class?" and "Removed from Class – ineligible" columns.

As a result of this work to refine the estimate of the size of the potential class, the first section of the spreadsheet now reflects FSA's estimate that there are 78,737 potential class members, which is approximately 10,000 less than the Department's previous estimate in the November Report.

Additionally, since filing its November Report, the Department has discovered through FSA's reverification and revalidation process that a larger number of potential class members than previously estimated were impacted by the Department's non-compliance, and the Department has already remedied harm to the vast majority of these newly identified borrowers. FSA discovered that errors in the communications between FSA and loan servicers in August

2019 asking the servicers to identify which potential class members received erroneous billing notices led to incorrect undercounting of borrowers who received notices but were put back in forbearance before their payment due date passed.  Although these borrowers had their forbearance (or similar status) renewed before the date the borrowers were told they needed to make a payment, these borrowers did receive an erroneous notice indicating that they would need to make a payment, so they should have been included in prior reports.  As indicated in response to question three below, these newly identified borrowers are now included in the list of impacted borrowers and the Department has confirmed that they are all currently in the appropriate repayment status.

In addition, FSA has identified a system limitation causing borrowers who consolidated their loans after submitting their borrower defense application to fall out of the forbearance directed by the Court. These borrowers, too, have now been included in the list of impacted borrowers.  Finally, FSA learned that the Customer Engagement Management System (CEMS) used to track borrower defense applications was missing the SSNs for a number of potential class members and, therefore, servicers were never sent notices to place these borrowers into forbearance or a similar repayment status.

FSA has also identified and corrected related undercounting problems which affected each of the other categories of impacted borrowers.  Specifically, the instructions sent to loan servicers in August 2019 asking them to identify which potential class members received erroneous billing notices incorrectly undercounted borrowers with a payment while out of forbearance if those same borrowers were not originally flagged by the servicers as having received a payment due notice.  As a result, the count of borrowers who made voluntary and involuntary payments was incorrectly limited to borrowers who were in the first impacted

7

category (*i.e.*, received an erroneous payment due notice), and the undercounting in that first category compounded the scale of undercounting of borrowers who made a payment. The updated figures are listed below in response to questions four, five, and six, and as also indicated there, the Department has already remedied the vast majority of harms incurred by these newly identified impacted borrowers.

FSA emphasizes that its undercounting of impacted class members was due to isolated issues, based largely on a miscommunication with servicers and the limited issues related to consolidated loans and missing SSNs that are discussed above and have now been corrected. FSA will continue the ongoing process of monitoring and verifying borrower defense applications to ensure compliance with the Court's injunction, but it now believes that it has an accurate account of existing borrower defense applicants that are appropriately included in the potential class, as well as the manner in which relevant individuals have been impacted by the Department's noncompliance.

FSA will remediate the remaining identified impacts to class members as quickly as possible, while continuing the ongoing process of reverifying and revalidating all information regarding the class in order to correctly identify all class members and all compliance failures.

**2.    The repayment status of each potential and confirmed class member**

The first section of the spreadsheet attachment provides the repayment status of each potential class member. For each potential class member not in forbearance or stopped collection status, the spreadsheet indicates the reason why, such as being in an alternative status that is similar to forbearance (e.g., a $0/month income-driven repayment plan or in-school deferment status). The abbreviations and shorthand terms used on this portion of the spreadsheet are defined in the third section of that spreadsheet.

3.  **Whether each potential and confirmed class member was erroneously taken out of forbearance or stopped collections status and whether the correct status has been restored**

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment (starting on page 1725) indicates whether the borrower was in an erroneous payment status and whether the status has been corrected.

As discussed above, FSA has restored the correct repayment status of 100 percent of the borrowers in the potential class identified since the November Report as previously having been in an incorrect status. As section two of the spreadsheet shows, an updated total of 45,801 borrowers were erroneously taken out of forbearance or stopped collections status, which includes approximately 29,000 borrowers identified since the November Report, and the original 16,034 identified in the November Report that still remain in the class. FSA has now placed all 45,801 borrowers in the correct status.

4.  **Whether each potential and confirmed class member made a payment or multiple payments due to Defendants' negligence, and whether refunds have been issued**

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment (starting on page 1725) indicates whether the borrower made one or more payments and refunds have been issued.

As of today, Treasury has sent a refund (via check or electronic funds transfer) to the vast majority of identified potential class members who made an erroneous voluntary payment on their loans. As indicated in section two of the spreadsheet attachment, an updated total of 14,804 borrowers made one or more voluntary payments, which includes approximately 11,500 borrowers identified since the November Report, and the original 3,111[3] borrowers identified in

---

[3] As discussed in the November Report, although FSA had originally identified 3,289 borrowers as having made a voluntary payment, after further review, FSA learned that 178 of those borrowers did not actually make a payment. ECF No. 136-1 at 6.

9

the November report that still remain in the class. Treasury has sent refunds to 13,515 of these borrowers.

As discussed in the November Report, the Department did not request that Treasury process refunds to the 270 of the potential class members identified at that time as having made voluntary payments, because these borrowers likely made payments for reasons unrelated to the incorrect payment due notices they were sent, and so refunding these borrowers would lead to unintended consequences and potential financial harm. (*See* Nov. Report at 6-7.) For the same reasons, FSA has not processed refunds for approximately 943 of the borrowers newly identified as having made an erroneous voluntary payment. Lastly, FSA is still processing refunds for 76 borrowers. For some of them, FSA does not have a valid address to send the refund check to, and others were transferred servicers over the last year; as a result, their refunds are taking longer to process.

