JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
NATALIE LYONS (SBN 293026)
nlyons@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
TOBY R. MERRILL (*Pro Hac Vice*)
tomerrill@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN CALVILLO MANRIQUEZ, JASON SPENCER, RTHWAN DOBASHI, and JENNIFER CRAIG on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of the United States Department of Education,<br><br>And<br><br>THE UNITED STATES DEPARTMENT OF EDUCATION,<br><br>*Defendants*. | Case Number: C 17-cv-07210-SK<br><br>**PROPOSED MOTION FOR PARTIAL RECONSIDERATION** |

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Plaintiffs respectfully request, pursuant to Civil Local Rule 7-9(b)(2), that the Court partially reconsider its Sanctions Order, ECF No. 130. The emergence of three new material facts warrants a significant increase to the compensatory sanctions fund of $100,000.

*First*, the Court's Sanctions Order was entered on the basis of the record before it at the time, which was grossly inaccurate. The record at the time showed, based on Defendants' representations in the Initial Compliance Report, that they had violated the injunction 16,000 times by seeking to collect the loans of individuals covered by the injunction. *See* ECF No. 124 at 4:2-5. In fact, this representation was off by almost 300 percent, ECF No. 156 (December Compliance Report).  Likewise, the number of people suffering compensable harm in the form of deprivation of money (through "voluntary" payments in response to an unlawful demand for collection, or because Defendants seized their tax refunds and/or wages) or adverse credit reporting was grossly understated. *Compare* Initial Compliance Report (showing 3298 individuals made voluntary payments, 1808 subjected to involuntary collection, and 847 the subject of adverse credit reporting by Defendants) *with* December Compliance Report (restating numbers as 14,611 (involuntary collection), 2358 (involuntary collection), and 5901 (credit reporting).

*Second*, information provided by Defendants to the undersigned counsel on December 13, 2019, shows that Defendants have *never* been in compliance with the injunction. The first instances of involuntary collection occurred in May 2018.  The Department acknowledges collecting on individuals covered by the injunction as recently as December 6, 2019.  At least 20 people were subjected to collection in violation of the injunction *this month*. All this time, Defendants have collected more than $21 million from individuals who were supposed to be

PROPOSED MOTION FOR
PARTIAL RECONSIDERATION

Case No. 17-cv-07210-SK

protected by a lawful Court order.[1] There has never before been a dollar amount attached to their noncompliance. But more disturbingly, the new information shows that the defendants

*Finally*, Plaintiffs are now able to present to the Court information about the nature and extent of the injury that has been caused to members of the class by the Defendants' contumacious conduct, in the form of survey response data, statements, and sworn declarations. This information demonstrates the need for compensation above and beyond the return of money unlawfully taken—the bare minimum that Defendants have yet to deliver to all affected individuals—and substantially in excess of $100,000.

## BACKGROUND

Plaintiffs brought suit on behalf of themselves and all others who attended specified programs at a school operated by Corinthian Colleges, borrowed federal student loans to pay for that attendance, and have since applied to have their loans cancelled pursuant to borrower defense.[2] Whereas such applications were granted in full under the prior administration, beginning on January 20, 2017, the Department abandoned that framework and adopted a methodology that would require Students to repay, on the whole, more than seventy percent of their Corinthian-related loans.

On May 25, 2018, the Court partially granted Plaintiffs' motion for a preliminary injunction of the Department's new Corinthian borrower defense methodology.  ECF No. 60. The Court ordered the Department to "cease all efforts to collect debts from Plaintiffs and any other borrower who successfully completed an attestation form." ECF No. 70. Defendants were directed to halt any action to collect a loan from the Plaintiffs and other students who attended Corinthian programs at specified times, as identified on published lists. ECF No. 70. The Defendants appealed the preliminary injunction ruling, and the Ninth Circuit Court of Appeals has yet to render an opinion on the appeal, which was fully submitted on March 5, 2019.

