JOSEPH H. HUNT
Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

MARCIA BERMAN
Assistant Branch Director

R. CHARLIE MERRITT (VA Bar No. 89400)
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
919 East Main Street, Suite 1900
Richmond, VA 23219
(202) 616-8098
robert.c.merritt@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARTIN CALVILLO MANRIQUEZ, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION and BETSY DEVOS, in her official capacity as Secretary of Education, <br><br> Defendants. | No. 3:17-cv-7210-SK <br><br> **OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

I.      The Preliminary Injunction ........................................................................................ 2

II.     The Sanctions Order .................................................................................................. 4

III.    Compliance Since The Sanctions Order .................................................................... 4

IV.    Plaintiffs' Motion....................................................................................................... 7

LEGAL STANDARD.............................................................................................................. 7

ARGUMENT ........................................................................................................................... 8

I.      The Department Is Substantially Complying With The Preliminary Injunction
And Its Conduct Provides No Basis On Which To Increase Sanctions..................... 8

II.     The $100,000 Monetary Sanction Should Not Be Increased................................... 10

CONCLUSION...................................................................................................................... 13

# TABLE OF AUTHORITIES

**CASES**

*Balla v. Idaho State Bd. Of Corrs.*,
  869 F.2d 461 (9th Cir. 1989) ............................................................................................... 9

*Barry v. Bowen*,
  884 F.2d 442 (9th Cir. 1993) ......................................................................................... 12, 13

*Cachil Dehe Band of Wintun Indians v. California*,
  649 F. Supp. 2d 1063 (E.D. Cal. 2009) ................................................................................ 8

*Coleman v. Espy*,
  986 F.2d 1184 (8th Cir. 1993) ............................................................................................ 13

*Credit Suisse First Boston Corp. v. Grunwald*,
  400 F.3d 1119 (9th Cir. 2005) .............................................................................................. 7

*Fox v. Vice*,
563 U.S. 826 (2011) ................................................................................................................ 12

*Goodyear Tire & Rubber Co. v. Haeger*,
  137 S. Ct. 1178 (2017) .................................................................................................. 10, 12

*In re Attorney General of U.S.*,
  596 F.2d 58 (2d Cir. 1979) ................................................................................................. 12

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*,
  10 F.3d 693 (9th Cir. 1993) .................................................................................................. 9

*Kona Ents., Inc. v. Estate of Bishop*,
  229 F.3d 877 (9th Cir. 2000) ................................................................................................ 8

*McBride v. Coleman*,
  955 F.2d 571 (8th Cir. 1992) .............................................................................................. 13

*Motorola, Inc. v. J.B. Rodges Mechanical Contractors*,
  215 F.R.D. 581 (D. Ariz. 2003) ........................................................................................... 8

*Navajo Nation v. Confederated Tribes & Bands of the Yakima Indian Nation*,
  331 F.3d 1041 (9th Cir. 2003) .............................................................................................. 7

*Pac. Coast Federation of Fishermen's Ass'n v. Locke*,
  No. C 10-04790 CRB, 2011 WL 289927 (N.D. Cal. Jan. 27, 2011) .................................... 8

*Tranxition, Inc. v. Novell, Inc.*,
  No. 3:12-cv-01404-HZ, 2015 WL 13675387 (D. Or. Mar. 30, 2015) ........................................ 8

*United States v. Bright*,
  No. CIV. 07-00311 ACK-KSC, 2009 WL 2366083 (D. Haw. June 4, 2009) ............................ 9

*United States v. Rylander*,
  460 U.S. 752 (1983) ................................................................................................................. 9

*Whittaker v. Execuair Corp.*,
  953 F.2d 510 (9th Cir. 1992) .................................................................................................... 9

**RULES**

Fed. R. Civ. P. 54 ............................................................................................................................ 7

