# U.S. Department of Education

# Office of Federal Student Aid

# Fifth Monthly Compliance Report in response to ECF 130, *Manriquez et al. v. DeVos*, Case No. 17-cv-07210-SK, U.S. District Court for the Northern District of California

**March 2, 2020**

## Introduction and Summary

Pursuant to the Court's Order of October 24, 2019, ECF No. 130, the U.S. Department of Education (the "Department") through its Federal Student Aid office ("FSA") submits its fifth monthly status report regarding its attempts to comply with the preliminary injunction in this case, *see* ECF No. 60.  That injunction, as amended on June 19, 2018, ECF No. 70, and clarified on August 30, 2018, ECF No. 89, prevents the Department from collecting relevant student loan debts from members of the class that has been certified in this case.[1]  *See also* Order Granting Mot. for Class Cert., ECF No. 96.

On December 16, 2019, the Department completed the remediation of all known impacts to potential class members that had been identified in prior reports to this Court. Further, the Department is maintaining substantial compliance with the preliminary injunction by immediately placing newly identified potential class members in the appropriate repayment status to stop debt collection and maintaining potential class members in appropriate repayment status on an ongoing basis (e.g., forbearance).

As mentioned in previous reports, the Department has resumed sending borrower defense decision letters to certain borrowers, including (and consistent with the Court's preliminary injunction orders) borrowers previously identified as potential *Manriquez* class members in the Department's previous compliance reports.  These decisions letters fall into three different categories: (a) Corinthian borrowers who had submitted borrower defense claims on the basis of the Department's findings that certain Corinthian schools had made job placement rate misrepresentations for certain programs during specific time periods ("JPR claims"), but who did

---

[1] Because the borrowers covered by the preliminary injunction are co-extensive with the borrowers covered by the order certifying the class in this case, references to class members in this Report refer to borrowers covered by the preliminary injunction.  *See* Order Certifying the Class, ECF No. 96; Amended PI Order ¶¶ A-C.

not meet the criteria for approval of their borrower defense claims (e.g., they did not attend a specified program or they did not attend during a time period covered by the Department's findings) and were determined to be ineligible for loan relief on that basis;[2] (b) whose JPR claims were approved and who received one hundred percent relief based on the new methodology[3] for assessing applications announced by the Secretary of Education on December 10, 2019;[4] and (c) Corinthian borrowers included in the potential class members list who were determined eligible based on a non-JPR claim (e.g., transfer of credits).[5]

In order to ensure that the former *Manriquez* class members who recently received decisions are kept in forbearance while federal loan servicers finish processing their adjudicated claims, the Department is continuing to monitor them.  In particular, these borrowers will be tracked on the first tab of the attached spreadsheet as potential class members until their borrower defense claims are fully closed out and the changes to their federal loans are processed.

As in prior reports, this report includes a spreadsheet containing a list of the currently known potential class members, which the Department will separately move to file under seal due to the personally identifying information contained therein.  For each potential class member, the spreadsheet includes information the Court has requested about the Department's attempts to comply with the preliminary injunction.  Throughout the spreadsheet, "1" is used to

---

[2] The court's June 19, 2018 amended preliminary injunction order, ECF No. 70, provides that the Department may determine whether a JPR claimant "is eligible for relief; i.e., whether the claimant actually borrowed a Direct Loan to finance the cost of enrollment in a program on the Lists and during the dates of enrollment covered by the attestation forms (Dkt. 35-6, Exs. 6, 7, 8, 9) and whether the claimant successfully completed the attestation forms." ECF No. 70 at ¶ C.

[3] *See* U.S. Dept. of Educ., "Secretary DeVos Approves New Methodology for Providing Student Loan Relief to Borrower Defense Applicants" (Dec. 10, 2019) ("December 10, 2019 press release"), *available at* https://www.ed.gov/news/press-releases/secretary-devos-approves-new-methodology-providing-student-loan-relief-borrower-defense-applicants.

