**Exhibit A**

# U.S. Department of Education

# Office of Federal Student Aid

# Seventh Monthly Compliance Report in response to ECF 130, *Manriquez et al. v. DeVos*, Case No. 17-cv-07210-SK, U.S. District Court for the Northern District of California

May 1, 2020

1

## Introduction and Summary

Pursuant to the Court's Order of October 24, 2019, ECF No. 130, the U.S. Department of Education (the "Department") through its Federal Student Aid office ("FSA") submits its seventh monthly status report regarding its attempts to comply with the preliminary injunction in this case, *see* ECF No. 60. That injunction, as amended on June 19, 2018, ECF No. 70, and clarified on August 30, 2018, ECF No. 89, prevents the Department from collecting relevant student loan debts from members of the class that has been certified in this case.[1] *See also* Order Granting Mot. for Class Cert., ECF No. 96.

On December 16, 2019, the Department completed the remediation of all known impacts to potential class members that had been identified in prior reports to this Court. Further, the Department is maintaining substantial compliance with the preliminary injunction by immediately placing newly identified potential class members in the appropriate repayment status to stop debt collection and maintaining potential class members in appropriate repayment status on an ongoing basis (e.g., forbearance).

The Department has continued sending borrower defense decision letters to certain borrowers as described in prior reports. To ensure that such borrowers who have been identified as potential class members in previous reports are kept in forbearance while federal loan servicers finish processing their adjudicated claims, the Department will continue to include these borrowers on the first tab of the attached spreadsheet as potential class members until their borrower defense claims are fully closed out and the changes to their federal loans are processed.

---

[1] Because the borrowers covered by the preliminary injunction are co-extensive with the borrowers covered by the order certifying the class in this case, references to class members in this Report refer to borrowers covered by the preliminary injunction. *See* Order Certifying the Class, ECF No. 96; Amended PI Order ¶¶ A-C.

As in prior reports, this report includes a spreadsheet containing a list of the currently known potential class members, which the Department will separately move to file under seal due to the personally identifying information contained therein. For each potential class member, the spreadsheet includes information the Court has requested about the Department's attempts to comply with the preliminary injunction. Throughout the spreadsheet, "1" is used to answer "Yes," and "0" is used to answer "No." The spreadsheet contains three sections. The first section (consisting of the first 1,164 pages with the footer "Class_M_Apr") lists each potential class member and then provides answers for the Court's first, second, and seventh questions. The second section (consisting of the next 308 pages with the footer "Impacted_Apr") lists the subset of potential class members who were impacted by the Department's non-compliance. For these impacted borrowers, the spreadsheet provides answers to the Court's third, fourth, fifth, and sixth questions. Finally, the third section (the final page) contains an index of shorthand terms and abbreviations used throughout the spreadsheet.

The Department continues to take every reasonable effort to ensure compliance with the Court's injunction, including an ongoing process of monitoring and verifying borrower defense applications.

1. **Defendants' progress toward identifying which of the 74,781 potential class members are class members**

The potential class currently consists of 76,203 borrowers, a net increase of 683 borrowers from the number (75,520) reported in the April 1, 2020 Compliance Report. This change reflects the addition of 1,010 borrowers to the class and the removal of 327 borrowers from the class. The additions to the potential class were the result of new borrower defense claims received by FSA, newly opened cases that were previously incomplete (e.g., claims

initiated by borrowers, but not fully documented with supporting information or evidence), borrowers with only FFEL loans who recently consolidated into Direct Loans, and FSA's ongoing data validation and verification efforts. On the other hand, contributing factors for the decrease include incomplete borrower defense applications, borrowers with no federal loans left to discharge, and duplicate applications. As expected, the number of potential class members will continue to be dynamic as new borrowers apply, validation and verification continues, and notification of claims adjudications are processed and released.

Of the 76,203 potential class members listed in the attachment, FSA has determined that 50,021 borrowers are confirmed class members (e.g., submitted a successful JPR claim against a CCI school and have outstanding Direct Loans). That is a net increase of 1,024 confirmed class members from last month's report (48,997 borrowers). These confirmed class members are identified in the first section of the spreadsheet and fall into two categories. The first category consists of borrowers who asserted Corinthian JPR claims that the Department adjudicated and awarded partial relief under the 2017 borrower defense relief methodology prior to the court's injunction (approximately 15,000 borrowers). The second category consists of borrowers who asserted Corinthian JPR claims that the Department has reviewed since the 2017 methodology was enjoined and has determined are eligible for relief (approximately 36,000 borrowers). Before the Department applies the new methodology announced on December 10, 2019, to issue final decisions awarding partial relief to any confirmed class member, it would seek relief from the Court from the preliminary injunction to do so, consistent with the Court's orders.