5. **Whether each potential and confirmed class member was erroneously subjected to wage garnishment or tax offset due to the Defendants' negligence, and whether refunds have been issued**

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment (starting on page 1725) indicates whether the borrower was erroneously subject to wage garnishment or tax offset and refunds have been issued.

As of today, Treasury has sent a refund (via check or electronic funds transfer) to the vast majority of the newly identified potential class members who made an erroneous involuntary payment on their loans. As indicated in section two of the spreadsheet attachment, an updated total of 2,369 borrowers made one or more involuntary payments, which includes approximately 550 borrowers identified since the November Report, and the original 1,808 identified in the

November report that still remain in the class. Treasury has sent refunds to 2,276 of these borrowers. FSA has not processed refunds for 75 such borrowers because refunding the payment may cause the borrower additional unintended harm. Lastly, FSA is still processing refunds for 18 borrowers who do not have a valid address to send the refund checks.

**6.    Whether each potential and confirmed class member was subject to adverse credit reporting due to Defendants' negligence, and whether each false credit report has been corrected**

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment (starting on page 1725) indicates whether the borrower was subject to adverse credit reporting and each false credit report has been corrected.

As discussed above, FSA has corrected the credit reports of 100 percent of the borrowers in the potential class whom it has identified since the November Report as previously having been in an incorrect status. As section two of the spreadsheet shows, an updated total of 5,981 borrowers were erroneously subject to adverse credit reporting, which includes approximately 5,000 borrowers identified since the November Report, and the original 847 identified in the November Report that still remain in the class. FSA has now corrected the credit reports of all such borrowers.[4]

**7.    Whether each potential and confirmed class member has received the revised notice of Defendants' noncompliance, to be approved by the Court**

As indicated in the first section of the spreadsheet, no members of the potential class have yet received a revised, Court-approved notice of the Department's noncompliance. The Court ordered the Department to "meet and confer with Plaintiffs and submit a proposed notice to the Court." On November 20, 2019, the Court approved Defendants' proposed notice and ordered

---

[4] FSA reverification efforts have not identified any additional class members who were subject to litigation efforts as a result of being placed in an incorrect status, so the number of impacted borrowers in that category remains at two.

11

Defendants to "personalize and send a copy of the notice to each potential class member no later than December 31, 2019." ECF No. 151. Defendants intend to notify potential class members in accordance with the Court's order.

**8.  Whether Defendants have established a hotline and webpage specifically for Corinthian borrowers**

The Department's communications team has revised the StudentAid.gov website to include prominently placed links to information on the *Manriquez* case on the website's home page in its "Announcement" and "Popular Topic" sections.[5] Additionally, highlighted and simplified language has been included on the linked webpage[6] within the website. As previously reported, these improvements were made on October 21, 2019. The communications team will continue to improve the website's content regarding this case and for Corinthian borrowers.

Additionally, the Department's communication team has improved the existing borrower defense telephone hotline at 1-855-279-6207, to include a targeted greeting and a dedicated menu option regarding the *Manriquez* case to connect callers with prepared customer service representatives able to provide information and address general questions regarding this litigation. The hotline improvement has remained operational since October 23, 2019.

**9.  Any other information relevant to the Defendants' compliance with the preliminary injunction**

On November 21, 2019, the Department — including the Secretary and Acting Under Secretary of Education — hosted its first-ever quality assurance and performance meeting with executives from all of the loan servicers. At this full-day session, the Secretary and Acting Under Secretary personally briefed these executives on their expectations for greater

---

[5] https://studentaid.ed.gov/sa/

[6] https://studentaid.ed.gov/sa/about/announcements/corinthian#preliminary-injunction

accountability in loan servicing. In addition to discussing FSA's enhanced quality assurance program and detailed performance measures throughout the day, the FSA Chief Operating Officer led a review about the *Manriquez* case, which specifically addressed process and communications lessons learned and mechanisms for improvement. The Department plans to hold a similar meeting with loan servicers each quarter for the foreseeable future and will continue to hold loan servicers accountable for compliance with the Department's instructions to protect borrowers. Finally, the FSA Chief Operating Officer will require monthly certification from not lower than the Vice President of each loan servicer of all borrower defense validation data and ongoing remediation efforts beginning immediately.

FSA is also vigorously addressing staffing and human resource requirements to implement borrower defense oversight and procedural improvements. Namely, FSA has hired a QAR director with experience from the commercial call center industry to assess cradle-to-grave borrower defense procedures and evaluate all associated call centers for operational effectiveness. Additionally, FSA has hired or is the process of hiring over 60 new attorneys and law clerks, and a smaller number of data scientists. These additional hires will allow FSA to more easily adjudicate and track cases at a level of specificity that is required given portfolio growth and litigation surrounding these cases, and to anticipate and head off other problems that could affect the class before they even materialize.

Since the November Report, the Department has also created a tracking mechanism within the FSA data warehouse to ensure that all identified class members are captured and thoroughly tracked for remediation actions, reporting capability, and verification throughout the Quality Assurance Review ("QAR") process. The staff performing the QAR is reviewing current processes and procedures and will make recommendations for longer-term solutions for

ensuring compliance with the preliminary injunction and any additional borrower defense-related repayment status policies with requisite controls and reporting.

The Department remains not only focused on remediating any harm to any and all borrowers that have been affected, but also making strategic improvements to our operational program management and loan servicing oversight, control, and communication framework. The Department will continue its exhaustive efforts to verify, validate, and report on progress to ensure compliance with the terms of the Court's order and reestablish the trust and confidence of our borrowers.