---

[1] This is the first time Defendants have provided information about the amount of money it has unlawfully seized. For reasons explained in the Merrill Declaration, ¶¶ 5(e), this figure is an underestimation. Defendants reported refunding over $21 million, but acknowledge that some refunds have yet to occur, and will, in some instances, never occur.

[2] The Court entered a class certification order on October 15, 2018. ECF No. 96.

On July 15, 2019, Plaintiffs notified the Court that Defendants were in substantial noncompliance with the preliminary injunction. ECF No. 103. The Court ordered Defendants to file a report regarding the status of their compliance with the preliminary injunction, which they filed on September 18, 2019. ECF No. 111 (Initial Compliance Report). The Initial Compliance Report revealed that the Department had erroneously sent 16,034 demands for payment to Students. ECF No. 111 at 17. As a result, 3,298 Students made one or more payments. *Id.* The Department provided adverse reports to credit reporting agencies regarding 847 Students, and had subjected 1,808 Students to involuntary collection in the form of wage garnishment or tax refund offset. *Id.* At the time of the Initial Compliance Report, the Department had not fully identified the borrowers affected by the incorrect notices, had not sent them a notice describing the error, and had not yet issued refunds. *Id.*

On October 24, 2019, after considering briefing and arguments from both parties, the Court entered an Order finding Defendants in civil contempt and requiring them to pay compensatory sanctions in the amount of $100,000. ECF No. 130. The Order details the limited steps Defendants took to ensure the injunction against collection was obeyed, and the absence of "the normal actions one would expect from an entity facing a binding court order," ECF No. 130 at 4.[3] After reviewing the guiding legal principles concerning civil contempt, the Court found:

> [T]here is no question that Defendants' violations harmed individual borrowers who were forced to repay loans either through voluntary actions or involuntary methods (offset from tax refunds and wage garnishment) and who suffered from the adverse credit reporting. Defendants have not provided evidence that they were unable to comply with the preliminary injunction, and the evidence shows only minimal efforts to comply with the preliminary injunction.

ECF 130 at 6. Finally, the Court did "not foreclose the possibility that, if Defendants fail to comply with the preliminary injunction in a timely manner, the Court will impose additional sanctions[.]" ECF No. 130 at 8.

---

[3] During a hearing on the issue, the Court characterized the Defendants' conduct as "at best…gross negligence…almost gross negligence of the magnitude of 'we don't care about the order, we're going to do the minimal amount of effort we need, take the minimal amount of steps we need to take in order to comply with the order.'" ECF No. 124 at 6:15-21. "At worst," Defendants' conduct was "intentional flouting of [the Court's] order." *Id.* at 15:15-16.

On November 1, 2019, Defendants filed a monthly compliance report (November Compliance Report), ECF No. 136.  Concurrent with this filing, Defendants moved for leave to file a motion for partial reconsideration of the Court's Sanction Order. ECF No. 133.  Defendants asserted that because they "ha[ve] already remedied the harm suffered by class members," the Court should reconsider its imposition of a compensatory sanction. ECF No. 133 at 7.  The claim of total remediation was based on "the most accurate, up-to-date information as possible," ECF No. 133 at 7 (citing Declaration of General Mark A. Brown, Chief Operating Officer of Federal Student Aid at ¶¶ 13-14).

Just four days later, on November 5, 2019, Defendants withdrew their motion for partial reconsideration. ECF No. 140. The Department acknowledged that the November Compliance Report identified 14,000 additional potential class members, ECF No. 136 at 4, and that the Defendants "cannot fairly represent that they are in 'full compliance' with the Court's preliminary injunction and have remediated the harm to all affected borrowers." ECF No. 140 at 2 (quoting ECF No. 133 at 2).