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Plaintiffs have identified no basis on which the Court should take the extraordinary measure of reconsidering its prior order to impose additional sanctions on Defendants for failure to comply with the Court's preliminary injunction. Since the Court entered its sanctions order, Defendants have filed multiple reports which demonstrate the significant efforts by the U.S. Department of Education ("Department") to comply with the injunction, including identifying errors in compliance, proactively undoing each of these errors (by ensuring that every covered borrower is in the correct repayment status) and remedying the direct harm caused by the errors (*i.e.*, issuing refunds and correcting credit reports), and implementing measures to ensure that further compliance errors do not occur going forward. These compliance reports demonstrate that the Department has brought itself into substantial compliance with the Court's preliminary injunction, not, as Plaintiffs contend, that the Department's recent conduct warrants additional sanctions. Indeed, as the Department explained in its most recent report, the purported "violations" of the injunction that Plaintiffs allege took place in December 2019 were the result of a small number of employers continuing to garnish the wages of potential class members over the Department's express instructions to cease collection activities. In any event, the Department has already initiated refunds to affected borrowers and reiterated its instructions to employers not to enforce suspended wage garnishment orders against covered borrowers.

Nor should the "new material facts" Plaintiffs' reference lead to a reconsideration of the Court's $100,000 monetary sanction. The Department has already remedied the primary harm associated with its noncompliance for all individuals that the Department has identified as being impacted (including those identified after the Court entered its sanctions order) by refunding, where appropriate, the payments that such individuals made and correcting any adverse credit reports. The Court imposed $100,000 in monetary sanctions as an apparent attempt to provide "rough justice" for a limited set of harms the Court found attributable to the Department's noncompliance, to include easily quantifiable costs such as administrative expenses. But Plaintiffs now seek sweeping compensation that is different in kind from what the Court has authorized—

essentially, consequential damages for every conceivable harm potentially related to the collection efforts of the Department and its servicers. This theory of damages is unbounded, seeking compensation for inherently speculative costs and offering no principle for limiting the damages claimed to losses actually caused by the Department. And it is unprecedented: Plaintiffs offer no authority in support of the proposition that awarding such broad consequential damages against the public fisc is appropriate. Indeed, subjecting the government to massive and unbounded liability raises serious separation of powers and sovereign immunity concerns, and the Court should reject Plaintiffs' attempt to do so in the guise of this reconsideration motion.

In short, the Department is in substantial compliance with the Court's preliminary injunction and has made significant progress implementing appropriate measures to ensure such compliance moving forward. Where it has identified improper efforts to collect debts subject to the preliminary injunction, it has taken sweeping remedial action. Plaintiffs, on the other hand, have identified no legitimate basis for the Court to alter the $100,000 fine it imposed or to engage in an unbounded quest to provide each impacted borrower with consequential damages that go well beyond any harms that are directly traceable to the Department's failure to comply substantially with the Court's preliminary injunction. The Court should deny Plaintiffs' motion.

## BACKGROUND

### I. The Preliminary Injunction

On May 25, 2018, the Court granted in part Plaintiffs' motion for a preliminary injunction, finding that Plaintiffs were likely to succeed on their claim that aspects of the methodology the Department developed in December 2017 to evaluate certain types of borrower defense claims (the "Average Earnings Rule") violate the Privacy Act. Order at 18-22, ECF No. 60 ("PI Order"). The order enjoined the Secretary from using the Average Earning Rule and ordered the Secretary to "cease all efforts to collect debts from Plaintiffs." *Id.* at 36-37. On June 19, 2018, the Court entered an "Amended Order Regarding Plaintiffs' Motion for Preliminary Injunction," ECF No. 70, which modified the original PI Order to require Defendant to "cease all efforts to collect debts from Plaintiffs and any other borrower who has successfully completed an attestation form," *id.* at 1. The Court's preliminary injunction prevents the Department from collecting federal student

loan debts from the class that has been certified in this case. *Id*; *see also* Order Granting Mot. for Class Cert., ECF No. 96.

On August 19, 2019, in response to Plaintiffs' motion to lift the stay of proceedings and enforce compliance with the preliminary injunction, ECF No. 103, the Court ordered Defendants to submit a full report detailing their compliance with the Court's preliminary injunction, ECF No. 110. In compiling this report, which was filed with the Court on September 18, 2019, the Department conducted a thorough review of the manner in which its loan servicers implemented the Department's policy and specific instructions, consistent with the preliminary injunction, to halt collection activity against Corinthian borrowers. *See* ECF No. 111-2 ("September Report"). The Department learned through this review that its servicers improperly attempted to collect the debts of a significant number of Corinthian borrowers. *See id*. at 2-4 (stating that 16,034 Corinthian borrowers had received incorrect notices that they owed payments, 3,289 such borrowers made payments they were not required to make, 1,808 borrowers were subject to involuntary collection, and 847 borrowers were subject to adverse credit reporting).