[4] The June 19, 2018 amended order also states that "[n]othing in this Order prohibits the Secretary from fully discharging the loans of any borrower who successfully completed or who successfully completes an attestation form."  ECF No. 70 at 2.

[5] Letters were also sent to borrower defense applicants that have not asserted CCI-based borrower defense claims.

answer "Yes," and "0" is used to answer "No."  The spreadsheet contains three sections.  The

first section (pages 1 through 1130) lists each potential class member and then provides answers

for the Court's first, second, and seventh questions.  The second section (pages 1131 through

1514) lists the subset of potential class members who were impacted by the Department's non-

compliance.  For these impacted borrowers, the spreadsheet provides answers to the Court's

third, fourth, fifth, and sixth questions.  Finally, the third section (page 1515) contains an index

of shorthand terms and abbreviations used throughout the spreadsheet.

       The Department continues to take every reasonable effort to ensure compliance with the

Court's injunction, including an ongoing process of monitoring and verifying borrower defense

applications.

### 1.  Defendants' progress toward identifying which of the 74,781 potential class members are class members

       The potential class has increased slightly to 80,087 borrowers, a net growth of 825

borrowers from the number (79,262) reported in the February 5, 2020 Compliance Report.  This

net growth reflects the addition of 902 borrowers to the class and the removal of 77 borrowers

from the class. Contributing factors for the growth included new borrower defense claims

received by FSA, newly opened cases that were previously incomplete (e.g., claims initiated by

borrowers, but not fully documented with supporting information or evidence), borrowers with

only FFEL loans who recently consolidated into Direct Loans, and FSA's ongoing data

validation and verification efforts.  Contributing factors for the decrease include incomplete

borrower defense applications, borrowers with no federal loans left to discharge, and duplicate

applications. As expected, the number of potential class members will continue to be dynamic as

new borrowers apply, validation and verification continues, and notification of claims adjudications are processed and released.

Of the 80,087 potential class members listed in the attachment, FSA has determined that 48,677 borrowers are confirmed class members (e.g., submitted a successful JPR claim against a CCI school and have outstanding Direct Loans). These confirmed class members are identified in the first section of the spreadsheet (pages 1 through 1130), and fall into two categories.  The first category consists of borrowers who asserted Corinthian JPR claims that the Department adjudicated and awarded partial relief under the 2017 borrower defense relief methodology prior to the court's injunction (approximately 15,000 borrowers). The second category consists of borrowers who asserted Corinthian JPR claims that the Department has reviewed since the 2017 methodology was enjoined and has determined are eligible for relief (approximately 33,000 borrowers).  Before the Department applies the new methodology announced on December 10, 2019, to issue final decisions awarding partial relief to any confirmed class member, it would seek relief from the Court from the preliminary injunction to do so, consistent with the Court's orders.  The first section of the spreadsheet also identifies borrowers who are not eligible for the class because they no longer have pending borrower defense claims that potentially meet the criteria, including borrowers who have been adjudicated for 100% relief (393 borrowers) and borrowers whose Corinthian JPR application has been determined ineligible because they did not attend the right program, attend during the right time period, or otherwise successfully fill out their application form (5,934 borrowers).

As previously noted, FSA will keep borrowers on the list of potential class members on tab 1 until their borrower defense claims have been fully processed by the servicers and their cases closed. Finally, FSA will continue to review applications and appropriately notify

borrowers of the outcomes of their applications.  These efforts, paired with ongoing validation

and verification, will permit FSA to continue confirming status for the remaining 25,083

potential class members.

2.    **The repayment status of each potential and confirmed class member**

As stated in prior reports, the Department continues to maintain all identified potential

class members in forbearance, stopped collections or a similar repayment status, unless a

particular borrower has proactively opted out of that status.

The first section of the spreadsheet attachment provides the repayment status of each

potential class member.  For each potential class member not in forbearance or stopped

collection status, the spreadsheet indicates the reason why, such as being in an alternative status

that is similar to forbearance (e.g., a $0/month income-driven repayment plan or in-school

deferment status). The abbreviations and shorthand terms used on this portion of the spreadsheet

are defined in the third section of that spreadsheet.