The first section of the spreadsheet also identifies borrowers who are no longer potential class members because they no longer have pending borrower defense claims that potentially meet the criteria, including borrowers who have been adjudicated for 100% relief (489

borrowers) and borrowers whose Corinthian JPR application has been determined ineligible because they did not attend the right program, did not attend during the right time period, or otherwise did not successfully fill out their application form (9,698 borrowers). As previously noted, FSA will keep borrowers on the list of potential class members on tab 1 until their borrower defense claims have been fully processed by the servicers and their cases closed.

Finally, FSA has made significant progress determining the class status of the remaining 15,995 unconfirmed class members. Based on initial adjudication determinations for the unconfirmed class members, FSA estimates that:

- 5% will become confirmed class members (job placement rate ("JPR") claims approved for less than 100%),
- 93% will be determined to be ineligible for the class (62% do not assert a qualifying JPR claim but will be approved for a non-JPR claim; 31% deemed ineligible for borrower defense relief at all; and less than 1% approved for a JPR claim and will receive 100% relief), and
- 2% are still being adjudicated.

2. **The repayment status of each potential and confirmed class member**

As stated in prior reports, the Department continues to maintain all identified potential class members in forbearance, stopped collections or a similar repayment status, unless a particular borrower has proactively opted out of that status.

The first section of the spreadsheet attachment provides the repayment status of each potential class member. For each potential class member not in forbearance or stopped

collection status, the spreadsheet indicates the reason why, such as being in an alternative status that is similar to forbearance (e.g., a $0/month income-driven repayment plan or in-school deferment status). The abbreviations and shorthand terms used on this portion of the spreadsheet are defined in the third section of that spreadsheet.

3. **Whether each potential and confirmed class member was erroneously taken out of forbearance or stopped collections status and whether the correct status has been restored**

FSA has continued its efforts to reduce the overcounting of impacts to potential class members. Beginning a process it started in the March report, in last month's report, FSA removed those borrowers from the impacted lists whose only impacts occurred (1) prior to the date they filed their BD application or (2) within the reasonable amount of time it takes for FSA to process the borrower defense application.[2]

FSA is continuing the process of confirming which borrowers in the impacted categories experienced debt collection activities caused by noncompliance with the injunction and identifying and removing those borrowers who only experienced debt collection activities unrelated to noncompliance with the injunction.

---

[2] As reported in last month's report, this takes account of the time that it takes the borrower's loan servicer to initiate applicable borrower defense protections (i.e., place the borrower into forbearance or stopped collections). For example, the contracts FSA has with its non-default servicers require those servicers to process all borrower defense related forbearance requests within five (5) business days of receiving the request in the borrower defense system of record (CEMS). To account for this processing time, impacts that occurred five or fewer days after a borrower submitted a borrower defense application have been removed from this report. For defaulted borrowers, it can take FSA's loan servicer approximately three weeks to effectively cease involuntary collection efforts (e.g., wage garnishment or tax offset). The default servicer also has 5 business days to apply a "stop collections" tag to the borrower's accounts once they have been notified by the BD system of record. However, the default servicer must then notify the borrower's employer and/or the Department of the Treasury to cease the involuntary collections. Those stopped collection notifications are then transmitted in batches on a weekly basis to employers and Treasury. While Treasury acts immediately on these notifications, it can take the employers a couple of weeks to fully process and cease collection activity. Thus, FSA has started to remove involuntary collections that occurred 21 days or fewer after a borrower submitted a borrower defense application from the report. This process remains ongoing and will continue in future reports.

All 30,103 borrowers whom FSA has identified at some point as having been erroneously taken out of forbearance or stopped collections status are currently in the correct repayment status. This total number of impacted borrowers represents a net decrease of 4,594 borrowers since the April Report.

The main contributing factor to the decrease in the number affected borrowers is, as mentioned above, that FSA is reducing the overcounting of impacts that occurred before a borrower became subject to the Court's injunction.

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment indicates whether the borrower was in an erroneous payment status and whether the status has been corrected.