Defendants next filed a compliance report on December 3, 2019. ECF No. 156 (December Compliance Report).[4] It showed that the Department demanded payment from 45,034 Students, as opposed to the 16,034 it initially reported to the Court (in the Initial Compliance Report)—the basis for the Court's Sanction Order. The Department collected voluntary payments from 14,804 Students, as opposed to 3298; the Department subjected 2369 Students to involuntary collection, as opposed to 1808; and the Department made adverse credit reports against 5981, as opposed to 847, Students.  The Department had yet to return all money taken in violation of the injunction.

On December 13, 2019, the counsel for Defendants provided to undersigned counsel additional information about the collections against Students since the injunction was issued. *See*

---

[4] Defendants filed a Notice of Errata with respect to the December Compliance Report on December 20, 2019. ECF No. 161.

| PROPOSED MOTION FOR | Case No. 17-cv-07210-SK |
| PARTIAL RECONSIDERATION | |

Declaration of Toby Merrill ("Merrill Declaration").[5] The information demonstrated, among other things, that the Department has refunded over $21 million to Students in connection with its violation of the injunction. Merrill Decl. ¶ 9. The single largest refund to an individual who made voluntary payments is $53,801. *Id.* The single largest refund to an individual who experienced involuntary collection is $25,881.25. *Id.* The unlawful collection began in May 2018, and continued until at least December 6, 2019. *Id.* The Department subjected at least 22 individuals to involuntary collection in violation of the injunction in December 2019. *Id.*

On December 20, 2019, the parties submitted a joint plan for the administration of the sanctions fund. ECF No. 163. Both parties reserved their rights to contest or challenge the Sanctions Order. *Id.* at 2. The plan calls for ten percent of the available sanctions fund to be distributed, on a pro-rata basis, to individuals who had negative credit reporting because the injunction was violated. *Id.* at 5. The remaining ninety percent of the available sanctions fund are to be distributed to individuals who experienced involuntary and voluntary collection, with instances of involuntary collection weighted relative to voluntary collection by a factor of three. *Id.* Assuming zero administrative costs, a sanctions fund of $100,000, and based on the numbers most recently reported by Defendants, this plan would award compensation of $1.69 to every individual who experienced negative credit reporting; $12.45 to every individual who experienced involuntary collection; and $4.15 to every individual who made voluntary payments. *Id.* at 6. In order to keep administrative costs at zero, the plan calls for compensation to be applied as a credit against the loan balances of each harmed class member. *Id.*

## ARGUMENT

Under Civil Local Rule 7-9(a), the Court is authorized to reconsider any interlocutory order prior to entry of final judgment. *See also* Fed. R. Civ. P. 54(b) ("any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and

---

[5] This information was provided pursuant to an agreement between counsel, as indicated in the Plaintiffs' Unopposed Motion for Second Extension of Time to File a Sanctions Plan, ECF No. 153.

PROPOSED MOTION FOR
PARTIAL RECONSIDERATION

Case No. 17-cv-07210-SK

liabilities of fewer than all the parties…may be revisited at any time before the entry of a judgment adjudicating all the claims"). The Court should do so here.

Plaintiffs have been "reasonably diligent" in bringing this motion, Civ. L.R. 7-9(b), which is based on the "emergence of new material facts…occurring after the time of such order," Civ. L.R. 7-9(b)(2).[6] Specifically, Plaintiffs point to three new material facts, all of which emerged in December, some as recently as the past week.

*First*, the December Compliance Report, filed on December 2, 2019, reveals a significant increase in the number of Students who have been impacted by the Defendants' noncompliance with the Court's injunction.[7] The Court's Sanction Order was founded on the Defendants' representations, which showed that they had "violat[ed] [the Court's] order 16,000 times." ECF. No. 124 at 4:2-3. In fact, Defendants demanded payment in violation of the injunction from over 45,000 individuals. The new figures show substantial upward adjustments to the three categories of collection, beyond mere dunning, as well. The instances of voluntary collection increased in estimation by nearly 450 percent (to 14,611); instances of involuntary collection were one and a half times greater (2358 individuals) than initially reported; and the Department corrected its statement of adverse credit reporting upwards by nearly 700 percent (to 5901 individuals). A commensurate upward increase in the amount of money available to compensate affected individuals is therefore warranted.