The Department regrets these errors, and since the time of the September Report has taken proactive measures to correct the errors, remedy their impacts, and ensure compliance with the preliminary injunction. By October 15, 2019, the Department had confirmed that each of the borrowers identified in the September Report as having received an incorrect repayment notice were in the proper repayment status (*i.e.*, forbearance or stopped collections unless there was a valid exception); requested appropriate refunds for each borrower who had made a payment he or she was not required to make (including through involuntary collection); and made arrangements to restore adverse credit reporting for the vast majority of individuals identified in the September report. *See* Defs.' Brief in Resp. to Oct. 8, 2019 Order at 3-4, ECF No. 125. And through the Department's ongoing review and oversight efforts, it has continued to place all newly identified potential class members (*i.e.*, borrowers who took out federal loans to attend Corinthian) in proper repayment status and remediated all known impacts to these individuals. *See* Third Monthly Compliance Report at 2 (Jan. 8, 2020), ECF No. 168-2 ("January Report").

Opposition to Plaintiffs' Motion for Partial Reconsideration
3:17-cv-7210-SK

3

## II. The Sanctions Order

On October 24, 2019, the Court entered an order finding Defendants in civil contempt based on its conclusions that Defendants had "violated the preliminary injunction," "harmed individual borrowers," and "not provided evidence that that they were unable to comply with the preliminary injunction." Order Regarding Sanctions at 6, ECF No. 130 ("Sanctions Order"). The Court determined that a $100,000 "monetary sanction," to be paid to a "fund held by Plaintiffs' counsel," was "the best method to remedy" the Department's noncompliance. *Id*. The Court found the amount "reasonable" because over 16,000 borrowers "suffered damages from Defendants' violation of the preliminary injunction" and "there may be some administrative expenses to remedy the harm." *Id*. The Court also ordered Defendants to provide monthly status reports "regarding their attempts to comply with the preliminary injunction," to contain certain specified information. *Id*. at 6-7.

The Sanctions Order required the parties to meet and confer and "submit their proposed plan for administering the fund." *Id*. The parties filed a joint submission on December 20, 2019, presenting Plaintiffs' proposal for administering the fund, to which Defendants do not object. *See* Joint Submission of Plan to Administer Sanctions, ECF No. 163 ("Sanctions Proposal"). That plan does not adopt the concept of consequential damages as an appropriate measure of damages or apportioning the Court's sanctions fund. Rather, it stipulates that each individual who either made a payment or was subject to involuntary collection or adverse credit reporting "qualifies . . . for a distribution from the sanctions fund," assigns a value for each of these types of harm, and provides for each potential class member to be compensated based on the number of times he or she experienced each type of impact, according to the fixed value assigned to each impact. *Id*. at 4-5. The plan proposes to eliminate administrative expenses entirely by having the compensation take the form of "a credit against the loan balance of each harmed class member" rather than a monetary payment." *Id*. at 5.

## III. Compliance Since The Sanctions Order

As the Department has previously reported, it manages the loans of approximately 45 million borrowers (and many more total loans), *see* September Report at 8, including the loans of

tens of thousands of potential class members who attended Corinthian programs.  In an operation of this size, it has taken the Department time to fully confirm and validate data relating to the loan status and repayment history of each of the borrowers covered by the injunction.  Even as the compliance reports highlight the practical difficulties the Department faces, they make clear that the Department has significantly improved its oversight and verification systems since it learned of the issues that precipitated the Sanctions Order; that it has been diligent in correcting any errors; and that it has proactively remediated associated harms as it has learned of them.  For example, in its first monthly compliance report, the Department confirmed that it had corrected all of the issues identified in its September Report.  Namely, it had verified that each of the 16,034 borrowers identified in that report were in the correct repayment status; ensured that refunds had been issued to all borrowers that the Department could confirm either made an erroneous payment or were subject to involuntary collection; and corrected the credit reports of all borrowers identified as having been subject to adverse credit reporting.  *See* First Monthly Compliance Report at 5-9 (Nov. 1, 2019), ECF No. 136-1 ("November Report").  The total size of the potential class grew by approximately 14,000 as new applications were received and the Department continued to review records to ensure that all individuals potentially subject to the Court's injunction were receiving the protections of that injunction.  But as the Department represented, this increase was mostly out of an abundance of caution, bringing in borrowers who "are likely excludable from the potential class." *Id*. at 4.