3.    **Whether each potential and confirmed class member was erroneously taken out of
      forbearance or stopped collections status and whether the correct status has been
      restored**

In previous monthly compliance reports, out of an abundance of caution, FSA adopted an

overinclusive approach for identifying and remediating "affected" borrowers that intentionally

cast the net as wide as possible to ensure no potentially harmed borrowers were overlooked. Any

borrower who experienced any of the categorized collection activities after the initial court order

on May 25, 2018, was identified in that category in each report. This approach overcounted

impacts because it included debt collection activities experienced before the borrower was

subject to the injunction, which were not actually in violation of the Court's order. For example, a borrower who made a voluntary payment before submitting a BD application but after the injunction issued was included in the voluntary payment impacted category in previous monthly reports. FSA took this overinclusive approach during the remediation process in light of known system and data limitations in order to ensure that all borrowers who were potentially impacted were identified and remediated.

Since completing remediation, FSA has dedicated additional resources to the data verification and validation necessary to identify and remove borrowers who were not actually subject to any violation of the Court's injunction. In this report, FSA has removed those borrowers from the impacted lists whose only impacts occurred prior to the date they filed their BD application. In addition, FSA has removed those borrowers whose only impacts occurred prior to the Court's Amended Order dated June 19, 2018, which was the first time the Court ordered the Department to cease efforts to collect debts from all class members, as opposed to just the named Plaintiffs.[6] Lastly, FSA has removed borrowers from the impacted list who have been determined to not be class members.

FSA is continuing the process of confirming which borrowers in the impacted categories experienced debt collection activities caused by noncompliance with the injunction and identifying and removing those borrowers who only experienced debt collection activities unrelated to noncompliance with the injunction.

All 37,813 borrowers whom FSA has identified at some point as having been erroneously taken out of forbearance or stopped collections status are currently in the correct repayment

---

[6] FSA has confirmed that none of the named Plaintiffs suffered an impact between the date the Court entered the initial preliminary injunction (May 25, 2018) and the date the Court entered the Amended Order (June 19, 2018).

status. This total number of impacted borrowers represents a net decrease of 7,260 borrowers since the February Report.

The main contributing factor to the decrease in the number affected borrowers is, as mentioned above, that FSA is now only counting impacts that occurred after a borrower became subject to the Court's injunction.

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment (starting on page 1131) indicates whether the borrower was in an erroneous payment status and whether the status has been corrected.

**4.     Whether each potential and confirmed class member made a payment or multiple payments due to Defendants' negligence, and whether refunds have been issued**

FSA has initiated refunds to all identified borrowers who made one or more voluntary payments and who would not potentially be harmed by a refund.  FSA has identified 12,988 borrowers who made one or more voluntary payments, a net decrease of 1,821 borrowers since the February Report. Again, the main contributing factor to the decrease in the number of affected borrowers is that FSA is now only counting impacts that occurred after a borrower became subject to the Court's injunction.

As discussed in prior compliance Reports, the Department did not request that the U.S. Department of the Treasury process refunds for some of the potential class members identified at that time as having made voluntary payments because these borrowers appear to have made payments for reasons unrelated to the incorrect payment due notices they were sent, and so refunding these borrowers would lead to unintended consequences and potential financial harm. (*See* Nov. Report at 6-7 and Dec. Report at 10.)

Additionally, FSA has identified 1,901 borrowers who may have been issued refunds for payments they made prior to the December Report, but who are still voluntarily making payments on their student loans. In light of these borrowers' decision to continue making payments, FSA has categorized those borrowers on the spreadsheet as "Borrower has submitted additional payments."

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment (starting on page 1131) indicates whether the borrower made one or more payments and refunds have been issued.