**4.     Whether each potential and confirmed class member made a payment or multiple payments due to Defendants' negligence, and whether refunds have been issued**

FSA has initiated refunds to all identified borrowers who made one or more voluntary payments and who would not potentially be harmed by a refund. FSA has identified 10,804 borrowers who made one or more voluntary payments, a net decrease of 1,407 borrowers since the April Report. Again, the main contributing factor to the decrease in the number of affected borrowers is that FSA is reducing the overcounting of impacts that occurred before a borrower became subject to the Court's injunction.

As discussed in prior compliance Reports, the Department did not request that the U.S. Department of the Treasury process refunds for some of the potential class members identified at that time as having made voluntary payments because these borrowers appear to have made payments for reasons unrelated to the incorrect payment due notices they were sent, and so

refunding these borrowers would lead to unintended consequences and potential financial harm. (*See* Nov. Report at 6-7 and Dec. Report at 10.)

Additionally, FSA has identified 1,505 borrowers who may have already been issued refunds for payments they made prior to the last Report, but who are still voluntarily making payments on their student loans. In light of these borrowers' decision to continue making payments, FSA has categorized those borrowers on the spreadsheet as "Borrower has submitted additional payments."

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment indicates whether the borrower made one or more payments and refunds have been issued.

**5.      Whether each potential and confirmed class member was erroneously subjected to wage garnishment or tax offset due to the Defendants' negligence, and whether refunds have been issued**

FSA has initiated refunds for all involuntary payments made by the 995 borrowers it has identified as having been subjected to wage garnishment or tax offsets, a net decrease of 108 borrowers since the April Report. Again, the main contributing factor to the decrease in the number of affected borrowers is that FSA is reducing the overcounting impacts that occurred before a borrower became subject to the Court's injunction.

As part of FSA's ongoing validation and verification process, FSA has identified 25 confirmed or potential class members who were subject to involuntary collection this past month. Twelve of these 25 borrowers were subject to wage garnishment because their employers continued to ignore stopped collections order notices, despite FSA's communications to the

employer to cancel the collection. FSA has instructed its default loan servicer to follow-up with these borrowers' employers until the employers actually cancel the garnishment order.

The remaining thirteen borrowers were inadvertently subject to involuntary collection. Eleven of these borrowers recently completed their borrower defense applications (within the past two months) and were subject to wage garnishments slightly more than 21 days after their application date. During this same time period that these borrowers' stop collection notices were being processed, the President declared a national emergency on March 13th, 2020, due to Covid-19, and the Secretary ordered FSA to place all 7.9 million defaulted borrowers into a stopped collection status similar to the repayment status for borrower defense applicants. FSA also ordered the default loan servicer to refund all involuntary payments received after March 13th, 2020. Due to the exponential increase in workload for the default loan servicer in March and April, the stopped collections notices for these eleven borrowers took slightly longer to process than the typical 21 days. All of these borrowers are now in stopped collections status and FSA has initiated refunds for all eleven borrowers. On average wage garnishments for these eleven borrowers ceased within 33 days.

Finally, two borrowers were mistakenly subjected to involuntary collections due to vendor processing errors. Specifically, one of the borrowers was not immediately placed into stopped collections when their application was processed due to a processing error by a borrower defense claims agent that was still in their training period. The other borrower was not immediately placed into stopped collections due to a temporary system issue resulting from a system update that delayed the transmission of stop collection notices from the borrower defense system to the default loan servicer. Both of these borrowers were subsequently placed into a stop collection status when FSA sent the servicers a monthly list of all potential class members in

order to ensure that all class members are in the proper repayment status.[3] FSA has also initiated refunds for both of these borrowers.

Under direction from the President, the Secretary and Congress, the Department has directed that all defaulted student loan borrowers with federally held student loans be placed in a stopped collection status until October 1st, 2020. FSA is aggressively working to ensure that no students with federally held student loans are subject to involuntary payments, and any involuntary payments that have been received since March 13, 2020, are being immediately refunded back to the borrower.

**6.    Whether each potential and confirmed class member was subject to adverse credit reporting due to Defendants' negligence, and whether each false credit report has been corrected**

FSA has completed correction to the credit reports for all 3,885 borrowers who FSA has identified as having been subject to adverse credit reporting. That number is a net decrease of 451 borrowers since the April Report. Again, the main contributing factor to the decrease in the number of affected borrowers is that FSA is reducing the overcounting of impacts that occurred before a borrower became subject to the Court's injunction.