*Second*, the Plaintiffs learned of information from counsel for Defendants on December 13, 2019 that reveals more about the scope of the Defendants' noncompliance—and thus the

---

[6] In accordance with Civil L.R. 7-9(c), Plaintiffs do not include legal argument concerning the basis for and appropriate scope of civil contempt, which was fully briefed in advance of the Sanctions Order, except to the extent it relates to newly emerged facts.

[7] The Defendants refer to "potential class members" throughout their Compliance Reports, *see, e.g.*, December Compliance Report, ECF 156-2 at 6-7 (discussing efforts to verify membership in class of individuals subjected to collection). If this is an attempt to downplay the scope of their noncompliance, it is unsuccessful. It accentuates the Department's "collect first, ask questions later" approach to compliance. Every individual identified by the Department as a "potential class member" attended Corinthian and filed a borrower defense application. They all should be afforded the benefit of the injunction if, at the time of collection, the Department was unable to say with conviction that they are *not* members of the class.

need for both compensatory *and* coercive sanctions—including the fact that Defendants continued to violate the injunction *this very month*. This speaks to the ongoing and urgent need for a contempt sanction to coerce Defendants to meet their obligation with more urgency and diligence. *See United States v. United Mine Workers*, 330 U.S. 258, 303–04, (1947) (sanctions for civil contempt appropriately directed to coerce obedience to a court order or to compensate for injuries resulting from contemptuous behavior, or both).

Indeed, the Court contemplated that a revision of sanctions would be warranted in the face of continued noncompliance by Defendants, ECF No. 130 at 8, further emphasizing the coercive purpose of the sanctions. And in spite of the shocking information that the scope of Defendant's noncompliance was grossly understated, and that they *continue* to violate the injunction, Defendants do not exhibit contrition. Rather, they downplay and shift blame for the seriousness of their mistakes.[8] *See* December Compliance Report (attributing significant increase in number of affected individuals to "isolated issues, based largely on a miscommunication with servicers and [other] limited issues"). Secretary DeVos has publicly characterized this Court's Sanctions Order—rather than the Department's own behavior—as "not appropriate."[9] She had also previously characterized the noncompliance as "an error on a small # of loans."[10] Defendants' ongoing noncompliance is unfortunate, disturbing, and harmful. It warrants a reconsideration of the appropriate sanction.

***Third***, as a result of outreach activities to members of the class, Plaintiffs are in a position to provide the Court additional information about the nature and severity of the harm that needs compensating, in the form of survey responses, *see* Withem Decl. Exs. C, D, statements, *see*

---

[8] In this context, it is truly confounding that in their Answer, ECF No. 152 (Ans.), filed November 26, 2019, Defendants claim to "lack knowledge or information sufficient to form a belief" as to the allegation that the Department has taken action to collect loans from members of the class, including by seizing their tax refunds and wages, *see* Ans. ¶ 197; *see also* Fed. R. Civ. Proc. 8 (such statement has same effect of a denial).
[9] Video of Test. of Sec'y DeVos before House Comm. on Educ. And Labor, 1:25:45 (Dec. 12, 2019) https://www.c-span.org/video/?467233-1/house-hearing-student-loan-debt-forgiveness.
[10] *See* Secretary Elizabeth DeVos (@BetsyDeVosED), Twitter (Oct. 10, 2019).

Withem Decl. ¶ 8, and sworn declarations, *see* Declaration of Julia Decker (Decker Decl.); Declaration of Naquasha Johnson (Johnson Decl.); Declaration of Melissa Young (Young Decl.).