The Department filed its next report in December 2, 2019, which confirmed that the Department's continuing efforts to review and revalidate information provided by its servicers was having the desired effect.  Those efforts, which include a newly-established procedure to "define, track, and continue to monitor potential class members by name, Social Security number . . ., and loan servicer within FSA's data warehouse," *see* Second Monthly Compliance Report at 5 (Dec. 2, 2019), ECF No. 156-2 ("December Report"), revealed that certain isolated issues had caused the Department to previously underreport the total number of borrowers who had incorrectly received notices that they had payments due, and thus underreport the number of borrowers who had made incorrect payments and been subject to adverse credit reporting and involuntary

collection, *id*. at 3, 6-8. Although this undercounting was significant—increasing, for example, the number of borrowers that had received a payment due notice at some point during the pendency of the injunction from 16,034 to 45,801[1]—the Department emphasized that it was due to isolated issues that were unlikely to recur in light of their nature and the Department's improved oversight and monitoring capacities. *Id*. at 8-9. The increase in impacted borrowers was due to a prior error in reporting, not continued issues of noncompliance following the Court's Sanctions Order, and the Department also highlighted that it now had an "accurate account of existing borrower defense applicants that are appropriately included in the potential class, as well as the manner in which relevant individuals have been impacted" by noncompliance with the injunction. *Id*. at 8. Critically, the Department represented that it had *already* substantially remediated these issues, confirming that each newly identified borrowers was in the correct repayment status, correcting the credit reports of each such individual, and issuing appropriate refunds to the vast majority of affected borrowers. *Id*. at 3.

      By the filing of its January report, the Department was able to confirm that it had "completed the remediation of all known impacts to potential class members" identified in all of the Department's prior reports, including the expanded set of impacted individuals identified in the December Report. January Report at 2. As Plaintiffs note, Defendants had provided Plaintiffs with certain information that Plaintiffs had requested regarding the dates on which each borrower identified in the Department's reports had been subject to the collection efforts of the Department and its servicers. In the January Report, the Department explained that this information revealed, after the fact, that some employers had garnished the wages of potential class members in

---

[1] The 45,801 impacted borrowers represent approximately 1.5% of the total number of federal loan borrowers currently in forbearance or stopped collections, *see* https://studentaid.gov/sites/default/files/fsawg/datacenter/library/PortfoliobyLoanStatus.xls, and approximately 0.1% of all borrowers Federal Student Aid currently serves, *see* https://studentaid.gov/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xl*s*. The Department has previously explained that it anticipates that this number will eventually decrease once it completes the process of validating data related to when borrowers submitted their applications in order to remove borrowers from the impacted list who experienced all of their identified impacts before they filed a borrower defense application and were put in forbearance on that basis. *See* January Report at 3.

1  December 2019 notwithstanding the Department's definitive instructions that such individuals be
2  placed in stopped collections status.  *See id*. at 2-3.  The Department further explained that the
3  employers' actions were out of its control, but that it had taken additional steps to reiterate the stop
4  collection orders to these borrowers' employers and refunded the payments.  *Id.* at 9-10.

### IV.    Plaintiffs' Motion

Plaintiffs moved for leave to file their motion for reconsideration on December 23, 2019, ECF No. 164, which the Court granted on January 7, 2020, ECF No. 165.  Plaintiffs' motion contends that "three new material facts" warrant reconsideration of the Sanctions Order.  Pls.' Mot. for Partial Reconsideration at 6, ECF No. 167 ("Pls.' Mot.").  Specifically, Plaintiffs argue that subsequent compliance reports have revealed that more individuals were subject to the Department's noncompliance than was reported at the time of the Sanctions Order; that information Defendants provided in December 2019 shows they are not currently in compliance; and that Plaintiffs have collected additional information about "the harm that needs compensating," implicitly requesting individualized consequential damages by providing examples of such claimed damages for certain class members.  *Id*. at 6-8.  Plaintiffs contend that these developments "warrant[] a significant increase to the compensatory sanctions fund of $100,000," but beyond that, Plaintiffs provide no concrete proposal.  *Id*. at 1.