**5.      Whether each potential and confirmed class member was erroneously subjected to wage garnishment or tax offset due to the Defendants' negligence, and whether refunds have been issued**

FSA has initiated refunds for all involuntary payments made by the 1,131 borrowers it has identified as having been subjected to wage garnishment or tax offsets, a net decrease of 1,235 borrowers since the February Report. Again, the main contributing factor to the decrease in the number affected borrower is that FSA is now only counting impacts that occurred after a borrower became subject to the Court's injunction.

As mentioned in the January and February Report, through FSA's ongoing verification and validation efforts, the Department identified 49 borrowers whose employers had ignored stop collection orders from the Department and continued to garnish the borrowers' wages. FSA has verified these borrowers were in the proper repayment status at the time the involuntary payments were received and FSA has initiated refunds for all of those payments.

Since the employer is actually the one that garnishes wages, the Department does not have the capability to prevent employers from continuing to garnish wages following a stopped

collection order. FSA has taken additional steps to continue to reiterate the Department's stopped

collection order to these borrowers' employers and have initiated enhanced contact protocols to

continue informing these employers into the future (e.g., multiple attempts to contact the

employers via email and phone).

For each potential class member impacted by the Department's non-compliance, the

second section of the spreadsheet attachment (starting on page 1131) indicates whether the

borrower was erroneously subject to wage garnishment or tax offset and refunds have been

issued.

**6.      Whether each potential and confirmed class member was subject to adverse credit
         reporting due to Defendants' negligence, and whether each false credit report has
         been corrected**

FSA has completed correction to the credit reports for all 4,668 borrowers who FSA has

identified as having been subject to adverse credit reporting.  That number is a net decrease of

1,300 borrowers since the February Report. Again, the main contributing factor to the decrease

in the number affected borrower is that FSA is now only counting impacts that occurred after a

borrower became subject to the Court's injunction.

For each potential class member impacted by the Department's non-compliance, the

second section of the spreadsheet attachment (starting on page 1131) indicates whether the

borrower was subject to adverse credit reporting and each false credit report has been corrected.

**7.      Whether each potential and confirmed class member has received the revised notice
         of Defendants' noncompliance, to be approved by the Court**

FSA completed distribution of the court-approved notice to the members of the class as

of December 31, 2019.  In order to prevent any borrower confusion, FSA did not send class

notifications to those borrowers who received separate notice of claim adjudication on December 11, 2019, and therefore did not have pending borrower defense applications at the time the revised notices were sent.

For each potential and confirmed class member, the first section of the spreadsheet attachment (starting on page 1) indicates whether the borrower was sent the revised notice.

**8.      Whether Defendants have established a hotline and webpage specifically for Corinthian borrowers**

The Department's communications team has revised the StudentAid.gov website to include prominently placed links regarding the *Manriquez* case on the website's home page (specifically in its "Announcement" and "Popular Topic" sections.)[7]  Additionally, highlighted and simplified language has been included on the linked webpage[8] within the website.  As previously reported, these improvements were made on October 21, 2019. The communications team will continue to improve the website's content regarding this case and for Corinthian borrowers.

Additionally, the Department's communication team has improved the existing borrower defense telephone hotline at 1-855-279-6207, to include a targeted greeting, a dedicated menu option regarding the *Manriquez* case, and current targeted information for customer service representatives to answer general questions regarding this litigation, as well as the adjudication and litigation class member notifications disseminated in December.

**9.      Any other information relevant to the Defendants' compliance with the preliminary injunction**

---

[7] https://studentaid.gov/

[8] https://studentaid.gov/announcements-events/corinthian#preliminary-injunction

As mentioned in the December report, FSA's Chief Operating Officer is now requiring monthly certifications from the federal loan servicers at the vice president level or above for all data being sent from the servicers to facilitate the Department's ongoing borrower defense data validation and remediation efforts.  The servicers have been complying with this requirement.

The Department remains not only focused on remediating any harm to any and all borrowers that have been affected, but also on making strategic improvements to our operational program management and loan servicing oversight, control, and communication frameworks. The Department will continue its exhaustive efforts to verify, validate, and report on progress to ensure compliance with the terms of the Court's order and reestablish the trust and confidence of our borrowers and the public.