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment indicates whether the borrower was subject to adverse credit reporting and each false credit report has been corrected.

**7.    Whether each potential and confirmed class member has received the revised notice of Defendants' noncompliance, to be approved by the Court**

---

[3] In the December Compliance Report FSA stated that "[w]hile FSA has an automatic system for placing and keeping borrower defense applicants in unending forbearance, FSA now separately sends the current list of potential class members to its student loan servicers each month with instructions to confirm that all members are still in forbearance, adding an additional layer of confirmation to ensuring compliance with the injunction."

FSA completed distribution of the court-approved notice to the members of the class as of December 31, 2019. In order to prevent any borrower confusion, FSA did not send class notifications to those borrowers who received separate notice of claim adjudication on December 11, 2019, and therefore did not have pending borrower defense applications at the time the revised notices were sent.

For each potential and confirmed class member, the first section of the spreadsheet attachment indicates whether the borrower was sent the revised notice.

**8. Whether Defendants have established a hotline and webpage specifically for Corinthian borrowers**

The Department's communications team has revised the StudentAid.gov website to include prominently placed links regarding this case on the website's home page (specifically in its "Announcement" and "Popular Topic" sections.)[4] Additionally, highlighted and simplified language has been included on the linked webpage[5] within the website. As previously reported, these improvements were made on October 21, 2019. The communications team will continue to improve the website's content regarding this case and for Corinthian borrowers.

Additionally, the Department's communication team has improved the existing borrower defense telephone hotline at 1-855-279-6207, to include a targeted greeting, a dedicated menu option regarding the this case, and current targeted information for customer service representatives to answer general questions regarding this litigation, as well as the adjudication and litigation class member notifications disseminated in December.

---

[4] https://studentaid.gov/

[5] https://studentaid.gov/announcements-events/corinthian#preliminary-injunction

9.  **Any other information relevant to the Defendants' compliance with the preliminary injunction**

As mentioned in the December report, FSA's Chief Operating Officer is now requiring monthly certifications from the federal loan servicers at the vice president level or above for all data being sent from the servicers to facilitate the Department's ongoing borrower defense data validation and remediation efforts. The servicers have been complying with this requirement.

In addition, in response to the ongoing Covid-19 national emergency, the Department has taken additional steps to provide relief to federal student loan borrowers that will build upon and reinforce the protections potential class members are already receiving pursuant to the Court's injunction. For example:

On March 13, 2020, the President directed the Department to waive student loan interest on all Department-held federal student loans until further notice.

On March 20, 2020, Secretary DeVos directed FSA to provide payment relief to all borrowers. In response, FSA again directed all servicers to place all borrowers who were 31 days delinquent or greater into a special, non-capping administrative forbearance for a period of no less than 60 days. Furthermore, any other borrower who requested the forbearance or became 31 days delinquent during this period would be automatically placed in the forbearance.

On March 25, 2020, Secretary DeVos directed FSA to stop all collection actions for defaulted student loan borrowers. FSA directed its defaulted loan servicer and each of its private collection agencies (PCAs) to cease, effective immediately, all proactive collections activities for defaulted borrowers. This included ceasing administrative wage garnishments. FSA also directed Treasury to stop any future offsets for federally-held student debts until further notice. The Department has also initiated refunds on payments collected through administrative wage garnishment or Treasury offset on or after March 13, 2020.

On March 27, 2020, Congress passed and the President signed the CARES Act. Among other things, the CARES Act suspended all payments due for Department-held loans through September 30, 2020, and extended the waiver of interest accrual on these loans for the same period. In addition, months during which payments are suspended count as payment credit towards loan forgiveness programs (Public Service Loan Forgiveness and income-driven repayment), as well as loan rehabilitation. The law also suspended all involuntary collections through September 30, 2020.

The Department has and will continue to work closely with its servicers and PCAs to implement the student loan provisions of the CARES Act, oversee servicers' efforts and monitor progress, and make changes as events warrant.

The Department remains not only focused on remediating any harm to any and all borrowers that have been affected, but also on making strategic improvements to our operational program management and loan servicing oversight, control, and communication frameworks. The Department will continue its exhaustive efforts to verify, validate, and report on progress to ensure compliance with the terms of the Court's order and reestablish the trust and confidence of our borrowers and the public.