At the outset, Plaintiffs dispute Defendants' position, articulated in their motion for partial reconsideration of the Contempt Order, ECF No. 133, that the Court's initial fine of $100,000 was unfounded or an abuse of discretion.[11] At the time of the Sanctions Order, only the Defendants had access to the information about the identity and contact information of individuals affected by their contemptuous behavior. *See* ECF No. 118 (Oct. 8, 2019) (ordering Defendants to provide undersigned counsel with contact and other information for impacted individuals by November 1, 2019). Under these circumstances, the absence of record information about the nature and extent of compensable injury should "not be charged against either the [opposing party] or result in a holding that the district court abused its discretion in imposing the sanction." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) (quoting *In re Grand Jury Witness*, 835 F.2d 437, 443 (2d Cir. 1987)).

In any event, Plaintiffs now present the Court with evidence demonstrating that the injury actually incurred as a result of Defendants' noncompliance far exceeds $100,000.

Melissa Young is 38, and lives in Allegan, Michigan with her three children. Young Decl. ¶¶ 2,3. She enrolled Everest College in Kalamazoo, because a recruiter promised her that she would be able to earn substantially more as a Medical Administrative Assistant than what she had been making; Ms. Young believed Everest would be "a path towards a better life for myself and my children." ¶5. She found at Everest that there were several weeks in which her class did not have an instructor, and students had to teach themselves. ¶7. Upon graduation, she was unable to find any work in the field that paid more than minimum wage, and that she needed

---

[11] Defendants stated intention is to renew their motion if and when they achieve full compliance with the Court's order. ECF No. 140. That time has not yet arrived. Moreover, as Plaintiffs seek to demonstrate in their proposed motion, the suggestion that simply returning all money unlawfully taken will itself "remediat[e] the harm to affected borrowers," ECF No. 133 at 2, is wrong. *See also* December Compliance Report, ECF No. 156-2 at 4 (stating that by returning money, "the Department has already remedied the harm incurred by the vast majority of newly identified impacted borrowers"). Returning money is an element of compliance with the preliminary injunction. But it does not fully compensate individuals who, "there is no question," suffered actual damages as a result of the unlawful taking. Sanctions Order, ECF No. 130 at 6.

PROPOSED MOTION FOR                                         Case No. 17-cv-07210-SK
PARTIAL RECONSIDERATION

prior experience. *Id.* She submitted a borrower defense application in early 2016, and was under the belief that her class was eligible for debt discharge, and that all collection activities would cease after she submitted her application. ¶ 8,9.

Ms. Young learned in early 2019 that she would be receiving a tax refund of $5,122. She planned to use this refund to leave her abusive spouse, on whom she was largely financially dependent. ¶10. The Department seized the entirety of her refund around February 2019. ¶ 11. Between then and October 2019, *id.* when the Department returned $5,122, Ms. Young suffered negative financial consequences. She had to borrow $600 from Instant Cash, plus interest, and over $3000 from family and friends. ¶12. She was charged late fees on several bills including telephone and cable. *Id.* She fell behind on a land contract, putting her home at risk. *Id.* She took a second job despite having a disabling injury from a car accident. ¶ 13. She had spinal surgery in July 2019 to address the worsening pain. *Id.* She was unable to buy her children basic school supplies or clothing. ¶ 14. In her words:

> *Everest and the Department of Education have added so much stress on my life. As a single mother working full time when I enrolled at Everest, I promised my young children that being absent from their lives would be worth it when I graduated and was able to provide more for us. My children now view college as a waste of time because they have seen how my degree did not lead to a better job and all the cruelty perpetuated by the Department of Education when I am unable to repay my loan.*

¶ 15.

Julie Decker is 38 years old and lives in Princeton, Indiana. Decker Decl. ¶¶ 3,4. She studied online through Everest Institute in Tampa. ¶5. She had been a bartender her whole life, and Everest "seemed like the best way to get new opportunities and a better job." *Id.* She was not able to finish her diploma in business. She learned about borrower defense from a letter, sent by the Pennsylvania attorney general, telling her that there had been findings of fraud at Everest. ¶8. She applied for a borrower defense multiple times, believing that her loan would definitely be cancelled. ¶¶ 7-9.