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) provides, in relevant part: "any order other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).  Pursuant to this authority, "a district court can modify an interlocutory order 'at any time' before entry of a final judgment."  *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005).

While the decision whether to grant reconsideration "is committed to the sound discretion of the court," *Navajo Nation v. Confederated Tribes & Bands of the Yakima Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003), "[m]otions for reconsideration are generally disfavored,"

*Tranxition, Inc. v. Novell, Inc.*, No. 3:12-cv-01404-HZ, 2015 WL 13675387, at *1 (D. Or. Mar. 30, 2015). They should not be "used to ask the Court to rethink what it has already thought." *Motorola, Inc. v. J.B. Rodges Mech. Contractors*, 215 F.R.D. 581, 582 (D. Ariz. 2003). "Reconsideration of a court's prior ruling is an 'extraordinary remedy, to be used sparingly.'" *Pac. Coast Fed'n of Fishermen's Ass'n v. Locke*, No. C 10-04790 CRB, 2011 WL 289927, at *1 (N.D. Cal. Jan. 27, 2011) (quoting *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)). The moving party bears the burden of demonstrating that this standard is met. *See, e.g.*, *Cachil Dehe Band of Wintun Indians v. California*, 649 F. Supp. 2d 1063, 1070 (E.D. Cal. 2009).

## ARGUMENT

### I. The Department Is Substantially Complying With The Preliminary Injunction And Its Conduct Provides No Basis On Which To Increase Sanctions

At the outset, the Court should reject Plaintiffs' misguided contention that the Department's "ongoing noncompliance . . . "warrants a reconsideration of the appropriate sanction." Pls.' Mot. at 7. To the contrary, the information Plaintiffs rely on, as well as the Department's monthly compliance reports more generally, demonstrate that the Department is in substantial compliance with the preliminary injunction.

Plaintiffs' argument is based on their contention that, according to information Defendants agreed to provide Plaintiffs to facilitate their proposal for administering the sanctions fund, "[t]he Department" collected on "[a]t least 20" potential class members in December 2019. Pls.' Mot. at 1-2.[2] But as Defendants explained in the January Report, this was the result of the independent actions of employers enforcing suspended wage garnishment orders "*despite* receiving instructions from the Department to cease such collection activities." January Report at 3. The Department "does not have the direct power to prevent employers from continuing to garnish wages following a stopped collection order." *Id.* at 10. Although the Department was, prior to Plaintiffs' filing, "already aware of this issue and had initiated refunds to [affected] borrowers," it has "reiterat[ed]

---

[2] Plaintiffs also cite the fact that the Department collected debts from potential class members in May 2018 as evidence that Defendants "have *never* been in compliance with the injunction." Pls.' Mot. at 1 (emphasis in original). This is flatly wrong, as the Court did not issue the preliminary injunction until the end of that month (May 25) and did not amend it to apply to individuals other than the named plaintiffs until June 19, 2018. *See* ECF Nos. 60 & 70.

its instructions to those employers" to cease garnishing wages, and it had already "ceased its own debt collection activities" with respect to potential class members. *Id*. at 3. These collection actions taken by the employers of class members in spite of directly contrary orders from the Department, which the Department has now in any event remediated, provide no basis for additional sanctions. *See* Sanctions Order at 5 (contempt only appropriate where party has "fail[ed] to take all reasonable steps *within the party's power to comply*" (emphasis added) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993))).

More generally, and as described above, the Department has filed compliance reports each of the past three months showing that the Department is taking significant measures to (1) confirm that the Court's injunction is being applied to every borrower subject to that injunction (including by reconfirming that each potential class member is in the proper repayment status); (2) identify each instance during the pendency of the injunction in which the Department and its servicers attempted to collect potential class members' debts; (3) refund payments improperly collected and correcting adverse credit reports; and (4) improve internal processes to remedy past errors and prevent them from occurring in the future. The facts demonstrate that the Department's current oversight procedures are working, not, as Plaintiffs suggest, that there is an "ongoing and urgent need for a contempt sanction to coerce Defendants to meet their obligation with more urgency and diligence," Pl.'s Mot. at 7. "Substantial compliance with a court order is a defense to an action for civil contempt," *Balla v. Idaho State Bd. of Corrs.*, 869 F.2d 461, 466 (9th Cir. 1989), and the contempt power is necessarily "limited by the individual's ability to comply with the court's order," *Whittaker v. Execuair Corp.*, 953 F.2d 510, 517 (9th Cir. 1992).