In February 2019, the Department seized her tax refund of $400. ¶ 10. That refund was the difference between being able to pay rent and not—she was evicted and became homeless, and has been ever since. ¶ 11. She is having trouble getting out of the hole that the

eviction caused. The cost of eviction and moving her belongings was about $750. *Id.* She had to borrow money from family and friends, and rely on a credit card to make ends meet. ¶ 12. She gets some help from the state and from food banks, but still is behind. *Id.* Her car is getting repossessed, and her credit is terrible, making it difficult to get a job or find a new apartment so that she can start over. *Id.*

Naquasha Johnson is 26 years old, and lives in Maywood, Illinois with her sister and her sister's family. Johnson Decl. ¶¶ 4,5. She enrolled in Everest at Melrose Park, Illinois, after being told by recruiters that its Medical Administrative Assistant program was a fast option for getting a job above minimum wage—which she was earning at the time—in the medical field. ¶ 5. She thought she was learning skills that would qualify her for a good job, but she found out from potential employers after she completed that her diploma only qualified her for minimum wage work. ¶ 7.

Ms. Johnson was unable to keep up with her loan payments, and her loans fell into default. ¶ 8. Her wages from her job at Coldwell Banker, where she made $16 per hour, were garnished. *Id.* She applied for a borrower defense around August 2018, after learning about it. ¶¶ 9, 10. She was told after calling a phone number on the application that her wages would no longer be garnished. ¶ 10. Believing she would be able to keep her entire paycheck, she rented her own apartment. ¶ 11. But the garnishment never stopped. ¶ 12. She had over $1800 taken from her wages, and was forced to choose between paying for rent or making her car payment. ¶ 13. Because she needed her car to get to work, she chose that payment, and was evicted from her apartment. *Id.* She was also unable to pay several other bills, including electricity, cable, and car insurance, incurring late fees. ¶ 13. She borrowed $5000 from Cash N' Go online. *Id.* Her credit report still shows that she is delinquent on her student loans. ¶ 14. She was recently given a job offer, only to have it rescinded after a credit check showed her defaulted student loans. *Id.* In Ms. Johnson's words:

> *The situation left me stressed, depressed, and feeling like my time was wasted. I went to Everest for an education and a better paying job and all I received in return was garnished paychecks, no job, and debt.*

¶ 15.

These are just three examples of the actual harm suffered by Students as a result of the Defendant's contemptuous conduct. Using information provided by Defendants, the undersigned counsel has endeavored to collect information about the types of compensable injury sustained by Students. *See generally* Withem Decl.[12]

The vast majority of Students (86.54% who made voluntary payments, Withem Decl. Ex. C at 3, and 99.12% of those who experienced involuntary collection, Withem Decl. Ex. D at 3) had a specific plan for the money that was unlawfully taken.[13]  Many needed the money to pay bills, *see, e.g.* Ex. C at 4, buy food, *see* Ex. C at 5, and make rent payments, Ex. C at 6. Multiple Students reported that they intended to make car repairs. *See, e.g.,* Ex. C at 9.  As one explained,

> *I am a single mother of 3 children under 7 years old. The car I have is a 2003 Ford Expedition that has been failing throughout the years. I have had to do several mechanical procedures to it and it still shows a check engine light so with my tax refund this year I was going to just purchase another vehicle for my children and I to commute without a scare that it will break down on us. Ex. D at 4.*

Others were planning to put money toward further education, since the education they already paid for is worthless. *See, e.g.,* Ex. C at 6. In the words of one WyoTech student:

---

[12] This information is drawn from survey responses from 471 individuals identified by the Department as having made voluntary payments after receiving dunning notices in violation of the injunction, *see* Withem Decl. ¶ 6; Ex. C, and from 245 individuals who experienced involuntary collection, Withem Decl. ¶ 7; Ex. D.  These survey responses were submitted between November 4, 2019 and December 20, 2019. Withem Decl. ¶ 5, 6, 7.