Here, Defendants' current and ongoing substantial compliance with the injunction demonstrates that there is no basis for additional sanctions. If anything, because the Department is "substantially compl[ying] with" the preliminary injunction, it would be appropriate for the Court to "purge" the Department's contempt. *See United States v. Bright*, No. CIV. 07-00311 ACK-KSC, 2009 WL 2366083, at *2 (D. Haw. June 4, 2009) (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983) and *In re Dual-Deck Video*, 10 F.3d at 695).

Opposition to Plaintiffs' Motion for Partial Reconsideration
3:17-cv-7210-SK

9

## II. The $100,000 Monetary Sanction Should Not Be Increased

In its Sanctions Order, the Court determined that a $100,000 monetary sanction was "reasonable" because "there are over 16,000 borrowers who have suffered damages from Defendants' violation of the preliminary injunction" and "there may be some administrative expenses to remedy the harm." Sanctions Order at 6. Plaintiffs argue that the Court should increase the amount of the sanction because class members are entitled to compensatory damages, of which Plaintiffs provide examples, and because the number of borrowers actually subject to improper collection efforts is higher than originally reported. The Court should decline to reconsider its prior order.

The Court's monetary sanction appeared to be designed to provide "rough justice," *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1187 (2017), by providing some limited level of compensation beyond the return of money improperly collected, to include quantifiable and non-speculative "administrative expenses." But Plaintiffs' current motion makes clear that they seek unbounded, individualized compensatory damages. As explained below, that is improper, administratively unfeasible, and raises serious separation of powers and sovereign immunity concerns.

For good reason the Court did not attempt, as Plaintiffs now request, to award each borrower that the Department identified as impacted by its noncompliance a precise measure of compensation based on particularized harms suffered by that borrower. Initially, such a task—which would require contacting each affected individual and discerning which if any of their claimed harms is appropriately attributable to the Department's noncompliance with the injunction—would prove administratively infeasible. Moreover, the parties' proposal for administering the fund does not attempt to quantify the harm suffered by particular members, but rather assigns a fixed value to the types of "harm" imposed as a result of the Department's noncompliance (*i.e.*, voluntary collection, involuntary collection, adverse credit reporting), and assigns each impacted individual a pro rata share based on the number of times they experienced each type of harm. *See generally* Sanctions Proposal at 4-5. The proposal reflects Plaintiffs' position that the harm the Court has identified as resulting from the Department's noncompliance

is best compensated by dispensing with administrative expenses entirely and providing affected individuals with a credit to their loan accounts rather than a cash payment. *Id*. This plan already accounts for the expanded universe of individuals identified in the Department's December Report, who would receive compensation through the fund, so there is no basis for the Court to reconsider the fine on the basis that these individuals were not identified prior to the Court's Sanction Order.

Plaintiffs erroneously argue for individualized consequential damages by suggesting that their collection of anecdotal, individualized evidence of additional "harm that needs compensating," Pls.' Mot. at 7, provides a basis for reconsideration. Indeed, they seek consequential damages that are different in kind from the Court's compensatory sanction and, in any event, improper and unprecedented in imposing massive damages liability on the federal government without any limiting principle and in spite of the serious separation of powers and sovereign immunity concerns discussed below. According to the declarations supporting Plaintiffs' motion, Plaintiffs sent surveys to roughly 5,000 individuals identified in the Department's compliance reports, approximately 700 of whom responded to the survey. *See* Decl. of Lindsey Withem ¶¶ 3-7, ECF No. 167-5. Based on these responses, Plaintiffs surmise that "the injury actually incurred as a result of Defendants' noncompliance far exceeds $100,000." Pls.' Mot. at 8. But Plaintiffs' evidence merely proves the difficulty of attempting to quantify, at an individualized level, harms that individuals claim to have suffered. Many of these harms are not quantifiable in any case, *see, e.g.*, Decl. of Melissa Young ¶ 15, ECF No. 167-2 ("Young Decl.") (describing the "stress" that the Department allegedly caused, along with the institution the borrower attended, including that her "children now view college as a waste of time"), and Plaintiffs more importantly provide no limiting principle that could reasonably tie the losses they claim to specific conduct of the Department not in compliance with the injunction, as opposed to the harm caused by the borrowers' schools or other life circumstances.[3]