[13] Those who made "voluntary" payments as a result of illegal demands for payment did not truly make volitional payments. For example, violation of the injunction triggered automatic payments from bank accounts in some cases, *see* Ex. C at 70 ("Because the student loans are automatically withdrawn, [I]  had to decide which other bills to pay late. Usually NIPSCO or phone bill"). Students are aware that missing a student loan payment has severe consequences for their credit. One Student reported that their parents refinanced their loan in order to make payments, so as to "preserve their credit," Ex. C at 97; *see also* Ex. C at 32 ("I needed that extra 100 something dollars during that rough patch in my life, but I chose to pay something I thought I HAD to, just to keep my credit up.").

> *I was planning to further my education again to try to get a better job. After using all of my GI bill on a useless training certificate at WyoTech, I was unable to find a decent job anywhere in the field I chose. This was because of the terrible training at WyoTech didn't even come close to preparing me for the career they said I would be prepared for. So with no trade I have had to take whatever job I can get. I could have used my tax return to try again to brighten my future. Instead, I am still being punished for the mistake of being tricked into attending WyoTech.*

Ex D. at 7.

Multiple Students reported that they were relying on their tax refund to take them out of homelessness:

- "I was dealing with homelessness at the time and I couldn't afford the payments. I needed that money to try to get my life together." Ex. C. at 16;
- "I needed to get myself back on my feet since I was homeless and I wanted a place to live for me and my kids and due to that I couldn't provide for my son and he had to go live with gramma while I was homeless." Ex. D at 4;
- "My family and I were homeless and living in a hotel. Working at door dash to bring in daily wages so I could afford the hotel stay which enabled us to save any money to move out of the hotel. So we had to wait for the tax check. We were packed and ready to leave the hotel and move into a house we found to rent with a deposit and first month's rent we promised to have, which we didn't. The day of the deposit it was not there. I was never notified about the hold. It took me another several weeks before I could get any answers…. I tried to fight the student loans [from Everest]. And they told me my account would be put into current while they investigated my application. Which obviously wasn't true." Ex. D at 10;
- "My plan was to move into an apartment, get some auto repairs on my car and put some away into a savings account. I am a single mother of a now 2 year old. I moved in with my parents after the birth of my son for help and support but after he turned 1 the agreement was for me to get back out on my own. I found an apartment and filed my taxes around the same time so I estimated my taxes would be back in time for me to put a deposit down and shop for house necessities. So you could imagine my surprise when I went to check the status of my refund and I was informed it was completely taken." Ex. D at 13.
- "I always plan to spend my taxes on rent and pay it ahead so I can afford my other bills. But because of this I was not able to, I faced eviction because what would have been my safety net quickly turned into something I could not handle and result[ed] in losing the house and making my wife and kids undergo stress that they should not have dealt with." Ex. D at 82.

Others had very specific intentions for the money. One respondent who made voluntary payments planned "to help my parents out with their finances while my father took time off from

work to help my mother out with her dialysis treatments. Ex. C at 7. Another wanted to buy an urn for her son's ashes. Ex. D. at 14. One person intended to pay for their father's chemotherapy with money that was unlawfully taken. Ex. D at 8. Another, whose husband had just received orders to move to Camp Pendleton in California from Newport News, Virginia, was planning to buy furniture for the move and acquire necessities for the baby she had just learned they were expecting. Ex. D at 4. In the words of one Student whose tax refund was unlawfully taken:

> *I am a single mother of two school-age children. Like I do every year, I was planning to use my tax refund to supplement my income and pay off some debts for myself and my children. As I make $10.34 an hour the large sum is always needed and provides some relief for us. Also, my mother had planned for her knee surgery for May 2019 because I was going to take off several weeks from work to help her during her recovery. I had planned to use most of my refund to set off my lost wages during the weeks she would need me.*

Ex. D at 4.