---

[3] *E.g.*, Young Decl. ¶ 14 (borrower stating that her son "faced extreme bullying at school" because borrower could not afford to buy him school supplies or clothing); Decl. of Naquasha Johnson ¶ 14, ECF 167-1 (stating that job offer was rescinded due to poor credit scores as a result of being unable to pay down debt); Decl. of Julie Decker ¶ 12, ECF No. 167-3 (borrower who was unable to pursue the career she had hoped to after attending an Everest campus asserting that it is "hard to get a job" because her "car is getting repoed and [her] credit is terrible").

Opposition to Plaintiffs' Motion for Partial Reconsideration
3:17-cv-7210-SK

Plaintiffs thus fail to demonstrate the requisite "but for" causal link between the Department's conduct and the consequential damages they now seek. *See Goodyear Tire & Rubber Co.*, 137 S. Ct. at 1187 ("but for" causal link required for compensatory sanction under a court's inherent authority); *Fox v. Vice*, 563 U.S. 826, 836 (2011). Moreover, the unworkability of Plaintiffs' theory is demonstrated by the fact that they do not even propose a monetary sanction that *would be* appropriate in their case, despite their investigation of the issue.

This is especially problematic in this case involving a federal agency defendant, where any compensatory sanction draws from the public fisc and, as this Court has previously recognized, would "divert more" of the Department's resources from its other important functions, such as ensuring continued compliance with the preliminary injunction in this case.[4] *See* Tr. of Oct. 7, 2019 Case Mgmt. Conference at 6. Indeed, it would raise serious concerns about the separation of powers. For example, in issuing a writ of mandamus and vacating a contempt order against the Attorney General, the Second Circuit has recognized that any contempt sanction against a high-ranking government official in his or her official capacity "has greater public importance, with separation of powers overtones, and warrants more sensitive judicial scrutiny than such a sanction imposed on an ordinary litigant." *In re Attorney General of U.S.*, 596 F.2d 58, 64 (2d Cir. 1979). The court explained that "holding the Attorney General of the United States in contempt to ensure compliance with a court order should be a last resort, to be undertaken only after all other means to achieve the ends legitimately sought by the court have been exhausted." *Id.* at 65. Here, the type of relief Plaintiffs seek is unnecessary because Defendants are in substantial compliance with the injunction and have already restored the proper forbearance status of every borrower defense applicant, returned any funds erroneously collected, and corrected any adverse credit reports. *See supra* pp. 4-7.

Plaintiffs' consequential damages theory would also raise serious concerns about sovereign immunity. *See, e.g.*, *Barry v. Bowen*, 884 F.2d 442, 444 (9th Cir. 1993) (expressing "doubts about the power of the district court to impose monetary sanctions" due to sovereign immunity);

---

[4] Defendants do not concede the propriety of the October Sanctions Order, given, *inter alia*, the separation of powers and sovereign immunity authorities cited herein. At a minimum, however, the sanctions should not be increased.

*Coleman v. Espy*, 986 F.2d 1184, 1192 (8th Cir. 1993) (finding that sovereign immunity barred suit seeking "civil compensatory contempt" damages because it could not find an express waiver for such an action and would "not lightly imply" one given "the potentially significant effect on the public fisc" (citation omitted)). Plaintiffs have not identified any explicit waiver of sovereign immunity allowing the imposition of such unprecedented consequential damages against the federal government. *See Barry*, 884 F.2d at 443 ("[Appellee] has not suggested, nor have we found, anything which suggests that the United States expressly has waived its sovereign immunity with respect to contempt sanctions."). Because "the contempt power is not to be used as a comprehensive device for redressing private injuries," *McBride v. Coleman*, 955 F.2d 571, 577 (8th Cir. 1992), the Court should reject Plaintiffs' legally baseless invitation to reconsider its fine and provide potentially unlimited consequential damages for the attenuated harms described in Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for partial reconsideration.

Dated: January 22, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar No. 89400)
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
919 East Main Street, Suite 1900
Richmond, VA 23219
(202) 616-8098
robert.c.merritt@usdoj.gov

*Counsel for Defendants*