The unexpected loss of their money caused Students financial injury beyond the sums that were taken.  More than half (55.74%) of those who made voluntary payments in response to illegal collection demands, Ex. C at 35, and more than three out of four (77.68%) of those who were subjected to involuntary collection, Ex. D at 27, had to borrow money to replace the missing funds.  They missed payments (54.06 % of those who made voluntary payments, Ex. C at 68, and 81.78% of those whose tax refunds or wages were seized, Ex. D at 57), causing them to incur late fees, see Ex. C at 86, Ex. D at 66, and cancellation of services, see Ex. C at 78, Ex. D at 73. The kinds of fees incurred because of unexpected shortage of funds include balance transfer fees, Ex. C at 87, bank overdraft fees, Ex. C at 88, vehicle towing fees, Ex. C at 97, and court fines related to eviction proceedings, Ex. D at 84.  Others put living expenses on credit cards with high interest rates. *See, e.g.,* Ex. C at 27 ("I have had to use credit cards more often than I would like to cover the times that I needed to pay the student loan payments instead. I have accrued a lot of unnecessary credit card debt and interest due to this."). A significant number of Students (22% of those making voluntary payments, Ex. C at 95, and 57.07% of those who made involuntary payments, Ex. D at 80), missed a rent or mortgage payment.

Although some Students have received refunds, they are still left further in the hole, especially given that their money was not returned with interest. For example, one person reported that they had a child who spent five weeks in the NICU:

> *On my salary as a single mother I simply struggled from paycheck to paycheck while being harassed for student loan repayment. As I waited for the assistance of my income tax refund and that was taken from me for months now I am in medical debt unable to pay bills on time. [ ] Almost a year later one can only imagine what those bills have now turned into. The little bit of money I received back although I'm thankful only provides me and my son a chance to slowly be able to pay off what I can while still trying to save every dollar I can worrying about will I have to go through the same things next year when my income tax money is taken again.*

Ex. D at 10, 21.

Another Student is also struggling to make up lost ground:

> *I planned to pay my car off, move out on my own with my child, and pay off loans I had. Just being a single mother I live on that refund to come in so my child has some extra time and we can go places. My son has asthma and sometimes needs hospital visits. When he gets really sick I couldn't even take him to the hospital. I couldn't take him anywhere or do anything for his birthdays because I didn't have the money! It made my life a living hell. Once I got my refund back, I had to pay everyone back that I borrowed from with interest instead of just being able to pay it off and do the things I wanted to do if I would have had it! Being a single mother is hard and when they took that money it made my life so much more hard than it should have been!*

Withem Decl. ¶ 8(a) (statement of Heather Bracale, Puyallup, WA).

Of course, even with a sanction sufficient to make Students "whole," they will never be compensated for the unnecessary stress and struggle caused by the Department's conduct. And, many suffered exactly the kind of irreparable harm that the preliminary injunction was intended to prevent.  The Student who intended to use her tax refund to visit her father, who had surgery for lung cancer, cannot visit him because he has since died. *See* Ex. D at 7, 19.  The person who needed to have dental work had to make the decision to have those teeth pulled instead of repaired. Ex. D. at 5, 21.  Others can't keep their homes because they have been evicted or foreclosed upon, Ex. D at 18, and can't make auto repairs because their cars have been

repossessed, Ex. D at 16, 21.  Those who experienced wage garnishment cannot change that their standing in their employer's eyes has diminished, *see* Ex. D at 87 ("I had to sign off with HR who now had an insight on my personal debt information, which seems as if I am irresponsible since they don't know the entire story"), 88 ("Boss found out about this…and it got him wondering if he could still count on me to perform my duties"), or that they have been denied jobs because of their debt, Ex. C at 89.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for partial reconsideration of the Sanctions Order.

Dated: December 23, 2019            Respectfully submitted,

/s *Eileen M. Connor*

Joseph Jaramillo
Natalie Lyons
HOUSING & ECONOMIC RIGHTS ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94604
Tel.: (510) 271-8443
Fax: (510) 280-2448

Eileen M. Connor
Toby R. Merrill
LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

*Attorneys for Plaintiffs*